**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------------ x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| MD HELICOPTERS, INC., *et al.*,[1] | : | Case No. 22-_____ (_____) |
| | : | |
| Debtors. | : | (Joint Administration Requested) |
| | : | |

------------------------------------------------------------ x

**DECLARATION OF BARRY SULLIVAN,**
**CHIEF FINANCIAL OFFICER OF THE DEBTORS,**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

Under 28 U.S.C. § 1764, BARRY SULLIVAN, declares as follows under the penalty of perjury:

1.     Since August 1, 2020, I have served as the Chief Financial Officer of MD Helicopters, Inc. ("**MDHI**") and its wholly-owned direct subsidiary Monterrey Aerospace, LLC ("**Monterrey**"), which are the debtors and debtors in possession (collectively, the "**Debtors**" or the "**Company**") in the above-captioned cases (collectively, the "**Chapter 11 Cases**").[2]  I hold an inactive Certified Public Accountant license and have over 25 years of experience in building and leading finance, treasury, tax, information technology, human resource, and supply chain organizations in a wide variety of industries, including manufacturing, technology, and

---

[1]     The two Debtors in these cases are MD Helicopters, Inc. and Monterrey Aerospace, LLC, and their address is 4555 E. McDowell Road, Mesa, AZ 85215.  The last four digits of MD Helicopters, Inc.'s taxpayer identification number are 4088.  Monterrey Aerospace, LLC has not been assigned a taxpayer identification number as of the date hereof.

[2]     Monterrey Aerospace Mexico S. de R.L. de C.V. is a dormant non-Debtor Mexican subsidiary with immaterial assets and liabilities (the "**Mexican Subsidiary**").  The Debtors intend to dissolve the Mexican Subsidiary and will seek Court authorization prior to commencing the dissolution process.

government contracting.  I am over the age of 18 and I am authorized by each of the Debtors to submit this declaration (the "**First Day Declaration**") on behalf of the Debtors.

2.     As the Debtors' Chief Financial Officer, I am one of four executives collectively responsible for the day-to-day operations of the Debtors.  Thus, I have personal knowledge of the Debtors' financial affairs and business operations.  In addition, I have been responsible for overseeing the Debtors' preparations for these Chapter 11 Cases, their business plans, the prepetition marketing process, and the procurement of debtor-in-possession financing.  I have further familiarized myself with the Debtors' day-to-day operations, financial affairs, business affairs, and books and records by reviewing key financial documents and engaging in discussions with other members of the management team.  Except as otherwise stated in this First Day Declaration, the statements set forth herein are based on (i) my personal knowledge or opinion derived from my experience, (ii) information that I have received from the Debtors' employees working directly with me or under my supervision, direction, or control, or from the various advisors of the Debtors, and/or (iii) my review of relevant documents.  Any references to the Bankruptcy Code (as defined below), the Chapter 11 process, and related legal matters herein reflect my understanding of such matters based on the explanations and advice counsel to the Debtors has provided.  If called upon, I would testify competently to the facts set forth in this First Day Declaration.

3.     On March 30, 2022 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief in the United States Bankruptcy Court for the District of Delaware (the "**Court**"). The Debtors will continue to operate their businesses and manage their properties as debtors in possession.

4.      I submit this First Day Declaration on behalf of the Debtors in support of their (i) voluntary petitions for relief that they filed under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**") and (ii) "first-day" pleadings, which the Debtors are filing concurrently herewith (collectively, the "**First Day Pleadings**").  The Debtors seek the relief set forth in the First Day Pleadings to minimize the adverse effects of the commencement of these Chapter 11 Cases on their businesses.  I have reviewed the Debtors' petitions and the other First Day Pleadings or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' businesses and to successfully maximize the value of the Debtors' estates.

5.      To familiarize the Court with the Debtors, their businesses, the circumstances leading to the commencement of these Chapter 11 Cases, the objectives of such cases, and the relief the Debtors are seeking in the First Day Pleadings, this First Day Declaration is organized as follows:

- Part I provides an overview of the Company's business and organizational structure;
- Part II provides an overview of the Company's prepetition capital structure and indebtedness;
- Part III describes the relationship between these Chapter 11 Cases, on the one hand, and the Chapter 11 cases of the Zohar Entities (defined below), on the other, as well as the prepetition marketing process that was undertaken in connection with the proposed sale of substantially all of the Debtors' assets;
- Part IV describes the changes in the Company's management;
- Part V provides an overview of the circumstances leading to the commencement of these Chapter 11 Cases by the Debtors, the objectives of these Chapter 11 Cases, and the means for implementing these Chapter 11 Cases; and
- Part VI introduces the various First Day Pleadings and sets forth my belief that the relief sought therein is crucial to the Debtors' business.

## I.    The Company's Business and Organizational Structure

### A.    Overview of the Business

6.    Headquartered in Mesa, Arizona, the Debtors are an original equipment manufacturer that (i) makes and distributes single-engine and light twin-engine helicopters and light scout and attack military helicopters that are used for commercial, military, law enforcement, medical, utility, and personal missions and (ii) provides parts, service, logistics, and related training to both military and commercial customers.  The Debtors' products are widely known for their ability to serve a variety of rotorcraft market segments.  The Debtors' class-leading helicopters offer responsive agility, versatility, and unparalleled safety and economic value.  Thus, operators worldwide turn to the Debtors for the advantage of high-performance solutions backed by a passion for service and support.  With approximately 2,000 aircraft currently in service around the world, the Debtors have a global and diversified customer base that includes the US Army, US Special Operations, the Columbus Police, the Houston Police, the Argentina Armed Forces, the Costa Rica National Police, the El Salvador Air Force, the Finnish Armed Forces, the Italian government, the Kenya Defense Forces, the Korean Armed Forces, the Lebanese Air Force, the Malaysian Army, the Japanese Self Defense Forces, the Jordanian Armed Forces, the Turkish National Police, the Saudi Arabia National Guard, and many others.

7.    The Debtors, as a leading manufacturer of military helicopters, are a valued partner of the United States, providing crucial helicopters and services for mission critical functions.  The Debtors currently have an indefinite-delivery, indefinite-quantity contract with the United States, under which goods and services are provided on an ongoing basis and in accordance with certain standing terms, albeit pursuant to separate future purchase orders and contracts.  The Debtors are committed to continuing to serve the United States in accordance with the highest legal and ethical standards.

8.    The Debtors' helicopters are approved by Federal Aviation Administration ("**FAA**")-issued type certificates for design, FAA production certificates for manufacturing, FAA repair certificates, and airworthiness certificates for operation that cover the Debtors' intellectual property for production of new aircraft and certified replacement parts for the Debtors' aftermarket maintenance and support business.  Additionally, unique proprietary technologies currently used in production allow the Debtors to build airframes to the requisite technical specifications, thereby differentiating the Debtors from their competitors.  Importantly, the Debtors produce the entire fuselage, rotor head, and gearbox, which enables the Debtors to build an aircraft from nose to tail in house at their single, vertically-integrated manufacturing site in Mesa, Arizona.

9.    The Debtors' business enjoys a recurring, high-margin commercial aftermarket segment and a military aftermarket business with initial spares, recurring spares, and other parts-based customer orders.  This recurring revenue stream is driven by the enduring need of the Company's customers for parts used in operating and maintaining the helicopters.  Essentially, a helicopter consists of a collection of line replaceable units (*i.e.*, modular components) with no airframe structural life restriction. Although a helicopter operates in a non-pressurized environment that exerts less stress on the airframe than the environment in which a commercial fixed-wing aircraft operates, the effects of torque and vibration call for recurring maintenance and parts replacement, as mandated by FAA regulations.  As a result of these unique operating conditions, the accompanying limited part life, and FAA maintenance protocols, a helicopter needs to be continuously maintained.  Therefore, each helicopter sold gives rise to a significant revenue tail derived from the parts needed for such maintenance, either through repairs or complete overhaul activities.  Such revenue potential is supported by the Company's expanding global

installed base and the proprietary nature of the parts, which require FAA airworthiness certifications.

10.     While the Company does not currently engage in heavy maintenance and engine restoration activities, its base of military end-customers and its vast network of service centers position the Company to expand future aftermarket revenue.   Additionally, the Company's aftermarket revenue is derived from pilot, military, and maintenance-training programs (as set forth in Section C.4 below).   The Company's aggregate aftermarket revenue is expected to experience significant compound annual growth from 2022 through 2025.

11.     The Company continues to focus on improving its product and service offerings for its customers and, to this end, devotes resources on an ongoing basis to process improvements, supply chain product flow, and fuselage ramp-up as well as innovations in aircraft design and technology integration.

### B.    Company History

12.     MDHI traces its roots back ninety years to when the Hughes Aircraft Company ("**Hughes Aircraft**") was founded in 1932.   After years of successfully manufacturing such models such as the Hughes 269, 300, 500 and 530F for civil use and TH-55 Osage, OH-6 Cayuse, and the highly successful AH 64-Apache for military use, Hughes Aircraft sold its helicopters business to McDonnell Douglas in 1984.   For the most part, McDonnell Douglas stayed true to the original Hughes designs and nomenclatures.   In 1997, McDonnell Douglas merged with Boeing to become The Boeing Company.   In 1999, Boeing sold the former MDHI commercial helicopter division to MD Helicopters Holdings Inc. ("**MD Holdings**"), a corporation of Netherlands Antilles and a wholly-owned subsidiary of RDM Technology Holding N.V.   Included in the sale were (i) the MD 500E and MD 530F single-engine helicopters with conventional tail rotors; (ii) the MD 520N and MD 600N single-engine helicopters with the NOTAR® no tail rotor system for anti-

torque and directional control; and (iii) the MD 902 Explorer series of twin-engine, eight-place helicopters, which also feature the NOTAR® system.  Boeing maintained the AH-64 line of helicopters and the intellectual property relating to the NOTAR® system.

13.    A controlling interest in MD Holdings was acquired in July 2005 by funds affiliated with Patriarch Partners, LLC ("**Patriarch**"), a private investment firm founded and owned by Lynn Tilton, with a substantial portion of such interest acquired by certain of the Zohar Entities (as defined below)[3] managed by Ms. Tilton (such transactions, the "**Patriarch / Zohar Acquisition**"). Ms. Tilton was appointed as the Company's sole director in 2005 and also assumed the role of Chief Executive Officer in late 2006.  As set forth below, Ms. Tilton resigned from both positions on March 21, 2020.

14.    The Company's issued and outstanding shares of common stock are owned by the following Stockholders: Zohar CDO 2003-1, Limited ("**Zohar I**") (21.04%); Zohar II 2005-1, Limited ("**Zohar II**") (28.63%); ARK Investment Partners II, L.P. ("**AIP**") (3.61%); ARK II CLO 2001-1, Limited ("**ARK II**") (38.15%); MD Helicopter B.V. (4.08%); and ABN AMRO Participaties B.V. (4.49%).  The Stockholders are party to a Stockholders Agreement dated as of July 7, 2005 (as amended, restated, supplemented, or otherwise modified prior to the date hereof, the "**Stockholders Agreement**").  The Stockholders Agreement provides for, among other matters, certain restrictions on the issuance and transfer of the Company's common stock, as well as certain voting rights, preemptive rights, and information rights.

15.    A chart illustrating the Company's organizational structure, as of the date hereof, is attached hereto as **Exhibit A**.

---

[3]    As discussed below, the Zohar Entities are debtors and debtors in possession in separate Chapter 11 cases pending in this Court.

### C.   The Company's Business Operations

#### 1.   *Helicopter Manufacturing and Product Line*

16.   The Company currently manufactures all of its helicopters at its headquarters in Mesa, Arizona.  The manufacturing of the Company's products involves the use of specially designed tooling and technologies, as well as highly skilled manual production.  The Company continually upgrades its aircraft designs and incorporates technological advances.  The Company's current product line includes the MD 500E, MD 520N, MD 530F, MD 600N, and the MD 902 Explorer for commercial applications, as well as the MD 530F Cayuse Warrior and MD 530G Scout Attack Helicopter for military and paramilitary customers.

#### 2.   *Sales and Marketing*

17.   The Company employs a global network of direct and authorized third-party sales experts and distribution facilities to deliver access to its complete family of helicopters.  The global network covers five regions: (i) North America; (ii) Latin America; (iii) Europe & Russia; (iv) Africa & Middle East; and (v) Asia Pacific.  The Company has a dedicated sales and marketing team to source new business leads, plan strategic partnerships, manage sale representatives, and conduct market research and analysis.  Additionally, the Company's senior management team invests significant time and resources in sales and marketing initiatives, including attending key tradeshows and conferences to showcase the Company's aircraft and capabilities.  For instance, prior to the onset of the COVID-19 pandemic, members of the Company's management team attended the 2019 Army Aviation Mission Solutions Summit, the 2019 Airborne Public Safety Association Conference, and the 2020 HAI Heli-Expo.  Recently, members of the Company's management team attended the 2021 APSCON, 2022 HAI Heli-Expo, and the 2022 Doha International Maritime Defense Exhibition and Conference.

### 3. *User Support*

18.     As noted above, the continual supply of parts to existing helicopters is an important component of the Debtors' business.  Notably, in recent years, in addition to high-touch personal customer service, the Company sought to augment the customer experience by investing in the MyMD.Aero portal, a user-driven, web-based platform that was designed to modernize and improve maintenance planning, parts availability, and communication for the Company's helicopter operators worldwide.

### 4. *Training*

19.     The Company offers pilot, military, and maintenance training programs.  For instance, one such program, referred to as transition training, is a five-day course designed to familiarize appropriately-rated helicopter pilots with MD500, MD520N, MD530, MD600N, and MD 902 Explorer helicopter systems and operations.  The program includes ground school and flight training.  The ground school segment covers publications, aircraft systems, operational procedures, and preflight inspection procedures.  The flight training consists of four to five hours of flight time that includes practice of both normal flight and selected emergency procedures.  Additionally, the Company offers military training courses for both armed MD 530 helicopters and the combat-configured MD 902 Explorers.  Each course provides instruction on (i) the fundamentals of the airframe, systems, mission equipment, weaponeering, and ballistics; (ii) basic and advanced military tactical employment; and (iii) assault tactics, including how to safely infiltrate/exfiltrate soldier passengers, fast rope, and land in a range of environments under demanding conditions.

### 5. *Patents, Trademarks and Licenses*

20.     The Company has rights under a number of patents that relate to a variety of products and processes.  For example, the NOTAR® anti-torque system eliminates all of the

mechanical and safety concerns of an exposed tail rotor, including long drive shafts, hanger bearings, intermediate gearboxes and ninety-degree gearboxes.  Using the natural characteristics of helicopter aerodynamics, the NOTAR® system provides directional control that is safe, quiet, responsive, and foreign object damage resistant.  The enclosed variable-pitch composite blade fan produces a low pressure, high volume of ambient air to pressurize the composite tailboom.  The air is expelled through two slots which run the length of the tailboom on the starboard (right) side, causing a boundary-layer control called the Coanda Effect.  The result is that the tailboom becomes a "wing," flying in the downwash of the rotor system, producing up to 60 percent of the anti-torque required in a hover.  The balance of the directional control is accomplished by a rotating direct jet thruster.  In forward flight, the vertical stabilizers provide the majority of the anti-torque while directional control remains a function of the direct jet thruster.  Such technology delivers greater safety, and reduced noise, pilot workload, and aircraft vibration.  The Company produces the only three production helicopters in the world that utilize the NOTAR® system.

### 6.    *Employees*

21.    As of the Petition Date, the Company employed 263 persons (excluding temporary staff and independent contractors), the vast majority of whom are employed at the Company's headquarters and manufacturing facility in Mesa, Arizona.  Only three of the Company's employees are employed in U.S. locations other than Mesa, Arizona, and only four employees are employed outside the United States.

22.    The Company pays approximately 114 of its employees on an hourly basis and approximately 149 employees by salary.  None of the Company's employees are covered by collective bargaining agreements.

23.    The Debtors' employees provide a range of critical functions, including operating the Debtors' facilities, maintaining equipment, building airframes, assembling aircraft, managing

the Debtors' supply chains and procurement needs, engineering and developing the Debtors' product lines and the manufacturing processes crucial to their production, ensuring employee health and safety, and providing compliance, government reporting, and general corporate services. The employees' skills, knowledge, and understanding of the Debtors' infrastructure and operations are essential to the continuation of the business during these Chapter 11 Cases and to maintaining the value of the Debtors' assets and business. The tightening labor market has only served to underscore how essential these employees are and increased the Debtors' ever-present concern about losing valuable employees to competitors. If the names and other information of the Debtors' employees were to be disseminated in the context of these Chapter 11 Cases, the Debtors' competitors could use such information to recruit the employees. Without their employees, the Debtors would lack a key component of their go-forward business.

### 7.   *Mesa, Arizona Facility*

24.    As noted above, the Company's headquarters is located in Mesa, Arizona, where it occupies a total of two million square feet of land area. The headquarters contains 257,000 square feet of office and factory space that consists of, among other things, a production building, a paint facility, a warehouse, an engineering and administration building, and a repair station. The Company leases the land but owns the various improvements made to the land underlying the Mesa facility. Additionally, the Company leases adjacent locations for maintenance and overhaul, flight and maintenance training, airframe components production, and pre-assembly work. The vertically-integrated facilities enable the Company to manufacture key components in-house, including fuselages, main rotor heads, tail rotors, gearboxes and composite parts. The vertical integration reduces lead times and accomplishes control of process from manufacturing of component parts to final assembly. Other key capabilities of the Company's Mesa facility include painting, metal bonding, composite detail parts fabrication, metallic sub-assembly fabrication, and

avionics installation and completion.  As a result, the vertically-integrated manufacturing process brings cost advantages and unique capabilities that result in industry leading aircraft delivery times—on average, nine to twelve months from time of contract award to first delivery.

## II.    Prepetition Capital Structure

### A.    Prepetition First Lien Facility

25.    Debtor MDHI is the borrower under that certain Credit Agreement, dated as of July 8, 2005 (as amended,[4] restated, amended and restated, supplemented, waived, or otherwise modified, the "**Prepetition First Lien Credit Agreement**," and collectively with all agreements, documents, notes, letters of credit, mortgages, security agreements, pledges, guarantees, subordination agreements, deeds, instruments, indemnities, indemnity letters, fee letters, assignments, charges, amendments, and any other agreements delivered pursuant thereto or in connection therewith, including, without limitation, the Prepetition First Lien Security Agreement (as defined below), the "**Prepetition First Lien Loan Documents**") with Debtor Monterrey, as guarantor, Ankura Trust Company, LLC ("**Ankura**"),[5] as the administrative agent for the Zohar Lenders,[6] Patriarch Partners Agency Services, LLC ("**PPAS**"), as the administrative agent for the

---

[4]    There are 55 amendments to the Prepetition First Lien Credit Agreement.  Such amendments effectuated, among other things, restructuring of unpaid interest and commitment fees into additional tranches and modification of various provisions in the credit agreement, such as defined terms and events of default.

[5]    On March 19, 2019, Ankura Trust Company, LLC ("**Ankura**") replaced PPAS as agent for the Zohar Lenders under the Prepetition First Lien Credit Agreement pursuant to the *Order (I) Authorizing the Appointment of Ankura Trust Company, LLC as New Agent Under the Court-Approved Settlement Agreement by and Between the Debtors, Lynn Tilton, the Patriarch Stakeholders, MBIA Insurance Corp., and the Zohar III Controlling Class and (II) Granting Related Relief* [*In re Zohar III Corp., et al.*, Case No. 18-10512 (KBO) (the "**Zohar Docket**"), Docket No. 709].  As of the Petition Date, PPAS remains the agent for the Patriarch Lenders under the Prepetition First Lien Credit Agreement.

[6]    "**Zohar Funds**", "**Zohar Lenders**", and "**Zohar Noteholders**" means, collectively, Zohar I, Zohar II, and Zohar III, Limited.  The Zohar Lenders constitute the Required Lenders (as defined in the Prepetition First Lien Credit Agreement) under the Prepetition First Lien Credit Agreement.

Patriarch Lenders,[7] Ankura and PPAS, as collateral agent (together with Ankura and PPAS in their capacities as administrative agent, the "**Prepetition First Lien Agent**"), and the lenders party thereto (collectively, the "**Prepetition First Lien Lenders**")

26.     Pursuant to the Prepetition First Lien Credit Agreement, the Prepetition First Lien Lenders provided MDHI with a term loan facility (the "**Prepetition First Lien Facility**").  As of the Petition Date, not less than $357 million in respect of the loans made under the Prepetition First Lien Facility remain outstanding, including outstanding principal and accrued and unpaid interest, fees, costs, expenses (including any attorneys' and financial advisors' fees), charges, indemnities and all other unpaid Obligations (as defined in the Prepetition First Lien Credit Agreement) incurred or accrued with respect to the foregoing pursuant to, and in accordance with, the Prepetition First Lien Loan Documents (collectively, the "**Prepetition First Lien Obligations**").  Of the Prepetition First Lien Obligations, the Zohar Lenders hold approximately $332 million, or approximately 93%, and the Patriarch Lenders hold approximately $25 million, or approximately 7%.  The indebtedness under the Prepetition First Lien Facility matured in April 2019 and is currently in default.

27.     In connection with the Prepetition First Lien Credit Agreement, the Debtors are party to that certain Security Agreement, dated as of July 8, 2005 (as amended, supplemented or otherwise modified from time to time, the "**Prepetition First Lien Security Agreement**"), among MDHI, as grantor, the other loan parties thereto, and the Prepetition First Lien Agent.  Pursuant to the Prepetition First Lien Security Agreement and the other Prepetition First Lien Loan Documents, the Prepetition First Lien Obligations are secured by first-priority security interests in and liens (the "**Prepetition First Lien Loan Liens**") on the "Collateral" (the "**Prepetition**

---

[7]    "**Patriarch Lenders**" and "**Patriarch Noteholders**" means AIP and Ark II.

**Collateral**") pursuant to, and as such term is defined in, the Prepetition First Lien Security Agreement, consisting of substantially all of the Debtors' assets, except as set forth in the Prepetition First Lien Security Agreement.

> **B.**     **Prepetition Subordinated Notes**

28.     Under that certain Notes Purchase Agreement, dated as of April 17, 2007 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified, the "**Prepetition Note Purchase Agreement**," and collectively with all agreements, documents, notes, mortgages, security agreements, pledges, guarantees, subordination agreements, deeds, instruments, indemnities, indemnity letters, fee letters, assignments, charges, amendments, and any other agreements delivered pursuant thereto or in connection therewith, the "**Prepetition Note Documents**"), Debtor MDHI issued certain Notes (as defined in the Prepetition Note Purchase Agreement) to the Purchasers (as defined in the Prepetition Note Purchase Agreement).[8]

29.     As of the Petition Date, an aggregate amount of not less than $59.8 million was outstanding under the Prepetition Note Documents, including outstanding principal and accrued and unpaid interest, fees, costs, expenses (including any attorneys' and financial advisors' fees), charges, indemnities and all other unpaid obligations under the Prepetition Note Documents (the "**Prepetition Note Obligations**" and, together with the Prepetition First Lien Obligations, the "**Prepetition Secured Obligations**").   Not less than $30.6 million of the Prepetition Note Obligations is held by Zohar Noteholders, in the aggregate, with the balance held by the Patriarch Noteholders.

---

[8]     The holders of the Notes as of the date hereof and their respective successors and assigns are collectively referred to herein as the "**Prepetition Noteholders**" and, together with the Prepetition First Lien Secured Parties, the "**Prepetition Secured Parties**".

30.    The Prepetition Note Obligations are secured by second priority security interests in and liens on the Prepetition Collateral (collectively, the "**Prepetition Note Liens**," and together with the Prepetition First Lien Loan Liens, the "**Prepetition Liens**") as set forth in the Prepetition Note Documents and subject to the terms of the Subordination Agreement (as defined below), and as of the Petition date, such Prepetition Note Liens were senior in priority over any and all other liens on the Prepetition Collateral, except as set forth in the Prepetition Note Documents.

31.    Pursuant to those certain Amended and Restated Subordinated Security Agreements, dated as of May 31, 2011, by and among Debtor MDHI, as grantor, and each of the Prepetition Noteholders, and the other subordination agreements entered into in connection with the Notes (collectively, the "**Subordination Agreement**"), the Prepetition Noteholders are deemed to consent to the use of the Prepetition Collateral (including Cash Collateral[9]) and the incurrence of the DIP Facility on the terms set forth in the DIP Orders because, among other reasons, the Prepetition First Lien Agent, acting at the direction of the Required Lenders under the Prepetition First Lien Credit Agreement, has consented to the same.

**C.    Terminated ABL**

32.    The Company was also party to that certain Amended and Restated Loan and Security Agreement dated as of October 18, 2006 (as subsequently modified, the "**ABL Credit Agreement**," and the facility established under such agreement, the "**ABL Credit Facility**"), under which (a) ARK II was most recently the sole lender providing a revolving line of credit in the amount of $35 million and (b) PPAS served as the administrative agent.  PPAS, at ARK II's

---

[9]    "**Cash Collateral**" means any and all of the Debtors' cash, including the Debtors' cash and other amounts on deposit or maintained in any account or accounts by the Debtors, and any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral existing as of the Petition Date, and the proceeds of any of the foregoing, is the Prepetition Secured Parties' cash collateral within the meaning of Section 363(a) of the Bankruptcy Code).

direction, terminated the ABL Credit Facility on May 21, 2020 and, as of that time, there were no loans outstanding thereunder. In the twelve months prior to the termination, as much as $34 million had been drawn from the ABL Credit Facility. After the termination, the Company was required to take actions to preserve liquidity to address working capital needs.

### D.  Unsecured Debt

33.    The Debtors have no funded unsecured debt. In the ordinary course, the Debtors incur trade debt with certain vendors and suppliers in connection with the operation of their business. In addition, the Debtors have other potential and contingent liabilities related to litigation, pension, and employee obligations, certain of which are described herein.

34.    In particular, the Debtors note the three following creditors arising from litigation and arbitration matters:

### 1.    *The 2020 Netherlands Judgment*

35.    In 2005, the National Police Services Agency of the Netherlands (the "**KLPD**") brought suit against the Company in two separate actions in the Hague District Court in the Netherlands, alleging that the Company is liable by way of a corporate guaranty for the default of a distributor to deliver certain aircraft to the KLPD under a procurement contract executed in 2001 under the Company's prior ownership (the "**2001 Contract**"). The Hague District Court rendered two separate judgments against the Company for damages plus fees and interest. The judgments were assigned to the State of the Netherlands (the "**Netherlands**") and appealed to the Hague Court of Appeal, which consolidated the appeals and awarded a consolidated judgment in the statutory amount of approximately €7 million in May 2012 (the "**Foreign Judgment**").

36.    On August 28, 2015, the Netherlands sought recognition of the Foreign Judgment in the Superior Court of Maricopa County, Arizona (the "**Superior Court**"). The Company moved successfully to dismiss the action on December 15, 2015. The Netherlands filed an amended claim,

and moved for summary judgment in March 2018.  The Superior Court issued a decision in favor of the Netherlands in August 2018, and on November 13, 2018, issued a judgment in favor of the Netherlands in the amount of $15,074,750, including interest and fees (the "**Arizona Judgment**"). *See State of the Netherlands v. MD Helicopters, Inc.*, No. CV2015-095127 (AZ Maricopa Super. Ct. Nov. 13, 2018).  The Company appealed the Arizona Judgment to the Arizona Supreme Court, which ultimately ruled that the judgment was enforceable in Arizona on December 30, 2020.  *See State of the Netherlands v. MD Helicopters, Inc.*, 250 Ariz. 235 (2020).  On September 23, 2020, the Netherlands registered the Arizona Judgment in the Supreme Court of the State of New York. *See State of the Netherlands v. MD Helicopters, Inc.*, Index. No. 157756/2020, ECF No. 6 (N.Y. Sup. Ct. Sept. 23, 2020).  On March 1, 2022, the Netherlands served a notice of deposition that required MDHI to appear for a debtor exam on March 29, 2022.  The parties subsequently agreed to reschedule the deposition until April 2022.

37.     Following the affirmation of the Foreign Judgment by the Netherlands Court of Appeals, on December 2, 2015, the Netherlands filed a separate claim in the Hague District Court, seeking additional contractual damages against the Company based on the 2001 Contract.  The Netherlands seek total contractual damages of €43 million in additional procurement costs it sustained following the breach.  The Company denied all liability under the 2001 Contract or otherwise.  On March 25, 2020, the Hague District Court rendered its final decision dismissing the Netherlands' claim for the additional damages.  On July 27, 2021, the Netherlands appealed this denial by the Hague District Court.  The Company has submitted its response to the appeal filed by the Netherlands.  The appeal is expected to be heard in the second quarter of 2022.  In the event a judgment is rendered against the Company, the Company expects to challenge the judgment as unenforceable in the United States.

### 2.    *The 2021 Qui Tam/FCA Litigation and Settlement*

38.    On May 3, 2013, Philip Marsteller and Robert Swisher (collectively, the "**Relators**") brought an action under the *qui tam* provisions of the False Claims Act in the United States District Court for the Northern District of Alabama (Northeastern Division) (the "**Alabama District Court**") captioned *United States ex rel. Philip Marsteller, et al. v. Lynn Tilton, MD Helicopters, Inc., et al.*, Case No. 5:13-cv-00830-AKK (the "**Qui Tam Action**").  The United States of America (the "**Government**") declined to intervene in the Qui Tam Action.  In the Qui Tam Action, the Relators named Ms. Tilton, Patriarch, MDHI, and Norbert Vergez as defendants, alleging improper conduct associated with MDHI's government contract procurement.  The conduct at issue in the Qui Tam Action occurred nearly 10 years ago.  The individuals involved with such conduct are no longer with the Company.[10]

39.    On August 23, 2021, the Alabama District Court granted MDHI's motion for summary judgment in part and denied it in part.  The summary judgment motion was granted as to (a) the Relators' pricing-based fraudulent inducement theory, (b) the Federal Acquisition Regulations ("**FAR**")-based fraudulent inducement theory regarding the Afghanistan primary trainer contract and CLS modification, and (c) the conspiracy claim against Ms. Tilton and Patriarch Partners, LLC.  Accordingly, the claims in Counts I-V related to a price-based fraudulent inducement theory, the FAR-based fraudulent inducement theory pled in Counts I and II, and the conspiracy claim in Count VI were dismissed with prejudice.  The summary judgment motion was denied as to the Relators' FAR-based theory of fraudulent inducement regarding the El Salvador

---

[10]    The Debtors have rigorous compliance and business ethics policies and procedures in place, with a strong commitment to maintaining the highest legal and ethical standards in conducting business.

(Count III), Saudi Arabia (Count IV), and Costa Rica (Count V) contracts.  The Qui Tam Action proceeded to trial solely as to the FAR-based theory on those three contracts, and only as to MDHI.

40.     On September 24, 2021, a jury returned a verdict against the Company in the amount of approximately $36.8 million on the FAR-based theory, which amount is subject to trebling under the applicable federal laws.  On October 18, 2021, the Alabama District Court entered an order (as amended) that, among other things, stayed the entry of final judgment and instructed the parties to engage in mediation.

41.     On November 8, 10, and 29, 2021, as ordered by the Alabama District Court, the Debtors, the Relators, and certain insurers of the Debtors (the "**Insurers**") participated remotely in mediation before the Honorable Leo S. Papas (ret.).  Following the mediation, on December 22, 2021, the Debtors and the Relators entered into an initial memorandum of understanding that outlined the terms of a prospective settlement.

42.     On January 31, 2022, the Debtors, the Relators, and the Prepetition First Lien Lenders commenced a series of remote mediation sessions before the Honorable Christopher S. Sontchi with the goals of inviting the Debtors' primary constituents to the table and resolving the Qui Tam Action to (i) prevent the entry of a judgment by the Alabama District Court that would necessitate an expedited Chapter 11 filing by the Debtors and (ii) minimize distractions to the Debtors' sale process.  At the conclusion of the mediation, on February 14, 2022, the Debtors and the Relators executed a first amended memorandum of understanding (the "**Qui Tam MOU**") that provided a roadmap for the terms that would be included in a settlement agreement by and among the Debtors, the Relators, the Government, the Insurers, and the Zohar Lenders.  As set forth in detail below, one of the terms in the Qui Tam MOU required that the Debtors and the Relators work cooperatively and in good faith to finalize a restructuring support agreement by and among

the Debtors, the Relators, the Insurers, and the Zohar Lenders, initially within fourteen (14) days after February 14, 2022, which deadline was extended from time to time to allow discussions regarding the settlement agreement to progress.  As set forth below, on the Petition Date, the Debtors, the Relators, the Zohar Lenders, and the Insurers entered into the restructuring support agreement attached hereto as **Exhibit B** (the "**RSA**").

3.     *The TAI Arbitration and Settlement*

43.     On March 20, 2015, Turkish Aerospace Industries ("**TAI**"), a supplier to the Debtors, filed a request for arbitration with the International Chamber of Commerce (the "**ICC**") seeking approximately $6.66 million in damages from the Debtors for breach of a purchase agreement.  The parties subsequently reached a settlement (the "**TAI Settlement**"), pursuant to which the arbitration was stayed and the Debtors agreed to purchase two fuselages for $900,000 along with approximately $2.1 million in other helicopter parts from TAI, with the purchase subject to the condition that TAI would provide certificates of conformance ("**certificates**") for the parts.  After the Debtors purchased and paid $900,000 for the two fuselages, a dispute arose regarding the certification requirements for the additional parts.  TAI requested that the arbitration tribunal declare the TAI Settlement void and order the Debtor to pay approximately $12.5 million in damages for breach of the original purchase agreement.  On July 20, 2021, the arbitration tribunal denied both of TAI's requests, made a finding that the TAI Settlement was valid, and directed TAI to provide certificates and the Debtors pay for all parts for which certificates were provided.

44.     Although TAI subsequently provided certificates in response to the ICC ruling, the dispute remained unresolved after the Debtors found most of the certificates to be inadequate.  Accordingly, the Debtors continue to withhold payment for the additional parts until

they receive adequate certificates pursuant to the arbitration tribunal's ruling.  In November 2021, the Company and TAI engaged in settlement discussions but were unable to resolve their dispute.

45.     On February 4, 2022, TAI filed a new request for arbitration with the ICC to declare the TAI Settlement void and to order the Debtors to pay approximately $12.8 million in damages.  The new arbitration tribunal has not yet set a date for the arbitration, and the case remains pending.  As of the Petition Date, the Debtors believe they owe approximately $1.98 million to TAI pursuant to the TAI Settlement, which will be due and payable upon their receipt of adequate certificates of conformance.

### III.    The Relationship Between These Cases and the Zohar Chapter 11 Cases

46.     As noted above, Zohar I and Zohar II together constitute the Debtors' largest shareholder owning approximately 49.67% of the MDHI's outstanding equity, and the Zohar Lenders, collectively, are the Debtors' largest senior secured creditor holding approximately 93% of the Prepetition First Lien Claims.  The Zohar Lenders and three affiliated entities (together with the Zohar Lenders, the "**Zohar Entities**") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on March 11, 2018 in this Court.  Their jointly administered Chapter 11 cases are currently pending under the caption *In re Zohar III Corp., et al.,* Case No. 18-10512 (the "**Zohar Chapter 11 Cases**").

47.     As described in the *Declaration of Lynn Tilton in Support of Chapter 11 Petitions* [Zohar Docket No. 5] and the *Declaration of Marc S. Kirschner in Support of Chapter 11 Petitions* [Zohar Docket No. 6],[11] the Zohar Entities were six collateralized loan obligation funds that were lenders to and owned equity in a number of portfolio companies, including MDHI.  According to her declaration, Ms. Tilton caused the Zohar Entities to commence the Zohar Chapter 11 Cases

---

[11]    "Zohar Docket No." indicates that a document was filed in the Zohar Chapter 11 Cases.

21

with the goal of providing an organized structure through which the value of the portfolio companies could be monetized and maximized for the benefit of the stakeholders in the Zohar Chapter 11 Cases.

48.     On May 21, 2018, the Court entered the *Order Approving and Authorizing the Settlement Agreement by and Between the Debtors, Lynn Tilton, the Patriarch Stakeholders, MBIA Insurance Corp., and the Zohar III Controlling Class* [Zohar Docket No. 266] (the "**Settlement Order**"), approving the Settlement Agreement (as defined in the Settlement Order) [Zohar Docket No. 266, Ex. 1] among the Zohar Entities, Ms. Tilton and her affiliates, and other key stakeholders in the Zohar Chapter 11 Cases.  Among other things, the Settlement Agreement required Ms. Tilton (on behalf of the Group A Portfolio Companies) and the Zohar Entities' Independent Director and Chief Restructuring Officer (on behalf of the Zohar Entities) to monetize the various portfolio companies in which the Zohar Entities hold secured debt and/or equity interests (such process, the "**Monetization Process**").

49.     On March 20, 2020, the Court entered the *Order Establishing Certain Guidelines and Milestones in Furtherance of the Monetization Process for the Group A and Group B Portfolio Companies* [Zohar Docket No. 1500] (the "**Monetization Process Order**"), which set forth certain guidelines and milestones to govern the go-forward Monetization Process under the Settlement Agreement.

50.     On July 2, 2020, the Court entered the *Amended Order Establishing Certain Guidelines and Milestones in Furtherance of the Monetization Process for the Group A and Group B Portfolio Companies* [Zohar Docket No. 1751] (the "**Amended Monetization Process Order**"), which made certain modifications to the Monetization Process Order to account for changing circumstances since its entry.  Among other things, the Amended Monetization Process Order

provides that, if the governing body for a Portfolio Company is an independent third party, the governing body "shall be responsible for conducting the sales process on behalf of the Portfolio Company." Amended Monetization Process Order ¶ 8.

## IV.    Company Management

51.     On March 21, 2020, Ms. Tilton resigned as the Chief Executive Officer and the sole director of the Company, leaving key offices at the Company vacant. As stated in a confidential submission to the Court, dated May 11, 2020, Alan Carr was elected as the sole director for MDHI (the "**Director**") on April 20, 2020 at a special meeting of shareholders and was re-elected as the sole director on May 15, 2020 at the annual meeting of shareholders. Pursuant to the Amended Monetization Process Order, Mr. Carr, in his capacity as MDHI's Independent Fiduciary (as defined in the order), has been responsible for, among other things, conducting the sale process of MDHI.

## V.    Key Events Leading to Commencement of These Chapter 11 Cases

### A.    The Circumstances Prior to the Petition Date

52.     A number of factors have negatively affected the Debtors' financial condition, destabilized the Debtors' business, and threaten to further deteriorate the value of the Debtors' assets. To begin, the Prepetition First Lien Obligations matured in June 2019, and the Debtors were unable to repay or refinance such indebtedness. Since that time, the Debtors have been in default under the Prepetition First Lien Credit Agreement, which has negatively affected the Debtors' ability to access financing and, in turn, has hampered their ability to compete for certain capital-intensive contracts. Specifically, the Debtors have been unable to obtain bonding due to the default under the Prepetition First Lien Credit Agreement and, as a result, have been unable to compete for contracts that include bonding requirements. As set forth above, the Debtors' liquidity became further restricted after the termination of the ABL Credit Facility.

23

53.     As set forth above, the Debtors have also been named as defendants in several lawsuits and have expended significant resources defending those lawsuits.  Two of those lawsuits have had significant adverse impact on the Debtors, as described above: (i) the State of the Netherlands obtained an approximately $15 million judgment against the Debtors in May 2012, which was registered in Arizona and New York in November 2018 and September 2020, respectively, and (ii) a jury returned a verdict against the Debtors in the Qui Tam Action awarding damages in the amount of approximately $36.8 million in September 2021.

54.     Compounding these issues, the Debtors' business has also faced headwinds from the U.S. military's withdrawal from Afghanistan and attendant wind-down of the Debtors' contracts to supply helicopters and provide related services to the Afghanistan military, which had represented a material portion of the Debtors' revenues.  The materiality of this wind-down cannot be overstated; it caused an approximately a 40% reduction in the Company's gross revenue and the loss of orders to supply approximately 20 helicopters that would have generated $160 million in gross revenue. Additionally, the Debtors have experienced supply chain disruptions caused by the COVID-19 pandemic, which have resulted in delays in certain sales.   As a result of these factors, among other financial and operating difficulties, the Debtors have been operating under a cloud of uncertainty that has strained the Debtors' cash flows and negatively affected liquidity.

### B.      Prepetition Sale and Marketing Process

55.     The Debtors have determined that, in consideration of cash-flow concerns and the Monetization Process, pursuing a sale of all or substantially all of the Debtors' assets (the "**Assets**") is the best available option for maximizing the value of those Assets.  In July 2020, the Debtors retained Moelis & Company LLC ("**Moelis**") to assist them in exploring a sale transaction to

maximize the value of the Assets in accordance with the Monetization Process.[12]  Beginning in

October 2021, the Debtors' management, together with the assistance of their advisors (in

particular, Moelis), undertook a robust process to market the Assets under the oversight of the

Director.  Moelis's efforts in respect of the prepetition sale and marketing process are described in

further detail in the *Declaration of Adam B. Keil in Support of Bid Procedures and Sale Motion*

(the "**Keil Declaration**").

C.    **The Debtors' Entry into the Stalking Horse Agreement**

56.    The prepetition marketing process culminated in execution of that certain Asset

Purchase Agreement (the "**Stalking Horse Agreement**"), by and between the Debtors and MDH

Holdco, LLC (the "**Stalking Horse Bidder**").[13]  The Stalking Horse Bidder is an affiliate of the

Zohar Funds which, as described above, hold approximately 49.7% of MDHI's equity and

approximately 93% of the Prepetition First Lien Obligations.  The Zohar Funds are bidding in

conjunction with their creditors, which creditors will be the ultimate beneficial economic owners

of the Stalking Horse Bidder.  The Stalking Horse Agreement was the product of arms'-length,

good-faith negotiations among the Debtors and the Stalking Horse Bidder.  The negotiation of the

Stalking Horse Agreement on behalf of the Debtors was led by the Debtors' management and

advisors under the oversight of the Director.  At all times, the Stalking Horse Bidder has been

represented by separate counsel in negotiations resulting in execution of the Stalking Horse

Agreement.  On March 29, 2022, the Director adopted resolutions authorizing the Debtors to enter

into the Stalking Horse Agreement.

---

[12]    Moelis was previously retained by the Debtors in May 2018 in connection with a sale transaction.  The Debtors (under prior leadership) ultimately determined not to pursue a transaction at that time.  Moelis was then reengaged by the Director in July 2020 for the latest prepetition sale process.

[13]    The Stalking Horse Bidder is controlled by a creditor consortium led by Bardin Hill Investment Partners LP and MBIA Insurance Corporation.

**D.**      **The Debtors, the Relators, and the Insurers Agreed to the Economic Terms of the Qui Tam Settlement Agreement and Entered into the RSA**

57.     Immediately following the execution of the Qui Tam MOU and in accordance with the terms thereof, the Debtors, the Relators, and the Insurers began to negotiate a form of settlement agreement that substantially reflects the terms found in the Qui Tam MOU (the "**Qui Tam Agreement**") and a form of stipulation containing bankruptcy related provisions (the "**DOJ Stipulation**," together with the Qui Tam Agreement, the "**Qui Tam Settlement**").  On March 29, 2022, subject to subsequent input from the Government (a contemplated signatory to the Qui Tam Settlement), the parties reached consensus on the terms of such agreement.  Discussions with the Government with respect to the Qui Tam Settlement commenced prepetition and will continue postpetition in a manner consistent with the RSA.  In order to effectuate the Qui Tam Settlement and pursuant to the RSA, the Debtors anticipate filing a motion under Rule 9019 of the Federal Rules of Bankruptcy Procedure in the coming weeks.

58.     On the Petition Date, the Debtors, the Relators, the Zohar Lenders, and the Insurers entered into the RSA, which contemplates execution of the Debtors' restructuring transactions through either (i) a plan of reorganization or a plan of liquidation or (ii) a sale pursuant to Section 363 of the Bankruptcy Code.  The "toggle" concept is reflected in the Bidding Procedures (as defined below) to preserve the flexibility for a value-maximizing transaction.

**E.**      **Bid Procedures and Postpetition Marketing**

59.     As described above, the Debtors believe that a prompt sale of the Assets through a competitive process is the best option available to maximize the value of the Assets for all stakeholders in these Chapter 11 Cases.  In light of the challenges the Debtors face, which are described in further detail above, the Debtors are critically focused on stabilizing the business and providing certainty to their vendors, suppliers, customers, and workforce regarding the path

forward for the business by consummating a value maximizing sale transaction.  Prepetition, the Debtors took important first steps toward achieving that goal by negotiating and executing the RSA and the Stalking Horse Agreement.  It is critical that the Debtors seize on that momentum by cementing a process for the swift and orderly transition of the Debtors' business to the successful bidder.  Doing so will signal to the Debtors' customers, vendors, employees, and other constituents from the outset of these Chapter 11 Cases that the Debtors' situation is only temporary and that the business will emerge from the Chapter 11 process with new owners and a more stable capital structure.

60.  Accordingly, the immediate focus of these Chapter 11 Cases is the approval of the sale of the Assets to the Stalking Horse Bidder or such other buyer that emerges postpetition with a higher or otherwise better offer for the Assets.  While there is a real need for expediency here, the Debtors recognize that conducting a postpetition market check on the terms and conditions set forth in the Stalking Horse Agreement is appropriate and necessary to ensure that the value of the Assets is maximized.  To that end, notwithstanding the lengthy and thorough Prepetition Marketing Process, there may be additional entities, in addition to the Stalking Horse Bidder, interested in participating in the auction with respect to the Assets.  Indeed, consistent with the Stalking Horse Agreement, the Debtors, with the assistance of their advisors, have continued, and will continue, to market the Assets to potential buyers through the bid deadline.  The Stalking Horse Agreement offers the Debtors and their stakeholders certainty by establishing a minimum purchase price for the Assets and signaling to other potential bidders the currently prevailing market value of the Assets, while also affording the Debtors an opportunity to seek higher or otherwise better offers.

61.  Contemporaneous with the filing of these Chapter 11 Cases, the Debtors filed a motion (the "**Bid Procedures/Sale Motion**") seeking, among other relief, approval of certain bid

procedures (the "**Bid Procedures**") and approval of the sale to the Stalking Horse Bidder or such other buyer providing a higher or better offer for the Assets.  Further, by the Bid Procedures/Sale Motion, the Debtors seek entry of an order establishing the following sale timeline:

(a)     ***Assumed Contract Objection Deadline***:  Objections to (i) the potential assumption and assignment of any contract to the Stalking Horse Bidder including the ability of the Stalking Horse Bidder to provide adequate assurance of future performance and (ii) the proposed cure amount to be paid in connection with the assumption and assignment of any contract shall be filed and served no later than **May 11**, **2022 at 4:00 p.m. (prevailing Eastern Time)** (the "**Assumed Contract Objection Deadline**"); *provided*, that, to the extent any contract counterparty is added to the Assumption Notice after the initial notice is served, such new contract counterparty shall have ten (10) days from the date of service of the supplemental contract notice to object to the proposed cure amount and assignment to the successful bidder.

(b)     ***Sale Objection Deadline***:  Objections to the sale shall be filed and served no later than **May 11**, **2022 at 4:00 p.m. (prevailing Eastern Time)**.

(c)     ***Intention to Submit Qualified Bid Deadline***: Intentions to submit qualified bid must be received by no later than **May 20, 2022 at 4:00 p.m. (prevailing Eastern Time)** (the "**Intention to Submit Qualified Bid Deadline**").

(d)     ***Bid Deadline***:  Bids for the Assets, including a marked-up form of the Stalking Horse Agreement, as well as the deposit and the other requirements for a bid to be considered a Qualified Bid (as defined in the Bid Procedures) must be received by no later than **June 3**, **2022 at 4:00 p.m. (prevailing Eastern Time)** or such later date as may be agreed to by the Debtors (the "**Bid Deadline**").

(e)     ***Auction***:  The Auction, if necessary, shall be held on **June 9, 2022 at 10:00 a.m. (prevailing Eastern Time)**, or such other location as identified by the Debtors after notice to all qualified bidders.

(f)     ***Post-Auction Notice Deadline***:  As soon as reasonably practicable after closing the auction, if any, and in any event not less than 24 hours after closing the auction, the Debtors shall file and serve a notice identifying the successful bidder and Back-Up Bidder.

(g)     ***Post-Auction Objection Deadline***:  If the successful bidder that prevails at the auction is not the Stalking Horse Bidder, the deadline to object solely to (i) the identity of a successful bidder or (ii) the ability of the successful bidder to provide adequate assurance of future performance under the

Assumed Contract shall be **June 13, 2022 at 4:00 p.m. (prevailing Eastern Time)**.

(h)  ***Sale Hearing***:  Subject to this Court's availability and schedule, if the Debtors receive one or more intention(s) to submit qualified bid by the Intention to Submit Qualified Bid Deadline, the sale hearing shall be **June 17, 2022**.  If the Debtors do not receive any intention to submit qualified bid by the Intention to Submit Qualified Bid Deadline, the sale hearing shall be **May 27, 2022**.

62.    This timeline maximizes the prospect of receiving the highest or best offer for the Assets while ensuring that the Debtors can close the Sale no later than August 27, 2022, as is contemplated under the Stalking Horse Agreement.  This outside date was one of the substantive negotiated deal points upon which the Stalking Horse Bidder insisted as a condition to agreeing to serve as the stalking horse and entering into the Stalking Horse Agreement.  Further, a lengthy sale process creates uncertainty among the Debtors' vendors, customers, and workforce, each of which is a key business partner whose confidence and cooperation is necessary to achieve the Debtors' goals in these Chapter 11 Cases.

**F.    DIP Financing**

63.    The Debtors are, via a motion filed contemporaneously herewith, seeking this Court's approval of a $60 million senior secured superpriority term loan facility (the "**DIP Facility**") with the lenders party thereto (the "**DIP Lenders**") and Acquiom Agency Services LLC, as administrative and collateral agent (the "**DIP Agent**").  The Debtors seek authority to make an initial draw of $12.5 million under the DIP Facility on an interim basis with the remainder of the DIP Facility available upon entry of the final order.

64.    The Debtors and their advisors commenced arms'-length, good-faith negotiations with a group of the Prepetition First Lien Lenders constituting Required Lenders under the Prepetition First Lien Credit Agreement and the DIP Lenders with respect to postpetition financing and the use of cash collateral.  The negotiations spanned several weeks and lasted until shortly

before the Petition Date.  Ultimately, the Debtors, in consultation with their advisors, determined that the DIP Facility represented the best postpetition DIP financing option available to the Debtors.

65.    The DIP Facility contains the following milestones for these Chapter 11 Cases:

- No later than three (3) Business Days after the Petition Date, the Bankruptcy Court shall enter the interim order;

- No later than twenty-eight (28) days after the Petition Date, the Bankruptcy Court shall enter the final order;

- The Debtors shall have filed a motion with the Bankruptcy Court in form and substance reasonably satisfactory to the Required Lenders  prior to the first day hearing seeking approval of bid procedures for a sale (the "**Bidding Procedures**"), pursuant to Section 363 of the Bankruptcy Code of all or a portion of the Assets with MDH Holdco, LLC as the proposed stalking horse bidder with the ability to credit bid up to the full amount of its claims (whether arising from the DIP Facility or the credit facilities provided in Prepetition First Lien Credit Agreement and which credit bid may provide for the assignment of the right to purchase the Assets to a newly formed acquisition vehicle);

- No later than twenty-eight (28) days after the Petition Date, the Bankruptcy Court shall have entered the order approving the Bidding Procedures (the "**Bidding Procedures Order**") and Stalking Horse Agreement, in form and substance reasonably acceptable to the Required Lenders;

- No later than one-hundred and five (105) days after the Petition Date, the Bankruptcy Court shall have entered an order approving the sale of the Assets to a successful bidder in accordance with the Bidding Procedures Order, in form and substance reasonably acceptable to the Required Lenders; and

- The closing of an acceptable sale shall have occurred no later than one hundred and twenty (120) days after entry of the Petition Date.

66.    As of the close of business on March 28, 2022, the Debtors' total cash balance was approximately $8,214,924, substantially all of which is encumbered by the liens securing the Prepetition Secured Obligations.  The Debtors worked with AlixPartners LLP ("**AlixPartners**") to analyze and quantify the Debtors' potential liquidity needs for a Chapter 11 process.  As part of the Debtors' evaluation of their liquidity position, AlixPartners worked closely with the Debtors' management to review, analyze, and assist in the development of the Debtors' 13-week cash flow

forecast, which takes into consideration a number of factors, including the effect of the Chapter 11 filing on the operations of the business, fees and interest expenses associated with postpetition financing, adequate protection payments, professional fees and expenses, and customer and vendor obligations.

67.      As described in the Approved Budget (as defined in the DIP Motion), the Debtors are projected to be unable to generate enough operating cash flow in the ordinary course of business to cover their ordinary course operating expenses, working capital needs, and the projected costs of these Chapter 11 Cases.

68.      As described more fully above, a number of factors have destabilized the Debtors' business and threatened to further deteriorate the Debtors' liquidity, including a default under the Prepetition First Lien Credit Agreement, two significant verdicts returned against the Debtors, and the wind-down of the Afghanistan contracts.  As a result of these factors, among other financial and operating difficulties, the Debtors have been operating under a cloud of uncertainty that has strained the Debtors' cash flows and negatively affected liquidity.

69.      The Debtors have an urgent need for immediate access to the DIP Facility and Cash Collateral on an interim and final basis.  The Debtors require immediate access to the DIP Facility to meet their obligations and avoid irreparable harm to the Debtors' estates.  Absent immediate access to the DIP Facility and Cash Collateral, the Debtors could (a) face a severe interruption of their business; (b) lose the support of key constituencies, including the Debtors' workforce, vendors, and customers; and (c) be forced to modify their operations in a significant and adverse manner.

70.      The Debtors rely on a highly qualified and specialized workforce whose skills are in high demand.  Indeed, in the current competitive labor market, the Debtors have faced

challenges retaining their most qualified and skilled employees.  If the Debtors are not able to access the DIP Facility on an interim basis and signal to employees that the Debtors have the liquidity necessary to meet ongoing obligations and bridge to a change of control transaction, I expect those challenges to be exacerbated, which would disrupt the Debtors' business and ultimately harm the estates.

71.     Likewise, the Debtors' business relies on a complex network of vendors to provide them with highly specialized goods and services needed to satisfy the Debtors' stringent safety standards, as well as the strict demands of FAA safety and other regulations and the exacting demands of their customers.  The aerospace industry is highly regulated and many of the parts and other components incorporated in the Debtors' helicopters must go through a rigorous FAA certification process, which can take two to three years to complete, to ensure the safety of the aircraft and its fitness to perform to specification.  Due to the rigorous nature of the certification process that the Debtors must undertake with each new vendor and each new part, the Debtors would incur significant delay and costs if their vendors refused to continue to do business with them as a result of uncertainty regarding the Debtors' financial wherewithal.  Further, without immediate access to the DIP Facility, vendors may demand onerous trade terms, such as cash on delivery, as a condition to continuing to do business with the Debtors, which would further strain the Debtors' liquidity.

72.     Further, maintaining customer relationships is critical to the success of the Debtors' business and preservation of the value of the estates.  The Debtors' customers rely on the Debtors to manufacture helicopters to the highest possible safety standards, and the Debtors approach their responsibilities to their customers in this regard with the utmost seriousness.  The Debtors' ability

to meet their obligations to customers may be irreparably harmed without immediate access to the DIP Facility and Cash Collateral.

73.     In particular, immediate access to the DIP Facility and Cash Collateral is necessary to preserve the beneficial business relationship that the Debtors have developed with the Government.  Historically, the Government has been the Debtors' largest and most important customer, representing a significant majority of the Debtors' operating revenue.  Maintaining a strong relationship with the Government is, therefore, critical to the success of these Chapter 11 Cases and the Debtors' business going forward.  Pursuant to federal regulations, in awarding contracts, the Government undertakes a holistic analysis to determine whether a prospective contractor is responsible and able to perform under the contract.  If the Debtors are unable to demonstrate that they have sufficient working capital to perform to the high standards customers, including the Government, have come to expect, it would in all likelihood significantly hamper the Debtors' ability to secure contracts going forward.

74.     Therefore, it is imperative that the Debtors have access to the DIP Facility from the outset of these cases in order to signal to the Debtors' stakeholders, including their employees, vendors, and customers, that their situation is only temporary and they have the liquidity necessary to meet their obligations in the ordinary course until the business is able to emerge from the Chapter 11 process with new owners and a more stable capital structure.

## VI.     Facts Supporting Relief Sought in First Day Pleadings[14]

75.     In furtherance of the objective of preserving value for all stakeholders, the Debtors have sought approval of the First Day Pleadings and related orders (the "**Proposed Orders**"), and respectfully request that the Court consider entering the Proposed Orders granting the First Day

---

[14]     Unless otherwise defined herein, all capitalized terms in this Part V shall have the meanings ascribed to them in the applicable First Day Pleadings.

Pleadings. For the avoidance of doubt, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in those of the First Day Pleadings for which such authority is sought. The First Day Pleadings include:

**A. Administrative and Procedural Pleadings**

 a.  *Motion of Debtors for Entry of an Order under Fed. R. Bankr. P. 1015 and Del. Bankr. L.R. 1015-1 Authorizing Joint Administration of the Chapter 11 Cases*

 b.  *Motion of Debtors for Entry of Order under 11 U.S.C. §§ 105(a) and 521, Fed. R. Bankr. P. 1007(c) and 9006(b) and Del. Bankr. L.R. 1007-1(b) (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs and (II) Granting Related Relief*

 c.  *Motion of Debtors for Entry of Order (I) Authorizing the Debtors to (A) File a Consolidated Creditor Matrix and Consolidated List of the Top Thirty Unsecured Creditors and (B) Redact from the Creditor Matrix Certain Personally Identifiable Information for Employees; and (II) Granting Related Relief*

 d.  *Application of Debtors for Appointment of Prime Clerk LLC as Claims and Noticing Agent*

**B. Business Operation Motions**

 a.  *Motion of Debtors for Entry of Interim and Final Orders Under 11 U.S.C. §§ 105(a), 345 and 363, Fed. R. Bankr. P. 6003 and 6004, and Del. Bankr. L.R. 2015-2 (I) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms and (II) Authorizing Continuation of Existing Deposit Practices*

 b.  *Motion of Debtors for Entry of Interim and Final Orders under 11 U.S.C. §§ 105(a), 362(d), 363(b), 507(a), 541, 1107(a) and 1108 and Fed. R. Bankr. P. 6003 and 6004 (I) Authorizing (A) Payment of Prepetition Workforce Obligations and (B) Continuation of Workforce Programs on Postpetition Basis, (II) Authorizing Payment of Payroll-related Taxes, (III) Confirming the Debtors' Authority to Transmit Payroll Deductions, (IV) Authorizing Payment of Prepetition Claims Owing to Administrators, (V) Directing Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments, and (VI) Granting Related Relief*

c. *Motion of Debtors for Entry of Interim and Final Orders Under 11 U.S.C. §§ 105(a), 363(b), 507(a)(8), and 541 and Fed. R. Bankr. P. 6003 and 6004 (I) Authorizing Payment of Prepetition Taxes and Fees and (II) Granting Related Relief*

d. *Motion of Debtors for Entry of Interim and Final Orders Under 11 U.S.C. §§ 105(a),363, 1107(a) and 1108 and Fed. R. Bankr. P. 6003 and 6004 (I) Authorizing Debtors to (A) Pay Their Prepetition Insurance and (B) Maintain Their Postpetition Insurance Coverage, and (II) Granting Related Relief*

e. *Motion of Debtors for Entry of Interim and Final Orders Under 11 U.S.C. §§ 105(a) and 366 (I) Prohibiting Utility Companies from Altering or Discontinuing Service on Account of Prepetition Invoices, (II) Approving Deposit as Adequate Assurance of Payment, and (III) Establishing Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment*

f. *Motion of Debtors for Entry of Interim and Final Orders Under 11 U.S.C. §§ 105(a), 363(b), 363(c), 1107 and 1108 and Fed. R. Bankr. P. 6003 and 6004 (I) Authorizing the Debtors to Continue Their Existing Customer Programs in the Ordinary Course of Business and Honor Prepetition Obligations Related Thereto and (II) Granting Related Relief*

## C. Vendor Motions

a. *Motion of Debtors for Entry of Interim and Final Orders Under 11 U.S.C. §§ 105(a), 363(b), 503(b)(9), 1107(a), and 1108 and Fed. R. Bankr. P. 6003 and 6004 (I) Authorizing Payment of Prepetition Claims of the Critical Vendors, (II) Authorizing the Payment of Certain Prepetition Claims of 503(b)(9) Claimants, (III) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers, and (IV) Granting Related Relief*

b. *Motion of Debtors for Entry of Interim and Final Orders Under 11 U.S.C. §§ 105(a), 363(b), 503(b)(9), 541 and 1107(a), and Fed. R. Bankr. P. 6003 and 6004 (I) Authorizing Payment of Prepetition Claims of Foreign Vendors, (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers, and (III) Granting Related Relief*

c. *Motion of Debtors for Entry of Interim and Final Orders Under 11 U.S.C. §§ 105(a), 363(b), 503(b), 506(b), 1107(a), and 1108 and Fed. R. Bankr. P. 6003 and 6004 (I) Authorizing Debtors to Pay Certain Prepetition Claims of Shippers and Lien Claimants, (II) Confirming Administrative Expense Priority of Undisputed and Outstanding Prepetition Orders, and (III) Granting Related Relief*

76.    I have reviewed each of the First Day Pleadings, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.  Moreover, I believe that the relief sought in each of the First Day Pleadings (i) is vital to enabling the Debtors to make the transition to, and operate in, Chapter 11 with minimal interruptions and disruptions to our businesses or loss of productivity or value; (ii) is necessary preserve valuable relationships with customers, trade vendors and other creditors; and (iii) constitutes a critical element in the Debtors' ability to successfully maximize value for the benefit of their estates.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 30, 2022
Mesa, Arizona

/s/ Barry Sullivan
Barry Sullivan
President and Chief Financial Officer

**Exhibit A**

Organizational Structure

# MD Helicopters Corporate Structure



**Key:**

| Zohar Shareholder |
| Ark / Tilton Debt |
| Third Party Shareholder |
| Intermediate Holdco |
| Group Holdco |
| Borrower / Issuer |
| Guarantor |
| Non-Guarantor / Non-Debtor |
| Zohar Debt |
| Ark / Tilton Debt |

X Security

## **Exhibit B**

RSA

Execution Version

*THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY. UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, NOTHING HEREIN SHALL BE OR BE DEEMED TO BE BINDING ON ANY OF THE PARTIES HERETO.*

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "***Agreement***"), dated as of March 30, 2022, is entered into by and among the following parties:

(i) MD Helicopters, Inc. ("***MDHI***") and Monterrey Aerospace, LLC (each, together with MDHI, a "***Company Entity***," and collectively, together with MDHI, the "***Company***");

(ii) Zohar CDO 2003-1, Limited ("***Zohar I***"), Zohar II 2005-1, Limited ("***Zohar II***"), and Zohar III, Limited ("***Zohar III***, together with Zohar I and Zohar II, the "***Zohar Lenders***"), each in their capacities as lenders under the Term Loan Credit Agreement;

(iii) National Union Fire Insurance Company of Pittsburgh, Pa. and AIG Specialty Insurance Company (together, the "***Insurers***"); and

(iv) Philip Marsteller and Robert M. Swisher, each in their capacity as the relators in the qui tam action ("***Relator Marsteller***" or "***Relator Swisher***," as applicable, and together, the "***Relators***," and together with the Zohar Lenders and the Insurers, each a "***Supporting Party***" and collectively, the "***Supporting Parties***") in the United States District Court for the Northern District of Alabama, captioned *United States ex rel. Marsteller and Swisher v. MD Helicopters, Inc., et al.*, Civil Action No. 5:13-cv-00830-AKK (the "***Qui Tam Action***").

Each of the Company, the Zohar Lenders, the Relators, and the Insurers are referred to as the "***Parties***" and individually as a "***Party***."

**WHEREAS**, the Company and the Zohar Lenders have in good faith and at arm's length negotiated and agreed to certain restructuring transactions, which shall be implemented in voluntary Chapter 11 cases commenced by the Company (the "***Chapter 11 Cases***") through either (i) a Plan (as defined below) or (ii) a sale pursuant to Section 363 of the Bankruptcy Code that is consistent with the Restructuring and agreements detailed herein (the "***Sale Transaction***" and, the process outlined therein, the "***Sale Process***") to be conducted pursuant to the Bidding Procedures (as defined below), and with such modifications as are reasonably acceptable to the Zohar Lenders and the Company and approved by the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") in connection with which the Company and the Zohar Lenders are currently negotiating in good faith as to an agreed upon form of asset purchase agreement (the

"**Stalking Horse Agreement**") by and among the Company and the purchaser thereunder (or its designee, together, the "**Stalking Horse Bidder**") in connection with the Sale Transaction;

**WHEREAS**, the Company, the Relators, and the Insurers have in good faith and at arm's length negotiated and agreed to the terms of a settlement with respect to the Qui Tam Action as set forth in (i) that certain Settlement Agreement (the "**Qui Tam Settlement Agreement**") and (ii) that certain stipulation and agreement (the "**DOJ Stipulation**," and together with the Qui Tam Settlement Agreement, the "**Qui Tam Settlement**"), each of which is subject to Government approval and, subject to such changes as may be agreed by the parties to the Qui Tam Settlement Agreement and DOJ Stipulation, will be presented to the Bankruptcy Court for approval pursuant to a single motion filed by the Company under Rule 9019 of the Federal Rules of Bankruptcy Procedure Bankruptcy in the Chapter 11 Cases (the "**9019 Motion**");

**WHEREAS**, in order to effectuate the Qui Tam Settlement, the Company and the Zohar Lenders have agreed to consent to (i) the allowance of two administrative expense claims in favor of the Government (as defined below) and the Relators, respectively, pursuant to Section 503 of the Bankruptcy Code in the Chapter 11 Cases on account of the Company's payment obligations under the Qui Tam Settlement and (ii) the payment of such claims in accordance with the Qui Tam Settlement;

**WHEREAS**, in the event that the Company pursues confirmation of the Plan, the Company will agree to grant, in accordance with the Qui Tam Settlement, (i) Relator Marsteller an allowed general unsecured claim in the amount of $38,613,337.50 on behalf of the Government and (ii) Relator Swisher an allowed general unsecured claim in the amount of $38,613,337.50 on behalf of the Government (together, the "**Qui Tam Unsecured Claims**"), and the Parties agree that (a) the Relators shall have sole decision-making authority as to their respective Qui Tam Unsecured Claims for all purposes, including (without limitation) for purposes of modifying, compromising or voting the Qui Tam Unsecured Claims, and (b) in the event (and only in the event) that the Cash Payments and the Supplemental Cash Payments are paid in full under the terms of the Qui Tam Settlement, (i) the Qui Tam Unsecured Claims shall be dischargeable under Section 1141(d)(1) of the Bankruptcy Code and shall be fully discharged on the Plan Effective Date (as defined below), (ii) neither the Relators nor the Government shall be entitled to any payment on account of the Qui Tam Unsecured Claims in connection with any cure costs associated with the assumption or assignment of any executory contract or unexpired lease, (iii) the Qui Tam Unsecured Claims shall not provide any basis for offsetting, setting off, netting, reducing, recouping, crediting or similar principle or right the Relators or the Government may have under any applicable contract, law or otherwise, including the Bankruptcy Code, and (iv) Section 1141(d)(6) and similar provisions of the Bankruptcy Code shall not be applicable to the Qui Tam Unsecured Claims or, to the extent applicable, shall be waived with respect to the Qui Tam Unsecured Claims.

**WHEREAS**, certain of the Zohar Lenders and their senior noteholders have further agreed to consent to the use of Cash Collateral and to provide the Company with debtor-in-possession financing (the "**DIP Facility**") on terms consistent with (i) the Interim DIP Order (as defined below) and (ii) the related credit agreement (the "**DIP Credit Agreement**"), each of which shall be consistent with the Restructuring and the Definitive Documents requirements set forth in <u>Section 2</u> of this Agreement;

2

**WHEREAS**, the transactions as described herein and in the Definitive Documents, including settlement of the Qui Tam Action, the Sale Process, the Sale Transaction, and certain restructuring and recapitalization transactions to be implemented through a Plan, if applicable, together constitute the "***Restructuring***" to be consummated through the Chapter 11 Cases under the Bankruptcy Code in the Bankruptcy Court on the terms set forth in this Agreement (including the Stalking Horse Agreement);

**WHEREAS**, as of the date hereof, the Zohar Lenders hold, in the aggregate, approximately 93% percent of the aggregate outstanding principal amount of the Term Loans (as defined below); and

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters discussed in this Agreement.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## 1.    **Certain Definitions.**

As used in this Agreement, the following terms have the following meanings:

a.      "***Agreement***" has the meaning set forth in the preamble hereto.

b.      "***Agreement Effective Date***" means the date on which counterpart signature pages to this Agreement are executed and delivered by (i) each Company Entity, (ii) the Zohar Lenders, (iii) the Relators, and (iv) the Insurers.

c.      "***Alternative Transaction***" means any reorganization, merger, transaction, consolidation, business combination, joint venture, partnership, sale of assets, financing (debt or equity), or restructuring or similar transaction of or by any of the Company Entities, other than the transactions contemplated by and in accordance with this Agreement.  For the avoidance of doubt, an Alternative Transaction shall not include (i) pursuit of the Sale Process or a sale determined to be higher or otherwise better by the Company in accordance with the Bidding Procedures, or (ii) pursuit of confirmation of a Chapter 11 plan of liquidation or reorganization that is consistent with the Restructuring and implements the Sale Transaction to (a) the plan sponsor identified on the Petition Date or (b) an alternative plan sponsor whose bid is determined to be higher or otherwise better by the Company in accordance with the Bidding Procedures, confirmation of which plan shall take place solely following the Bankruptcy Court's entry of the Sale Order or, in lieu of the Sale Order, with the occurrence of any "effective date" or similar concept under such plan subject to the occurrence of the Closing Date, if applicable, provided that such Chapter 11 plan is not inconsistent with the Sale Process or Sale Transaction.

d.      "***Bankruptcy Code***" means Title 11 of the United States Code.

e.      "***Bankruptcy Court***" has the meaning set forth in the recitals to this Agreement.

f.    "***Bankruptcy Rule***" means the Federal Rules of Bankruptcy Procedure.

g.    "***Bidding Procedures***" means the procedures by which (i) parties other than the Stalking Horse Bidder or (ii) a plan sponsor (depending upon the structure proposed by the Company on the Petition Date) may submit competing bids to acquire all or substantially all of the Company's assets or equity.

h.    "***Bidding Procedures Motion***" means the motion filed with the Bankruptcy Court seeking approval of the Bidding Procedures.

i.    "***Bidding Procedures Order***" means the order of the Bankruptcy Court approving the Bidding Procedures.

j.    "***Business Day***" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the state of Delaware.

k.    "***Cash Collateral***" has the meaning set forth in Section 363(a) of the Bankruptcy Code.

l.    "***Cash Payments***" has the meaning set forth in the Qui Tam Settlement Agreement.

m.    "***Chapter 11 Cases***" has the meaning set forth in the recitals to this Agreement.

n.    "***Claim***" has the meaning ascribed to such term under Section 101(5) of the Bankruptcy Code.

o.    "***Closing Date***" means the date on which the Sale Transaction contemplated herein shall have been consummated.

p.    "***Company***" has the meaning set forth in the recitals to this Agreement.

q.    "***Company Advisors***" means Latham & Watkins LLP, Troutman Pepper Hamilton Sanders LLP, Moelis & Company LLC, and AlixPartners LLP.

r.    "***Company Entity***" has the meaning set forth in the recitals to this Agreement.

s.    "***Company G Order***" means that certain *Order (I) Authorizing the Debtors to Enter Into One or More Potential Transactions Relating to Company G and (II) Granting Related Relief* entered by the Bankruptcy Court in the Zohar Lender Chapter 11 Cases at Docket No. 2852 in such cases.

t.    "***Company Termination Event***" has the meaning set forth in <u>Section 6.b</u> of this Agreement.

u.    "***Confirmation Order***" means an order of the Bankruptcy Court confirming the Plan in form and substance reasonably acceptable to the Zohar Lenders.

v.    "***Debtors***" means the Company Entities that commence Chapter 11 Cases.

4

w.     "***Definitive Documents***" has the meaning set forth in <u>Section 2</u> of this Agreement.

x.     "***DIP Credit Agreement***" has the meaning set forth in the recitals to this Agreement.

y.     "***DIP Facility***" has the meaning set forth in the recitals to this Agreement.

z.     "***DIP Facility Documents***" means, collectively, the DIP Credit Agreement, the DIP Motion, and the DIP Orders.

aa.     "***DIP Motion***" has the meaning set forth in <u>Section 2</u> of this Agreement.

bb.     "***DIP Orders***" has the meaning set forth in <u>Section 2</u> of this Agreement.

cc.     "***Disclosure Statement***" means the disclosure statement with respect to the Plan.

dd.     "***Disclosure Statement Approval Motion***" means the motion filed with the Bankruptcy Court seeking entry of the Disclosure Statement Approval Order.

ee.     "***Disclosure Statement Approval Order***" means the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials.

ff.     "***DOJ Stipulation***" has the meaning set forth in the recitals to this Agreement.

gg.     "***Final DIP Order***" has the meaning set forth in <u>Section 2</u> of this Agreement.

hh.     "***First Day Pleadings***" means the first-day pleadings that the Company Entities determine are necessary or desirable to file with the Bankruptcy Court.

ii.     "***Government***" means the United States of America and any department, agency, or instrumentality thereof.

jj.     "***MDHI***" has the meaning set forth in the recitals to this Agreement.

kk.     "***Insurers***" has the meaning set forth in the preamble to this Agreement.

ll.     "***Interest***" means an equity interest.

mm.     "***Interim DIP Order***" has the meaning set forth in <u>Section 2</u> of this Agreement.

nn.     "***Lenders***" means the lenders party from time to time to the Term Loan Credit Agreement.

oo.     "***Party(ies)***" has the meaning set forth in the recitals to this Agreement.

pp.     "***Patriarch Lenders***" means, collectively, ARK II CLO 2001-1, Ltd. and ARK Investment Partners II, L.P.

qq.     "***Person***" means an individual, firm, corporation (including any non-profit corporation), partnership, limited partnership, limited liability company, joint venture, association, trust, governmental entity, or other entity or organization.

rr.     "***Petition Date***" has the meaning set forth in <u>Section 3</u> of this Agreement.

ss.     "***Plan***" means a plan of liquidation or reorganization proposed by the Debtors, which plan shall (a) provide for (i) the Zohar Lenders or their designees owning all of the equity interests in the reorganized Debtors or acquiring all or substantially all of the Debtors' assets, (ii) an allowed general unsecured claim of Relator Marsteller in the amount of $38,613,337.50 on behalf of the Government, and (iii) an allowed general unsecured claim of Relator Swisher in the amount of $38,613,337.50 on behalf of the Government, (b) be consistent with the Restructuring and the Definitive Documents requirements set forth in <u>Section 2</u> of this Agreement, and (c) be in form and substance acceptable to the Zohar Lenders; *provided*, that (a) the Relators shall have sole decision-making authority as to their respective Qui Tam Unsecured Claims for all purposes, including (without limitation) for purposes of modifying, compromising or voting the Qui Tam Unsecured Claims, and (b) in the event (and only in the event) that the Cash Payments and the Supplemental Cash Payments are paid in full under the terms of the Qui Tam Settlement, (i) the Qui Tam Unsecured Claims shall be dischargeable under Section 1141(d)(1) of the Bankruptcy Code and shall be fully discharged on the Plan Effective Date, (ii) neither the Relators nor the Government shall be entitled to any payment on account of the Qui Tam Unsecured Claims in connection with any cure costs associated with the assumption or assignment of any executory contract or unexpired lease, (iii) the Qui Tam Unsecured Claims shall not provide any basis for offsetting, setting off, netting, reducing, recouping, crediting or similar principle or right the Relators or the Government may have under any applicable contract, law or otherwise, including the Bankruptcy Code, and (iv) Section 1141(d)(6) and similar provisions of the Bankruptcy Code shall not be applicable to the Qui Tam Unsecured Claims or, to the extent applicable, shall be waived with respect to the Qui Tam Unsecured Claims.

tt.     "***Plan Effective Date***" means the occurrence of the effective date of the Plan according to its terms.

uu.     "***Plan Supplement***" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court.

vv.     "***Qui Tam Action***" has the meaning set forth in the preamble to this Agreement.

ww.     "***Qui Tam Settlement***" has the meaning set forth in the recitals to this Agreement.

xx.     "***Qui Tam Settlement Agreement***" has the meaning set forth in the recitals to this Agreement.

yy.     "***Qui Tam Unsecured Claims***" has the meaning set forth in the recitals to this Agreement.

zz.     "***Relator Marsteller***" has the meaning set forth in the preamble to this Agreement.

aaa.     "***Relator Swisher***" has the meaning set forth in the preamble to this Agreement.

bbb.    "***Representatives***" means, with respect to any Person, such Person's directors, officers, members, partners, managers, employees, agents, investment bankers, attorneys, accountants, advisors, and other representatives.

ccc.    "***Required Lenders***" has the meaning set forth in the Term Loan Credit Agreement.

ddd.    "***Restructuring***" has the meaning set forth in the recitals to this Agreement.

eee.    "***Sale Transaction***" has the meaning set forth in the recitals to this Agreement.

fff.    "***Sale Order***" has the meaning set forth in <u>Section 2</u> of this Agreement.

ggg.    "***Sale Process***" means the third-party marketing process for the Sale Transaction, in accordance with the terms of this Agreement.

hhh.    "***Sale Process Trigger Event***" has the meaning set forth in <u>Section 2</u> of this Agreement.

iii.    "***Settlement Approval Order***" means the order entered by the Bankruptcy Court granting the 9019 Motion.

jjj.    "***Stalking Horse Agreement***" has the meaning set forth in the recitals to this Agreement.

kkk.    "***Stalking Horse Bidder***" has the meaning set forth in the recitals to this Agreement.

lll.    "***Supplemental Cash Payments***" has the meaning set forth in the Qui Tam Settlement Agreement.

mmm.    "***Supporting Parties***" has the meaning set forth in the preamble hereto.

nnn.    "***Support Period***" means, with respect to any Party, the period commencing on the Agreement Effective Date and ending on the earlier of (i) the date on which this Agreement is terminated by or with respect to such Party in accordance with <u>Section 6</u> hereof and (ii) the later of (x) the Closing Date and (y) the Plan Effective Date.

ooo.    "***Solicitation Materials***" means all solicitation materials in respect of the Plan as provided for in the Disclosure Statement Approval Order.

ppp.    "***Term Loans***" means the loans under the Term Loan Credit Agreement.

qqq.    "***Term Loan Claim***" means any Claim on account of the Term Loans.

rrr.    "***Term Loan Credit Agreement***" means that certain Credit Agreement, dated as of July 8, 2005 (as amended), by and among the Company, the Zohar Lenders, the Patriarch Lenders, Patriarch Partners Agency Services, LLC as agent for the Patriarch Lenders, and Ankura Trust Company, LLC as agent for the Zohar Lenders.

sss.    "***Termination Events***" has the meaning set forth in <u>Section 6.e</u> of this Agreement.

ttt.    "***Zohar Lender Chapter 11 Cases***'" means the voluntary cases of the Zohar Lenders commenced under Chapter 11 of the Bankruptcy Code pending in the Bankruptcy Court under jointly administered Case No. 18-10512 (KBO).

uuu.    "***Zohar Lenders***'" has the meaning set forth in the recitals to this Agreement.

vvv.    "***Zohar Lender Termination Event***" has the meaning set forth in Section 6.a of this Agreement.

www.    "***9019 Motion***" has the meaning set forth in the recitals to this Agreement.

## 2.    Definitive Documents and Overview of Restructuring Transactions.

The definitive documents, including any material amendments, supplements or modifications thereof approved in accordance with the terms of this Agreement (the "***Definitive Documents***"), with respect to the Restructuring are (as applicable): (a) the Stalking Horse Agreement; (b) the Bidding Procedures; (c) the Bidding Procedures Motion; (d) the Bidding Procedures Order; (e) the order entered by the Bankruptcy Court approving the Sale Transaction in accordance with the Bidding Procedures (the "***Sale Order***"); (f) the motion seeking approval of the DIP Facility (the "***DIP Motion***"); (g) the interim and final orders granting the DIP Motion (the "***Interim DIP Order***" and "***Final DIP Order***", respectively, and collectively, the "***DIP Orders***"); (h) the 9019 Motion; (i) the Settlement Approval Order; (j) the Qui Tam Settlement Agreement; (k) the DOJ Stipulation; and (l) in the event the Company proposes a Plan, (i) the Plan, (ii) the Plan Supplement, (iii) the Confirmation Order, (iv) the Disclosure Statement and the other Solicitation Materials, (v) the Disclosure Statement Approval Motion, and (vi) the Disclosure Statement Approval Order.  The Definitive Documents, including all exhibits, annexes, schedules and material amendments, supplements or modifications thereof relating to such Definitive Documents, not executed or in a form attached to this Agreement as of the Agreement Effective Date remain subject to negotiation and completion, as applicable, and except as otherwise provided for herein, shall be consistent with this Agreement and otherwise in form and substance reasonably acceptable to the Company and the Zohar Lenders.

The Parties acknowledge that (a) the Government may not have completed its internal approval process regarding the Qui Tam Settlement Agreement and/or the DOJ Stipulation in advance of the Petition Date and (b) modifications to the Qui Tam Settlement Agreement and/or the DOJ Stipulation may be made prior to the hearing at which the Bankruptcy Court considers the approval of the 9019 Motion; *provided* that (i) the 9019 Motion, the Settlement Approval Order, the Qui Tam Settlement Agreement, and the DOJ Stipulation, including any proposed and agreed upon changes thereto, and (ii) any term, condition, or provision of any of the Definitive Documents that materially affects the Settlement Approval Motion, the Settlement Approval Order, the Qui Tam Settlement Agreement, or the DOJ Stipulation shall be in form and substance reasonably acceptable to the Insurers and the Relators.  The Parties agree to negotiate in good faith with the Company regarding the execution of the Definitive Documents.

The Restructuring shall be consummated either through (i) a Sale Transaction or (ii) a Plan. In the event (a) the Debtors and the Zohar Lenders have not agreed on the terms of a Plan by March 26, 2022, or (b) the Debtors, with the consent of the Zohar Lenders and in consultation with the

other Supporting Parties, have determined that pursuing a Sale Transaction via a motion filed under Section 363 of the Bankruptcy Code (rather than through a Plan) is, as of March 26, 2022, the most value maximizing or otherwise best path available, the Debtors shall pursue a Sale Transaction with the Stalking Horse Bidder pursuant to the Stalking Horse Agreement and in accordance with the Bidding Procedures (each, a "***Sale Process Trigger Event***") by filing the Bidding Procedures Motion in accordance with the Milestones set forth in <u>Section 3</u> of this Agreement, without prejudice to the Company's ability to propose a Plan, upon the request and with the consent of the Zohar Lenders, at a later date consistent with this Agreement.  In the event the Debtors have agreed on the terms of a Plan by March 26, 2022, in accordance with the Milestones set forth in <u>Section 3</u> of this Agreement, the Debtors shall file such Plan and a form of the Bidding Procedures Motion that provides adequate mechanisms to (a) allow the Company to obtain higher and better offers from third parties, (b) afford the flexibility to any such third party to structure its bid either (i) under an alternative Chapter 11 plan under which such party would serve as a plan sponsor or (ii) pursuant to a sale under Section 363 of the Bankruptcy Code, and (c) permit the Zohar Lenders to participate in such a process as a "qualified bidder."

**3.**     <u>**Milestones.**</u>

During the Support Period, the Company shall implement the Restructuring in accordance with the following milestones (the "***Milestones***"), as applicable, unless extended or waived in writing (email from counsel being sufficient) by the Zohar Lenders; *provided* that any extension or waiver of the Milestones set forth in <u>Section 3</u> of this Agreement (as they apply to the 9019 Motion and the Settlement Approval Order only) shall require the written consent of the Insurers and the Relators (email from counsel being sufficient).

a.     No later than March 31, 2022 (the "***Petition Date***"), the Debtors shall have commenced the Chapter 11 Cases;

b.     If the Sale Process Trigger Event has not occurred:

(i)     No later than the Petition Date, the Debtors shall have filed (i) the Plan, (ii) the Disclosure Statement, (iii) the Disclosure Statement Approval Motion, (iv) the Bidding Procedures Motion, and (v) the DIP Motion;

(ii)     No later than three (3) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;

(iii)     No later than twenty-eight (28) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;

(iv)     No later than twenty-eight (28) days after the Petition Date, the Bankruptcy Court shall have entered the Bidding Procedures Order;

(v)     No later than forty (40) days after the Petition Date, the Bankruptcy Court shall have entered the Disclosure Statement Approval Order;

(vi)     No later than forty-five (45) days after the Petition Date, the Debtors shall have filed the 9019 Motion; *provided* that the Milestone in this <u>Section 3(b)(vi)</u> shall be

extended by an additional twenty (20) days if the Government's agreement to the form of the Qui Tam Settlement Agreement and the DOJ Stipulation is not obtained by twenty (20) days after the Petition Date;

(vii)     No later than sixty (60) days after the Petition Date, the Bankruptcy Court shall have entered the Settlement Approval Order; *provided* that the Milestone in this Section 3(b)(vii) shall be extended by an additional twenty-five (25) days if the Government's approval of the Qui Tam Settlement Agreement and the DOJ Stipulation is not obtained by the Petition Date;

(viii)     No later than one-hundred and five (105) days after the Petition Date, the Bankruptcy Court shall have entered either the Confirmation Order or the Sale Order, as applicable; and

(ix)     No later than one-hundred and twenty (120) days after the Petition Date, either the Plan Effective Date shall have occurred or, if the Sale Order has been entered, the Sale Transaction shall have closed.

c.     If the Sale Process Trigger Event has occurred:

(i)     No later than the Petition Date, the Debtors shall have filed (i) the Bidding Procedures Motion and (ii) the DIP Motion;

(ii)     No later than three (3) business days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;

(iii)     No later than twenty-eight (28) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;

(iv)     No later than twenty-eight (28) days after the Petition Date, the Bankruptcy Court shall have entered the Bidding Procedures Order;

(v)     No later than forty-five (45) days after the Petition Date, the Debtors shall have filed the 9019 Motion; *provided* that the Milestone in this Section 3(c)(vi) shall be extended by an additional twenty (20) days if the Government's agreement to the form of the Qui Tam Settlement Agreement and the DOJ Stipulation is not obtained by twenty (20) days after the Petition Date;

(vi)     No later than sixty (60) days after the Petition Date, the Bankruptcy Court shall have entered the Settlement Approval Order; *provided* that the Milestone in this Section 3(c)(vi) shall be extended by an additional twenty-five (25) days if the Government's approval of the Qui Tam Settlement Agreement and the DOJ Stipulation is not obtained by the Petition Date;

(vii)     No later than one-hundred and five (105) days after the Petition Date, the Bankruptcy Court shall have entered the Sale Order; and

(viii)    No later than one-hundred and twenty (120) days after the Petition Date, the Sale Transaction shall have closed.

## 4.    Agreements of the Supporting Parties.

a.    Restructuring Support.  During the Support Period, subject to the terms and conditions hereof, each Supporting Party agrees, severally and not jointly, that it shall (to the extent applicable to such Supporting Party and objectively within such Supporting Party's ability and control):

(i)    consult and negotiate in good faith with the Company, its Representatives, other Supporting Parties and their respective Representatives, and use commercially reasonable efforts to execute, perform its obligations under, and consummate the transactions contemplated by, the Definitive Documents to which it is or will be a party or for which its approval or consent is required, including, to the extent necessary or appropriate, directing the administrative and/or collateral agents under the Term Loan Credit Agreement or the DIP Facility to effectuate the transactions contemplated herein;

(ii)    use commercially reasonable efforts to support and not object to the Restructuring, including the other transactions contemplated by this Agreement and the other Definitive Documents, and use commercially reasonable efforts to take any reasonable action necessary or reasonably requested by the Company in a timely manner to effectuate the Restructuring, including the transactions contemplated by the other Definitive Documents, in a manner consistent with this Agreement, including the timelines set forth herein;

(iii)    not, directly or indirectly, seek, solicit, support, encourage, propose, assist, consent to, vote for, or enter or participate in any discussions or any agreement with any non-Party regarding, any Alternative Transaction;

(iv)    use commercially reasonable efforts to cooperate with and assist the Company Entities in obtaining additional support for the Restructuring and Sale Transaction from the Company Entities' other creditors and interest holders;

(v)    support and not object to the DIP Motion and entry of the DIP Orders in accordance with this Agreement;

(vi)    support and not object to the Sale Process, the Bidding Procedures Motion, the entry of the Sale Order, the Sale Transaction, and any Chapter 11 plan that is consistent with the Restructuring and is designed to implement the Sale Transaction and any Disclosure Statement and Disclosure Statement Approval Motion with respect to any such Chapter 11 plan;

(vii)    support and not object to the 9019 Motion and the entry of the Settlement Approval Order;

(viii)    not, directly or indirectly, interfere with the Company's efforts to implement and consummate the Restructuring;

(ix)    not, directly or indirectly, seek, solicit, support, or encourage any other Person to, directly or indirectly, (A) object to, delay, postpone, challenge, oppose, impede, or take any other action or any inaction to interfere with or delay the acceptance, implementation, or consummation of the Restructuring and the transactions contemplated in this Agreement on the terms set forth in this Agreement and any other applicable Definitive Document, including commencing or joining with any Person in commencing any litigation or involuntary case for relief under the Bankruptcy Code against any Company Entity or any subsidiary thereof; (B) solicit, negotiate, propose, file, support, enter into, consummate, file with the Bankruptcy Court, vote for, or otherwise knowingly take any other action in furtherance of any restructuring, workout, plan of arrangement, or Chapter 11 plan for the Company (except a Chapter 11 plan that is consistent with and pursued in compliance with this Agreement); or (C) object to or oppose, or support any other Person's efforts to object to or oppose, any motions filed by the Company that are consistent with this Agreement;

(x)    support and take all commercially reasonable actions reasonably requested by the Company to facilitate the implementation and consummation of the Restructuring;

(xi)    not direct any administrative agent, collateral agent or indenture trustee (as applicable) or other such agent or trustee to take any action inconsistent with such Supporting Party's obligations under this Agreement, and, if any applicable administrative agent, collateral agent or indenture trustee or other such agent or trustee (as applicable) takes any action inconsistent with such Supporting Party's obligations under this Agreement, such Supporting Party shall use its commercially reasonable efforts to direct such administrative agent, collateral agent or indenture trustee or other such agent or trustee (as applicable) to cease and refrain from taking any such action;

(xii)    to the extent any legal or structural impediment arises that would prevent, hinder or delay the consummation of the Restructuring, negotiate with the Debtors in good faith appropriate additional or alternative provisions to address any such impediment;

(xiii)    not object to or oppose (or support any other Person in objecting to or opposing) the retention of the Company Advisors;

(xiv)    use commercially reasonable efforts to cooperate with and assist the Company Entities, as well as any Successful Bidder (as defined in the Bidding Procedures and the Bidding Procedures Order) and any assignee or designee thereof, in obtaining the Government's approval of the Qui Tam Settlement Agreement by March 31, 2022 or as soon as reasonably practicable thereafter, and take any reasonable action necessary or reasonably requested by the Company in a timely manner to obtain such approval;

(xv)    use commercially reasonable efforts to cooperate with and assist the Company, as well as any Successful Bidder and any assignee or designee thereof, with respect to obtaining any required regulatory or third-party approvals in connection with the Restructuring and the Sale Transaction, including with respect to any Government approvals for novation of any contracts to which the Government is a counterparty, and take reasonable action necessary or reasonably requested by the Company in a timely manner to obtain such approval; and

(xvi)    only seek approval of, or lend support to, a Sale Transaction or confirmation of a Plan, as applicable, that (a) provides for payment in full of the Supplemental Cash Payments to the Relators and (b) does not interfere with the Insurers' obligation or ability to pay the Cash Payments to the Relators in accordance with the Qui Tam Settlement Agreement;

b.    <u>Commitments with Respect to the Plan</u>.  To the extent the Company proposes a Plan, during the Support Period, each Supporting Party (severally and not jointly) agrees that it shall, subject to receipt by such Supporting Party of the Solicitation Materials:

(i)    to the extent it is entitled to vote to accept or reject the Plan pursuant to its terms, vote each of its Claims against and Interests in the Company to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii)    not object to the Plan;

(iii)    support the release, exculpation, and injunction provisions to be provided in the Plan;

(iv)    to the extent it is permitted to elect to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

(v)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i), (ii), (iii), and (iv) above.

The Parties agree that, with respect to the Plan, the Relators shall have sole discretion with respect to the Qui Tam Unsecured Claims for all purposes including (without limitation) for purposes of modifying, compromising or voting the Qui Tam Unsecured Claims.

Notwithstanding the foregoing, nothing in this Agreement shall be construed (i) to affect the ability of any Supporting Party to consult with any other Supporting Party, the Company, or any other party in interest in the Chapter 11 Cases (including any official committee appointed in the Chapter 11 Cases and the United States Trustee); (ii) to prohibit any Supporting Party from appearing as a party-in-interest in any matter arising in the Chapter 11 Cases; (iii) to prohibit any Supporting Party from enforcing any right, remedy, condition, consent, or approval requirement under this Agreement or any Definitive Document; or (iv) to prohibit any Zohar Lender from taking any action as is necessary to preserve or defend the validity or existence of its Claims and Interests in the Company (including the filing of proofs of claim).

## 5.    <u>Agreements of the Company.</u>

a.    <u>Restructuring Support</u>.  During the Support Period, subject to the terms and conditions hereof (including <u>Section 9</u> of this Agreement), the Company agrees that it shall, and shall cause each of its subsidiaries, to:

(i)        implement the Restructuring in accordance with the terms and conditions set forth herein and for the avoidance of doubt, only seek approval of a Sale Transaction or confirmation of a Plan, as applicable, that (a) provides for payment in full of the Supplemental Cash Payments to the Relators and (b) does not interfere with the Insurers' obligation or ability to pay the Cash Payments to the Relators in accordance with the Qui Tam Settlement Agreement;

(ii)       implement and consummate the Sale Transaction in a timely manner and take any and all commercially reasonable and appropriate actions in furtherance of the Sale Transaction, as contemplated under this Agreement;

(iii)      upon reasonable request and subject to any limitations that the Company believes to be necessary to protect the integrity of the Sale Process, inform the legal and financial advisors to the Zohar Lenders, in their capacities as lenders under the Term Loan Credit Agreement, as to the material business and financial (including liquidity) performance of the Company Entities;

(iv)      without interfering with the Sale Process, (A) support and take all commercially reasonable actions necessary and appropriate, including those actions reasonably requested by the Zohar Lenders to facilitate the Sale Transaction, and the other transactions contemplated thereby, in accordance with this Agreement within the timeframes contemplated herein, (B) not take any action directly or indirectly that is materially inconsistent with, or is intended to, or that would reasonably be expected to prevent, interfere with, delay, or impede, the Sale Transaction, any Definitive Document or the Restructuring, (C) not, nor encourage any other person to, take any action which would reasonably be expected to breach or be inconsistent with this Agreement in any material respect or materially delay or impede, appeal, or take any other negative action, directly or indirectly, to materially interfere with the Sale Transaction, any Definitive Document or the Restructuring;

(v)       use commercially reasonable efforts to obtain entry of the Bidding Procedures Order, the DIP Orders, the Settlement Approval Order, the Sale Order, the Disclosure Statement Approval Order, and the Confirmation Order within the timeframes contemplated in this Agreement;

(vi)      except as otherwise noted in the Stalking Horse Agreement or the Plan, as applicable, use commercially reasonable efforts to maintain good standing under the laws of the state or other jurisdiction in which each Company Entity or subsidiary is incorporated or organized;

(vii)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring (or the Sale Process) contemplated herein, support and take all steps reasonably necessary and desirable to address any such impediment and to effectuate the Restructuring in accordance with this Agreement;

(viii)    not take any action, and not encourage any other person or entity to, take any action, directly or indirectly, that would reasonably be expected to, breach or be inconsistent with this Agreement, or take any other action, directly or indirectly, that would

14

reasonably be expected to interfere with the implementation of the Restructuring, this Agreement, or the Sale Transaction;

(ix)    use reasonable best efforts under the circumstances to provide to counsel to the Zohar Lenders draft copies of all pleadings, motions, declarations, supporting exhibits and proposed orders and any other document that the Company intends to file with the Bankruptcy Court that materially affects the Term Loan Credit Agreement, the Term Loan Claims, the DIP Facility, the Stalking Horse Agreement, or the rights of the Zohar Lenders at least two (2) calendar days prior to the date when the Company intends to file or execute such documents and consult in good faith with such counsel regarding the form and substance of such documents;

(x)    use reasonable best efforts under the circumstances to provide to counsel to the Insurers and the Relators draft copies of all pleadings, motions, declarations, supporting exhibits and proposed orders and any other document that the Company intends to file with the Bankruptcy Court that materially affect the Qui Tam Settlement, or the rights of the Insurers or the Relators, at least two (2) calendar days prior to the date when the Company intends to file or execute such documents and consult in good faith with such counsel regarding the form and substance of such documents;

(xi)    timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (A) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code), (B) converting the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code, or (C) dismissing the Chapter 11 Cases;

(xii)    support and take all actions as are reasonably necessary and appropriate to obtain any and all required regulatory and/or third-party approvals to consummate the Restructuring and Sale Transaction and to cooperate with any efforts undertaken by the Stalking Horse Bidder with respect to obtaining any required regulatory or third-party approvals in connection with the Sale Transaction;

(xiii)    actively oppose and object to the efforts of any person seeking to object to, delay, impede, or take any other action to interfere with the approval, implementation, or consummation of the Restructuring (including, if applicable, the filing of timely filed objections or written responses in support of approval of any Definitive Documents) to the extent such opposition or objection is reasonably necessary to facilitate implementation of the Restructuring;

(xiv)    timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of liquidation or reorganization;

(xv)    inform the Supporting Parties promptly after becoming aware of: (i) any matter or circumstance which they know, or believe is likely, to be a material impediment to the implementation or consummation of the Restructuring; (ii) any notice of any commencement of any material involuntary insolvency proceedings, legal suit for payment of debt or securement of security from or by any person in respect of any Company Entity; (iii) a material breach of this

Agreement by any Company Entity; and (iv) any representation or statement made or deemed to be made by them under this Agreement which is or proves to have been incorrect or misleading in any material respect when made or deemed to be made; and

(xvi)   use commercially reasonable efforts to seek additional support for the Restructuring from their other material stakeholders to the extent the Company deems reasonably prudent.

b.    <u>Negative Covenants</u>.  The Company agrees that, for the duration of the Support Period, the Company shall not:

(i)   take any action materially inconsistent with, or omit to take any material action required by, this Agreement, the Qui Tam Settlement, the Sale Transaction, the Restructuring, or any of the other Definitive Documents;

(ii)   object to, delay, impede, or take any other action or inaction that could reasonably be expected to materially interfere with or prevent acceptance, approval, implementation, or consummation of the Restructuring;

(iii) except as agreed in writing by the Supporting Parties, file any pleading, motion, declaration, supporting exhibit or Definitive Document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or other Definitive Documents, or that could reasonably be expected to frustrate or materially impede the implementation and consummation of the Restructuring, or is materially inconsistent with any of the Definitive Documents;

(iv) modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects; or

(v) except as provided in the Stalking Horse Agreement, the Sale Process, the Bidding Procedures or the Plan, as applicable, engage in any merger, consolidation, material disposition, material acquisition, investment, dividend, incurrence of indebtedness or other similar transaction outside of the ordinary course of business other than the transactions contemplated herein.

Notwithstanding anything herein to the contrary, the provisions hereof shall not restrict the Company's rights under <u>Section 9</u> hereof.

### 6.    <u>Termination of Agreement.</u>

a.    <u>Zohar Lender Termination Events</u>.  This Agreement may be terminated with respect to the Zohar Lenders by the Zohar Lenders by the delivery to the Company and its counsel of a written notice in accordance with <u>Section 20</u> hereof upon the occurrence and continuation of any of the following events (each, a "***Zohar Lender Termination Event***"):

(i)   the breach by any Company Entity of (A) any affirmative or negative covenant contained in this Agreement or (B) any other obligations of such breaching

Company Entity set forth in this Agreement, in each case, in any material respect and which breach remains uncured (to the extent curable) for a period of five (5) Calendar Days following the Company's receipt of notice from the Zohar Lenders, as applicable, pursuant to <u>Section 20</u> hereof;

(ii)    any representation or warranty in this Agreement made by any Company Entity shall have been untrue in any material respect when made, and such breach remains uncured (to the extent curable) for a period of five (5) Calendar Days following the Company's receipt of notice from the Zohar Lenders, as applicable, pursuant to <u>Section 20</u> hereof;

(iii)    any Company Entity files any motion, pleading, or related document with the Bankruptcy Court that is materially inconsistent with this Agreement or the Definitive Documents and such motion, pleading or related document has not been withdrawn within five (5) Calendar Days after the Company receives written notice from the Zohar Lenders, as applicable, in accordance with <u>Section 20</u> that such motion, pleading, related document or public disclosure is materially inconsistent with this Agreement;

(iv)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining, or denying the grant of any approval or consent to, any part of the Restructuring (including the Qui Tam Settlement and the Sale Transaction or the Plan, as applicable) or rendering illegal any material portion thereof, and either (A) such ruling, judgment, or order has been issued at the request of or with the acquiescence of any Company Entity, or (B) in all other circumstances, such ruling, judgment, or order has not been reversed, vacated or stayed within fourteen (14) calendar days after such issuance; *provided* that this termination right may not be exercised by any Zohar Lender who sought or requested such ruling or order in a manner in contravention of any obligation set forth in this Agreement and, in such instance, without obtaining the Company's consent;

(v)    the Bankruptcy Court (or other court of competent jurisdiction) enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in any of the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code, (C) dismissing any of the Chapter 11 Cases, or (D) the effect of which would render the Sale Transaction incapable of consummation on the terms set forth in this Agreement;

(vi)    except as provided in this Agreement or with the consent of the Zohar Lenders, the Company (A) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect except consistent with this Agreement, (B) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described below, (C) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator or similar official, trustee or an examiner pursuant to Section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases, or (D) makes a general assignment or arrangement for the benefit of creditors;

(vii)    any Company Entity files (A) a motion, application, pleading, or proceeding challenging the amount, validity, enforceability, perfection, or priority of, or seeking

avoidance or subordination of, any Claims or liens held by any Zohar Lender against the Company, (B) any plan of liquidation or reorganization, liquidation, dissolution, administration, moratorium, receivership, winding up, bankruptcy, or sale of all or substantially all of the Company's assets other than as contemplated by the Stalking Horse Agreement, the Plan, as applicable, and this Agreement, or (C) a motion, application, pleading or proceeding asserting (or seeking standing to assert) any purported claims or causes of action against any of the Zohar Lenders;

(viii)    the Debtors enter into any commitment or agreement to receive or obtain, or the Bankruptcy Court enters any order approving, debtor in possession financing, cash collateral usage, exit financing and/or other financing arrangements, other than as expressly contemplated in the DIP Facility or any of the DIP Orders or the Debtors incur any liens or claims that are made senior to, or pari passu with, the liens and claims of the Zohar Lenders, inclusive of the liens and claims, granted pursuant to the DIP Facility Documents;

(ix)    the Bankruptcy Court enters an order denying the Sale Transaction or confirmation of the Plan, as applicable, and such order remains in effect for fourteen (14) calendar days after entry of such order;

(x)    after entry by the Bankruptcy Court of any DIP Order, Settlement Approval Order, Bidding Procedures Order, Sale Order, Disclosure Statement Approval Order or Confirmation Order, as applicable, such order is reversed, dismissed, stayed, vacated or reconsidered or modified or amended in a manner that materially affects the rights and obligations of the Zohar Lenders, without the consent of the Zohar Lenders;

(xi)    entry of a final order that grants relief terminating, annulling, or materially modifying the automatic stay (as set forth in Section 362 of the Bankruptcy Code) with regard to any assets with an aggregate fair market value in excess of $1,500,000;

(xii)    the termination of the DIP Facility in accordance with the DIP Facility Documents;

(xiii)    unless a Plan has been proposed by the Debtors in the Chapter 11 Cases prior to such termination, the termination of the Stalking Horse Agreement pursuant to the terms set forth therein (other than as a result of the breach thereof by the Zohar Lenders or the consummation of a Sale Transaction that results in the indefeasible payment in full, in cash, of the DIP Obligations (as defined in the Bidding Procedures) and Term Loan Claims or as a result of the Debtors' designation of a Successful Bid (as defined in the Bidding Procedures) that provides for a purchase price that would result in the indefeasible payment in full, in cash, of the DIP Obligations (as defined in the Bidding Procedures) and Term Loan Claims);

(xiv)    the Company (i) publicly announces its intention not to support the Sale Transaction or the Restructuring, (ii) provides notice to counsel the Zohar Lenders pursuant to Section 20 of this Agreement, or (iii) publicly announces, or executes a definitive written agreement with respect, to an Alternative Transaction; or

(xv)    This Agreement is validly terminated by any Party hereto, in whole or in part.

b.      Company Termination Events. This Agreement may be terminated by the Company by the delivery to the Supporting Parties (or counsel on their behalf) of a written notice in accordance with Section 20 hereof, upon the occurrence and continuation of any of the following events (each, a "*Company Termination Event*"):

(i)      the breach in any material respect by one or more of the Supporting Parties of any of the representations, warranties, or covenants of such Supporting Party set forth in this Agreement, which breach remains uncured for a period of ten (10) Business Days after the receipt by the applicable Supporting Party from the Company of written notice of such breach, which written notice will set forth in reasonable detail the alleged breach;

(ii)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of or rendering illegal the Sale Transaction or the Plan, as applicable, or any material portion thereof, and either (A) such ruling, judgment, or order has been issued at the request of (or agreement by) a Supporting Party, or (B) in all other circumstances, such ruling, judgment, or order has not been reversed or vacated within thirty (30) calendar days after such issuance; *provided* that this termination right may not be exercised by the Company if any Company Entity sought or requested such ruling or order in contravention of any obligation set forth in this Agreement;

(iii)      the board of directors or managers or similar governing body, as applicable, of any Company Entity determines (after consulting with counsel) (A) that continued performance under this Agreement (including taking any action or refraining from taking any action) would be inconsistent with the exercise of its fiduciary duties under applicable law or (B) in the exercise of its fiduciary duties to pursue an Alternative Transaction; or

(iv)      the Bankruptcy Court enters an order denying the Sale Transaction, or confirmation of the Plan, as applicable, and such order remains in effect for fourteen (14) calendar days after entry of such order.

c.      Relator Termination Events.  This Agreement may be terminated with respect to the Relators by the Relators by the delivery to the Company and its counsel of a written notice in accordance with Section 20 hereof upon the occurrence and continuation of any of the following events to the extent related to the Qui Tam Settlement, the 9019 Motion, or the Settlement Approval Order (each, a "*Relator Termination Event*"):

(i)      the material breach by any Company Entity of (A) any affirmative or negative covenant contained in this Agreement or (B) any other obligations of such breaching Company Entity set forth in this Agreement, in each case, in any material respect and which breach remains uncured (to the extent curable) for a period of five (5) Business Days following the Company's receipt of notice from the Relators, as applicable, pursuant to Section 20 hereof;

(ii)      the breach in any material respect by one or more of the Supporting Parties of any of the representations, warranties, or covenants of such Supporting Party set forth in this Agreement with respect to its obligations to only seek approval of, or lend support to, a Sale Transaction or confirmation of a Plan, as applicable, that (a) provides for payment in full of the

Supplemental Cash Payments to the Relators and (b) does not interfere with the Insurers' obligation or ability to pay the Cash Payments to the Relators in accordance with the Qui Tam Settlement Agreement;

(iii)    any representation or warranty in this Agreement made by any Company Entity shall have been untrue in any material respect when made, and such breach remains uncured (to the extent curable) for a period of five (5) Business Days following the Company's receipt of notice from the Relators, as applicable, pursuant to Section 20 hereof;

(iv)    any Company Entity files any motion, pleading, or related document with the Bankruptcy Court that is materially inconsistent with this Agreement, the DIP Orders, the Qui Tam Settlement, the 9019 Motion, and Settlement Approval Order and such motion, pleading or related document has not been withdrawn within five (5) Business Days after the Company receives written notice from the Relators, as applicable, in accordance with Section 20 that such motion, pleading, related document or public disclosure is materially inconsistent with this Agreement;

(v)    the Bankruptcy Court (or other court of competent jurisdiction) enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in any of the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code, (C) dismissing any of the Chapter 11 Cases, or (D) the effect of which would render the Sale Transaction incapable of consummation on the terms set forth in this Agreement;

(vi)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining, or denying the grant of any approval or consent to, the Sale Transaction, the Plan, as applicable, or the consummation of any material portion of the Settlement Approval Order, and either (A) such ruling, judgment, or order has been issued at the request of or with the acquiescence of any Company Entity, or (B) in all other circumstances, such ruling, judgment, or order has not been reversed, vacated or stayed within fourteen (14) calendar days after such issuance; *provided* that this termination right may not be exercised by the Relators who sought or requested such ruling or order in contravention of any obligation set forth in this Agreement;

(vii)    except as provided in this Agreement or with the consent of the Relators, the Company (A) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect except consistent with this Agreement, (B) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described below, (C) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator or similar official, trustee or an examiner pursuant to Section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases, or (D) makes a general assignment or arrangement for the benefit of creditors;

(viii)    the Milestones set forth in Section 3 of this Agreement (as they apply to the 9019 Motion and the Settlement Approval Order only) have not been achieved,

extended, or waived after the required date for achieving such Milestone, unless such failure is the result of any act, omission or delay on the part of the Relators in violation of its obligations under this Agreement (in which case this Relator Termination Event shall not be available as a basis for termination of this Agreement to the Relators); or

(ix)    after entry by the Bankruptcy Court of the Settlement Approval Order, such order is reversed, dismissed, stayed, vacated or reconsidered or modified or amended in a manner that materially affects the rights and obligations of the Relators, without the consent of the Relators;

(x)    the Company files any plan of liquidation or reorganization, or seeks authority for the sale of all or substantially all of the Company's assets other than as contemplated by the Stalking Horse Agreement, the Plan, as applicable, and this Agreement;

(xi)    the Insurers fail to timely provide for payment in full of the Cash Payment in accordance with the Qui Tam Settlement Agreement and such non-payment remains uncured for a period of five (5) Business Days following the Company and the Insurers' receipt of notice from the Relators, as applicable, pursuant to <u>Section 20</u> hereof; and

(xii)    the Company fails to timely provide for payment in full of, or provides notice to the Relators and the Government of its inability to timely provide for payment in full of, the Supplemental Cash Payments in accordance with the Qui Tam Settlement Agreement and such non-payment remains uncured for a period of five (5) Business Days following the Company's receipt of notice from the Relators, as applicable, pursuant to <u>Section 20</u> hereof.

d.    <u>Insurer Termination Events</u>.  This Agreement may be terminated with respect to the Insurers by the Insurers by the delivery to the Company and its counsel of a written notice in accordance with <u>Section 20</u> hereof upon the occurrence and continuation of any of the following events to the extent related to the Qui Tam Settlement, the 9019 Motion, or the Settlement Approval Order (each, a "***Insurer Termination Event***"):

(i)    the breach by any Company Entity of (A) any affirmative or negative covenant contained in this Agreement or (B) any other obligations of such breaching Company Entity set forth in this Agreement, in each case, in any material respect and which breach remains uncured (to the extent curable) for a period of five (5) Business Days following the Company's receipt of notice from the Insurers, as applicable, pursuant to <u>Section 20</u> hereof;

(ii)    any representation or warranty in this Agreement made by any Company Entity shall have been untrue in any material respect when made, and such breach remains uncured (to the extent curable) for a period of five (5) Business Days following the Company's receipt of notice from the Insurers, as applicable, pursuant to <u>Section 20</u> hereof;

(iii)    any Company Entity files any motion, pleading, or related document with the Bankruptcy Court that is materially inconsistent with this Agreement, the Qui Tam Settlement, the 9019 Motion, and the Settlement Approval Order and such motion, pleading or related document has not been withdrawn within five (5) Business Days after the Company receives written notice from the Insurers, as applicable, in accordance with <u>Section 20</u> that such

motion, pleading, related document or public disclosure is materially inconsistent with this Agreement;

(iv)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining, or denying the grant of any approval or consent to, the Sale Transaction or the consummation of any material portion of the Settlement Approval Order, and either (A) such ruling, judgment, or order has been issued at the request of or with the acquiescence of any Company Entity, or (B) in all other circumstances, such ruling, judgment, or order has not been reversed, vacated or stayed within fourteen (14) calendar days after such issuance; *provided* that this termination right may not be exercised by the Insurers if one or more of the Insurers sought or requested such ruling or order in contravention of any obligation set forth in this Agreement;

(v)    except as provided in this Agreement or with the consent of the Insurers, the Company (A) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect except consistent with this Agreement, (B) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described below, (C) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator or similar official, trustee or an examiner pursuant to Section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases, or (D) makes a general assignment or arrangement for the benefit of creditors;

(vi)    the Milestones set forth in <u>Section 3</u> of this Agreement (as they apply to the 9019 Motion and the Settlement Approval Order only) have not been achieved, extended, or waived after the required date for achieving such Milestone, unless such failure is the result of any act, omission or delay on the part of the Insurers in violation of its obligations under this Agreement (in which case this Insurer Termination Event shall not be available as a basis for termination of this Agreement to the Insurers); or

(vii)    after entry by the Bankruptcy Court of the Settlement Approval Order, such order is reversed, dismissed, stayed, vacated or reconsidered or modified or amended in a manner that materially affects the rights and obligations of the Insurers, without the consent of the Insurers.

e.    <u>Mutual Termination</u>.  This Agreement may be terminated in writing by mutual agreement of the Company Entities and each of the Supporting Parties (collectively with the Zohar Lender Termination Events, the Company Termination Events, the Relator Termination Events, and the Insurer Termination Events, each, a "***Termination Event***").

f.    <u>Effect of Termination</u>.   Upon any termination of this Agreement in accordance with this <u>Section 6</u>, this Agreement shall forthwith become null and void and of no further force or effect as to any Party, and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings, and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions that it would have been entitled to take

22

had it not entered into this Agreement; *provided* that in no event shall any such termination relieve a Party from any liability for its breach or non-performance of its obligations hereunder that arose prior to the date of such termination or any obligations hereunder that expressly survive termination of this Agreement under Section 16 hereof, and *provided further*, that notwithstanding anything to the contrary herein, the right to terminate this Agreement under this Section 6 shall not be available to any Party whose failure to fulfill any material obligation under this Agreement has been the cause of, or resulted in, the occurrence of the applicable Termination Event. Upon the termination of this Agreement that is limited in its effectiveness as to an individual Party or Parties in accordance with Section 6: (i) this Agreement shall become null and void and of no further force or effect with respect to the terminated Party or Parties, who shall be immediately released from its or their liabilities, obligations, commitments, undertakings, and agreements under or related to this Agreement and shall have all the rights and remedies that it or they would have had and such Party or Parties shall be entitled to take all actions that it or they would have been entitled to take had it or they not entered into this Agreement; *provided,* the terminated Party or Parties shall not be relieved of any liability for breach or non-performance of its or their obligations hereunder that arose prior to the date of such termination or any obligations hereunder that expressly survive termination of this Agreement under Section 16 hereof; and (ii) this Agreement shall remain in full force and effect with respect to all Parties other than the terminated Party or Parties. The Company acknowledges that, after the Petition Date, the giving of notice of termination by any Party pursuant to this Agreement shall not be considered a violation of the automatic stay of Section 362 of the Bankruptcy Code. For the avoidance of doubt, any termination of this Agreement after the Settlement Approval Order is entered will not alter the Parties' rights or obligations under the Qui Tam Settlement, including any release which has taken effect under the terms of that Qui Tam Settlement.

## 7.      **Definitive Documents; Good Faith Cooperation; Further Assurances.**

Subject to the terms and conditions described herein, during the Support Period, each Party, severally and not jointly, hereby covenants and agrees to reasonably cooperate with each other in good faith in connection with, as applicable, the negotiation, drafting, execution (to the extent such Party is a party thereto), consummation, and delivery of the Definitive Documents. Furthermore, subject to the terms and conditions hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings. Notwithstanding the foregoing, provided that they take no action in contravention of this Agreement, the Insurers shall have no further obligations or duties under this Agreement after the Settlement Approval Order becomes final and the Insurers make payment in full of the Cash Payments in accordance with the Qui Tam Settlement Agreement.[1]

## 8.      **Representations and Warranties.**

a.      Each Party, severally and not jointly, represents and warrants to the other Parties that the following statements are true, correct, and complete as of the date hereof (*provided,*

---

[1]    A "final" Settlement Approval Order is a Settlement Approval Order that remains in effect and has not been reversed, withdrawn, vacated, or stayed, and as to which the time to appeal or seek review, rehearing, or writ of certiorari has expired or, if such appeal or review has been taken, it has been resolved and no longer remains pending.

*however*, that with respect to the Zohar Lenders, it is understood that the following statements are subject to the terms of the Company G Order):

(i)       such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company, or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership, or other similar action on its part;

(ii)      the execution, delivery, and performance by such Party of this Agreement does not and will not (A) violate any provision of law, rule, or regulation applicable to it, its charter, or bylaws (or other similar governing documents), or (B) conflict with, result in a breach of, or constitute a default under any material contractual obligation to which it is a party (*provided*, *however*, that with respect to the Company, it is understood that commencing the Chapter 11 Cases may result in a breach of or constitute a default under such obligations);

(iii)     this Agreement is, and each of the other Definitive Documents to which such Party is a party prior to its execution and delivery will be, duly authorized;

(iv)      except as expressly provided in this Agreement, the Stalking Horse Agreement, or the Bankruptcy Code, the execution, delivery, and performance by such Party of this Agreement does not and will not require any registration or filing with, consent or approval of or notice to, or other action with or by, any other Person, including any federal, state, or governmental authority or regulatory body, except such filings as may be necessary and, with respect to the Company, will be required by the Bankruptcy Court; and

(v)       this Agreement, and each of the Definitive Documents to which such Party is a party will be following execution and delivery thereof, is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

b.       Subject and to the extent of the terms of the Company G Order, each Zohar Lender severally (and not jointly) represents and warrants to the Company that, as of the date hereof (or, if later, as of the date such Zohar Lender becomes a party hereto):

(i)       such Zohar Lender is the beneficial owner of (or investment manager, advisor, or subadvisor to one or more beneficial owners of) the aggregate principal amount of Term Loan Claims set forth below its name on the signature page hereto; [2]

---

[2]  For the avoidance of doubt and to be clear, MBIA Insurance Corp. (not the Zohar Lenders) is the beneficial and equitable owner of the loan and equity interests in MDHI that were issued or are otherwise recorded in the name of Zohar I specifically since MBIA acquired all of Zohar I's assets as the result of a foreclosure action in January

(ii)  such Zohar Lender has, with respect to the beneficial owners of such Term Loan Claims (as may be set forth on a schedule to such Zohar Lender's signature page hereto), (A) sole investment or voting discretion with respect to such Term Loan Claims, (B) full power and authority to vote on and consent to matters concerning such Term Loan Claims, and to exchange, assign, and transfer such Term Loan Claims, and (C) full power and authority to bind or act on the behalf of such beneficial owners;

(iii) other than pursuant to this Agreement, such Term Loan Claims are free and clear of any pledge, lien, security interest, charge, claim, option, proxy, voting restriction, right of first refusal, or other limitation on disposition or encumbrance of any kind, that would prevent in any way such Zohar Lender's performance of its obligations contained in this Agreement at the time such obligations are required to be performed; and

(iv) such Zohar Lender is not the beneficial owner of (or investment manager, advisor, or subadvisor to one or more beneficial owners of) any other Term Loan Claims against any Company Entity.

c.  No action or inaction on the part of any director, officer or advisor of any Zohar Lender that Joseph J. Farnan, Jr. (independent director of the Zohar Lenders) reasonably concludes, in consultation with counsel, is required by their fiduciary duties to such Zohar Lender, its creditors, or its Chapter 11 estate, shall be limited or precluded by this Agreement.

## 9.    Additional Provisions Regarding Company Entities' Commitments.

a.  No action or inaction on the part of any director, manager or officer of any Company Entity that such directors, managers or officers reasonably believe is required by their fiduciary duties to such Company Entity shall be limited or precluded by this Agreement.

b.  Prior to entry of the Bidding Procedures Order, in the event that the Company determines that a proposal for an Alternative Transaction or a competing offer is higher or otherwise better, the Company shall notify the Zohar Lenders in writing within two (2) calendar days after making such determination and the Zohar Lenders shall submit any competing offer within one (1) calendar day after receiving the notice.  After entry of the Bidding Procedures Order, notwithstanding anything to the contrary in this Agreement, but subject to the terms of Section 9.a and the Bidding Procedures, the Bidding Procedures Order, and the Stalking Horse Agreement, each Company Entity and its respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to: (i) consider or respond to any proposals for Alternative Transactions or competing offers in the Sale Process that are higher or otherwise better as determined by the Company in its sole discretion, (ii) provide access to non-public information concerning any Company Entity to any person who enters into confidentiality agreements or nondisclosure agreements with the Company, (iii) maintain or continue discussions or negotiations with respect to Alternative Transactions or

---

2017.  For purposes of this Agreement, MBIA Insurance Corp. takes no issue with the Zohar Lenders, on behalf of Zohar I, making the requisite representations herein in order to consummate the agreements reflected in this Agreement.

competing offers in the Sale Process, (iv) otherwise respond to inquiries or proposals and undertake discussions thereof, with respect to Alternative Transactions or competing offers in the Sale Process, and (v) enter into discussions or negotiations with holders of Claims or Interests, any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee).  If the board of directors of the Company Entities decides (i) that proceeding with the Restructuring would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue a proposal for an Alternative Transaction (a "***Fiduciary Out***"), such decision shall not be limited or precluded by this Agreement and the Company shall notify the Supporting Parties in writing within two (2) Business Days of such decision.  Upon acceptance of any Alternative Transaction, the Company shall share a copy of such Alternative Transaction and the terms and provisions thereof with the Zohar Lenders.  Upon any determination by any Company Party to exercise a Fiduciary Out, the other Parties to this Agreement shall be immediately and automatically relieved of any obligation to comply with their respective covenants and agreements herein in accordance with <u>Section 6.b</u> hereof.

c.    Notwithstanding anything to the contrary herein, nothing in this Agreement shall create or impose any additional fiduciary obligations upon any Company Entity or any of the Zohar Lenders, or any members, partners, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents or other representatives of the same or their respective affiliated entities, in such person's capacity as a member, partner, manager, managing member, officer, director, employee, advisor, principal, attorney, professional, accountant, investment banker, consultant, agent or other representative of such Party, that such entities did not have prior to the Agreement Effective Date.

d.    Nothing in this Agreement shall prevent any Company Entity from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

10.    **<u>Amendments and Waivers.</u>**

a.    This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 10.

b.    This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed: (i) in the case of a waiver, by the Party against whom the waiver is to be effective, and (ii) in the case of a modification, amendment, or supplement, by the Company Entities and the Zohar Lenders, *provided* that (A) if the proposed modification, amendment, supplement or waiver will result in a material change from the terms provided in this Agreement that adversely affects the rights or obligations of the Relators or the Insurers, then the written consent of such affected Party shall also be required to effectuate such modification, amendment, supplement or waiver; (B) any proposed modification, amendment, supplement or waiver to Section 6.d or this Section 10 shall require the written consent of the Insurers; and (C) any proposed modification, amendment, supplement or waiver to Section 6.c or this Section 10 shall require the written consent of the Relators.

11.    **Effectiveness.**

This Agreement shall become effective and binding on the Parties on the Agreement Effective Date.

12.    **Governing Law; Jurisdiction; Waiver of Jury Trial.**

a.    Except to the extent superseded by the Bankruptcy Code, this Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of Delaware, without giving effect to the conflicts of law principles thereof.

b.    Each of the Parties irrevocably agrees that any legal action, suit, or proceeding arising out of or relating to this Agreement brought by any party or its successors or assigns shall be brought and determined in (a) the Bankruptcy Court, for so long as the Chapter 11 Cases are pending, and (b) otherwise, any federal or state court in the state of Delaware, and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement. Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in the courts described above, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court as described herein. Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient. Subject to the foregoing, each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim, or otherwise, in any proceeding arising out of or relating to this Agreement, any claim (i) that it is not personally subject to the jurisdiction of the courts as described herein for any reason, (ii) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment, or otherwise) and (iii) that (A) the proceeding in any such court is brought in an inconvenient forum, (B) the venue of such proceeding is improper, or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.

c.    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY). EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

13. **Specific Performance/Remedies.**

The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to seek an injunction or injunctions without the necessity of posting a bond to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity.  Unless otherwise expressly stated in this Agreement, no right or remedy described or provided in this Agreement is intended to be exclusive or to preclude a Party from pursuing other rights and remedies to the extent available under this Agreement, at law, or in equity.

14. **Survival.**

Notwithstanding the termination of this Agreement pursuant to Section 6 hereof, the agreements and obligations of the Parties set forth in Sections 6.f, 10, and 12 through 25 (inclusive and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof; *provided* that any liability of a Party for failure to comply with the terms of this Agreement also shall survive such termination.

15. **Headings.**

The headings of the sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

16. **Successors and Assigns; Severability; Several Obligations.**

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators, and representatives, including, without limitation, any trustee for any Company Entity appointed pursuant to Section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases and any Chapter 7 trustee appointed for any Company Entity in the event that any of the Chapter 11 Cases are converted to cases under Chapter 7 of the Bankruptcy Code; *provided* that nothing contained in this Section 16 shall be deemed to permit Transfers of interests in any Claims against any Company Entity other than in accordance with the express terms of this Agreement.  If any provision of this Agreement, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible. The agreements, representations, and obligations of the Parties are, in all respects, several and neither joint nor joint and several.

17.     **No Third-Party Beneficiaries.**

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof.

18.     **Prior Negotiations; Entire Agreement.**

This Agreement, including any exhibits and schedules hereto (including the Qui Tam Settlement), constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company and any Zohar Lender shall continue in full force and effect in accordance with their terms.

19.     **Counterparts.**

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by facsimile, electronic mail, or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

20.     **Notices.**

All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier or by registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(1)     If to the Company, to:

MD Helicopters, Inc.
4555 E. McDowell Road
Mesa, AZ 85215
Tel:     (480) 346-6638
Attn:   Y.R. Hladkyj, Esq.
Email:  yr.hladkyj@mdhelicopters.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10022
Tel:     (212) 906-1200
Attn:   Suzzanne S. Uhland, Esq. and Adam S. Ravin, Esq.
Email:  suzzanne.uhland@lw.com and adam.ravin@lw.com

(2)     If to the Zohar Lenders, to the addresses or facsimile numbers set forth below such Zohar Lender's signature to this Agreement, with a copy (which shall not constitute notice) to:

29

Young Conaway Stargatt & Taylor, LLP
1000 North King Street
Wilmington, DE 19801
Tel:      (302) 571-6600
Attn:    Michael R. Nestor, Esq. and Ryan M. Bartley, Esq.
Email:   mnestor@ycst.com and rbartley@ycst.com


(3)    If to the Relators, to:

Reese Marketos LLP
750 N. St. Paul Street, Suite 600
Dallas, TX 75201
Tel:      (214) 382-9810
Attn:    Pete Marketos, Esq. and Joshua M. Russ, Esq.
Email:   pete.marketos@rm-firm.com and josh.russ@rm-firm.com


(4)    If to the Insurers, to:

Dentons US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606-6361
Tel:      (312) 876-8220
Attn:    Keith Moskowitz, Esq. and Patrick C. Maxcy, Esq.
Email:   keith.moskowitz@dentons.com and patrick.maxcy@dentons.com

Any notice given by electronic mail, facsimile, delivery, mail, or courier shall be effective when received.

### 21.    Reservation of Rights; No Admission.

a.    Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of each of the Parties to protect and preserve its rights, remedies, and interests, including its claims against any of the other Parties (or their respective affiliates or subsidiaries) or its full participation in any bankruptcy case filed by the Company or any of its affiliates and subsidiaries.  This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties.  Pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence, and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.  This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

22.     **No Solicitation; Representation by Counsel; Adequate Information.**

a.      This Agreement is not and shall not be deemed to be a solicitation for votes in favor of any plan in the Chapter 11 Cases.

b.      Each Party acknowledges that has been represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

23.     **Non-Disparagement**

a.      The Relators, the Company, and the Insurers agree not to make any statements relating to the Qui Tam Settlement or the Restructuring, written or verbal, or cause or encourage others to make any statements relating to the Qui Tam Settlement or the Restructuring, written or verbal, that defame, disparage, or in any way criticize the personal or business reputation, products, practices, services, or conduct of each other. Likewise, the Relators, the Company, and the Insurers agree that they will instruct their successors, attorneys, agents, assigns, officers, and employees not to make any statements relating to the Qui Tam Settlement or the Restructuring, written or verbal, or cause or encourage others to make any statements relating to the Qui Tam Settlement or the Restructuring, written or verbal, that defame, disparage, or in any way criticize the personal or business reputation or conduct of each other.

b.      However, nothing in the Agreement shall prevent any Party from making truthful statements in compliance with a lawful subpoena or order from a court of competent jurisdiction.

24.     **Email Consents.**

Where a written consent, acceptance, approval, notice, or waiver is required pursuant to or contemplated by this Agreement, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic email) between each such counsel without representations or warranties of any kind on behalf of such counsel.

25.     **Interpretation.**

For purposes of this Agreement:

a.      in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

b.      capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

31

c.     unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

d.     unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; *provided* that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

e.     unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribe or allowed herein. If any payment, distribution, act or deadline hereunder is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act, or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but shall be deemed to have been completed or to have occurred as of the required date;

f.     unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

g.     the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

h.     captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

i.     references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company laws; and

j.     the use of "include" or "including" is without limitation, whether stated or not.

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**COMPANY ENTITIES**

**MD Helicopters, Inc.**
**Monterrey Aerospace, LLC**

By: _____

Name: Barry Sullivan

Title: Chief Financial Officer of MD Helicopters,
Inc.

**RELATORS**

**Philip Marsteller**
**Robert M. Swisher**

By: _____
Name: Philip Marsteller


By: _____
Name: Robert M. Swisher

**<u>RELATORS</u>**

**Philip Marsteller**
**Robert M. Swisher**

By: _____
Name: Philip Marsteller

By: _____
Name: Robert M. Swisher

**The Insurers**

**National Union Fire Insurance Company Of Pittsburgh, Pa.**

By: _____
Name: Anthony Fowler
Title:   Financial Lines Claims Executive     3/30/22

**AIG Specialty Insurance Company**

By: _____
Name: Anthony Fowler
Title:   Financial Lines Claims Executive     3/30/22

*[Signature Page to Restructuring Support Agreement]*

**Zohar CDO 2003-1, Limited**
**Zohar II 2005-1, Limited**
**Zohar III, Limited**

By: _____

Name: Michael Katzenstein
Title: Chief Restructuring Officer

Notice Address:

1166 Avenue of the Americas
15th Floor
New York, NY 10036
United States

Email address: mike.katzenstein@fticonsulting.com

---

*Aggregate Outstanding Principal Amount of the Term Loans:*

**Zohar CDO 2003-1, Limited:  $61,647,494.35**
**Zohar II 2005-1, Limited:  $141,439,374.43**
**Zohar III, Limited:  $104,245,140.82**

---

*[Signature Page to Restructuring Support Agreement]*