## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
--------------------------------------------------- x
                                                    :   Chapter 11
In re:                                              :
                                                    :   Case No. 22-10263 (KBO)
MD HELICOPTERS, INC., et al.,¹                      :
                                                    :   (Joint Administration Requested)
            Debtors.                                :
                                                    :   Obj. Deadline: April 13, 2022 at 4:00 p.m. (ET)
                                                    :
--------------------------------------------------- x
```

**MOTION OF DEBTORS FOR ENTRY OF (I) AN ORDER (A) APPROVING BID PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) SCHEDULING AN AUCTION AND A SALE HEARING, (C) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (D) AUTHORIZING THE DEBTORS TO ENTER INTO THE STALKING HORSE AGREEMENT, (E) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND (F) GRANTING RELATED RELIEF; AND (II) AN ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND (C) GRANTING RELATED RELIEF**

The debtors and debtors in possession in the above-captioned cases (collectively, the "**Debtors**") hereby file this motion (this "**Motion**") pursuant to Sections 105(a), 363, and 365 of Title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**") for the entry of (i) an order, substantially in the form attached hereto as Exhibit B (the "**Bid Procedures Order**"),

---

¹    The two Debtors in these cases are MD Helicopters, Inc. ("**MDHI**") and Monterrey Aerospace, LLC ("**Monterrey**"), and their address is 4555 E. McDowell Road, Mesa, AZ 85215.  The last four digits of MD Helicopters, Inc.'s taxpayer identification number are 4088.  Monterrey Aerospace, LLC has not been assigned a taxpayer identification number as of the date hereof.

(a) approving procedures in connection with the sale of substantially all of the Debtors' assets substantially in the form attached to the Bid Procedures Order as Exhibit 1 (the "**Bid Procedures**"), (b) scheduling the related auction and hearing to consider approval of the Sale (as defined below), (c) approving the form and manner of notice thereof, (d) approving, and authorizing the Debtors to perform under, the Stalking Horse Agreement (as defined below), (e) approving procedures related to the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases (including Government Contracts (as defined below)), and (f) granting related relief; and (ii) an order, substantially in the form attached hereto as Exhibit C (the "**Sale Order**"),[2] (a) approving the Sale of the Assets (as defined below) free and clear of all liens, claims, encumbrances, and other interests, (b) approving the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases related thereto (subject to the satisfaction of certain requirements related to the Government Contracts), and (c) granting related relief.  In support of this Motion, the Debtors rely upon (i) the *Declaration of Barry Sullivan, Chief Financial Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**"), and (ii) *Declaration of Adam B. Keil in Support of Motion of Debtors for Entry of (I) an Order (A) Approving Bid Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (B) Scheduling an Auction and Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, (D) Authorizing the Debtors to Enter Into the Stalking Horse Agreement, (E) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (F) Granting Related Relief; and (II) An Order (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances,*

---

[2]    Exhibit C was not available for inclusion with the Motion at the time of filing.  The Debtors shall file the Sale Order as soon as possible after the filing of this Motion.

*and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief* (the "**Keil Declaration,**" and together with the First Day Declaration, the "**Declarations**"). In further support of this Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## JURISDICTION AND VENUE

1.       This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.       The statutory predicates for the relief requested in this Motion are Sections 105, 363, 365, 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014 and Local Rules 2002-1, 6004-1, and 9013-1(m).

## BACKGROUND

**A.       The Debtors' Chapter 11 Cases**

3.       On the date hereof (the "**Petition Date**"), the Debtors filed voluntary petitions in this Court commencing cases (the "**Chapter 11 Cases**") for relief under chapter 11 of the Bankruptcy Code. The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the First Day Declaration and fully incorporated herein by reference.[3]

4.       The Debtors continue to manage and operate their business as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been requested in the Chapter 11 Cases, and no committees have yet been appointed.

---

[3]   Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to such terms in the First Day Declaration.

5.      Simultaneously with the filing of this Motion, the Debtors filed a motion with this Court pursuant to Bankruptcy Rule 1015(b) seeking joint administration of these cases and for consolidation for procedural purposes only.

**RELIEF REQUESTED**

6.      As described more fully herein and in the Declarations, the Debtors have determined, in consultation with their advisors and certain of their constituents, that a sale of substantially all of their Assets (as defined below) is the best available path to maximize the value of their estates and in the best interest of the Debtors and their stakeholders (including their customers, employees, and suppliers).    The Debtors undertook several actions prior to commencing these Chapter 11 Cases to ensure that the sale process yields a value-maximizing transaction.  Specifically, the Debtors have conducted an extensive prepetition marketing process that culminated in entry into the Stalking Horse Agreement, subject to the Debtors' receipt of higher or better offers at the Auction.  The Stalking Horse Agreement offers the Debtors and their stakeholders certainty by establishing a minimum purchase price for the Assets and signaling to other potential bidders the prevailing market value of the Assets, while also affording the Debtors an opportunity to seek higher or otherwise better offers.  In addition to the prepetition marketing efforts, the Debtors (in consultation with the Zohar Lenders) executed a settlement agreement with the relators in the Qui Tam Action, thereby clearing a significant impediment to an orderly and swift sale transaction.

7.      As described in further detail herein, it is imperative that the Debtors stabilize their business and provide certainty to their vendors, suppliers, customers, and workforce regarding the path forward for the business from the outset of these Chapter 11 Cases.  Establishing a process for the swift and orderly transition of the Debtors' business to the Successful Bidder will signal to the Debtors' stakeholders that the situation in which the Debtors find themselves is temporary only

and the Debtors will emerge from the chapter 11 process with new owners and a clean slate. It is therefore imperative that the Debtors consummate a value-maximizing sale as expeditiously as possible.

8.      Accordingly, by this Motion, first the Debtors seek entry of the Bid Procedures Order in substantially the form attached hereto as <u>Exhibit B</u>:

(a)      authorizing and approving the Bid Procedures attached to the Bid Procedures Order as <u>Exhibit 1</u> in connection with the sale (the "**<u>Sale</u>**") of substantially all of the Debtors' assets (the "**<u>Assets</u>**");

(b)      scheduling an auction (the "**<u>Auction</u>**") and sale hearing (the "**<u>Sale Hearing</u>**") with respect to the Sale of the Assets;

(c)      approving the form and manner of notice of the Auction and the Sale Hearing, a copy of which is attached to the Bid Procedures Order as <u>Exhibit 2</u> (the "**<u>Sale Notice</u>**");

(d)      authorizing the Debtors to enter into, and perform under, that certain Asset Purchase Agreement with MDH Holdco LLC (the "**<u>Stalking Horse Bidder</u>**"), dated March 30, 2022 (including all schedules and exhibits attached thereto, as it may be amended from time to time in accordance with its terms), a copy of which is attached hereto as <u>Exhibit A</u> (the "**<u>Stalking Horse Agreement</u>**"), pursuant to which the Stalking Horse Bidder agrees to purchase the Assets (as defined in the Stalking Horse Agreement) from the Debtors on the terms and conditions set forth therein (the "**<u>Stalking Horse Bid</u>**");

(e)      approving an overbid amount of $1,000,000;

(f)      approving procedures for the assumption and assignment (as set forth in the Bid Procedures Order, the "**<u>Assumption Procedures</u>**") of certain executory contracts and unexpired leases in connection with the Sale (collectively, the "**<u>Assumed Contracts</u>**") and approving the form and manner of notice thereof, a copy of which is attached to the Bid Procedures as <u>Exhibit 3</u> (the "**<u>Assumption Notice</u>**"); and

(g)      granting related relief.

9.      Following entry of, and compliance with, the Bid Procedures Order, the Debtors intend to seek entry of the Sale Order at the conclusion of the Sale Hearing in substantially the form attached hereto as <u>Exhibit C</u>:

(a)     if an Auction is conducted, authorizing and approving the sale of the Assets to the Qualified Bidder (as defined in the Bid Procedures) that the Debtors determine has made the highest or otherwise best Qualified Bid (as defined in the Bid Procedures) for the Assets (the "**Successful Bidder**") (or, if the Successful Bidder fails to consummate the Sale, to the Qualified Bidder with the next-highest or second-best Qualified Bid at the Auction for the Assets (the "**Back-Up Bidder**")), free and clear of all liens, claims, encumbrances, and other interests other than Permitted Liens and Assumed Liabilities (as such terms are defined in the Stalking Horse Agreement);

(b)     if an Auction is not conducted, authorizing and approving the Sale of the Assets to the Stalking Horse Bidder free and clear of all liens, claims, encumbrances, and other interests other than Permitted Liens and Assumed Liabilities;

(c)     authorizing the assumption and assignment of the Assumed Contracts; and

(d)     granting any related relief.

10.     The Debtors reserve the right to file and serve any supplemental pleading or declaration that the Debtors deem appropriate or necessary in their reasonable business judgment, including any pleading summarizing the competitive bidding and sale process and the results thereof, in support of their request for entry of the Sale Order before the Sale Hearing.

**THE ZOHAR FUNDS' BANKRUPTCY AND RELATED ORDERS**

11.     As described more fully in the First Day Declaration, the lenders under the Debtors' senior secured term loan credit agreement (the "**Prepetition First Lien Credit Agreement**"), dated as of July 8, 2005, are Zohar CDO 2003-1, Limited ("**Zohar I**"), Zohar II 2005-1, Limited ("**Zohar II**"), Zohar III, Limited ("**Zohar III**," and together with Zohar I and Zohar II, the "**Zohar Funds**" or the "**Zohar Lenders**"), Ark Investment Partners II, L.P. ("**AIP**") and Ark II 2001-1 Limited ("**Ark II**," and together with AIP, the "**Patriarch Lenders**" and together with the Zohar Lenders, the "**Prepetition First Lien Lenders**").  As of the Petition Date, not less than $357 million in respect of loans made under the Prepetition First Lien Credit Agreement remain outstanding, of which the Zohar Funds hold no less than approximately $332 million, or

approximately 93%, and the Patriarch Lenders hold no less than approximately $25 million, or approximately 7%. The term loan indebtedness matured in April 2019 and is currently in default.

12.     Zohar I and Zohar II also own approximately 49.7% of MDHI's equity. The Patriarch Lenders together own approximately 45.8% of MDHI's equity and third-party investors own the remaining approximately 4.5%.

13.     In March 2018, the Zohar Funds commenced cases under chapter 11 of the Bankruptcy Code in this Court and their cases are ongoing (the "**Zohar Chapter 11 Cases**"). On November 9, 2018, the Court entered the *Order in Aid of Implementation of the Global Settlement Agreement Approved in these Cases Establishing Certain Procedures for the Independent Director's Approval of Monetization Transactions and Related Relief* [Docket No. 545] (the "**Zohar Monetization Procedures Order**") and on July 2, 2020, entered the *Amended Order Establishing Certain Guidelines and Milestones in Furtherance of the Monetization Process for the Group A and Group B Portfolio Companies* [Docket No. 1751] (the "**Zohar Timeline Order**" and together with the Zohar Monetization Procedures Order, the "**Zohar Orders**").

14.     The Zohar Monetization Procedures Order governs the processes and procedures for the Zohar Funds' disposition and monetization of their debt and equity interests in a slate of portfolio companies, which includes MDHI (the "**Zohar Interests**"). The Zohar Timeline Order establishes additional guidelines and milestones regarding the disposition of the Zohar Interests from and after the period of time when Lynn Tilton resigned as the sole director of MDHI (and other Zohar Fund portfolio companies). In April 2020, a majority of MDHI's shareholders – including non-Zohar Fund investors – elected Alan Carr (the "**Director**") as the sole director for Debtor MDHI. The Director was subsequently appointed as the sole manager of Debtor Monterrey. Under the Zohar Timeline Order, the Director, as MDHI's Independent Fiduciary (as

defined in the Zohar Timeline Order), is "responsible for conducting the sale process on behalf of the Portfolio Company [i.e., the Debtors]." *See* Zohar Timeline Order, ¶ 8.

## PREPETITION MARKETING AND SALE PROCESS

15.      As described in further detail in the First Day Declaration, the Debtors have determined that pursuing a sale of the Assets pursuant to Section 363 of the Bankruptcy Code is the best available method for maximizing the value of those Assets for the benefit of all stakeholders.

16.      In July 2020, the Debtors engaged Moelis & Company LLC ("**Moelis**") to serve as their financial advisor and investment banker in connection with developing, and advising the Debtors with respect to, various strategic alternatives, including a potential sale and chapter 11 sale process.[4]   In October 2021, Moelis, at the direction of and under the supervision of the Director, commenced a process to market the Assets.

17.      Throughout the pre-marketing process, Moelis has worked closely with Debtors' management and other restructuring professionals and has become well-acquainted with the Debtors' capital structure, which is more fully set forth in the *Declaration of Barry Sullivan, Chief Financial Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**"), liquidity needs, and business operations.

18.      The Debtors' marketing efforts included targeted mailings and calls to both potential strategic and financial entities that the Debtors and their advisors believed might be interested in discussing a potential purchase of the Assets.  During this process, the Debtors and/or Moelis contacted and sent form non-disclosure agreements to over 170 potential buyers, including

---

[4]     Moelis was previously retained by the Debtors in May 2018 to explore strategic alternatives.  The Debtors (under prior leadership) ultimately determined not to pursue a transaction at that time.  Moelis was then reengaged by the Director in July 2020.

26 strategic buyers.  The potential buyers included 19 of the 24 parties that were contacted as part of the process commenced in 2018.[5]  The Debtors invited these potential buyers to execute non-disclosure agreements and submit an initial indication of interest with respect to a sale of the Assets.  In response to the initial outreach, the Debtors executed confidentiality agreements (collectively, the "**NDAs**") with 83 prospective buyers of the Assets, each of which received the same package of marketing materials, and received 21 initial indications of interests.

19.     The Debtors, in consultation with their advisors, selected 12 potential buyers with the most competitive indications of interest to move to the next phase of the sale process.  The Debtors then engaged in further discussions regarding a sale transaction for the Assets with those potential buyers over the following weeks.  During this period, each of the potential buyers was granted dataroom access and the Debtors additionally arranged for representatives of each potential buyer to meet with members of the Debtors' management team, either in person at the Debtors' headquarters in Mesa, Arizona or through video conference depending on the preference of the particular potential buyer.

20.     On or before December 26, 2021, the Debtors received 9 further indications of interest and selected the 2 potential buyers with the highest and best offers to move to the next phase of the sale process.  The Debtors engaged in advanced discussions regarding a sale transaction for the Assets with each of those potential buyers over the following 12 weeks leading up to the Petition Date, including engaging in extensive negotiations with each regarding the form of a stalking horse asset purchase agreement.

---

[5]     Given the overall deterioration in the financial performance of the Debtors since the 2018 process commenced, there were 5 parties contacted by Moelis in connection with the prior process for whom the Debtors' financial profile was no longer a good fit in that the transaction size now fell below the party's investment mandate.   As a result, these parties were not contacted in connection with the current process.

21.     The culmination of the prepetition marketing process was the execution of the Stalking Horse Agreement, which represents the highest or otherwise best offer the Debtors have received to date.  The Stalking Horse Agreement was the product of arms' length, good faith negotiations among the Debtors and the Stalking Horse Bidder.  The negotiation of the Stalking Horse Agreement on behalf of the Debtors was led by the Debtors' management and advisors under the oversight of the Director.  On March 29, 2022, the Director adopted resolutions authorizing the Debtors to enter into the Stalking Horse Agreement.

22.     The Stalking Horse Bidder is an affiliate of the Zohar Funds, which own approximately 49.7% of MDHI's equity and hold approximately 93% of the Obligations under the Prepetition First Lien Credit Agreement and are therefore affiliates of the Debtors.  The Zohar Funds are bidding in conjunction with their creditors, which will be the ultimate beneficial economic owners of the Stalking Horse Bidder.  As demonstrated by the fact that the Stalking Horse Bid does not provide for a break-up fee, expense reimbursement, or any other bid protections, the Zohar Funds' and their creditors' interests are aligned with the Debtors in ensuring that the Debtors are able to run a fulsome, competitive process that maximizes the value of the Assets.  In furtherance of the process, certain creditors of the Zohar Funds have offered the Debtors' debtor-in-possession ("**DIP**") financing, as an integral component of the Stalking Horse Bid, that will ensure the Debtors have liquidity required to run the process contemplated in the Bid Procedures and close a value-maximizing transaction.

23.     Notwithstanding the lengthy and thorough prepetition process noted above, there may be additional entities, in addition to the Stalking Horse Bidder, interested in participating in the Auction with respect to the Assets.  Pursuant to the terms of the Stalking Horse Agreement, and with the support of the Stalking Horse Bidder and the DIP Lenders, the Debtors, with the

assistance of Moelis, have continued, and will continue, to market the Assets to potential buyers through the Bid Deadline. Further, upon entry of the Bid Procedures Order, the Debtors, with the assistance of Moelis, will continue discussions with any party that complies with the requirements of the Bid Procedures Order and the Bid Procedures, with the goal of having such parties participate in the Auction in order to maximize the value achievable for the Assets. The Debtors believe that, given the extensive prepetition marketing effort, the number of parties that already have executed NDAs, and the fact that the Debtors already have marketed the Assets to the most likely bidders for Assets of the type the Debtors are selling, the prepetition and postpetition marketing process leading up to the Auction will achieve the greatest possible level of interest and consideration for the Assets in the Chapter 11 Cases and confirm whether the bid submitted by the Stalking Horse represents the highest and otherwise best offer for the Assets.

## STALKING HORSE AGREEMENT

24.    The key terms of the proposed transaction can be found in the Stalking Horse Agreement attached hereto as <u>Exhibit A</u>. The material terms of the Stalking Horse Agreement, including those provisions required to be highlighted pursuant to Local Rule 6004-1(b)(iv), are as follows:

| Provision | Summary |
|---|---|
| **Purchase Price / Consideration** | The Stalking Horse Agreement provides for the following consideration in exchange for the Assets:<br><br>On the terms and subject to the conditions set forth in the Stalking Horse Agreement, the aggregate consideration for the Purchased Assets shall be (a)(i) the credit bid pursuant to Section 363(k) of the Bankruptcy Code against $150,000,000 of the Obligations (as defined in the Term Loan Agreement) as of the Closing and (ii) an assumption by Buyer of up to $60,000,000 of the DIP Obligations, subject to Buyer reaching an acceptable agreement for such assumption with the requisite lenders under the DIP Facility (clause (a)(i) and (ii), collectively the "***Credit Bid***"), (b) the instruction to Sellers to retain and use the Retained Cash in accordance with the Wind-Down Budget and (c) the assumption of the Assumed Liabilities (collectively, the "***Purchase Price***"); provided, however, that the credit bid amount in *Section 3.1(a)(i)* shall be |

| Provision | Summary |
|---|---|
| | increased by the difference between $60,000,000 and the outstanding DIP Obligations being assumed pursuant to *Section 3.1(a)(ii)*, up to a maximum increase of $30,000,000; provided, further, that Buyer reserves the right, in its sole discretion to increase the Purchase Price (including any component thereof), subject to the Bid Procedures Order and applicable Law.<br><br>*See* Stalking Horse Agreement § 3.2. |
| **Assets** | On the terms and subject to the conditions set forth in the Stalking Horse Agreement, effective as of the Closing, each Seller shall sell, assign, transfer, convey and deliver to Buyer or its Designated Purchaser, and Buyer or its Designated Purchaser shall purchase and acquire from each Seller, all of each Seller's right, title and interest in and to all of the assets, properties, interests and rights of every nature, kind and description, tangible and intangible of each Seller, other than the Excluded Assets (the "***Purchased Assets***"), in each case, free and clear of any Liens (other than Permitted Liens). The Purchased Assets shall include the following:<br><br>(a)    the Leased Real Property set forth on *Schedule 2.1(a)*, together with any buildings, fixtures and improvements located on or attached to such real property, and all rights arising therefrom, and all tenements, hereditaments, appurtenances and other real property rights appertaining thereto;<br><br>(b)    all tangible assets, including machinery, tools, equipment, computers, information management systems (including software and hardware related thereto), telephone systems, supplies and other tangible personal property owned by any Seller, including (i) any such property located at any Leased Real Property, (ii) any such property that is leased to the extent such lease is an Assigned Contract and (iii) any such property on order to be delivered to any Seller;<br><br>(c)    all warranties, indemnities or guaranties from any Person with respect to any Purchased Asset, including any item of real property, personal property or equipment;<br><br>(d)    all Intellectual Property owned by any Seller, including the Intellectual Property set forth on *Schedule 2.1(d)* (the "***Purchased Intellectual Property***");<br><br>(e)    the Seller Plans set forth on *Schedule 2.1(e)* (the "***Assumed Plans***"), all funding arrangements related thereto (including all assets, trusts, insurance policies (including, for the avoidance of doubt, any director and officer insurance policy) and administrative service Contracts related thereto), and all rights and obligations thereunder;<br><br>(f)    other than the Excluded Permits, all Permits held by any Seller, including those set forth on *Schedule 2.1(f)*; |

| Provision | Summary |
|---|---|
|  | (g) other than the Retained Cash, all Cash and Cash Equivalents (the "***Transferred Cash***"); <br><br> (h) all deposits, credits, prepaid expenses, deferred charges, advance payments, refunds, rights of set-off, rights of recovery, security deposits, prepaid items and duties related to the Purchased Assets (including the Assigned Contracts); <br><br> (i) all accounts receivable, notes, negotiable instruments and chattel paper owned or held, together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto, and other amounts receivable from any Person before the Closing; <br><br> (j) all rights and obligations under or arising out of all insurance policies (including, for the avoidance of doubt, all rights of the Sellers under any director and officer insurance policy, if any) relating to any of the Purchased Assets or any of the Assumed Liabilities (including returns and refunds of any premiums paid, or amounts due back to any Seller, with respect to cancelled insurance policies), and all benefits of any nature of any Seller with respect thereto (including any claims of Seller arising under such policies and all credits, premium refunds, proceeds, causes of action or rights thereunder); <br><br> (k) subject to *Section 7.13*, all rights against any Person (including (i) customers, suppliers, vendors, lessors, lessees, licensees, licensors of any Seller and (ii) Buyer, its Affiliates or any of its or their respective directors, officers, members, partners, shareholders, managers, advisors or representatives) arising under or related to any Assigned Contract, other Purchased Asset (including any use, ownership, possession, operation, sale or lease thereof) or Assumed Liability or the operation or conduct of the Business, including Proceedings, Claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds, rights of set off, rights of recovery (including rights to insurance proceeds), rights of subrogation, rights of recoupment, rights under or with respect to express or implied guarantees, warranties, representations, covenants, indemnities, exculpation, advancement, reimbursement of expenses or contract renewal rights and other similar rights, in each case, whether direct or derivative, known or unknown, liquidated or unliquidated, contingent or otherwise; including all rights of any Seller against any current or former directors, officers, members, partners, shareholders, equity holders, managers, advisors or other professionals of such Seller, including any Proceedings and Claims ("***D&O Claims***") and all avoidance, recovery, subordination claims or causes of action of any Seller under Chapter 5 of the Bankruptcy Code or any analogous state or federal statutes or common law relating to the Purchased Assets and Assumed Liabilities; <u>provided</u> that neither Buyer, the Designated Purchaser or any Person claiming by or through Buyer or the Designated Purchaser (including by operation of law, sale, assignment, conveyance or otherwise) shall pursue, prosecute, litigate, institute or commence any Proceeding based on, assert, sell, convey, assign or file any Claim that relates to any rights, claims or causes of action transferred under this *Section 2.1(k)* against any Seller or any of their |

| Provision | Summary |
|---|---|
| | current or former subsidiaries or any of their respective current or former officers or directors, in each cash other than a Specified Person. Nothing herein shall limit the right of Buyer (or any assignee or transferee thereof) to bring any claims or causes of action against a Specified Person. "***Specified Person***" shall mean Lynn Tilton, or any other officer, director, employee, manager, advisor or other representative of any Seller who is or has been a director, officer, equityholder, manager, Affiliate, member or representative of Patriarch Partners, LLC or any of its Affiliates (excluding, for purposes of this *Section 2.1(k)* and *Section 7.13*, Sellers and their respective current or former subsidiaries). For the avoidance of doubt, the Patriarch Stakeholders and any other Affiliate of Lynn Tilton (other than Sellers and the Zohars) shall be deemed Specified Persons; <br><br> (l)      all goodwill related to the Purchased Assets (including the goodwill associated with the Trademarks and other Intellectual Property included in the Purchased Assets); <br><br> (m)      the Type Certificates; <br><br> (n)      all inventory, including all (i) raw materials, bulk and pan stock, (ii) stores inventory, (iii) work-in process, (iv) aircraft in flow, (v) used Parts, (vi) finished goods, (vii) Aircraft, (viii) Airframe, (ix) Engines and (x) spare Parts (collectively, "***Inventory***"); <br><br> (o)      all Tax refunds, overpayments, credits or other attributes, including (i) with respect to Taxes for any Pre-Closing Tax Period or (ii) with respect to Taxes that are Excluded Liabilities; <br><br> (p)      the Assigned Contracts (including, with respect to the Specified Contracts, in accordance with *Section 2.5(g)*); and <br><br> (q)      other than the Excluded Records, all of each Seller's current or historical written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, ledgers, journals, title policies, customer lists, supplier lists, vendor lists, price lists, mailing lists, invoices, shipping records, standard forms of documents, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, *etc.*), user documentation (installation guides, user manuals, training materials, release notes, working papers, *etc.*), marketing documentation (catalogs, sales brochures, flyers, pamphlets, web pages, *etc.*), consulting materials, opinions and other documents commissioned by or on behalf of any Seller, development, quality control, quality assurance, and other regulatory documents, all personnel and employment records for the Transferred Employees or any individual independent contractors of any Seller, and other books and records of any Seller and any rights thereto owned by any Seller, in each case whether stored in hard copy form or on electronic, magnetic, optical |

14

| Provision | Summary |
|---|---|
| | or other media, and including any of the foregoing (other than the Excluded Records) that is subject to attorney-client privilege or attorney work-product protection.<br><br>*See* Stalking Horse Agreement § 2.1. |
| **Assumed Liabilities** | On the terms and subject to the conditions of the Stalking Horse Agreement, effective as of the Closing, Buyer or its Designated Purchaser shall assume only the following Liabilities of each Seller (the "***Assumed Liabilities***"):<br><br>(a)    all Cure Costs to the extent they have not been paid on or before the Closing; provided, however, that neither Buyer nor any Designated Purchaser shall be liable for any applicable Cure Costs that are waived by the contract counterparty pursuant to and consistent with *Section 2.5(a)* hereof, or otherwise paid by or on behalf of Buyer or its Designated Purchaser in an amount and on terms agreed upon between Buyer and such contract counterparty;<br><br>(b)    all Liabilities with respect to the Assumed Plans to the extent relating to Transferred Employees, whether or not arising prior to or after the Closing Date;<br><br>(c)    all Liabilities of each Seller relating to or arising out of the Assigned Contracts to be paid or performed after the Closing Date, except to the extent such liabilities and obligations, but for a breach or default by any Seller would have been paid, performed or otherwise discharged on or prior to the Closing Date or to the extent the same arises out of any such breach or default;<br><br>(d)    any and all Liabilities for (i) Taxes that relate to the Purchased Assets or the Assumed Liabilities with respect to Post-Closing Tax Periods allocable to Buyer in accordance with *Section 7.3(a)* and (ii) Transfer Taxes;<br><br>(e)    all accounts payable and other trade obligations, in each case, to the extent (and solely to the extent) (i) incurred in the ordinary course of business and otherwise in compliance with the terms and conditions of the Stalking Horse Agreement (including *Section 6.1*), (ii) not yet delinquent and (iii) not arising under or otherwise relating to any Excluded Asset; and<br><br>accrued compensation, vacation pay, employee unreimbursed business expenses and benefits, in each case for any Transferred Employee, but only to the extent allocable to Buyer in accordance with *Section 7.4*.<br><br>*See* Stalking Horse Agreement § 2.3. |
| **Sale to Insider (Local Rule 6004-1(b)(iv)(A))** | As described above and in the First Day Declaration, the Stalking Horse Bidder is an affiliate of the Zohar Funds, which own approximately 49.7% of MDHI's equity and hold approximately 93% of the Obligations under the Prepetition First Lien Credit Agreement and are therefore affiliates of the Debtors.  The |

| Provision | Summary |
|---|---|
| | Zohar Funds are bidding in conjunction with their creditors, which will be the ultimate beneficial economic owners of the Stalking Horse Bidder.<br><br>Prior to the Petition Date, the Director was appointed as the sole director for Debtor MDHI and the sole manager of Debtor Monterrey. Under the Zohar Timeline Order, the Director, as MDHI's Independent Fiduciary (as defined in the Zohar Monetization Order), is "responsible for conducting the sale process on behalf of the Portfolio Company [e.g., the Debtors]." *See* Zohar Monetization Order, ¶ 8.<br><br>The Debtors' management and advisors, at the direction of and in consultation with the Director, engaged in extensive arms' length negotiations with the Stalking Horse Bidder regarding the Stalking Horse Agreement. The Director ultimately determined, in consultation with the Debtors' advisors, that the Stalking Horse Agreement represented the highest and best offer received for the Assets.<br><br>At all times, the Stalking Horse Bidder has been represented by separate counsel in negotiations resulting in entry into the Stalking Horse Agreement. |
| **Agreements with Management (Local Rule 6004-1(b)(iv)(B))** | The Stalking Horse Agreement also provides that the Stalking Horse Bidder and the Debtors will execute (i) a Subcontract Agreement Pending Novation and (ii) a Transition Services Agreement concerning the provision of wind-down services by the Debtors to Seller following the Closing. In order to effectuate the assumption and assignment of the Government Contracts, the Debtors, the Stalking Horse Bidder, and the Government must enter one or more novation agreements, and such other documents as the applicable governmental authorities may require. The Parties do not expect to obtain such approvals prior to the Closing and therefore, obtaining such approvals is not a condition to the Closing. Following the Closing, so long as such approvals remain pending, the Stalking Horse Bidder will engage the Debtors as a subcontractor under the Government Contracts and perform under the Transition Services Agreement in order to enable the new ownership to operate the business in the ordinary course in accordance with the terms and conditions of the Subcontract Agreement Pending Novation<br><br>*See* Stalking Horse Agreement § 6.5. |
| **Releases (Local Rule 6004-1(b)(iv)(C))** | Not applicable. |
| **Private Sale/No Competitive Bidding (Local Rule 6004-1(b)(iv)(D))** | Not applicable. |

| Provision | Summary |
|---|---|
| **Closing and Other Deadlines (Local Rule 6004-1(b)(iv)(E))** | The Stalking Horse Agreement sets forth the conditions and terms for the Closing of the sale:<br><br>The closing of the transactions contemplated by the Stalking Horse Agreement (the "***Closing***") shall take place by electronic exchange of documents on the date that is two (2) Business Days after the date on which the conditions set forth in *Article VIII* have been satisfied or waived in writing by the Party entitled to the benefit thereof (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver in writing (by the Party entitled to the benefit thereof) of such conditions at the Closing) or such other time and place as Buyer and Sellers may mutually agree in writing. The date on which the Closing occurs is referred to in the Stalking Horse Agreement as the "***Closing Date***".<br><br>*See* Stalking Horse Agreement § 3.1.<br><br>The Stalking Horse Agreement also includes the following milestones:<br><br>(a)    within two (2) Business Days after the Execution Date, commence the Chapter 11 Cases by filing in the Bankruptcy Court one or more voluntary petitions for relief as debtors-in-possession under Chapter 11 of the Bankruptcy Code;<br><br>(b)    within two (2) Business Days after the Petition Date, Sellers shall have filed the Sale Motion, including this Agreement;<br><br>(c)    no later than twenty-eight (28) days after the Petition Date, the Bankruptcy Court shall have (x) approved the (i) Bid Procedures and (ii) the form and manner of notice of the sale of the Purchased Assets hereunder and assumption and assignment of executory contracts and unexpired leases, in form and substance reasonably acceptable to Sellers and Buyer, and (y) scheduled the Auction and Sale Hearing; and<br><br>(d)    within ten (10) days after consummation of the Auction (or if the Auction is not necessary, within ten (10) days after the deadline for submitting a qualified bid as set forth in the Bid Procedures), but subject to availability of the Bankruptcy Court, the Sale Hearing shall have occurred and the Bankruptcy Court shall have approved the transaction contemplated by this Agreement. |
| **Good Faith Deposit (Local Rule 6004-1(b)(iv)(F))** | The Purchase Price is comprised of the Credit Bid and assumption of the Assumed Liabilities.  Accordingly, the Stalking Horse Agreement does provide for a deposit. |
| **Interim Arrangements with Proposed Buyer** | The Stalking Horse Agreement sets forth customary provisions regarding the Debtors' conduct of their businesses pending the Closing Date.<br><br>*See* Stalking Horse Agreement § 6.1. |

| Provision | Summary |
|---|---|
| **(Local Rule 6004-1(b)(iv)(G))** | The Stalking Horse Agreement also provides that the Stalking Horse Bidder and the Debtors will execute (i) a Subcontract Agreement Pending Novation and (ii) a Transition Services Agreement concerning the provision of wind-down services by the Debtors to Seller following the Closing. In order to effectuate the assumption and assignment of the Government Contracts, the Debtors, the Stalking Horse Bidder, and the Government must enter one or more novation agreements, and such other documents as the applicable governmental authorities may require. The Parties do not expect to obtain such approvals prior to the Closing and therefore, obtaining such approvals is not a condition to the Closing. Following the Closing, so long as such approvals remain pending, the Stalking Horse Bidder will engage the Debtors as a subcontractor under the Government Contracts and perform under the Transition Services Agreement in order to enable the new ownership to operate the business in the ordinary course in accordance with the terms and conditions of the Subcontract Agreement Pending Novation<br><br>*See* Stalking Horse Agreement § 6.5. |
| **Use of Proceeds (Local Rule 6004-1(b)(iv)(H))** | The Purchase Price is comprised of the Credit Bid and assumption of the Assumed Liabilities. Accordingly, the Stalking Horse Agreement does provide for the use of proceeds. |
| **Tax Exemption (Local Rule 6004-1(b)(iv)(I))** | Applicable law shall apply. |
| **Record Retention (Local Rule 6004-1(b)(iv)(J))** | Excluded from the Purchased Assets are (a) records, documents or other information solely to the extent relating to any current or former Employee who is not or does not become a Transferred Employee and any materials to the extent containing information about any Employee, disclosure of which to Buyer as the acquirer of the Business would violate applicable Law and (b) all attorney-client privilege and attorney work-product protection of any Seller or associated with its businesses solely to the extent arising with respect to legal counsel representation of any Seller or any of their respective Affiliates or their businesses in connection with the transactions contemplated by the Stalking Horse Agreement or any of the Transaction Documents.<br><br>For a period of six (6) years following the Closing Date, Buyer shall provide to Sellers, their respective Affiliates, and their respective officers, employees and representatives (after reasonable advance notice and during regular business hours) reasonable access to, including the right to make copies of, all books and records included in and otherwise related to the Business, any of the Purchased Assets or any of the Assumed Liabilities, to the extent necessary to permit each Seller to determine any matter relating to their respective rights and obligations hereunder, to any Proceeding or to any Pre-Closing Tax Period (for example, for purposes of any Tax or accounting audit or any claim or litigation matter) or otherwise related to the Excluded Assets or Excluded Liabilities, for periods prior to the Closing and shall preserve such books and records until the latest of (i) such period as shall be consistent with Buyer's |

| Provision | Summary |
|---|---|
| | records retention policy in effect from time to time, (ii) the retention period required by applicable Law, (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases and (iv) in the case of books and records relating to Taxes, the expiration of the statute of limitations applicable to such Taxes. Such access shall include access to any information in electronic form to the extent reasonably available.<br><br>*See* Stalking Horse Agreement §§ 2.2, 7.1(a). |
| **Sale of Avoidance Actions (Local Rule 6004-1(b)(iv)(K))** | Avoidance actions are sold to the Purchaser.<br><br>*See* Stalking Horse Agreement § 2.1(k). |
| **Requested Findings as to Successor Liability (Local Rule 6004-1(b)(iv)(L))** | The Stalking Horse Agreement provides that the Sale Order shall, among other things, find that Buyer shall have no Liability or responsibility for any Liability or other obligation of any Seller other than the Assumed Liabilities as expressly set forth in the Stalking Horse Agreement or as required under applicable non-bankruptcy Law, whether known or unknown as of the Closing Date or in connection with the transactions contemplated to occur on the Closing, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the businesses of Sellers, the Purchased Assets or any Liability of any Seller, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, successor, or transferee Liability, labor law, de facto merger, or substantial continuity and that Buyer shall not be the successor of any Seller, have, de facto, or otherwise, merged with or into any Seller, or be a mere continuation or substantial continuation of any Seller or the enterprise of any Seller, (v) find that Buyer has provided adequate assurance (as that term is used in Section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts.<br><br>*See* Stalking Horse Agreement § 7.2(d)(iv). |
| **Sale Free and Clear of Unexpired Leases (Local Rule 6004-1(b)(iv)(M))** | The Debtors are seeking to sell the Assets free and clear of all Claims, encumbrances, and other interests pursuant to Section 363(f) of the Bankruptcy Code, except as to the Permitted Liens and Assumed Liabilities. |
| **Credit Bid (Local Rule 6004-1(b)(iv)(N))** | Included in the Purchase Price is shall be (a)(i) the credit bid pursuant to Section 363(k) of the Bankruptcy Code against $150,000,000 of the Obligations (as defined in the Term Loan Agreement) as of the Closing and (ii) an assumption by Buyer of up to $60,000,000 of the DIP Obligations, subject to Buyer reaching an acceptable agreement for such assumption with the requisite lenders under the DIP Facility; provided, however, that the credit bid amount in *Section 3.1(a)(i)* shall be increased by the difference between $60,000,000 and the outstanding DIP Obligations being assumed pursuant to *Section 3.1(a)(ii)*, up to a maximum increase of $30,000,000 |

| Provision | Summary |
|---|---|
|  | *See* Stalking Horse Agreement § 3.2. |
| **Relief from Bankruptcy Rule 6004(h) (Local Rule 6004-1(b)(iv)(O))** | As noted in this Motion, the Debtors are requesting relief from the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d). |

**THE PROPOSED SALE**

25.     The Debtors believe that a prompt sale of the Assets through a competitive sale process represents the best option available to maximize value for all stakeholders in these Chapter 11 Cases.  Moreover, it is critical for the Debtors to execute on a sale transaction as expeditiously as possible.

26.     As described in further detail in the First Day Declaration, a number of factors have destabilized the Debtors' business and threaten to further deteriorate the value of the Assets.  The Debtors' senior secured prepetition term loan indebtedness matured in June 2019 and the Debtors were unable to repay or refinance such indebtedness.  Since that time, the Debtors have been in default under the Prepetition First Lien Credit Agreement, which effectively foreclosed the Debtors' access to financing and, in turn, has hampered its ability to compete for certain contracts.  Specifically, the Debtors have been unable to obtain bonding due to the default under the Prepetition First Lien Credit Agreement and, as a result, has been unable to compete for contracts that include bonding requirements.

27.     The Debtors have also been named as defendants in several lawsuits and have expended significant resources defending those lawsuits.  Two of those lawsuits resulted in significant verdicts against the Debtors: (i) the State of the Netherlands obtained a judgment of approximately $15 million against Debtor MDHI in May 2012, which was registered in Arizona

and New York in November 2018 and September 2020, respectively, and (ii) a jury returned a verdict against Debtor MDHI in the Qui Tam Action awarding damages in the amount of approximately $36.8 million in September 2021.

28.     Compounding these issues, the Debtors' business has also faced headwinds from the U.S. military's withdrawal from Afghanistan and attendant wind-down of the Debtors' contracts to supply helicopters and provide related services to the Afghanistan military, which represented approximately 40% of the Debtors' gross revenues.  The Afghanistan withdrawal resulted in the Debtors losing orders to supply approximately 20 helicopters that would have generated $160 million in gross revenue.  Additionally, the Debtors have experienced supply chain disruptions caused by the COVID-19 pandemic, which have resulted in delays in certain sales.  As a result of these factors, among others, the Debtors have been operating under a cloud of uncertainty that has strained the Debtors' cash flows and negatively affected liquidity.

29.     In light of these challenges, the Debtors are critically focused on stabilizing the business and providing certainty to their vendors, suppliers, customers and workforce regarding the path forward for the business by consummating a value maximizing sale transaction. Prepetition, the Debtors took important first steps towards achieving that goal by executing the Qui Tam Settlement, which contemplates a sale of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code, and negotiating and executing the Stalking Horse Agreement.  It is critical that the Debtors seize on that momentum by cementing a process for the swift and orderly transition of the Debtors' business to the Successful Bidder.  This is of the utmost importance as it will signal to the Debtors' customers, vendors, employees, and other constituents from the outset of these Chapter 11 Cases that the Debtors' situation is temporary only and that the business will emerge from the chapter 11 process with new owners, a more stable capital structure, and the

issues related to the Qui Tam Action squarely in the rear-view mirror.  In other words, time is of the essence.

30.    While there is a manifest need for expediency here, the Debtors recognize that conducting a postpetition market check on the Stalking Horse Bid is appropriate and necessary to ensure that the value of the Assets is maximized.  To that end, the timeline contemplated by the Bid Procedures appropriately balances the need for expediency with the interest in providing interested parties with a sufficient opportunity to participate in a competitive postpetition sale process and auction.  Specifically, by this Motion, the Debtors respectfully request that this Court approve the following sale timeline:

(a)    ***Assumed Contract Objection Deadline***:  Objections to (i) the potential assumption and assignment of any Contract to the Stalking Horse Bidder including the ability of the Stalking Horse Bidder to provide adequate assurance of future performance and (ii) the proposed cure amount to be paid in connection with the assumption and assignment of any Contract shall be filed and served no later than **May 11, 2022 at 4:00 p.m. (prevailing Eastern Time) (the "<u>Assumed Contract Objection Deadline</u>"**); *provided* that, to the extent any Contract Counterparty is added to the Assumption Notice after the initial notice is served, such new Contract Counterparty shall have ten (10) days from the date of service of the Supplemental Contract Notice to object to the proposed cure amount and assignment to the Successful Bidder.

(b)    ***Sale Objection Deadline***:  Objections to the Sale shall be filed and served no later than **May 11, 2022 at 4:00 p.m. (prevailing Eastern Time)**.

(c)    ***Intention to Submit Qualified Bid Deadline***:  Intentions to Submit Qualified Bid must be received by no later than **May 20, 2022 at 4:00 p.m. (prevailing Eastern Time) (the "<u>Intention to Submit Qualified Bid Deadline</u>"**).

(d)    ***Bid Deadline***:  Bids for the Assets, including a marked-up form of the Stalking Horse Agreement, as well as the deposit and the other requirements for a bid to be considered a Qualified Bid (as defined in the Bid Procedures) must be received by no later than **June 3, 2022 at 4:00 p.m. (prevailing Eastern Time)** or such later date as may be agreed to by the Debtors (the "<u>**Bid Deadline**</u>").

(e)     ***Auction***:  The Auction, if necessary, shall be held on **June 9, 2022 at 10:00 a.m. (prevailing Eastern Time)**, or such other location as identified by the Debtors after notice to all Qualified Bidders.

(f)     ***Post-Auction Notice Deadline***:  As soon as reasonably practicable after closing the Auction, if any, and in any event not less than 24 hours after closing the Auction, the Debtors shall file and serve a notice identifying the Successful Bidder and Back-Up Bidder (the "**Post-Auction Notice**").

(g)     ***Post-Auction Objection Deadline***:  If the Successful Bidder that prevails at the Auction is not the Stalking Horse Bidder, the deadline to object solely to (i) the identity of a Successful Bidder or (ii) the ability of the Successful Bidder to provide adequate assurance of future performance under the Assumed Contract shall be **June 13, 2022 at 4:00 p.m. (prevailing Eastern Time)** (the "**Post-Auction Objection Deadline**").

(h)     ***Sale Hearing***:  Subject to this Court's availability and schedule, (i) if the Debtors receive one or more Intention(s) to Submit Qualified Bid, the Sale Hearing shall commence on or before **June 17, 2022** and (ii) if the Debtors do not receive any Intention to Submit Qualified Bid by the Intention to Submit Qualified Bid Deadline, the Sale Hearing shall commence on or before **May 27, 2022**.

31.     The Debtors believe this timeline maximizes the prospect of receiving the highest or best offer for the Assets while ensuring that the Debtors can close the Sale on the timeline contemplated in the Stalking Horse Agreement.  Given the Debtors' extensive prepetition marketing efforts, the proposed timeline is more than adequate to complete a fair, robust and open sale process that will maximize the value received for the Assets.  Indeed, the Debtors and their advisors have been actively marketing the Assets to prospective bidders since October 2021 and believe that the most likely potential bidders in an auction have already been contacted and afforded an opportunity to conduct diligence in connection with the prepetition marketing process. To further ensure that the Debtors' proposed sale process maximizes value for the benefit of the Debtors' estates, and in accordance with the Stalking Horse Agreement, the Debtors and their professionals will use the time following the Petition Date to continue to actively market the Assets in an attempt to solicit the highest or otherwise best bids available.  The Debtors believe the relief

requested by this Motion is in the best interests of their creditors, their other stakeholders, and all other parties in interest, and should be approved.

## THE BID PROCEDURES ORDER

### A.    The Bid Procedures and Auction Process

32.    To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Debtors have developed and proposed the Bid Procedures, attached as Exhibit 1 to the Bid Procedures Order.  The Bid Procedures were developed to promote participation and active bidding, and to ensure that the Debtors receive the highest or otherwise best offer for the Assets.  As such, the Debtors believe the timeline for consummating the sale process established pursuant to the Bid Procedures is in the best interest of their estates and all parties in interest.

33.    The Bid Procedures describe, among other things, the requirements for prospective purchasers to participate in the bidding process, the availability and conduct of due diligence, the deadline for submitting a competing bid, the method and factors for determining qualifying bids, the criteria for selecting a successful bidder and the non-exhaustive procedures for conducting an action if timely Qualified Bids other than the Stalking Horse Bid are received.

34.    The following summary describes the salient points of the Bid Procedures and discloses certain information required pursuant to Local Rule 6004-1:[6]

---

[6]    This summary of the Bid Procedures is qualified in its entirety by the Bid Procedures attached as Exhibit 1 to the Bid Procedures Order.  All capitalized terms that are used in this summary, but not otherwise defined herein, shall have the meanings set forth in the Bid Procedures.  To the extent there are any conflicts between this summary and the Bid Procedures, the terms of the Bid Procedures shall govern.

| Provision | Summary |
|---|---|
| **Provisions Governing Qualifications of Bidders** (Local Bankr. R.6004-1(c)(i)(A)) | The Stalking Horse Bidder shall at all times be deemed to be a Qualified Bidder and the Stalking Horse Agreement shall at all times be deemed to be a Qualified Bid (the "**Stalking Horse Bid**"). <br><br> To receive due diligence information, including full access to the Debtors' electronic data room and to additional non-public information regarding the Debtors, any party interested in submitting a bid, other than the Stalking Horse Bidder (each a "**Potential Bidder**"), must deliver the following documents (collectively, the "**Preliminary Bid Documents**") by email to the Debtors' investment banker, Moelis, Attn: Azad Badakhsh (azad.badakhsh@moelis.com) and Adam Keil (adam.keil@moelis.com), with a copy to the Debtors' counsel, Latham & Watkins, LLP, Attn: Suzzanne Uhland (suzzanne.uhland@lw.com), Adam S. Ravin (adam.ravin@lw.com) and Brett M. Neve (brett.neve@lw.com), and Troutman Pepper Hamilton Sanders LLP, Attn: David B. Stratton (david.stratton@troutman.com), David M. Fournier (david.fournier@troutman.com) and Evelyn J. Meltzer (evelyn.meltzer@troutman.com) (collectively, the "**Bid Recipients**"): <br><br> (i) an "**Acceptable Confidentiality Agreement**," which, as defined in the Stalking Horse Agreement, shall mean a confidentiality agreement that contains provisions that are not less favorable in the aggregate to the Debtors than those contained in the confidentiality agreement executed between the Debtors and the Stalking Horse Bidder, to the extent not already executed; <br><br> (ii) identification of the Potential Bidder and any principals and representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated Sale; and <br><br> (iii) evidence by the Potential Bidder of its financial capacity to close a proposed transaction, which shall include financial statements of the Potential Bidder, including current audited and unaudited financial statements or other financial information of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, current audited and unaudited financial statements or other financial information of the Potential Bidder's equity holder or other financial backer, or such other form of financial disclosure and evidence acceptable to the Debtors and their advisors in their reasonable discretion, demonstrating such Potential Bidder's ability to close the proposed transaction, to finance going concern operations to the extent contemplated, and to provide adequate assurance of future performance to counterparties to any executory contracts and unexpired leases to be assumed by the Potential Bidder. |

| Provision | Summary |
|---|---|
| | Promptly after a Potential Bidder delivers Preliminary Bid Documents to the Bid Recipients, the Debtors shall assess the adequacy of the evidence of its capacity and notify the Potential Bidder whether such Potential Bidder has submitted acceptable Preliminary Bid Documents so that the Potential Bidder may proceed to conduct due diligence and ultimately submit an Intention to Submit Qualified Bid, a Bid and participate in the Auction, as applicable. Only those Potential Bidders that have submitted acceptable Preliminary Bid Documents (each, a "**Bidder**") may submit Bids.<br><br>As soon as reasonably practicable after the Debtors determine that a Potential Bidder is a Bidder, the Debtors shall provide such Bidder with access to an electronic data room and reasonable due diligence information as requested by such Bidder (to the extent such Bidder has not already been provided such access and information). All due diligence requests must be directed to Moelis. Moelis will work to facilitate meetings between any interested Bidder and the Debtors' management team. For all Bidders (except for the Stalking Horse Bidder), the due diligence period will end on the Bid Deadline, and after the Bid Deadline, the Debtors will have no obligation to furnish any due diligence information.<br><br>The Debtors and their advisors shall coordinate all reasonable requests from Bidders for additional information and due diligence access. The Debtors may decline to provide such information to Bidders who, in the Debtors' business judgment, have not established, or who have raised doubt, that such Bidder intends in good faith or has the capacity to consummate a sale transaction of all or substantially all of the Assets (a "**Transaction**").<br><br>For any Bidder who is a competitor of the Debtors or is affiliated with any competitor of the Debtors, the Debtors reserve the right to withhold any diligence materials that the Debtors determine are business-sensitive or otherwise inappropriate for disclosure to such Bidder at such time.<br><br>Each Bidder shall comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors regarding such Bidder and its contemplated Transaction.<br><br>*See* Bid Procedures § J.2.<br><br>After receipt of the Diligence Materials, each Potential Bidder that intends, in good faith, to submit a Bid that it believes will be a Qualified Bid must submit an indication of interest setting forth its intention to submit a Qualified Bid to the Bid Recipients (an "**Intention to Submit Qualified Bid**") by the Intention to Submit Qualified Bid Deadline. Each Intention to Submit Qualified Bid shall include:<br><br>      (i)     <u>Purchase Price</u>. Each Intention to Submit Qualified Bid must clearly set forth the terms of any proposed Transaction, including and identifying separately any cash and non-cash components of the proposed Transaction consideration, such as |

| Provision | Summary |
|---|---|
| | certain liabilities to be assumed by the Bidder as part of the Transaction; |

(ii)  <u>Financing</u>. Each Intention to Submit Qualified Bid must clearly state whether the Potential Bidder intends to (a) consummate the Transaction set forth in its Intention to Submit Qualified Bid with cash on hand or (b) rely on financing to consummate such Transaction.  To the extent that a Potential Bidder intends to consummate such Transaction with cash on hand, evidence by the Potential Bidder of its financial capacity to close a proposed transaction, which shall include financial statements of the Potential Bidder, including current audited and unaudited financial statements or other financial information of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, current audited and unaudited financial statements or other financial information of the Potential Bidder's equity holder or other financial backer, or such other form of financial disclosure and evidence acceptable to the Debtors and their advisors in their reasonable discretion, demonstrating such Potential Bidder's ability to close the proposed transaction, to finance going concern operations to the extent contemplated, and to provide adequate assurance of future performance to counterparties to any executory contracts and unexpired leases to be assumed by the Potential Bidder.  To the extent that a Potential Bidder intends to consummate such Transaction through financing, each Intention to Submit Qualified Bid must identify the source(s) of potential debt and/or equity funding commitments to satisfy the Potential Bidder's purchase price;

(iii)  <u>Identity</u>.  Each Intention to Submit Qualified Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with a potential Bid (including each equity holder or other financial backer of the Potential Bidder if such Potential Bidder is an entity formed for the purpose of consummating the proposed Transaction contemplated by a potential Bid), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any potential Bid.  Each potential Bid must also include contact information for the specific person(s) and counsel the Debtors' advisors should contact regarding such potential Bid;

(iv)  <u>Authorization</u>.  Each Intention to Submit Qualified Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors) acceptable to the Debtors with respect to the submission of the

| Provision | Summary |
|-----------|---------|
|  | Intention to Submit Qualified Bid and its potential Bid and the consummation of the Transactions contemplated in such potential Bid; |
|  | (v) <u>Regulatory or Third-Party Approval</u>. Each Intention to Submit Qualified Bid must set forth any regulatory or third-party approval required for the Potential Bidder to consummate the Sale, and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals; |
|  | (vi) <u>Due Diligence</u>. Each Intention to Submit Qualified Bid must set forth with specificity any due diligence that must be conducted in order for the Potential Bidder to submit a timely Bid. |
|  | (vii) <u>Substantial Contribution Waiver</u>. Each Intention to Submit Qualified Bid must contain an express waiver, effective upon submission of the Intention to Submit Qualified Bid, of any substantial contribution claims by the Potential Bidder; |
|  | (viii) <u>Expenses; Disclaimer to Fees</u>. Each Intention to Submit Qualified Bid must disclaim any right to receive a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, no Potential Bidder will be permitted to request, or be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, substantial contribution, or any other similar form of compensation, and by submitting an Intention to Submit Qualified Bid any Potential Bidder is waiving any assertion or request for reimbursement on any basis, including under Section 503(b) of the Bankruptcy Code; |
|  | (ix) <u>Consent to Jurisdiction</u>. Each Intention to Submit Qualified Bid must submit to the exclusive jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of Bids, the Auction, the construction and enforcement of these Bid Procedures, the Sale documents, and the closing of the sale, as applicable; and |
|  | (x) <u>Other Information</u>. Each Intention to Submit Qualified Bid must contain such other information as may be reasonably requested by the Debtors. |
|  | Promptly after a Potential Bidder delivers an Intention to Submit Qualified Bid to the Bid Recipients, the Debtors will assess the adequacy of such Intention to Submit Qualified Bid and notify the Potential Bidder whether such Potential Bidder has submitted an acceptable Intention to Submit Qualified Bid so that |

| Provision | Summary |
|---|---|
| | the Potential Bidder may proceed to conduct due diligence and ultimately submit a Bid and participate in the Auction, as applicable.<br><br>If no Potential Bidder submits an Intention to Submit Qualified Bid by the Intention to Submit Qualified Bid Deadline, the Debtors shall promptly file a Notice of Successful Bidder identifying the Stalking Horse Bidder as the Successful Bidder.  Such notice shall terminate the Bid Deadline, cancel the Auction, and provide notice of the Sale Hearing to be held on May 27, 2022.<br><br>*See* Bid Procedures § J.3. |
| **Good Faith Deposit (Local Rule 6004-1(b)(iv)(F))** | Each Qualified Bid, other than the Stalking Horse Bid, must be accompanied by a cash deposit in the amount of 10% of the total cash and non-cash consideration proposed by the bidder to be held in an escrow account to be identified and established by the Debtors (the "**Deposit**").<br><br>*See* Bid Procedures § J.3(xii). |
| **Other Highlighted Terms Under Del. Bankr. L.R. 6004-1(b)(iv)** | Private Sale/No Competitive Bidding:  The Sale is being conducted pursuant to the competitive bidding process detailed in the Motion.<br><br>Credit Bid:   The Stalking Horse Bidder shall automatically be deemed a Qualified Bidder and shall have the right to credit bid on a dollar-for-dollar basis all or a portion of (i) the DIP Obligations (as defined in the Stalking Horse Agreement) held by the Stalking Horse Bidder, which may include any DIP Obligations assigned to, and assumed by, the Stalking Horse Bidder, and (ii) the Obligations (as defined in the Prepetition First Lien Credit Agreement) held by the Stalking Horse Bidder, which may include any Obligations assigned to, and assumed by, the Stalking Horse Bidder.<br><br>*See* Bid Procedures § J.4.<br><br>Relief from Bankruptcy Rule 6004(h):  As noted in this Motion, the Debtors are requesting relief from the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d). |
| **Provisions Governing Qualified Bids (Local Bankr. R. 6004-1(c)(i)(A), (B))** | To be eligible to participate in the Auction, each offer, solicitation, or proposal (each, a "**Bid**"), and each Bidder, must be determined by the Debtors, to satisfy each of the following conditions:<br><br>(i)    Stalking Horse Bidder.   The Stalking Horse Bidder shall be deemed to be a Qualified Bidder and the Stalking Horse Agreement shall be deemed to be a Qualified Bid (the "**Stalking Horse Bid**").<br><br>(ii)    Bid Deadline. The Debtors must receive a Bid in writing, on or before **June 3, 2022 at 4:00 p.m. (prevailing Eastern Time)** or such later date as may be agreed to by the Debtors (the "**Bid** |

| Provision | Summary |
|---|---|
| | **Deadline**”).  Bids must be sent to the Bid Recipients by the Bid Deadline to be considered. |

(i)    Form and Contents.  All Bids shall be in the form of an irrevocable offer letter from a person or persons that the Debtors, in their reasonable discretion taking into account its fiduciary duties, deem financially able to consummate the purchase of the Assets, which letter states and includes:

(A)    Marked Agreement.  Each Bid must state the Bidder irrevocably offers to purchase some or all of the Assets upon the terms and conditions set forth in a duly executed non-contingent and attached complete asset purchase agreement, which shall be in substantially the same form as the Stalking Horse Agreement, prepared and executed by the Bidder (an electronic version in Word format and blacklined against the Stalking Horse Agreement), together with its exhibits and schedules, including terms relating to price and the time of closing (the “**Proposed Agreement**”);

(B)    Assets.  Each Bid must clearly specify the Assets that are included in the Bid (it being understood that while Bids for a portion or subset of the Assets may be permitted, the Debtors may consider whether the combined consideration for the Assets exceeds the Purchase Price of the Stalking Horse Agreement and/or other aspects of the bid in determining whether the Bid is a Qualified Bid);

(C)    Purchase Price.  Each Bid must clearly set forth the terms of any proposed Transaction, including and identifying separately any cash and non-cash components of the proposed Transaction consideration, such as certain liabilities to be assumed by the Bidder as part of the Transaction (the “**Purchase Price**”);

(D)    Overbid.  Each Bid or combination of Bids (a) must propose a purchase price equal to or greater than the sum of (i) the value of the Stalking Horse Agreement, as determined by the Debtors; and (ii) an initial overbid of at least $1,000,000, and (b) must obligate the Bidder(s) to pay, to the extent provided in the Agreement, all amounts which the Stalking Horse Bidder under the Agreement has agreed to pay, including any assumed liabilities (as set forth in the Stalking Horse Agreement);

| Provision | Summary |
|---|---|
|  | (E)    <u>Committed Financing</u>.  To the extent that a Bid is not accompanied by evidence of the Bidder's capacity to consummate the Transaction set forth in its Bid with cash on hand, each Qualified Bid must include evidence of committed financing that demonstrates that the Bidder has received sufficient, non-contingent financing that demonstrates that the Bidder has received sufficient non-contingent and binding debt and/or equity funding commitments to satisfy the Bidder's Purchase Price and other obligations under its Bid.  Such funding commitments or other financing acceptable to the Debtors must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors; |
|  | (F)    <u>Contingencies; No Financing or Diligence Outs</u>.  A Bid shall not be conditioned on a Bidder obtaining, or the sufficiency of, financing or any internal approval, or on the outcome or review of due diligence, which must be completed before the Bid Deadline, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions; |
|  | (G)    <u>Identity</u>.  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Bidder if such Bidder is an entity formed for the purpose of consummating the proposed Transaction contemplated by such Bid), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid.  Each Bid must also include contact information for the specific person(s) and counsel the Debtors' advisors should contact regarding such Bid; |
|  | (H)    <u>Authorization</u>.  Each Bid must contain evidence that the Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors) acceptable to the Debtors with respect to the submission of its Bid and the consummation of the Transactions contemplated in such Bid; |

| Provision | Summary |
|---|---|
| | (I) Regulatory or Third-Party Approval. Each Bid must set forth any regulatory or third-party approval required for the Bidder to consummate the Sale, and the time period within which the Bidder expects to receive such regulatory and third-party approvals; |
| | (J) Substantial Contribution Waiver. Each Bid must contain an express waiver, effective upon submission of the Bid, of any substantial contribution claims by the Bidder; |
| | (K) Expenses; Disclaimer to Fees. Each Bid must disclaim any right to receive a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, no Potential Bidder will be permitted to request, or be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, substantial contribution, or any other similar form of compensation, and by submitting a Bid any Potential Bidder is waiving any assertion or request for reimbursement on any basis, including under Section 503(b) of the Bankruptcy Code; |
| | (L) Consummation. Each Bid must include a statement or evidence reflecting (i) that the Bidder is prepared to consummate the transaction upon entry of an order of the Bankruptcy Court approving the Sale to the Successful Bidder (the "**Sale Order**") and consummation shall not be contingent on obtaining requisite government, regulatory, or other third-party approvals for novation of the Government Contracts or security clearances, (ii) that the Bidder has made or will make as soon as reasonably practicable all necessary filings with respect to any regulatory, antitrust and other laws and pay the fees associated therewith; and (iii) the Bidder's plan and ability to obtain all requisite governmental, regulatory, or other third-party approvals, including novation of the Government Contracts (as defined below) and obtaining security clearances, and the proposed timing for the Bidder to undertake the actions required to obtain such approvals; |
| | (M) Irrevocability. Each Bid must include a statement that, in the event the Bidder becomes the Successful Bidder or the Back-Up Bidder (as defined below), such |

| Provision | Summary |
|-----------|---------|
| | Qualified Bidder's offer is irrevocable until two (2) business days after the closing of the sale of the Assets; |
| | (N)   <u>Actual Value</u>. The Bid must state the proposed actual value of such Bidder's bid to the Debtors' estate; |
| | (O)   <u>Assumed Contracts and Leases</u>. Each Bid must identify any and all executory contracts and unexpired leases of the Debtors that the Qualified Bidder wishes to be assumed pursuant to a Sale. A Bid must specify that such Bidder will be responsible for any cure costs associated with such assumption, and include a good faith estimate of such cure costs (which estimate shall be provided by the Debtors); |
| | (P)   <u>Employees</u>. Each Bid must detail the treatment of the employees of the Debtors; |
| | (Q)   <u>Damages</u>. Each Bid must provide that the Debtors have the right to pursue all available damages in the event of the Bidder's breach of, or failure to perform under, the Proposed Agreement; |
| | (R)   <u>Consent to Jurisdiction</u>. Each Bidder must submit to the exclusive jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of Bids, the Auction, the construction and enforcement of these Bid Procedures, the Sale documents, and the closing of the sale, as applicable; and |
| | (S)   <u>Other Information</u>. Each Bid must contain such other information as may be reasonably requested by the Debtors. |
| | <u>Same or Better Terms</u>. Each Bid shall be based on the Stalking Horse Bid and must exceed, either on its own terms or, in the case of a Bid for a portion or subset of the Assets, in combination with another Qualified Bid(s), the Stalking Horse Bid in relation to the Assets by the Minimum Overbid Increment (as that term is defined in the Bid Procedures Order). Each Bid must be on terms that are not more burdensome than the terms of the Stalking Horse Bid, as determined by the Debtors, and considering, among other factors, the scope and manner of the proposed Transaction. |
| | (ii)   <u>Corporate Authority</u>. Written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization to consummate the proposed transaction; provided, however, if the Bidder is an entity specially formed |

| Provision | Summary |
|---|---|
| | for the purpose of effectuating the transaction, then the Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the transaction by the equity holder(s) of such Bidder. |
| | (iii) <u>Adequate Assurance</u>.  All Bids must provide for adequate working capital financing to finance going concern operations to the extent contemplated, and to provide adequate assurance of future performance to counterparties to any executory contracts and unexpired leases to be assumed by the Bidder. |
| | (iv) <u>Back-Up Bidder</u>.  Each Bidder must acknowledge that by submitting a Bid, the Bidder agrees to be a Back-Up Bidder, should the Bid be so selected. |
| | (v) <u>Wind-Down Amounts</u>.  The Bid must ensure that the Debtors will retain sufficient cash to fund the orderly wind-down of the Debtors' estates in a manner at least equivalent to the Wind-Down Budget (as defined in the Stalking Horse Agreement). |
| | (vi) <u>Proof of Financial Ability to Perform</u>.  All Bidders must provide written evidence the Debtors reasonably conclude demonstrates the Bidder has the necessary financial ability to close the Transaction and provide adequate assurance of future performance under all contracts to be assumed and assigned in such Transaction.  Such information should include, <u>inter</u> <u>alia</u>, the following: (a) contact names and numbers for verification of financing sources; (b) written evidence of the Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the transaction; (c) the Bidder's current financial statements (audited if they exist); (d) a description of the Bidder's pro forma capital structure; and (e) any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors demonstrating such Bidder has the ability to close the transaction. |
| | (vii) <u>As Is, Where Is</u>.  The sale of the Assets shall be on an "as is, where is" and "with all defects" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents or estates, except to the extent set forth in the Proposed Agreement of the Successful Bidder. |
| | (viii) <u>Free and Clear</u>.  Except as otherwise provided in the Proposed Agreement, all of the Debtors' right, title, and interest in and to the Assets to be acquired shall be sold free and clear of all liens, claims, charges, security interests, restrictions, and other encumbrances of any kind or nature thereon and there against |

| Provision | Summary |
|---|---|
| | (collectively, the "Transferred Liens"), with such Transferred Liens to attach to the proceeds of the sale. |
| | (ix) <u>Good Faith Deposit</u>.  Each Qualified Bid must be accompanied by a cash deposit in the amount of 10% of the total Purchase Price to be held in an escrow account to be identified and established by the Debtors (the "**<u>Deposit</u>**"). |
| | (x) <u>Binding Effect</u>.  By submitting its Bid, each Bidder is agreeing, and shall be deemed to have agreed, to abide by and honor the terms of the Bid Procedures and to refrain from submitting a Qualified Bid or seeking to reopen the Auction after conclusion of the Auction. |
| | (xi) <u>Repayment of DIP Obligations</u>.  A Bid by a Bidder must provide for (a) payment, in full, in cash of all DIP Obligations (as defined in the Stalking Horse Agreement) and (b) funding of the carve-out under any financing order(s) entered by the Bankruptcy Court, in each case as of the Closing Date. |
| | (xii) <u>Time Frame for Closing</u>.  A Bid by a Bidder must be reasonably likely to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors but in no event later than one hundred fifty (150) days following the Petition Date. |
| | Notwithstanding anything to the contrary herein, a Bid may be in the form of a plan of reorganization (a "**<u>Restructuring Transaction</u>**"), it being understood that the Debtors reserve the right to modify these procedures, including without limitation, the Qualified Bid requirements, as necessary or appropriate to accommodate the submission and the Debtors' consideration of one or more Bids in the form of a Restructuring Transaction; *provided* that (a) in order for a Bid in the form of a Restructuring Transaction to constitute a Qualified Bid, such Bid must be capable of satisfying the requirements of Section 1129 of the Bankruptcy Code and being consummated, as determined by the Debtors, and (b) the failure of any such Bid to satisfy the requirements set forth above in subparagraphs (ii) through (xiv) may be taken into account by the Debtors in evaluating the Bid.<br><br>*See* Bid Procedures § J.4. |
| **Stalking Horse Bid Protections (Local Rule 6004-1(c)(i)(C))** | Not applicable. |

| Provision | Summary |
|---|---|
| **Bidding Increments (Local Rule 6004-1(c)(i)(C)(3))** | Any Overbid after the Baseline Bid (as defined in the Bid Procedures) shall be made in increments of at least **$1,000,000** (the "**Minimum Overbid Increment**"). Additional consideration in excess of the amount set forth in the Baseline Bid may include cash and/or non-cash consideration; <u>provided</u>, <u>however,</u> that the value for such non-cash consideration shall be determined by the Debtors in their reasonable business judgment. Upon the solicitation of each round of Overbids, the Debtors may announce a deadline (the "**Overbid Round Deadline**"), by which time any Overbids must be submitted to the Debtors. An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Qualified Bid or Overbid and shall otherwise comply with the terms of these Bid Procedures.<br><br>*See* Bid Procedures § K.2<br><br>After each Overbid Round Deadline, the Debtors shall determine whether an Overbid is higher or otherwise better than the Baseline Bid (as defined in the Bid Procedures) in the initial Overbid round or, in subsequent rounds, the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid (the "**Prevailing Highest Bid**"). The Debtors shall announce and describe to all Qualified Bidders present at the Auction the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid, as well as the value attributable by the Debtors to such Prevailing Highest Bid.<br><br>Any Overbid to a Prevailing Highest Bid by any Qualified Bidder must provide more value for the Debtors' estates than any prior bid.<br><br>*See* Bid Procedures § K.2. |
| **Modifications of Bidding and Auction Procedures (Local Rule 6004-1(c)(i)(D))** | The Debtors reserve their rights to modify these Bid Procedures in their reasonable business judgment in any manner that will best promote the goals of the bidding process, at or prior to the Auction, subject to the rights of the Stalking Horse Bidder. Notwithstanding the foregoing and subject in all respects to the Stalking Horse Agreement, the Debtors may not (i) impair or modify the Stalking Horse Bidder's rights and obligations under the Stalking Horse Agreement; or (ii) modify Section J.4(xiv) without the consent of the Required DIP Lenders (as defined in the DIP Credit Agreement).<br><br>*See* Bid Procedures § O. |

| Provision | Summary |
|---|---|
| **Closing with Alternative Backup Bidders (Local Rule 6004-1(c)(i)(E))** | Prior to concluding the Auction, the Debtors shall: (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale; and (ii) using their reasonable discretion, identify and announce to all attending the Auction the highest or otherwise best offer or combination of offers for the Assets (the "**Successful Bid**") and any second-highest offer (the "**Back-Up Bid**" and the "**Back-Up Bidder**").  Any Potential Bidder submitting a Bid that otherwise constitutes a Qualified Bid is deemed, by the submission of such Qualified Bid, to consent to such Qualified Bid being treated by the Debtors as Back-Up Bidder. <br><br> *See* Bid Procedures § K.2. <br><br> The Stalking Horse Agreement provides that if an Auction is conducted and the Debtors do not choose the Stalking Horse Bidder as the Successful Bidder, but instead chooses the Stalking Horse Bidder as the Back-Up Bidder, the Stalking Horse Bidder will serve as the Back-up Bidder. If the Stalking Horse Bidder is chosen as the Back-up Bidder, the Stalking Horse Bidder will be required to keep its bid to consummate the transactions contemplated by the Stalking Horse Agreement on the terms and conditions set forth in the Stalking Horse Agreement (as may be amended with Stalking Horse Bidder's written consent prior to or at the Auction) open and irrevocable until two (2) Business Days after the closing of the sale of the Purchased Assets to the Successful Bidder. If the agreement with the Successful Bidder is terminated prior to closing of the sale of the Purchased Assets to the Successful Bidder, the Stalking Horse Bidder will be deemed the Successful Bidder and will forthwith consummate the transactions contemplated by the Stalking Horse Agreement on the terms and conditions set forth in the Stalking Horse Agreement (as may be amended with the Stalking Horse Bidder's written consent prior to or at the Auction). <br><br> *See* Stalking Horse Agreement § 7.2(g). |
| **Provisions Governing the Auction (Local Rule 6004-1(c)(ii))** | <u>Auction</u>.  If one or more Qualified Bid is received by the Bid Deadline (other than the Stalking Horse Bid), the Debtors will conduct the Auction to determine the highest or otherwise best Qualified Bid or combination of Qualified Bids. <br><br> <u>Time and Place</u>.  The Auction, if necessary, shall be held on **June 9, 2022, at 10:00 a.m. (prevailing Eastern Time)**, or such other location as identified by the Debtors after notice to all Qualified Bidders. |

| Provision | Summary |
|---|---|
| | Baseline Bid. Prior to the commencement of the Auction, the Debtors shall determine which of the Qualified Bids, at such time, is the highest or otherwise best bid for purposes of constituting the opening bid of the Auction (the "**Baseline Bid**" and the Qualified Bidder submitting the Baseline Bid, the "**Baseline Bidder**"), and shall promptly notify the Stalking Horse Bidder and all Qualified Bidders with Qualified Bids of the Baseline Bid.  The Baseline Bid may be comprised of any combination of the Assets, and the Debtors may determine that different Baseline Bids exist for different groupings of the Assets.  The Debtors shall have the discretion to determine how to proceed when auctioning the Assets in groupings that do not include all of Debtors' Assets so as to maximize the value of the Assets. |

Auction Procedures.   The Auction shall be conducted in a timely fashion according to the following procedures:

(i)     The Debtors and their professional advisors shall direct, preside over, and transcribe the Auction.

(ii)    At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid.  All incremental Bids made thereafter shall be Overbids and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders.  The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids, and the Successful Bid.

(iii)   Only the Stalking Horse Bidder and other Qualified Bidders shall be entitled to make Bids at the Auction, subject to the terms of the Bid Procedures and other limitations as may reasonably be imposed by the Debtors.

(iv)    The Auction Bidders shall appear at the Auction, or through a duly authorized representative, who also may appear at the Auction.  Only the Debtors, the Auction Bidders, any creditor of the Debtors, together with the professional advisors to each of the foregoing parties, may attend the Auction; *provided* that any of the Debtors' creditors must provide three (3) business days' written notice to counsel to the Debtors of their intent to attend the Auction.

(v)     The Auction shall continue until the Debtors determine which Qualified Bid is the highest or otherwise best bid for the Assets, which determination shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the estates, including, *inter alia,* the following non-exhaustive factors: (a) the amount and nature of the consideration; (b) the proposed assumption of any liabilities

| Provision | Summary |
|---|---|
| | and/or executory contracts or unexpired leases, if any, and the excluded assets and/or executory contracts or unexpired leases, if any; (c) the ability of the Qualified Bidder to close the proposed Transaction and the conditions related thereto, and the timing thereof; (d) whether the Bid is a bulk bid or a partial bid for only some of the Debtors' assets; (e) the proposed closing date and the likelihood, extent and impact of any potential delays in closing; (f) any purchase price adjustments; (g) the impact of the transaction on any actual or potential litigation; (h) the net after-tax consideration to be received by the Debtors' estates; (i) the tax consequences of such Qualified Bid; and (j) the consent of the parties in interest and/or the cost and expense to the Debtors of resolving sale issues before Closing (collectively, the "**Bid Assessment Criteria**"). <br><br> <u>Closing the Auction</u>.  The Auction shall continue until there is only one Qualified Bid that the Debtors determine, after taking into account the Bid Assessment Criteria, to be the highest or otherwise best Qualified Bid for the Assets.  Such Qualified Bid shall be declared the Successful Bid, and such Qualified Bidder, the Successful Bidder, and the Auction shall be closed.  Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Court of the Successful Bid. <br><br> <u>No Collusion; Good-Faith Bona Fide Offer</u>.  Each Qualified Bidder participating at the Auction shall be required to confirm on the record at the Auction that (i) it has not engaged in any collusion with respect to the bidding, (ii) its Qualified Bid is a good-faith bona fide offer, and (iii) it intends to consummate the proposed Transaction if selected as the Successful Bidder. <br><br> *See* Bid Procedures § K. |

35.     Importantly, the Bid Procedures (and the Stalking Horse Bid) recognize the Debtors' fiduciary obligations to maximize the value of their Assets and, as such, do not impair the Debtors' ability to consider all Qualified Bids.  Additionally, as noted above, the Bid Procedures preserve the Debtors' rights to modify the Bid Procedures as necessary or appropriate to maximize the value of the Assets for the benefit of the Debtors' estates.

**B.    Form and Manner of Sale Notice**

36.     On or within two (2) business days after entry of the Bid Procedures Order, the Debtors shall cause the Sale Notice to be served on: (a) the Office of the United States Trustee for

the District of Delaware (the "**U.S. Trustee**"), 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Joseph J. McMahon, Jr. (joseph.mcmahon@usdoj.gov); (b) the holders of the thirty (30) largest, non-insider unsecured claims against the Debtors, if no official committee of unsecured creditors has been appointed; (c) counsel to the official committee of unsecured creditors, if one has been appointed; (d) counsel to the Stalking Horse Bidder; (e) counsel to Ankura Trust Company, LLC ("**Ankura**"); (f) counsel to Patriarch Partners Agent Services, LLC ("**PPAS**"); (g) counsel to the Zohar Lenders; (h) counsel to the Patriarch Lenders; (i) all parties known by the Debtors to assert a lien on any of the Assets; (j) all entities reasonably known to have expressed an interest in a transaction with respect to any of the Assets during the past nine (9) months; (k) the United States Attorney's Office for the District of Delaware; (l) the Internal Revenue Service; (m) all state and local taxing authorities with an interest in the Assets; (n) the offices of the attorneys general for the states in which the Debtors operate; (o) all other governmental agencies with an interest in the Sale and transactions proposed thereunder; (p) the office of the secretary of state in each state in which the Debtors operate or are organized; (q) all environmental authorities having jurisdiction over any of the Assets; (r) all other parties known or reasonably believed to have asserted an interest in the Assets; (s) the counterparties to the Assumed Contracts (the "**Assumed Contract Counterparties**"); (t) the Debtors' insurance carriers; (u) all known creditors of the Debtors; (v) all known holders of equity interests in the Debtors; (x) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (y) to the extent not included above, all parties in interest listed on Debtors' creditor matrix.

37.    In addition, the Debtors propose to publish the notice attached hereto as <u>Exhibit D</u> (the "**Publication Notice**") once in *USA Today*, *The Arizona Republic*, and *Vertical Magazine* as soon as practicable after entry of the Bid Procedures Order.  Finally, the Debtors will post a copy

of the Sale Notice at the website of their claims and noticing agent, Kroll Restructuring Administration LLC (f/k/a Prime Clerk LLC), located at https://cases.primeclerk.com/MDHelicopters.

**C.     Summary of the Assumption Procedures**

38.     The Debtors are also seeking approval of certain procedures to facilitate the fair and orderly assumption and assignment of the Assumed Contracts in connection with the Sale. Pursuant to the Bid Procedures Order, notice of the proposed assumption and assignment of the Assumed Contracts to the Successful Bidder, the proposed cure amounts related thereto, and the right, procedures, and deadlines for objecting thereto, shall be provided in the Assumption Notice to be sent to the applicable Assumed Contract Counterparties.  Because the Bid Procedures Order sets forth the Assumption Procedures in detail, they are not restated herein.  Generally, however, the Assumption Procedures: (i) outline the process by which the Debtors shall serve notice to all Assumed Contract Counterparties regarding the proposed assumption and assignment and related cure amounts, if any, informing such parties of their right, and the procedures, to object thereto, and (ii) establish objection and other relevant deadlines and the manner for resolving disputes relating to the assumption and assignment of the Assumed Contracts to the extent necessary.

39.     The Debtors are party to a number of contracts (collectively, the "**Government Contracts**") with the United States, its agencies, departments or agents (collectively, the "**Government**").  For the avoidance of doubt, the Sale Order will provide that, notwithstanding anything to the contrary in the Motion, the Bid Procedures Order, the Stalking Horse Agreement or any other document in connection with the Sale, no Government Contract may be assumed and/or assigned without: (i) the express written consent of the Government, (ii) the execution of a novation agreement applicable to the Government Contract, and (iii) the payment of all outstanding obligations and cure amounts arising under or related to such Government Contract.

**BASIS FOR RELIEF**

**A.      The Relief Sought in the Bid Procedures Order Is in the Best Interests of the Debtors' Estates and Should Be Approved**

40.      The Debtors filed these Chapter 11 Cases to pursue a value-maximizing sale for the benefit of the Debtors' stakeholders.  The Stalking Horse Agreement is the product of a five-plus month prepetition marketing process, during which the Debtors and Moelis contacted 170 potential buyers, executed 83 NDAs, and received initial indications of interest from 21 prospective buyers. The Debtors believe that the most likely bidders for the Assets have already been contacted as part of the prepetition marketing process and had amble opportunity to engage in the process and conduct appropriate diligence.  In light of the extensive prepetition marketing process, the Debtors believe that the Bid Procedures, and in particular the timeline contemplated therein, will ensure a value-maximizing sale while, at the same time, providing an achievable path towards an orderly resolution of these Chapter 11 Cases.  Moreover, the sale timeline is designed to comply with the milestones in the DIP Credit Agreement, which require, among other milestones, the entry of the Sale Order no later than 105 days after the Petition Date and the closing of a Sale no later than 120 days after the Petition Date.

**2.      The Proposed Notice of the Bid Procedures and the Sale Process Is Appropriate**

41.      The Debtors seek authority to sell the Assets through an Auction and related sale process, subject to the Debtors' right to seek an alternative course of action to maximize the value of their estates.  The Debtors and their advisors have conducted and will continue to conduct an extensive marketing process.  Moelis has a list of "**Contact Parties**" who will receive a copy of the "**Information Package**" (both as defined in the Bid Procedures).  The list of Contact Parties shall encompass those parties whom the Debtors believe may be interested in pursuing a Sale, or whom the Debtors reasonably believe may have the financial resources to consummate such a

transaction. The Bid Procedures are designed to elicit bids from one or more parties and to encourage a robust auction of the Assets, thus maximizing the value of the Debtors' estates for the benefit of their creditors and other stakeholders.

42.     Under Bankruptcy Rule 2002(a) and (c), the Debtors shall notify creditors of the proposed Sale of the Assets, including a disclosure of the time and place of any Auction, the terms and conditions of a Sale, and the deadline for filing any objections.

43.     The Debtors respectfully submit that the Sale Notice is reasonably calculated to provide parties with timely and proper notice of the proposed Sale, including: (i) the date, time, and place of the Auction (if one will be held), (ii) the Bid Procedures, (iii) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing, (iv) a reasonably specific identification of the Assets, (v) a description of the Sale as being free and clear of all liens, claims, encumbrances, and other interests other than Permitted Liens and Assumed Liabilities (as such terms are defined in the Stalking Horse Agreement), with all such liens, claims, encumbrances, and other interests attaching with the same validity and priority to the Sale proceeds, and (vi) notice of the proposed assumption and assignment of the Assumed Contracts to the Successful Bidder.

44.     The Debtors further submit that notice of this Motion and the related hearing to consider entry of the Bid Procedures Order, coupled with service of the Sale Notice, the Assumption Notice, and publication of the Publication Notice, as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. The Debtors further submit the proposed notice procedures are designed to maximize the chance of obtaining the broadest possible participation in the Debtors' marketing process, while minimizing costs to the

estates.    Accordingly, the Debtors respectfully request the Court find the proposed notice procedures set forth in this Motion are sufficient, and no other or further notice of the Bid Procedures, Auction, Sale, or Sale Hearing is required.

### 3.      The Bid Procedures Are Appropriate and Will Maximize Value

45.      Bid procedures should be approved when they provide a benefit to the debtor's estate by maximizing the value of the debtor's assets.  *See In re Edwards*, 228 B.R. 552, 361 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate.").  Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets.  *See, e.g., In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'") (internal citations omitted); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (quoting *Schipper*); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (same); *see also In re Integrated Resources, Inc.*, 147 B.R. 650, 656-57 (S.D.N.Y. 1992) (noting that bid procedures that have been negotiated by a trustee are to be reviewed in accordance with the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

46.      The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See Mushroom Transp. Co., Inc.*, 382 F.3d 325, 339 (3d Cir. 2004); *Official Comm. of Unsecured Creditors of Cybergenics, Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003); *see also In re Food Barn Stores, Inc.*, 101 B.R. 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain

the highest price or greatest overall benefit possible for the estate.") (internal citations omitted); *Edwards*, 228 B.R. at 561.

47.    To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore appropriate in the context of bankruptcy transactions. *See, e.g.*, *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *Integrated Resources*, 147 B.R. at 659 (bid procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

48.    The Debtors believe the proposed Bid Procedures will establish the parameters under which the value of the Sale may be tested at the Auction.  The Bid Procedures will increase the likelihood the Debtors will receive the greatest possible consideration because they will ensure a competitive and fair bidding process.

49.    The Debtors believe that the proposed Bid Procedures will promote active bidding from seriously interested parties and will elicit the highest or otherwise best offers available for the Assets.  The proposed Bid Procedures will enable the Debtors to conduct the Sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the Assets and who can demonstrate the ability to close the transaction.

50.    Specifically, the proposed Bid Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to

perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

51. At the same time, the proposed Bid Procedures provide the Debtors with a robust opportunity to consider competing bids and select the highest or otherwise best offer for the completion of the Sale. Additionally, entering into the Stalking Horse Agreement with the Stalking Horse Bidder ensures that the Debtors obtain fair market value by setting a minimum purchase price for the Assets that will be tested in the marketplace. As such, creditors of the Debtors' estates can be assured the consideration obtained will be fair and reasonable and at or above the market.

52. The Debtors submit the proposed Bid Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with other procedures previously approved in this District. *See, e.g.*, *In re Alpha Latam Management, LLC,* et al., Case No. 21-11109 (JKS) (Bankr. D. Del. Sept. 15, 2021); *In re Avadim Health, Inc.,* et al., Case No. 21-10883 (CTG) (Bankr. D. Del. June 23, 2021); *In re CarbonLite Holdings LLC*, et al., Case No. 21-10527 (JTD) (Bankr. D. Del. April 9, 2021); *In re RTI Holding Company, LLC*, Case No. 20-12456 (JTD) (Bankr. D. Del. Nov. 20, 2020); *In re Gorham Paper and Tissue, LLC*, et al., Case No. 20-12814 (KBO) (Bankr. D. Del. Nov. 19, 2020); *In re Kona Grill, Inc.,* et al., Case No. 19-10953 (CSS) (Bankr. D. Del May 29, 2019); *In re Emerald Oil, Inc.*, No. 16-10704 (KG) (Bankr. D. Del. July 28, 2016); *In re Quicksilver Res. Inc.*, No. 15-10585 (LSS) (Bankr. D. Del. Oct. 6, 2015).[7]

---

[7] Because the number of orders cited is voluminous, individual orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' counsel.

53.     Thus, the Bid Procedures are reasonable, appropriate, and within the Debtors' sound business judgment under the circumstances because the Bid Procedures are designed to maximize the value to be received by the Debtors' estates.

**4.     The Minimum Overbid Increment Is Appropriate**

54.     One important component of the proposed Bid Procedures is the "Overbid" provision.  Once the Debtors determine the Baseline Bid, which shall equal or exceed the value of the Stalking Horse Agreement plus $1,000,000, as determined by the Debtors, and hold the Auction, bidding on the Assets must be in Minimum Overbid Increments of at least **$1,000,000**.

55.     The Debtors believe that such Minimum Overbid Increment is reasonable under the circumstances and will enable the Debtors to maximize the value received for the Assets while limiting any potential chilling effect in the marketing process.

**5.     The Proposed Notice Procedures for the Assumed Contracts and the Identification of Related Cure Amounts Are Appropriate**

56.     As set forth above, the Sale contemplates the potential assumption and assignment of the Assumed Contracts to the Successful Bidder arising from the Auction, if any.  In connection with this process, the Debtors believe it is necessary to establish a process by which: (i) the Debtors and the Assumed Contract Counterparties can reconcile cure obligations, if any, in accordance with Sections 105(a) and 365 of the Bankruptcy Code, and (ii) such counterparties can object to the potential assumption and assignment of the Assumed Contracts and/or related cure amounts.

57.     The Bid Procedures specify the process by which the Debtors will serve Assumption Notices and the procedures and deadline for Assumed Contract Counterparties to Assumed Contracts to file and serve Assumed Contract Objections and Post-Auction Objections.

58.     Except as may otherwise be agreed to in the Successful Bid or by the parties to an Assumed Contract, at the closing of the Sale, the Successful Bidder shall cure those defaults under

the Assumed Contracts that need to be cured in accordance with Section 365(b) of the Bankruptcy Code, by (i) payment of the undisputed cure amount (the "**Cure Amount**") and/or (ii) reserving amounts with respect to any disputed cure amounts.

59.     As set forth in the Bid Procedures Order, the Debtors also request, to the fullest extent permitted by law, that any party that fails to object to the proposed assumption and assignment of any Assumed Contract be deemed to consent to the assumption and assignment of the applicable Assumed Contract pursuant to Section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the Cure Amounts identified in the Assumption Notice.  *See, e.g.*, *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to the Motion, a creditor is deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

60.     The Debtors believe the Assumption Procedures are fair and reasonable, provide sufficient notice to the Assumed Contract Counterparties of the potential assumption and assignment of its Assumed Contracts, and provide certainty to all parties in interest regarding their obligations and rights with respect thereof.  Accordingly, the Debtors request this Court approve the Assumption Procedures set forth in the Bid Procedures Order.

**B.     Approval of the Proposed Sale Is Appropriate and in the Best Interests of the Estates**

> **1.     The Sale of the Assets Should Be Authorized Pursuant to Bankruptcy Code Section 363 as a Sound Exercise of the Debtors' Business Judgment.**

61.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  A sale of the debtor's assets should be authorized pursuant to Section 363 if a sound business purpose exists for the proposed transaction.  *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re ICL Holding Co.*, 802 F.3d 547, 551

(3d Cir. 2015) (finding that bankruptcy courts use the "sound business purpose" test to decide approval of sales under section 363) (citing *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153-54 (Bankr. D. Del. 1999)); *Chamberlain v. Stanziale (In re Chamberlain)*, 545 B.R. 827, 844 (D. Del. 2016) ("Transactions under Section 363 must be based upon the sound business judgment of the trustee."); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 174 (Bankr. D. Del. 1991); *see also In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate outside the ordinary course of business if: he has an 'articulated business justification' . . . ."); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Telesphere Commc'ns, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999).

62.     Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (i) whether a sound business justification exists for the sale, (ii) whether adequate and reasonable notice of the sale was given to interested parties, (iii) whether the sale will produce a fair and reasonable price for the property, and (iv) whether the parties have acted in good faith.  *See Del. & Hudson*, 124 B.R. at 176; *In re Phoenix Steel Corp.*, 82 B.R. 334, 33536 (Bankr. D. Del. 1987).

63.     A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estates, creditors, or interest holders.  *See, e.g., In re Abbotts Dairies of Pa, Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983).

64.     "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  *Comm. of Asbestos-Related Litigants and/or Creditors v.*

*Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986); *see also In re Chamberlain*, 545 B.R. at 844 (same) (citing *In re Filene's Basement, LLC*, 2014 Bankr. LEXIS 2000, *39-40 (Bankr. D. Del. April 29, 2014)).   There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."  *In re Integrated Res.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995) ("The business judgment rule is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company.") (citations omitted); *In re Filene's Basement, LLC*, No. 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate.") (citations omitted).   Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under Section 363(b)(1) of the Bankruptcy Code.   Indeed, when applying the business judgment standard, courts show great deference to a debtor's business decisions.  *See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.)*, 1989 WL 106838, at *3 (N.D. Ill. 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

65.    The Debtors have a sound business justification for selling the Assets.  As described in further detail in the First Day Declaration, Debtor MDHI's equity holders include certain entities that are themselves debtors in the Zohar Chapter 11 Cases.  The Zohar Chapter 11 Cases were commenced to provide an orderly mechanism to monetize and maximize the value of the Zohar

portfolio companies.  In furtherance of that goal, this Court entered the Zohar Orders, which established guidelines and milestones for monetization of certain Zohar portfolio companies, including the Debtors.  The Director was appointed as the sole director of Debtor MDHI and sole manager of Debtor Monterrey in advance of the Petition Date, and under the Zohar Monetization Order, is the person "responsible for conducting the sales process on behalf of the Portfolio Company [(i.e., the Debtors)]."  The Debtors determined, in consultation with their advisors, that pursuing a sale of the Assets under section 363 of the Bankruptcy Code, and in accordance with the Zohar Monetization Order, is the best available means to maximize the value of the Assets for the benefit of all stakeholders.

66.    Further, the Debtors believe the sale of substantially all of the Debtors' Assets will preserve substantial going-concern value that would otherwise be lost if the Assets were sold on a stand-alone or liquidation basis.  To the extent the Successful Bidder assumes certain of the Assumed Contracts, it will result in payment in full for a number of the Debtors' creditors.

67.    The sale of the Assets will also be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Assets.  The value of the Assets, which has already been market-tested through an extensive prepetition sale process, will be further tested through the Auction conducted pursuant to and according to the Bid Procedures. Ultimately, the Successful Bid, after being subject to a postpetition "market check" in the form of the Auction and accepted by the Debtors in the exercise of their reasonable business judgment, will constitute the highest or otherwise best offer for the Assets and at this time the Debtors believe will provide a greater recovery for their estates than any known or practically available alternative. *See, e.g., In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure . . . the

auction procedure has developed over the years as an effective means for producing an arm's-length fair value transaction").  Consequently, the fairness and reasonableness of the consideration to be paid by the Successful Bidder ultimately will be demonstrated by adequate "market exposure" and an open and fair auction process—the best means for establishing whether a fair and reasonable price is being paid.

68.     Thus, absent a change in circumstances that causes the Debtors to abandon the sale process, the Debtors submit the Successful Bidder's purchase agreement will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.[8]  As such, the Debtors' determination to explore selling the Assets through an auction process and subsequently to enter into the asset purchase agreement with the Successful Bidder (to the extent the Successful Bidder is someone other than the Stalking Horse Bidder) will be a valid and sound exercise of the Debtors' business judgment.  The Debtors will submit evidence at the Sale Hearing to support these conclusions.  Therefore, the Debtors request the Court make a finding the proposed Sale of the Assets is a proper exercise of the Debtors' business judgment and is rightly authorized.

## 2.      Adequate and Reasonable Notice of the Sale Will Be Provided

69.     As described above, the Sale Notice will: (i) be served in a manner that provides at least 21-days' notice of the date, time, and location of the Sale Hearing, (ii) inform parties in interest of the deadlines for objecting to the Sale or the assumption and assignment of the Assumed Contract, and (iii) otherwise include all information relevant to parties interested in or affected by the Sale.  Significantly, the form and manner of the Sale Notice will have been approved by this

---

[8]     The Debtors reserve all rights to implement the sale in a manner that in their determination will maximize value for the estates.

Court pursuant to the Bid Procedures Order, after notice and a hearing, before it is served on parties in interest.

### 3.    The Sale and Purchase Price Will Reflect a Fair-Value Transaction

70.    It is well settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999). The Debtors will continue to market the Assets and solicit offers consistent with the Bid Procedures and Stalking Horse Agreement, including, without limitation, by providing acceptable Bidders, with executed NDAs, with access to the Data Room and requested information. In this way, the number of Bidders eligible to participate in the competitive auction process will be maximized. On the other hand, if the Debtors enter into the Stalking Horse Agreement and no Auction is held because no Auction is necessary, the Stalking Horse Agreement's purchase price conclusively will have been demonstrated to be fair value.

### 4.    The Sale of the Assets Should Be Free and Clear of Interests Pursuant to Section 363(f) of the Bankruptcy Code

71.    The Debtors further submit it is appropriate to sell the Assets free and clear of all liens, claims, encumbrances, and other interests (collectively, the "Interests") other than Permitted Liens and Assumed Liabilities (as such terms are defined in the Stalking Horse Agreement) pursuant to Section 363(f) of the Bankruptcy Code, with any such Claims and Interests attaching to the net sale proceeds of the Assets, as and to the extent applicable.

72.    Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if (i) applicable nonbankruptcy law permits such a free and clear sale, (ii) the holder of the interest consents, (iii) the interest is a lien and the sale price of the property exceeds the value of all liens on the property, (iv) the interest is the subject

of a bona fide dispute, or (v) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  *See* 11 U.S.C. § 363(f).

73.     Section 363(f) is drafted in the disjunctive.  Thus, satisfaction of any of the requirements enumerated therein will suffice to permit the Debtors' Sale of the Assets free and clear of all Interests (*i.e.*, all liens, claims, rights, interests, charges, or encumbrances), except with respect to any interests that may be assumed liabilities under the applicable purchase agreement. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *see also In re Dundee Equity Corp.*, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); *Citicorp Homeowners Servs., Inc. v. Eliot (In re Eliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same); *Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating § 363(f) of the Bankruptcy Code is written in the disjunctive; holding the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code Section 363(f) has been satisfied).

74.     The Debtors submit that, excluding Assumed Contracts, if any, the Assets may be sold free and clear of liens, claims, encumbrances, and other Interests—all in accordance with at least one of the five conditions of Section 363(f).  Consistent with Section 363(f)(2), subject to the terms of the Stalking Horse Agreement, each of the parties holding liens on the Assets, if any, will consent, or absent any objection to this Motion, will be deemed to have consented to, the Sale and transfer of the Assets.  Furthermore, any party holding a valid lien against the Assets will be adequately protected by having its liens, if any, attach to the sale proceeds received by the Debtors

from the Sale of the Assets to the Successful Bidder, in the same order of priority, with the same validity, force, and effect such creditor had prior to such sale, subject to any order by this Court, and claims and defenses the Debtors and their estates may possess with respect thereto. Accordingly, Section 363(f) of the Bankruptcy Code authorizes the sale and transfer of the Assets free and clear of any such Interests.

> **5.** **The Assets and the Assumed Contracts Should Be Sold Free and Clear of Successor Liability.**

75.     The Sale Order provides the Purchaser shall not have any successor liability related to Seller or the Assets to the maximum extent permitted by law.  *See* Sale Order, ¶ 24.  Extensive case law establishes that claims against a winning bidder may be directed to the proceeds of a free and clear sale of property and may not subsequently be asserted against that buyer.

76.     Although Section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code.  *Folger Adam Security v. DeMatteis/MacGregor JV*, 209 F.3d 252, 257 (3d Cir. 2000).  In the case of *In re Trans World Airlines. Inc.*, 322 F.3d 283, 288-89 (3d Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest."  The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'"  *Id.* at 289 (citing 3 Collier on Bankruptcy 363.06[1]).  As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-82 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in *Folger*, the scope of Section 363(f) is not limited to *in rem* interests.  Thus, the Third Circuit in *Folger* cited *Leckie* for the proposition that the debtors "could sell their assets

under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute." *Folger*, 209 F.3d at 258.

77.     Courts have consistently held a buyer of a debtor's assets pursuant to a Section 363 sale takes free from successor liability resulting from pre-existing claims. *See In re Trans World Airlines, Inc.*, 322 F.3d 283, 290 (3d Cir. 2002) (agreeing with *Collier's* that "Section 363(f) permits the bankruptcy court to authorize a sale free of 'any interest' that an entity has in property of the estate."); *In re NE Opco, Inc.*, 513 B.R. 871, 876 (Bankr. D. Del. 2014) (finding that "*TWA* establishes that successor liability claims may be barred by section **363**(f) findings."); *The Ninth Avenue Remedial Group v. Allis-Chalmers Corp.*, 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under Bankruptcy Code § 363(f)); *In re New England Fish Co.*, 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale was free and clear of Title VII employment discrimination and civil rights claims of debtor's employees); *In re Hoffman*, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes); *American Living Systems v. Bonapfel (In re All Am. of Ashburn, Inc.)*, 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product liability claims precluded from being asserted against his successor in a sale of assets free and clear); *WBQ P'ship v. Virginia Dept. of Medical Assistance Services (In re WBQ P'ship)*, 189 B.R. 97, 104-05 (Bankr E D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an "interest" as used in § 363(f)).

78.     The purpose and value of an order authorizing the transfer of the Assets would be frustrated if claimants thereafter could still assert claims against the purchaser or the Assets.  Under Section 363(f) of the Bankruptcy Code, the Purchaser is entitled to know the Assets are not tainted by latent claims that could be asserted against the Purchaser after the proposed transaction is completed.  Absent that ruling, the value of the Assets could be severely compromised.

79.     Accordingly, consistent with the above-cited case law and provisions of the Bankruptcy Code, the order approving the sale of the Assets should state the Purchaser is not liable as a successor under any theory of successor liability, for Interests that encumber or relate to the Assets.

**6.      The Sale Has Been Proposed in Good Faith and Without Collusion, and the Successful Bidder Will Be a "Good-Faith Purchaser" Entitled to the Full Protection of Bankruptcy Code Section 363(m); and the Sale of the Assets Does Not Violate Bankruptcy Code Section 363(n)**

80.     The Debtors request that the Court find the Successful Bidder is entitled to the benefits and protections provided by Section 363(m) of the Bankruptcy Code in connection with the sale of the Assets.

81.     Section 363(m) provides, in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

82.     Section 363(m) thus protects the purchaser of assets sold pursuant to Section 363 from the risk it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser purchased or leased the assets in "good faith."  Although the

Bankruptcy Code does not define "good faith," courts have held a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that, where there is a lack of such integrity, a good-faith finding may not be made. *See, e.g., Abbotts Dairies of Pa.*, 788 F.2d at 147 ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy Frain Servs., Inc.*, 798 F.2d 1113 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

83.     The Debtors submit the Stalking Horse Bidder, or any other Successful Bidder arising from the Auction, would be a "good faith purchaser" within the meaning of Section 363(m) of the Bankruptcy Code, and the resulting purchase agreement would be a good-faith agreement on arm's length terms entitled to the protections of Section 363(m).[9]  First, as set forth in more detail above, the consideration to be received by the Debtors pursuant to the Sale will be subject to a market process by virtue of the Debtors' marketing efforts and the Auction and will be substantial, fair, and reasonable.  Second, the asset purchase agreement entered into by the Debtors and the Successful Bidder (to the extent the Successful Bidder is someone other than the Stalking Horse Bidder) will be the result of extensive arm's-length negotiations, during which all parties will have the opportunity to be, and the Debtors will be, represented by competent counsel, and any purchase agreement with a Successful Bidder will be the culmination of the Debtors'

---

[9]     The Debtors believe a finding of good faith within the meaning of Section 363(m) will be appropriate for the Successful Bidder arising from the Auction and the Bid Procedures.  Pursuant to the Bid Procedures, any Successful Bidder will have had to present a proposal in accordance with the Bid Procedures.  In addition, the Debtors will not choose as the Successful Bidder or the Back-Up Bidder any entity whose good faith under Section 363(m) can reasonably be doubted, and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of Section 363(m) has been satisfied.

competitive market process and, if necessary, the Auction, in which all negotiations will be conducted on an arm's length, good-faith basis. Third, where there is no indication of any "fraud or collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct, there is no cause that would permit the Sale to be avoided pursuant to Section 363(n). Moreover, with respect to potential bidders, the Bid Procedures are designed to ensure no party is able to exert undue influence over the process. Finally, the Successful Bidder's offer will be evaluated and approved by the Debtors in consultation with their advisors. Accordingly, the Debtors believe the Successful Bidder and the resulting purchase agreement should be entitled to the full protections of Section 363(m).

84.     Moreover, because there will be absolutely no fraud or improper insider dealing of any kind, the Sale does not constitute an avoidable transaction pursuant to Section 363(n) of the Bankruptcy Code, and, as a result, the Purchaser should receive the protections afforded good faith purchasers by Section 363(m). Accordingly, the Debtors request that the Court make a finding at the Sale Hearing that the agreement reached with the Successful Bidder was at arm's length and is entitled to the full protections of Section 363(m) of the Bankruptcy Code. The Debtors will submit evidence at the Sale Hearing to support these conclusions.

### 7.     Credit Bidding Should Be Authorized Pursuant to Section 363(k) of the Bankruptcy Code

85.     A secured creditor is allowed to "credit bid" the amount of its claims in a sale of assets in which it has a security interest. Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k). Even if a secured creditor is undersecured as determined in

accordance with Section 506(a) of the Bankruptcy Code § 506(a), Section 363(k) of the Bankruptcy Code allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the creditor's economic value. *See In re Submicron Sys. Corp.*, 432 F.3d 448, 459-60 (3d Cir. 2006) (explaining "[i]t is well settled . . . that creditors can bid the full face value of their secured claims under section 363(k)").

86.    In this District, absent cause for restriction on credit bidding, courts have consistently ruled in favor of reserving a secured creditor's right to credit bid its claim. *See In re Alpha Latam Management, LLC,* et al., Case No. 21-11109 (JKS) (Bankr. D. Del. Sept. 15, 2021) (order approved bid procedures authorizing secured creditors to exercise right under Bankruptcy Code § 363(k) to credit bid); *In re Avadim Health, Inc.,* et al., Case No. 21-10883 (CTG) (Bankr. D. Del. June 23, 2021) (order authorizing secured creditors to credit bid); *In re RTI Holding Company, LLC*, Case No. 20-12456 (JTD) (Bankr. D. Del. Nov. 20, 2020) (order authorizing secured creditors to exercise right under Bankruptcy Code § 363(k) to credit bid); *In re Source Home Entm't, LLC*, No. 14-115533 (KG) (Bankr. D. Del. July 21, 2014) (order approving Bid Procedures which authorized parties with secured claims to credit bid); *In re Fisker Auto. Hldgs, Inc.*, No. 13-13087 (KG) (Bankr. D. Del. Jan. 23, 2014) (order authorizing secured creditors to exercise right under Bankruptcy Code § 363(k) to make a credit bid); *In re PTC Alliance Corp.*, No. 09-13395 (Bankr. D. Del. Nov. 6, 2009) (order authorizing, but not directing, the administrative agent to credit bid); *In re Hayes Lemmerz Int'l, Inc.*, No. 09-11655 (Bankr. D. Del. Sept. 22, 2009) (order authorizing interested party to exercise its right under Bankruptcy Code § 363(k) to make a credit bid); *In re Foamex Int'l Inc.*, 09-10560, (Bankr. D. Del. May 27, 2009) (order authorizing the sale of substantially all of the debtor's assets in a $155 million credit bid

over a $151.5 million all-cash bid); *see also Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 459-60 (3d Cir. 2006) (citations omitted).

87.     Thus, pursuant to Section 363(k) of the Bankruptcy Code and subject to the Bid Procedures, the Stalking Horse Bidder, in its capacity as an assignee of Obligations under the Prepetition First Lien Credit Agreement and by virtue of its proposed assumption of the DIP Obligations (as defined in the Stalking Horse Agreement), should be allowed to submit a Credit Bid as set forth in the Stalking Horse Agreement at an Auction.  Stalking Horse Agreement, § 3.2. *See In re GNC Holdings, Inc.* et al., 20–11662 (KBO) (Bank. D. Del. July 22, 2020), Docket No. 59 at ¶ 17 ("Subject to the terms of the Bidding Procedures, in the event of a competing Qualified Bid, the Stalking Horse Bidder (if any) will be entitled, but not obligated, to submit overbids and will be entitled in any such overbids to credit bid all of its claims for Bid Protections pursuant to section 363(k) of the Bankruptcy Code.").

**C.     The Assumption and Assignment of the Assumed Contracts Should Be Approved**

**1.     The Assumption and Assignment of the Assumed Contracts Reflects the Debtors' Reasonable Business Judgment**

88.     To facilitate and effectuate the sale of the Assets, the Debtors are seeking authority to assign the Assumed Contracts to the Successful Bidder to the extent required by such Successful Bidder.

89.     Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, provided the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  *See* 11 U.S.C. § 365(b)(1).

90.     The standard applied by the Third Circuit in determining whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which requires a

debtor to determine that the requested assumption or rejection would be beneficial to its estate. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superseded in part by 11 U.S.C. § 1113).

91.    Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract.  *See In re Decora Indus., Inc.*, 2002 WL 32332749, at *8 (D. Del. 2002); *Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp)*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard"); *see also Phar Mor, Inc. v. Strouss Bldg. Assocs.*, 204 B.R. 948, 952 (N.D. Ohio 1997) ("Courts should generally defer to a debtor's decision whether to reject an executory contract.") (citation omitted).  A debtor's decision to assume or reject an executory contract or expired lease will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment.  *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pac. Ry. Co.*, 318 U.S. 523 (1943) (applying Bankruptcy Act section 77(b), predecessor to Bankruptcy Code § 365, and rejecting a test of whether an executory contract was burdensome in favor of determining whether rejection is within the debtor's business judgment); *see also Sharon Steel*, 872 F.2d at 40 (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code"); *Network Access Solutions*, 330 B.R. at 75; *Exide Techs.*, 340 B.R. at 239.

92.     Here, the Court should approve the decision to assume and assign the Assumed

Contracts in connection with the Sale as a sound exercise of the Debtors' business judgment.  First,

the Assumed Contracts are necessary to operate the Assets and, as such, they are essential to

inducing the best offer for the Assets.  Second, it is unlikely any purchaser would want to acquire

the Assets unless a significant number of the contracts and leases needed to manage the day-to-day

operations of the Debtors' business and which represent important sources of revenue were

included in the transaction.  Third, the Assumed Contracts will be assumed and assigned as part

of a process approved by the Court pursuant to the Bid Procedures Order and, thus, will be

reviewed by key constituents in these Chapter 11 Cases.  Accordingly, the Debtors submit the

assumption and assignment of the Assumed Contracts, if required by the Successful Bidder, should

be approved as a sound exercise of the Debtors' business judgment.

93.     A debtor in possession may assign an executory contract or an unexpired lease of

the debtor if it assumes the agreement in accordance with Section 365(a), and provides adequate

assurance of future performance by the assignee, whether or not there has been a default under the

agreement.  *See* 11 U.S.C. § 365(f)(2).  Significantly, among other things, adequate assurance may

be provided by demonstrating the assignee's financial health and experience in managing the type

of enterprise or property assigned.  *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr.

S.D.N.Y. 1986) (stating adequate assurance of future performance is present when the prospective

assignee of a lease from the debtor has financial resources and has expressed willingness to devote

sufficient funding to the business in order to give it a strong likelihood of succeeding).  The

meaning of "adequate assurance of future performance" depends on the facts and circumstances

of each case, but should be given "practical, pragmatic construction."  *EBG Midtown South*

*Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592

(S.D.N.Y. 1992) (citations omitted), *aff'd*, 993 F.2d 300 (2d Cir. 1993); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

94.     Counterparties to Assumed Contracts will have the opportunity to object to adequate assurance of future performance by the Successful Bidder by the Assumed Contract Objection Deadline or the Post-Auction Objection Deadline as applicable.   Accordingly, the Debtors submit the assumption and assignment of the Assumed Contracts as set forth herein should be approved.

95.     To assist in the assumption, assignment, and sale of the Assumed Contracts, the Debtors also request, to the fullest extent permitted by law, that the Sale Order approving the Sale of the Assets provide that anti-assignment provisions in the Assumed Contracts shall not restrict, limit, or prohibit the assumption, assignment, and sale of the Assumed Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of Section 365(f) of the Bankruptcy Code.   However, nothing in the Sale Order, or any of the other sale documents, shall affect the validity or enforceability of any anti-assignment provisions in any Government Contracts.

96.     Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired leases and contracts free from such anti-assignment restrictions, providing, in pertinent part, that:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection . . . .

11 U.S.C. § 365(f)(1).

97.     Section 365(f)(1), by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease.   *See, e.g., Coleman Oil Co., Inc. v. The Circle K Corp. (In re The Circle K Corp.)*, 127 F. 3d 904, 910-11 (9th Cir. 1997) ("no

principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365"), *cert. denied*, 522 U.S. 1148 (1998).  Section 365(f)(3) goes beyond the scope of Section 365(f)(1) by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof.  *See, e.g., In re Jamesway Corp.*, 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (section 365(f)(3) prohibits enforcement of any lease clause creating right to terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

98.     Other courts have recognized provisions that have the effect of restricting assignments cannot be enforced.  *See In re Rickel Home Ctrs., Inc.*, 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 365(f) [*sic*], courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions.").  Similarly, in *In re Mr. Grocer., Inc.*, the court noted that:

> [the] case law interpreting § 365(f)(1) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987).  Thus, the Debtors request that any anti-assignment provisions be deemed not to restrict, limit, or prohibit the assumption, assignment, and sale of the Assumed Contracts, and be deemed and found to be unenforceable anti-assignment provisions within the meaning of Section 365(f).

99.     Orders granting motions to sell property and for the assumption and assignment of executory contracts or unexpired leases frequently contain language explicitly stating the counterparty to the assumed contracts are barred from asserting against the debtor any default by reason of the closing, including any breach or right of termination relating to a change in control of the debtor.  *See, e.g., In re Irish Bank Resolution Corp. Ltd.*, No. 13-12159 (CSS), 2014 WL 1759609, at *8 (Bankr. D. Del. Feb. 14, 2014) ("[n]o sections or provisions of the Contracts that purport to...declare a breach or default as a result of a change in control in respect of the Debtor...shall have any force and effect, and such provisions constitute unenforceable anti-assignment provisions under 11 U.S.C. § 365(f) and/or are otherwise unenforceable under 11 U.S.C. § 365(e)."); *see also In re McPhillips Motors, Inc.*, No. 6:09-BK-37488-RN, 2010 WL 3157062, at *7 (Bankr. C.D. Cal. Feb. 9, 2010) ("any breach related to or arising out of change-in-control or other assignment in such Assumed Contracts, or any purported written or oral modification to the Assumed Contracts" was unenforceable); *In re Bethel Healthcare, Inc.*, No. 1:13-BK-12220-GM, 2014 WL 12758523, at *4 (Bankr. C.D. Cal. May 1, 2014) ("[a]ny provision in the Lease that purports to declare a breach or default as a result of a change in control of the Debtor's business or requires the consent of a non-seller party is hereby determined unenforceable under section 365(f) of the Bankruptcy Code . . . .").

100.     Notwithstanding the general prohibition that the Bankruptcy Code places on contractual provisions that attempt to restrict assignment of such contracts, the Debtors recognize that such Bankruptcy Code prohibitions may be inapplicable with respect to the Government Contracts as Section 365(c) of the Bankruptcy Code recognizes the applicability of statutes, such as the Anti-Assignment Act (41 U.S.C. § 6305) that excuse the non-debtor from accepting performance from an entity other than the debtor.  It is for that reason that, prior to the Petition

Date, the Debtors developed a comprehensive plan for interfacing with the appropriate points of contact within the Government in an effort to obtain the Government's consent to the assignment of the Government Contracts to the Stalking Horse Bidder or other Successful Bidder.  In advance of the filing of these Chapter 11 Cases, the Director met with the appropriate points of contact within the Government to inform the Government of (a) the decision to commence these Chapter 11 Cases to effectuate a sale transaction, (b) the identity of the Stalking Horse Bidder, and (c) the likelihood that the sale will necessitate a request for novation of the Government Contracts.  The Debtors have also begun, in consultation with the Stalking Horse Bidder's advisors, preparing a comprehensive package of documents in support of a novation request, which the Debtors expect to be prepared to submit to the Government promptly after the Successful Bidder is identified.  The Debtors are hopeful that the time spent in the development of the process will result in an efficient novation process and the Debtors further intend to keep the Court apprised of the status of such process and any material issues that develop that would be likely to have a negative impact upon any aspect of the sale process.

### D.     Relief Pursuant to Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate

101.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Additionally, Bankruptcy Rule 6006(d) provides an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  The Debtors request the Sale Order be effective immediately upon its entry by providing the 14-day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

102.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee

Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay periods, the leading treatise on bankruptcy suggests the 14-day stay periods should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 *Collier on Bankruptcy* ¶ 6004.10 (15th rev. ed. 2006). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  *Id.*

103.    To maximize the value received from the Assets, and to ensure they are in compliance with their obligations under the Stalking Horse Agreement, the Debtors seek to close the Sale as soon as possible after the Sale Hearing.  Accordingly, the Debtors hereby request that the Court waive the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

## CONSENT TO JURISDICTION

104.    Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

## NOTICE

105.    Notice of this Motion shall be given to (a) the Office of the United States Trustee for the District of Delaware; (b) the United States Attorney for the District of Delaware; (c) the Internal Revenue Service; (d) the offices of the attorneys general for the states in which the Debtors operate; (e) those creditors listed on the Debtors' consolidated list of thirty creditors holding the largest unsecured claims; (f) counsel to the Stalking Horse Bidder; (g) counsel to Ankura; (h) counsel to PPAS; (i) counsel to the Zohar Lenders; (j) counsel to the Patriarch Lenders; (k) counsel to the DIP Lenders; (l) the offices of the attorneys general for the states in which the

Debtors operate; (m) all parties known by the Debtors to assert a lien on any of the Assets; (n) all parties entitled to notice pursuant to Local Rules 2002-1(b). The Debtors submit that, under the circumstances, no other or further notice is required.

106.    A    copy    of this Motion    is    available    on    (a)    the    Court's    website, at www.deb.uscourts.gov, and (b) the website maintained by the Debtors' proposed Claims and Noticing    Agent,    Kroll    Restructuring    Administration    LLC    (f/k/a    Prime    Clerk    LLC), at https://cases.primeclerk.com/MDHelicopters/.

*[Signature Page Follows]*

**WHEREFORE**, the Debtors respectfully request this Court: (i) enter the Bid Procedures Order, the form of which is attached as Exhibit B hereto, (ii) enter the Sale Order, the form of which is attached as Exhibit C hereto, and (iii) grant such other and further relief as is just and proper.

Dated: March 30, 2022
      Wilmington, Delaware

Respectfully Submitted,

*/s/ David B. Stratton*
**TROUTMAN PEPPER HAMILTON SANDERS LLP**

David B. Stratton (DE No. 960)
David M. Fournier (DE No. 2812)
Evelyn J. Meltzer (DE No. 4581)
Kenneth A. Listwak (DE No. 6300)
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, DE 19801
Telephone:  (302) 777-6500
Facsimile:  (302) 421-8390
Email:  david.stratton@troutman.com
      david.fournier@troutman.com
      evelyn.meltzer@troutman.com
      kenneth.listwak@troutman.com

- and -

**LATHAM & WATKINS LLP**

Suzanne Uhland (*pro hac vice* admission pending)
Adam S. Ravin (*pro hac vice* admission pending)
Brett M. Neve (*pro hac vice* admission pending)
Tianjiao (TJ) Li (*pro hac vice* admission pending)
Alexandra M. Zablocki (*pro hac vice* admission pending)
1271 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 906-1200
Facsimile:  (212) 751-4864
Email:  suzanne.uhland@lw.com
      adam.ravin@lw.com
      brett.neve@lw.com
      tj.li@lw.com
      alexandra.zablocki@lw.com

*Proposed Counsel for Debtors and Debtors-in-Possession*