**<u>Exhibit A to Motion</u>**

**Stalking Horse Agreement**

**CONFIDENTIAL**
*Execution Version*

**ASSET PURCHASE AGREEMENT**

by and among

MD HELICOPTERS, INC.,

MONTERREY AEROSPACE, LLC,

and

MDH HOLDCO, LLC

Dated as of March 30, 2022

US-DOCS\127730119

**ARTICLE I** DEFINITIONS AND INTERPRETATION ..............................................1

    1.1     Defined Terms ..............................................................................1
    1.2     References and Rules of Construction ...................................................18

**ARTICLE II** PURCHASE AND SALE........................................................19

    2.1     Purchase and Sale ........................................................................19
    2.2     Excluded Assets ..........................................................................21
    2.3     Assumed Liabilities ......................................................................22
    2.4     Excluded Liabilities ......................................................................23
    2.5     Assigned Contracts; Cure Costs..........................................................24
    2.6     Purchase Price Allocation ................................................................27

**ARTICLE III** CLOSING; PURCHASE PRICE ..............................................27

    3.1     Closing ..................................................................................27
    3.2     Purchase Price ............................................................................28
    3.3     Closing Deliverables .....................................................................28
    3.4     Withholding ..............................................................................30

**ARTICLE IV** REPRESENTATIONS AND WARRANTIES OF SELLERS............................30

    4.1     Organization; Existence ..................................................................30
    4.2     Subsidiaries ..............................................................................30
    4.3     Authorization; Execution and Delivery; Enforceability ...................................30
    4.4     Noncontravention; Consents and Approvals ...............................................31
    4.5     Litigation................................................................................31
    4.6     Compliance with Laws ....................................................................32
    4.7     Permits ..................................................................................32
    4.8     Material Contracts........................................................................32
    4.9     Material Customers; Material Suppliers ...................................................34
    4.10    Financial Statements; No Undisclosed Liabilities ..........................................34
    4.11    Title and Sufficiency of Assets; Tangible Property.........................................35
    4.12    Intellectual Property......................................................................35
    4.13    Real Property ............................................................................38
    4.14    Environmental, Health and Safety .........................................................39
    4.15    Taxes ....................................................................................40
    4.16    Employee Benefits ........................................................................41
    4.17    Labor Matters............................................................................42
    4.18    Insurance Policies ........................................................................43
    4.19    Brokers..................................................................................43
    4.20    Absence of Changes......................................................................43
    4.21    Products Warranties and Liabilities .......................................................44
    4.22    Absence of Unlawful Payments; Anticorruption; Anti-Money Laundering; Sanctions ..............................................................................44
    4.23    Government Contracts ....................................................................45

4.24    No other Representations ...................................................................................49

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER** ..................................49

5.1    Organization; Existence ..................................................................................49
5.2    Authorization; Execution and Delivery; Enforceability ........................................49
5.3    Noncontravention; Consents and Approvals ......................................................50
5.4    Availability of Funds; Solvency ......................................................................50
5.5    Litigation ......................................................................................................51
5.6    Brokers .........................................................................................................51
5.7    Non-Foreign Person .......................................................................................51
5.8    Independent Evaluation ..................................................................................51
5.9    OFAC Obligations ..........................................................................................52

**ARTICLE VI COVENANTS OF SELLERS** ......................................................................52

6.1    Conduct of Business .......................................................................................52
6.2    Access to Information .....................................................................................55
6.3    Change of Name ............................................................................................56
6.4    Antitrust Approvals and Cooperation ...............................................................56
6.5    Ancillary Agreements .....................................................................................58
6.6    Further Assurances .........................................................................................58

**ARTICLE VII ADDITIONAL COVENANTS** .....................................................................58

7.1    Preservation of and Access to Books and Records; Contacts with Business
       Relations .......................................................................................................58
7.2    Bankruptcy Court Matters ...............................................................................59
7.3    Tax Matters ...................................................................................................62
7.4    Employee Matters ..........................................................................................63
7.5    Misallocated Transfers; Wrong Pocket .............................................................65
7.6    Public Announcements ...................................................................................66
7.7    Notification of Certain Matters; Schedule Updates .............................................66
7.8    Specified Contracts ........................................................................................67
7.9    Cape Town Convention ...................................................................................67
7.10   ITAR .............................................................................................................67
7.11   Financing ......................................................................................................67
7.12   Minimum Cash ..............................................................................................68
7.13   Matters Relating to Directors and Officers .......................................................68

**ARTICLE VIII CONDITIONS TO CLOSING** ....................................................................69

8.1    Mutual Conditions to Closing ..........................................................................69
8.2    Buyer's Conditions to Closing .........................................................................69
8.3    Sellers' Conditions to Closing .........................................................................70

**ARTICLE IX** NON-SURVIVAL.................................................................................71

    9.1    Non-Survival..........................................................................................71

**ARTICLE X** TERMINATION................................................................................71

    10.1    Termination........................................................................................71
    10.2    Effect of Termination........................................................................73

**ARTICLE XI** MISCELLANEOUS........................................................................73

    11.1    Expenses and Transfer Taxes............................................................73
    11.2    Notices ..............................................................................................73
    11.3    Amendments and Waivers ................................................................75
    11.4    Successors and Assigns....................................................................75
    11.5    Governing Law .................................................................................76
    11.6    Exclusive Jurisdiction .....................................................................76
    11.7    WAIVER OF JURY TRIAL..............................................................76
    11.8    Counterparts; Third-Party Beneficiaries .........................................76
    11.9    Specific Performance .......................................................................77
    11.10    Privileges..........................................................................................77
    11.11    Entire Agreement .............................................................................78
    11.12    No Strict Construction .....................................................................78
    11.13    Severability ......................................................................................78
    11.14    Disclosure Schedules .......................................................................78
    11.15    Diligence Materials..........................................................................79
    11.16    Bulk Sales ........................................................................................79
    11.17    No Recourse......................................................................................79

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "*Agreement*") is entered into as of March 30, 2022 (the "*Execution Date*"), by and among MD Helicopters, Inc., an Arizona corporation ("*MDH*"), and Monterrey Aerospace, LLC, a Delaware limited liability company ("*Monterrey Sub*" and, together with MDH, "*Sellers*" and, each, a "*Seller*"), on the one hand, and MDH Holdco, LLC, a Delaware limited liability company ("*Buyer*"), on the other hand. Buyer and each Seller may be referred to collectively as the "*Parties*" or individually as a "*Party*."

### Recitals

**WHEREAS**, Sellers (collectively, the "*Debtors*"), intend to file voluntary petitions for relief as debtors-in-possession, to be jointly administered (the "*Chapter 11 Cases*"), under Chapter 11 of the United States Bankruptcy Code, 11 USC §§ 101-1532 (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*");

**WHEREAS**, each Seller owns personal property assets and intangible assets, and holds various rights, in each case relating to the Business (as defined below); and

**WHEREAS,** Buyer desires to purchase substantially all assets of each Seller, and to assume certain liabilities of each Seller, and each Seller desires to sell such assets to Buyer or its Designated Purchaser and to assign such liabilities to Buyer or its Designated Purchaser, all on the terms and subject to the conditions set forth in this Agreement, the Bid Procedures Order and the Sale Order (each as defined below), and in accordance with Sections 105, 363 and 365 of the Bankruptcy Code and other applicable provisions of the Bankruptcy Code (the "*Transaction*").

**NOW, THEREFORE,** for and in consideration of the representations, warranties, covenants and agreements set forth in this Agreement, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties hereby agree as follows:

### ARTICLE I
### DEFINITIONS AND INTERPRETATION

*1.1*    *Defined Terms*. Capitalized terms used herein and not otherwise defined shall have the meanings given such terms as set forth below in this *Section 1.1*:

"*Accounting Firm*" has the meaning set forth in *Section 2.6*.

"*Affiliate*" means, with respect to any Person, another Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, by contract or otherwise. For the avoidance of doubt, ownership of more than fifty percent (50%) of the voting securities shall be deemed to be "control" for purposes of this definition. For purposes of this Agreement, Buyer's Affiliates shall in no event include any Seller.

"*Agreement*" has the meaning set forth in the preamble.

1

"***Aircraft***" means the aircraft described in *Schedule 4.11(c)* (including the Airframe, each Engine, each Part and the Aircraft Documents).

"***Airframe***" means the Aircraft together with all Parts relating to it, but excluding the Engines (or any engines from time to time installed thereon) and the Aircraft Documents.

"***Aircraft Documents***" means all logs, books, modification, technical data, manuals and maintenance records pertaining to the Aircraft at any time required to be maintained with respect to the Aircraft, any Engine or any Part, in accordance with the rules and regulations of the Aviation Authority.

"***Aircraft Object***" has the meaning assigned to the term "aircraft object" under the Cape Town Convention.

"***Allocation Schedule***" has the meaning set forth in *Section 2.6*.

"***Alternative Transaction***" means, subject to the Bid Procedures, the sale, transfer or disposition of all or any material portion of the Purchased Assets (whether effected pursuant to a reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets, or restructuring or similar transaction), other than (a) the transactions contemplated by and in accordance with this Agreement and (b) sales of Inventory in the ordinary course of business.

"***Anti-Bribery Laws***" means collectively, the Foreign Corrupt Practices Act of 1977, as amended, and all other applicable anti-corruption and bribery Laws (including the U.K. Bribery Act 2010, and any rules or regulations promulgated thereunder or other Laws of other countries implementing the OECD Convention on Combating Bribery of Foreign Officials).

"***Anti-Money Laundering Laws***" means collectively, all Laws concerning or relating to the prevention of money laundering or countering the financing of terrorism, including, without limitation, the Currency and Financial Transactions Reporting Act of 1970, as amended by the USA PATRIOT Act, which legislative framework is commonly referred to as the "Bank Secrecy Act," and the rules and regulations thereunder.

"***Applicable Contracts***" means all Contracts, if any, to which any Seller is a party that relate to any of the Purchased Assets or the Business.

"***Approvals***" has the meaning set forth in *Section 4.4(b)*.

"***Assigned Contracts***" has the meaning set forth in *Section 2.5(b)*.

"***Assignment and Assumption Agreements***" has the meaning set forth in *Section 3.3(a)(i)*.

"***Assignment of Copyrights***" has the meaning set forth in *Section 3.3(a)(iii)*.

"***Assignment of Domain Names***" has the meaning set forth in *Section 3.3(a)(iii)*.

"***Assignment of Patents***" has the meaning set forth in *Section 3.3(a)(iii)*.

"*Assignment of Trade Secrets and Software*" has the meaning set forth in *Section 3.3(a)(iii)*.

"*Assignment of Trademarks*" has the meaning set forth in *Section 3.3(a)(iii)*.

"*Assumed Liabilities*" has the meaning set forth in *Section 2.3*.

"*Assumed Plans*" has the meaning set forth in *Section 2.1(e)*.

"*Antitrust Laws*" has the meaning set forth in *Section 6.4(a)*.

"*Auction*" means an auction or auctions, if any, for the sale of each Seller's assets conducted pursuant to the terms and conditions of the Bid Procedures Order.

"*Aviation Authority*" means the FAA and any successor organization and each other Governmental Authority or other Person who shall from time to time be vested with the control and supervision of, or have jurisdiction over, the registration, airworthiness and operation of aircraft or other matters relating to civil aviation in the United States or the country of registration of the applicable aircraft and engines.

"*Avoidance Action*" means any and all claims for relief of the Debtors under chapter 5 of the Bankruptcy Code or state fraudulent conveyance, fraudulent transfer, or similar Laws.

"*Back-up Bidder*" means the bidder for the Purchased Assets with the next-highest or otherwise second-best bid for the Purchased Assets as determined in accordance with the Bid Procedures.

"*Balance Sheet Date*" has the meaning set forth in *Section 4.10*.

"*Bankruptcy and Equity Exception*" means any Laws relating to bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or preferential transfers, or similar Laws relating to or affecting creditors' rights generally and subject, as to enforceability, to the effect of general principles of equity (regardless of whether such enforceability is considered in any Proceeding in equity or at Law).

"*Bankruptcy Code*" has the meaning set forth in the recitals.

"*Bankruptcy Court*" has the meaning set forth in the recitals.

"**Bid Procedures**" means the Bid Procedures attached to the Bid Procedures Order as Exhibit 1 thereto.

"*Bid Procedures Order*" means an Order by the Bankruptcy Court, in form and substance reasonably acceptable to Buyer and Sellers, among other things, (a) approving the Bid Procedures and (b) authorizing the other transactions contemplated by this Agreement, as such order may be amended, supplemented or modified from time to time.

"***Boeing Cross License***" means that certain cross license, dated February 4, 2005, by and between MDH and McDonnell Douglas Helicopter Company, an indirect wholly-owned subsidiary of The Boeing Company.

"***Business***" means the business of developing, manufacturing, selling and servicing helicopters and after-market Parts and components for helicopters and providing training and similar services in connection therewith.

"***Business Day***" means any day other than Saturday or Sunday or a day on which banking institutions in New York, New York are required or authorized by Law to close.

"***Buyer***" has the meaning set forth in the preamble.

"***Cape Town Convention***" means, collectively, the official English language texts of the Convention on International Interests in Mobile Equipment (the "***Convention***") and the Protocol on the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment (the "***Protocol***") both signed in Cape Town, South Africa on 16 November 2001, together with any protocols, regulations, rules, orders, agreements, instruments, amendments, supplements or revisions or otherwise, that have or will be made subsequently in connection with the Convention or the Protocol by the "Supervisory Authority" (as defined in the Protocol), the "International Registry" or "Registrar" (as defined in the Convention) or appropriate "Registry Authority" (as defined in the Protocol) or any other international, or national, body or authority.

"***Cash and Cash Equivalents***" means, with respect to each Seller, all cash (including petty cash and checks held as of the close of business on the day immediately prior to the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities, and any other cash equivalents, in each case, of each Seller, whether on hand, in transit to any Seller, in banks or other financial institutions, or otherwise held as of the close of business on the day immediately prior to the Closing Date, including any amounts used as deposit or escrow or otherwise securing any surety bonds or financial assurances, but in each case other than (x) any uncleared checks or amounts in transit from any Seller and (y) any amounts used as deposit or escrow or otherwise securing any surety bonds or financial assurances relating to any Excluded Asset.

"***Certificate of Airworthiness***" means a standard airworthiness certificate, FAA form 8100-2.

"***Certificate of Registration***" means, with respect to any Aircraft or Engine, a certificate of registration for such Aircraft or Engine, as the case may be, issued by the applicable Aviation Authority.

"***Chapter 11 Cases***" has the meaning set forth in the recitals.

"***Claim***" means a "claim" as defined in Section 101 of the Bankruptcy Code.

"***Closing***" has the meaning set forth in *Section 3.1*.

"***Closing Date***" has the meaning set forth in *Section 3.1*.

"***COBRA***" means the Consolidated Omnibus Budget Reconciliation Act of 1985, Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the Code and any similar state Law.

"***Code***" means the Internal Revenue Code of 1986, as amended.

"***Company Financial Statements***" has the meaning set forth in *Section 4.10*.

"***Confidentiality Agreements***" means (i) that certain Confidentiality Agreement among MDH, Zohar CDO 2003-1 Limited, Zohar II 2005-1 Limited and Zohar III Limited, dated as of October 15, 2021 and (ii) that certain Confidentiality Agreement among MDH, Zohar CDO 2003-1 Limited, Zohar CDO 2003-1, Corp., Zohar II 2005-1 Limited, Zohar III Limited and Zohar III, Corp., dated as of January 25, 2021.

"***Contract***" means any written or oral contract, agreement, license, sublicense, Lease, sales order, purchase order, instrument, undertaking or other legally binding commitment.

"***Contributor***" has the meaning set forth in *Section 4.12(d)*.

"***Credit Bid***" has the meaning set forth in *Section 3.2*.

"***Cure Costs***" has the meaning set forth in *Section 2.5(a)*.

"***Current Government Contract***" has the meaning set forth in *Section 4.8(a)(iv)*.

"***D&O Claims***" has the meaning set forth in *Section 2.1(k)*.

"***Data***" has the meaning set forth in *Section 4.12(g)*.

"***Data Laws***" has the meaning set forth in *Section 4.12(g)*.

"***Data Standards***" has the meaning set forth in *Section 4.12(g)*.

"***Data Room***" has the meaning set forth in *Section 4.10*.

"***Debt Financing***" means any debt financing incurred or intended to be incurred by Buyer or one of its Subsidiaries in connection with the consummation of the transactions contemplated by this Agreement.

"***Debtors***" has the meaning set forth in the recitals.

"***Designated Purchaser***" has the meaning set forth in *Section 11.4(b)*.

"***Designation Deadline***" means the date that is one (1) Business Day prior to the Closing Date, or such other date as Buyer and Sellers may mutually agree in writing and, if applicable, as the Bankruptcy Court may authorize.

"***DFARS***" means the Defense Federal Acquisition Regulation Supplement.

"***DIP Credit Agreement***" means that certain debtor-in-possession financing agreement dated as of 30, 2022, and as agreed to by and among Sellers, the DIP Agent (as defined therein) and the lenders party thereto.

"***DIP Facility***" means a superpriority senior secured new money debtor-in-possession financing facility as further described in the DIP Credit Agreement, as approved by the Bankruptcy Court.

"***DIP Obligations***" means all "Obligations" under and as defined in the DIP Credit Agreement and shall include all Indebtedness outstanding under the DIP Credit Agreement during the pendency of the Chapter 11 Cases, including any Obligations and Indebtedness arising from any subsequent conversion of all or a portion of the DIP Obligations or Indebtedness into an exit credit facility (or similar post-Chapter 11 or post-bankruptcy emergence credit facility).

"***DIP Order***" means any order of the Bankruptcy Court approving the Debtors' entry into the DIP Facility.

"***DOJ***" has the meaning set forth in *Section 6.4(a)*.

"***Disclosure Schedules***" means the disclosure schedules delivered by Sellers to Buyer concurrently with this Agreement.

"***Employee***" means all employees of each Seller, including those on disability or a leave of absence, whether paid or unpaid.

"***Employee Schedule***" has the meaning set forth in *Section 4.17(a)*.

"***Engine***" means the engines described in *Schedule 4.11(c)* (including each Part and the Aircraft Documents) or, if applicable, any part of any such engine that is a Purchased Asset.

"***Environmental Laws***" means all applicable Laws concerning or relating to pollution or protection of the environment, including those relating to the presence, use, manufacturing, refining, production, generation, handling, transportation, treatment, recycling, transfer, storage, disposal, distribution, importing, labeling, testing, processing, Release, threatened Release, control or other action or failure to act involving cleanup of any Hazardous Materials, or the protection of worker health and safety (solely to the extent related to exposure to Hazardous Materials).

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"***ERISA Affiliate***" means any entity which is a member of (a) a controlled group of corporations (as defined in Section 414(b) of the Code), (b) a group of trades or businesses under common control (as defined in Section 414(c) of the Code), (c) an affiliated service group (as defined under Section 414(m) of the Code) or (d) any group specified in Treasury Regulations promulgated under Section 414(o) of the Code, any of which includes or included any Seller.

"***Escrow Agent***" has the meaning set forth in *Section 3.3(c)(i)*.

"*Excluded Assets*" has the meaning set forth in *Section 2.2*.

"*Excluded Contracts*" has the meaning set forth in *Section 2.2(c)*.

"*Excluded Permits*" means the Permits set forth on *Schedule 1.1(b)*.

"*Excluded Plans*" has the meaning set forth in *Section 2.2(e)*.

"*Excluded Records*" has the meaning set forth in *Section 2.2(b)*.

"*Execution Date*" has the meaning set forth in preamble.

"*Export Approvals*" has the meaning set forth in *Section 4.22(c)*.

"*FAA*" means the Federal Aviation Administration of the Department of Transportation of the United States of America and any successor that under the laws of the United States of America shall from time to time have control or supervision of civil aviation in the United States of America or have jurisdiction over the registration, airworthiness or operation of, or other matters relating to, any aircraft or engine.

"*FAA Bill of Sale*" means the FAA form AC-8050-2.

"*FAR*" means the Federal Acquisition Regulation.

"*FAR Rights*" has the meaning set forth in *Section 4.23(s)*.

"*Filing Party*" has the meaning set forth in *Section 11.1*.

"*Final Order*" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Chapter 11 Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed.

"*Fraud*" means, with respect to a Party, an actual and intentional fraud with respect to the making of the representations and warranties by such Party in *Article IV* or *Article V*, as applicable; provided that such actual and intentional fraud of a Party shall only be deemed to exist if any such Person has actual knowledge (as opposed to imputed or constructive knowledge) of a material misrepresentation with respect to the representations and warranties made by such Person in such *Article IV* or *Article V*, as applicable, as qualified by the Disclosure Schedules, and such misrepresentation was made with the intention of deceiving another Party who is relying on such representation or warranty (and does not include any fraud claim based on constructive knowledge, negligent misrepresentation, recklessness or any similar theory).

"*Former Government Employee*" has the meaning set forth in *Section 4.23(t)*.

"*FTC*" has the meaning set forth in *Section 6.4(a)*.

"*Fundamental Representations*" means, collectively, the representations and warranties of Sellers set forth in *Section 4.1 (Organization; Existence)*, *Section 4.3 (Authorization; Execution*

*and Delivery; Enforceability), Section 4.19 (Brokers)* and *Section 4.23(n) (Government Contracts, Suspension and Debarment).*

"*GAAP*" means generally accepted accounting principles in the United States of America.

"*Government Bid*" means any outstanding quotation, bid or proposal by any Seller that, if accepted or awarded, would lead to a Government Contract.

"*Government Contract*" means any Contract entered into between any Seller and: (a) any Governmental Authority; (b) any prime contractor to any Governmental Authority (in its capacity as such); or (c) any subcontractor (of any tier) with respect to any Contract described in clauses (a) and (b).

"*Governmental Authority*" means any (a) national, multinational, tribal, federal, state, municipal, local or other governmental or public department, central bank, court, commission, commissioner, tribunal, arbitrator, board, bureau, agency or instrumentality, domestic or foreign, (b) subdivision or authority of any of the foregoing, (c) regulatory or administrative authority or (d) other body exercising executive, judicial, regulatory, administrative, police, military or taxing governmental functions.

"*Hazardous Materials*" means any waste, pollutant, mixture, hazardous or toxic substance or waste, petroleum, petroleum-byproduct or waste, asbestos, radioactive material, pesticide, contaminant, polychlorinated biphenyls, or any other substance or waste which is defined or regulated as hazardous or toxic under applicable Environmental Law.

"*HSR*" has the meaning set forth in *Section 6.4(a).*

"*Inbound License*" has the meaning set forth in *Section 4.8(a)(v).*

"*Indebtedness*" means, of any Person, without duplication, (a) the principal of, premium (if any) on, accrued but unpaid interest on, and prepayment penalties or similar contractual charges in respect of (i) indebtedness of such Person for money borrowed, whether or not contingent, and (ii) indebtedness of such Person evidenced by notes, debentures, bonds or other similar instruments for the payment; (b) all obligations of such Person, whether or not contingent, issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but, in each case, excluding trade accounts payable for goods and services arising in the ordinary course of business); (c) all obligations of such Person, whether or not contingent, for the reimbursement of any obligor on any performance bond, security bond, bank guarantee, letter of credit, banker's acceptance or similar credit transaction; (d) the liquidation value of all redeemable preferred stock of such Person; (e) all obligations of such Person with respect to leases required to be classified as capitalized leases in accordance with GAAP (without giving effect to the treatment of operating leases as capital leases under ASC 842), (f) obligations under any interest rate, currency or hedging agreement, (g) all pension obligations, including under any defined benefit pension plan, retiree welfare plan or any frozen plan, (h) all obligations of the type references in clauses (a) through (g) of any other Person for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise and whether or not contingent, including guaranties of such obligations, whether or not evidenced by a note, bond, debenture, mortgage or

other debt security, guaranty or similar instrument; and (i) all obligations of the type referred to in clauses (a) through (h) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"*Initial Contract Notices*" has the meaning set forth in *Section 2.5(c).*

"*Intellectual Property*" means any and all intellectual property of every kind or nature throughout the world, whether protected or arising under the Laws of the United States or any other jurisdiction, including all intellectual or industrial property rights in any of the following: (a) all trademarks, service marks, names, brand names, product names, corporate names, trade names, symbols, trade dress, logos, protectable distinguishing guises and indicia, design rights, slogans and other similar designations of source or origin, together with the goodwill symbolized by any of the foregoing and, in each case, all worldwide rights, title and interest associated with the foregoing, whether registered or not, in any form including abbreviation, derivation, variation, diffusion or otherwise, whether stylized or not stylized, and for all purposes and for all goods, products and services, and all registrations, renewals and applications therefor (collectively, "*Trademarks*"), (b) methods, techniques, ideas, know-how, research and development, technical data, molds, prototypes, models and designs, programs, materials, specifications, processes, patents, patent applications, patent disclosures, and all related continuations, continuations-in-part, divisional, reissues, re-examinations, substitutions, and extensions thereof and other similar materials and improvements thereto, and all tangible embodiments of the foregoing (collectively, "*Patents*"), (c) all copyrights and copyrightable subject matter (registered or unregistered), including published and unpublished works of authorship, including without limitation audiovisual works, collective works, computer programs, databases, derivative works, literary works, maskworks, and sound recordings, and any associated rights, including applications and registrations thereof (collectively, "*Copyrights*"), (d) all trade secrets, confidential or proprietary business information, including Software, business databases, data analytics, data, know-how, algorithms, techniques, concepts, methods, processes, inventions (patentable or unpatentable), specifications, product designs, prototypes, blue prints, surveys, customer reviews, customer/vendor lists, customer contact information, email lists, databases, sales plans, formulae, reports, and other proprietary or confidential information and know-how including rights granted under the Uniform Trade Secrets Act or the Defend Trade Secrets Act (collectively, "*Trade Secrets*"), (e) databases, compilations and collections of data, (f) domain names, and web addresses, (g) all rights of publicity, (h) all moral and economic rights of authors, inventors, however denominated, and (i) all other intellectual property and proprietary rights.

"*International Interest*" has the meaning set forth under the Cape Town Convention.

"*International Registry*" has the meaning set forth under the Cape Town Convention.

"*International Trade Laws*" means all Laws relating to the import, export, re-export, deemed export, deemed re-export, or transfer of information, data, goods, and technology, including the Export Administration Regulations administered by the United States Department of Commerce, the International Traffic in Arms Regulations administered by the United States Department of State, customs and import Laws administered by United States Customs and Border Protection, any other export or import controls administered by an agency of the United States government, the anti-boycott regulations administered by the United States Department of

Commerce and the United States Department of the Treasury, and other Laws adopted by Governmental Authorities of other countries relating to the same subject matter as the Laws described above.

"***Inventory***" has the meaning set forth in *Section 2.1(n)*.

"***Knowledge***" means, with respect to each Seller, the actual knowledge, after reasonable inquiry, of the following Persons: (i) Cheryl Bazzelll (solely with respect to *Section 4.16* and *Section 4.17*); (ii) Richard Borough (solely with respect to *Section 4.14*); (iii) Alan Carr; (iv) Yaropolk R. (YR) Hladkyj; (v) Chris Jaran; (vi) Jason Lindauer; (vii) Nick Nenadovic; and (viii) Barry Sullivan.

"***Law***" means each provision of any law, treaty, statute, ordinance, directive, decree, Order, rule, regulation, constitution or code of any Governmental Authority.

"***Lease***" means any lease, together with any other subleases, assignments and similar agreements, in each case under which any Seller leases, uses or occupies, or has the right to use or occupy, any real property.

"***Leased Real Property***" means any real property leased, subleased or which any Seller has the right to use or occupy, pursuant to a Lease.

"***Liability***" means any and all debts, liabilities, commitments and obligations of any kind, whether fixed, contingent or absolute, matured or unmatured, liquidated or unliquidated, accrued or not accrued, asserted or not asserted, known or unknown, secured or unsecured, disputed or undisputed, joint or several, due or to become due, determined, determinable or otherwise, whenever or however arising and whether or not the same is required to be accrued on the financial statements of a Person (including, whether arising out of any Contract, Law, Order or tort based on negligence, strict liability or otherwise).

"***Lien***" means any mortgage, lien, pledge, security interest, charge or other encumbrance.

"***Material Adverse Effect***" means any change, effect, event, circumstance, occurrence or state of facts (collectively, "***Effects***") that, individually or in the aggregate, (a) has, or would reasonably be expected to have, a material adverse effect on the Purchased Assets and the Assumed Liabilities, taken as a whole, or on the results of operations or condition (financial or otherwise) of the Business, or (b) prevents or materially impairs, or would reasonably be expected to prevent or materially impair, the consummation of the transactions contemplated by this Agreement and the other Transaction Documents; <u>provided</u>, <u>however</u>, that in no event shall any Effect that results from or arises out of the following be deemed to constitute, or be taken into account, in determining whether there has been, or would reasonably be expected to be, a Material Adverse Effect: (i) general changes or developments in global or national political, economic, business, monetary, financial or capital or credit market conditions or trends; (ii) general political, economic, business, monetary, financial or capital or credit market conditions or trends (including interest rates, exchange rates, tariffs, trade wars and credit markets); (iii) geopolitical conditions or any outbreak or escalation of hostilities, acts of terrorism or war, cyberterrorism, sabotage, cybercrime, civil unrest, regional, national or international emergency, or any acts of God, effects of weather, meteorological conditions or events or natural or manmade disasters (including earthquakes,

hurricanes, tsunamis, typhoons, lightning, hail storms, blizzards, tornadoes, droughts, floods, cyclones, artic frosts, mudslides or wildfires); (iv) the failure of the financial or operating performance of any Seller or any of their respective businesses to meet any projections, forecasts, budgets estimates or predictions for any period (it being understood that the underlying cause of such failure to meet such projections, forecasts, budgets, estimates or predictions may be taken into account in determining whether a Material Adverse Effect has occurred, or would reasonably be expected to occur, to the extent not otherwise excluded by another clause of this definition); (v) changes in Laws or any guidance relating thereto or the interpretation or enforcement thereof, in each case after the date hereof; (vi) changes in GAAP or other accounting regulations or principles or any guidance relating thereto or the interpretation thereof, in each case after the date hereof; (vii) the execution, announcement or pendency of this Agreement and the Transaction Documents or the terms hereof or thereof or the transactions contemplated hereby or thereby, including the impact thereof on the relationships, contractual or otherwise, of the Business with customers, employees, suppliers or other business relationships (in each case solely to the extent resulting from the identity of Buyer or any of its Affiliates, or any communication by Buyer or any of its Affiliates regarding plans, proposals or projections with respect to the Business, any of the Purchased Assets or any of the Assumed Liabilities); (viii) any global or national epidemic, disease outbreak or pandemic (including the COVID-19 pandemic); (ix) any Law issued by a Governmental Authority requiring business closures, quarantine or sheltering-in-place or similar restrictions in connection with the COVID-19 pandemic; (x) any actual or potential sequester, stoppage, shutdown, default or similar event or occurrence by or involving any Governmental Authority; (xi) any actual or potential break-up of any existing political or economic union of or within any country or countries or any actual or potential exit by any country or countries from, or suspension or termination of its or their membership in, any such political or economic union; (xii) any action taken or omitted to be taken by or at the written request or with the written consent of Buyer or that is required or expressly permitted by this Agreement; (xiii) labor strikes, requests for representation, organizing campaigns, work stoppages, slowdowns or other labor disputes; (xiv) any breach, violation or non-performance of any provision of this Agreement by Buyer or any of its Affiliates; or (xv) the Chapter 11 Cases, including (A) the Auction and any announced liquidation of any Seller or any of their respective assets, (B) any objections in the Bankruptcy Court to this Agreement or any of the transactions contemplated hereby, the reorganization of any Seller, the Bid Procedures Order, the assumption or rejection of any Assigned Contract otherwise in compliance with this agreement, and (C) any Order of the Bankruptcy Court or any actions or omissions of any Seller required to be taken (or not taken) to comply therewith; provided, further, that, in the case of clause (i), (ii), (iii), (v), (vi), (viii), (ix), (x), (xi) or (xiii), only to the extent that the effects of any such Effect has a disproportionate effect on the Purchased Assets and the Assumed Liabilities, taken as a whole, or the Business, relative to other Persons in the industries in which any Seller operates, then such Effect may be taken into account in determining whether there has been or would reasonably be expected to be, a Material Adverse Effect (in which case only such incremental disproportionate effect may be taken into account in determining whether there has been a Material Adverse Effect).

"***Material Contracts***" has the meaning set forth in *Section 4.8*.

"***Material Customer***" has the meaning set forth in *Section 4.9(a)*.

"***Material Permits***" has the meaning set forth in *Section 4.7*.

"*Material Supplier*" has the meaning set forth in *Section 4.9(b)*.

"*NIST*" has the meaning set forth in *Section 4.23(r)*.

"*Non-Filing Party*" has the meaning set forth in *Section 11.1*.

"*Non-Offered Employee*" has the meaning set forth in *Section 7.4(a)*.

"*Non-Paying Party*" has the meaning set forth in *Section 7.3(b)*.

"*Non-PII*" has the meaning set forth in *Section 4.12(g)*.

"*Offered Employees*" has the meaning set forth in *Section 7.4(a)*.

"*Open Source Software*" means any Software that is licensed, distributed or conveyed as "open source software", "free software", "copyleft" or under a similar licensing or distribution model, or under a Contract that requires as a condition of its use, modification or distribution that it, or other Software into which such Software is incorporated, integrated or with which such Software is combined or distributed or that is derived from or linked to such Software, be disclosed or distributed in source code form, delivered at no charge or be licensed, distributed or conveyed under the same terms as such Contract (including, but not limited to, Software licensed under the GNU General Public License (GPL), GNU Lesser General Public License (LGPL), Mozilla Public License (MPL), BSD licenses, Microsoft Shared Source License, Common Public License, Artistic License, Netscape Public License, Sun Community Source License (SCSL), Sun Industry Standards License (SISL), Apache License and any license listed at www.opensource.org or www.fsf.org).

"*Order*" means any award, writ, injunction, judgment, order, ruling, decision, subpoena, precept, directive, consent, approval, award, decree or similar determination or finding entered, issued, made or rendered by any Governmental Authority, including for the avoidance of doubt any order entered by the Bankruptcy Court, including the Sale Order.

"*Organizational Conflict of Interest*" has the meaning set forth in *Section 4.23(u)*.

"*Organizational Documents*" means, with respect to any Person, the certificate or articles of incorporation and by-laws, certificate of formation or articles of organization and limited liability company agreement or operating agreement, partnership agreement, trust agreement, equity or stockholders' agreement or other similar governing documents of such Person.

"*Outbound License*" has the meaning set forth in *Section 4.8(a)(v)*.

"*Parts*" means, collectively, all appliances, components, parts, instruments, appurtenances, avionics, accessories, furnishings, auxiliary power units, software and other equipment of whatever nature (other than complete Engines or engines) that may now or from time to time be incorporated or installed in or attached to the Airframe or any Engine, or that, having been removed therefrom remain the property of Sellers (each of the foregoing individually, a "*Part*").

"*Party*" and "*Parties*" have the meanings set forth in the preamble.

12

"*Patriarch Stakeholders*" means, without limitation, each of the following entities or individuals: Ark Angels, LLC; Ark Angels II, LLC; Ark Angels III, LLC; Ark Angels VIII, LLC; Ark Investment Partners II, LP; Ark II CLO 2001-1, Ltd.; LD Investments, LLC; Lynn Tilton; Octaluna LLC; Octaluna II, LLC; Octaluna III, LLC; Patriarch Partners, LLC; Patriarch Partners VIII, LLC; Patriarch Partners, XIV, LLC; Patriarch Partners XV, LLC; Patriarch Partners Management Group, LLC; Patriarch Partners Agency Services, LLC; Zohar Holdings, LLC; and any respective current and former controlled Affiliates of each of the foregoing (each, a "*Patriarch Stakeholder*").

"*Paying Party*" has the meaning set forth in *Section 7.3(b).*

"*Permit*" means any franchises, permits, licenses, consents, certificates, clearances, approvals, exceptions, variances, permissions, filings, publications, declarations, notices, waivers, and authorizations, including environmental permits, of or with any Governmental Authority.

"*Permitted Liens*" means the following Liens: (a) statutory Liens for Taxes, assessments or other governmental charges or levies that are not yet due and payable or delinquent or that are being contested in good faith by appropriate Proceedings and for which adequate reserves are being maintained in accordance with GAAP; (b) mechanics', materialmen's, repairmen's and other statutory Liens incurred in the ordinary course of business and for which adequate reserves are being maintained in accordance with GAAP; (c) Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance or other types of social security; (d) purchase money Liens and Liens securing rental payments under capital lease arrangements set forth on *Schedule 1.1(a)*; (e) with respect to Leased Real Property, easements, declarations, covenants or rights-of-way, restrictions and similar non-monetary Liens which do not, individually or in the aggregate, materially impair the use, occupancy or value of such Leased Real Property or the ordinary conduct of the Business as currently conducted; (f) zoning ordinances, variances, conditional use permits and other generally applicable land use restrictions which do not, individually or in the aggregate, materially impair the use, occupancy or value of any Leased Real Property or the ordinary conduct of the Business as currently conducted; (g) Liens that will be released at the Closing with no Liability to Buyer or its Affiliates; (h) any Lien granted or incurred pursuant to an Order of the Bankruptcy Court; and (i) outbound Intellectual Property licenses, covenants not to sue and similar rights or licenses that are subject to Section 365(n) of the Bankruptcy Code.

"*Person*" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, unincorporated organization, estate, trust, association, organization or other legal entity or group or Governmental Authority.

"*Petition Date*" means the date of the Debtors' voluntary petitions for relief as debtors-in-possession, under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"*PII*" has the meaning set forth in *Section 4.12(g).*

"*Post-Closing Tax Period*" means any Tax period beginning after the Closing Date and with respect to any taxable period that begins on or prior to the Closing Date and ending after the Closing Date, the portion thereof beginning after the Closing Date.

"*Pre-Closing Tax Period*" means any Tax period ending on or before the Closing Date and with respect to any taxable period that includes but does not end on the Closing Date, the portion thereof ending on the Closing Date.

"*Privacy Policy*" has the meaning set forth in *Section 4.12(g)*.

"*Proceeding*" means any claim, action, suit, arbitration, audit, hearing, inquiry, review, prosecution, examination, investigation, litigation or proceeding by or before any Governmental Authority.

"*Property Taxes*" has the meaning set forth in *Section 7.3(a)*.

"*Purchase Price*" has the meaning set forth in *Section 3.2*.

"*Purchased Assets*" has the meaning set forth in *Section 2.1*.

"*Purchased Intellectual Property*" has the meaning set forth in *Section 2.1(d)*.

"*Qui Tam Action*" means that certain qui tam action filed against MDH, among others, in the United States District Court for the Northern District of Alabama (Northeastern Division), captioned United States ex rel. Philip Marsteller, et al. v. Lynn Tilton, MD Helicopters, Inc., et al., Case No. 5:13-cv-00830-AKK.

"*Qui Tam Settlement Agreement*" means that certain settlement agreement with respect to the Qui Tam Action to be entered into pursuant to the terms of the Restructuring Support Agreement.

"*Qui Tam Settlement Motion*" means a motion filed by the Debtors with the Bankruptcy Court under Rule 9019 of the Federal Rules of Bankruptcy Procedure seeking entry of an order approving the Qui Tam Settlement Agreement.

"*Qui Tam Settlement Order*" means an order entered by the Bankruptcy Court granting the relief sought in the Qui Tam Settlement Motion.

"*Release*" means any release, spill, emission, leaking, pumping, injection, emitting, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Materials into the indoor or outdoor environment.

"*Responsible Contracting Officer*" has the meaning set forth in *Section 2.5(g)*.

"*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of March 30, 2022, among the Debtors, Zohar CDO 2003-1, Ltd., Zohar II 2005-1, Ltd., Zohar III, Ltd., Philip Marsteller, Robert M. Swisher, and National Union Fire Insurance Company of Pittsburgh, Pa.

"*Retained Cash*" means Cash and Cash Equivalents held by any Seller at the time of Closing in an amount equal to $1,000,000 or such other amount as may be mutually agreed to by the Parties in good faith.

"*Sale Hearing*" means the hearing held in the Bankruptcy Court on the Sale Motion.

"*Sale Motion*" means a motion filed by the Debtors in the Bankruptcy Court, in form and substance reasonably acceptable Buyer and Seller, among other things, requesting (a) approval of this Agreement, (b) authorization of the sale of the Purchased Assets to Buyer pursuant to section 363 of the Bankruptcy Code, pursuant to the terms and conditions set forth herein, free and clear of any Liens (other than Permitted Liens), (c) authorization of the assumption by, and assignment to, Buyer of the Assigned Contracts and the Assumed Liabilities pursuant to section 365 of the Bankruptcy Code and (d) authorization of the other transactions contemplated by this Agreement.

"*Sale Order*" means an Order by the Bankruptcy Court, in form and substance reasonably acceptable to Buyer and Sellers, among other things, (a) approving this Agreement, (b) authorizing the sale of the Purchased Assets to Buyer pursuant to section 363 of the Bankruptcy Code, pursuant to the terms and conditions set forth herein, free and clear of any Liens (other than Permitted Liens), (c) authorizing the assumption by, and assignment to, Buyer of the Assigned Contracts and the Assumed Liabilities pursuant to section 365 of the Bankruptcy Code and (d) authorizing the other transactions contemplated by this Agreement.

"*Sanctioned Country*" means at any time, a country or territory which is itself the subject or target of any comprehensive Sanctions Laws (including, at the time of this Agreement, the Crimea region of Ukraine, the so-called Donetsk People's Republic or Luhansk People's Republic regions of Ukraine, Cuba, Iran, North Korea and Syria).

"*Sanctioned Person*" means any Person that is the target of Sanctions Laws, including (i) any Person identified in any Sanctions Law-related list of designated Persons maintained by (a) the United States, including by the U.S. Department of the Treasury's Office of Foreign Assets Control, the U.S. Department of Commerce, Bureau of Industry and Security, or the U.S. Department of State; (b) Her Majesty's Treasury of the United Kingdom; (c) any committee of the United Nations Security Council; or (d) the European Union; (ii) any Person located, organized, or resident in, organized in, or a Governmental Authority or government instrumentality of, any Sanctioned Country; or (iii) any Person directly or indirectly owned or controlled by, or acting for the benefit or on behalf of, a Person described in clause (i) or (ii), either individually or in the aggregate.

"*Sanctions Laws*" means any trade, economic or financial sanctions Laws administered, enacted or enforced from time to time by (i) the United States (including the Department of the Treasury's Office of Foreign Assets Control or the U.S. Department of State), (ii) the European Union and/or its member states, (iii) the United Nations, or (iv) Her Majesty's Treasury of the United Kingdom.

"*SBA*" has the meaning set forth in *Section 4.23(o)*.

"*Security Incident*" has the meaning set forth in *Section 4.12(g)*.

"*Seller*" has the meaning set forth in the preamble.

"*Seller Plan*" means each (i) "employee benefit plan" as defined in Section 3(3) of ERISA, whether or not subject to ERISA, (ii) end of service or severance, termination protection,

retirement, pension, profit sharing, deferred compensation, phantom, equity or equity-based, health or welfare, vacation, change in control, transaction, retention, bonus or other incentive, fringe benefit, paid time off or similar plan, agreement, arrangement, program or policy, or (iii) other plan, Contract, policy or arrangement providing compensation or benefits, in each case whether or not written, including any employment or consulting agreements with Service Providers that are not terminable at will or upon 30 days or less notice, in the case of clauses (i)-(iii), that is sponsored, maintained, administered, contributed to or entered into by any Seller, for the benefit of any of its current or former Service Providers, or for which any Seller has any direct or indirect liability.

"**Service Provider**" means a director, officer, employee or independent contractor that is an individual or alter ego thereof.

"**Software**" means software, artificial intelligence, algorithms, firmware and computer programs and applications (including source code, executable or object code, software architecture, software algorithms, data files, computerized databases, plugins, libraries, operating systems, subroutines, tools, and APIs) and related documentation used to design, plan, organize and develop any of the foregoing.

"**Specified Contracts**" has the meaning set for in *Section 2.5(g)*.

"**Specified Contract Assignments**" has the meaning set forth in *Section 2.5(g)*.

"**Specified Date**" means April 20, 2020.

"**Specified Litigation**" means (i) the Qui Tam Action, (ii) that certain litigation arising out of a contract dispute between the Dutch National Police Services Agency and Helifly, nv., including (w) the judgment against MDH issued by the Hague Court of Appeal in May 2012, (x) State of the Netherlands v. MD Helicopters, Inc., No. CV2015-095127 (AZ Maricopa Super. Ct. Nov. 13, 2018), (y) State of the Netherlands v. MD Helicopters, Inc., 250 Ariz. 235 (2020), and (z) State of the Netherlands v. MD Helicopters, Inc., Index. No. 157756/2020, ECF No. 6 (N.Y. Sup. Ct. Sept. 23, 2020) and (iii) that certain ICC Arbitration No. 26802/FS - TAI vs. MDHI.

"**Specified Person**" has the meaning set forth in *Section 2.1(k)*.

"**Straddle Period**" has the meaning set forth in *Section 7.3(a)*.

"**Structures**" has the meaning set forth in *Section 4.13(a)(i)*.

"**Subcontract Agreement Pending Novation**" has the meaning set forth in *Section 6.5*.

"**Subsidiary**" means, with respect to any Person, any corporation, entity or other organization, whether incorporated or unincorporated, of which (a) such first Person directly or indirectly owns or controls at least a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions or (b) such first Person is a general partner or managing member.

"**Successful Bidder**" has the meaning set forth in the Bid Procedures.

"***Supplemental Contract Notices***" has the meaning set forth in *Section 2.5(c).*

"***Tax***" means all federal, state, local or foreign income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, real property gains, registration, value added, excise, natural resources, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, special assessment, personal property, capital stock, social security, unemployment, disability, payroll, license, employee or other withholding tax, profits, lease, service, recording, documentary, filing, permit or authorization, gains, import, export, intangibles, or any other taxes, fees, assessments or charges of any kind whatsoever imposed by any Governmental Authority including any interest, penalties or additions to tax or additional amounts in respect of the foregoing.

"***Tax Return***" means any report, return, election, extension or similar document (including declarations, disclaimers, notices, disclosures, estimates, claims (including claims for refunds), real property transfer tax returns, information returns, schedules or any related or supporting information) filed or required to be filed with respect to Taxes with any Governmental Authority or other authority in connection with the determination, assessment or collection of any Tax or the administration of any Laws or administrative requirements relating to any Tax, including any amended return or declaration of estimated Taxes.

"***Term Loan***" means all obligations, Liabilities, and Indebtedness of every kind, nature and description owing by MDH in its capacity as the borrower under the Term Loan Agreement.

"***Term Loan Agreement***" means that certain Credit Agreement, dated as of July 8, 2005 among the Debtors and the Term Loan Lenders and Term Loan Agent thereunder, as amended.

"***Term Loan Lenders***" means, collectively, the lenders that are or may become parties to the Term Loan Agreement and their respective successors and assigns (including any other lender or group of lenders that at any time succeeds to or refinances, replaces or substitutes) for all or any portion of the Term Loan at any time and from time to time.

"***Transaction***" has the meaning set forth in the recitals of this Agreement.

"***Transaction Documents***" means this Agreement, the Assignment and Assumption Agreements, the Bills of Sale, the Assignment of Patents, the Assignment of Trademarks, the Subcontract Agreement Pending Novation, the Transition Services Agreement and any other agreements, instruments or documents entered into pursuant to, or as contemplated by, this Agreement.

"***Transfer Taxes***" means any sales, use, purchase, excise, gross receipts, ad valorem, direct or indirect real property, business and occupation, value added, filing, permit or authorization, leasing, license, lease, severance, franchise, profits, fixed asset, property transfer or gains, documentary, stamp, registration, intangible, conveyance, recording or similar Tax (including, for certainty, goods and services tax, harmonized sales tax and land transfer tax) and any recording costs or fees, however styled or designated, or other amounts in the nature of transfer Taxes payable in connection with the transactions contemplated by this Agreement.

"***Transferred Cash***" has the meaning set forth in *Section 2.1(g).*

"***Transferred Employee***" has the meaning set forth in *Section 7.4(a).*

"***Transition Services Agreement***" has the meaning set forth in *Section 6.5.*

"***Type Certificates***" means the type certificates issued by the Federal Aviation Administration set forth on *Schedule 1.1(c).*

"***Willful Breach***" means an action or failure to act by one of the Parties that constitutes a material and intentional breach of this Agreement, and such action was taken or such failure occurred as a consequence of a deliberate act or failure to act by such Party.

"***Zohars***" means, collectively, Zohar CDO 2003-1 Limited, Zohar II 2005-1 Limited and Zohar III Limited, Zohar CDO 2003-1, Corp. and Zohar III, Corp.

*1.2    **References and Rules of Construction**.* All references in this Agreement to Exhibits, Schedules, Articles, Sections, subsections and other subdivisions refer to the corresponding Exhibits, Schedules, Articles, Sections, subsections and other subdivisions of or to this Agreement unless expressly provided otherwise. Titles appearing at the beginning of any Articles, Sections, subsections and other subdivisions of this Agreement are for convenience only, do not constitute any part of this Agreement, and shall be disregarded in construing the language hereof. The words "this Agreement," "herein," "hereby," "hereunder" and "hereof," and words of similar import, refer to this Agreement as a whole and not to any particular Article, Section, subsection or other subdivision unless expressly so limited. The word "including" (in its various forms) means including without limitation. Unless expressly provided to the contrary, the word "or" is not exclusive and has the meaning represented by the phrase "and/or". All references to "$" or "dollars" shall be deemed references to United States dollars. Each accounting term not defined herein, and each accounting term partly defined herein to the extent not defined, will have the meaning given to it under GAAP as in effect from time to time. An item arising with respect to a specific representation or warranty shall be deemed to be "reflected" or "disclosed" on a balance sheet or financial statements, to the extent (A) there is a reserve, accrual or other similar item underlying a number on such balance sheet or financial statement that is specifically related to the subject matter of such item, (B) such item is otherwise specifically set forth on the balance sheet or financial statement, or (C) such item is reflected on the balance sheet or financial statement and is referred to in the notes thereto. The phrase "ordinary course" or "ordinary course of business" means the ordinary course of business consistent with past practice. Pronouns in masculine, feminine or neuter genders shall be construed to state and include any other gender, and words, terms and titles (including terms defined herein) in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires. Except as expressly provided otherwise in this Agreement, references to any Law or agreement means such Law or agreement as it may be amended from time to time. The word "extent" in the phrase "to the extent" shall mean the degree or proportion to which a subject or other thing extends, and such phrase shall not mean simply "if." If a date specified herein for giving any notice or taking any action is not a Business Day (or if the period during which any notice is required to be given or any action taken expires on a date which is not a Business Day), then the date for giving such notice or taking such action (and the expiration date of such period during which notice is required to be given or action taken) shall be the next day which is a Business Day.

## ARTICLE II
## PURCHASE AND SALE

**2.1**    ***Purchase and Sale***. On the terms and subject to the conditions set forth in this Agreement, effective as of the Closing, each Seller shall sell, assign, transfer, convey and deliver to Buyer or its Designated Purchaser, and Buyer or its Designated Purchaser shall purchase and acquire from each Seller, all of each Seller's right, title and interest in and to all of the assets, properties, interests and rights of every nature, kind and description, tangible and intangible of each Seller, other than the Excluded Assets (the "***Purchased Assets***"), in each case, free and clear of any Liens (other than Permitted Liens). The Purchased Assets shall include the following:

(a)    the Leased Real Property set forth on *Schedule 2.1(a)*, together with any buildings, fixtures and improvements located on or attached to such real property, and all rights arising therefrom, and all tenements, hereditaments, appurtenances and other real property rights appertaining thereto;

(b)    all tangible assets, including machinery, tools, equipment, computers, information management systems (including software and hardware related thereto), telephone systems, supplies and other tangible personal property owned by any Seller, including (i) any such property located at any Leased Real Property, (ii) any such property that is leased to the extent such lease is an Assigned Contract and (iii) any such property on order to be delivered to any Seller;

(c)    all warranties, indemnities or guaranties from any Person with respect to any Purchased Asset, including any item of real property, personal property or equipment;

(d)    all Intellectual Property owned by any Seller, including the Intellectual Property set forth on *Schedule 2.1(d)* (the "***Purchased Intellectual Property***");

(e)    the Seller Plans set forth on *Schedule 2.1(e)* (the "***Assumed Plans***"), all funding arrangements related thereto (including all assets, trusts, insurance policies (including, for the avoidance of doubt, any director and officer insurance policy) and administrative service Contracts related thereto), and all rights and obligations thereunder;

(f)    other than the Excluded Permits, all Permits held by any Seller, including those set forth on *Schedule 2.1(f)*;

(g)    other than the Retained Cash, all Cash and Cash Equivalents (the "***Transferred Cash***");

(h)    all deposits, credits, prepaid expenses, deferred charges, advance payments, refunds, rights of set-off, rights of recovery, security deposits, prepaid items and duties related to the Purchased Assets (including the Assigned Contracts);

(i)    all accounts receivable, notes, negotiable instruments and chattel paper owned or held, together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto, and other amounts receivable from any Person before the Closing;

19

(j)      all rights and obligations under or arising out of all insurance policies (including, for the avoidance of doubt, all rights of the Sellers under any director and officer insurance policy, if any) relating to any of the Purchased Assets or any of the Assumed Liabilities (including returns and refunds of any premiums paid, or amounts due back to any Seller, with respect to cancelled insurance policies), and all benefits of any nature of any Seller with respect thereto (including any claims of Seller arising under such policies and all credits, premium refunds, proceeds, causes of action or rights thereunder);

(k)      subject to *Section* 7.13, all rights against any Person (including (i) customers, suppliers, vendors, lessors, lessees, licensees, licensors of any Seller and (ii) Buyer, its Affiliates or any of its or their respective directors, officers, members, partners, shareholders, managers, advisors or representatives) arising under or related to any Assigned Contract, other Purchased Asset (including any use, ownership, possession, operation, sale or lease thereof) or Assumed Liability or the operation or conduct of the Business, including Proceedings, Claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds, rights of set off, rights of recovery (including rights to insurance proceeds), rights of subrogation, rights of recoupment, rights under or with respect to express or implied guarantees, warranties, representations, covenants, indemnities, exculpation, advancement, reimbursement of expenses or contract renewal rights and other similar rights, in each case, whether direct or derivative, known or unknown, liquidated or unliquidated, contingent or otherwise; including all rights of any Seller against any current or former directors, officers, members, partners, shareholders, equity holders, managers, advisors or other professionals of such Seller, including any Proceedings and Claims ("***D&O Claims***") and all avoidance, recovery, subordination claims or causes of action of any Seller under Chapter 5 of the Bankruptcy Code or any analogous state or federal statutes or common law relating to the Purchased Assets and Assumed Liabilities; underlined(provided) that neither Buyer, the Designated Purchaser or any Person claiming by or through Buyer or the Designated Purchaser (including by operation of law, sale, assignment, conveyance or otherwise) shall pursue, prosecute, litigate, institute or commence any Proceeding based on, assert, sell, convey, assign or file any Claim that relates to any rights, claims or causes of action transferred under this *Section 2.1(k)* against any Seller or any of their current or former subsidiaries or any of their respective current or former officers or directors, in each cash other than a Specified Person. Nothing herein shall limit the right of Buyer (or any assignee or transferee thereof) to bring any claims or causes of action against a Specified Person. "***Specified Person***" shall mean Lynn Tilton, or any other officer, director, employee, manager, advisor or other representative of any Seller who is or has been a director, officer, equityholder, manager, Affiliate, member or representative of Patriarch Partners, LLC or any of its Affiliates (excluding, for purposes of this *Section 2.1(k)* and *Section 7.13*, Sellers and their respective current or former subsidiaries). For the avoidance of doubt, the Patriarch Stakeholders and any other Affiliate of Lynn Tilton (other than Sellers and the Zohars) shall be deemed Specified Persons;

(l)      all goodwill related to the Purchased Assets (including the goodwill associated with the Trademarks and other Intellectual Property included in the Purchased Assets);

(m)      the Type Certificates;

(n)      all inventory, including all (i) raw materials, bulk and pan stock, (ii) stores inventory, (iii) work-in process, (iv) aircraft in flow, (v) used Parts, (vi) finished goods, (vii) Aircraft, (viii) Airframe, (ix) Engines and (x) spare Parts (collectively, "***Inventory***");

(o)      all Tax refunds, overpayments, credits or other attributes, including (i) with respect to Taxes for any Pre-Closing Tax Period or (ii) with respect to Taxes that are Excluded Liabilities;

(p)      the Assigned Contracts (including, with respect to the Specified Contracts, in accordance with *Section 2.5(g)*); and

(q)      other than the Excluded Records, all of each Seller's current or historical written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, ledgers, journals, title policies, customer lists, supplier lists, vendor lists, price lists, mailing lists, invoices, shipping records, standard forms of documents, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, *etc.*), user documentation (installation guides, user manuals, training materials, release notes, working papers, *etc.*), marketing documentation (catalogs, sales brochures, flyers, pamphlets, web pages, *etc.*), consulting materials, opinions and other documents commissioned by or on behalf of any Seller, development, quality control, quality assurance, and other regulatory documents, all personnel and employment records for the Transferred Employees or any individual independent contractors of any Seller, and other books and records of any Seller and any rights thereto owned by any Seller, in each case whether stored in hard copy form or on electronic, magnetic, optical or other media, and including any of the foregoing (other than the Excluded Records) that is subject to attorney-client privilege or attorney work-product protection.

    **2.2      *Excluded Assets***. Notwithstanding any provision in this Agreement to the contrary, Buyer shall not purchase, no Seller shall sell, transfer, assign, convey or deliver, and Sellers shall retain all right, title and interest to, in and under the following assets, properties, interests and rights (collectively, the "***Excluded Assets***"):

(a)      the Organizational Documents, corporate records and minute books, in each case solely to the extent pertaining to the formation or capitalization of any Seller;

(b)      any (i) records, documents or other information solely to the extent relating to any current or former Employee who is not or does not become a Transferred Employee and any materials to the extent containing information about any Employee, disclosure of which to Buyer as the acquirer of the Business would violate applicable Law and (ii) all attorney-client privilege and attorney work-product protection of any Seller or associated with its businesses solely to the extent arising with respect to legal counsel representation of any Seller or any of their respective Affiliates or their businesses in connection with the transactions contemplated by this Agreement or any of the Transaction Documents (such documents described in clauses (i) and (ii), collectively, the "***Excluded Records***");

21

(c)     subject to *Section 2.5*, any Contract that is not an Assigned Contract (collectively, the "***Excluded Contracts***");

(d)     all rights, claims or causes of action that accrue or will accrue to any Seller pursuant to this Agreement or any of the other Transaction Documents;

(e)     any Seller Plans other than the Assumed Plans (the "***Excluded Plans***" which such Excluded Plans include, in all events, all equity incentive plans and grants thereunder and any arrangements subject to Title IV of ERISA), together with all funding arrangements related thereto (including all assets, trusts, insurance policies and administrative service Contracts related thereto), and all rights and obligations thereunder;

(f)     all shares of capital stock or other equity interests of any Seller or any Affiliate thereof or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests of any Seller or any Affiliate thereof;

(g)     all proceeds received from the sale or liquidation of any other Excluded Assets;

(h)     all bank accounts of any Seller;

(i)     the Retained Cash; and

(j)     the Excluded Permits.

**2.3     Assumed Liabilities**. On the terms and subject to the conditions of this Agreement, effective as of the Closing, Buyer or its Designated Purchaser shall assume only the following Liabilities of each Seller (the "***Assumed Liabilities***"):

(a)     all Cure Costs to the extent they have not been paid on or before the Closing; provided, however, that neither Buyer nor any Designated Purchaser shall be liable for any applicable Cure Costs that are waived by the contract counterparty pursuant to and consistent with *Section 2.5(a)* hereof, or otherwise paid by or on behalf of Buyer or its Designated Purchaser in an amount and on terms agreed upon between Buyer and such contract counterparty;

(b)     all Liabilities with respect to the Assumed Plans to the extent relating to Transferred Employees, whether or not arising prior to or after the Closing Date;

(c)     all Liabilities of each Seller relating to or arising out of the Assigned Contracts to be paid or performed after the Closing Date, except to the extent such liabilities and obligations, but for a breach or default by any Seller would have been paid, performed or otherwise discharged on or prior to the Closing Date or to the extent the same arises out of any such breach or default;

(d)     any and all Liabilities for (i) Taxes that relate to the Purchased Assets or the Assumed Liabilities with respect to Post-Closing Tax Periods allocable to Buyer in accordance with *Section 7.3(a)* and (ii) Transfer Taxes;

(e)     all accounts payable and other trade obligations, in each case, to the extent (and solely to the extent) (i) incurred in the ordinary course of business and otherwise in compliance with the terms and conditions of this Agreement (including *Section 6.1*), (ii) not yet delinquent and (iii) not arising under or otherwise relating to any Excluded Asset; and

(f)     accrued compensation, vacation pay, employee unreimbursed business expenses and benefits, in each case for any Transferred Employee, but only to the extent allocable to Buyer in accordance with *Section 7.4*.

**2.4     *Excluded Liabilities***. Notwithstanding any provision in this Agreement to the contrary, other than the Assumed Liabilities, neither Buyer nor any Designated Purchaser shall assume, be required to pay, perform or discharge, or be liable hereunder for any Liabilities of any Seller, whether or not related to the Business or the Purchased Assets, and Sellers shall retain and be responsible for all other Liabilities, including the following (collectively, the "***Excluded Liabilities***"):

(a)     all Liabilities arising out of or relating to any Purchased Asset or the operation of the Business on or prior to the Closing Date, other than Assumed Liabilities pursuant to *Section 2.3*;

(b)     all Liabilities for Taxes (other than Transfer Taxes), including Taxes payable by reason of contract, assumption, transferee or successor Liability, operation of Law, pursuant to Treasury Regulation Section 1.1502-6 (or any similar provision of any state or local law), (i) that relate to the Purchased Assets or Assumed Liabilities with respect to Pre-Closing Tax Periods allocable to any Seller in accordance with *Section 7.3(a)*, (ii) owed by any Seller or any of their respective Affiliates (whether or not relating to a Pre-Closing Tax Period) or (iii) arising from or in connection with an Excluded Asset;

(c)     except to the extent of any Liabilities expressly assumed pursuant to *Section 2.3(c)*, all Liabilities arising under any Contract;

(d)     except to the extent of any Liabilities expressly assumed pursuant to *Section 2.3(c), Section 2.3(e)* or *Section 2.3(f)*, all Liabilities of each Seller for Indebtedness;

(e)     all obligations of each Seller pursuant to this Agreement or any of the other Transaction Documents;

(f)     all Liabilities arising out of, relating to or with respect to (i) the employment or termination of employment of any current or former Employee or other Service Provider who is not a Transferred Employee or (ii) the employment of any Transferred Employee, in each case except to the extent allocable to Buyer in accordance with *Section 7.4*;

(g)     all Liabilities arising out of, relating to or with respect to any Excluded Plan;

(h)     all Liabilities of each Seller arising under or pursuant to any Environmental Laws or Health and Safety Requirements, including with respect to any real property owned, operated, leased or otherwise used by any Seller, whether or not used in the ordinary course, including any Liabilities for noncompliance with any Environmental Laws or Health and Safety

23

Requirements (including the Release of Hazardous Materials), in each case only to the extent arising as a result of any act, omission, or circumstances taking place on or prior to the Closing, whether known or unknown as of the Closing;

(i)    all Liabilities arising out of, relating to or with respect to any Order or Proceeding involving, against or affecting any Purchased Asset, the Business, any Seller or any assets or properties of any Seller (i) commenced, filed or initiated as of the Closing or (ii) relating to facts, events or circumstances arising or occurring prior the Closing (including, for the avoidance of doubt, any Order related to fraud, breach of fiduciary duty, misfeasance or under any other theory relating to conduct, performance or non-performance of any Seller, or any of their respective directors, officers, or employees, and any breach, default, failure to perform, torts related to performance, violations of Law, infringements or indemnities, guaranties and overcharges, underpayments or penalties, whether in respect of any Contract, agreement, arrangement, promise or understanding of any kind), including (x) any successor liability claims or obligations that may be owed to or assessed by, any Governmental Authority or other Person, and whether commenced, filed, initiated, or threatened prior to, on or following the Closing, and (y) the Specified Litigation; and

(j)    all other Liabilities of each Seller that are not Assumed Liabilities.

**2.5    *Assigned Contracts; Cure Costs*.**

(a)    Unless otherwise waived by a contract counterparty, at the Closing, Buyer or its Designated Purchaser shall pay in cash an amount and on terms agreed between Buyer or its Designated Purchaser and such contract counterparty, or otherwise satisfy as agreed between Buyer or its Designated Purchaser and such contract counterparty, in each case pursuant to Section 365 of the Bankruptcy Code, Section 1123(b)(2) of the Bankruptcy Code, and the Sale Order, any and all costs or expenses that are required to be paid under Sections 365(b)(1)(A) and 365(b)(1)(B) of the Bankruptcy Code, as applicable, to cure any defaults in connection with the assumption and assignment of the Assigned Contracts (such costs or expenses required to be paid by Buyer, the "***Cure Costs***"). Buyer agrees that, in exchange for a waiver of any Cure Costs, it shall not initiate any civil or administrative proceeding related to any Avoidance Action against any Assigned Contract counterparty with an allowed claim for or entitled to receive Cure Costs at the time of Closing; <u>provided</u> that such contract counterparty consents in return to the assignment of its Assigned Contract to Buyer and waives its claim for or right to receive Cure Costs from Buyer. For the avoidance of doubt, neither Buyer nor any Designated Purchaser or Buyer Affiliates shall be required to make any payment of Cure Costs with respect to any Excluded Contract.

(b)    On the Execution Date, and subject to Buyer's rights under *Section 2.5(d)* to subsequently amend such designations, Buyer will deliver to Sellers a list of the Applicable Contracts to be assumed by Sellers and assigned to Buyer at the Closing (such Applicable Contracts (as such designation may be modified in accordance with *Section 2.5(d)*), the "***Assigned Contracts***"). Sellers shall promptly commence appropriate proceedings before the Bankruptcy Court and otherwise use commercially reasonable efforts to take all reasonably necessary actions in order to determine Cure Costs with respect to any Assigned Contracts including providing sufficient notice in accordance with the Bid Procedures Order to all counterparties to the Assigned Contracts of their assumption or rejection and, with respect to the Assigned Contracts to be

assumed, providing a schedule of Cure Costs. Any Applicable Contracts that are not set forth on such list of Applicable Contracts to be assumed shall be Excluded Contracts and deemed rejected, and shall be an Excluded Asset for all purposes hereof.

(c)     No later than two (2) Business Days following entry of the Bid Procedures Order, Sellers shall deliver written notices, in form and substance reasonably acceptable to Buyer and Sellers (the "*Initial Contract Notices*"), of the potential assignments of the Applicable Contracts then known to Sellers for each such Applicable Contract to all non-debtor parties to such Applicable Contracts, which notice shall specify (i) Sellers' good faith estimate of the proposed Cure Cost for such Applicable Contract and (ii) an objection deadline for such non-debtor party to object to the proposed Cure Cost. To the extent Buyer exercises its right under *Section 2.5(d)* to amend or modify designations from time to time to include additional Assigned Contracts, Sellers shall deliver written notices (each, a "*Supplemental Contract Notice*" and, together with the Initial Contract Notice, the "*Contract Notices*") to all non-debtor parties to such Applicable Contracts in substantially the same form as the Initial Contract Notices and in accordance with the Bid Procedures Order.

(d)     At any time prior to the Designation Deadline, Buyer shall have the right, which may be exercised in Buyer's sole discretion, to provide written notice to Sellers of Buyer's election to designate any Applicable Contract (including any Contract that is an Assigned Contract immediately before such designation) (i) as an Excluded Contract and upon such designation such Contract shall constitute an Excluded Contract and, if applicable, shall cease to constitute an Assigned Contract or (ii) to the extent not already rejected, as an Assigned Contract and upon such designation such Contract shall constitute an Assigned Contract. If an Applicable Contract is subject to a cure dispute or other dispute as to the assumption or assignment of such Applicable Contract that has not been resolved to the reasonable satisfaction of Buyer and Sellers prior to the Designation Deadline, then the Designation Deadline shall be extended (but only with respect to such Applicable Contract) to no later than the earliest of (A) the date on which such dispute has been resolved to the reasonable satisfaction of Buyer and Sellers, (B) the date on which such Applicable Contract is deemed rejected by operation of Sections 365(d)(4) or 1123(b)(2) of the Bankruptcy Code, as applicable, or (C) the date required by the Bankruptcy Court and set forth in the Sale Order.

(e)     Notwithstanding anything in this Agreement to the contrary, Sellers shall not reject any Applicable Contracts without the prior written consent of Buyer in its sole discretion; provided that, after the Designation Deadline, Sellers may reject Excluded Contracts without the consent of Buyer so long as such Applicable Contracts were identified to Buyer in writing prior to the Designation Deadline. In the event that any Seller identifies (whether before or after the Designation Deadline) any additional Applicable Contracts capable of being assumed or rejected that were not previously identified as such, Sellers shall promptly notify Buyer of (i) such Applicable Contracts and (ii) Sellers' good faith estimate of the amount of the Cure Costs payable in respect of each such Applicable Contract. For the avoidance of doubt, Buyer may designate each such additional Applicable Contract described in the immediately preceding sentence as an Assigned Contract or Excluded Contract pursuant to this *Section 2.5*, notwithstanding the passage of the Designation Deadline.

(f)     Subject to *Section 2.5(g)* in the case of any Specified Contract, in the event any Assigned Contract requires a third party's, including any Governmental Authority's, consent to the assignment thereof, and any such consent is not obtained prior to Closing, such Assigned Contract will not be assigned to Buyer at the Closing and each Seller and Buyer will continue to use commercially reasonable efforts to obtain such consent. Unless and until the applicable consent is obtained, each Seller will, to the extent practicable, keep the relevant Assigned Contract in effect and give Buyer the rights and benefits of such Assigned Contract to the same extent as if it had been assigned to Buyer and as if Buyer was directly a party thereto, and Buyer will perform the obligations under such Assigned Contract on behalf of Sellers in a timely manner to the extent that such obligations would have existed if such Assigned Contract had been assigned to Buyer. In addition, such Seller will not enter into, or negotiate to enter into, any amendment, extension, termination, modification, cancellation, assignment, transfer or renewal of any such Assigned Contract, or grant any waiver thereunder, or compromise or settle any amount receivable or payable arising thereunder after the Closing, without the prior written consent of Buyer, which consent shall not be unreasonably withheld, conditioned or delayed. If after the Closing Date such consent is obtained, Buyer will assume such Assigned Contract as of the date of such consent. Nothing in this Agreement may be construed as an attempt to assign any Contract that is by its terms nonassignable without the consent of the other party thereto. For the avoidance of doubt, notwithstanding anything to the contrary in this *Section 2.5(f)*, in no event shall any Seller have any obligation to renew or extend any such Assigned Contract. The Parties shall treat Buyer as the owner of such Assigned Contracts for applicable Tax purposes from and after the Closing Date to the maximum extent permitted by Law. For the avoidance of doubt, in no event will the failure to obtain the consent of any third party to the assignment of any Assigned Contract, in and of itself, be a breach of this Agreement.

(g)     Without limiting anything contained in *Section 2.5(f)*, from and after the Closing and until the receipt of all Approvals required to effect the transfer (by novation or assignment or otherwise) of each of the contracts set forth on *Schedule 2.5(g)* (the "**Specified Contracts**" and such transfers, the "**Specified Contract Assignments**") in accordance with this *Section 2.5(g)*: (i) the Parties will enter into and shall comply with the terms of the Subcontract Agreement Pending Novation concerning the disposition of each Specified Contract not yet assigned at Closing; and (ii) the Parties shall use commercially reasonable efforts to obtain any Approvals of any Governmental Authority, including by jointly preparing, in accordance with FAR Subpart 42.12, and any applicable agency regulations or policies, written requests meeting the requirements of FAR Subpart 42.12, as reasonably interpreted by the applicable responsible contracting officer (as such term is used in FAR Subpart 42.1202, each, a "**Responsible Contracting Officer**"), which shall be in form and substance reasonably satisfactory to the Parties and which shall be submitted by the applicable Seller to the applicable Responsible Contracting Officer to (A) recognize Buyer as such Seller's successor-in-interest to each such Specified Contract, and (B) enter into one or more novation agreements, and such other documents as the applicable Governmental Authorities may require, in form and substance reasonably satisfactory to the Parties, pursuant to which, subject to the requirements of the FAR Subpart 42.12, all of such Seller's right, title and interest in and to, and all of such Seller's obligations and liabilities under, such Specified Contract shall be validly conveyed, transferred and assigned and novated to Buyer, in each case in order to permit the Specified Contract Assignments as promptly as reasonably practicable following the Closing.

**2.6     *Purchase Price Allocation*.** No later than sixty (60) days after the Closing Date, Buyer shall deliver to Sellers a schedule allocating the Purchase Price (less the Retained Cash, and taking into account other relevant items for U.S. federal income tax purposes) among the Purchased Assets (the "*Allocation Schedule*"). The Allocation Schedule (including the determination of the purchase price for applicable tax purposes) shall be prepared in accordance with Section 1060 of the Code, the regulations promulgated thereunder, Treasury Regulations Section 1.166-6(b)(2), and any similar provision of applicable Law. The Allocation Schedule shall be deemed final unless Sellers notify Buyer in writing that Sellers object to one or more items reflected in the Allocation Schedule as inconsistent with applicable Law within thirty (30) days after delivery of the Allocation Schedule to Sellers. In the event of any such objection, Buyer and Sellers shall negotiate in good faith to resolve such dispute. Upon resolution of the disputed items, the Allocation Schedule shall be adjusted to reflect such resolution. If Buyer and Sellers are unable to resolve any disputed items regarding the Allocation Schedule (including, for the avoidance of doubt, the determination of the purchase price for applicable tax purposes) within twenty (20) days following the date Buyer receives Sellers' written notice of objection, Buyer and Sellers shall submit the dispute on the next Business Day to a mutually agreed independent internationally recognized accounting firm (the "*Accounting Firm*") (which may in turn select an appraiser if needed) whose review shall be limited to whether a disputed item has been prepared in accordance with the applicable law and shall be final and binding on all Parties. The Accounting Firm shall resolve any such disputed items within thirty (30) days after it receives the submission. The costs, fees and expenses of the Accounting Firm shall be borne equally by Buyer and Sellers. If the Purchase Price is adjusted pursuant to this Agreement, the final Allocation Schedule shall be correspondingly adjusted as appropriate and the Parties shall cooperate in making any such adjustments. The Parties shall report all Taxes and file all Tax Returns, including Form 8594 (*Asset Acquisition Statement Under Section 1060*), in a manner consistent with the final Allocation Schedule and shall not take any position inconsistent therewith (including upon examination of any Tax Return, in any Tax refund claim, in any Tax Proceeding, or otherwise) unless, in each case and then only to the extent, otherwise required by a "final determination" within the meaning of Section 1313 of the Code. Buyer and Sellers (or any of their respective Affiliates) shall exchange completed and executed forms required by applicable Law with respect to the allocation (including IRS Form 8594) at least thirty (30) days prior to the due date for filing such forms and shall cooperate in the filing of any such forms, including any amendments to such forms required as a result of any adjustment to the Purchase Price pursuant to this Agreement.

## ARTICLE III
## CLOSING; PURCHASE PRICE

**3.1     *Closing*.** The closing of the transactions contemplated by this Agreement (the "*Closing*") shall take place by electronic exchange of documents on the date that is two (2) Business Days after the date on which the conditions set forth in *Article VIII* have been satisfied or waived in writing by the Party entitled to the benefit thereof (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver in writing (by the Party entitled to the benefit thereof) of such conditions at the Closing) or such other time and place as Buyer and Sellers may mutually agree in writing. The date on which the Closing occurs is referred to in this Agreement as the "*Closing Date*".

**3.2    Purchase Price**. On the terms and subject to the conditions set forth in this Agreement, the aggregate consideration for the Purchased Assets shall be (a)(i) the credit bid pursuant to Section 363(k) of the Bankruptcy Code against $150,000,000 of the Obligations (as defined in the Term Loan Agreement) as of the Closing and (ii) an assumption by Buyer of up to $60,000,000 of the DIP Obligations, subject to Buyer reaching an acceptable agreement for such assumption with the requisite lenders under the DIP Facility (clause (a)(i) and (ii), collectively the "**Credit Bid**"), (b) the instruction to Sellers to retain and use the Retained Cash and (c) the assumption of the Assumed Liabilities (collectively, the "**Purchase Price**"); provided, however, that the credit bid amount in *Section 3.2(a)(i)* shall be increased by the difference between $60,000,000 and the outstanding DIP Obligations being assumed pursuant to *Section 3.2(a)(ii)*, up to a maximum increase of $30,000,000; provided, further, that Buyer reserves the right, in its sole discretion to increase the Purchase Price (including any component thereof), subject to the Bid Procedures Order and applicable Law.

**3.3    Closing Deliverables**.

(a)    At or prior to the Closing, Sellers shall deliver, or cause to be delivered:

(i)    to Buyer, one or more assignment and assumption agreements, in a form and substance reasonably acceptable to Buyer and Seller (the "**Assignment and Assumption Agreements**"), duly executed by each Seller;

(ii)    to Buyer, one or more bills of sale, in a form and substance reasonably acceptable to Buyer and Sellers (the "**Bills of Sale**"), duly executed by each Seller;

(iii)    to Buyer, (A) one or more instruments of assignment of the Patents in form and substance reasonably acceptable to Buyer and Sellers (the "**Assignment of Patents**"); (B) one or more instruments of assignment of the Trademarks in a form and substance reasonably acceptable to Buyer and Sellers (the "**Assignment of Trademarks**"); (C) one or more instruments of assignment of the Trade Secrets and Software in form and substance reasonably acceptable to Buyer and Sellers (the "**Assignment of Trade Secrets and Software**"); (D) one or more instruments of assignment of the Copyrights in form and substance reasonably acceptable to Buyer and Sellers (the "**Assignment of Copyrights**"); and (E) one or more instruments of assignment of the domain names in form and substance reasonably acceptable to Buyer and Sellers (the "**Assignment of Domain Names**"), in each case, duly executed by each Seller;

(iv)    to Buyer, pursuant to wire instructions provided by Buyer to Sellers at least two (2) Business Days prior to the Closing, the Transferred Cash;

(v)    to Buyer, a properly executed IRS Form W-9 with respect to each Seller;

(vi)    to Buyer, a counterpart of the Subcontract Agreement Pending Novation, duly executed by each Seller;

(vii)    to Buyer, a counterpart of the Transition Services Agreement, duly executed by each Seller;

(viii)    to the Escrow Agent, an original, signed but undated FAA Bill of Sale in respect of each Aircraft, together with all other documents required to be filed with the applicable Aviation Authority to register such Aircraft and Engine in the name of Buyer with the applicable Aviation Authority;

(ix)    to Buyer, at least two (2) Business Days prior to the Closing Date, a priority search certificate from the International Registry evidencing either (A) that there are no registrations on the International Registry relating to each Airframe and Engine or (B) if there are any registrations on the International Registry relating to any Airframe or Engine, evidence of the discharge of such registration effective at or prior to the Closing; and

(x)    to Buyer, at least five (5) Business Days prior to the Closing Date, copies of the Certificate of Registration and Certificate of Airworthiness with respect to each Aircraft.

(b)    At the Closing, Buyer shall deliver, or cause to be delivered, to Sellers:

(i)    satisfaction of the Purchase Price as to the Credit Bid by discharging each Seller, and each Seller shall be discharged, from (x) the Term Loan Agreement in an amount equal to the Term Loan Agreement component of the Credit Bid and (y) the DIP Credit Agreement in an amount equal to the DIP Obligations that are a component of the Credit Bid;

(ii)    the Assignment and Assumption Agreements, duly executed by Buyer;

(iii)    the Bills of Sale, duly executed by Buyer;

(iv)    the Assignment of Patents, Assignment of Trademarks, Assignment of Trade Secrets and Software, Assignment of Copyrights and Assignment of Domain Names, each duly executed by Buyer;

(v)    a counterpart of the Subcontract Agreement Pending Novation, duly executed by Buyer; and

(vi)    a counterpart of the Transition Services Agreement, duly executed by Buyer.

(c)    *Escrow Procedures*.

(i)    As promptly as reasonably practicable following the date hereof, Sellers shall engage an escrow agent reasonably acceptable to Buyer (the "*Escrow Agent*") for purposes of facilitating the transfer of the Airframe and Engines to Buyer as

contemplated by this Agreement. Sellers, on the one hand, and Buyer, on the other hand, shall each bear fifty percent (50%) of the costs of the Escrow Agent.

(ii)     Immediately following the Closing, Sellers shall instruct the Escrow Agent to (A) date and cause the filing and recording of the FAA Bill of Sale for the benefit of Buyer or its Designated Purchaser and (B) upon receipt of the necessary authorization codes from the FAA register the transfer of each Airframe and Engine) from Sellers to Buyer or its Designated Purchaser as a sale on the International Registry.

**3.4     *Withholding***. Buyer shall be entitled to deduct and withhold from any consideration otherwise payable or deliverable to Sellers pursuant to this Agreement such amounts as may be required to be deducted or withheld therefrom under any Law. The Parties shall cooperate in good faith to minimize, to the extent permissible under applicable Law, the amount of any such deduction or withholding. To the extent such amounts are so deducted or withheld, and remitted to the applicable Governmental Authority in accordance with applicable Law, such amounts shall be treated for all purposes as having been paid to the Person to whom such amounts would otherwise have been paid absent such deduction or withholding.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Each Seller represents and warrants to Buyer, as of the Execution Date and as of the Closing Date, the following:

**4.1     *Organization; Existence***.

(a)     Each Seller is duly organized, validly existing and in good standing under the Laws of jurisdiction of its organization and, subject to the provisions of the Bankruptcy Code, has requisite power and authority to own, lease and operate its properties and conduct its business (including the Business) as currently conducted.

(b)     Each Seller is duly qualified to do business and is in good standing as a foreign corporation or other entity in each jurisdiction where such qualification is required for the ownership or operation of the its assets, except for failures to be so qualified or to be in such good standing as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**4.2     *Subsidiaries***. Other than Monterrey Sub, MDH has no Subsidiaries and does not own any securities of any other Person. Monterrey Sub has no Subsidiaries and does not own any securities of any other Person. Monterrey Sub does not own or hold any Permits necessary for Sellers to own, lease and use the Purchased Assets as currently owned, leased or used and to carry on and operate the Business as currently conducted.

**4.3     *Authorization; Execution and Delivery; Enforceability***. Subject to entry of the Sale Order and any other Order necessary to consummate the transactions contemplated by this Agreement, the execution, delivery and performance by each Seller of this Agreement and each Transaction Document to which any Seller is or will be a party and the consummation by each Seller of the transactions contemplated hereby and thereby have been, or prior to the Closing will

be, duly authorized by all necessary corporate or other action on the part of each Seller. Each Seller has all necessary power and authority to execute and deliver this Agreement and each other Transaction Document to which any Seller is or will be a party and to consummate the transactions contemplated hereby and thereby and to perform its obligations hereunder and thereunder. Subject to entry of the Sale Order and any other Order necessary to consummate the transactions contemplated by this Agreement and the other Transaction Documents, this Agreement has been, and at or prior to the Closing, each Transaction Document to which any Seller is or will be a party will be, duly and validly executed and delivered by each Seller and, assuming due authorization, execution and delivery by the other Parties and the entry of the Sale Order, this Agreement constitutes, and each other Transaction Document to which any Seller is or will be a party (when duly and validly executed and delivered) will constitute, the legal, valid and binding obligation of each Seller, enforceable against each Seller in accordance with its terms, subject to the Bankruptcy and Equity Exception.

**4.4    *Noncontravention; Consents and Approvals*.**

(a)    Subject to entry of the Sale Order and any other Order necessary to consummate the transactions contemplated by this Agreement, neither the execution and delivery by any Seller of this Agreement and each other Transaction Document to which any Seller is or will be a party, nor the consummation by any Seller of the transactions contemplated hereby or thereby, will (i) conflict with or result in a breach of the Organizational Documents of any Seller, (ii) violate any Law or Order to which any Seller or its respective assets or properties, or any of the Purchased Assets may be subject, (iii) violate, conflict with, result in a breach of, constitute a default (with or without notice or lapse of time, or both) under, result in the acceleration of, create in any Person the right to accelerate, terminate, modify or cancel or require any notice under, or result in the creation of any Lien (other than Permitted Liens) on, any Material Contract, after giving effect to the Sale Order and any applicable Order of the Bankruptcy Court authorizing the assignment and assumption of any such Material Contract hereunder, or (iv) result in the creation of any Lien (other than Permitted Liens) upon any of the Purchased Assets, except, in the case of clause (ii), (iii) or (iv), for such violations, conflicts, breaches, defaults, accelerations, rights, failures to give notice, or Liens as would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Purchased Assets, taken as a whole.

(b)    Except for (i) the entry of the Sale Order, (ii) compliance with applicable requirements under Antitrust Laws, and (iii) as set forth on *Schedule 4.4(b)*, no consent, waiver, approval, Order or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority ("***Approvals***") is required on the part of any Seller in connection with the execution and delivery by any Seller of this Agreement or any other Transaction Document which any Seller is or will be a party or the consummation by any Seller of the transactions contemplated hereby or thereby (with or without notice or lapse of time, or both), except for such consents, waivers, approvals, Orders, authorizations, declarations, filings or notifications, the failure of which to obtain or make would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Purchased Assets, taken as a whole.

**4.5    *Litigation*.** Except as set forth on *Schedule 4.5*, there are no, and since January 1, 2019 there have been no, (a) Proceedings pending, or, to the Knowledge of any Seller, threatened against any Seller, the Purchased Assets, the Assumed Liabilities or the Business, or (b) Orders

outstanding, which, in each case, would (x) adversely affect the ability of any Seller to enter into this Agreement or to consummate the transactions contemplated hereby, (y) impose any material Liability upon the Purchased Assets, the Assumed Liabilities or the Business (other than an Excluded Liability) or (z) otherwise, individually or in the aggregate, reasonably be expected to be material to the Business and the Purchased Assets, taken as a whole.

*4.6    Compliance with Laws*. Each Seller is, and since the Specified Date has been, in compliance with applicable Laws, except where any non-compliance would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Purchased Assets, taken as a whole. No Seller has received any written notice, or to Knowledge of any Seller any other notice, from any Governmental Authority relating to violations or alleged violations of, failure to comply with or defaults under, any Law, Order or Permit, except as would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Purchased Assets, taken as a whole.

*4.7    Permits*. Each Seller holds all Permits necessary for Sellers to own, lease and use the Purchased Assets as currently owned, leased or used and to carry on and operate the Business as currently conducted except where the failure to possess any such Permit would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Purchased Assets, taken as a whole. *Schedule 4.7(i)* sets forth a list as of the date hereof of all Permits material to the Business (the "**Material Permits**"). Except as set forth on *Schedule 4.7(ii)*, (i) all Permits held by Sellers are valid and in full force and effect, (ii) each Seller is in compliance with the terms of all such Permits, (iii) there are no Proceedings pending or, to the Knowledge of any Seller, threatened that seek the revocation, cancellation, suspension, failure to renew or adverse modification of any such Permit or that would reasonably be expected to result in the imposition of a fine, forfeiture, or civil penalty against any Seller, (iv) each Seller has timely filed applications to renew all such Permits, (v) no Governmental Authority has commenced, or given written notice to any Seller that it intends to commence, any Proceeding to revoke, or suspend, rescind, modify or not renew, or to impose any materially adverse condition on, any such Permit, and (vi) all reports and filings required to be filed with any Governmental Authority by any Seller with respect to any such Permit have been timely filed, and all regulatory fees, contributions and surcharges due and payable with respect to such Permits have been timely paid, in each case of the foregoing clauses (i) through (vi), except as would not, individually or in the aggregate, reasonably be expected to be material to the Purchased Assets and the Business, taken as a whole.

*4.8    Material Contracts*.

(a)    *Schedule 4.8* sets forth a true, correct and complete list of the following Assigned Contracts as of the date hereof (collectively, the "**Material Contracts**"):

(i)    any Lease with respect to the Leased Real Property;

(ii)    any Contract for the lease of personal property (tangible or intangible) to or from any Person providing for lease payments in excess of $250,000 per annum;

(iii)    any Contract with any Material Customer or Material Supplier;

32

(iv)    any Government Contract the period of performance of which has not yet expired or been terminated and that provides for payments to any Seller ("***Current Government Contract***");

(v)    any Contract to which any Seller is a party (A) pursuant to which any Seller is granted a right to use any third party Intellectual Property that is material to the Business, other than (x) non-exclusive licenses for commercially available or off-the-shelf software or (y) software that is subject to click-through or shrink wrap agreements entered into by any Seller in the ordinary course of business, in each case solely to the extent licensed at less than $50,000 per annum (each, an "**Inbound License**"), (B) pursuant to which any Seller grants a third party the right to use any Purchased Intellectual Property that is material to the Business, other than any Contract with any end user of any Sellers' products or services which is entered into in the ordinary course of business or any marketing agreement which contains an incidental trademark license to use the Trademarks of any Seller in the scope of providing such services (each, an "**Outbound License**"), (C) covering the settlement of any claims related to any Intellectual Property or (D) pursuant to which any Seller is prohibited or restricted in any manner from using any Purchased Intellectual Property; or

(vi)    any Contract with any Employee that includes base annual compensation in excess of $100,000 that is not terminable at-will on no more than thirty (30) days' advance notice and includes no severance-type benefits;

(vii)    any Contract that (A) restricts the ability of any Seller or the Business to compete in any geography or in any line of business with any Person, (B) grants any right of first refusal or right of first obligations or restrictions to any Person, (C) contains exclusivity obligations binding on any Seller or the Business or (D) grants "most favored nation" status to any Person;

(viii)    any Contract for capital expenditures in excess of $250,000;

(ix)    any Contract with respect to a joint venture, partnership or other similar arrangement exclusively;

(x)    any Contract that relates to the acquisition or disposition of any assets or properties used in the conduct of the Business (whether by merger, sale of stock, sale of assets or otherwise) pursuant to which (A) payment obligations by or to any Seller that remain outstanding, (B) any earn-out, indemnification, deferred or contingent payment obligations remain outstanding or (C) any indemnification payment obligations remain outstanding (in each case, excluding acquisitions or dispositions of supplies, inventory, merchandise or products in the ordinary course of business);

(xi)    any Contract related to Indebtedness;

(xii)    any Contract that is a collective bargaining agreement; and

(xiii)    to the extent not otherwise included in *Section 4.8(a)(i)-(xii)*, any Contract with an Affiliate of any Seller (other than another Seller).

(b)     With respect to each Material Contract, (i) such Contract is in full force and effect and constitutes the legal, valid and binding obligation of the applicable Seller and, to the Knowledge of any Seller, each counterparty thereto, enforceable against the applicable Seller and, to the Knowledge of any Seller, each counterparty thereto in accordance with its terms and conditions, subject to the Bankruptcy and Equity Exception and (ii) neither the applicable Seller nor, to the Knowledge of any Seller, any counterparty thereto is in material breach or material default thereof, and (iii) since the Specified Date, neither the applicable Seller nor, to the Knowledge of any Seller, any counterparty thereto, has commenced any Proceeding against any other party to such Contract or given or received any written or, to the Knowledge of any Seller, other notice of any material breach or material default under such Contract that has not been withdrawn or dismissed, except, in the cases of clauses (ii) and (iii), for breaches or defaults caused by or resulting from the Chapter 11 Cases. Each Seller has prior to the date of this Agreement delivered to, or made available to, Buyer, true and complete copies of each Material Contract.

### 4.9    *Material Customers; Material Suppliers*.

(a)     *Schedule 4.9(a)* contains a true and correct list of the two (2) customers that generated the most revenue for the Business during the twelve (12)-month period ended December 31, 2021 ("***Material Customers***"), and the aggregate amount of such sales for each Material Customer during such period. Since December 31, 2020, no Material Customer has canceled or otherwise adversely modified in any material respect, any Contract related to the Business (and no Seller has received, since December 31, 2020, any written or, to Knowledge of any Seller, other notice or communication of any intention to do so). There is no material dispute pending or, to the Knowledge of any Seller, threatened with or by any Material Customer with respect to its business relationship with the Business.

(b)     *Schedule 4.9(b)* contains a true and correct list of the ten (10) suppliers and venders of goods and services for which the Business paid the most fees to during the twelve (12)-month period ended December 31, 2021 ("***Material Suppliers***"), and the aggregate amount paid to each Material Supplier during such period. Since December 31, 2020, no Material Supplier has canceled or otherwise adversely modified in any material respect, any Contract related to the Business (and no Seller has received, since December 31, 2020, any written or, to Knowledge of any Seller, other notice or communication of any intention to do so). There is no material dispute pending or, to the Knowledge of any Seller, threatened with or by any Material Supplier with respect to its business relationship with the Business.

### 4.10    *Financial Statements; No Undisclosed Liabilities*.

(a)     Sellers have delivered to Buyer true and complete copies of (collectively the "***Company Financial Statements***"): (i) audited financial statements of Sellers as of and for the years ended December 31, 2019 and December 31, 2020 and (ii) an interim unaudited balance sheet and statement of income of Sellers as of and for the nine (9)-month-period ended September 30, 2021 (the "***Balance Sheet Date***"). A true and accurate copy of the Company Financial Statements has been posted to the data room hosted by Intralinks titled "Project Maverick" (the "***Data Room***") in a location accessible to Buyer at least five (5) days prior to the Execution Date. The Company Financial Statements present fairly, in all material respects, the financial condition, and results of operations of Sellers for the dates or periods indicated thereon, in all material

respects in accordance with GAAP applied on a consistent basis throughout the periods indicated, except, in the case of the interim unaudited Company Financial Statements, for normal recurring year-end adjustments and the absence of footnotes and other presentation items.

(b)    Sellers do not have any known Liabilities, except for (i) the Liabilities and obligations reflected in the Company Financial Statements as of the Balance Sheet Date, (ii) trade payables, accrued expenses and other current liabilities incurred by any Seller in the ordinary course of business after the Balance Sheet Date, (iii) Liabilities in respect of future performance under existing executory Contracts (other than on account of a breach or default thereunder), (iv) Liabilities that constitute Excluded Liabilities or (v) such Liabilities that would not reasonably be expected to be material to the Business and the Purchased Assets, taken as a whole.

(c)    The books and records of Sellers, in all material respects, accurately and fairly reflect in reasonable detail the transactions in and dispositions of the assets of the Business. Sellers maintain a system of internal accounting controls sufficient to provide reasonable assurance that, with respect to the Business, in all material respects: (i) transactions are executed in accordance with management's general or specific authorization, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with the methodologies and assumptions used in the preparation of the Company Financial Statements in accordance with GAAP, (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

**4.11    Title and Sufficiency of Assets; Tangible Property**.

(a)    The applicable Seller has good and valid title to, a valid leasehold interest in or a valid license to use all of the material Purchased Assets (whether tangible or intangible, including Intellectual Property), free and clear of all Liens (other than Permitted Liens). Upon Closing, Buyer will acquire exclusive, good and valid title to, a valid leasehold interest in or a valid license to use all of the material Purchased Assets.

(b)    Disregarding *Section 2.5*, the Purchased Assets constitute all material assets (whether tangible or intangible, including Intellectual Property) and material rights used in or necessary to conduct the Business in all material respects as conducted by Sellers as of the date hereof and as of the Closing and are sufficient in all material respects for the continued conduct of the Business immediately following the Closing in substantially the same manner as conducted as of the date hereof and as of the Closing.

(c)    *Schedule 4.11(c)* contains a true and complete list of all Aircraft, Airframes and Engines, in each case, as of February 23, 2022. All material tangible Purchased Assets, including all Inventory, machinery, tools and equipment, are in good condition (subject to normal wear and tear and taking into account age and usage) and are suitable in all material respects for the uses for which intended.

**4.12    Intellectual Property**.

(a)    **Registered Intellectual Property; Material Software**. *Schedule 4.12(a)(i)* contains a complete and accurate list, as of the date hereof, of the following items included in the

Purchased Intellectual Property (including the title, registration or application number (as applicable), filing date and issuance date therefor): (i) Patent applications and issued Patents, (ii) Trademark registrations and applications, (iii) Copyright registrations and applications, and (iv) domain names of any Seller. The applicable Seller is the sole and exclusive legal and beneficial owner and, with respect to applications and registrations, record owner of all of the Purchased Intellectual Property in *Schedules 4.12(a)(i)* and *4.12(a)(ii)*, and all such Purchased Intellectual Property is subsisting, and to the Knowledge of any Seller, valid and enforceable. No Seller has granted any Person any right to control the prosecution or registration of any Purchased Intellectual Property, or to commence, defend, or otherwise control any Claim with respect to any Purchased Intellectual Property. All necessary maintenance and renewal documentation and fees in connection with the Patents in *Schedule 4.12(a)* have been timely filed with the appropriate authorities and paid.

(b)    ***Ownership and Rights to Use Intellectual Property***. No Seller has assigned any Purchased Intellectual Property to any other Person. Except as set forth on *Schedule 4.12(b)*, none of the Purchased Intellectual Property is subject to any Proceeding before, outstanding Order, writ, or injunction of or stipulation with any Governmental Authority, or any Contract entered into in settlement of such a Proceeding, restricting the use, transfer, licensing or exploitation by any Seller. Except as disclosed in *Schedule 4.12(b)*, no Seller has granted any exclusive licenses to or exclusive rights under any material Purchased Intellectual Property. Except as set forth on *Schedule 4.12(b)*, neither this Agreement nor the transactions contemplated hereby will result in (A) any Person being granted rights or access to, or the placement in or release from escrow of, any source code of any Seller, (B) Buyer or any Seller being obligated to grant to any other Person any right in any Purchased Intellectual Property, (C) any current or former Affiliate, partner, director, stockholder, officer, third-party consultant or employee retaining any rights to use or otherwise exploit any of the Purchased Intellectual Property, (D) any Person having the right to terminate or alter Buyer's or Sellers' right to own, use, or hold for use any Purchased Intellectual Property as presently owned, used or held for use in the conduct of the Business, or (E) Buyer or any Seller being obligated to pay any royalties or other amounts to any other Person in excess of those payable by any Seller prior to the Closing Date. The applicable Seller has the right to use any Inbound License and Outbound License, and Buyer will have the same rights immediately after the Closing Date, in each case as would not, individually or in the aggregate, have a Material Adverse Effect.

(c)    ***No Infringement***. To the Knowledge of Sellers, the conduct of the business of Sellers, as such business has been conducted, has not infringed, diluted, misappropriated or otherwise violated, and Sellers' continued conduct of the business, which includes the sale or other distribution of its products does not infringe, dilute, misappropriate, or otherwise violate the Intellectual Property or other rights of any Person. Since the Specified Date there has been no written or, to the Knowledge of Sellers, oral claim of infringement, dilution, misappropriation, or other violation, asserted or, to the Knowledge of any Seller, threatened (including in the form of offers or invitations to obtain a license) against any Seller. To the Knowledge of any Seller, (i) no product currently sold by any Seller infringes any Person's Intellectual Property rights or otherwise violates or is in breach of any Material Contract, including the Boeing Cross License; and (ii) no Person is infringing, misappropriating, or otherwise violating any Purchased Intellectual Property, and since January 1, 2019 no such claims have been asserted or threatened in writing against any Person by any Seller.

(d)     ***Contributors***. Each current and former employee, consultant and independent contractor of each Seller that has invented, created, developed or reduced to practice any Patents, Copyrights or Trade Secrets included in the Purchased Intellectual Property (each, a "***Contributor***") has executed a written agreement substantially in the form provided to Buyer that (i) assigns to the applicable Seller all right, title and interest in and to any and all Purchased Intellectual Property invented, created, developed or reduced to practice by such Contributor in the course of his, her or its activities for any Seller or during working hours for any Seller or using the resources of any Seller (except for moral rights for which Sellers have received a waiver) and (ii) contains provisions designed to prevent unauthorized disclosure of Sellers' Trade Secrets. To the Knowledge of any Seller, no party to such written agreements has breached or violated the terms thereof or has attempted or threatened to challenge the enforceability, scope or applicability of any such agreement. No Purchased Intellectual Property that is material to the Business as currently conducted was invented, created, developed or reduced to practice by a current or former employee, consultant or independent contractor of any Seller prior to such Person's employment or engagement by any Seller which has not been assigned to any Seller pursuant to a written agreement, copies of which agreements have been provided to Buyer.

(e)     ***Maintenance of Trade Secrets***. Each Seller takes reasonable measures consistent with industry standards to protect the confidentiality of Trade Secrets, including requiring all Persons having access thereto to execute written non-disclosure agreements. To the Knowledge of any Seller, there has not been any unauthorized disclosure or publication of any material Trade Secret of each Seller (including any such information of any other Person disclosed in confidence to any Seller) to any Person in a manner that has resulted in the loss of Trade Secret protection or other proprietary rights in and to such information.

(f)     ***Information Technology; Security***. Each Seller has taken commercially reasonable steps and implemented commercially reasonable procedures to protect its information technology systems from (i) the inclusion of any device or feature designed to permit unauthorized access, disrupt, disable or otherwise harm, damage or impair Software, hardware or data and (ii) unauthorized access, use, modification or other misuse. There have been no material security breaches in the information technology systems of each Seller, and there have been no disruptions in any of the information technology systems of each Seller that have materially adversely impacted the Business or operations of any Seller. Each Seller maintains commercially reasonable disaster recovery and security plans, procedures and facilities.

(g)     ***Privacy***. Each Seller with respect to the privacy and security of all information and data of any kind possessed, received, held, accessed, used or processed by any Seller in each case defined as "personal data," "personally identifiable information," or "personal information" under any applicable Data Laws (as defined below), including information that identifies any individual, or can be used to identify any individual ("***PII***"), has since the Specified Date, been in material compliance with (A) all applicable Laws that apply to such Seller's use of such PII (collectively, "***Data Laws***"), and (B) any applicable externally published privacy policy of such Seller applicable to such PII (each being a "***Privacy Policy***") and (A) to (B) being together the "***Data Standards***"). Except as would not reasonably be expected to be, individually or in the aggregate, material to the Business or the Purchase Assets, since January 1, 2020, each Seller has taken commercially reasonable measures, including organizational, physical and technical measures, designed to protect PII against unauthorized and unlawful loss, access, use, or

modification. To the Knowledge of any Seller, since the Specified Date, there has been no material unauthorized or unlawful loss, access, use, modification, or disclosure of PII by any Seller or, to the Knowledge of any Seller, by any of Sellers' suppliers, service providers, or contractors ("*Security Incident*"). Since the Specified Date, no claims have been asserted in writing or, to the Knowledge of any Seller, threatened against any Seller alleging a violation of any Person's privacy rights, or any Data Laws, including with respect to a Security Incident.

(h)     *Open Source*. Except as set forth on *Schedule 4.12(h)*, no Seller has Open Source Software that has been incorporated into, integrated with, combined with, or linked to any Software developed by any Seller in any way, or used in any manner that, with respect to any of Sellers' products (excluding the Open Source Software itself): (i) requires its disclosure or distribution in source code form, (ii) requires the licensing thereof for the purpose of making derivative works, (iii) imposes any restriction on the consideration to be charged for the distribution thereof, or (iv) creates, or purports to create, obligations for any Seller with respect to Purchased Intellectual Property or grant, or purport to grant, to any third party, any rights or immunities under Purchased Intellectual Property. With respect to any Open Source Software that is or has been used by any Seller in any way that is material to the Business, such Seller has been, and is in material compliance with, all applicable licenses with respect thereto.

### 4.13    *Real Property*.

(a)     *No Owned Real Property.*

(i)     Sellers do not own any real property or any buildings or other structures (other than the structures located on the Leased Real Property (the "*Structures*")), and Sellers do not own any interest in real property, except for the Leased Real Property. None of the Sellers has any options or any contractual obligations to purchase or acquire any interest in real property.

(ii)     *Schedule 4.13(a)(ii)* sets forth a true, correct and complete list of all material Structures. All Structures and all improvements and fixtures located on, under or within the Structures, and all other material aspects of each Structure (including heating, cooling and ventilation, electrical, plumbing, drainage, sprinkler and other mechanical or other systems or improvements) comply in all material respects with valid and current certificates of occupancy or similar Permits to the extent required by Law for the use thereof, and conform in all material respects with all applicable Laws.

(iii)     No Seller has leased or granted to any Person, nor are any of the Structures subject to any Lease or grant to any Person of, any right to the use, purchase, occupancy or enjoyment of such Structures (or any portion thereof). The Structures are located within the boundary lines of the real property parcels on which they reside, are not encroached upon, are not in violation in any material respect of any applicable setback requirements, Law, restriction or similar agreement and do not encroach in any material way on any other property or any easement that may burden in any material respect the Structures.

(b)     *Leased Real Property.*

(i)     *Schedule 4.13(b)* sets forth a true, correct and complete list of all Leased Real Property as of the date hereof. The applicable Seller has a good and valid leasehold or sublease interest to the Leased Real Property, free and clear of all Liens (other than Permitted Liens). Except as set forth on *Schedule 4.13(b)*, none of the Leased Real Property is subject to any sublease or grant to any Person of any right to the use, occupancy or enjoyment of the Leased Real Property (or any portion thereof) that would materially impair the use of the Leased Real Property in the operation of the Business as conducted on the date hereof.

(ii)     With respect to the Leased Real Property: (A) the applicable Seller is in exclusive possession thereof; (B) the Leases are valid, binding and in full force and effect and there are no unwritten or oral modifications thereof or any course of dealing or business operations that would reasonably be construed as a modification to the Leases that would reasonably be expected to be material to the Business; (C) the applicable Seller is not a lessor under, or otherwise a party to, any lease, sublease, license, concession or other agreement pursuant to which such Seller has granted to any Person the right to use or occupy all or any portion of the Leased Real Property; (D) there is no, and no Seller has received written notice from any Governmental Authority regarding, condemnation, expropriation or other Proceedings in eminent domain pending or affecting the Leased Real Property, or any change in zoning affecting the current use thereof, and, to the Knowledge of any Seller, no such condemnation or other taking or change in zoning is threatened; and (E) no Seller has received notice from any Governmental Authority or other Person, that the use and occupancy of any of the Leased Real Property, as currently used and occupied, and the conduct of the business thereon, in the ordinary course, violates in any material respect any deed restrictions, contractual obligation, or applicable Law consisting of building codes, zoning, subdivision or other land use or similar Laws.

(iii)     Except pursuant to the Leases relating to the Leased Real Property, no Seller leases, subleases, licenses or uses or occupies any real property.

**4.14    *Environmental, Health and Safety*.**

(a)     Except as set forth on *Schedule 4.14*, each Seller is in compliance with all applicable Environmental Laws with respect to the Purchased Assets and the Leased Real Property, except in any such case where the failure to be in compliance would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Purchased Assets, taken as a whole. No Seller has received any notice or report regarding any material violation of Environmental Laws or any material Liabilities relating to the Purchased Assets or the Leased Real Property arising under Environmental Laws, other than any such notice or report that has now been resolved. There are no material Orders issued to any Seller outstanding, or any Proceedings pending or, to the Knowledge of any Seller, threatened relating to compliance with or Liability under any Environmental Laws affecting the Purchased Assets or any Leased Real Property.

(b)     There is no pending or, to the Knowledge of any Seller, threatened Proceeding alleging Liability under or a violation of any Environmental Law that would

reasonably be expected to be material to the Business and the Purchased Assets, taken as a whole. There are no currently existing facts, circumstances, conditions or occurrences regarding any Seller, the Purchased Asset, the Assumed Liabilities or the Business that, to the Knowledge of any Seller, would reasonably be expected (i) to form the basis of such a Proceeding or (b) cause any Purchased Asset to be subject to any material restrictions on its ownership, occupancy, operation or use under any Environmental Laws.

(c)     In connection with Sellers' operation of the Business, there has been no Release of, or exposure to, any Hazardous Materials at any Leased Real Property or, to the Knowledge of any Seller, at any off-site location to which Hazardous Materials generated by the Business were sent for treatment, recycling, storage or disposal, that, in either case, would reasonably be expected to give rise to any liability under any Environmental Laws that would be material to the Business and the Purchased Assets, taken as a whole.

(d)     Each Seller has made available to Buyer all material environmental reports, studies, analyses, investigations, audits and reviews in Sellers' possession with respect to the Purchased Assets and the Leased Real Property.

### 4.15   *Taxes*.

(a)     All Tax Returns required to be filed relating to the Purchased Assets or the Assumed Liabilities have been timely filed (taking into account any extension of time within which to file), and all such Tax Returns are true, correct, and complete in all material respects. No Seller is currently the beneficiary of any extension of time within which to file any Tax Return, except for any automatic extensions obtained in the ordinary course of business. All material amounts of Taxes (whether or not reflected on such Tax Returns) relating to the Purchased Assets, the Business or the Assumed Liabilities required to be paid have been timely paid in full.

(b)     No written notice from any Governmental Authority of any proposed adjustment, deficiency or underpayment of material amounts of Taxes by, or with respect to, the Purchased Assets has been received by any Seller that has not since been fully satisfied by payment or been finally withdrawn, and no written notification has been provided by any Governmental Authority of an intent to raise such issues.

(c)     No claim has been made in the past five (5) years by a Governmental Authority that material Tax Returns are required to be filed in relation to the Purchased Assets, the Business or the Assumed Liabilities in a jurisdiction where no such Tax Returns have been filed are currently filed (as applicable).

(d)     No agreement or waiver extending any statute of limitations period for assessment, reassessment or collection of any Taxes with respect to the Purchased Assets, the Business or the Assumed Liabilities has been executed or filed with any Governmental Authority for any taxable period with respect to which the statute of limitations has not expired (after giving effect to any extension or waiver).

(e)     No Liens for Taxes (other than Permitted Liens) exist with respect to any of the Purchased Assets.

(f)    There are no pending, in progress or threatened audits, investigations, disputes, notices of deficiency, assessments or other actions or Proceedings for or relating to any Liability for Taxes of any Seller with respect to the Purchased Assets, the Business or the Assumed Liabilities.

(g)    None of the Assumed Liabilities includes (i) any obligation to any Person under any Tax allocation, sharing, indemnity obligation, or similar agreement, arrangement, understanding, or practice with respect to Taxes (other than any commercial agreement entered into in the ordinary course of business, the principal subject of which is not Taxes), and (ii) an obligation to pay the Taxes of any Person as a transferee or successor or by contract, including an obligation under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign Law) (other than any commercial agreement entered into in the ordinary course of business, the principal subject of which is not Taxes).

### 4.16    *Employee Benefits*.

(a)    *Schedule 4.16(a)* contains a true, correct and complete list of all material Seller Plans as of the date hereof. With respect to each material Seller Plan, each Seller has made available to Buyer true, correct and complete copies of (i) the current plan document, including any amendments thereto, (ii) the most recent summary plan description (including any summary of material modifications), (iii) any material communication to or from any Governmental Authority, (iv) the most recently filed IRS Form 5500, (v) the most recent actuarial report, financial statement and trustee report and (vi) the most recent determination or opinion letter from the IRS.

(b)    (i) Each Assumed Plan has been and is being administered, maintained and operated in all material respects in compliance with all applicable Laws and in accordance with its terms, (ii) each Assumed Plan that is intended to be "qualified" within the meaning of Section 401(a) of the Code has received or is the subject of a currently applicable favorable determination letter, opinion letter or advisory letter from the IRS, stating that its related trust is exempt from taxation under Section 501(a) of the Code, and no event or circumstance exists that has affected or is likely to adversely affect the qualified status of any such Assumed Plan, (iii) there are no Proceedings (other than routine claims for benefits) relating to any Assumed Plan.

(c)    No Seller has any obligation to provide or make available postemployment benefits under any Assumed Plan which is a "welfare plan" (as defined in Section 3(1) of ERISA), except as may be required under COBRA or similar Law, and at the sole expense of such individual.

(d)    Except as set forth on *Schedule 4.16(d)*, no Seller nor any ERISA Affiliate maintains or contributes to, or has any Liability in respect of any plan that is (i) subject to Section 412 or 430 of the Code, Section 302 or 303 of ERISA or Title IV of ERISA, (ii) a multiple employer plan as described in Section 413(c) of the Code, or (iii) a "multiple employer welfare arrangement" within the meaning of Section 3(40) of ERISA.

(e)    The consummation of the transactions contemplated by this Agreement will not, either alone or in combination with another event, (i) increase any benefits or result in the acceleration of the timing of payment, vesting or funding of any benefits under any Assumed Plan,

(ii) entitle any Service Provider to, or accelerate the time of payment or vesting, or increase the amount of, any compensation or benefit due any Service Provider, (iii) result in the triggering or imposition of any restrictions or limitations on the rights to amend or terminate any Assumed Plan, or (iv) result in any payment or benefit that would be nondeductible pursuant to Section 280G of the Code.

(f)    No Assumed Plan is maintained, contributed to or required to be contributed to outside the United States or otherwise covers any Employee or other Service Provider who principally resides or works outside of the United States on behalf of any Seller.

(g)    There are no pending, or to the Knowledge of any Seller, threatened claims involving any Assumed Plan (other than routine claims for benefits).

(h)    Each Assumed Plan that constitutes a "non-qualified deferred compensation plan" within the meaning of Section 409A of the Code complies in all material respects in both form and operation with the requirements of Section 409A of the Code.

**4.17    Labor Matters**.

(a)    Each Seller has provided Buyer on a confidential basis a true, complete and correct list of the Employees as of the most recent practicable date prior to the date hereof specifying each individual's (i) title or position, (ii) base salary, (iii) 2021 bonus, (iv) date of hire, (v) Fair Labor Standards Act classification, and (vi) leave status (the "***Employee Schedule***").

(b)    Except as set forth on *Schedule 4.17(b)*, (i) no Seller is a party to any collective bargaining agreement with respect to Employees, (ii) no Employee is represented by any labor organization, (iii) no labor organization or group of Employees has made a demand for recognition or request for certification that is pending as of the date hereof and (iv) there are no representation or certification Proceedings or petitions seeking a representation election presently pending or, to the Knowledge of any Seller, threatened in writing, to be brought or filed with the National Labor Relations Board or other labor relations tribunal involving any Seller. During the past year, there have been no strikes, lockouts, work stoppages or slowdowns pending nor, to the Knowledge of any Seller, are any currently threatened in writing, against or involving any Seller.

(c)    Except as set forth on *Schedule 4.17(c)*, there are no material charges, arbitrations, grievances, complaints or Proceedings pending or, to the Knowledge of any Seller, threatened against any Seller relating to the employment or termination of employment of any individual or group of individuals by any Seller.

(d)    No Seller has experienced a "plant closing" or "mass layoff" or similar group employment loss (as defined in the WARN Act) with respect to which there is any unsatisfied Liability.

(e)    Each Seller is, and for the last three (3) years has been, in compliance in all material respects with all applicable Laws respecting labor and employment practices, including all Laws respecting discrimination or harassment in employment, terms and conditions of employment, termination of employment, wages, disability rights or benefits, occupational safety and health (including the federal Occupational Safety and Health Act and any applicable state or

local Laws concerning COVID-19-related health and safety issues), employee whistle-blowing, immigration, workers' compensation, employee leave issues, affirmative action, unemployment insurance, employee privacy, employment practices and classification of employees, consultants and independent contractors.

(f)    Since the Specified Date, no Seller has been party to a settlement agreement with a current or former Employee or other Service Provider resolving allegations of sexual harassment, nor have there been any material allegations of sexual harassment by or against any current or former Employee or other Service Provider in respect of the Business.

*4.18    Insurance Policies*. Except as would not, individually or in the aggregate, be material to Sellers, taken as a whole, Sellers are insured by insurance policies that are sufficient for compliance by Sellers with all applicable Laws and all Material Contracts. *Schedule 4.18* sets forth each material insurance policy or binders of fire, liability, product liability, umbrella liability, real and personal property, workers' compensation, vehicular, directors' and officers' liability, fiduciary liability and other casualty and property insurance and other material policies or binders applicable to or otherwise covering any Seller relating to the Purchased Assets or the Assumed Liabilities as of the date hereof. With respect to each such material insurance policy, (a) such policy is in full force and effect and constitutes the legal, valid and binding of the applicable Seller and, to the Knowledge of any Seller, the counterparty thereto, enforceable against the applicable Seller and, to the Knowledge of any Seller, the counterparty thereto in accordance with its terms and conditions, subject to the Bankruptcy and Equity Exception, (b) no Seller has received any written or, to the Knowledge of any Seller, other notice of cancellation or termination with respect to such policy or that any insurance will not be available in the future on substantially the same terms as currently in effect, and (c) there is no material claim pending under such policy, except, in the case of the foregoing clauses (a) through (c), as would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Purchased Assets, taken as a whole.

*4.19    Brokers*. Except as set forth on *Schedule 4.19*, the fees and expenses of which will be paid by Sellers on or prior to the Closing Date, no broker, finder, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of any Seller.

*4.20    Absence of Changes*.

(a)    Since the Balance Sheet Date to the date hereof (i) there has not been any Material Adverse Effect and (ii) except for the activities undertaken in (x) connection with the transactions contemplated by this Agreement or (y) preparation of the Chapter 11 Cases and actions related thereto, each Seller has operated in all material respects in the ordinary course of business.

(b)    Except as set forth on *Schedule 4.20(b)*, since the Balance Sheet Date there have not been any actions or events that would have required Buyer's consent pursuant to *Section 6.1* had such action or event occurred after the date hereof.

**4.21    Products Warranties and Liabilities**. The products that, since the Specified Date, have been sold by any Seller have been in conformity in all material respects with all express and implied warranties. No Seller has any material Liabilities arising out of any actual or alleged injury to individuals or property as a result of the ownership, possession or use of any product manufactured, sold, leased or delivered by any Seller. Since the Specified Date, (a) there have been no written, or to the Knowledge of any Seller, other product recalls or withdrawals or requests for product recalls or withdrawals by any Governmental Authority and (b) no written, or to the Knowledge of any Seller, other report of any material defects or malfunctions involving any product of any Seller has been filed or was or is required to have been filed with any Governmental Authority or Law.

**4.22    Absence of Unlawful Payments; Anticorruption; Anti-Money Laundering; Sanctions**.

(a)    Except as set forth on *Schedule 4.22(a)*, each Seller is, and since the Specified Date, has been, in compliance with all applicable Anti-Bribery Laws, Anti-Money Laundering Laws, International Trade Laws and Sanctions Laws. Each Seller has adopted policies, procedures, and a system of internal controls that prohibit bribery and are designed to ensure compliance with all Anti-Bribery Laws, Anti-Money Laundering Laws, International Trade Laws and Sanctions Laws.

(b)    Since the Specified Date, (i) no director, officer, or employee of any Seller is a Governmental Authority or employed by a Governmental Authority and (ii) no Seller nor, to the Knowledge of any Seller, any director, officer, employee, or agent acting on behalf of any Seller, has offered or given anything of value to: (x) any official or employee of a Governmental Authority, any political party or official thereof, or any candidate for political office or (y) any other Person, in any such case while knowing that all or a portion of such money or thing of value will be offered, given or promised, directly or indirectly, to any official or employee of a Governmental Authority or candidate for political office, in each case in violation of the Anti-Bribery Laws. There are no current or pending, and there have not since the Specified Date been any, internal investigations, third party investigations (including by any Governmental Authority), or internal or external audits that address any allegations or information concerning possible violations of the Anti-Bribery Laws by any Seller.

(c)    Except as set forth on *Schedule 4.22(c)*, each Seller has obtained all required licenses, consents, notices, waivers, approvals, orders, registrations, declarations, Permits or other authorizations from, and have made any filings with, any applicable Governmental Authority for the import, export, re-export, deemed export, deemed re-export, or transfer required under the International Trade Laws and Sanctions Laws (the "***Export Approvals***"), in each case, necessary for the conduct of the Business as currently conducted. There are no pending or, to the Knowledge of any Seller, threatened, claims, complaints, charges, investigations, voluntary disclosures or Proceedings against any Seller related to any Anti-Money Laundering Laws, International Trade Laws or Sanctions Laws or any Export Approvals.

(d)    No Seller nor, to the Knowledge of any Seller, any of their respective directors, officers, employees, (i) is, or has during the past five (5) years, been a Sanctioned Person

44

or (ii) has transacted business directly or indirectly with any Sanctioned Person or in or with any Sanctioned Country.

   *4.23    Government Contracts*. Notwithstanding anything in the representations and warranties in this Agreement (including this *Section 4.23*) to the contrary, the Parties acknowledge that a jury trial in the Qui Tam Action was conducted in the Alabama District Court, on September 24, 2021, the jury returned a unanimous verdict finding against MDH and awarding damages in the amount of $36,181,725 (the "***Jury Verdict***") and MDH, Philip Marsteller and Robert M. Swisher, the United States, and National Union Fire Insurance Company of Pittsburgh, Pa. intend to enter into the Qui Tam Settlement Agreement. The existence of the Qui Tam Action, the Jury Verdict, and the Qui Tam Settlement Agreement, and the facts underlying the foregoing, in and of itself, shall not be deemed a breach or failure to perform any of Sellers' representations, warranties, covenants or agreements in this Agreement for any purpose, including in respect of the conditions to Closing set forth in *Article VIII*; provided that the foregoing shall not limit in any manner the representations made in *Section 4.23(n)*.

   (a)    *Schedule 4.23(a)(i)* contains a complete and accurate list of each Current Government Contract as of the date hereof. To Sellers' Knowledge, each Current Government Contract entered into since the Specified Date was legally awarded to Sellers. *Schedule 4.23(a)(ii)* contains a complete and accurate list as of the date hereof of all Government Bids submitted by Sellers since the Specified Date and for which no award has yet been made, including for each such Government Bid: (A) the customer name, (B) the type and number of the relevant solicitation document; (C) if such Government Bid is for a subcontract or task order under a prime contract, the applicable prime contract number, (D) the date of submission, and (E) the estimated value of the anticipated contract based on the Government Bid. Set forth on *Schedule 4.23(a)(iii)* is a list of each outstanding teaming agreement or existing joint venture agreement, of which Sellers have made available to Buyer correct and complete copies.

   (b)    (i) Sellers are not in material breach of or material default under any Current Government Contract, and no event has occurred which would constitute such a material breach or material default by Sellers; (ii) Sellers are in compliance with all applicable Laws relating to Government Contracts in all material respects, including FAR, DFARS, Cost Accounting Standards, Service Contract Act of 1963, as amended (including requirements for paying applicable Service Contract Act wage rate and fringe benefit rates), the Truthful Cost or Pricing Data Act (f/k/a the Truth in Negotiations Act), the Procurement Integrity Act and the Anti-Kickback Act, where and as applicable to each Current Government Contract or Government Bid; (iii) to the Knowledge of Sellers, no reasonable basis exists to give rise to a claim for Fraud in connection with any Government Contract or under the False Claims Act; and (iv) no Current Government Contract or Government Bid is currently the subject of any bid protest before any Governmental Authority and to the Knowledge of any Seller, no reasonable basis exists for any such Current Government Contract or Government Bid to become the subject of a bid protest.

   (c)    With respect to each Current Government Contract entered into since the Specified Date: (i) all representations and certifications made by Sellers in relation to any such Government Contract or Government Bid were complete and accurate in all material respects as of the date such representations and certificates were made by Sellers; and (ii) except as set forth on *Schedule 4.23(c)(ii)*, Sellers have not, since the Specified Date, received any notice of

termination for convenience, notice of termination for default, cure notice or show cause notice that related to a material non-performance that was not properly resolved and withdrawn pertaining to such Government Contract and, to the Knowledge of any Seller, there is no reasonable basis for any such notice.

(d)     Since the Specified Date, Sellers have not been the subject or target of any audit, subpoena, investigation, prosecution or administrative proceeding related to any Government Contract or Government Bid (other than routine audits or review conducted by the Defense Contract Audit Agency, Defense Contract Management Agency, or the Office of Federal Contract Compliance Policy that were closed without any finding of liability or non-compliance). Since the Specified Date, no Seller has received any written or, to the Knowledge of any Seller, other notice of any pending or threatened audit, subpoena, investigation, prosecution or administrative proceeding related to any Government Contract or Government Bid (other than routine audits or review conducted by the Defense Contract Audit Agency, Defense Contract Management Agency, or the Office of Federal Contract Compliance Policy that were closed without any finding of liability or non-compliance).

(e)     Since the Specified Date, no Seller has conducted or initiated any internal investigation or made any voluntary or mandatory disclosure to any Governmental Authority with respect to any alleged irregularity, misstatement, noncompliance or omission arising under or relating to a Government Contract or Government Bid or any Laws.

(f)     To the Knowledge of any Seller, since the Specified Date, no cost incurred by any Seller pertaining to any Current Government Contract has been disallowed by any Governmental Authority.

(g)     Since the Specified Date, no money due to any Seller under any Current Government Contract has been withheld or set off.

(h)     Since the Specified Date, Sellers have not received any written or, to the Knowledge of any Seller, oral notification of quality, cost, schedule or technical problems that reasonably would support claims against Seller (or successors in interest) by a Governmental Authority, a prime contractor, or a higher-tier subcontractor, with regard to any Current Government Contract.

(i)     Since the Specified Date, Sellers have not received any adverse or negative past performance evaluations or ratings by any Governmental Authority on any Current Government Contract, and, to the Knowledge of any Seller, there is no reasonable basis for any adverse or negative past performance evaluation or rating by any Governmental Authority regarding Sellers' Current Government Contracts, or that would reasonably be expected to adversely affect the evaluation of Sellers' Government Bids.

(j)     To the Knowledge of any Seller, with respect to any Current Government Contract that is a "fixed price" Government Contract, the costs associated with completing the performance of such "fixed price" Government Contract after the Closing Date are not currently expected to exceed the fixed price to be earned and paid thereunder after the Closing Date.

(k)     Since the Specified Date, all invoices and claims (including requests for progress payments and provisional costs payments) submitted under any Current Government Contracts were current, accurate and complete in all material respects as of their submission date.

(l)     To the Knowledge of any Seller, no Government Bid, if accepted and resulting in the award of a Government Contract, is reasonably expected to result in a loss in excess of $100,000 to Sellers at contract completion, and no Current Government Contract is reasonably expected to result in a loss in excess of $100,000 to Sellers at contract completion.

(m)     Except as set forth on *Schedule 4.23(m)(i)*, since the Specified Date, no Seller has received any written, or to the Knowledge of any Seller, other notice of any (i) outstanding claims, either by any Governmental Authority or by any prime contractor, subcontractor, vendor or other Person, arising under or relating to any Government Contract, or (ii) except as set forth on *Schedule 4.23(c)(ii)*, outstanding claims or requests for equitable adjustment or disputes between any Seller, on the one hand, and the United States government, on the other hand, under the United States Contract Disputes Act, as amended, or any other Law or between any Seller, on the one hand, and any prime contractor, higher-tier contractor, subcontractor, vendor or other Person, on the other hand, arising under or relating to any Government Contract or Government Bid.

(n)     *Suspension and Debarment*. Except as set forth on *Schedule 4.23(n)*, since the Specified Date, no Seller nor, to the Knowledge of any Seller, any director, officer, employee or consultant of any Seller (i) has been or has been proposed for, or is currently (x) debarred or suspended from participation in, or the award of, Contracts with any Governmental Authority; (y) the subject of any debarment or suspension inquiry; or (z) otherwise precluded from participating in programs funded by any Governmental Authority or in the award of any Government Contract or (ii) has received any letter of concern regarding Sellers' present responsibility, request to show cause or notice of proposed suspension or debarment from any Government Authority.

(o)     Except as set forth on *Schedule 4.23(o)*, since the Specified Date, (i) none of the Current Government Contracts were set-asides reserved for small businesses or any other designation that entitles any Seller to a favored status or benefits, and (ii) aside from the any Seller's small business status, no member Seller has certified, represented or otherwise indicated (either orally or in writing) to any Person, including any Governmental Authority, that it is a woman-, veteran-, or minority-owned business or any other designation that entitles any Seller to a favored status or benefits. Sellers have not, since the Specified Date, been the subject of a Small Business Administration ("**SBA**") certificate of competency, size determination, size protest, size appeal or a review of eligibility of any status under the administration of the SBA. Any representations made by Sellers since the Specified Date about size status were accurate, complete, and in compliance with all applicable Laws as of the date such representations were made by Sellers.

(p)     No Seller nor any of its employees is required to maintain any personnel or facility security clearance to perform any Current Government Contract.

47

(q)       No Seller uses any covered articles (as defined in FAR 52.204-23), telecommunications equipment, or services, (as defined in FAR 52.204-25) and no Seller provides covered articles, telecommunications equipment, or services to the U.S. federal government.

(r)       Each Seller is compliant with the requirements of DFARS 252.204-7012, Safeguarding Covered Defense Information and Cyber Incident Reporting, including compliance with the cybersecurity standards set forth in the National Institute of Standards and Technology ("*NIST*") Special Publication 800-171, if applicable to the Current Government Contracts. All facts set forth in or acknowledged by, and any representations or certifications made or submitted by or on behalf of any Seller since the Specified Date in connection with its compliance with DFARS 252.204-7012 and DFARS 252.204-7008, Compliance with Safeguarding Covered Defense Information Controls, were true and accurate as of the date such representations or certificates were made or submitted by or on behalf of Sellers.

(s)       Except as set forth on *Schedule 4.23(s)* no Governmental Authority has rights in any Intellectual Property of Sellers, except for Limited Rights in technical data or Restricted Rights in computer software (as each term is defined in FAR 52.227-14 and "DFARS" 252.227-7013 and -7014), or SBIR data rights in either technical data or computer software (as each term is defined in DFARS 252.227-7018), or other applicable similar rights pursuant to Government Contract clauses that are prescribed in the applicable federal acquisition regulations (collectively, "*FAR Rights*"). No prime contractor or subcontractor at any tier under a Government Contract with Sellers has been granted or otherwise is entitled to any rights in any material Intellectual Property of Sellers pursuant to the terms of such Government Contract with Sellers or otherwise.

(t)       Each Seller has since the Specified Date been in compliance in all material respects with all applicable Laws regarding post-employment conflict of interest restrictions applicable to such Seller's employees formerly employed by a Governmental Authority ("*Former Government Employees*"), and to the Knowledge of any Seller, Former Government Employees are, and have been, in compliance in all material respects with all Laws regarding post-employment conflict of interest restrictions applicable Former Government Employees.

(u)       No Seller is (i) subject to or bound by any Organizational Conflict of Interest (as defined by Subpart 9.5 of the FAR, an "*Organizational Conflict of Interest*") contractual provisions that have had or reasonably would be expected to have an effect on the ability of any Seller to perform or seek to perform future Government Contracts, or (ii) a party to or bound by any mitigation plan resulting from any actual or perceived Organizational Conflict of Interest involving Sellers. Since the Specified Date, Sellers have not had access to non-public information or provided systems engineering, technical direction, consultation, technical evaluation, source selection services, or services of any type, or prepared specifications or statements of work, or engaged in any other conduct, that creates an unmitigated Organizational Conflict of Interest with respect to those Current Government Contracts to which any Seller is a party.

(v)       *Schedule 4.23(v)* lists as of the date hereof all U.S. Government property which has been provided to any Seller pursuant to the Current Government Contracts and which, as of the date of this Agreement, is in Sellers' possession ("*Government Furnished Items*"). Since

the Specified Date, each Seller, when and as required, has certified to the applicable Governmental Authority in a timely manner that all government property is in good working order, reasonable wear and tear excepted, and otherwise meets the requirements of the applicable Current Government Contract and all applicable Laws. There are no outstanding loss, damage or destruction reports that have been or were required by law to be submitted to any Governmental Authority in respect of any government property.

(w)     Each Seller is in compliance with all U.S. domestic preference requirements (including the Buy American Act, 41 U.S.C. §§ 8301-8305) and foreign sourcing prohibitions, and supply chain security requirements as included in the Current Government Contracts.

*4.24    No other Representations*. OTHER THAN THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS *ARTICLE IV* AND IN ANY OTHER TRANSACTION DOCUMENT, NO SELLER MAKES ANY REPRESENTATION OR WARRANTY, ORAL OR WRITTEN, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF THE BUSINESS, THE PURCHASED ASSETS OR THE ASSUMED LIABILITIES, INCLUDING WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OR THE ACCURACY OR COMPLETENESS OF ANY DOCUMENTS OR OTHER INFORMATION PROVIDED OR MADE AVAILABLE IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY AND IRREVOCABLY DISCLAIMED. NO SELLER NOR ANY OF THEIR RESPECTIVE AFFILIATES, NOR ANY OF THEIR RESPECTIVE DIRECTORS, MANAGERS, OFFICERS, EMPLOYEES, EQUITY HOLDERS, PARTNERS, MEMBERS, ADVISORS, AGENTS OR REPRESENTATIVES HAS MADE, OR IS MAKING, ANY REPRESENTATION OR WARRANTY, ORAL OR WRITTEN, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, RELATING OR WITH RESPECT TO ANY FINANCIAL PROJECTIONS, FORECASTS OR BUDGETS MADE AVAILABLE TO BUYER OR TO ANY OTHER PERSON.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to each Seller, as of the Execution Date and as of the Closing Date, the following:

*5.1    Organization; Existence*. Buyer is a limited liability company duly formed, validly existing and in good standing under the laws of the State of the State of Delaware and has all power and authority to carry on its business as presently conducted.

*5.2    Authorization; Execution and Delivery; Enforceability*. The execution, delivery and performance by Buyer of this Agreement and each Transaction Document to which Buyer is or will be a party and the consummation by Buyer of the transactions contemplated hereby and thereby have been, or prior to the Closing will be, duly authorized by all necessary corporate or other action on the part of Buyer. Buyer has all necessary power and authority to execute and deliver this Agreement and each other Transaction Documents to which Buyer is or will be a party and to consummate the transactions contemplated hereby and thereby and to perform its obligations hereunder and thereunder. This Agreement has been, and at or prior to the Closing,

each Transaction Document to which Buyer is or will be a party will be, duly and validly executed and delivered by Buyer and, assuming due authorization, execution and delivery by Sellers and the entry of the Sale Order, this Agreement constitutes, and each other Transaction Document to which Buyer is or will be a party (when duly and validly executed and delivered) will constitute, the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, subject to the Bankruptcy and Equity Exception.

### 5.3    *Noncontravention; Consents and Approvals*.

(a)    Neither the execution and delivery by Buyer of this Agreement and each other Transaction Document to which Buyer is or will be a party, nor the consummation by Buyer of the transactions contemplated hereunder or thereunder, will (with or without notice or lapse of time, or both), subject to entry of the Sale Order and compliance with applicable requirements under Antitrust Laws, (i) conflict with or result in a breach of the Organizational Documents of Buyer, (ii) violate any Law or Order to which Buyer or any of its assets or properties may be subject, (iii) violate, conflict with, result in a breach of, constitute a default (with or without notice or lapse of time, or both) under, result in the acceleration of, create in any Person the right to accelerate, terminate, modify or cancel or require any notice under, or result in the creation of any Lien (other than Permitted Liens) on, any Contract to which Buyer is a party or by which Buyer or any of its assets or properties is bound, except, in the case of clause (ii) or (iii), for such violations, conflicts, breaches, defaults, accelerations, rights, failures to give notice or Liens as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Buyer's ability to consummate the transactions contemplated by this Agreement.

(b)    No consent, waiver, approval, Order or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of any Buyer in connection with the execution and delivery of this Agreement or any other Transaction Document which Buyer is or will be a party, the compliance by Buyer with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or any other action by Buyer contemplated hereby or thereby (with or without notice or lapse of time, or both), except for such consents, waivers, approvals, Orders, authorizations, declarations, filings or notifications, the failure of which to obtain or make would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Buyer's ability to consummate the transactions contemplated by this Agreement.

### 5.4    *Availability of Funds; Solvency*. Buyer will have at the Closing, sufficient funds to pay the costs, fees and expenses which may be required to be paid by or on behalf of Buyer under this Agreement and the other Transaction Documents to which Buyer is or will be a party. Buyer has not incurred any obligation, commitment, restriction or Liability of any kind, and is not contemplating or aware of any obligation, commitment, restriction or Liability of any kind, in either case which would reasonably be expected to impair or adversely affect such resources. Buyer acknowledges that receipt or availability of funds or financing by Buyer or any of its Affiliates shall not be a condition to Buyer's obligations hereunder. No funds to be paid to any Seller have derived from or will have been derived from, or constitute, either directly or indirectly, the proceeds of any criminal activity under the anti-money laundering Laws of the United States. Upon consummation of the transaction contemplated by this Agreement, (a) Buyer will not be insolvent as defined in Section 101 of the Bankruptcy Code, (b) Buyer will not be left with

unreasonably small capital, (c) Buyer will not have incurred debts beyond its ability to pay such debts as they mature and (d) the capital of Buyer will not be impaired.

**5.5** **Litigation**. Except as set forth on *Schedule 5.5*, there are no Proceedings to which Buyer is a party pending, or, to the knowledge of Buyer, threatened against Buyer that would affect in any material respect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

Buyer's representations in *Section 5.2*, *Section 5.3*, *Section 5.4* and this *Section 5.5* are subject to entry of the Order referenced in *Section 8.1(c)*.

**5.6** **Brokers**. Except as set forth on *Schedule 5.6*, the fees and expenses of which will be paid by Buyer, no broker, finder, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Buyer.

**5.7** **Non-Foreign Person**. Upon consummation of the transaction contemplated by this Agreement, Buyer will not be owned or controlled directly or indirectly by (a) any foreign person within the meaning of the CFIUS regulations (31 C.F.R. Part 800.208) or (b) a "foreign interest," as defined in the NISPOM. Upon consummation of the transaction contemplated by this Agreement, Buyer will be a "U.S. Person" as defined at 22 C.F.R. §120.15).

**5.8** **Independent Evaluation**.

(a)    Buyer acknowledges that it has conducted its own independent investigation and analysis of the business, operations, assets, liabilities, results of operations, condition (financial or otherwise) and prospects of the Business, the Purchased Assets and the Assumed Liabilities, and that it and its representatives have received adequate access to the books and records, facilities, equipment, Contracts and other assets of the Business (including the Purchased Assets and the Assumed Liabilities) for such purpose. Buyer has relied on its own legal, tax and financial advisers for its evaluation of its investment decision to purchase the Business and the Purchased Assets, to assume the Assumed Liabilities and to enter into this Agreement and not on the advice of any Seller or any of their respective Affiliates or any of its or their respective legal, tax or financial advisers.

(b)    Buyer acknowledges that any financial projections that may have been provided to it are based on assumptions of future operating results based on assumptions about certain events (many of which are beyond the control of Sellers). Buyer understands that no assurances or representations can be given that the actual results of the operation of the Business or the Purchased Assets will conform to the projected results for any period. Buyer specifically acknowledges that no representation or warranty has been made, and that Buyer has not relied on any representation or warranty as to the accuracy of any such projections, estimates, budgets, future revenues, future results from operations, future cash flows, the future condition (financial or otherwise) of any Seller or the businesses or assets thereof (including the Business, the Purchased Assets and the Assumed Liabilities).

(c)     Buyer acknowledges and agrees that, except for the representations and warranties of Sellers contained in *Article IV* and the certificate delivered pursuant to *Section 8.2(d)*, (i) no Seller nor any of their respective Affiliates makes or has made any representation or warranty, either express or implied in connection with the transactions contemplated by this Agreement (including any implied warranty or representation as to condition, merchantability, suitability or fitness for a particular purpose or trade), (ii) none of Buyer, any of its Affiliates and any of its and their respective directors, officers, employees, equity holders, stockholders, partners, members and other representatives, has relied on or is relying on any representation, warranty or statement of any kind by any Seller, or any of their respective Affiliates, agents or other representatives, or any other Person, beyond those expressly given by each Seller in *Article IV* and the certificate delivered pursuant to *Section 8.2(d)*, and (iii) each Seller and each of their respective Affiliates, agents and other representatives have specifically disclaimed and do hereby specifically disclaim any such representations or warranties made by any Person, beyond those expressly given by each Seller in *Article IV* and in any other Transaction Document. Without limiting the generality of the foregoing, it is understood that any cost estimates, financial or other projections or other predictions that may be contained or referred to in the Disclosure Schedules or elsewhere, as well as any information, documents or other materials (including any such materials contained in the Data Room or reviewed by Buyer or any of its Affiliates, agents or other representatives) or management presentations that have been or shall hereafter be provided to Buyer or any of its Affiliates, agents or other representatives are not and will not be deemed to be representations or warranties of any Seller, or any of their respective Affiliates, agents or other representatives, and no representation or warranty is made as to the accuracy or completeness of any of the foregoing. Buyer understands and agrees that any inventory, equipment, vehicles, assets, properties and businesses of each Seller are furnished "as is", "where is" and, subject only to the representations and warranties contained in *Article IV* and the certificate delivered pursuant to *Section 8.2(d)*.

**5.9     OFAC Obligations**. Neither Buyer nor any of Buyer's Affiliates nor any of their respective directors, officers, managers, members, partners, equity holders, shareholders, representatives, agents, or employees, or any person who owns a controlling interest in or otherwise controls Buyer or any of Buyer's Affiliates, nor any of Buyer's transferees or permitted assigns will be at the time of Closing, a person or entity (i) listed on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Asset Control ("*OFAC*"), Department of Treasury or any other similar lists maintained by OFAC pursuant to any authorizing statute, Executive Order or regulation, (ii) listed on the Denied Persons List maintained by the United States Department of Commerce, (iii) designated under Section 1(b), (c) or (d) of Executive Order No. 13224 (September 23, 2001), any related enabling legislation or any other similar Executive Orders, or (iv) included on any other United States Governmental list of prohibited or restricted parties, and Buyer is not and will not engage in any dealings or transactions or be otherwise associated with any such Persons. There exists no prohibition under the Laws of the United States on the transaction contemplated by this Agreement related to the identity, citizenship, location or business of Buyer or the purpose for which Buyer is acquiring any Aircraft.

## ARTICLE VI
## COVENANTS OF SELLERS

**6.1     Conduct of Business**. Except (w) as consented to by Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), (x) as required or approved by the

Bankruptcy Code or any Orders entered by the Bankruptcy Court in the Chapter 11 Cases, or as required or approved by the DIP Credit Agreement or DIP Order, (y) as otherwise necessary to comply with applicable Law or (z) as set forth on *Schedule 6.1*, from the date hereof until the Closing Date (or the earlier valid termination of this Agreement), Sellers (i) shall conduct the Business in the ordinary course, including using commercially reasonable efforts to maintain the goodwill associated with the Purchased Assets and Sellers' business relationships with employees, customers, suppliers, vendors, clients, contractors and other Persons in connection with the Purchased Assets and (ii) shall not:

(a)    sell, lease or license on an exclusive basis or otherwise create any Lien (other than Permitted Liens) or dispose of any Purchased Assets, other than (x) sales of Inventory in the ordinary course of business and (y) sales and dispositions of obsolete or worn-out assets to unaffiliated third parties;

(b)    establish a record date for, declare, set aside for payment or pay any dividend on, make any other distribution in respect of, or redeem or repurchase, any shares of the capital stock or other equity or voting interests of any Seller;

(c)    renew, materially amend or modify, terminate (excluding expirations in accordance with the terms of any Material Contract or Material Permit), cancel or waive any material rights under, or create any Lien (other than a Permitted Lien) on, any of the Material Contracts or any Material Permits, or enter into any Contract that would have been a Material Contract if in effect on the date hereof;

(d)    acquire any Person or all or substantially all of the assets of any Person or any business line of such Person or make any other investment in any Person;

(e)    terminate, let lapse or amend or modify any material insurance policy maintained by any Seller or any of their respective Affiliates with respect to any Purchased Assets or any Assumed Liability;

(f)    cancel any debts owed to or claims held by the Business;

(g)    (A) accelerate or delay collection of notes or accounts receivable generated by the Business in advance of or beyond their regular due dates or the dates when the same would have been collected in the ordinary course of business; (B) delay or accelerate payment of any account payable or other liability of the Business beyond or in advance of its due date or the date when such liability would have been paid in the ordinary course of business; or (C) other than (x) sales of Inventory or (y) the disposition of obsolete Inventory, in each case in the ordinary course of business, change the levels of Inventory (excluding any Aircraft, Airframes or Engines that constitute Inventory) in any material respect from the levels customarily maintained in the Business;

(h)    (A) sell, transfer, assign, abandon, cancel any Purchased Intellectual Property that is material to the Business, (B) let lapse or fail to renew, continue to prosecute, protect or defend, or otherwise dispose of, any Purchased Intellectual Property that is material to the Business, or (C) enter into any Contract regarding the license, sublicense, agreement or permission

to use any Purchased Intellectual Property that is material to the Business, other than non-exclusive license agreements in the ordinary course of business;

(i)    (A) fail to exercise any rights of renewal with respect to any Leased Real Property that by its terms would otherwise expire and such expiration would be material to the Business or (B) enter into any Contract for the sublease of Leased Real Property that is material to the Business;

(j)    except (i) for any payments made pursuant to the "first day" or "second day" orders entered by the Bankruptcy Court or the Qui Tam Settlement Order or (ii) as provided pursuant to any other order of the Bankruptcy Court reasonable acceptable to Buyer, concede, discharge, waive, release, assign, satisfy, consent to, pay, compromise, settle or agree to settle (A) any Proceeding or Claim before any court or other Governmental Authority that would reasonably be expected to result in (i) (a) liability or the payment of money damages in excess of $100,000 individually or $250,000 in the aggregate that is entitled to administrative expense priority status in the Bankruptcy Cases pursuant to an order entered by the Bankruptcy Court or (b) liability or the payment of money damages in excess of $20,000 individually or $100,000 in the aggregate that is entitled to general unsecured claim status or otherwise (except claims entitled to administrative claim status which shall be governed by the thresholds noted in the immediately preceding clause (a)) in the Bankruptcy Cases pursuant to an order entered by the Bankruptcy Court or (ii) any material restriction on the Purchased Assets or the Business, or (B) any material Claims which are included in the Purchased Assets;

(k)    make any commitments for capital expenditures with respect to the Business which are in excess of $250,000 individually or $500,000 in the aggregate in any twelve (12) month period;

(l)    (A) other than in the course of annual renewals for health and welfare plans for 2022, or the termination of deferred compensation deferral opportunities for 2022, enter into, materially amend, or terminate (other than for cause) any Assumed Plan or any other agreement, plan or arrangement that would be an Assumed Plan as in effect on the date hereof (including any Contracts for the administration of any Assumed Plan) or waive any performance or vesting criteria or accelerate vesting or exercisability under any Assumed Plan, (B) increase or decrease or change in any manner the compensation or benefits payable or to become payable to any Employee, (C) grant any bonus, severance, retention, change in control, termination or similar pay to any Employee, (D) communicate in writing with Employees regarding any compensation or benefits to be provided by Buyer or any of its Affiliates after the Closing without the prior consent of Buyer (which consent shall not be unreasonably withheld), and Buyer shall review such written communication within five (5) business days of the date any Seller provides Buyer with a copy of such written communication, or (E) hire any individual as an Employee or cause any employee of any Seller or any of their respective Affiliates to become an Employee or terminate the employment of any Employee (other than for cause) with annual base compensation in excess of $100,000;

(m)    recognize any labor union or enter into, terminate, or amend any collective bargaining agreement or other labor union agreement with respect to Employees;

(n)      make any changes in any accounting methods, principles or practices in connection with the Purchased Assets or the Assumed Liabilities, except as required by Law or a change in GAAP (or authoritative interpretation thereof) or by a Governmental Authority;

(o)      (A) make, alter or rescind any material Tax election in respect of the Purchased Assets, Assumed Liabilities or the Business, (B) settle or compromise any Tax liability or enter into any closing agreement relating to any Taxes in respect of the Purchased Assets, Assumed Liabilities or the Business, (C) consent to any claim or audit adjustment relating to Taxes of the Purchased Assets, Assumed Liabilities or the Business, or (D) consent to any extension or waiver of a limitation period applicable to any Tax claim or assessment relating to the Purchased Assets, Assumed Liabilities or the Business, in each case of clauses (A) through (D), to the extent such action would reasonably be expected to materially and adversely impact Buyer or its Affiliates; or

(p)      enter into a binding agreement, in writing or otherwise, to take any of the foregoing actions.

Notwithstanding the foregoing, nothing contained in this Agreement is intended to give Buyer, directly or indirectly, the right to control any Sellers' operations prior to the Closing. Any action taken, or omitted to be taken, by any Seller that is necessary (as determined by Sellers in good faith) to comply with any Law or guidance issued by a Governmental Authority providing for business closures, "sheltering-in-place" or other restrictions in connection with the COVID-19 pandemic shall in no event be deemed to constitute a breach of this *Section 6.1*; provided that Sellers provides notice to Buyer as soon as reasonably practicable prior to taking (or omitting to take) any such action or, to the extent not possible, as soon as reasonably practicable after taking (or omitting to take) any such action.

*6.2*      *Access to Information*. From the date hereof until the Closing (or the earlier valid termination of this Agreement), Buyer shall be entitled, through its Affiliates and representatives, to have such reasonable access to and make such reasonable investigation and examination of the books and records, properties, assets, operations and personnel of each Seller relating (and solely to the extent relating) to the Purchased Assets and the Assumed Liabilities as Buyer may reasonably request. Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and in a manner not to unreasonably interfere with the Business. Each Seller shall use commercially reasonable efforts to cause its representatives to cooperate with Buyer and its Affiliates and representatives in connection with such investigations and examinations. Notwithstanding the foregoing, no Seller shall be required to afford such access to the extent that such Seller reasonably believes that doing so would: (a) result in the loss of attorney-client or other legal privilege, (b) violate any applicable Law or (c) contravene any obligation of confidentiality or restriction on access by reason of any Contract with a third party or would otherwise expose any Seller or any of their respective Affiliates to a material risk of Liability; provided that, in the case of each of subclauses (a) through (c), each Seller shall use its commercially reasonable efforts to allow for such access or disclosure in a manner that does not result in any such loss of attorney-client privilege, violation, contravention or exposure. Buyer shall have the right to retain copies of all information and documents provided by Sellers to Buyer subject to the terms of the Confidentiality Agreements. Any information provided to or obtained

by Buyer or its Affiliates or representatives pursuant to this *Section 6.2* shall be subject to the terms of the Confidentiality Agreements.

6.3     ***Change of Name***. Promptly (and, in any event, within thirty (30) Business Days) following the Closing, Sellers shall discontinue the use of the current name (and any other trade names or "d/b/a" names currently utilized by Sellers in the Business) and shall not subsequently change any of its names to or otherwise use or employ any name which includes the words "MD Helicopters" without the prior written consent of Buyer.

6.4     ***Antitrust Approvals and Cooperation***.

(a)     Each of Buyer and Sellers shall, as promptly as reasonably practicable after the date of this Agreement (and, in any event, within ten (10) Business Days), file with the United States Federal Trade Commission (the "***FTC***") and the United States Department of Justice (the "***DOJ***") the notification and report form, with respect to the transactions contemplated hereby and any supplemental information requested in connection therewith pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "***HSR Act***"). Such notification and report form and supplemental information shall be in substantial compliance with the requirements of the HSR Act. Each of Buyer and Sellers shall (and Buyer shall cause its Affiliates to) furnish to the other such necessary information and reasonable assistance as the other may reasonably request in connection with its preparation of any filing or submission which is necessary under the HSR Act. Sellers and Buyer shall keep each other apprised of the status of any substantive communications with, and any inquiries or requests for additional information from, the FTC and the DOJ relating to the transactions contemplated hereby. Each of Buyer and Sellers shall use commercially reasonable efforts to take, or cause to be taken, any and all steps necessary to obtain any clearance required under the HSR Act for the consummation of the transactions contemplated hereby as promptly as reasonably practicable.

(b)     Buyer and Sellers shall use commercially reasonable efforts to take, or cause to be taken, any and all steps necessary to resolve such objections, if any, as may be asserted by any Governmental Authority with respect to the transactions contemplated by this Agreement under the HSR Act, the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, and any other applicable United States federal or state or foreign Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade (collectively, the "***Antitrust Laws***"). Each of Buyer and Sellers shall take, and Buyer will cause its Affiliates to take, any and all steps necessary to avoid or eliminate each and every impediment under any Law that may be asserted by any Governmental Authority with respect to the transactions contemplated by this Agreement under the Antitrust Laws so as to enable all waiting periods under applicable Antitrust Laws to expire, to avoid or eliminate impediments under applicable Antitrust Laws asserted by any Governmental Authority and to otherwise enable the Parties to expeditiously close the transactions contemplated by this Agreement, including (i) promptly complying with or modifying any requests for additional information (including any second request) by any Governmental Authority, (ii) if necessary to obtain clearance by any Governmental Authority, offering, negotiating, committing to and effecting, by consent decree, hold separate order or otherwise, the sale, divestiture, license or other disposition of any and all of the capital stock, assets, rights, products or businesses of Buyer and its Affiliates after the Closing (including entering into customary ancillary agreements relating to

any such sale, divestiture, licensing or disposition of such assets or businesses) and any other restrictions on the activities of Buyer and its Affiliates and (iii) after taking all steps necessary pursuant to clauses (i) and (ii) above, contesting, defending and appealing any threatened or pending preliminary or permanent injunction or other order, decree or ruling or statute, rule, regulation or executive order that would adversely affect the ability of any Party to consummate the transactions contemplated by this Agreement and taking other actions to prevent the entry, enactment or promulgation thereof.

(c)    Each Party (i) shall cooperate with each other Party in connection with the filings and consents contemplated by this *Section 6.4*, (ii) shall promptly inform each other Party of any material substantive communication received by such Party from any Governmental Authority with respect to the transactions contemplated by this Agreement under the Antitrust Laws and any filing, notification or request for consent related thereto, and (iii) shall permit each other Party to review in advance any proposed written communication or information submitted to any such Governmental Authority in response thereto and in good faith consider the other Party's reasonable comments on drafts of any such communication or information, in each case under any Antitrust Laws relating to the transactions contemplated by this Agreement except for the notification and report form filed pursuant to *Section 6.4(a)*, including all attachments, and in each case subject to an appropriate confidentiality agreement and the advice of such party's antitrust counsel. In addition, none of Sellers or Buyer shall (and Buyer shall ensure that its Affiliates do not) agree to participate in any substantive meeting, discussion, telephone call or conference with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to the transactions contemplated by this Agreement under the Antitrust Laws or any such filing, notification or request for consent related thereto unless it consults with the other Parties in advance and, to the extent permitted by any such Governmental Authority and applicable Law, gives the other Parties the opportunity to attend and participate thereat, in each case to the maximum extent practicable. Sellers and Buyer shall, and Buyer shall cause its Affiliates to, furnish to the other Party, copies of all material correspondence, filings and communications between it and its Affiliates on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to the transactions contemplated by this Agreement under the Antitrust Laws or any such filing, notification or request for consent related thereto (in each case, excluding documents and communications which are subject to confidentiality agreements or to the attorney-client privilege or work product doctrine and, for the avoidance of doubt, except for the notification and report form filed pursuant to *Section 6.4(a)*, including all attachments). Each of Sellers and Buyer shall (and Buyer shall cause its Affiliates to) furnish each other Party with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with its preparation of necessary filings, registrations or submissions of information to any Governmental Authority with respect to the transactions contemplated by this Agreement under the Antitrust Laws and any such filing, notification or request for consent related thereto.

(d)    None of the Parties or their respective Affiliates shall take any action, or refrain from taking any action, or permit any action to be taken or not taken, that would reasonably be expected to have the effect of preventing, materially delaying, making illegal or otherwise materially interfering with obtaining the required clearances under the Antitrust Laws of the transactions contemplated by this Agreement.

**6.5    *Ancillary Agreements*.** Each of Sellers and Buyer undertakes and agrees to, as promptly as practicable and advisable, negotiate in good faith and use commercially reasonable efforts to take or cause to be taken all actions, and to do or cause to be done all things necessary, proper or advisable on their respective parts to execute and enter into (i) a Subcontract Agreement Pending Novation (the "*Subcontract Agreement Pending Novation*") concerning the disposition of the Specified Contracts not yet assigned at Closing and (ii) a Transition Services Agreement (the "*Transition Services Agreement*") concerning the provision of certain wind-down services by Buyer to Seller following the Closing, in each case not later than the Closing Date.

**6.6    *Further Assurances*.** Without prejudice to any other term or provision of this Agreement, from time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the Transaction and the transfer of title to the Purchased Assets to Buyer or its Designated Purchaser in accordance with the terms of the Agreement. Except for Approvals with respect to the Specified Contracts, which shall be governed by *Sections 2.5* and *7.8*, to the extent applicable, Sellers and Buyer shall, and shall cause their respective Affiliates to, use commercially reasonable efforts to obtain promptly, or cause to be obtained promptly, all Approvals required to sell, assign, assume or otherwise transfer the Purchased Assets and Assumed Liabilities.

# ARTICLE VII
# ADDITIONAL COVENANTS

**7.1    *Preservation of and Access to Books and Records; Contacts with Business Relations*.**

(a)    For a period of six (6) years following the Closing Date, Buyer shall provide to Sellers, their respective Affiliates, and their respective officers, employees and representatives (after reasonable advance notice and during regular business hours) reasonable access to, including the right to make copies of, all books and records included in and otherwise related to the Business, any of the Purchased Assets or any of the Assumed Liabilities, to the extent necessary to permit each Seller to determine any matter relating to their respective rights and obligations hereunder, to any Proceeding or to any Pre-Closing Tax Period (for example, for purposes of any Tax or accounting audit or any claim or litigation matter) or otherwise related to the Excluded Assets or Excluded Liabilities, for periods prior to the Closing and shall preserve such books and records until the latest of (i) such period as shall be consistent with Buyer's records retention policy in effect from time to time, (ii) the retention period required by applicable Law, (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases and (iv) in the case of books and records relating to Taxes, the expiration of the statute of limitations applicable to such Taxes. Such access shall include access to any information in electronic form to the extent reasonably available.

(b)    Prior to Closing and following entry of the Bid Procedures Order, each Seller shall, and shall cause its representatives to, (i) as soon as is reasonably practicable, and in any event prior to the Closing, make reasonable arrangements for Buyer to conduct customer calls with all customers under any Current Government Contract, (ii) upon Buyer's reasonable request, provide Buyer with reasonable access to the Material Customers, Material Suppliers and other

material contractual counterparties of such Seller; provided that while in no event shall Buyer engage in any communications with Material Customers or Material Suppliers without such Seller's participation in such communications (unless such Seller in its sole discretion affirmatively elects to not so participate), Buyer shall be permitted to engage in communications with Governmental Authorities to the extent reasonably necessary to obtain governmental approvals necessary for Closing, (iii) to the extent permitted by Law, upon request, promptly inform the legal and financial advisors to Buyer as to the status, or any changes in the status, of obtaining any necessary authorizations (including consents) from any competent judicial body, Governmental Authority, banking, taxation or regulatory body, and (iv) to the extent permitted by Law, provide the legal and financial advisors to Buyer with copies of any information, correspondence and communications from a Governmental Authority that is material to such Sellers' business.

### 7.2    *Bankruptcy Court Matters.*

(a)    Sellers and Buyer shall cooperate to obtain the Bankruptcy Court's entry of the Sale Order and any other Order reasonably necessary in connection with the transactions contemplated by this Agreement as promptly as reasonably practicable, including furnishing affidavits, non-confidential financial information, or other documents or information for filing with the Bankruptcy Court and making such advisors of Buyer and Sellers and their respective Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things, providing adequate assurances of future performance by Buyer as required under Section 365 of the Bankruptcy Code, and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. To the extent such adequate assurance of future performance is not provided with respect to an Assigned Contract, then such Assigned Contract will be excluded from the Purchased Assets and included in the Excluded Assets. Sellers and Buyer acknowledge that in order to obtain such approval and to satisfy each Sellers' fiduciary duties to all applicable stakeholders in accordance with applicable Law, each Seller must demonstrate that they have taken reasonable steps to obtain the highest or otherwise best offer possible for the Purchased Assets and that such demonstration shall include serving notice of the transactions contemplated by this Agreement to creditors and interested parties as ordered by the Bankruptcy Court and, if necessary, conducting the Auction.

(b)    Each of Sellers and Buyer shall appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement and keep the other Party reasonably apprised of the status of material matters related to this Agreement, including promptly furnishing the other Party with copies of notices or other communications received by such Party from the Bankruptcy Court or any third party or any Governmental Authority with respect to the transactions contemplated by this Agreement.

(c)    Each Seller shall consult with Buyer and its representatives concerning any order of the Bankruptcy Court relating to this Agreement and use commercially reasonable efforts to provide Buyer with copies of all applications, pleadings, proposed orders and other material documents relating thereto as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court. If any order of the Bankruptcy Court relating to this Agreement, including the Bid Procedures Order and the Sale Order, shall be appealed by any Person (or a petition for

certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or re-argument shall be filed with respect to any such order), each Seller shall diligently defend against such appeal, petition or motion and shall use commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motions; provided that Sellers shall consult with Buyer regarding the status of any such actions. Sellers further covenant and agree that, after the Closing, the terms of any reorganization plan submitted to the Bankruptcy Court or any other court by or with the support of Sellers for confirmation shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement.

(d)     The Sale Order shall, among other things, (i) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by each Seller of this Agreement, (B) the sale of the Purchased Assets to Buyer on the terms set forth herein and free and clear of all Liens (other than Liens included in the Assumed Liabilities and Permitted Liens) and (C) the performance by each Seller of its obligations under this Agreement, (ii) authorize and empower each Seller to assume and assign to Buyer the Assigned Contracts, (iii) find that Buyer is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, find that Buyer is not a successor to any Seller and grant Buyer the protections of Section 363(m) of the Bankruptcy Code, (iv) find that Buyer shall have no Liability or responsibility for any Liability or other obligation of any Seller other than the Assumed Liabilities as expressly set forth in this Agreement or as required under applicable non-bankruptcy Law, whether known or unknown as of the Closing Date or in connection with the transactions contemplated to occur on the Closing, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the businesses of Sellers, the Purchased Assets or any Liability of any Seller, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, successor, or transferee Liability, labor law, de facto merger, or substantial continuity and that Buyer shall not be the successor of any Seller, have, de facto, or otherwise, merged with or into any Seller, or be a mere continuation or substantial continuation of any Seller or the enterprise of any Seller, (v) find that Buyer has provided adequate assurance (as that term is used in Section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts and (vi) find that Buyer shall have no Liability for any Excluded Liability. Without limiting any Sellers' obligation to take all such actions as are reasonably necessary to obtain Bankruptcy Court approval of the Sale Order, Buyer agrees that it will promptly take reasonable actions to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and (y) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code. Nothing in this Agreement shall require Buyer, any Seller or any of their respective Affiliates to give testimony to or submit any pleading, affidavit or information to the Bankruptcy Court or any Person that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or their respective stakeholders.

(e)     Each Seller acknowledges and agrees, and the Sale Order shall provide that, except as otherwise provided in *Section 2.3*, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Liens of, against or created by any Seller or its bankruptcy estate, to the fullest extent permitted by Section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Purchased Assets. On the Closing Date,

the Purchased Assets shall be transferred to Buyer free and clear of all obligations, Liabilities and Liens, other than Permitted Liens and the Assumed Liabilities to the fullest extent permitted by Section 363 of the Bankruptcy Code.

(f)       Notwithstanding anything to the contrary herein, Buyer agrees and acknowledges that each Seller and their respective Affiliates, including through their representatives, are and may continue soliciting or responding to inquiries, proposal or offers from third parties with respect to the Purchased Assets or any reorganization, merger, transaction, consolidation, business combination, joint venture, partnership, financing, or restructuring or similar transaction, and may facilitate, including furnishing any information (subject to entering into a customary confidentiality agreement) with respect to, any effort or attempt by any Person to seek to do any of the foregoing in connection with the same. No later than one day prior to the start of the Auction, Sellers shall provide Buyer with a copy of each Qualified Bid (as defined in the Bid Procedures).

(g)       If an Auction is conducted and Sellers do not choose Buyer as the Successful Bidder, but instead chooses Buyer as the Back-Up Bidder, Buyer will serve as the Back-up Bidder. If Buyer is chosen as the Back-up Bidder, Buyer will be required to keep its bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as may be amended with Buyer's written consent prior to or at the Auction) open and irrevocable until two (2) Business Days after the closing of the sale of the Purchased Assets to the Successful Bidder. If the agreement with the Successful Bidder is terminated prior to closing of the sale of the Purchased Assets to the Successful Bidder, Buyer will be deemed the Successful Bidder and will forthwith consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as may be amended with Buyer's written consent prior to or at the Auction).

(h)       Nothing in this Agreement, including this *Section 7.2*, shall require any director or officer of any Seller to violate the fiduciary duties they owe to such Seller. No action or inaction on the part of any director or officer of any Seller that such director or officer reasonably believes is required by the fiduciary duties they owe to such Seller shall be limited or precluded by this Agreement; provided, however, that no such action or inaction shall be deemed to prevent Buyer from exercising any termination rights it may have hereunder as a result of such action or inaction.

(i)       Each Seller shall comply with the following timeline:

(i)       within two (2) Business Days after the Execution Date, commence the Chapter 11 Cases by filing in the Bankruptcy Court one or more voluntary petitions for relief as debtors-in-possession under Chapter 11 of the Bankruptcy Code;

(ii)       within two (2) Business Days after the Petition Date, Sellers shall have filed the Sale Motion, including this Agreement;

(iii)       no later than twenty-eight (28) days after the Petition Date, the Bankruptcy Court shall have (x) approved the (i) Bid Procedures and (ii) the form and manner of notice of the sale of the Purchased Assets hereunder and assumption and

assignment of executory contracts and unexpired leases, in form and substance reasonably acceptable to Sellers and Buyer, and (y) scheduled the Auction and Sale Hearing; and

(iv) within ten (10) days after consummation of the Auction (or if the Auction is not necessary, within ten (10) days after the deadline for submitting a qualified bid as set forth in the Bid Procedures), but subject to availability of the Bankruptcy Court, the Sale Hearing shall have occurred and the Bankruptcy Court shall have approved the transaction contemplated by this Agreement.

### 7.3 *Tax Matters*.

(a) For purposes of this Agreement, any real property, personal property, *ad valorem* and similar Taxes imposed on a periodic basis (other than Transfer Taxes, which shall be governed by *Section 11.1*) (including for this purpose, for the avoidance of doubt, any exemptions, allowances or deductions) ("***Property Taxes***") relating to a taxable period beginning on or before and ending after the Closing Date (a "***Straddle Period***") shall be allocated as follows: the amount of Property Taxes that is allocable to the Pre-Closing Tax Period shall be the amount of such Taxes for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of calendar days in the portion of the Straddle Period ending on and including the Closing Date, and the denominator of which is the number of calendar days in the entire Straddle Period, and the remaining amount of such Taxes shall be allocable to the Post-Closing Tax Period.

(b) The Party required by applicable Law to pay to a Governmental Authority any Taxes described in *Section 7.3(a)* for a Straddle Period, and to file any related Tax Return (the "***Paying Party***"), shall provide the other party (the "***Non-Paying Party***") a statement setting forth the Non-Paying Party's share of such Taxes for a Straddle Period as determined pursuant to this Agreement, together with such supporting evidence as is reasonably necessary to calculate such amount, and the Non-Paying Party shall reimburse the Paying Party its share of such Taxes, not later than five (5) Business Days before such Taxes are required to be paid. The Paying Party shall furnish the Non-Paying Party a copy of any such Tax Return and a copy of a receipt showing payment of any such Taxes to the Governmental Authority.

(c) The Parties agree to treat any payment made from one Party to another pursuant to this Agreement that is not reflected as part of the Purchase Price under this Agreement as an adjustment to the Purchase Price for all income Tax purposes, unless otherwise required by applicable Law.

(d) Buyer and Sellers agree to use commercially reasonable efforts to promptly furnish or cause their Affiliates to promptly furnish, to each other, upon request, such information and assistance relating to the Purchased Assets and Assumed Liabilities as is reasonably necessary for the filing of all Tax Returns and other Tax filings contemplated by this Agreement, the preparation for any audit or Tax Proceeding by any Governmental Authority.

(e) To the extent that this *Section 7.3* conflicts with any other provision in this Agreement (other than *Section 11.1* as it relates to Transfer Taxes), this *Section 7.3* shall govern.

**7.4     Employee Matters**.

(a)     At least fifteen (15) Business Days prior to the anticipated Closing Date, Sellers shall provide, or cause to be provided, to Buyer an updated Employee Schedule. At least ten (10) Business Days prior to the anticipated Closing Date, Buyer shall, or shall cause one or more of its Affiliates to, make an offer of employment, to commence as of the Closing (or, in the case of any Employee who is not actively at work immediately prior to the Closing, as of the date of such individual's return to active employment within three (3) months following the Closing Date), to all Employees who are employed immediately prior to the Closing (each such Employee, an "*Offered Employee*"). Each Offered Employee who receives and accepts such an offer of employment with Buyer or its applicable Affiliate and who commences employment as of the Closing Date (or, in the case of any Employee who is not actively at work immediately prior to the Closing, such later date) is referred to herein as a "*Transferred Employee*", and Buyer shall, or shall cause its applicable Affiliate to, employ each Transferred Employee in accordance with such accepted offer as of the Closing (or, in the case of any Employee who is not actively at work immediately prior to the Closing, such later date). Buyer hereby agrees that the offers to the Offered Employees shall include, and for the period immediately following the Closing through and including the twelve (12) month anniversary of the Closing, Buyer shall, or shall cause the applicable Buyer Affiliate to, provide (i) a level of base pay to each Transferred Employee that is no less favorable than the base pay provided by each Seller or their respective Affiliates to such Offered Employee as of the Closing, and (ii) welfare benefit plans and defined contribution retirement savings plans for the benefit or welfare of each Transferred Employee (each, a "*Buyer Benefit Plan*"), that are comparable in the aggregate to such benefits (exclusive of any retention benefits) provided to such Offered Employee by each Seller or their respective Affiliates as of the Closing.

(b)     Not more than ten (10) Business Days following the Closing Date (and in the case of any Offered Employee not actively at work immediately prior to the Closing, not more than ten (10) Business Days following such individual's employment commencement date with Buyer or its Affiliates in compliance with *Section 7.4(a)*), Buyer shall deliver, or cause to be delivered, to Sellers a list of Transferred Employees.

(c)     The applicable Seller shall be solely responsible for all Liabilities and obligations with respect to any Employee or former Employee who is not and does not become a Transferred Employee (including all severance obligations with respect to any Employee or former employee in connection with their termination of employment with such Seller and its Affiliates); provided that no Seller shall be responsible for any severance, termination pay or notice pay with respect to any Employee who was employed immediately prior to the Closing who did not receive an offer of employment from Buyer consistent with *Section 7.4(a)* ("*Non-Offered Employees*").

(d)     Following the Closing, Buyer or its employing Affiliate shall process the payroll for, and pay (or cause to be paid), the base wages, base salary and ordinary course sales commissions accrued for the payroll period in which the Closing Date falls (the "*Closing Payroll Period")* with respect to each Employee employed at any time during the Closing Payroll Period. Each Seller shall reimburse Buyer for the base wages, base salary and ordinary course sales commissions accrued and payable for the Closing Payroll Period to any Employee who is not a Transferred Employee. The Closing Payroll Period shall extend from the final payroll date

preceding the Closing through and including the first payroll date on or following the Closing Date. In connection therewith, Buyer shall withhold and remit, on behalf of each Seller, all applicable Taxes, including payroll taxes, as required by Law.

(e)     Buyer shall assume, pay and discharge the Liabilities of each Seller for unused vacation, sick days, personal days or leave earned or accrued by each Transferred Employee through Closing. In addition, Buyer shall assume, pay and discharge the liabilities of each Seller for any obligations or Liabilities under any Assumed Plan other than any severance obligations under any Assumed Plan in connection with the termination of any Transferred Employee that is not an Non-Offered Employee. Sellers and Buyer shall adopt the "alternate procedure" for preparing and filing IRS Forms W-2 (Wage and Tax Statements) and filing IRS Form W-4, as described in Revenue Procedure 2004-53. Additionally, with respect to garnishments, tax levies, child support orders, and wage assignments in effect with any Seller on the Closing Date for Transferred Employees, to the extent permitted by applicable Law Buyer shall honor such payroll deduction authorizations with respect to Transferred Employees and will continue to make payroll deductions and payments to the authorized payee, as specified by the Court or Order from a Governmental Authority which was filed with any Seller on or before the Closing Date. Each Seller shall, as soon as practicable (and in any event not more than two (2) Business Days) after the Closing Date, provide Buyer with such information as may be reasonably requested by Buyer or necessary for Buyer to make the payroll deductions and payments to the authorized payee as required by this *Section 7.4(e)*.

(f)     Unless otherwise prohibited by this or another agreement entered into in connection with the transactions contemplated hereby, or by a Seller Plan document, with respect to Transferred Employees with authorizations for payroll deductions in effect with any Seller or any of their respective Affiliates on the Closing Date, to the extent permitted by applicable Law Buyer will honor such payroll deduction authorizations relating to each Transferred Employee, and shall not require that such Transferred Employee submit a new authorization to the extent that the type of deduction by Buyer does not differ from that made by any Seller. Such deduction types include: contributions to any Assumed Plan; scheduled loan repayments to any Assumed Plan or to an employee credit union; and direct deposit of payroll, bonus advances, union dues, employee relocation loans, and other types of authorized company receivables usually collectible through payroll deductions. Each Seller shall, as soon as practicable (and in any event not more than two (2) Business Days) after the Closing Date, provide Buyer with such information as may be reasonably requested by Buyer or necessary for Buyer to honor the payroll deduction authorizations contemplated by this *Section 7.4(f)*.

(g)     With respect to Transferred Employees and Non-Offered Employees, Buyer shall assume, pay and discharge the Liabilities of each Seller under the WARN Act (provided, however, that, to the extent that the WARN Act is applicable to any such Employee, such Seller and its Affiliates shall have complied with all procedural aspects thereof through the Closing Date and, on the Closing Date, such Seller shall have provided Buyer with any information needed by Buyer to determine whether any Liability could arise under this *Section 7.4(g)* by reason of actions taken by Buyer or its Affiliates on or after the Closing Date), and such Seller shall be solely responsible for all other obligations under the WARN Act in respect of current or former Employees.

(h)    Notwithstanding anything in this Agreement to the contrary, Buyer shall assume, pay and discharge the Liabilities of each Seller under COBRA (and any comparable state law) for all individuals who are "M&A qualified beneficiaries" (as such term is defined in U.S. Treasury Regulation Section 54.4980B-9) from and after the Closing. Buyer hereby acknowledges that it will be a "successor employer" for purposes of U.S. Treasury Regulation Section 54.4980B-9.

(i)    Transferred Employees shall receive credit for purposes of eligibility to participate and vesting (and, for purposes of paid time off and severance benefits only, benefit accrual) under any Buyer Benefit Plan under which each Transferred Employee may be eligible to participate on or after the Closing to the same extent recognized by any Seller under comparable Seller Plans as of the date hereof; provided, however, that such crediting of service shall not operate to duplicate any benefit or the funding of any such benefit. With respect to any Buyer Benefit Plan that is a welfare benefit plan, program or arrangement and in which a Transferred Employee may be eligible to participate on or after the Closing, Buyer shall, or shall cause the applicable Buyer Affiliate to, use commercially reasonable efforts to, (i) waive, or use reasonable efforts to cause its insurance carrier to waive, all limitations as to pre-existing, waiting period or actively-at-work conditions, if any, with respect to participation and coverage requirements applicable to each Transferred Employee under such Buyer Benefit Plan to the same extent waived under a comparable Seller Plan and (ii) provide credit to each Transferred Employee (and such Transferred Employee's beneficiaries) for any co-payments, deductibles and out-of-pocket expenses paid by such Transferred Employee (and such Transferred Employee's beneficiaries) under the comparable Seller Plan during the relevant plan year, up to and including the Closing; provided, however, that such credit shall not operate to duplicate any benefit or the funding of any such benefit.

(j)    Buyer agrees to honor and assume, or to cause a Buyer Affiliate to honor and assume, in accordance with their terms, each Assumed Plan and all trust agreements, insurance contracts, administrative service agreements and investment management agreements related to the funding and administrations of such Assumed Plans. Each Seller shall take such actions as are reasonably required to enable Buyer to comply with such obligations.

(k)    No provision in this *Section 7.4* or otherwise in this Agreement, whether express or implied, shall (a) create any third-party beneficiary or other rights in any employee or former employee of any Seller or any of their respective Affiliates (including any beneficiary or dependent thereof), any other participant in any Seller Plan or any other Person; (b) create any rights to continued employment with any Seller, Buyer or any of their respective subsidiaries or Affiliates or in any way limit the ability of any Seller, Buyer or any of their respective subsidiaries or Affiliates to terminate the employment of any individual at any time and for any reason; or (c) constitute or be deemed to constitute an amendment to any Seller Plan, Buyer Benefit Plan or any other employee benefit plan, program, policy, agreement or arrangement sponsored or maintained by any Seller, Buyer or any of their respective subsidiaries or Affiliates.

### 7.5    *Misallocated Transfers; Wrong Pocket*.

(a)    If, following the Closing, Buyer or any of its Affiliates own or hold any Excluded Asset (including by having an Excluded Asset located at any Leased Real Property that

is or will be owned or leased by Buyer or any of its Affiliates), Buyer shall transfer, or shall cause its applicable Affiliate to transfer, at no cost to any Seller, such Excluded Asset as soon as practicable to the applicable Seller. If, following the Closing, any Seller or any of their respective Affiliates own any Purchased Asset, such Seller shall transfer, or shall cause its applicable Affiliates to transfer, such Purchased Asset as soon as practicable to Buyer.

(b)     In the event that any Seller receives any payment from a third party (other than Buyer or any of its Affiliates) after the Closing Date pursuant to any of the Assigned Contracts (or with respect to the operation by Buyer of the business of any Seller or any Purchased Asset following the Closing) and to the extent such payment is not made in connection with an Excluded Asset or an Excluded Liability, such Seller shall forward such payment, as promptly as practicable but in any event within thirty (30) days after such receipt, to Buyer (or other entity nominated by Buyer in writing to such Seller). Notwithstanding anything to the contrary in this Agreement, in the event that Buyer or any of its Affiliates receives any payment from a third party after the Closing on account of, or in connection with, any Excluded Asset, Buyer shall forward such payment, as promptly as practicable but in any event within thirty (30) days after such receipt, to the applicable Seller (or such other entity as such Seller may designate).

**7.6     *Public Announcements*.** The Parties shall reasonably consult with each other before issuing any press release or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby, and neither Party shall, except as may be required to comply with applicable Law (in which case such Party and shall provide the other Party a reasonable opportunity to review and comment on such proposed disclosure, which such disclosing Party shall consider in good faith), issue any press release or make any public statement prior to obtaining, with respect to any Seller, Buyer's, and with respect to Buyer, each Sellers', prior written consent (which consent, in each case, shall not be unreasonably withheld, conditioned or delayed).

**7.7     *Notification of Certain Matters; Schedule Updates*.**

(a)     Each Party will promptly (and, in any event, within five (5) Business Days) notify the other Party in writing (e-mail being sufficient) of: (i) any written notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the Transaction; (ii) any written notice or other written communication from any Governmental Authority, or the commencement of any Proceeding by any Governmental Authority, related to or in connection with the Transaction (including that would reasonably be expected to restrain, enjoin or otherwise prohibit the consummation of the Transaction); or (iii) any Proceeding commenced or, to the Knowledge of any Seller, or Buyer, as applicable, threatened against, relating to or involving or otherwise affecting such Party which relates to this Agreement or the transactions contemplated hereunder that would reasonably be expected to restrain, enjoin or otherwise prohibit the consummation of the Transaction or adversely affect in any material respect the right or ability of Buyer to own, operate or control the Business or the Purchased Assets as currently conducted or as will be conducted immediately prior to the Closing; provided that in no event will any notice be deemed to amend or modify any section of the Disclosure Schedules or otherwise affect the representations, warranties or covenants of, or the conditions of, any Party to this Agreement.

(b)     Until the date that is fifteen (15) Business Days following the date hereof, Sellers may disclose to Buyer in writing (in the form of updated Disclosure Schedules) any occurrence, fact or circumstance existing as of the date hereof that is discovered or becomes known to Sellers in connection with the review of the representations and warranties contained in this Agreement by the individuals identified in clauses (i), (ii), (v), (vi) or (vii) of the definition of "Knowledge". Any such disclosure shall for all purposes hereunder amend and supplement the Disclosure Schedules delivered on the date hereof. The delivery of any such updated Disclosure Schedules will be deemed to cure any misrepresentation or breach of warranty that otherwise might have existed hereunder as of the date hereof by reason of any such inaccuracy or breach of the representations or warranties of Sellers contained in this Agreement and Buyer will not have any claim (including any claim that the conditions to Closing set forth in *Section 8.2(a)* have not been satisfied) in respect of any such breach or inaccuracy.

**7.8    Specified Contracts**. In connection with the Specified Contracts set forth on *Schedule 2.5(g)* and referenced in *Section 2.5(g)*, during the period following the Closing and prior to the assignment of such Specified Contracts to Buyer, (A) Buyer (or one of its Subsidiaries) shall, as a subcontractor of the applicable Seller, perform such Seller's obligations under the Specified Contracts to the maximum extent permitted under the terms of such Specified Contract, (B) to the extent Buyer (or one of its Subsidiaries) cannot perform such Seller's obligations under the Specified Contracts, such Seller will continue to perform its obligations under the Specified Contracts, and (C) to the extent the applicable Seller cannot perform such Seller's obligations under the Specified Contracts as provided in clause (B), Buyer (or one of its Subsidiaries) shall, if requested by Sellers, second necessary employees to the applicable Seller. Sellers and Buyer agree that any fees or quantifiable accommodations (financial or otherwise) paid or granted to any third party (including any Governmental Authority) in connection with *Sections 2.5(f)* or *2.5(g)* shall be borne by Sellers.

**7.9    Cape Town Convention**. The Parties agree that for all purposes of the Cape Town Convention (i) this Agreement constitutes a separate International Interest with respect to the Airframe and each Engine, and (ii) the Airframe and each Engine constitutes an Aircraft Object.

**7.10    ITAR**. Buyer shall issue any required notice within five (5) days after Closing pursuant to Section 122.4 of the International Traffic in Arms regulations.

**7.11    Financing**. Each Seller agrees to use commercially reasonable efforts to provide customary assistance with the Debt Financing as is reasonably requested by Buyer, including by: (a) participating (and causing senior management and representatives of Sellers to participate) in a reasonable number of calls, presentations, due diligence sessions (including accounting due diligence sessions), drafting sessions and, in the case of any asset backed securitization financing, sessions with rating agencies; (b) assisting Buyer with the timely preparation of customary rating agency presentations (in the case of any asset backed securitization financing), lender presentations and similar documents required in connection with the Debt Financing; (c) furnishing any financing source in connection with the Debt Financing with financial and other pertinent information regarding the Business, the Purchased Assets and the Assumed Liabilities as may be reasonably requested by Buyer to consummate the Debt Financing; and (d) providing Buyer with customary and readily available financial information. Sellers hereby consent to the use of all of Sellers logos solely in connection with the Debt Financing. Buyer shall promptly reimburse Sellers

for all reasonable and documented out-of-pocket costs and expenses (including attorneys' fees) to the extent such costs and expenses are incurred by Sellers in connection with the cooperation contemplated by this *Section 7.11*. For the avoidance of doubt and notwithstanding anything to the contrary in this Agreement, Buyer acknowledges and agrees that its obligations to consummate the transactions contemplated hereby are not conditioned upon the availability or consummation of the Debt Financing or receipt of proceeds therefrom. Buyer acknowledges and agrees that, other than the obligations to cooperate expressly set forth in this *Section 7.11*, none of the Sellers have any responsibility in relation to any financing that Buyer may seek or obtain in connection with the transactions contemplated hereby. Notwithstanding anything herein to the contrary, it is understood and agreed that the condition precedent set forth in *Section 8.2(b)*, as applied to Sellers' obligations under this *Section 7.11*, shall be deemed to be satisfied unless the failure of such condition to be satisfied was caused by the knowing and willful material breach by any Seller of their obligations under this *Section 7.11*.

     **7.12**    **Minimum Cash**. The Parties shall cooperate in good faith to determine the appropriate amount of Cash to be held by the Company immediately prior to the Closing.

     **7.13**    **Matters Relating to Directors and Officers**.

     (a)    Neither Buyer nor the Designated Purchaser shall initiate, and shall cause their respective Affiliates not to initiate, any civil or administrative Proceeding of any nature against any present or former director or officer of any Seller or any of their current or former subsidiaries (other than any Specified Person), out of or in connection with the transactions contemplated by this Agreement; provided, however, that nothing herein shall impact, impair or otherwise prejudice in any way whatsoever (i) Buyer's (or the Designated Purchaser's) rights to bring a Claim or initiate a Proceeding against Sellers under and in accordance with the terms and limitations of this Agreement or (ii) Buyer's (or the Designated Purchaser's) ability to comply with any criminal or other Proceeding initiated by any Governmental Authority or to otherwise comply with applicable Law.

     (b)    In the event that any present or former director or officer of any Seller or any of their current or former subsidiaries, is sued or made party to or subject of (or is threatened to be sued in or made party to or subject of) any Proceeding out of or in connection with any acts or omissions of such person in connection with his or her current or former position as a director or officer of any Seller or any of their current or former subsidiaries prior to the Closing, Buyer (or the Designated Purchaser, if applicable) shall arrange that, subject to adequate measures regarding confidentiality (such as the execution of a customary confidentiality agreement), such director or officer shall have reasonable access to documents and information constituting Purchased Assets as are in the possession of Buyer (or the Designated Purchaser, if applicable) or its Affiliates, and that such director or officer may make copies of such documents as are reasonably necessary for the defense of such Proceeding.

     (c)    Buyer (or the Designated Purchaser, if applicable) shall not, directly or indirectly, cancel or otherwise reduce coverage under any "tail", "run-off" or other insurance policies purchased by Sellers or any of their current or former subsidiaries prior to the Closing; provided that no payments shall be required of Buyer (or the Designated Purchaser, as applicable) after the Closing.

(d)      This *Section 7.13* is intended to be for the benefit of each of the directors, and officers described in this *Section 7.13* and may be enforced by any such Person as if such Person were a party to this Agreement. The obligations of *Section 7.13* will not be terminated or modified in such a manner as to adversely affect any Person to whom this *Section 7.13* applies without the express written consent of each such affected Person.

## ARTICLE VIII
## CONDITIONS TO CLOSING

**8.1      *Mutual Conditions to Closing*.** The obligations of each of Buyer and Sellers to consummate the Closing, are subject to the satisfaction or valid waiver (to the extent permitted by Law) of the following conditions:

(a)      (i) no provision of any Law or Order shall then be in effect prohibiting, enjoining or making illegal the consummation of the Closing, (ii) no Proceeding seeking to prohibit, enjoin or make illegal the consummation of the Closing, or that would reasonably be expected to result in the imposition of criminal liability or the imposition of regulatory fines, shall be pending and (iii) no Proceeding seeking monetary damages that would reasonably be expected to result in an Material Adverse Effect shall be pending;

(b)      the Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be a Final Order;

(c)      Buyer shall have obtained all requisite authority to consummate the Closing (and all transactions related thereto) and for the transfer of membership interests in Buyer, including any requisite Order, and such Order shall have become a Final Order and shall be in both form and substance reasonably acceptable to both Buyer and Sellers;

(d)      all filing and waiting periods applicable (including any extensions thereof) to the consummation of the transactions contemplated by this Agreement under the HSR Act shall have expired or been terminated; and

(e)      the Parties shall have given notice to the controlling FAA Flight Standards District Office for each Type Certificate of the pending transfer of such Type Certificate to Buyer at the Closing.

**8.2      *Buyer's Conditions to Closing*.** The obligations of Buyer to consummate the Closing are subject to the satisfaction or valid waiver of the following conditions:

(a)      (i) the Fundamental Representations shall be true and correct in all respects, except for *de minimis* inaccuracies, as of the date of this Agreement and at and as of the Closing Date with the same force and effect as if they had been made at such time (except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct in all respects, except for *de minimis* inaccuracies, as of such earlier date), and (ii) all other representations and warranties of each Seller in *Article IV* shall be true and correct as of the date of this Agreement and at and as of the Closing Date with the same force and effect as if they had been made at such time (except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date) except

where the failure of such representations and warranties to be true and correct (without giving effect to any limitation as to "materiality," "material adverse effect," "Material Adverse Effect" or similar qualifiers contained therein), has not had a Material Adverse Effect;

(b)  the covenants and agreements that each Seller is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects;

(c)  since the date of this Agreement, there shall not have occurred any Material Adverse Effect;

(d)  Sellers shall have delivered to Buyer a certificate, dated as of the Closing Date and executed by a duly authorized officer of Sellers, certifying that the conditions set forth in *Section 8.2(a), Section 8.2(b)* and *Section 8.2(c)* have been satisfied;

(e)  Sellers shall have delivered, or cause to be delivered, to Buyer each item set forth in *Section 3.3(a)*;

(f)  there shall be no Order of the Bankruptcy Court or any other court of competent jurisdiction prohibiting Buyer from submitting a credit bid and consummating the Transaction;

(g)  (i) Buyer shall have received or been issued all Permits necessary to replace the Excluded Permits or (ii) the applicable Seller shall have agreed to, and shall have full power and authority to, provide Buyer will use of the Excluded Permits pursuant to the Transition Services Agreement; and

(h)  Sellers shall have obtained the consents and approvals required from third parties on *Schedule 8.2(h)*, and all such consents and Contracts shall be in full force and effect.

**8.3**  **Sellers' Conditions to Closing**. The obligations of each Seller to consummate the Closing are subject to the satisfaction or valid waiver of the following conditions:

(a)  the representations and warranties of Buyer in *Article V* shall be true and correct as of the date of this Agreement and at and as of the Closing Date with the same force and effect as if they had been made at such time (except to the extent expressly made as of an earlier date in which case such representations and warranties shall be true and correct as of such earlier date), except where the failure of such representations and warranties to be true and correct (without giving effect to any limitation as to "materiality," "material adverse effect" or similar qualifiers contained therein), would not materially impair or prevent Buyer's ability to consummate the transactions contemplated by this Agreement;

(b)  the covenants and agreements that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects;

(c)      Buyer shall have delivered to Sellers a certificate, dated as of the Closing Date and executed by a duly authorized officer of Buyer, certifying that the conditions set forth in *Section 8.3(a)* and *Section 8.3(b)* have been satisfied; and

(d)      Buyer shall have delivered, or caused to be delivered, to Sellers each item set forth in *Section 3.3(b)*.

## ARTICLE IX
## NON-SURVIVAL

*9.1*    ***Non-Survival***. The Parties, intending to modify any applicable statute of limitations, agree that (a)(i) the representations and warranties in this Agreement and in any certificate delivered pursuant hereto and (ii) the covenants in this Agreement only requiring performance prior to the Closing shall, in each case, terminate and be of no further force and effect effective as of the Closing and shall not survive the Closing for any purpose, and thereafter there shall be no liability on the part of, nor shall any claim be made by or on behalf of, any Party or any Party's Affiliates in respect thereof and (b) the covenants in this Agreement that contemplate performance at or after the Closing or expressly by their terms survive the Closing shall survive the Closing in accordance with their respective terms (the "***Surviving Post-Closing Covenants***") until the earlier of (i) full performance of such covenant in accordance with its terms and (ii) three (3) years following the Closing Date. Except with respect to the Surviving Post-Closing Covenants, no other remedy shall be asserted or sought by Buyer, and Buyer shall cause its Affiliates not to assert or seek any other remedy, against any Seller or any of their respective Affiliates under any contract, misrepresentation, tort, strict liability, or statutory or regulatory Law or theory or otherwise, in each case for any liabilities in connection with this Agreement or the transactions contemplated by this Agreement, all such remedies being hereby knowingly and expressly waived and relinquished to the fullest extent permitted under applicable Law; <u>provided</u> that, notwithstanding anything to the contrary in this Agreement, the foregoing shall not waive any remedies in the case of Fraud. Buyer and Sellers acknowledge and agree, on their own behalf and on behalf of their Affiliates that the agreements contained in this *Section 9.1* are an integral part of the transactions contemplated hereby and that, without the agreements set forth in this *Section 9.1*, none of the Parties would enter into this Agreement.

## ARTICLE X
## TERMINATION

*10.1*   ***Termination***. This Agreement may be terminated and the transactions contemplated herein may be abandoned at any time at or prior to Closing:

(a)      by mutual written agreement of Sellers and Buyer;

(b)      by either Sellers or Buyer, if the Closing shall not have been consummated on or before the date that is one hundred fifty (150) days following the date hereof (the "***End Date***"); <u>provided</u> that the right to terminate this Agreement pursuant to this *Section 10.1(b)* shall not be available to a Party whose breach of any of its representations, warranties, covenants or agreements contained herein has been the primary cause of the failure of the Closing to occur on or before the End Date;

(c) by Sellers, if Buyer breaches or fails to perform any of its representations, warranties, covenants or agreements contained in this Agreement and such breach or failure to perform (i) would prevent (or delay beyond the End Date) the satisfaction of a condition set forth in *Section 8.1* or *Section 8.3* and (ii) cannot be, or has not been, cured by the earlier of (A) the End Date or (B) ten (10) days following delivery of written notice to Buyer of such breach or failure to perform; <u>provided</u> that the right to terminate this Agreement pursuant to this *Section 10.1(c)* shall not be available to Sellers if any Seller is then in material breach of its representations, warranties, covenants or agreements contained herein;

(d) by Buyer, if any Seller breaches or fails to perform any of its representations, warranties, covenants or agreements contained in this Agreement and such breach or failure to perform (i) would prevent (or delay beyond the End Date) the satisfaction of a condition set forth in *Section 8.1* or *Section 8.2* and (ii) cannot be, or has not been, cured by the earlier of (A) the End Date or (B) ten (10) days following delivery of written notice to Sellers of such breach or failure to perform; <u>provided</u> that the right to terminate this Agreement pursuant to this *Section 10.1(d)* shall not be available to Buyer if Buyer is then in material breach of its representations, warranties, covenants or agreements contained herein;

(e) by Sellers or Buyer, if any Governmental Authority issues any Order permanently enjoining or otherwise permanently prohibiting the transactions contemplated by this Agreement and such Order shall have become final and non-appealable;

(f) by either Sellers or Buyer, if at the end of the Auction for the Purchased Assets (if any), Buyer is not determined by Sellers to be either the Successful Bidder or the Back-up Bidder;

(g) by either Buyer or Sellers, if an Order of the Bankruptcy Court is entered denying approval of the Bid Procedures Order, the Sale Order or the Order referenced in *Section 8.1(c)* and such Order denying approval shall have become a non-appealable Final Order;

(h) by Buyer, if, under Section 363(k) of the Bankruptcy Code, Buyer is disallowed from providing the Credit Bid as contemplated by this Agreement in connection with the payment of the Purchase Price pursuant to an Order of the Bankruptcy Court or any other court of competent jurisdiction;

(i) by Buyer, if there is an Event of Default as defined in the DIP Credit Agreement, the DIP Facility is accelerated and the Commitments (as defined in the DIP Credit Agreement), are terminated;

(j) by Buyer, if Sellers file a motion seeking an order of the Bankruptcy Court dismissing the Chapter 11 Cases or converting the Chapter 11 Cases to a case or cases under Chapter 7 of the Bankruptcy Code (except with Buyer's prior written consent), or if Sellers file a motion seeking an order of the Bankruptcy Court appointing a trustee or examiner with expanded powers to operate or manage the financial affairs, the business or the reorganization of Sellers in the Chapter 11 Cases;

(k) by Buyer, if the Bankruptcy Court approves an Alternative Transaction and Buyer is not the Back-Up Bidder; or

(l)    automatically, upon consummation of an Alternative Transaction.

**10.2    Effect of Termination.** If this Agreement is terminated in accordance with *Section 10.1*, this Agreement shall become null and void and of no further force, and no Party (nor any stockholder, director, officer, employee, agent, consultant or representative of any such Party) shall thereafter have any Liability hereunder, in each case except for the provisions of this *Section 10.2* and *Article XI* and the Confidentiality Agreements, which shall survive such termination of this Agreement; provided that nothing in this *Section 10.2* shall be deemed to release any Party from any liability for any Willful Breach of this Agreement or Fraud by such Party occurring prior to its termination.

**ARTICLE XI**
**MISCELLANEOUS**

**11.1    Expenses and Transfer Taxes**. Except as otherwise specifically provided, all fees, costs and expenses incurred by the Parties in negotiating this Agreement or in consummating the transactions contemplated by this Agreement (including legal and accounting fees, costs and expenses) shall be paid by the Party incurring the same, whether or not the transactions contemplated hereby are consummated. All Transfer Taxes and all required documentary, filing and recording fees and expenses in connection with the filing and recording of the assignments, conveyances or other instruments required to convey title to the Purchased Assets to Buyer shall be borne by Buyer. The Parties will use commercially reasonable efforts to cooperate and timely prepare any Tax Returns relating to such Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes. Unless otherwise required by applicable Law, Buyer or any of its Affiliates will prepare and timely file all Tax Returns with respect to Transfer Taxes. Sellers or any of their Affiliates will file any other Tax Return with respect to Transfer Taxes required to be filed by Sellers or any of their Affiliates. The Party that files such Tax Return ("***Filing Party***") shall furnish to the other Party ("***Non-Filing Party***") a copy of any such Tax Return and a copy of a receipt showing payment (or, if the applicable Governmental Authority does not make such a receipt reasonably available to the Filing Party, other documentation evidencing such payment) of any such Transfer Taxes within ten (10) Business Days of availability of such receipt or such other documentation, as applicable. The Non-Filing Party shall pay to the Filing Party all Transfer Taxes that it owes pursuant to this *Section 11.1* within five (5) Business Days of written demand from the Filing Party, provided that no payment shall be required more than three (3) days before the Transfer Tax is required to be paid.

**11.2    Notices**. All notices, requests and other communications to any Party hereunder shall be in writing and shall be delivered to the addresses set forth below (or pursuant to such other address(es) as may be designated in writing by the Party to receive such notice):

if to Buyer:

> MDH Holdco, LLC
> c/o MBIA Insurance Corporation
> 1 Manhattanville Road #301
> Purchase, New York 10577
> Attention:  Jonathan Harris – Managing Director and Counsel
>                        Keith Borelli – Director

73

Email:      jonathan.harris@mbia.com
            keith.borelli@mbia.com

with copies, which shall not constitute notice, to:

Cadwalader, Wickersham & Taft LLP
200 Liberty Street
New York, New York 10281
Attention: Gregory M. Petrick
            Ingrid Bagby
            William P. Mills
            Braden K. McCurrach
Email:      gregory.petrick@cwt.com
            ingrid.bagby@cwt.com
            william.mills@cwt.com
            braden.mccurrach@cwt.com

and

Young Conaway Stargatt & Taylor, LLP
1000 N. King Street
Wilmington, Delaware 19801
Attention: Michael Nestor
            Allurie Kephart
Email:      mnestor@ycst.com
            akephart@ycst.com

if to any Seller, to:

MD Helicopters, Inc.
4555 E. McDowell Road
Mesa, Arizona 85215
Attention: Alan Carr
            Barry Sullivan
Email       acarr@drivetrainllc.com
            barry.sullivan@mdhelicopters.com

with a copy, which shall not constitute notice, to:

Latham & Watkins LLP
1271 Avenue of the Americas
New York, New York 10020
Attention: James Gorton
            Suzzanne Uhland
            Adam Ravin
            Edmond Parhami
Email       james.gorton@lw.com

suzzanne.uhland@lw.com
adam.ravin@lw.com
edmond.parhami@lw.com

All such notices, requests and other communications shall be deemed received (a) if delivered prior to 5:00 p.m. New York time on a day which is a Business Day, then on such date of delivery if delivered personally, or, if by email, upon written confirmation of delivery by email (which may be electronic), and if delivered after 5:00 p.m. New York time (whether personally or by email) then on the next succeeding Business Day, (b) on the first (1st) Business Day following the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier or (c) on the earlier of confirmed receipt or the fifth (5th) Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid.

**11.3   Amendments and Waivers**.

(a)     Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each of Buyer and Sellers, or, in the case of a waiver, by the Party against whom the waiver is to be effective. For clarity, Bankruptcy Court approval shall not be required for any amendment to this Agreement.

(b)     No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by Law.

**11.4   Successors and Assigns**.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns; provided that Buyer, on the one hand, may not assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of Sellers, and Sellers, on the other hand, may not assign, delegate or otherwise transfer any of their respective rights or obligations under this Agreement without the prior written consent of Buyer; provided, further, that a Party (subject to such Party remaining liable for its obligations hereunder) may assign any of its rights or obligations hereunder to any of its Affiliates without the consent of any Person. Any attempted assignment in violation of this *Section 11.4* shall be null and void, *ab initio*. For the avoidance of doubt, a change of control of Buyer shall not be deemed an assignment for purposes of this Agreement and shall not require the consent of any other Party.

(b)     At any time prior to the date that is five (5) Business Days prior to the Closing, and notwithstanding anything contained herein to the contrary, Buyer shall be entitled to designate, by written notice to Sellers, one or more U.S. Persons to (i) purchase the Purchased Assets (including specified Assigned Contracts), pay the corresponding Purchase Price relating to such Purchased Assets or require payment of the Cure Costs, as applicable or (ii) assume the Assumed Liabilities (any such U.S. Person that shall be designated in accordance with this clause,

a "*Designated Purchaser*"). In addition, and for the avoidance of doubt, a Designated Purchaser shall be entitled to employ any of the Transferred Employees on and after the Closing Date (otherwise in accordance with *Section 7.4*) and to perform any other covenants or agreements of Buyer under this Agreement. Notwithstanding the foregoing, Buyer's designation of any Designated Purchaser pursuant to this *Section 11.4* shall not relieve Buyer of its obligations under this Agreement.

**11.5    *Governing Law***. This Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware, without regard to the conflicts or choice of law rules of the State of Delaware that would result in the application of the Laws of any other jurisdiction.

**11.6    *Exclusive Jurisdiction***. The Parties irrevocably agree that, during the period from the date hereof until the date on which the Chapter 11 Cases are closed or dismissed, any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought exclusively in the Bankruptcy Court. The Parties further irrevocably agree that, after the Chapter 11 Cases are closed or dismissed, any Proceeding with respect to this Agreement or the transactions contemplated hereby shall be brought against any of the Parties exclusively in either the United States District Court for the District of Delaware or any state court of the State of Delaware located in such district, and each of the Parties hereby irrevocably consents to the jurisdiction of such court and the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such Proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such Proceeding in such courts or that any such Proceeding which is brought in such courts has been brought in an inconvenient forum. Process in any Proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court, the United States District Court for the District of Delaware or any state court of the State of Delaware. Without limiting the foregoing, each Party agrees that service of process on such Party in the manner as provided in *Section 11.2* for notices shall be deemed effective service of process on such Party.

**11.7    *WAIVER OF JURY TRIAL***. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, EACH PARTY HEREBY WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSES OF ACTION ARISING IN WHOLE OR IN PART UNDER, RELATED TO, BASED ON OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT OR THE SUBJECT MATTER HEREOF OR THEREOF, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE. ANY PARTY MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS *SECTION 11.7* WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

**11.8    *Counterparts; Third-Party Beneficiaries***. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each Party shall have received a counterpart hereof signed by the other Party. Delivery of a .pdf

version of one or more signatures to this Agreement shall be deemed adequate delivery for purposes of this Agreement. No other provision of this Agreement is intended to confer upon any Person other than the Parties any rights, benefits, Proceedings or remedies hereunder.

*11.9    Specific Performance*. It is understood and agreed by the Parties that money damages (even if available) would not be a sufficient remedy for any breach of this Agreement by Sellers or Buyer and as a consequence thereof, after the Bankruptcy Court's entry of the Sale Order and the Order referenced in *Section 8.1(c)*, Sellers and Buyer shall each be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach or threatened breach in addition to any other remedy to which such Party may be entitled in Law or in equity, including an Order of the Bankruptcy Court or other court of competent jurisdiction requiring Buyer or Sellers, as may be applicable, to comply promptly with any of their obligations hereunder. Each of the Parties agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that the other Party has an adequate remedy at Law or that any award of specific performance is not an appropriate remedy for any reason at Law or in equity. Any Party seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement shall not be required to provide any bond or other security in connection with such Order.

*11.10    Privileges*. The Parties hereto hereby agree that their respective rights and obligations to maintain, preserve, assert or waive any attorney-client and work product privileges belonging to any such Party with respect to the Business, the Purchased Assets, the Excluded Assets, the Assumed Liabilities, and the Excluded Liabilities (collectively, "*Privileges*"), shall be governed by the provisions of this *Section 11.10*. With respect to matters relating to the Excluded Assets or the Excluded Liabilities, and with respect to the Excluded Records, Sellers shall have sole authority to determine whether to assert or waive any Privileges, including the right to assert any Privilege against Buyer and its Affiliates. Buyer and its Affiliates shall take no action without the prior written consent of Sellers that would reasonably be expected to result in any waiver of any such Privileges of Sellers or any of their Affiliates. After the Closing, Buyer and its Affiliates shall have sole authority to determine whether to assert or waive any Privileges with respect to matters relating to the Business (except for the Excluded Liabilities or the Excluded Assets), the Purchased Assets or the Assumed Liabilities, including the right to assert any Privilege against Sellers or their Affiliates. Sellers shall not, and shall cause its Affiliates not to, take any action after the Closing without the prior written consent of Buyer that would reasonably be expected to result in any waiver of any such Privileges of Buyer or any of its Affiliates. The rights and obligations created by this *Section 11.10* shall apply to all files, documents, instruments, papers, books, reports, work papers, communications, records and other information as to which Sellers or Buyer or their respective Affiliates would be entitled to assert or has asserted a Privilege without regard to the effect, if any, of the Transaction (the "*Privileged Information*"). Upon receipt by Seller or their Affiliates, or by Buyer and its Affiliates, as the case may be, of any subpoena, discovery or other request from any third party that actually or arguably calls for the production or disclosure of Privileged Information of the other Party, such Party shall promptly notify the other Party of the existence of the request and shall provide such other Party a reasonable opportunity to review the Privileged Information and to assert any rights it may have under this *Section 11.10* or otherwise (at its sole cost) to prevent the production or disclosure of Privileged Information. Sellers' transfer of any files, documents, instruments, papers, books, reports, work papers, communications, records or other information or Privileged Information to Buyer in accordance

with this Agreement and Sellers' agreement to permit Buyer to obtain Privileged Information existing prior to the Closing are made in reliance on the Parties' respective agreements, as set forth in the Confidentiality Agreements and this *Section 11.10* to maintain the confidentiality of such Privileged Information and to take the steps provided herein for the preservation of all Privileges that may belong to or be asserted by Sellers or Buyer, as the case may be. The access to files, documents, instruments, papers, books, reports, work papers, communications, records or other information or Privileged Information being granted pursuant to this Agreement, and the disclosure to Buyer and Sellers of Privileged Information relating to the Business, the Purchased Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities pursuant to this Agreement in connection with the Transaction shall not be asserted by Sellers or Buyer to constitute, or otherwise be deemed, a waiver of any Privilege that has been or may be asserted under this *Section 11.10* or otherwise.

**11.11    *Entire Agreement***. This Agreement and the other Transaction Documents (together with the Schedules and Exhibits hereto and thereto) constitute the entire agreement between the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, both oral and written, between the Parties with respect to such subject matter. No Party to this Agreement shall be liable or bound to any other Party in any manner by any representations, warranties, covenants or agreements relating to such subject matter except as specifically set forth herein and therein.

**11.12    *No Strict Construction***. Buyer and Sellers participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer and Sellers and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

**11.13    *Severability***. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transaction contemplated hereby be consummated as originally contemplated to the fullest extent possible.

**11.14    *Disclosure Schedules***. The representations and warranties of each Seller set forth in this Agreement are made and given subject to the Disclosure Schedules. Inclusion of information in the Disclosure Schedules will not be construed as an admission that such information is material to the business, operations of condition (financial or otherwise) of any Seller or their respective businesses, in whole or in part, or as an admission of Liability or obligation of any Seller to any Person. The sections of the Disclosure Schedules have been organized for purposes of convenience in numbered sections corresponding to the sections in this Agreement; provided, however, that any disclosure in any section of the Disclosure Schedules will

apply to and will be deemed to be disclosed with respect to any other representation and warranty, so long as the applicability of such disclosure is readily apparent on its face. It is understood and agreed that the specification of any dollar amount in the representations and warranties or covenants contained in this Agreement or the inclusion of any specific item in the Disclosure Schedules is not intended to imply that such amounts or higher or lower amounts, or the items so included or other items, are or are not material, and no Party or other Person shall use the fact of the setting of such amounts or the fact of the inclusion of any such item in the Disclosure Schedules in any dispute or controversy as to whether any obligation, item or matter not described in this Agreement or included in the Disclosure Schedules is or is not material for purposes of this Agreement. Nothing in this Agreement (including the Disclosure Schedules) shall be deemed an admission by either Party or any of its Affiliates, in any Proceedings, that such Party or any such Affiliate, or any third party, is or is not in breach or violation of, or in default in, the performance or observance of any term or provisions of any Contract or Law. The Disclosure Schedules and the information and disclosures contained therein are intended only to modify the representations or warranties of Sellers contained in this Agreement. Where the terms of a contract or document have been summarized or described in the Disclosure Schedules, such summary or description does not purport to be a complete statement of the material terms of such contract or document and all such summaries and descriptions are qualified in their entirety by reference to the contract or document being summarized or descried to the extent such contract or other document has been made available to Buyer prior to the date hereof.

*11.15  Diligence Materials*. Sellers shall, within ten (10) Business Days after the Closing Date and at Buyer's sole cost and expense, direct its applicable representative to deliver to Buyer (at the address designated by Buyer) one (1) USB containing copies of all the documents and information furnished to Buyer or its representatives in the Data Room.

*11.16  Bulk Sales*. Buyer hereby waives compliance by Sellers with the provision of any bulk sales, or bulk transfer Laws of any jurisdiction in connection with the transactions contemplated hereby.

*11.17  No Recourse*. Notwithstanding anything in this Agreement or in any other Transaction Document, the Parties hereby acknowledge and agree that, except to the extent a Person is a named party to this Agreement, no Person, including any current, former or future director, officer, employee, incorporator, member, manager, director, partner, investor, shareholder, agent, representative, or Affiliate of any, shall have any liability to the other Party, and each Party shall have no recourse against, any Person other than the other Party in connection with any liability, claim or cause of action arising out of, or in relation to, this Agreement, any other Transaction Document or the transactions contemplated hereby and thereby, whether granted by statute or based on theories of contract, tort, strict liability, equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise. Notwithstanding the foregoing, nothing herein shall limit, restrict, or otherwise affect any Person's right or ability to make, pursue, enforce or prosecute a claim for Fraud.

*[Signature pages follow]*

IN WITNESS WHEREOF, Sellers and Buyer have executed this Agreement on the Execution Date.

**SELLERS:**

MD HELICOPTERS, INC.

By: _____
Name: Barry A Sullivan
Title: CFO

MONTERREY AEROSPACE, LLC

By: _____
Name: Barry A Sullivan
Title: CEO

*[Signature Page to Asset Purchase Agreement]*

**BUYER:**

MDH HOLDCO, LLC

By: Zohar II 2005-1, Corp., its manager

By: _____
Name: Michael Katzenstein
Title: Chief Restructuring Officer