# EXHIBIT A

**DIP Credit Agreement**

**EXECUTION VERSION**

**SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**dated as of April 1, 2022,**

**among**

**MD HELICOPTERS, INC.,**
a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,

**as Borrower,**

**and**

**THE SUBSIDIARY GUARANTORS PARTY HERETO,**
a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,

**as Guarantors,**

**THE LENDERS PARTY HERETO,**

**and**

**ACQUIOM AGENCY SERVICES LLC,**

**as**
**Administrative Agent and Collateral Agent**

171390607

# TABLE OF CONTENTS

**Page 1**

ARTICLE I DEFINITIONS ................................................................................................................1

Section 1.01    Defined Terms ...............................................................................1
Section 1.02    [Reserved]. ..................................................................................26
Section 1.03    Terms Generally ..........................................................................26
Section 1.04    Accounting Terms; GAAP ...........................................................26
Section 1.05    [Reserved]. ..................................................................................27
Section 1.06    Resolution of Drafting Ambiguities .............................................27

ARTICLE II THE CREDITS ...........................................................................................................27

Section 2.01    Commitments ...............................................................................27
Section 2.02    Loans ..........................................................................................28
Section 2.03    Borrowing Procedure ..................................................................29
Section 2.04    Evidence of Debt; Repayment of Loans......................................29
Section 2.05    Fees. ...........................................................................................30
Section 2.06    Interest on Loans .........................................................................31
Section 2.07    Termination or Reduction of Commitments .................................31
Section 2.08    [Reserved]. ..................................................................................31
Section 2.09    Repayment of Loans....................................................................31
Section 2.10    Optional and Mandatory Prepayments of Loans .........................32
Section 2.11    [Reserved]. ..................................................................................33
Section 2.12    Increased Costs; Change in Legality ...........................................33
Section 2.13    [Reserved]. ..................................................................................34
Section 2.14    Payments Generally; Pro Rata Treatment; Sharing of Setoffs ....34
Section 2.15    Taxes ..........................................................................................35
Section 2.16    Mitigation Obligations; Replacement of Lenders ........................39

ARTICLE III REPRESENTATIONS AND WARRANTIES ............................................................41

Section 3.01    Organization; Powers ..................................................................41
Section 3.02    Authorization; Enforceability.......................................................41
Section 3.03    No Conflicts; No Default .............................................................41
Section 3.04    Financial Condition; No Material Adverse Effect.........................41
Section 3.05    Properties.....................................................................................42
Section 3.06    Intellectual Property ....................................................................42
Section 3.07    Equity Interests and Subsidiaries .................................................43
Section 3.08    Litigation; Compliance with Legal Requirements ........................43
Section 3.09    [Reserved]. ..................................................................................44
Section 3.10    Federal Reserve Regulations .......................................................44
Section 3.11    Investment Company Act, etc ......................................................44
Section 3.12    Use of Proceeds ..........................................................................44
Section 3.13    Taxes ..........................................................................................44
Section 3.14    No Material Misstatements ..........................................................44
Section 3.15    Labor Matters ..............................................................................45

-1-

**TABLE OF CONTENTS**
(continued)

Section 3.16     [Reserved]. ................................................................................................45
Section 3.17     Employee Benefit Plans ............................................................................45
Section 3.18     Environmental Matters ..............................................................................45
Section 3.19     Insurance ...................................................................................................46
Section 3.20     [Reserved]. ................................................................................................46
Section 3.21     Anti-Terrorism Law; Foreign Corrupt Practices Act .................................46
Section 3.22     Cases; DIP Orders; Secured Super-Priority Obligations............................47
Section 3.23     Intercompany Indebtedness.......................................................................48
Section 3.24     Certifications. ............................................................................................48

ARTICLE IV CONDITIONS TO CREDIT EXTENSIONS ...........................................................48

Section 4.01     Conditions to Initial Credit Extension .......................................................48
Section 4.02     [Reserved]. ................................................................................................50
Section 4.03     Conditions to All Credit Extensions...........................................................50

ARTICLE V AFFIRMATIVE COVENANTS ..............................................................................51

Section 5.01     Financial Statements, Reports, etc ............................................................51
Section 5.02     Litigation and Other Notices .....................................................................53
Section 5.03     Existence; Businesses and Properties.........................................................54
Section 5.04     Insurance ...................................................................................................54
Section 5.05     Obligations and Taxes ...............................................................................55
Section 5.06     Employee Benefits ....................................................................................55
Section 5.07     Maintaining Records; Access to Properties and Inspections; Annual
                 Meetings....................................................................................................55
Section 5.08     Use of Proceeds.........................................................................................56
Section 5.09     Compliance with Environmental Laws; Environmental Reports................57
Section 5.10     Additional Guarantors ...............................................................................57
Section 5.11     Security Interests; Further Assurances. ......................................................57
Section 5.12     [Reserved]. ................................................................................................58
Section 5.13     [Reserved]. ................................................................................................58
Section 5.14     [Reserved]. ................................................................................................58
Section 5.15     Priority of Liens ........................................................................................58
Section 5.16     Milestones .................................................................................................59
Section 5.17     Bankruptcy Related Matters.......................................................................59
Section 5.18     Budget Compliance ...................................................................................60
Section 5.19     Lender Calls ..............................................................................................60
Section 5.20     Ordinary Course and Compliance with Applicable Laws...........................60
Section 5.21     Post-Closing Date Covenants.....................................................................60

ARTICLE VI NEGATIVE COVENANTS ...................................................................................60

Section 6.01     Indebtedness ..............................................................................................60
Section 6.02     Liens..........................................................................................................61
Section 6.03     Sale and Leaseback Transactions ...............................................................63

**TABLE OF CONTENTS**

(continued)

**Page 3**

| | | |
|---|---|---|
| Section 6.04 | Investments, Loans and Advances | 63 |
| Section 6.05 | Mergers and Consolidations | 64 |
| Section 6.06 | Asset Sales | 64 |
| Section 6.07 | Acquisitions | 65 |
| Section 6.08 | Dividends | 66 |
| Section 6.09 | Transactions with Affiliates | 66 |
| Section 6.10 | [Reserved]. | 66 |
| Section 6.11 | Prepayments of Other Indebtedness; Modifications of Organizational Documents, Acquisition and Certain Other Documents, etc. | 66 |
| Section 6.12 | Limitation on Certain Restrictions on Subsidiaries | 67 |
| Section 6.13 | Business | 67 |
| Section 6.14 | Limitation on Issuance of Capital Stock | 67 |
| Section 6.15 | Limitation on Accounting Changes | 68 |
| Section 6.16 | Fiscal Periods | 68 |
| Section 6.17 | No Further Negative Pledge | 68 |
| Section 6.18 | Anti-Terrorism Law; Anti-Money Laundering | 68 |
| Section 6.19 | Embargoed Person | 68 |
| Section 6.20 | Subsidiaries | 69 |
| Section 6.21 | Additional Bankruptcy Matters | 69 |

ARTICLE VII GUARANTEE .... 70

| | | |
|---|---|---|
| Section 7.01 | The Guarantee | 70 |
| Section 7.02 | Obligations Unconditional | 70 |
| Section 7.03 | Reinstatement | 71 |
| Section 7.04 | Subrogation; Subordination | 71 |
| Section 7.05 | Remedies | 72 |
| Section 7.06 | Instrument for the Payment of Money | 72 |
| Section 7.07 | Continuing Guarantee | 72 |
| Section 7.08 | General Limitation on Guarantee Obligations | 72 |
| Section 7.09 | [Reserved]. | 72 |
| Section 7.10 | Right of Contribution | 72 |

ARTICLE VIII EVENTS OF DEFAULT .... 72

| | | |
|---|---|---|
| Section 8.01 | Events of Default | 72 |
| Section 8.02 | Rescission | 78 |
| Section 8.03 | [Reserved]. | 78 |
| Section 8.04 | Application of Proceeds | 78 |

ARTICLE IX THE ADMINISTRATIVE AGENT AND THE COLLATERAL AGENT .... 79

| | | |
|---|---|---|
| Section 9.01 | Appointment | 79 |
| Section 9.02 | Agent in Its Individual Capacity | 80 |
| Section 9.03 | Exculpatory Provisions | 80 |
| Section 9.04 | Reliance by Agent | 81 |

-3-

**TABLE OF CONTENTS**
(continued)

| | | |
|---|---|---|
| Section 9.05 | Delegation of Duties | 81 |
| Section 9.06 | Successor Agent | 82 |
| Section 9.07 | Non-Reliance on Agent and Other Lenders | 82 |
| Section 9.08 | [Reserved]. | 82 |
| Section 9.09 | Indemnification | 82 |
| Section 9.10 | [Reserved]. | 83 |
| Section 9.11 | Lender Action | 83 |
| Section 9.12 | [Reserved]. | 83 |
| Section 9.13 | Lender's Representations, Warranties and Acknowledgements | 83 |
| Section 9.14 | Security Documents and Guarantee | 84 |
| Section 9.15 | Administrative Agent May File Bankruptcy Disclosure and Proofs of Claim | 85 |

ARTICLE X MISCELLANEOUS .......... 86

| | | |
|---|---|---|
| Section 10.01 | Notices | 86 |
| Section 10.02 | Waivers; Amendment | 89 |
| Section 10.03 | Expenses; Indemnity; Damage Waiver | 91 |
| Section 10.04 | Successors and Assigns | 93 |
| Section 10.05 | Survival of Agreement | 96 |
| Section 10.06 | Counterparts; Integration; Effectiveness | 97 |
| Section 10.07 | Severability | 97 |
| Section 10.08 | Right of Setoff; Marshalling; Payments Set Aside | 97 |
| Section 10.09 | Governing Law; Jurisdiction; Consent to Service of Process | 98 |
| Section 10.10 | Waiver of Jury Trial | 98 |
| Section 10.11 | Headings | 99 |
| Section 10.12 | Confidentiality | 99 |
| Section 10.13 | Interest Rate Limitation | 99 |
| Section 10.14 | Assignment and Assumption | 100 |
| Section 10.15 | Obligations Absolute | 100 |
| Section 10.16 | Waiver of Defenses; Absence of Fiduciary Duties | 100 |
| Section 10.17 | Reinstatement | 101 |
| Section 10.18 | USA Patriot Act | 101 |
| Section 10.19 | DIP Orders | 101 |
| Section 10.20 | Acknowledgement and Consent to Bail-In of EEA Financial Institutions | 101 |

ANNEXES

Annex I              Lenders and Commitments
Annex II             Backstop Lenders and Backstop Commitments

SCHEDULES

Schedule 1.01(c)     Pledgors
Schedule 3.05(c)     Real Property
Schedule 3.07(a)     Subsidiaries
Schedule 3.07(c)     Organizational Chart
Schedule 3.08        Litigation
Schedule 3.19        Insurance
Schedule 3.23        Intercompany Notes
Schedule 6.01(b)     Existing Indebtedness
Schedule 6.02(c)     Existing Liens
Schedule 6.04(b)     Existing Investments
Schedule 6.12        Existing Restrictive Agreements

EXHIBITS

Exhibit A            Form of Assignment and Assumption
Exhibit B            Form of Borrowing Request
Exhibit C            Form of Compliance Certificate
Exhibit D            Interim Order
Exhibit E            Form of Note
Exhibit F            Form of Non-Bank Certificate

## SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "**Agreement**"), dated as of April 1, 2022, among MD Helicopters, Inc., an Arizona corporation and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code ("**Borrower**"), the Subsidiary Guarantors (such term and each other capitalized term used but not defined herein having the meaning given to it in Article I), each a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code, the Lenders and Acquiom Agency Services LLC, as administrative agent for the Lenders (in such capacity, the "**Administrative Agent**") and as collateral agent for the Secured Parties (in such capacity, the "**Collateral Agent**").

### WITNESSETH:

WHEREAS, on April 1, 2022 (the "**Petition Date**"), Borrower and the Subsidiary Guarantors (each a "**Debtor**" and collectively, the "**Debtors**") filed voluntary petitions with the Bankruptcy Court commencing their respective cases that are pending under Chapter 11 of the Bankruptcy Code (each case of Borrower and each other Debtor, a "**Case**" and collectively, the "**Cases**") and have continued in the possession of their assets and management of their business pursuant to Section 1107(a) and 1108 of the Bankruptcy Code.

WHEREAS, Borrower has requested that the Lenders extend credit to Borrower in the form of new money term loans in an aggregate principal amount of up to $60,000,000 pursuant to this Agreement (collectively, the "**DIP Term Facility**"), with all of Borrower's obligations under the DIP Term Facility to be guaranteed by the Subsidiary Guarantors.

WHEREAS, the priority of the DIP Term Facility with respect to the Collateral granted to secure the Obligations shall be as set forth in the Interim Order and the Final Order, as applicable, in each case upon entry thereof by the Bankruptcy Court.

WHEREAS, Borrower and the Subsidiary Guarantors are engaged in related businesses, and the Subsidiary Guarantor will derive substantial direct and indirect benefit from the making of the extensions of credit under this Agreement.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

### ARTICLE I
### DEFINITIONS

**Section 1.01    Defined Terms.** As used in this Agreement, the following terms shall have the meanings specified below:

"**Acceptable Sale**" shall mean a sale of all or substantially all of the assets of the Loan Parties that either (i) pays all Obligations in full, in cash or (ii) is reasonably acceptable to the Required Lenders in their sole discretion; *provided* that the sale contemplated in the Stalking Horse APA is an Acceptable Sale.

"**Adequate Protection**" has the meaning set forth in the Interim Order or Final Order, as applicable.

"**Administrative Agent**" shall have the meaning assigned to such term in the preamble hereto and includes each other Person appointed as the successor administrative agent pursuant to Article IX.

"**Administrative Agent Fees**" shall have the meaning assigned to such term in <u>Section 2.05(b)</u>.

"**Administrative Questionnaire**" shall mean an Administrative Questionnaire in the form supplied from time to time by the Administrative Agent.

"**Advisors**" shall mean legal counsel (including local, foreign and in-house counsel), auditors, accountants, consultants, appraisers, engineers or other advisors.

"**Affiliate**" shall mean, when used with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; *provided*, *however*, that, solely for purposes of <u>Section 6.09</u>, the term "**Affiliate**" shall also include (i) any Person that directly or indirectly owns more than 10% of any class of Equity Interests of the Person specified or (ii) any Person that is an officer or director of the Person specified.

"**Agents**" shall mean the Administrative Agent and the Collateral Agent; and "**Agent**" shall mean any of them as the context may require.

"**Agreement**" shall have the meaning assigned to such term in the preamble hereto.

"**Aircraft**" shall mean aircraft, including, without limitation, now or hereafter owned by the Loan Parties and shall include, without limitation, all aircraft objects, existing and future airframes, engines, rotors and propellers, parts and other goods, accessions and property attached to, incorporated in, affixed to or used in connection with such aircraft.

"**Airworthiness Certificate**" shall mean, as to any Aircraft, an Airworthiness Certificate with respect to such Aircraft issued by the FAA pursuant to the Aviation Laws.

"**Alternative DIP Financing**" shall have the meaning assigned to such term in <u>Section 2.05</u>.

"**Ankura**" means Ankura Trust Company, LLC.

"**Anti-Terrorism Laws**" shall have the meaning assigned to such term in <u>Section 3.21(a)</u>.

"**Applicable Margin**" means, for any day with respect to the Loans, 8.50% per annum.

"**Approved Budget**" means the Initial Budget or then most current Budget prepared by Borrower and approved by the Required Lenders pursuant to <u>Section 5.01(d)</u>, as applicable.

"**Approved Electronic Communications**" shall mean any notice, demand, communication, information, document or other material that any Loan Party provides to the Administrative Agent pursuant to any Loan Document or the transactions contemplated therein which is distributed to the Agents or the Lenders by means of electronic communications pursuant to <u>Section 10.01(b)</u>.

"**Approved Fund**" shall mean any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or investing in bank and other commercial loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Asset Sale**" shall mean (a) any disposition of any property, by any Company (including any disposition of property to a Delaware Divided LLC pursuant to a Delaware LLC Division) and (b) any issuance or sale of any Equity Interests of any Subsidiary of Borrower, in each case, to any Person other

2

than a Loan Party.  Notwithstanding the foregoing, none of the following shall constitute "**Asset Sales**": any disposition of assets permitted by, or expressly referred to in, 6.06(a), 6.06(c), 6.06(d), 6.06(e), 6.06(f), 6.06(g), 6.06(h), 6.06(i), 6.06(j), or 6.06(k).

"**Assignment and Assumption**" shall mean an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required pursuant to Section 10.04(b)), and accepted by the Administrative Agent, substantially in the form of Exhibit A, or such other form (including electronic documentation generated by MarkitClear or other electronic platform) as shall be approved by the Administrative Agent.

"**Automatic Stay**" means the automatic stay imposed with respect to creditors of the Debtors pursuant to Section 362 of the Bankruptcy Code.

"**Aviation Laws**" shall mean Title 49 of the United States Code, including without limitation, all regulations issued by the FAA and all regulations issued under the Cape Town (Aircraft Protocol) Laws, as the same now exist or may hereafter from time to time be amended, modified, recodified or supplemented, together with all rules, regulations, procedures, orders, handbooks, guidelines and interpretations thereunder or related thereto.

"**Avoidance Action**" means the Debtors' claims and causes of action under Sections 502(d), 544, 545, 547, 548, 553 and 550 of the Bankruptcy Code.

"**Avoidance Proceeds**" means any proceeds or property recovered, unencumbered or otherwise in connection with successful Avoidance Actions, whether by judgment, settlement or otherwise.

"**Backstop Commitment**" means the several and not joint backstop commitment of each Backstop Lender in the respective amounts under the heading "Backstop Commitment" set forth on Annex II, to fund, collectively among all Backstop Lenders, the full amount of the Commitments.

"**Backstop Fee**" has the meaning specified in Section 2.05.

"**Backstop Lender**" means each Lender set forth on Annex II.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"**Bankruptcy Code**" means Chapter 11 of Title 11 of the United States Code, as amended from time to time and any successor statute and all rules and regulations promulgated thereunder.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, or any appellate court having jurisdiction over the Cases from time to time.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Cases, including any local rules of the Bankruptcy Court.

"**Bidding Procedures**" shall have the meaning assigned to such term in <u>Section 5.16</u>.

"**Bidding Procedures Order**" shall have the meaning assigned to such term in <u>Section 5.16</u>.

"**Board**" shall mean the Board of Governors of the Federal Reserve System of the United States.

"**Board of Directors**" shall mean, with respect to any Person, (i) in the case of any corporation, the board of directors of such Person, (ii) in the case of any limited liability company, the board of managers or board of directors, as applicable, of such Person, or if such limited liability company does not have a board of managers or board of directors, the functional equivalent of the foregoing, (iii) in the case of any partnership, the board of directors or board of managers, as applicable, of the general partner of such Person and (iv) in any other case, the functional equivalent of the foregoing.

"**Borrower**" shall have the meaning assigned to such term in the preamble hereto.

"**Borrower Competitor**" shall mean those Persons whose primary business consists of manufacturing and distributing helicopters to the U.S. and foreign militaries identified by name in writing by Borrower to the Administrative Agent prior to the Closing Date, as such list may be supplemented after the Closing Date as reasonably agreed by the Administrative Agent (acting at the direction of the Required Lenders). Any such supplement to the list of Borrower Competitors will become effective two Business Days after delivery to the Administrative Agent.  In no event shall a supplement apply retroactively to disqualify any Lender as of the date of such supplement.  Notwithstanding anything to the contrary contained herein, no Backstop Lender shall be deemed to be a Borrower Competitor.

"**Borrowing Date**" shall have the meaning set forth in <u>Section 2.03</u>.

"**Borrowing Request**" shall mean a request by Borrower in accordance with the terms of <u>Section 2.03</u> and substantially in the form of <u>Exhibit B</u>, or such other form as shall be approved by the Administrative Agent.

"**Budget**" means a rolling 13-week cash flow forecast delivered on or prior to the Closing Date and on the final Business Day of every fourth calendar week following entry of the Interim Order beginning with the fourth full week following the Petition Date, setting forth all forecasted receipts and disbursements of the Debtors and their Subsidiaries on a weekly basis during such 13-week period which shall include, among other things, available cash, revenue, cash flow, trade payables and ordinary course expenses, total expenses and capital expenditures, fees and expenses relating to the DIP Term Facility, vendor disbursements, liquidity, net operating cash flow and net cash flow, fees and expenses related to the Cases (including, for the avoidance of doubt, professional fees), working capital and other general corporate financial needs, (i) initially, covering the period commencing on or about the Petition Date and (ii) thereafter, covering the period commencing on the first day of each four-week anniversary of the Petition Date or the prior forecast, as applicable.

"**Budget Variance Report**" means a weekly variance report provided by Borrower to the Administrative Agent (i) showing, in each case, by line item the actual operating receipts and operating disbursements for the immediately preceding week, noting therein all variances, on a line-item and aggregate basis, from the amounts set forth for such period in the applicable Approved Budget, and shall include explanations, in reasonable detail, for all material variances, and (ii) certified by a Responsible Officer of Borrower.  The Budget Variance Report shall be in a form reasonably satisfactory to the Required

Lenders, and shall contain supporting information reasonably requested by the Administrative Agent (acting at the direction of the Required Lenders) and reasonably satisfactory to the Required Lenders.

"**Business Day**" shall mean any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by law or other governmental action to close.

"**Capital Lease**" shall mean, with respect to any Person, any lease of, or other arrangement conveying the right to use, any property by such Person as lessee that has been or should be accounted for as a capital lease on a balance sheet of such Person prepared in accordance with GAAP.

"**Capital Lease Obligations**" of any Person shall mean the obligations of such Person to pay rent or other amounts under any Capital Lease, any lease entered into as part of any Sale and Leaseback Transaction or any Synthetic Lease, or a combination thereof, which obligations are (or would be, if such Synthetic Lease or other lease were accounted for as a Capital Lease) required to be classified and accounted for as Capital Leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof (or the amount that would be capitalized, if such Synthetic Lease or other lease were accounted for as a Capital Lease) determined in accordance with GAAP.

"**Capital Requirements**" shall mean, as to any Person, any matter, directly or indirectly, (i) regarding capital adequacy, capital ratios, capital requirements, the calculation of such Person's capital or similar matters, or (ii) affecting the amount of capital required to be obtained or maintained by such Person or any Person controlling such Person (including any direct or indirect holding company), or the manner in which such Person or any Person controlling such Person (including any direct or indirect holding company), allocates capital to any of its contingent liabilities (including letters of credit), advances, acceptances, commitments, assets or liabilities.

"**Carve-Out**" as defined in the Interim Order or the Final Order, as applicable.

"**Carve-Out Trigger Date**" as defined in the Interim Order or the Final Order, as applicable.

"**Carve-Out Trigger Notice**" as defined in the Interim Order or the Final Order, as applicable.

"**Case**" and **Cases**" has the meaning specified in the preamble hereto.

"**Cash Collateral**" as defined in the Interim Order or the Final Order, as applicable.

"**Cash Equivalents**" means, as at any date of determination, any of the following: (a) marketable securities (i) issued or directly and unconditionally guaranteed as to interest and principal by the United States of America or (ii) issued by any agency of the United States of America and backed by the full faith and credit of the United States of America, in each case maturing within one year after such date; (b) marketable direct obligations issued by any State of the United States of America or the District of Columbia or any political subdivision of any such State or District or any public instrumentality thereof, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (c) commercial paper maturing no more than 270 days from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (d) time deposits, certificates of deposit or bankers' acceptances maturing within 270 days after such date and issued or accepted by any commercial bank organized or licensed to conduct a banking business under the laws of the United States of America, any State thereof or the District of Columbia that (i) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator) and (ii) has Tier 1 capital (as defined in such regulations) of not less than $500,000,000; (e) fully collateralized repurchase agreements with a term of not

5

more than 30 days from such date for securities described in clause (a) or clause (b) above and entered into with a financial institution satisfying the criteria described in clause (d) above and (f) shares of any money market mutual fund that (i) has substantially all its assets invested continuously in the types of investments referred to in clauses (a) through (e) above, (ii) has net assets of not less than $5,000,000,000 and (iii) has ratings of at least AA+ from S&P or at least Aa1 from Moody's.

"**Casualty Event**" shall mean any loss of title (other than through a consensual disposition of such property in accordance with this Agreement) or any loss of or damage to or any destruction of, or any condemnation or other taking (including by any Governmental Authority) of, any property of any Company. "**Casualty Event**" shall include any taking of all or any part of any Real Property of any Person or any part thereof, in or by condemnation or other eminent domain proceedings pursuant to any Legal Requirement, or by reason of the temporary requisition of the use or occupancy of all or any part of any Real Property of any Person or any part thereof by any Governmental Authority, or any settlement in lieu thereof.

"**CERCLA**" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9601 *et seq*.

"**Change in Law**" shall mean the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, order, rule, regulation, policy, or treaty by any Governmental Authority, (b) any change in any law, order, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"**Charges**" shall have the meaning assigned to such term in Section 10.13.

"**Claim**" means all claims, demands, rights, actions, causes of action, liabilities, duties, damages, losses, obligations, diminution in value, judgments, decrees, suits, liens, undertakings, rights to property or information, and controversies of any kind or nature whatsoever, whether absolute or contingent, due or to become due, accrued or unaccrued, disclosed or undisclosed, foreseen or unforeseen, apparent or not apparent, disputed or undisputed, liquidated or unliquidated, at law or in equity, or known or unknown, and whether existing, accrued or arising on, before or after the Petition Date, including all claims arising under state, federal or foreign laws, common law, statutes, rules, regulations or agreements. Without limiting the generality of the foregoing, the term "Claim" shall include the items described in the definition of "Claim" in 11 U.S.C. § 101(5), all claims or causes of action under Chapter 5 of the Bankruptcy Code (including Sections 542, 544, 545, 546, 547, 548, 549 and 550 of the Bankruptcy Code), all claims or causes of action under Sections 105 or 362 of the Bankruptcy Code, all claims or causes of action under any other Bankruptcy Law, all claims or causes of action arising under the Uniform Fraudulent Conveyance Act, Uniform Fraudulent Transfer Act, or Uniform Voidable Transactions Act as in effect in any state, and all rights of contribution, subrogation, exoneration or indemnity.

"**Closing Date**" shall mean the later of (i) April 1, 2022 and (ii) the first date on which all conditions precedent in Sections 4.01 and 4.03 are satisfied or waived in accordance with Section 10.02.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended.

"**Collateral**" shall mean, all the "Collateral" (or equivalent term) as defined in the Interim Order (and, when entered, the Final Order) or in any Security Document.

"**Collateral Agent**" shall have the meaning assigned to such term in the preamble hereto.

"**Commitment**" shall mean, with respect to each Lender, the commitment of such Lender to make Loans to Borrower hereunder in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name under the heading "Commitment" on Annex I hereto, as such commitment may be (a) reduced from time to time pursuant to Section 2.01 or 2.07 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption. The aggregate amount of the Commitments as of the Closing Date is $60,000,000.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"**Communications**" shall have the meaning assigned to such term in Section 10.01(b).

"**Companies**" shall mean Borrower and its Subsidiaries; and "**Company**" shall mean any one of them.

"**Compliance Certificate**" shall mean a certificate of a Financial Officer of Borrower substantially in the form of Exhibit C or such other form as may be approved by the Required Lenders and Borrower.

"**Connection Income Taxes**" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Contingent Obligation**" shall mean, as to any Person, any obligation, agreement, understanding or arrangement of such Person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("**primary obligations**") of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, including any obligation, agreement, understanding or arrangement of such Person, whether or not contingent, (a) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth, net equity, liquidity, level of income, cash flow or solvency of the primary obligor, (c) to purchase property, securities or services primarily for the purpose of assuring the primary obligor of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, (d) with respect to bankers' acceptances, letters of credit and similar credit arrangements, until a reimbursement or equivalent obligation arises (which reimbursement obligation shall constitute a primary obligation), or (e) otherwise to assure or hold harmless the primary obligor of any such primary obligation against loss (in whole or in part) in respect thereof; *provided*, *however*, that the term "Contingent Obligation" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or any product warranties given in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation, or portion thereof, in respect of which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable, whether singly or jointly, pursuant to the terms of the instrument, agreements or other documents or, if applicable, unwritten agreement, evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

7

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise, and the terms "**Controlling**" and "**Controlled**" shall have meanings correlative thereto.

"**Credit Extension**" shall mean the making of a Loan by a Lender.

"**Debt Issuance**" shall mean the incurrence by any Company of any Indebtedness after the Closing Date (other than as permitted by Section 6.01).

"**Debtor**" and "**Debtors**" has the meaning specified in the preamble hereto.

"**Debtor Relief Laws**" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"**Default**" shall mean any event, occurrence or condition which is, or upon notice, lapse of time or both would constitute, an Event of Default.

"**Default Excess**" shall have the meaning assigned to such term in Section 2.16(c).

"**Default Period**" shall have the meaning assigned to such term in Section 2.16(c).

"**Default Rate**" means a rate of interest per annum equal to the rate of interest otherwise in effect from time to time pursuant to the terms of this Agreement plus 2.00%.

"**Defaulted Loan**" shall have the meaning assigned to such term in Section 2.16(c).

"**Defaulting Lender**" shall mean any Lender that (a) has failed (i) to fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder, unless such Lender notifies the Administrative Agent and Borrower in good faith in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (which conditions precedent, together with the applicable Default, if any, shall be specifically identified in such writing) has not been satisfied, or (ii) to pay to the Administrative Agent, the Collateral Agent or any Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified Borrower and the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with the applicable Default, if any, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent or Borrower, to confirm in writing to the Administrative Agent and Borrower that it will comply with its prospective funding obligations hereunder (*provided* that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and Borrower), or (d) is, or a direct or indirect parent company of such Lender is, (i) the subject of a Bail-In Action, (ii) insolvent, or is generally unable to pay its debts as they become due, or admits in writing its inability to pay its debts as they become due, or makes a general assignment for the benefit of its creditors or (iii) the subject of a proceeding under any Debtor Relief Laws, or a receiver, trustee, conservator, intervenor or sequestrator or the like (including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in a like capacity with respect to such Lender) has been appointed

8

for such Lender or its direct or indirect parent company, or such Lender or its direct or indirect parent company has taken any action in furtherance of or indicating its consent to or acquiescence in any such proceeding or appointment; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interests in such Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent or the Required Lenders that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender upon delivery of written notice of such determination by the Administrative Agent or the Required Lenders to Borrower and each Lender, and, if such determination is made by the Required Lenders, to the Administrative Agent.

"**Delaware LLC**" shall mean any limited liability company organized or formed under the laws of the State of Delaware.

"**Delaware Divided LLC**" shall mean any Delaware LLC which has been formed upon consummation of a Delaware LLC Division.

"**Delaware LLC Division**" shall mean the statutory division of any Delaware LLC into two or more Delaware LLCs pursuant to Section 18-217 of the Delaware Limited Liability Company Act.

"**DIP Orders**" means the Interim Order and the Final Order, as applicable, in each case upon entry thereof by the Bankruptcy Court.

"**DIP Professional Fees**" shall have the meaning assigned to such term in <u>Section 10.03</u>.

"**DIP Term Facility**" has the meaning specified in the preamble hereto.

"**Disqualified Capital Stock**" shall mean any Equity Interest which, by its terms (or by the terms of any security or instrument into which it is convertible or for which it is exchangeable or exercisable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the first anniversary of the Maturity Date, (b) is convertible into or exchangeable or exercisable (unless at the sole option of the issuer thereof) for (i) debt securities or other indebtedness or (ii) any Equity Interests referred to in (a) above, in each case at any time on or prior to the first anniversary of the Maturity Date, or (c) contains any repurchase or payment obligation which may come into effect prior to the first anniversary of the Maturity Date.

"**Dividend**" shall mean, with respect to any Person, that such Person has declared or paid a dividend or returned any equity capital to the holders of its Equity Interests or authorized or made any other distribution, payment or delivery of property (other than Qualified Capital Stock of such Person) or cash to the holders of its Equity Interests as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for consideration any of its Equity Interests outstanding (or any options or warrants issued by such Person with respect to its Equity Interests), or set aside or otherwise reserved, directly or indirectly, any funds for any of the foregoing purposes, or shall have permitted any of its Subsidiaries to purchase or otherwise acquire for consideration any of the outstanding Equity Interests of such Person (or any options or warrants issued by such Person with respect to its Equity Interests).  Without limiting the foregoing, "**Dividends**" with respect to any Person shall also include all payments made or required to be made by

9

such Person with respect to any stock appreciation rights, plans, equity incentive or achievement plans or any similar plans or setting aside of or otherwise reserving any funds for the foregoing purposes.

"**Dollars**" or "**$**" shall mean lawful money of the United States.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country that is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country that is a parent of an institution described in clause (a) above, or (c) any financial institution established in an EEA Member Country that is a subsidiary of an institution described in clause (a) or (b) above and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligible Assignee**" means any Person that meets the requirements to be an assignee under Section 10.04(b) (subject to such consents, if any, as may be required under Section 10.04(b)).

"**Embargoed Person**" shall have the meaning assigned to such term in Section 6.19.

"**Employee Benefit Plan**" shall mean any "**employee benefit plan**" as defined in Section 3(3) of ERISA which is or was maintained, contributed to, or required to be maintained or contributed to by any Company.

"**Environment**" shall mean any surface or subsurface physical medium or natural resource, including air, land, soil, surface waters, ground waters, stream and river sediments, biota and any indoor area, surface or physical medium.

"**Environmental Claim**" shall mean any claim, notice, demand, Order, action, suit, proceeding, or other communication alleging or asserting liability or obligations under or relating to Environmental Law, including liability or obligation for investigation, assessment, remediation, removal, cleanup, response, corrective action, monitoring, post-remedial or post-closure studies, investigations, operations and maintenance, injury, damage, destruction or loss to natural resources, personal injury, wrongful death, property damage, fines, penalties or other costs resulting from, related to or arising out of (i) the presence, Release or threatened Release of Hazardous Material in, on, into or from the Environment at any location or (ii) any violation of or non-compliance with Environmental Law, and shall include any claim, notice, demand, Order, action, suit or proceeding seeking damages (including the costs of remediation), contribution, indemnification, cost recovery, penalties, fines, indemnities, compensation or injunctive relief resulting from, related to or arising out of the presence, Release or threatened Release of Hazardous Material or alleged injury or threat of injury to human health, safety or the Environment.

"**Environmental Law**" shall mean any and all applicable current and future Legal Requirements relating to human health or safety or the Environment, the Release or threatened Release of Hazardous Material, natural resources or natural resource damages, or, to the extent relating to exposure to Hazardous Materials, occupational safety or health.

10

"**Environmental Permit**" shall mean any permit, license, approval, consent, registration, notification, exemption or other authorization required by or from a Governmental Authority under any Environmental Law.

"**Equipment**" has the meaning assigned to such term in the UCC.

"**Equity Conversion Rate**" means the equivalent amount of Equity Interests in New MD Helicopter based on an equity value of $180,000,000.

"**Equity Interest**" shall mean, with respect to any Person, any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents, including membership interests (however designated, whether voting or nonvoting), of equity of such Person, including, if such Person is a partnership, partnership interests (whether general or limited), or if such Person is a limited liability company, membership interests and any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of property of, such partnership, whether outstanding on the date hereof or issued on or after the Closing Date, but excluding debt securities convertible or exchangeable into such equity.

"**Equity Issuance**" shall mean, without duplication, (i) any issuance or sale by Borrower after the Closing Date of any Equity Interests in Borrower (including any Equity Interests issued upon exercise of any warrant or option or equity-based derivative) or any warrants or options or equity-based derivatives to purchase Equity Interests in Borrower, (ii) any Preferred Stock Issuance or (iii) any contribution to the capital of Borrower.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, the regulations promulgated thereunder and any successor statute.

"**ERISA Affiliate**" shall mean, with respect to any Person, any trade or business (whether or not incorporated) that, together with such Person, is treated as a single employer under Section 414(b) or (c) of the Code, or solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.  Any former ERISA Affiliate of a Person or any of its Subsidiaries shall continue to be considered an ERISA Affiliate of such Person or such Subsidiary within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of such Person or such Subsidiary and with respect to liabilities arising after such period for which such Person or such Subsidiary could reasonably be expected to be liable under the Code or ERISA, but in no event for more than six years after such period if no such liability has been asserted against such Person or such Subsidiary; *provided*, *however*, that such Person or such Subsidiary shall continue to be an ERISA Affiliate of such Person or such Subsidiary after the expiration of the six-year period solely with respect to any liability asserted against such Person or such Subsidiary prior to the expiration of such six-year period.

"**ERISA Event**" shall mean (i) a "**reportable event**" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan; (ii) the failure to meet the minimum funding standard of Section 412 of the Code with respect to any Pension Plan (whether or not waived) or the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Pension Plan or the failure to make a required contribution to a Multiemployer Plan; (iii) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (iv) the withdrawal by any Company or any of its ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability to any Company pursuant to Section 4063 or 4064 of ERISA; (v) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which could reasonably constitute grounds under ERISA

11

for the termination of, or the appointment of a trustee to administer, any Pension Plan; (vi) the imposition of liability on any Company or any of its ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (vii) the withdrawal of any Company or any of its ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan, or the receipt by any Company or any of its ERISA Affiliates of notice from any Multiemployer Plan that it is in insolvency pursuant to Section r 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA, if, in any such case, there is liability of any Company therefor; (viii) the assertion of a claim (other than routine claims for benefits) against any Employee Benefit Plan, or the assets thereof, or against any Company or any of its ERISA Affiliates in connection with any Employee Benefit Plan; (ix) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Code) to qualify under Section 401(a) of the Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Code; (x) the imposition of a Lien pursuant to Section 401(a)(29) or 430(k) of the Code or pursuant to ERISA with respect to any Pension Plan; or (xi) the occurrence of a non-exempt prohibited transaction (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could reasonably be expected to result in liability to any Company or any of its ERISA Affiliates.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"**Event of Default**" shall have the meaning assigned to such term in Section 8.01 and shall include any Default.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934.

"**Excluded Taxes**" shall mean, with respect to the Administrative Agent, any Lender or any other recipient hereunder of any payment to be made by or on account of any obligation of Borrower hereunder, (a) Taxes imposed on (or measured by) net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such recipient being organized under the laws of, or having its principal office located in, or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by Borrower under Section 2.16(b)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.15, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such recipient's failure to comply with Section 2.15(f), and (d) any withholding Taxes imposed under FATCA.

"**Executive Order**" shall have the meaning assigned to such term in Section 3.21(a).

"**Existing Lien**" shall have the meaning assigned to such term in Section 6.02(c).

"**Exit Fee**" shall mean 5% of the aggregate amount of the Commitments as of the Closing Date.

"**Exit Rollover Facility**" means a term loan facility of up to $60,000,000 entered into by certain of the Lenders and New MD Helicopter.

"**FAA**" shall mean the Federal Aviation Administration of the United States Department of Transportation, an agency of the United States of America, and any subdivision or office thereof, and any successor or replacement administrator, agency or other entity having the same or similar authority and responsibilities.

"**Fair Market Value**" shall mean, with respect to any asset (including any Equity Interests of any Person), the price at which a willing buyer, not an Affiliate of the seller, and a willing seller who does not have to sell, would agree to purchase and sell such asset, as determined in good faith by the Board of Directors or, pursuant to a specific delegation of authority by such Board of Directors or a designated senior executive officer, of Borrower, or the Subsidiary of Borrower selling such asset.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"**Federal Funds Effective Rate**" shall mean, for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System of the United States arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary to the next 1/100th of 1%) of the quotations for the day for such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"**Fee Letter**" shall mean the Fee Letter, dated March 30, 2022, between Borrower and the Agents.

"**Fees**" shall mean the Backstop Fee, the Administrative Agent Fees and the other fees referred to in Section 2.05.

"**Final Order**" means an order of the Bankruptcy Court authorizing and approving on a final basis, among other things, the DIP Term Facility and the transactions contemplated by this Agreement in the form of the Interim Order (with only such modifications thereto as are necessary to convert the Interim Order to a final order and such other modifications as are satisfactory to Borrower and the Required Lenders, each in their sole discretion) (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Lenders in their sole discretion) as to which no stay has been entered.

"**Final Order Entry Date**" means the date on which the Final Order is entered by the Bankruptcy Court.

"**Financial Officer**" of any Person shall mean the chief financial officer, principal accounting officer, treasurer or controller of such Person.

"**Foreign Lender**" shall mean any Lender that is not, for U.S. federal income tax purposes, a U.S. Person (as defined herein).

"**Foreign Plan**" means each "employee pension benefit plan" (within the meaning of Section 3(2) of ERISA, whether or not subject to ERISA) that is not subject to U.S. law and is maintained, contributed

to, or required to be maintained or contributed to, by any Company primarily for the benefit of any Company employees not located in the United States.

"**GAAP**" shall mean generally accepted accounting principles in the United States, or successors thereto (e.g., subject to <u>Section 1.04</u>, IFRS) applied on a consistent basis.

"**Governmental Authority**" shall mean any federal, state, local or foreign (whether civil, criminal, military or otherwise) court, central bank or governmental agency, tribunal, authority, instrumentality or regulatory body or any subdivision thereof or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Governmental Real Property Disclosure Requirements**" shall mean any Legal Requirement of any Governmental Authority requiring notification of the buyer, lessee, mortgagee, assignee or other transferee of any Real Property, facility, establishment or business, or any notification, registration or filing to or with any Governmental Authority, in connection with the disposition (including any transfer of control) of any Real Property, facility, establishment or business, as may be required under any applicable Environmental Law or of any actual or threatened presence or Release in, on, into or from the Environment, or the use, disposal or handling of Hazardous Material on, at, under, from or near the Real Property, facility, establishment or business to be sold, acquired, leased, mortgaged, assigned or transferred.

"**Granting Lender**" shall have the meaning assigned to such term in <u>Section 10.04(h)</u>.

"**Guaranteed Obligations**" shall have the meaning assigned to such term in <u>Section 7.01</u>.

"**Guarantees**" shall mean the guarantees issued pursuant to <u>Article VII</u> by the Subsidiary Guarantors.

"**Hazardous Materials**" shall mean hazardous substances, hazardous wastes, hazardous materials, polychlorinated biphenyls ("**PCBs**") or any substance or compound containing PCBs, asbestos or any asbestos-containing materials in any form or condition, lead-based paint, urea formaldehyde, pesticides, radon or any other radioactive materials including any source, special nuclear or by-product material, petroleum, petroleum products, petroleum-derived substances, crude oil or any fraction thereof, any toxic mold, microbial or fungal contamination that could pose a risk to human health or the Environment or would negatively impact the condition of the Real Property in any material respect or any other pollutants, contaminants, chemicals, wastes, materials, compounds, constituents or substances subject to regulation under, or which can give rise to liability or obligations under, any Environmental Laws.

"**IFRS**" means International Financial Reporting Standards issued by the International Accounting Standards Board (or the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or the SEC, as the case may be), as in effect from time to time.

"**Indebtedness**" of any Person shall mean, without duplication, (a) all obligations of such Person for borrowed money or advances; (b) all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or similar instruments; (c) all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (d) all obligations of such Person issued or assumed as part of the deferred purchase price of property or services (excluding trade accounts payable and accrued obligations incurred in the ordinary course of business on normal trade terms and not overdue by more than 90 days); (e) all Indebtedness secured by any Lien on property owned or acquired by such Person, whether or not the

14

obligations secured thereby have been assumed, but limited to the lower of (i) the Fair Market Value of such property and (ii) the amount of the Indebtedness secured; (f) all Capital Lease Obligations, Purchase Money Obligations and Synthetic Lease Obligations of such Person; (g) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Equity Interests of such Person, valued, in the case of a redeemable preferred Equity Interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; (h) [reserved]; (i) all obligations of such Person for the reimbursement of any obligor in respect of letters of credit, letters of guaranty, bankers' acceptances and similar credit transactions, but excluding obligations with respect to letters of credit (including trade letters of credit) securing obligations of such Person described in clause (c) above or entered into in the ordinary course of business of such Person to the extent such letters of credit are not drawn upon; and (j) all Contingent Obligations of such Person in respect of Indebtedness or obligations of others of the kinds referred to in clauses (a) through (i) above.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except (other than in the case of general partner liability) to the extent that terms of such Indebtedness expressly provide that such Person is not liable therefor.

"**Indemnified Liabilities**" means has the meaning specified in Section 10.03(b).

"**Indemnified Taxes**" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrower under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"**Indemnitee**" shall have the meaning assigned to such term in Section 10.03(b).

"**Information**" shall have the meaning assigned to such term in Section 10.12.

"**Initial Budget**" means the Budget delivered on or prior to the Closing Date.

"**Insolvency Laws**" shall mean the Bankruptcy Code and all other insolvency, bankruptcy, receivership, liquidation, conservatorship, assignment for the benefit of creditors, moratorium, rearrangement, reorganization, or similar federal or state Legal Requirements of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Insolvency Proceeding**" shall mean (i) any case, action or proceeding before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up or relief of debtors, or (ii) any general assignment for the benefit of creditors, formal or informal moratorium, composition, marshaling of assets for creditors or other, similar arrangement in respect of its creditors generally or any substantial portion of its creditors, in each case, undertaken under United States federal or state or non-United States Legal Requirements, including the Bankruptcy Code of the United States.

"**Intellectual Property**" shall have the meaning assigned to such term in Section 3.06(a).

"**Interest Payment Date**" shall mean the first Business Day of each calendar month, commencing May 1, 2022, and the Maturity Date.

"**Interim Order**" means an order of the Bankruptcy Court, in the form set forth in Exhibit D, authorizing on an interim basis, among other things, the DIP Term Facility and the transactions contemplated by this Agreement, with only such modifications as are satisfactory to Borrower and the Required Lenders in their sole discretion (as the same may be amended, supplemented, or modified from

time to time after entry thereof with the consent of the Required Lenders in their sole discretion) as to which no stay has been entered.

"**Interim Order Entry Date**" means the date on which the Interim Order is entered by the Bankruptcy Court.

"**Investments**" shall have the meaning assigned to such term in <u>Section 6.04</u>.

"**Leases**" shall mean any and all leases, subleases, tenancies, options, concession agreements, rental agreements, occupancy agreements, franchise agreements, access agreements and any other agreements (including all amendments, extensions, replacements, renewals, modifications and/or guarantees thereof), whether or not of record and whether now in existence or hereafter entered into, affecting the use or occupancy of all or any portion of any Real Property.

"**Legal Requirements**" shall mean, as to any Person, the Organizational Documents of such Person, and any treaty, law (including the common law), Aviation Law, statute, ordinance, code, rule, regulation, guidelines, license, permit requirement, Order or determination of an arbitrator or a court or other Governmental Authority, and any interpretation thereof published by the applicable Governmental Authority or administrative procedures relating thereto established by the applicable Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject, in each case whether or not having the force of law.

"**Lenders**" shall mean (a) the financial institutions and other Persons party hereto as "**Lenders**" on the date hereof, and (b) each financial institution or other Person that becomes a party hereto pursuant to an Assignment and Assumption, other than, in each case, any such financial institution or Person that has ceased to be a party hereto pursuant to an Assignment and Assumption.

"**Lien**" shall mean, with respect to any property, (a) any mortgage, deed of trust, lien (statutory or other), judgment liens, pledge, encumbrance, claim, charge, assignment, hypothecation, deposit arrangement, security interest or encumbrance of any kind or any arrangement to provide priority or preference or any filing of any financing statement under the UCC or any other similar notice of Lien under any similar notice or recording statute of any Governmental Authority, including any easement, servitude, right-of-way or other encumbrance on title to Real Property, in each of the foregoing cases whether voluntary or imposed or arising by operation of law, and any agreement to give any of the foregoing, (b) the interest of a vendor or a lessor under any conditional sale agreement, Capital Lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such property, and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**Loan**" shall mean an extension of credit by a Lender to Borrower under <u>Article II</u>.

"**Loan Documents**" shall mean this Agreement, the Security Documents (if any), any other document executed in connection with this Agreement (including any joinder agreements executed pursuant to <u>Section 5.10</u>), and the Fee Letter.

"**Loan Parties**" shall mean Borrower and the Subsidiary Guarantors.

"**Margin Stock**" shall have the meaning assigned to such term in Regulation U.

"**Material Adverse Effect**" shall mean (a) a material adverse effect on, or material adverse change in, the condition (financial or otherwise), results of operations, assets, liabilities (contingent or otherwise)

or properties, solvency, business or value of the Companies, taken as a whole, or the Loan Parties, taken as a whole, (b) material impairment of the ability of the Loan Parties to fully and timely perform any of their obligations under any Loan Document, (c) a material impairment of the rights of or benefits or remedies available to the Lenders or any Agent under any Loan Document, or (d) a material adverse effect on the Collateral (or any portion thereof) or the Liens in favor of the Collateral Agent (for its benefit and for the benefit of the other Secured Parties) on the Collateral or the validity, enforceability, perfection or priority of such Liens; *provided* that none of the following shall constitute a Material Adverse Effect (either individually or in the aggregate): (i) the commencement of the Cases, the events leading up to the commencement of the Cases and the continuation and prosecution thereof, (ii) any defaults under agreements so long as the exercise of remedies as a result of such defaults are stayed under the Bankruptcy Code or such agreements are voided or invalidated by the Bankruptcy Court, (iii) reduction in payment terms by suppliers, reclamation claims, and any "going concern" or other qualification, exception or explanatory note in the Loan Parties' audited financial statements, (iv) any matters publicly disclosed prior to the Closing Date, and (v) any matters disclosed in the "first day" and "second day" motions and orders.

"**Material Contract**" shall have the meaning set forth in the Stalking Horse APA (as in effect on the date hereof.)

"**Maturity Date**" shall mean the earliest of (a) twenty-eight (28) days following the date of entry of the Interim Order (or such later date as may be agreed to by the Required Lenders) if the Final Order shall not have been entered by such date, (b) the effective date of any Chapter 11 plan for the reorganization of Borrower or any other Debtor, (c) 150 days following the Petition Date, (d) the date that all Loans shall become due and payable in full in accordance with the terms of the DIP Term Facility, including due to acceleration, (e) the DIP Termination Date under the DIP Orders and (f) the consummation of a sale pursuant to Section 363 of the Bankruptcy Code of all or substantially all of the assets of the Loan Parties.

"**Maximum Rate**" shall have the meaning assigned to such term in Section 10.13.

"**Milestones**" has the meaning specified in Section 5.16.

"**Multiemployer Plan**" shall mean a multiemployer plan within the meaning of Section 4001(a)(3) or Section 3(37) of ERISA, (a) to which any Company or any of its ERISA Affiliates is then making or accruing an obligation to make contributions, or (b) to which any Company or any of its ERISA Affiliates has within the preceding six plan years made or been obligated to make contributions.

"**Net Cash Proceeds**" shall mean:

(a)       with respect to any Asset Sale (other than any issuance or sale of Equity Interests), the proceeds thereof in the form of cash, cash equivalents and marketable securities (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable, or by the sale, transfer or other disposition of any non-cash consideration received in connection therewith or otherwise, but only as and when received) received by any Company (including cash proceeds subsequently received (as and when received by any Company) in respect of non-cash consideration initially received) net of (i) reasonable and customary selling expenses (including reasonable brokers' fees or commissions, legal, accounting and other professional and transactional fees, transfer and similar taxes (but excluding any such amounts payable to any Affiliate of Borrower) and Borrower's good faith estimate of income taxes paid or payable in connection with such sale (after taking into account any available tax credits or deductions and any tax sharing arrangements)), (ii) amounts provided as a reserve, in accordance with GAAP, against (x) any liabilities under any indemnification obligations associated with such Asset Sale or (y) any other liabilities retained by any Company associated with the properties sold in such Asset Sale (*provided* that, to the extent and at the time

17

any such amounts are released from such reserve, such amounts shall constitute Net Cash Proceeds), and (iii) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness for borrowed money that is secured by a Lien on the properties sold in such Asset Sale (so long as such Lien was permitted to encumber such properties under the Loan Documents at the time of such sale) and which is repaid with such proceeds (other than any such Indebtedness assumed by the purchaser of such properties);

(b)        with respect to any (i) Debt Issuance, (ii) Equity Issuance or (iii) other issuance or sale of Equity Interests by Borrower or any of its Subsidiaries, the cash proceeds thereof received by any Company, net of reasonable and customary fees (including legal, accounting and other professional and transaction fees and brokers' fees), commissions, costs and other expenses incurred in connection therewith; and

(c)        with respect to any Casualty Event, the cash insurance proceeds, condemnation awards and other compensation received by any Company in respect thereof, net of all reasonable costs and expenses (including legal, accounting and other professional and transaction fees and brokers' fees) incurred in connection with the collection of such proceeds, awards or other compensation in respect of such Casualty Event (including legal, accounting and other professional and transaction fees and brokers' fees).

"**New MD Helicopter**" means (i) in the event of a sale pursuant to Section 363 of the Bankruptcy Code of all or substantially all of the assets of the Loan Parties, the entity that acquired such assets or any successors thereto or (ii) in the event of a plan of reorganization liquidation under Chapter 11 of the Bankruptcy Code, reorganized MD Helicopter, Inc., or any successors thereto, by merger, consolidation, or otherwise on or after the effective date of such plan of reorganization.

"**Non-Public Information**" shall mean (i) material non-public information (within the meaning of United States federal, state or other applicable securities laws) with respect to Borrower or its Subsidiaries or their securities and (ii) information of a type that would be material non-public information (within the meaning of United States federal, state or other applicable securities laws) relating to Borrower if Borrower were a public reporting company with respect to Borrower or its Subsidiaries or their respective securities.

"**Notes**" shall mean any notes evidencing the Loans pursuant to Section 2.04(e), if any, substantially in the form of Exhibit E.

"**Obligations**" shall mean (a) all obligations of Borrower and the other Loan Parties from time to time arising under or in respect of the due and punctual payment of (i) the principal of and premium, if any, and interest (including interest accruing during the pendency of any Insolvency Proceeding, regardless of whether allowed or allowable in such Insolvency Proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, and (ii) all other monetary obligations, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any Insolvency Proceeding, regardless of whether allowed or allowable in such Insolvency Proceeding), of Borrower and the other Loan Parties under this Agreement and the other Loan Documents, including, for the avoidance of doubt, DIP Professional Fees, and (b) the due and punctual performance of all covenants, agreements, obligations and liabilities of Borrower and the other Loan Parties under or pursuant to this Agreement and the other Loan Documents, in each case, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising.

"**OFAC**" shall have the meaning assigned to such term in Section 3.21(b).

"**Officer's Certificate**" shall mean a certificate executed by the chairman of the Board of Directors (if an officer), the chief executive officer, the president or one of the Financial Officers, each in his or her official (and not individual) capacity.

"**Order**" shall mean any judgment, decree, verdict, order, consent order, consent decree, writ, declaration or injunction.

"**Organizational Documents**" shall mean, with respect to any Person, (i) in the case of any corporation, the certificate of incorporation or deed of incorporation and by-laws (or similar documents) of such Person, (ii) in the case of any limited liability company, the certificate or articles of formation or organization and operating agreement or memorandum and articles of association (or similar constitutive documents) of such Person, (iii) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar constitutive documents) of such Person (and, where applicable, the equityholders or shareholders registry of such Person), (iv) in the case of any general partnership, the partnership agreement (or similar constitutive document) of such Person, (v) in any other case, the functional equivalent of the foregoing, and (vi) any shareholder, voting trust or similar agreement between or among any holders of Equity Interests of such Person.

"**Other Connection Taxes**" shall mean, with respect to any Administrative Agent, any Lender or any other recipient hereunder of any payment to be made by or on account of any obligation of Borrower hereunder, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Taxes**" shall mean any and all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes arising from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.16(b)).

"**Patriarch Lenders**" shall mean Ark Investment Partners II, L.P. and Ark II CLO 2001-1, Ltd.

"**Participant**" shall have the meaning assigned to such term in Section 10.04(e).

"**Participant Register**" shall have the meaning assigned to such term in Section 10.04(e).

"**Patriot Act**" shall have the meaning assigned to such term in Section 3.21(a).

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"**Pension Plan**" shall mean any Employee Benefit Plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA which is maintained, contributed to, or required to be maintained or contributed to by any Company or any of its ERISA Affiliates or with respect to which any Company could reasonably be expected to incur liability, contingent or otherwise, under ERISA (including under Section 4069 of ERISA).

"**Permitted Liens**" shall have the meaning assigned to such term in Section 6.02.

"**Permitted Variances**" shall mean with respect to (i) total projected operating disbursements in each then-current Approved Budget, not to exceed (a) 125% in week 1 of the applicable Budget Period, (b) 120% in week 2 of the applicable Budget Period, (c) 115% in week 3 of the applicable Budget Period, and (d) 110% in week 4 of the applicable Budget Period, each on an aggregate basis of total actual operating disbursements, and (ii) total projected operating (a) 75% in weeks 1 and 2 of the applicable Budget Period and (b) 80% in weeks 3 and 4 of the applicable Budget Period on an aggregate basis of total actual operating receipts; provided that each dollar of favorable variance in operating disbursements in any Variance Testing Period may be credited to operating receipts in the same Variance Testing Period for purposes of testing Permitted Variances. Permitted Variances shall be tested on the applicable Variance Testing Date over the applicable Variance Testing Period.

"**Person**" shall mean any natural person, corporation, business trust, joint venture, trust, association, company (whether limited in liability or otherwise), partnership (whether limited in liability or otherwise) or Governmental Authority, or any other entity, in any case, whether acting in a personal, fiduciary or other capacity.

"**Petition Date**" shall have the meaning specified in the preamble hereto.

"**Platform**" shall have the meaning assigned to such term in Section 10.01(d).

"**Pledgor**" shall mean each Company listed on Schedule 1.01(c), and each other Subsidiary of any Loan Party that is or becomes a party to this Agreement (in its capacity as a Subsidiary Guarantor) and the Security Documents pursuant to Section 5.10.

"**Post Carve-Out Trigger Notice Cap**" as defined in the Interim Order or the Final Order, as applicable.

"**Post-Petition**" means the time period commencing immediately upon the filing of the Cases.

"**PPAS**" means Patriarch Partners Agency Services, LLC.

"**Preferred Stock**" shall mean, with respect to any Person, any and all preferred or preference Equity Interests (however designated) of such Person whether now outstanding or issued after the Closing Date.

"**Preferred Stock Issuance**" shall mean the issuance or sale by any Company of any Preferred Stock after the Closing Date.

"**Prepayment Receipt**" shall mean, with respect to any Asset Sale or Casualty Event that results in Net Cash Proceeds in excess of $50,000, 100% of the Net Cash Proceeds of such Asset Sale or Casualty Event, as the case may be.

"**Pre-Petition Agent**" means Ankura, as administrative agent for the Zohar Lenders, and PPAS, as administrative agent for the Patriarch Lenders.

"**Pre-Petition Lenders**" means the Zohar Lenders and Patriarch Lenders.

"**Pre-Petition Term Loan Credit Agreement**" means that certain Credit Agreement, dated as of July 8, 2005 (as amended, amended and restated or otherwise modified prior to or on the Closing Date), among Borrower, the Pre-Petition Agent and the Pre-Petition Lenders.

20

"**Pre-Petition Term Loan Documents**" means the "Loan Documents" as defined in the Pre-Petition Term Loan Credit Agreement.

"**property**" shall mean any right, title or interest in or to property or assets of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible and including Equity Interests of any Person and whether now in existence or owned or hereafter entered into or acquired, including all Real Property, cash, securities, accounts, revenues and contract rights.

"**Public Lenders**" shall mean Lenders that do not wish to receive Non-Public Information with respect to Borrower or its Subsidiaries.

"**Purchase Money Obligation**" shall mean, for any Person, the obligations of such Person in respect of Indebtedness (including Capital Lease Obligations) incurred for the purpose of financing all or any part of the purchase price of any fixed or capital assets (including Equity Interests of any Person owning fixed or capital assets) or the cost of installation, construction or improvement of any fixed or capital assets.

"**Qualified Capital Stock**" of any Person shall mean any Equity Interests of such Person that are not Disqualified Capital Stock.

"**Qui Tam Settlement**" shall mean that certain settlement entered into pursuant to the terms of the RSA by and among the United States of America, Borrower, Relators Philip Marsteller and Robert M. Swisher, National Union Fire Insurance Company of Pittsburgh, Pa and AIG Specialty Insurance Company.

"**Qui Tam Settlement Motion**" shall mean a motion filed with the Bankruptcy Court seeking entry of an order approving the Qui Tam Settlement.

"**Real Property**" shall mean, collectively, all right, title and interest (including any leasehold, fee, mineral or other estate) in and to any and all parcels of or interests in real property owned, leased or operated by any Person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

"**Register**" shall have the meaning assigned to such term in Section 10.04(c).

"**Regulation D**" shall mean Regulation D of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation T**" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation U**" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation X**" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Related Person**" shall mean, with respect to any Person, (a) each Affiliate of such Person and each of the officers, directors, partners, trustees, employees, affiliates, shareholders, investors, potential investors, Advisors, agents, attorneys-in-fact and Controlling Persons of each of the foregoing, and (b) if

such Person is an Agent, each other Person designated, nominated or otherwise mandated by or assisting such Agent pursuant to <u>Section 9.05</u> or any comparable provision of any Loan Document.

"**Release**" shall mean any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, dispersing, emanating or migrating of any Hazardous Materials in, into, onto, from or through the Environment or any Real Property (including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Materials).

"**Remedies Notice Period**" as defined in <u>Section 8.01</u>.

"**Required Lenders**" shall mean, at any date of determination (and subject to <u>Section 2.16(c)</u>), Lenders having Loans and the unused Commitments representing more than 50% of the sum of all Loans outstanding and the unused Commitments of all Lenders at such time; *provided* that at all times when there are two or more Lenders (who are not Affiliates of one another or Defaulting Lenders), the term "Required Lenders" shall in no event mean less than two Lenders (who are not Affiliates of one another) solely for purposes of (i) the definitions of "Acceptable Sale" and "Approved Budget"; (ii) <u>Sections 4.01(i)</u>, <u>4.01(l)</u>, <u>4.03(e)</u>, <u>4.03(f)</u> and <u>9.01(b)</u>; and (iii) waiving any Event of Default arising under <u>Section 8.01(c)</u> or <u>Section 8.01(g)</u>.

"**Response**" shall mean (a) "**response**" as such term is defined in CERCLA, 42 U.S.C. § 9601(25) or any other applicable Environmental Law, or (b) all other actions required by any Governmental Authority or voluntarily undertaken to (i) clean up, remove, treat, remediate, contain, assess, abate, monitor or in any other way address any Hazardous Materials at, in, on, under or from any Real Property, or otherwise in the Environment, (ii) prevent, stop, control or minimize the Release or threat of Release, or minimize the further Release, of any Hazardous Material, or (iii) perform studies, investigations, maintenance or monitoring in connection with, following, or as a precondition to or to determine the necessity of, the actions set forth in clause (i) or (ii) above.

"**Restricted Indebtedness**" shall mean Indebtedness of any Company, the payment, prepayment, repurchase, defeasance or acquisition for value of which is restricted under <u>Section 6.11</u>.

"**Responsible Officer**" of any Person shall mean any executive officer or Financial Officer of such Person and any other officer or similar official thereof with significant responsibility for the administration of the obligations of such Person in respect of this Agreement.

"**RSA**" means that certain Restructuring Support Agreement dated as of March 25, 2022 (as amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof) by and among the Borrower, Monterrey Aerospace, LLC, the Zohar Lenders, Philip Marsteller and Robert M. Swisher, National Union Fire Insurance Company of Pittsburgh, Pa and AIG Specialty Insurance Company.

"**Sale**" shall have the meaning assigned to such term in <u>Section 5.16</u>.

"**Sale and Leaseback Transaction**" shall have the meaning assigned to such term in <u>Section 6.03</u>.

"**Sarbanes-Oxley Act**" shall mean the United States Sarbanes-Oxley Act of 2002, as amended from time to time, and any successor statute.

"**Seabury**" shall mean Seabury Capital Group LLC and its subsidiaries and affiliates, as financial advisor to Bardin Hill.

22

"**SEC**" means, the Securities and Exchange Commission (or successors thereto or an analogous Governmental Authority).

"**Secured Obligations**" shall mean the Obligations.

"**Secured Parties**" shall mean, collectively, the Administrative Agent, the Collateral Agent and the Lenders.

"**Securities Act**" shall mean the Securities Act of 1933, as amended from time to time, and any successor statute.

"**Security Documents**" shall mean the each security document or pledge agreement delivered in accordance with applicable local or foreign Legal Requirements to grant a valid, enforceable, perfected security interest (with the priority required under the DIP Orders) in any property as collateral for the Secured Obligations, and all UCC or other financing statements (including fixture filings) or instruments of perfection required by any other security document or pledge agreement to be filed or registered with respect to the security interests in property created pursuant to any document or instrument utilized to pledge any property as collateral for the Secured Obligations.  The Security Documents shall supplement, and shall not limit, the grant of Collateral pursuant to the DIP Orders.

"**SPC**" shall have the meaning assigned to such term in <u>Section 10.04(h)</u>.

"**Specified Litigation**" shall mean (i) that certain qui tam action filed against MDH, among others, in the United States District Court for the Northern District of Alabama (Northeastern Division), captioned United States ex rel. Philip Marsteller, et al. v. Lynn Tilton, MD Helicopters, Inc., et al., Case No. 5:13-cv-00830-AKK, (ii) that certain litigation arising out of a contract dispute between the Dutch National Police Services Agency and Helifly, nv., including (w) the judgment against MDH issued by the Hague Court of Appeal in May 2012, (x) State of the Netherlands v. MD Helicopters, Inc., No. CV2015-095127 (AZ Maricopa Super. Ct. Nov. 13, 2018), (y) State of the Netherlands v. MD Helicopters, Inc., 250 Ariz. 235 (2020), and (z) State of the Netherlands v. MD Helicopters, Inc., Index. No. 157756/2020, ECF No. 6 (N.Y. Sup. Ct. Sept. 23, 2020) and (iii) that certain ICC Arbitration No.26802/FS - TAI vs. MDHI.

"**Stalking Horse APA**" shall mean that certain Asset Purchase Agreement between the Debtors and the Stalking Horse Bidder, dated March 30, 2022 (including all schedules and exhibits attached thereto, as it may be amended from time to time in accordance with its terms).

"**Stalking Horse Bidder**" shall mean the Buyer, as such term is defined in the Stalking Horse APA.

"**Subordinated Indebtedness**" shall mean Indebtedness of any Company that is by its terms subordinated in right of payment to all or any portion of the Secured Obligations.

"**Subsidiary**" shall mean, with respect to any Person (the "**parent**") at any date, (i) any Person the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, (ii) any other corporation, limited liability company, association or other business entity of which securities or other ownership interests representing more than 50% of the voting power of all Equity Interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Board of Directors thereof are, as of such date, owned, controlled or held by the parent and/or one or more subsidiaries of the parent, (iii) any partnership (a) the sole general partner or the managing general partner of which is the parent and/or one or more subsidiaries of the parent or (b) the only general partners of which are the parent and/or one or more subsidiaries of the parent and (iv) any other Person that is otherwise Controlled by the parent and/or

23

one or more subsidiaries of the parent.  Unless the context requires otherwise, "**Subsidiary**" refers to a Subsidiary of Borrower.

"**Subsidiary Guarantor**" shall mean each Debtor (other than Borrower) and any Subsidiary that is or becomes a party to this Agreement and the Security Documents pursuant to <u>Section 5.10</u>.  It is understood and agreed that Monterrey Aerospace Mexico S. de R.L. de C.V. is not, and shall not be required to become, a Subsidiary Guarantor.

"**Superpriority Claim**" means any administrative expense claim in the case of any Loan Party having priority over any and all administrative expenses, adequate protection claims, diminution claims, and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(b), 506(c) (subject to the entry of the Final Order), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for the purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, without limitation, subject to entry of the Final Order, any proceeds or property recovered in connection with the pursuit of claims or causes of action arising under chapter 5 of the Bankruptcy Code, if any, all subject only to, and subordinated in all respects to, the Carve Out.

"**Synthetic Lease**" shall mean, as to any Person, (a) any lease (including leases that may be terminated by the lessee at any time) of any property (i) that is accounted for as an operating lease under GAAP and (ii) in respect of which the lessee retains or obtains ownership of the property so leased for U.S. federal income tax purposes, other than any such lease under which such Person is the lessor or (b) (i) a synthetic, off-balance sheet or tax retention lease, or (ii) an agreement for the use or possession of property (including a Sale and Leaseback Transaction), in each case under this clause (b), creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Insolvency Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"**Synthetic Lease Obligations**" shall mean, as to any Person, an amount equal to the capitalized amount of the remaining lease payments under any Synthetic Lease that would appear on a balance sheet of such Person in accordance with GAAP if such obligations were accounted for as Capital Lease Obligations.

"**Synthetic Purchase Agreement**" shall mean any swap, derivative or other agreement or combination of agreements pursuant to which any Company is or may become obligated to make (a) any payment in connection with a purchase by any third party from a Person other than a Company of any Equity Interest or Restricted Indebtedness or (b) any payment (other than on account of a permitted purchase by it of any Equity Interest or Restricted Indebtedness) the amount of which is determined by reference to the price or value at any time of any Equity Interest or Restricted Indebtedness.

"**Tax Returns**" shall mean all returns, statements, filings, attachments and other documents or certifications filed or required to be filed in respect of Taxes, including any supplement, schedule, statement or attachment thereto, and any amendment to any of the foregoing.

"**Taxes**" shall mean any and all present or future taxes, duties, levies, imposts, assessments, deductions, withholdings (including backup withholding), fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Title Company**" shall mean any title insurance company as shall be retained by Borrower and reasonably acceptable to the Administrative Agent.

"**Title Policy**" shall have the meaning assigned to such term in <u>Section 5.15(a)(C)</u>.

"**Transactions**" shall mean collectively, (a) the execution and delivery of, and the performance under, the Loan Documents, in each case by the Loan Parties party thereto, (b) the making of the Loans hereunder, and (c) the payment of fees, costs and expenses related to the foregoing.

"**Treasury Rate**" shall mean the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year.

"**UCC**" shall mean the Uniform Commercial Code as in effect from time to time (except as otherwise specified) in any applicable state or jurisdiction.

"**UK Financial Institution**" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any Person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"**Unfunded Pension Liability**" shall mean the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the actuarial assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"**United States**" and "**U.S.**" shall mean the United States of America.

"**U.S. Person**" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"**Variance Testing Date**" shall mean the last Business Day of each week beginning with the first full calendar week after the Petition Date.

"**Variance Testing Period**" shall mean (i) for the first Variance Testing Date after the Closing Date, the period beginning on the Closing Date and ending on such Variance Testing Date and (ii) for each Variance Testing Date thereafter, the four-week period immediately preceding such Variance Testing Date.

"**Voting Stock**" shall mean, with respect to any Person, any class or classes of Equity Interests pursuant to which the holders thereof have the general voting power under ordinary circumstances to elect at least a majority of the Board of Directors of such Person.

"**Wholly Owned Subsidiary**" shall mean, with respect to any Person, (a) any corporation 100% of whose capital stock (other than directors' qualifying shares to the extent required under applicable Legal

Requirements) is at the time owned by such Person and/or one or more Wholly Owned Subsidiaries of such Person and (b) any partnership, association, joint venture, limited liability company or other entity in which such Person and/or one or more Wholly Owned Subsidiaries of such Person have a 100% Equity Interest (other than directors' qualifying shares to the extent required under applicable Legal Requirements) at such time.

"**Womble**" shall mean Womble Bond Dickenson (US) LLP.

"**Write-Down and Conversion Powers**" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that Person or any other Person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

"**Zohar Lenders**" shall mean Zohar CDO 2003-1, Limited, Zohar II 2005-1, Limited, and Zohar III, Limited, collectively.

**Section 1.02**    [**Reserved**].

**Section 1.03**    **Terms Generally.**  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The phrase "Material Adverse Effect" shall be deemed to be followed by the phrase ", individually or in the aggregate".  The words "asset" and "property" shall be construed to have the same meaning and effect.  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise (a) any definition of or reference to any Loan Document, agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in any Loan Document), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, and (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, unless otherwise indicated and (e) any reference to any law or regulation shall (i) include all statutory and regulatory provisions consolidating, amending, replacing or interpreting or supplementing such law or regulation, and (ii) unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time.  This Section 1.03 shall apply, *mutatis mutandis*, to all Loan Documents.

**Section 1.04**    **Accounting Terms; GAAP.**  Except as otherwise expressly provided herein, all financial statements to be delivered pursuant to this Agreement shall be prepared in accordance with and all terms of an accounting or financial nature shall be construed and interpreted in accordance with GAAP as in effect from time to time.  If at any time any change in GAAP would affect the computation of any financial ratio set forth in any Loan Document or any financial definition of any other provision of any Loan Document, and Borrower or the Required Lenders shall so request, the Required Lenders and

26

Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP; *provided* that, until so amended, such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein, and Borrower shall provide to the Administrative Agent and the Lenders within five days after delivery of each certificate or financial report required hereunder that is affected thereby a written statement of a Financial Officer of Borrower setting forth in reasonable detail the differences that would have resulted if such financial statements had been prepared without giving effect to such change.  Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made (i) without giving effect to any election under Accounting Standards Codification 825-10-25 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of Borrower or any Subsidiary at "fair value", as defined therein and (ii) without giving effect to any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof.  Notwithstanding the foregoing, all liabilities under or in respect of any lease (whether now outstanding or at any time entered into or incurred) that, under GAAP as in effect on the Closing Date, would be accrued as rental and lease expense and would not constitute a Capital Lease Obligation as in effect on the Closing Date shall continue to not constitute a Capital Lease Obligation, in each case, for purposes of the covenants set forth herein and all defined terms as used therein.

Without limiting the foregoing, if at any time the SEC permits or requires United States reporting companies to use IFRS in lieu of GAAP for reporting purposes, Borrower may notify the Administrative Agent that it has elected to so use IFRS in lieu of GAAP and, upon any such notice, references herein to GAAP shall thereafter be construed to mean IFRS as in effect from time to time; *provided* that, to the extent that such election would affect any financial ratio set forth in this Agreement or any requirement set forth in Section 5.01, (i) Borrower shall provide to the Administrative Agent financial statements and other documents reasonably requested by the Administrative Agent or any Lender setting forth a reconciliation with respect to such ratio or requirement made before and after giving effect to such election and (ii) if Borrower, the Administrative Agent or the Required Lenders shall so request, the Required Lenders and Borrower shall negotiate in good faith to amend such ratio to preserve the original intent thereof in light of such change.

  **Section 1.05  [Reserved].**

  **Section 1.06  Resolution of Drafting Ambiguities.**  Each Loan Party acknowledges and agrees that it was represented by counsel in connection with the execution and delivery of the Loan Documents to which it is a party, that it and its counsel reviewed and participated in the preparation and negotiation hereof or thereof and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation hereof or thereof.

**ARTICLE II**
**THE CREDITS**

  **Section 2.01  Commitments.**

    (a)  Term Loans.  Subject to the terms and conditions hereof and in the DIP Orders, each Lender agrees to make loans to Borrower denominated in Dollars on the applicable Borrowing Date in an aggregate amount not to exceed such Lender's Commitment.  Borrower may make up to four borrowings on the Commitments, the first of which will occur on the initial Borrowing Date on or following

27

the Closing Date in an aggregate principal amount of up to $12,500,000 and the succeeding Credit Extensions will occur on or following the entry of the Final Order, as requested by Borrower pursuant to Section 2.03, in each case, in an aggregate principal amount not to exceed the then aggregate unfunded Commitments on the applicable Borrowing Date.

(b)    [Reserved].

(c)    Loans Generally.  Following the making of any Loan by a Lender, the Commitment of such Lender shall be automatically and permanently reduced by the amount of such Loan so made by such Lender, and shall automatically and permanently terminate when reduced to $0.   Amounts borrowed under this DIP Term Facility and repaid or prepaid may not be reborrowed.

Section 2.02    Loans.  (a) Subject to Section 2.01, each Loan shall be made by the Lenders simultaneously and ratably in accordance with their applicable Commitments; *provided* that the failure of any Lender to make any Loan shall not in itself relieve any other Lender of its obligation to lend hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to make any Loan required to be made by such other Lender).  Each Loan requested hereunder shall be in an aggregate principal amount that is (i) an integral multiple of $500,000 and not less than $1,000,000 (or such amount as the Required Lenders may agree in their reasonable discretion(which agreement may be by email)) or, subject to Section 2.01, (ii) equal to the remaining available balance of the applicable Commitments.

(b)    Each Lender may at its option make any Loan by causing any domestic or foreign branch of such Lender to make such Loan; *provided* that any exercise of such option shall not affect the obligation of the Lender to make such Loan and Borrower to repay such Loan in accordance with the terms of this Agreement.

(c)    Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds to such account in New York City as the Administrative Agent may designate from time to time not later than 11:00 a.m., New York City time, and upon satisfaction or waiver of the applicable conditions precedent specified herein and receipt by the Administrative Agent of all of the proceeds of the Loans, the Administrative Agent will remit the amounts so received, in like funds, to an account as directed by Borrower in the applicable Borrowing Request or, if a proposed Loan shall not occur on such date because any condition precedent herein specified shall not have been met, return the amounts so received to the respective Lenders within two Business Days.

(d)    Unless the Administrative Agent shall have received written notice from a Lender prior to the date of any Loan that such Lender will not make available to the Administrative Agent such Lender's portion of such Loan, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such proposed Loan in accordance with Section 2.02(c), and the Administrative Agent may (but shall not be obligated to), in reliance upon such assumption, make available to Borrower on such date a corresponding amount.  If the Administrative Agent shall have so made funds available, then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, each of such Lender and Borrower severally agrees to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to Borrower until the date such amount is repaid to the Administrative Agent at, in the case of repayment by such Lender, (A) from the date such amount is required to be paid to the date that is two Business Days after payment by such Lender is due hereunder, the greater of, for each such day, (1) the Federal Funds Effective Rate and (2) an overnight rate determined by the Administrative Agent in accordance with banking industry rules or practices on interbank compensation plus any standard administrative or processing fees charged by the Administrative Agent in connection with

28

such Lender's non-payment and (B) from the date that is two Business Days after the date such amount is required to be paid to the date such payment is made by such Lender, interest at the Applicable Margin.  If such Lender shall repay to the Administrative Agent such corresponding amount, such amount shall constitute such Lender's portion of such Loan for purposes of this Agreement, and Borrower's obligation to repay the Administrative Agent such corresponding amount pursuant to this <u>Section 2.02(d)</u> shall cease.

Section 2.03    **Borrowing Procedure.**  To request a Loan, Borrower shall deliver, by telecopy (or transmit by other electronic transmission, if arrangements for doing so have been approved in writing by the Administrative Agent), a duly completed and executed Borrowing Request to the Administrative Agent not later than 11:00 a.m., New York City time, seven (7) Business Days before the date of the proposed Loan.  Each Borrowing Request shall be irrevocable and shall specify the following information in compliance with <u>Section 2.02</u>:

(a)        [reserved];

(b)        the aggregate principal amount of such proposed Loan;

(c)        the date of such proposed Loan, which shall be a Business Day (the "**Borrowing Date**");

(d)        [reserved];

(e)        that the conditions set forth in <u>Sections 4.03(b)</u>, <u>(d)</u>, <u>(e)</u> and <u>(f)</u> are satisfied as of the date of the notice;

(f)        [reserved]; and

(g)        the location and number of Borrower's account to which funds are to be disbursed, which shall comply with the requirements of <u>Section 2.02(c)</u>.

Promptly following receipt of a Borrowing Request in accordance with this <u>Section 2.03</u>, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Loan.

Section 2.04    **Evidence of Debt; Repayment of Loans.**  (a) Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender, the unpaid principal amount of each Loan of such Lender on the Maturity Date.

(b)        Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of Borrower to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)        The Administrative Agent shall maintain accounts in which it will record (i) the amount of each Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from Borrower to each Lender hereunder, and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)        The entries made in the accounts maintained pursuant to <u>Sections 2.04(b)</u> and <u>(c)</u> shall be *prima facie* evidence of the existence and amounts of the obligations therein recorded; *provided* that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein

29

shall not in any manner affect the obligations of Borrower and the other Loan Parties to pay, and perform, the Obligations in accordance with the Loan Documents.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such entries, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

> **Section 2.05    Fees.**

(a)    On the Closing Date, each Backstop Lender shall fully earn and be entitled to receive, as fee compensation for such Backstop Lender's Backstop Commitment, a backstop fee (the "**Backstop Fee**") in an amount equal to 8.00% of such Backstop Lender's Backstop Commitments.  The Backstop Fee shall be payable to the Backstop Lenders on the Maturity Date either (i) in cash or Equity Interests in New MD Helicopter at the Equity Conversion Rate at the sole discretion of the Stalking Horse Bidder in the event that either (x) the Stalking Horse Bidder is the successful bidder in a sale pursuant to Section 363 of the Bankruptcy Code of all or substantially all of the assets of the Loan Parties or (y) the Stalking Horse Bidder is the plan sponsor in a plan of reorganization under Chapter 11 of the Bankruptcy Code or (ii) in cash, in the event that a third party is the (x) successful bidder in the preceding clause (i)(x) or (y) the plan sponsor in the preceding clause (i)(y), unless the Backstop Lenders agree to a different form of consideration.  Notwithstanding anything in this Section 2.05 to the contrary, if the Borrower determines to obtain financing under Section 364 of the Bankruptcy Code other than the DIP Term Facility ("**Alternative DIP Financing**") prior to entry of the Final Order, which the Borrower determines, in the exercise of its business judgment, is offered on terms and conditions that are superior to the DIP Term Facility, the Backstop Fee with respect to each Backstop Lender's unfunded Backstop Commitments shall be payable in an amount of 3.00% of such Backstop Lender's unfunded Backstop Commitments in cash on entry of an order approving the Alternative DIP Financing.  Such Backstop Fees shall not be refundable for any reason whatsoever.  Notwithstanding the foregoing, the Backstop Fee shall not be payable to any Backstop Lender that is not a lender under the Exit Rollover Facility at the time of the closing of such facility.  To the extent any Backstop Lender is not a lender under the Exit Rollover Facility, such Backstop Lender's Backstop Fee allocation shall be reallocated ratably among those Backstop Lenders that are lenders under the Exit Rollover Facility.  BORROWER EXPRESSLY WAIVES THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE BACKSTOP FEES.  Borrower expressly agrees that: (A) the Backstop Fees are reasonable and are the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (B) the Backstop Fees shall be payable notwithstanding the then prevailing market rates at the time payment is made; (C) there has been a course of conduct between the Backstop Lenders and Borrower giving specific consideration in this transaction for such agreement to pay the Backstop Fees; and (D) Borrower shall be estopped hereafter from claiming differently than as agreed to in this paragraph.  Borrower expressly acknowledges that its agreement to pay the Backstop Fees to the Backstop Lenders as herein described is a material inducement for the Backstop Lenders to provide the Backstop Commitments.  For the avoidance of doubt, the Backstop Lenders are the Lenders on the Closing Date.

(b)    [Reserved].

(c)    Administrative Agent Fees.  Borrower agrees to pay to the Administrative Agent, for its own account, the fees set forth in the Fee Letter in the amounts and at the times set forth in the Fee Letter (the "**Administrative Agent Fees**").  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever, except as otherwise set forth in the Fee Letter. Such fees will be in addition to the payment of the Administrative Agents' fees, costs and expenses pursuant to the terms hereof.

(d)        Exit Fee.  On the Maturity Date, Borrower agrees to pay each Lender its pro rata share of the Exit Fee.  The Exit Fee shall be payable either in cash or Equity Interests in New MD Helicopter at the Equity Conversion Rate at the sole discretion of the Stalking Horse Bidder in the event that either (x) the Stalking Horse Bidder is the successful bidder in a sale pursuant to Section 363 of the Bankruptcy Code of all or substantially all of the assets of the Loan Parties or (y) the Stalking Horse Bidder is the plan sponsor in a plan of reorganization under Chapter 11 of the Bankruptcy Code, *provided* however, the Exit Fee will be deemed to be $0 in the event that a third party is the successful bidder in the preceding clause (i)(x) or where a third party is the plan sponsor in preceding clause (i)(y)].  Borrower expressly agrees that: (A) the Exit Fees are reasonable and are the product of an arm's length transaction between sophisticated business people, ably represented by counsel; and (B) the Exit Fee shall be payable notwithstanding the then prevailing market rates at the time payment is made.

**Section 2.06    Interest on Loans.**  (a) Subject to the provisions of Section 2.06(c), the Loans shall bear interest at the Applicable Margin.

(b)        [Reserved].

(c)        Notwithstanding the foregoing, upon the occurrence and during the continuance of an Event of Default pursuant to Sections 8.1(a) or (b), any overdue amount shall bear interest, after as well as before judgment, at the Default Rate.

(d)        Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan; *provided* that (i) interest accrued pursuant to Section 2.06(c) (including interest on past due interest) and all interest accrued but unpaid on or after the Maturity Date shall be payable on demand, and (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(e)        All interest hereunder shall be computed on the basis of a year of 360 days and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day); *provided* that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.14, bear interest for one day.

**Section 2.07    Termination or Reduction of Commitments.**  (a) To the extent not terminated earlier, the Commitments of each Lender shall terminate immediately and without further action on the Maturity Date.

(b)        On or prior to the borrowing (if any) that reduces the Commitments to $0 pursuant to Section 2.01(c), the aggregate unfunded Commitments shall be automatically and permanently reduced on a dollar-for-dollar basis by the amount of each Prepayment Receipt remaining (if any) after any prepayments made in accordance with Section 2.10. Any reduction of the aggregate unfunded Commitments pursuant to this Section 2.07(b) shall be applied to the unfunded Commitments of each Lender on a *pro rata* basis.

**Section 2.08    [Reserved].**

**Section 2.09    Repayment of Loans.**  On the Maturity Date, Borrower shall pay (in cash, unless a Lender agrees to a different form of payment, in its sole discretion) to the Administrative Agent for the ratable account of the Lenders, the aggregate principal amount of all Loans outstanding, together with all accrued and unpaid interest thereon, and all other Obligations then due and payable.  No Backstop Lender shall be required to accept loans from New MD Helicopter in satisfaction of the Obligations unless the governance documents of New MD Helicopter are reasonably acceptable to such Backstop Lender.

**Section 2.10    Optional and Mandatory Prepayments of Loans.** (a) Optional Prepayments. Borrower shall have the right at any time and from time to time to prepay any Loan, in whole or in part, without premium or penalty, subject to the requirements of this Section 2.10; *provided* that each partial prepayment shall be in an amount that is an integral multiple of $100,000 and not less than $250,000 or, if less, the outstanding principal amount of such Loan.

(b)        [Reserved].

(c)        Asset Sales.  Not later than three Business Days following the receipt of any Net Cash Proceeds of Asset Sale, other than a sale pursuant to Section 363 of the Bankruptcy Code, by any Company, Borrower shall apply 100% of such Net Cash Proceeds to make prepayments in accordance with Section 2.10(g).

(d)        Debt Issuance or Equity Issuance.  Not later than three Business Days following the receipt of any Net Cash Proceeds of any Debt Issuance or Equity Issuance by any Company, Borrower shall make prepayments in accordance with Section 2.10(g) in an aggregate principal amount equal to 100% of such Net Cash Proceeds.

(e)        Casualty Events.  Not later than three Business Days following the receipt of any Net Cash Proceeds from a Casualty Event by any Company, Borrower shall apply an amount equal to 100% of such Net Cash Proceeds to make prepayments in accordance with Section 2.10(g); *provided* that:

(i)        so long as no Default or Event of Default shall then exist or arise therefrom, such proceeds shall not be required to be so applied on such date to the extent that Borrower has elected by notice to Administrative Agent on or prior to such date to use such proceeds to repair, replace or restore any property in respect of which such Net Cash Proceeds were paid or to reinvest in fixed or capital assets of any Loan Party, no later than 180 days following the date of receipt of such proceeds (which Officer's Certificate shall set forth the estimates of the proceeds to be so expended); *provided* that if the property subject to such Casualty Event constituted Collateral, then all property purchased or otherwise acquired with the Net Cash Proceeds thereof pursuant to DIP Orders and this subsection shall be made subject to the first priority perfected Lien (subject to Permitted Liens) of the applicable Security Documents in favor of the Collateral Agent, for its benefit and for the benefit of the other Secured Parties in accordance with Section 5.11; and

(ii)        if all or any portion of such Net Cash Proceeds shall not be so applied within such 180-day period, such unused portion shall be applied on the last day of such period as a mandatory prepayment as provided in this Section 2.10(e).

(f)        [Reserved].

(g)        Application of Prepayments. Any prepayments required pursuant to Section 2.10 shall be applied ratably to the Loans then outstanding; and each such prepayment shall be paid to the Lenders in accordance with their respective *pro rata* shares of such prepayment.

(h)        Notice of Prepayment.  Borrower shall notify the Administrative Agent by written notice of any prepayment hereunder not later than 11:00 a.m., New York City time, one Business Day before the date of prepayment; *provided* that a notice of optional prepayment delivered by Borrower in accordance with this Section 2.10(g) and Section 2.10(a) that contemplates payment in full of the Loans may, if the Administrative Agent (in its reasonable discretion) has previously agreed to a customary pay-off letter with Borrower, expressly state that such notice is conditioned upon the effectiveness of new credit facilities or similar new Indebtedness and which effectiveness will result in the immediate payment in full

32

of all Obligations, in which case such notice may be revoked by Borrower (by notice to the Administrative Agent on or prior to 2:00 p.m., New York City time, one Business Day prior to the specified notice effective date) if such condition is not satisfied (or is then unlikely to be satisfied). Subject to the proviso in the previous sentence, each such notice shall be irrevocable. Each such notice shall specify the prepayment date, the principal amount of each Loan or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment. Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof. Such notice to the Lenders may be by electronic communication. Prepayments shall be accompanied by accrued interest to the extent required by Section 2.06.

> **Section 2.11** **[Reserved].**

> **Section 2.12** **Increased Costs; Change in Legality.** (a) If any Change in Law shall:

(i) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against property of, deposits with or for the account of, or credit extended by or participated in by, any Lender; or

(ii) impose on any Lender any other condition, cost or expense affecting this Agreement or Loans made by such Lender or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making, converting to or from, continuing or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise), then Borrower shall, upon the written request of such Lender, pay to such Lender, such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered, it being understood that this Section 2.12 shall apply to Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes). The protection of this Section 2.12 shall be available to each Lender regardless of any possible contention of the invalidity or inapplicability of the Change in Law that shall have occurred or been imposed.

(b) If any Lender determines (in good faith, but in its sole absolute discretion) that any Change in Law regarding Capital Requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company, for any such reduction suffered.

(c) A certificate of a Lender setting forth in reasonable detail the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in Sections 2.12(a) or (b) shall be delivered to Borrower (with a copy to the Administrative Agent) and shall be conclusive and binding absent manifest error; *provided, however*, that such certificate need not include any confidential or price sensitive information or any information that is prohibited by applicable Legal Requirements from being disclosed. Borrower shall pay such Lender the amount shown as due on any such certificate within three Business Days after receipt thereof.

(d)        Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.12 shall not constitute a waiver of such Lender's right to demand such compensation; *provided* that Borrower shall not be required to compensate a Lender pursuant to this Section 2.12 for any increased costs incurred or reductions suffered more than 12 months prior to the earlier of (x) the date on which such Lender notifies Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor and (y) the date on which such Change in Law becomes effective; *provided* that if such Change in Law is retroactive, then the 12 month period referred to above shall be extended to indicate the period of retroactive effect thereof.

**Section 2.13        [Reserved].**

**Section 2.14        Payments Generally; Pro Rata Treatment; Sharing of Setoffs.** (a) Borrower shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal, interest or fees, or of amounts payable under Section 2.12 or 2.15, or otherwise) on or before the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 1:00 p.m., New York City time), on the date when due, in immediately available funds, without setoff, deduction or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at its account most recently designated by it for such purpose by notice to Borrower and the Lenders except that payments pursuant to Sections 2.12, 2.15 and 10.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  Except as otherwise provided herein, if any payment under any Loan Document shall be due on a day that is not a Business Day, unless specified otherwise, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments under each Loan Document shall be made in Dollars.

(b)        If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) *first*, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, (ii) *second*, towards payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties, and (iii) *third*, towards the payment of all other Obligations then due hereunder, ratably among the parties entitled thereto in accordance with the amount of such amounts then due to such parties.

(c)        If any Lender shall, by exercising any right of setoff or counterclaim (including pursuant to Section 10.08) or otherwise (including by exercise of its rights under the Security Documents), obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; *provided* that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this Section 2.14(c) shall not be construed to apply to any payment made by Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to

34

any Eligible Assignee or participant.  Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable Legal Requirements, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against each Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.  If under applicable Insolvency Law any Secured Party receives a secured claim in lieu of a setoff or counterclaim to which this <u>Section 2.14(c)</u> applies, such Secured Party shall to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights to which the Secured Party is entitled under this <u>Section 2.14(c)</u> to share in the benefits of the recovery of such secured claim.

(d)      Unless the Administrative Agent shall have received written notice from Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that Borrower will not make such payment, the Administrative Agent may assume that Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules or practices on interbank compensation.

(e)      If any Lender shall fail to make any payment required to be made by it pursuant to <u>Section 2.02(c)</u>, <u>2.14(d)</u>, or <u>10.03(e)</u>, then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

**Section 2.15      <u>Taxes</u>.**      For purposes of this <u>Section 2.15</u>, the term "applicable law" includes FATCA.

(a)      Any and all payments by or on account of any obligation of the Loan Parties hereunder or under any other Loan Document shall be made without setoff, counterclaim or other defense and free and clear of and without deduction or withholding for any and all Taxes, except as required by applicable law; *provided* that if any Taxes shall be required by applicable law (as determined in the good faith discretion of an applicable withholding agent) to be deducted or withheld from such payments, then (i) if such Tax is an Indemnified Tax, the sum payable by the relevant Loan Party shall be increased as necessary so that after making all required deductions or withholdings (including deductions or withholdings applicable to additional sums payable under this <u>Section 2.15</u>) the Administrative Agent or any Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the applicable withholding agent shall be entitled to make such deductions or withholdings and (iii) the applicable withholding agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law. Without duplication, the Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable Legal Requirements, or at the option of the Administrative Agent timely reimburse it for payment of, any Other Taxes.

(b)      Without duplication of Section 2.15(a), the Loan Parties shall jointly and severally indemnify the Administrative Agent and each Lender, within ten Business Days after written demand therefor, for the full amount of any Indemnified Taxes paid or payable by the Administrative Agent or such Lender, as the case may be, on or with respect to any payment by or on account of any obligation of any Loan Party hereunder or under any other Loan Document or required to be withheld or deducted

from a payment to such recipient (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 2.15</u>) and any penalties (other than any penalties resulting from the gross negligence, bad faith or willful misconduct of such recipient), interest and expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate setting forth the basis for such claim and the amount of any such payment or liability delivered to Borrower by a Lender on its own behalf (in each case, with a copy delivered concurrently to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(c)        Each Lender shall severally indemnify the Administrative Agent, within ten days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that a Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of <u>Section 10.04(e)</u> relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (c).

(d)        As soon as practicable after any payment of Taxes (and in any event within 20 Business Days following any such payment being due) by any Loan Party to a Governmental Authority pursuant to this <u>Section 2.15</u>, Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment (if the applicable Governmental Authority makes such receipts available to Borrower), a copy of the Tax Return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)        (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to Borrower and the Administrative Agent, at the time or times reasonably requested by Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by Borrower or the Administrative Agent as will enable Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in <u>paragraphs (e)(ii)(A)</u>, <u>(ii)(B)</u> and <u>(ii)(D)</u> of this Section) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)        Without limiting the generality of the foregoing,

(A)        any Lender that is a U.S. Person shall deliver to Borrower and the Administrative Agent on or about the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower

36

or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower or the Administrative Agent), whichever of the following is applicable:

(1) in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2) executed copies of IRS Form W-8ECI or W-8EXP;

(3) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit F-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to Borrower as described in Section 881(c)(3)(C) of the Code (a "**Non-Bank Certificate**") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E; or

(4) to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a Non-Bank Certificate substantially in the form of Exhibit F-2 or Exhibit F-3, IRS Form W-9, or other certification documents from each beneficial owner, as applicable; *provided* that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a Non-Bank Certificate substantially in the form of Exhibit F-4 on behalf of each such direct and indirect partner;

(C) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower or the Administrative Agent), executed copies of any other form prescribed by Applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by Applicable Law to permit Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D) if a payment made to a Lender hereunder or under any other Loan Document would be subject to U.S. federal withholding Tax under FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender

37

shall deliver to Borrower and the Administrative Agent, at the time or times prescribed by law and at such time or times reasonably requested by Borrower or the Administrative Agent, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrower or the Administrative Agent as may be necessary for Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this clause (D), the term "FATCA" shall include any amendments to FATCA after the date hereof.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Borrower and the Administrative Agent in writing of its legal inability to do so.

(f)    Any Administrative Agent (or any sub-agent or successor Administrative Agent, appointed pursuant to Section 9.05, Section 9.06 or otherwise) will deliver to Borrower, on or about the date on which it becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of Borrower), a duly completed and executed copy of IRS Form W-9 certifying that such Administrative Agent (or applicable Person acting as sub-agent) is exempt from U.S. federal backup withholding tax.

(g)    If the Administrative Agent or a Lender (or an assignee) determines in its sole discretion exercised in good faith, that it has received a refund of any Indemnified Taxes as to which it has been indemnified by Borrower or with respect to which Borrower has paid additional amounts pursuant to this Section 2.15, it shall pay over an amount equal to such refund to Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by Borrower under this Section 2.15 with respect to the Indemnified Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of the Administrative Agent or such Lender (or assignee) and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); *provided, however,* that if the Administrative Agent or such Lender (or assignee) is required to repay all or a portion of such refund to the relevant Governmental Authority, Borrower, upon the request of the Administrative Agent or such Lender (or assignee), shall repay the amount paid over to Borrower that is required to be repaid (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender (or assignee) within 5 Business Days after receipt of written notice that the Administrative Agent or such Lender (or assignee) is required to repay such refund (or a portion thereof) to such Governmental Authority.  Nothing contained in this Section 2.15(g) shall require the Administrative Agent or any Lender (or assignee) to make available its Tax Returns or any other information which it deems confidential or privileged to Borrower or any other Person.  Notwithstanding anything to the contrary in this Section 2.15(g), in no event will the Administrative Agent or any Lender (or assignee) be required to pay any amount to Borrower the payment of which would place the Administrative Agent or such Lender (or assignee) in a less favorable net after-tax position than the Administrative Agent or such Lender (or assignee) would have been in if the Indemnified Taxes subject to indemnification and giving rise to such refund had not been deducted, withheld, or otherwise imposed and the indemnification payments or additional amounts with respect to such Taxes had never been paid.

(h)    Survival.  Each party's obligations under this Section 2.15 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

**Section 2.16    Mitigation Obligations; Replacement of Lenders.**    (a) Mitigation of Obligations.  If any Lender requests compensation under Section 2.12(a) or (b), or if Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce materially amounts payable pursuant to Section 2.12(a), 2.12(b) or 2.15, as the case may be, in the future, (ii) would not subject such Lender to any unreimbursed cost or expense, (iii) would not require such Lender to take any action inconsistent with its internal policies or legal or regulatory restrictions, and (iv) would not otherwise be disadvantageous to such Lender.  Borrower shall pay all reasonable out-of-pocket costs and expenses incurred by any Lender in connection with any such designation or assignment.  A certificate setting forth such costs and expenses submitted by such Lender to the Administrative Agent shall be conclusive and binding absent manifest error.

(b)    Replacement of Lenders.  In the event (i) any Lender delivers a certificate requesting compensation pursuant to Section 2.12(a) or (b), (ii) any Lender delivers a notice described in Section 2.12(e), (iii) Borrower is required to pay any additional amount to any Lender or any Governmental Authority on account of any Lender pursuant to Section 2.15, (iv) any Lender fails to consent to any amendment, waiver or other modification of any Loan Document requested by Borrower that requires the consent of 100% of the Lenders or 100% of all affected Lenders and, which, in each case, has been consented to by all other Lenders or all other affected Lenders, as the case may be, or (v) any Lender defaults in its obligations to make Loans, Borrower may, at its sole expense and effort (including with respect to the processing and recordation fee referred to in Section 10.04(b)), upon notice to such Lender and the Administrative Agent, require such Lender to transfer and assign, without recourse (in accordance with and subject to the restrictions contained in Section 10.04), all of its interests, rights and obligations under this Agreement to an Eligible Assignee which shall assume such assigned obligations (which Eligible Assignee may be another Lender, if a Lender accepts such assignment); *provided* that (w) except in the case of clause (iv) above if the effect of such amendment, waiver or other modification of the applicable Loan Document would cure any Default or event of Default then ongoing, no such Default or Event of Default shall have occurred and be continuing, (x) such assignment shall not conflict with any applicable Legal Requirement, (y) Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld or delayed, and (z) Borrower or such assignee shall have paid to the affected Lender in immediately available funds an amount equal to the sum of the principal of and interest and any prepayment premium or penalty (if any) accrued to the date of such payment on the outstanding Loans of such Lender affected by such assignment plus all Fees and other amounts owing to or accrued for the account of such Lender hereunder (including any amounts under Sections 2.12 and 2.15); *provided further* that, if prior to any such transfer and assignment the circumstances or event that resulted in such Lender's claim for compensation under Section 2.12(a) or (b) or notice under Section 2.12(e) or the amounts paid pursuant to Section 2.15, as the case may be, cease to cause such Lender to suffer increased costs or reductions in amounts received or receivable or reduction in return on capital, or cease to have the consequences specified in Section 2.12(e), or cease to result in amounts being payable under Section 2.15, as the case may be (including as a result of any action taken by such Lender pursuant to Section 2.16(a)), or if such Lender shall waive its right to claim further compensation under Section 2.12(a) or (b) in respect of such circumstances or event or shall withdraw its notice under Section 2.12(e) or shall waive its right to further payments under Section 2.15 in respect of such circumstances or event, as the case may be, then such Lender shall not thereafter be required to make any such transfer and assignment hereunder.  Each Lender hereby grants to the Administrative Agent an irrevocable power of attorney (which power is coupled with an interest) to execute and deliver, on behalf of such Lender as assignor, any Assignment and Assumption necessary to effectuate any assignment of such Lender's interests hereunder in the circumstances contemplated by this Section 2.16(b).

(c)        Defaulting Lenders.    Anything contained herein to the contrary notwithstanding, in the event that any Lender becomes a Defaulting Lender, then (i) during any Default Period (as defined below) with respect to such Defaulting Lender, such Defaulting Lender shall be deemed not to be a "**Lender**", and the amount of such Defaulting Lender's Commitments and Loans shall be excluded for purposes of voting, and the calculation of voting, on any matters (including the granting of any consents or waivers) with respect to any of the Loan Documents; *provided*, *however*, that such Defaulting Lender shall continue to be deemed a Lender for purposes of Section 10.02(b)(i), (ii) and (iii); and (ii) to the extent permitted by applicable Legal Requirements, until such time as the Default Excess (as defined below) with respect to such Defaulting Lender shall have been reduced to zero, (A) any voluntary prepayment of the Loans pursuant to Section 2.10(a) shall, if Borrower so directs at the time of making such voluntary prepayment, be applied to the Loans of other Lenders in accordance with Section 2.10(a) as if such Defaulting Lender had no Loans outstanding, and (B) any mandatory prepayment of the Loans pursuant to Section 2.10 shall, if Borrower so directs at the time of making such mandatory prepayment, be applied to the Loans of other Lenders (but not to the Loans of such Defaulting Lender) in accordance with Section 2.10 as if such Defaulting Lender had funded all Defaulted Loans of such Defaulting Lender, it being understood and agreed that Borrower shall be entitled to retain any portion of any mandatory prepayment of the Loans that is not paid to such Defaulting Lender solely as a result of the operation of the provisions of this clause (B).

For purposes of this Agreement, (i) "**Funding Default**" means, with respect to any Defaulting Lender, the occurrence of any of the events set forth in the definition of "Defaulting Lender," (ii) "**Defaulted Loan**" means the Loans of a Defaulting Lender, (iii) "**Default Period**" means, with respect to any Defaulting Lender, the period commencing on the date of the applicable Funding Default and ending on the earliest of the following dates: (a) the date on which all Commitments are cancelled or terminated and/or the Secured Obligations are declared or become immediately due and payable, (b) with respect to any Funding Default (other than any such Funding Default arising pursuant to clause (e) of the definition of "**Defaulting Lender**"), the date on which (1) the Default Excess with respect to such Defaulting Lender shall have been reduced to zero (whether by the funding by such Defaulting Lender of any Defaulted Loans of such Defaulting Lender or by the non-pro rata application of any voluntary or mandatory prepayments of the Loans in accordance with the terms hereof or any combination thereof) and (2) such Defaulting Lender shall have delivered to Borrower and the Administrative Agent a written reaffirmation of its intention to honor its obligations under this Agreement with respect to its Commitment(s), and (c) the date on which Borrower, the Administrative Agent and the Required Lenders waive all Funding Defaults of such Defaulting Lender in writing, and (iv) "**Default Excess**" means, with respect to any Defaulting Lender, the excess, if any, of such Defaulting Lender's *pro rata* share of the aggregate outstanding principal amount of the Loans of all Lenders (calculated as if all Defaulting Lenders (including such Defaulting Lender) had funded all of their respective Defaulted Loans) over the aggregate outstanding principal amount of Loans of such Defaulting Lender.

No amount of the Commitment of any Lender shall be increased or otherwise affected, and, except as otherwise expressly provided in Section 2.16(c), performance by Borrower of its obligations under this Agreement and the other Loan Documents shall not be excused or otherwise modified, as a result of any Funding Default or the operation of Section 2.16(c).  The rights and remedies against a Defaulting Lender under Section 2.16(c) are in addition to other rights and remedies that Borrower may have against such Defaulting Lender with respect to any Funding Default and that the Administrative Agent or any Lender may have against such Defaulting Lender with respect to any Funding Default.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to the Administrative Agent, the Collateral Agent, and each of the Lenders on the Closing Date and on the date of each Credit Extension that:

**Section 3.01    Organization; Powers.**  Each Company (a) is duly organized and validly existing under the laws of the jurisdiction of its incorporation or organization, (b) subject to the entry of the DIP Orders and any other orders of the Bankruptcy Court, if applicable, has all requisite power and authority to carry on its business as now conducted and (c) is qualified, licensed and in good standing (to the extent such concept is legally recognized in the applicable jurisdiction) to do business in every jurisdiction where such qualification is required, except in such jurisdictions where the failure to so qualify, be licensed or be in good standing could not reasonably be expected to result in a Material Adverse Effect.

**Section 3.02    Authorization; Enforceability.**  Subject to the entry of the DIP Orders and the terms thereof, the Transactions to be entered into by each Loan Party are within such Loan Party's powers and have been duly authorized by all necessary corporate or other organizational action on the part of each such Loan Party.  Subject to the entry of the DIP Orders and the terms thereof, this Agreement has been duly executed and delivered by each Loan Party and constitutes, and each other Loan Document  to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally, regardless of whether considered in a proceeding in equity or at law.

**Section 3.03    No Conflicts; No Default.**  Subject to the entry of the DIP Orders and the terms thereof, the Transactions (including, without limitation, the creation, perfection and first priority status (or maintenance thereof) of the security interest of the Collateral Agent in the Collateral) (a) do not require any consent, exemption, authorization or approval of, registration or filing with, or any other action by, any Governmental Authority or other Person, except (i) such as have been obtained or made and are in full force and effect and (ii) consents, approvals, exemptions, authorizations, registrations, filings, permits or actions the failure of which to obtain or perform could not reasonably be expected to result in a Material Adverse Effect, (b) will not violate the Organizational Documents of any Company, (c) will not violate or result in a default or require any consent or approval (other than such as have been obtained and are in full force and effect) under (x) any Post-Petition indenture, instrument, agreement, or other document binding upon any Company or its property or to which any Company or its property is subject, or give rise to a right thereunder to require any payment to be made by any Company or (y) any Organizational Document, (d) will not violate any Legal Requirement in any material respect (other than violations arising as a result of the commencement of the Cases and except as otherwise excused by the Bankruptcy Code), and (e) will not result in the creation or imposition of any Lien on any property of any Company, except Liens created by the Security Documents and the DIP Orders.  No Default or Event of Default has occurred and is continuing.

**Section 3.04    Financial Condition; No Material Adverse Effect.**

(a)    All financial statements relating to any Loan Party which have been or may hereafter be delivered by any Loan Party to the Administrative Agent and the Lenders pursuant to the terms of the Agreement have been prepared in accordance with GAAP and present fairly, in all material respects, the financial position and results of operations and cash flows of Borrower and its consolidated Subsidiaries as of such dates and for such periods.  The representations in this Section 3.04(a), as applicable, are subject, in the case of unaudited financial statements, to normal year-end audit adjustments and accruals and the absence of notes.

41

(b)     Since the Petition Date, there has been no event, change, circumstance or occurrence that has had, or could reasonably be expected to result in, a Material Adverse Effect.

**Section 3.05    Properties.** (a) Each Company has good title to, or valid leasehold interests in, all its property material to its business, free and clear of all Liens and irregularities, deficiencies and defects in title except for Permitted Liens and minor irregularities, deficiencies and defects in title that, individually or in the aggregate, do not, and could not reasonably be expected to, interfere in any material respect with its ability to conduct its business as currently conducted or to utilize such property for its intended purpose.

(b)     The property of the Companies, taken as a whole, (i) is in good operating order, condition and repair (ordinary wear and tear excepted), and (ii) constitutes all the property which is required for the business and operations of the Companies as presently conducted.

(c)     Schedule 3.05(c) contains a true and complete list of each ownership and leasehold interest in Real Property (i) owned by any Company as of the Closing Date and describes the type of interest therein held by such Company and (ii) leased, subleased or otherwise occupied or utilized by any Company, as lessee, sublessee, franchisee or licensee, as of the Closing Date and describes the type of interest therein held by such Company.

(d)     [Reserved].

(e)     Each Company owns or has rights to use all of its property and all rights with respect to any of the foregoing used in or necessary for each Company's business as currently conducted, except for those the failure to own or have rights to use which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  The use by each Company of its property and all such rights with respect to the foregoing do not infringe on the rights or other interests of any Person, other than any infringement that could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  No claim has been made and remains outstanding that any Company's use of any of its property does or may violate the rights of any third party that, individually or in the aggregate, has had, or could reasonably be expected to result in, a Material Adverse Effect.  The Real Property is zoned in all material respects to permit the uses for which such Real Property is currently being used.  The present uses of the Real Property and the current operations of each Company's business do not violate in any material respect any provision of any applicable building codes, subdivision regulations, fire regulations, health regulations or building and zoning by-laws.

(f)     Except for exceptions to the following that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, there is no pending or threatened condemnation or eminent domain proceeding with respect to, or that could affect any of the Real Property of the Companies.

(g)     Each parcel of Real Property is taxed as a separate tax lot and is currently being used in a manner that is consistent with and in compliance in all material respects with the property classification assigned to it for real estate tax assessment purposes.

**Section 3.06    Intellectual Property.** (a) Each Company owns or is licensed to use, free and clear of all Liens (other than Permitted Liens), all patents and patent applications, trademarks, trade names, service marks, copyrights, domain names and applications for registration thereof, and technology, trade secrets, proprietary information, inventions, know-how and processes, in each case necessary for the conduct of its business as currently conducted (the "**Intellectual Property**"), except for those the failure to own or license which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

42

(b)         Except pursuant to franchise agreements, no Company has authorized any other Person to use any such Intellectual Property, which use, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  Each Company has taken commercially reasonable actions to protect the secrecy, confidentiality and value of all material trade secrets used in such Company's business.

(c)         (i) No Company has received a written claim in the prior two years that any Company is infringing upon or misappropriating any copyright, patent, trademark, trade secret or other intellectual property right of any other Person except such as individually or in the aggregate could not reasonably be expected to result in a Material Adverse Effect, (ii) no Company is in breach of, or in default under, any license of Intellectual Property by any other Person, to such Company, except in any case where such breach or default, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, and (iii) no proceedings are pending against any Company alleging that such Company is infringing upon or misappropriating any copyright, patent, trademark, trade secret or other intellectual property right of any other Person, except to the extent that such proceedings or claims, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(d)         Neither the execution, delivery or performance of this Agreement and the other Loan Documents, nor the consummation of the Transactions and the other transactions contemplated hereby and thereby, will alter or impair any right of any Company in any Intellectual Property, except for such alterations or impairments which result from any Company's compliance with, or the Agent's enforcement of its rights under, the Loan Documents, and except to the extent that such alterations or impairments, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(e)         No Company is subject to any settlement, covenant not to sue or other similar instrument, agreement, or any outstanding Order, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

**Section 3.07    Equity Interests and Subsidiaries.**  (a)  Schedule 3.07(a) sets forth a list of (i) Borrower and each Subsidiary of Borrower and its jurisdiction of incorporation or organization as of the Closing Date and (ii) the number of each class of its Equity Interests authorized, and the number outstanding, on the Closing Date and the number of Equity Interests covered by all outstanding options, warrants, rights of conversion or purchase and similar rights on the Closing Date.  All Equity Interests of each Company are duly and validly issued and are fully paid and non-assessable, and, other than the Equity Interests of Borrower, are owned by Borrower, directly or indirectly, through Wholly Owned Subsidiaries. Each Loan Party is the record and beneficial owner of, and has good and marketable title to, the Equity Interests listed on Schedule 3.07(a), free of any and all Liens, rights or claims of other Persons, except the security interest created by the DIP Orders or the Security Documents and any Permitted Liens that arise by operation of applicable Legal Requirements and are not voluntarily granted, and, as of the Closing Date, there are no outstanding warrants, options or other rights (including derivatives) to purchase, or shareholder, voting trust or similar agreements outstanding with respect to, or property that is convertible into, or that requires the issuance or sale of, any such Equity Interests (or any economic or voting interests therein).

(b)         [Reserved].

(c)         An accurate organizational chart, showing Borrower and each Subsidiary as of the date hereof and as of the Closing Date, and after giving effect to the Transactions, is set forth on Schedule 3.07(c) (which shall be permitted to be updated by Borrower before the Closing Date).

**Section 3.08    Litigation; Compliance with Legal Requirements.**  (a)  Except for the Cases and as set forth on Schedule 3.08, there are no actions, suits, claims, disputes or proceedings at law or in equity

by or before any Governmental Authority now pending or, to the best of the knowledge of any Loan Party, threatened against or affecting any Company or any business, property or rights of any Company (i) that purport to affect or involve any Loan Document or any of the Transactions or (ii) that have resulted, or as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

Section 3.09    **[Reserved].**

Section 3.10    **Federal Reserve Regulations.**  (a)  No Company is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing, buying or carrying Margin Stock.

(b)    No part of the proceeds of any Credit Extension will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of the regulations of the Board, including Regulation T, U or X.

Section 3.11    **Investment Company Act, etc.**  No Company is (a) an "investment company" or a company "controlled" by an "investment company," as defined in, or subject to regulation under, or required to be registered pursuant to, the Investment Company Act of 1940, as amended, or (b) subject to regulation under any Legal Requirement (other than Regulation X) that limits its ability to incur, create, assume or permit to exist Indebtedness or grant any Contingent Obligation in respect of Indebtedness.

Section 3.12    **Use of Proceeds.**  Borrower will use the proceeds of any Loan solely in accordance with Section 5.08.

Section 3.13    **Taxes.**  Each Company has (a) timely filed or caused to be timely filed all material federal, state, local and foreign Tax Returns required to have been filed by it and all such Tax Returns are true and correct in all material respects and (b) duly and timely paid or caused to be duly and timely paid all material Taxes (whether or not shown on any Tax Return) due and payable by it and all assessments received by it, except Taxes that are being contested in good faith by appropriate proceedings and for which such Company maintains adequate reserves in accordance with GAAP and except Taxes that need not be paid pursuant to an order of the Bankruptcy Court or pursuant to the Bankruptcy Code.  Each Company has made adequate provision in accordance with GAAP for all Taxes not yet due and payable.  No Company has knowledge of any proposed or pending tax assessments, deficiencies, audits or other proceedings reasonably expected to result (and no proposed or pending tax assessments, deficiencies, audits or other proceedings have resulted or could reasonably be expected to result), individually or in the aggregate, in a Material Adverse Effect.  No Company has ever "participated" in a "reportable transaction" within the meaning of U.S. Department of the Treasury Regulations Section 1.6011-4(b). No Company is party to any tax sharing or similar agreement (other than any customary commercial agreement entered into in the ordinary course of business, the principal subject matter of which is not Taxes).

Section 3.14    **No Material Misstatements.**    Borrower has disclosed to the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.   None of the reports, financial statements, certificates or other information furnished by or on behalf of Borrower to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or delivered pursuant thereto (as modified or supplemented by other information so furnished) contained or contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading as of the date such information is dated or certified; *provided* that, with

44

respect to projected financial information, Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

**Section 3.15    Labor Matters.**    There are no strikes, lockouts or slowdowns against any Company pending or, to the best of the knowledge of the Loan Parties, threatened that have resulted in, or could reasonably be expected to result in, a Material Adverse Effect.  Except to the extent the failure to comply could reasonably be expected to result in a Material Adverse Effect, each Company is in compliance with all Legal Requirements relating to employment, employment standards, classification of employees, employment of minors, equal employment opportunity, collective bargaining, civil rights, employment discrimination, sexual harassment, health and safety, the WARN Act, labor relations, immigration, withholding wages, hours, overtime workplace safety and insurance, sick leave, vacation pay, fringe benefits or pay equity.

**Section 3.16    [Reserved].**

**Section 3.17    Employee Benefit Plans.**  (a)  Except to the extent the failure to comply could reasonably be expected to result in a Material Adverse Effect, each Company is in compliance with all applicable Legal Requirements, including all applicable provisions of ERISA and the Code and the regulations and published interpretations thereunder, with respect to all Employee Benefit Plans.  Each Employee Benefit Plan complies in all material respects, and is operated and maintained in compliance in all material respects, with all applicable Legal Requirements, including all applicable provisions of ERISA and the Code and the regulations and published interpretations thereunder.  Each Employee Benefit Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination from the Internal Revenue Service for all required amendments and nothing has occurred, to the knowledge of any Company, which could reasonably be expected to prevent, or cause the loss of, such qualification.

(b)        No ERISA Event has occurred or is expected to occur except to the extent such ERISA Event has not or could not reasonably be expected to result in a Material Adverse Effect.  No Pension Plan has any Unfunded Pension Liability except to the extent such Unfunded Pension Liability has not or could not reasonably be expected to result in a Material Adverse Effect.  Except as could not reasonably be expected to result in a Material Adverse Effect (either individually or in the aggregate), within the last six years, no Pension Plan has been terminated, whether or not in a "standard termination" as that term is used in Section 4041 of ERISA, nor has any Pension Plan (determined at any time within the last six years) with an Unfunded Pension Liability been transferred outside of the "controlled group" (within the meaning of Section 4001(a)(14) of ERISA) of any Company or any of its ERISA Affiliates.  Using actuarial assumptions and computation methods consistent with subpart I of subtitle E of Title IV of ERISA, the aggregate liabilities of any Company or any of its ERISA Affiliates to all Multiemployer Plans in the event of a complete withdrawal therefrom, as of the close of the most recent fiscal year of each such Multiemployer Plan, have not resulted in, and could not reasonably be expected to result in, a Material Adverse Effect.

(c)        All Foreign Plans are in material compliance with, and have been established, administered and operated in accordance with, the terms of such Foreign Plans and applicable law.  All contributions or other payments which are due with respect to each Foreign Plan have been made in full and there are no funding deficiencies thereunder, except as would not reasonably be expected to result in a material liability to any Company.  All amounts payable under any Foreign Plan are properly reflected on the financial statements of the applicable Company.

**Section 3.18    Environmental Matters**.  Except as could not reasonably be expected to result in a material loss to the condition (financial or otherwise), results of operations, assets, properties, solvency, business, prospects or value of the Companies, individually or in the aggregate:

(i)     the Companies and their businesses, operations and Real Property are and have at all times during the Companies' ownership or lease thereof been in compliance in all material respects with, and the Companies have no liability under, any applicable Environmental Law;

(ii)     the Companies have obtained all Environmental Permits required for the conduct of their businesses and operations, and the ownership, operation and use of their Real Property, under all applicable Environmental Laws.  The Companies are in compliance in all material respects with the terms and conditions of such Environmental Permits, and all such Environmental Permits are valid and in good standing;

(iii)     there has been no Release of, or exposure to, any Hazardous Materials on, at, under or from any Real Property or facility presently or formerly owned, leased or operated by any of the Companies or their predecessors in interest that has resulted in, or is reasonably likely to result in, liability under Environmental Law or in an Environmental Claim that would be material to the Company;

(iv)     there is no Environmental Claim pending or, to the knowledge of the Loan Parties, threatened against any of the Companies, or relating to the Real Property currently or formerly owned, leased or operated by any of the Companies or relating to the operations of the Companies, and, to the knowledge of the Loan Parties, there are no actions, activities, circumstances, conditions, events or incidents that are reasonably likely to form the basis of such an Environmental Claim; and

(v)     the execution, delivery and performance of this Agreement and the other Loan Documents and the consummation of the Transactions and the other transactions contemplated hereby and thereby will not require any notification, registration, filing, reporting, disclosure, investigation, remediation or cleanup obligations pursuant to any Governmental Real Property Disclosure Requirements or any other Environmental Law.

**Section 3.19     Insurance.**  Schedule 3.19 sets forth a true, complete and accurate description in reasonable detail of all insurance maintained by each Company as of the Closing Date.  Each Company has insurance in such amounts and covering such risks and liabilities as are customary for companies of a similar size engaged in similar businesses in similar locations or as are otherwise deemed prudent by Borrower, in the exercise of its reasonable business judgment including, but not limited to, (i) any insurance required by any contract to which any Company is a party, (ii) physical hazard insurance on an "all risk" basis and (iii) worker's compensation insurance and such other insurance as may be required by any Legal Requirement.  All material insurance maintained by the Companies is in full force and effect, all premiums have been duly paid, and no Company has received notice of violation, invalidity or cancellation thereof.

**Section 3.20     [Reserved].**

**Section 3.21     Anti-Terrorism Law; Foreign Corrupt Practices Act.**  (a)  Each Company is, and, to the knowledge of each Company, its Affiliates are, in compliance with all applicable Legal Requirements relating to terrorism or money laundering ("**Anti-Terrorism Laws**"), including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "**Executive Order**"), and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56 (the "**Patriot Act**").  No Company and, to the knowledge of each Company, none of its Affiliates shall use any proceeds of the Loans in violation of, any Legal Requirements relating to Anti-Terrorism Laws.

(b)     No Company and to the knowledge of each Company, no Affiliate or broker or other agent of any Company acting or benefiting in any capacity in connection with the Credit

Extensions, is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("**OFAC**"); and Borrower will not directly or indirectly use the proceeds of the Loans or otherwise make available such proceeds to any Person, for the purpose of financing the activities of any Person currently subject to any U.S. sanctions administered by OFAC.

(c)     No Company and, to the knowledge of each Company, no Affiliate or broker or other agent of any Company acting in any capacity in connection with the Loans (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in <u>Section 3.21(b),</u> (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked or frozen pursuant to the Executive Order, or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(d)     No Company nor any director or officer, nor to the knowledge of any Company, any agent, employee or other Person acting, directly or indirectly, on behalf of any Company, has, in the course of its actions for, or on behalf of, any Company, directly or indirectly (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977; or (iv) made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or domestic government official or employee.

**Section 3.22     Cases; DIP Orders; Secured Super-Priority Obligations.**

(a)     The Cases were commenced on the Petition Date in accordance with applicable Laws and notice thereof determined by the Interim Order or Final Order, as applicable, to be adequate under the circumstances was given for (i) the motion seeking approval of the Loan Documents and the Interim Order and, when applicable, Final Order, (ii) the hearing for the entry of the Interim Order, and (iii) the hearing for the entry of the Final Order (*provided* that notice of the final hearing will be given as soon as reasonably practicable after such hearing has been scheduled).

(b)     The provisions of the Loan Documents and the Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, are effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, legal, valid and perfected Liens on and security interests in all right, title and interest in the Collateral, having the priority provided for herein and in the Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, and enforceable against the Loan Parties.

(c)     After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute Superpriority Claims.

(d)     After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Secured Obligations will be secured by a valid and perfected Lien on all of the Collateral of the Debtors subject, as to priority, to the Carve-Out and any Claims secured by Permitted Liens that (A) are in existence on the Petition Date and (B) are either perfected as of the Petition Date or perfected subsequent to the Petition Date solely to the extent permitted by Section 546(b) of the Bankruptcy Code, each in accordance with the DIP Orders.

(e)     The Interim Order (with respect to the period on and after entry of the Interim Order and prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry

47

of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), vacated, or, without the Administrative Agent's consent, modified or amended.  The Loan Parties are in compliance in all material respects with the Interim Order (with respect to the period on and after entry of the Interim Order and prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order).

(f)        Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Order or the Final Order, as the case may be, upon the Maturity Date (whether by acceleration or otherwise) of any of the Obligations, the Administrative Agent and Lenders shall be entitled to immediate payment of such Obligations.

(g)        To the best of the Loan Parties' knowledge, the stipulations of the Loan Parties in each of the DIP Orders are true, accurate and correct in all material respects.

(h)        Subject to the applicable provisions of the Interim Order or the Final Order, as the case may be, neither the Obligations nor the Obligations (as defined in the Pre-Petition Term Loan Credit Agreement) shall be subject to setoff or recoupment or any such rights under Bankruptcy Code Section 553 or otherwise with respect to any claim the Loan Parties may have against the Lenders arising on or before the Petition Date.

**Section 3.23    Intercompany Indebtedness.**  Other than as set forth in Schedule 3.23 hereto, there are not any intercompany notes owing from any Loan Party or Subsidiary to Borrower or form Borrower to any Loan Party or Subsidiary.

**Section 3.24    Certifications.**  Each Company is, and to the knowledge of each Company, its Affiliates are, in compliance in all material respects with all applicable Aviation Laws and each Company has, and its Affiliates have, any and all certifications required to maintain compliance in all material respects with any such laws, including but not limited to Airworthiness Certificates.

## ARTICLE IV
## CONDITIONS TO CREDIT EXTENSIONS

**Section 4.01    Conditions to Initial Credit Extension.**  The obligation of each Lender to fund the initial Credit Extension requested to be made by it shall be subject to the prior or concurrent satisfaction (or waiver) of each of the conditions precedent set forth in this Section 4.01.

(a)        Loan Documents.  The Credit Extensions hereunder and the other Loan Documents shall be satisfactory to the Lenders and there shall have been delivered to the Administrative Agent a properly executed counterpart of each of the Loan Documents.

(b)        Corporate Documents.  The Administrative Agent shall have received:

(i)        a certificate of the secretary or assistant secretary of each Loan Party dated the Closing Date, certifying (A) that attached thereto is a true and complete copy of each Organizational Document of such Loan Party and, in the case of Monterrey Aerospace, LLC, certified by the Secretary of State of the state of its organization, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the Board of Directors of such Loan Party authorizing the execution, delivery and performance of the Loan Documents to which such Person is a party and, in the case of Borrower, the Credit Extensions hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect and (C) as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf

48

of such Loan Party (together with a certificate of another officer as to the incumbency and specimen signature of the secretary or assistant secretary executing the certificate required by this clause (i)); and

(ii)     a certificate as to the good standing (to the extent such concept is legally recognized in the applicable jurisdiction) of each Loan Party (in so-called "long-form" if available) as of a recent date, from such Secretary of State.

(c)     Officer's Certificate.  The Administrative Agent shall have received a certificate, dated the Closing Date and signed by the chief executive officer or the chief financial officer of Borrower, confirming compliance with the conditions precedent set forth in this Section 4.01 and Sections 4.03(b), (c) and (d).

(d)     Stalking Horse APA.  The Debtors shall have entered into the Stalking Horse APA.

(e)     [Reserved].

(f)     Bank Regulatory Documentation.  To the extent requested two (2) Business Days prior to the Closing Date, the Administrative Agent and the Lenders shall have received, in form and substance satisfactory to them, all documentation and other information required by bank regulatory authorities or reasonably requested by the Administrative Agent or any Lender under or in respect of applicable Anti-Terrorism Laws or "**know-your-customer**" Legal Requirements, including the Executive Order.

(g)     Petition Date.  The Petition Date shall have occurred, and Borrower and each Guarantor shall be a debtor and debtor-in-possession in the Cases.

(h)     Fees.  The Backstop Fee shall be fully earned and payable pursuant to the terms hereof.  DIP Professional Fees and any and all other fees and expenses required to be paid hereunder shall have been paid in full in cash or will be paid on the Closing Date out of the initial Credit Extension.  The Administrative Agent shall have received a fully executed copy of the Fee Letter.

(i)     Budget.  The Administrative Agent shall have received the Initial Budget, in form and substance satisfactory to the Required Lenders.

(j)     No Material Adverse Effect.  No change in the business, assets, management or operations of Borrower and its Subsidiaries, other than the filing of the Cases, shall have occurred since the Petition Date, which change has had or would reasonably be expected to have a Material Adverse Effect.

(k)     No Action.  Except for the Cases and any Specified Litigation, there shall exist no unstayed action, suit, investigation, litigation or proceeding pending or (to the knowledge of the Loan Parties) threatened in any court or before any arbitrator or governmental instrumentality (other than the Cases and any Specified Litigation) that would reasonably be expected to have a Material Adverse Effect.

(l)     Bankruptcy Related Items.

(i)     The Cases of any of the Debtors shall have not been dismissed or converted to cases under Chapter 7 of the Bankruptcy Code.

(ii)     All "first day" orders to be entered on or prior to the Interim Order Entry Date that directly relate to, or would have a material effect on the treatment of, the

49

Obligations, the Obligations (as defined in the Pre-Petition Term Loan Credit Agreement), the Loan Documents and the Pre-Petition Term Loan Documents, shall have been entered by the Bankruptcy Court and shall be reasonably acceptable in form and substance to the Required Lenders and the Administrative Agent.

(iii)    Borrower shall have made no payments after the Petition Date on account of any Indebtedness arising prior to the Petition Date unless such payment is made (i) with the consent of the Required Lenders or (ii) pursuant to "first day" orders; *provided that*, for purposes of this Section, first day orders entered without objection from Required Lenders will be treated as acceptable to Required Lenders.

(iv)    No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner (other than a fee examiner) shall have been appointed in any of the Cases.

(v)    The Interim Order shall have been entered by the Bankruptcy Court and such Interim Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the prior written consent of the Required Lenders.

(vi)    A motion, in form and substance satisfactory to the Required Lenders, seeking approval of the Bidding Procedures shall have been filed in each of the Cases prior to the first day hearing.

(m)    Insurance.  The Administrative Agent shall have received evidence of insurance coverage in form, scope, and substance reasonably satisfactory to the Required Lenders and otherwise in compliance with the terms of  Section 5.04 of this Agreement.

Each Lender, by delivering its signature page to this Agreement, and funding its Loans on the Closing Date, shall be deemed to have acknowledged receipt of, and consented to and approved or accepted or to be satisfied with, each Loan Document and each other document required to be approved by, acceptable or satisfactory to any Agent, the Required Lenders or any other Lenders, as applicable, on the Closing Date.

**Section 4.02    [Reserved].**

**Section 4.03    Conditions to All Credit Extensions.**  The obligation of each Lender to make any Credit Extension (including the initial Credit Extension on the Closing Date) shall be subject to, and to the satisfaction of, each of the conditions precedent set forth below.

(a)    Notice.  The Administrative Agent shall have received a Borrowing Request as required by Section 2.03.

(b)    No Default.  Borrower and each other Loan Party shall be in compliance in all material respects with all the terms and provisions set forth herein and in each other Loan Document on its part to be observed or performed, and, at the time of and immediately after giving effect to such Credit Extension and the application of the proceeds thereof, no Default or Event of Default shall have occurred and be continuing on such date.

(c)    Representations and Warranties.  Each of the representations and warranties made by any Loan Party set forth in Article III or in any other Loan Document shall be true and correct in all material respects on and as of the date of such Credit Extension with the same effect as though made on

50

and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date); *provided* that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(d)    DIP Orders.  The Interim Order or the Final Order, as the case may be, shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal.

(e)    Second Day Orders.  With regard to any Credit Extension after the Closing Date, all "second day orders" approving on a final basis any first day orders intended to be entered on or prior to the date of entry of the Final Order that directly relate to, or materially affect the treatment of, the Obligations, the Obligations (as defined in the Pre-Petition Term Loan Credit Agreement), the Loan Documents and the Pre-Petition Term Loan Documents shall have been entered by the Bankruptcy Court, shall be reasonably acceptable to the Required Lenders in form and substance, shall be in full force and effect, shall not have been vacated or reversed, shall not be subject to a stay and shall not have been modified or amended other than as reasonably acceptable to the Required Lenders (or the Administrative Agent at the direction of the Required Lenders).

(f)    Entry of Final Order.  With respect to any Credit Extension that is on or after the date which is 28 days following the date of the entry of the Interim Order, the Final Order shall have been entered by the Bankruptcy Court, and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated absent the prior written consent of the Required Lenders.

Each Borrowing Request submitted by Borrower after the Closing Date shall be deemed to be a representation and warranty that the conditions specified in Sections 4.01 and 4.03(b), (c), (d), (e), and (f) have been satisfied on and as of the date of the applicable Credit Extension.

## ARTICLE V
## AFFIRMATIVE COVENANTS

Each Loan Party warrants, covenants and agrees with the Administrative Agent, the Collateral Agent and each Lender that so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest and premium (if any) on each Loan and all Fees and all other expenses or amounts payable under any Loan Document shall have been paid in full, each Loan Party will, and will cause each of its Subsidiaries to, at their sole cost and expense:

**Section 5.01    Financial Statements, Reports, etc.**  Furnish to the Administrative Agent and each Lender:

(a)    Annual Reports.  As soon as available and in any event within 180 days after the end of each fiscal year, the audited consolidated balance sheet of Borrower as of the end of such fiscal year and related consolidated statements of income, cash flows and stockholders' equity for such fiscal year, in comparative form with such financial statements as of the end of, and for, the preceding fiscal year, and notes thereto (including a note with a consolidating balance sheet and statements of income and cash flows separating out Borrower and its Subsidiaries), all prepared in accordance with GAAP;

(b)    Quarterly Reports.  As soon as available and in any event within 45 days after the end of each fiscal quarter of each fiscal year, the consolidated balance sheet of Borrower as of the end

51

of such fiscal quarter and related consolidated statements of income and cash flows for such fiscal quarter and for the then elapsed portion of the fiscal year, in comparative form with the consolidated statements of income and cash flows for the comparable periods in the previous fiscal year, all prepared in accordance with GAAP and accompanied by a certificate of a Financial Officer stating that such financial statements fairly present, in all material respects, the consolidated financial condition, results of operations and cash flows of Borrower as of the date and for the periods specified in accordance with GAAP consistently applied, and on a basis consistent with audited financial statements referred to in clause (a) of this Section 5.01, subject to normal year-end audit adjustments and the absence of footnotes;

(c)        Monthly Reports.  As soon as available and in any event within 30 days after the end of each of the first two months of each fiscal quarter, the unaudited consolidated balance sheet of Borrower as of the end of such fiscal month and related consolidated statements of income and cash flows for such fiscal month and for the then elapsed portion of the fiscal year, in comparative form with the consolidated statements of income and cash flows for the comparable periods in the previous fiscal year, all prepared in accordance with GAAP and accompanied by a certificate of a Financial Officer stating that such financial statements fairly present, in all material respects, the consolidated financial condition, results of operations and cash flows of Borrower as of the date and for the periods specified in accordance with GAAP consistently applied, and on a basis consistent with audited financial statements referred to in clause (a) of this Section 5.01, subject to normal year-end audit adjustments and the absence of footnotes;

(d)        Budget.  No later than by 5:00 p.m. (New York City time) on the final Business Day of every fourth calendar week after the Petition Date, a Budget.  Each Budget delivered after the Closing Date shall be deemed to constitute an Approved Budget, with the most recently delivered Budget constituting the Approved Budget, upon (i) approval by the Required Lenders and the "Required Lenders" under the Pre-Petition Term Loan Credit Agreement or (ii) 5:00 p.m. (prevailing Eastern Time three (3) Business Days following delivery of such Budget if the Required Lenders and the "Required Lenders" under the Pre-Petition Term Loan Credit Agreement have neither approved nor rejected the Budget; *provided,* that in the event the conditions for the most recently delivered Budget to constitute an Approved Budget are not met as set forth herein, the prior Approved Budget shall remain in full force and effect; *provided*, *further* that Administrative Agent and the Lenders (i) may assume that the Loan Parties will comply with the Approved Budget, (ii) shall have no duty to monitor such compliance, (iii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget, (iv) the line items in the Approved Budget for payment of interest, expenses and other amounts to the Administrative Agent and the Lenders shall be estimates only, and the Loan Parties remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents and the applicable DIP Order regardless of whether such amounts exceed such estimates, and (v) nothing in any Approved Budget  shall constitute an amendment or other modification of any Loan Document;

(e)        [Reserved]

(f)        Compliance Certificate.  (i) Concurrently with any delivery of financial statements under Section 5.01(a) or (b) above, a Compliance Certificate certifying that no Default has occurred or, if such a Default has occurred, specifying in reasonable detail the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto; and (ii) in the case of delivery of financial statements under Section 5.01(a) above, a report of the accounting firm opining on or certifying such financial statements stating that in the course of its regular audit of the financial statements of Borrower and its Subsidiaries, which audit was conducted in accordance with GAAP, such accounting firm obtained no knowledge that any Default has occurred or, if in the opinion of such accounting firm such a Default has occurred, specifying in reasonable detail the nature and extent thereof in each case insofar as such Default relates to financial or accounting matters (*provided*, *however*, that such report may indicate

that the accounting firm's audit was not directed primarily toward obtaining knowledge of such noncompliance);

(g)        <u>Management Letters</u>.  Promptly after the receipt thereof by any Company, a copy of any "management letter" or similar document received by any such Person from its certified public accountants and the management's responses thereto;

(h)        <u>Budget Variance Report</u>.  On each Variance Testing Date, a Budget Variance Report. Each such report shall be certified by the chief financial officer of Borrower as being prepared in good faith and fairly presenting in all material respects the information set forth therein;

(i)        [Reserved];

(j)        <u>Certification of Public Information</u>.  Borrower and each Lender acknowledge that certain of the Lenders may be Public Lenders and, if documents or notices required to be delivered pursuant to this <u>Section 5.01</u> or otherwise are being distributed through a Platform, any document or notice that Borrower has not specifically labeled "Public—Contains Only Public Information" shall not be posted on that portion of the Platform designated for such Public Lenders.  If Borrower has not so labeled a document or notice delivered pursuant to this <u>Section 5.01</u>, the Administrative Agent reserves the right to post such document or notice solely on that portion of the Platform designated for Lenders who wish to receive material Non-Public Information with respect to Borrower, its Subsidiaries and their securities. Notwithstanding anything in any Loan Document to the contrary, documents required to be delivered pursuant to <u>Section 5.01(a)(i)</u> and <u>(b)</u> may be posted on that portion of the Platform designated for Public Lenders regardless of whether Borrower has or has not specifically labeled any such document "Public—Contains Only Public Information"; and

(k)        <u>Other Information</u>.  Promptly, from time to time, such other information regarding the operations, business affairs and financial condition of any Company, or compliance with the terms of any Loan Document, or the environmental condition of any Real Property, or the 363 sale process as the Administrative Agent or any Lender may reasonably request subject to any limitations that the Company reasonably believes to be necessary to protect the fairness and integrity of such 363 sale process. Each Lender acknowledges that the Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to in this <u>Section 5.01</u>, and in any event shall have no responsibility to monitor compliance by Borrower with any such request for delivery, and each Lender shall be solely responsible for requesting delivery (from the Administrative Agent) of or maintaining its copies of such documents.

**Section 5.02    <u>Litigation and Other Notices</u>.**  Furnish to the Administrative Agent and each Lender written notice of the following promptly (and, in any event, within five Business Days following the date on which a Responsible Officer obtains knowledge thereof):

(a)        any Default or Event of Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(b)        the filing or commencement of, or any threat or notice of intention of any Person to file or commence, any action, suit, litigation or proceeding (other than before the Bankruptcy Court), whether at law or in equity or otherwise by or before any Governmental Authority, (i) against any Company or any Affiliate thereof that has had, or could reasonably be expected to result in, a Material Adverse Effect, (ii) with respect to any Loan Document or (iii) with respect to any of the other Transactions;

(c)        any development that has resulted, or could reasonably be expected to result, in a Material Adverse Effect after the Petition Date;

(d)        the occurrence of a Casualty Event in excess of $2,000,000 (whether or not covered by insurance);

(e)        the occurrence of any ERISA Event or any other substantially similar event with respect to a Foreign Plan, that, alone or together with any other ERISA Events or any other substantially similar events with respect to a Foreign Plan that have occurred, could reasonably be expected to result in liability of Borrower and its Subsidiaries in an aggregate amount exceeding $2,000,000, and the action, if any, that the Companies or any of their ERISA Affiliates propose to take with respect thereto;

(f)        except to the extent filed with the Bankruptcy Court, the receipt by any Company of any notice of any Environmental Claim or violation of or potential liability under, or knowledge by any Company that there exists a condition that has resulted, or could reasonably be expected to result, in an Environmental Claim or a violation of or liability under, any Environmental Law, except for Environmental Claims, violations and liabilities the consequence of which, in the aggregate, have not and could not be reasonably likely to subject the Companies collectively to liabilities exceeding $2,000,000; and

(g)        (i) the incurrence of any Lien (other than Permitted Liens) on, or claim asserted against, all or any substantial portion of the Collateral (except with respect to the Pre-Petition Term Loan Documents as provided herein), or (ii) the occurrence of any other event which could reasonably be expected to materially and adversely affect the value of the Collateral (other than the commencement of the Bankruptcy Cases and related matters).

Section 5.03    **Existence; Businesses and Properties.**  (a)  Do or cause to be done all things necessary to preserve, renew and maintain in full force and effect its legal existence and all rights and franchises, licenses and permits material to the conduct of its business, except as otherwise expressly permitted under Section 6.05 or Section 6.06.

(b)        Do or cause to be done all things necessary to maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear excepted, all properties material to the conduct of the business of Borrower and its Subsidiaries and from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof necessary in order that the business carried on in connection therewith may be properly conducted at all times; *provided* that nothing in this Section 5.03(b) shall prevent any abandonment or other disposition of property or assets permitted to be made pursuant to Section 6.06.

Section 5.04    **Insurance.**  (a)  Maintain such insurance, to such extent and against such risks as is customary with companies in the same or similar businesses operating in the same or similar locations or as is otherwise deemed prudent by Borrower in the exercise of its reasonable business judgment, including, but not limited to, (i) any insurance required by any contract to which any Company is a party, (ii) physical hazard insurance on an "all risk" basis and (iii) worker's compensation insurance and such other insurance as may be required by any Legal Requirement, *provided* that with respect to physical hazard insurance, (x) neither the Required Lenders nor the applicable Company shall agree to the adjustment of any claim thereunder without the consent of the other (such consent not to be unreasonably conditioned, withheld, or delayed), and (y) no consent of any Company shall be required during an Event of Default.  Each such policy of insurance maintained by or on behalf of the Loan Parties shall (a) in the case of liability insurance policies, name the Collateral Agent, for the benefit of the Secured Parties, as an additional insured thereunder and (b) in the case of business interruption and casualty insurance policies, contain a lender's

54

loss payee clause or endorsement, reasonably satisfactory in form and substance to the Requisite Lenders, that names the Collateral Agent, for the benefit of the Secured Parties, as the lender's loss payee thereunder, and shall provide that it shall not be canceled or not renewed (i) by reason of nonpayment of premium upon not less than 10 days' prior written notice thereof by the insurer to the Collateral Agent (giving the Collateral Agent the right to cure defaults in the payment of premiums) or (ii) for any other reason upon not less than 30 days' (or such shorter number of days as may be agreed to by the Collateral Agent or as may be the maximum number of days permitted by applicable law) prior written notice thereof by the insurer to the Collateral Agent.

(b)       Notify the Administrative Agent and the Collateral Agent immediately whenever any separate insurance concurrent in form or contributing in the event of loss with that required to be maintained under this <u>Section 5.04</u> is taken out by any Company; and promptly (and, in any event, within five Business Days (or such longer period of time as may be agreed by the Administrative Agent at the direction of the Required Lenders)) deliver to the Administrative Agent and the Collateral Agent a duplicate original copy of such policy or policies.

**Section 5.05    Obligations and Taxes.**  In accordance with the Bankruptcy Code and subject to any required approval by the Bankruptcy Court (it being understood that no Debtor shall be obligated to make any payments hereunder that may, in its reasonable judgment, result in a violation of any applicable law, including the Bankruptcy Code, without an order of the Bankruptcy Court authorizing such payments), pay its Indebtedness and other material obligations promptly and in accordance with their terms and pay and discharge promptly when due all material Taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default, as well as all lawful claims for labor, services, materials and supplies or otherwise that, if unpaid, might give rise to a Lien other than a Permitted Lien upon such properties or any part thereof; *provided* that such payment and discharge shall not be required with respect to any such Tax, assessment, charge, levy or claim so long as (i) the validity or amount thereof shall be contested in good faith by appropriate proceedings timely instituted and diligently conducted and the applicable Company shall have set aside on its books adequate reserves or other appropriate provisions with respect thereto in accordance with GAAP, and (ii) such contest operates to suspend collection of the contested obligation, Tax, assessment or charge and enforcement of a Lien other than a Permitted Lien.

**Section 5.06    Employee Benefits.**  (a)  In accordance with the Bankruptcy Code and subject to any required approval by the Bankruptcy Court (it being understood that no Debtor shall be obligated to make any payments hereunder that may, in its reasonable judgment, result in a violation of any applicable law, including the Bankruptcy Code, without an order of the Bankruptcy Court authorizing such payments), comply in all material respects with all applicable Legal Requirements, including the applicable provisions of ERISA and the Code with respect to all Employee Benefit Plans and Foreign Plans and (b) furnish to the Administrative Agent upon request by the Administrative Agent or the Required Lenders, copies of (i) annual report (Form 5500 Series) filed by any Company or any of its ERISA Affiliates with the Employee Benefits Security Administration with respect to each Employee Benefit Plan; (ii) the most recent actuarial valuation report for each Pension Plan; (iii) all notices received by any Company or any of its ERISA Affiliates from a Multiemployer Plan sponsor or any governmental agency concerning an ERISA Event; and (iv) such other information, documents or governmental reports or filings relating to any Employee Benefit Plan or Foreign Plan as the Administrative Agent shall reasonably request.

**Section 5.07    Maintaining Records; Access to Properties and Inspections; Annual Meetings.**  Keep proper books of record and account in which full, true and correct entries in conformity with GAAP and all Legal Requirements are made of all dealings and transactions in relation to its business and activities.  Each Company will permit any representatives designated by the Administrative Agent or any Lender (i) to visit and inspect the financial records and the property of such Company upon reasonable

55

prior notice and at reasonable times (such visits and inspections to be limited to one visit and inspection coordinated by the Administrative Agent per fiscal year so long as no Default or Event of Default has occurred and is continuing), and (ii) to make extracts from and copies of such financial records, and permit any representatives designated by the Administrative Agent (at the direction of the Required Lenders) or, upon the occurrence and during the continuation of any Event of Default, any Lender to discuss the affairs, finances, accounts and condition of any Company with the officers and employees thereof and advisors therefor (including independent accountants) in the presence of representatives of such Company.

  **Section 5.08**  <u>Use of Proceeds.</u> Use the proceeds of the Term Loans solely in accordance with the DIP Orders and the Approved Budget, (i) to pay fees and expenses in connection with the Loan Documents, (ii) for working capital of the Debtors following the commencement of the Cases and pay the costs of administrative of their estates, and (iii) fund the Adequate Protection Account (as defined in the DIP Orders). Except to the extent set forth in the DIP Orders, no proceeds of the DIP Term Facility, any Collateral or any Cash Collateral may be used (i) to investigate (including by way of examinations or discovery proceedings), initiate, assert, prosecute, join, commence, support, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other litigation of any type (a) against any of the Secured Parties or the Secured Parties under the Prepetition Term Loan Documents (each in their capacities as such), or any of their respective affiliates, officers, directors, employees, agents, representatives, attorneys, consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action, or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, any so-called "lender liability" claims and causes of action, or seeking relief that would impair the rights and remedies of the Secured Parties or the Secured Parties under the Prepetition Term Loan Documents (each in their capacities as such) under the Loan Documents, the Prepetition Term Loan Documents, the Prepetition Note Documents (as defined in the DIP Orders), or the DIP Orders, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors or any official committee of unsecured creditors appointed in the Cases in connection with the assertion of or joinder in any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of any of the Secured Parties or the Secured Parties under the Prepetition Term Loan Documents to recover on the Collateral or the Collateral under the Prepetition Term Loan Documents or seeking affirmative relief against any of the Secured Parties or the Secured Parties under the Prepetition Term Loan Documents related to the Obligations or the Obligations under the Prepetition Term Loan Documents; (b) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the Obligations, the Obligations under the Prepetition Term Loan Documents, or liens or security interests of the Secured Parties or the Secured Parties under the Prepetition Term Loan Documents in the Collateral or Collateral under the Prepetition Term Loan Documents, as applicable; or (c) for monetary, injunctive, or other affirmative relief against the Secured Parties or the Secured Parties under the Prepetition Term Loan Documents, or the respective liens on or security interests in the Collateral or the Collateral under the Prepetition Term Loan Documents of the Secured Parties or the Secured Parties under the Prepetition Term Loan Documents that would impair the ability of any of the Secured Parties or the Secured Parties under the Prepetition Term Loan Documents, as applicable, to assert or enforce any lien, claim, right, or security interest or to realize or recover on the Obligations or the Obligations under the Prepetition Term Loan Documents, to the extent applicable; (ii) for objecting to or challenging in any way the legality, validity, priority, perfection, or enforceability of the claims, liens, or interests held by or on behalf of each of the Secured Parties or the Secured Parties under the Prepetition Term Loan Documents related to the Obligations and the Obligations under the Prepetition Term Loan Documents, as applicable; (iii) for asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions related to the Obligations, the DIP Liens (as defined in the DIP Orders), the Obligations under the Prepetition Term Loan Documents, or the Prepetition Liens (as defined in the

DIP Orders); or (iv) for prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of: (x) any of the DIP Liens (as defined in the DIP Orders) or any other rights or interests of the Agent or the Lenders related to the Obligations or the DIP Liens (as defined in the DIP Orders), (y) any of the Prepetition First Lien Loan Liens (as defined in the DIP Orders) or any other rights or interests of any of the Secured Parties under the Prepetition First Lien Loan Documents related to Obligations under the Prepetition First Lien Loan Documents or the Prepetition First Lien Loan Liens (as defined in the DIP Orders), or (z) any of the Prepetition Note Liens or any other rights or interests of any of the Prepetition Noteholders related to the Prepetition Note Obligations or the Prepetition Note Liens (each as defined in the DIP Orders).

**Section 5.09    Compliance with Environmental Laws; Environmental Reports.**    In accordance with the Bankruptcy Code and subject to any required approval by the Bankruptcy Court (it being understood that no Debtor shall be obligated to make any payments hereunder that may, in its reasonable judgment, result in a violation of any applicable law, including the Bankruptcy Code, without an order of the Bankruptcy Court authorizing such payments), comply, and use commercially reasonable efforts to cause all lessees and other Persons occupying its properties to comply, in all material respects with all Environmental Laws applicable to its operations and properties; obtain and renew all material environmental permits necessary for its operations and properties; and conduct any remedial action in accordance with Environmental Laws.

**Section 5.10    Additional Guarantors.**    With respect to any Person that is or becomes a Subsidiary of a Loan Party after the Closing Date, promptly (and in any event within 30 days after such Person becomes a Subsidiary, unless extended by the Administrative Agent in writing (which may be sent by e-mail) in its sole discretion) cause such new Subsidiary (A) to execute a joinder agreement in form and substance reasonably satisfactory to the Required Lenders to become a Subsidiary Guarantor to cause such Subsidiary to become a Subsidiary Guarantor and a Pledgor, (B) deliver opinions of counsel to Borrower in form and substance, and from counsel, reasonably satisfactory to the Required Lenders, and (C) to take all actions necessary or advisable in the opinion of the Administrative Agent or the Required Lenders to cause the Lien created by the applicable Security Document to be duly perfected to the extent required by such Security Document in accordance with all applicable Legal Requirements, including the filing of financing statements (or equivalent registrations) in such jurisdictions as may be reasonably requested by the Administrative Agent or the Required Lenders.

**Section 5.11    Security Interests; Further Assurances.**    (a) Promptly, upon the reasonable request of the Administrative Agent, the Collateral Agent or the Required Lenders, at the Companies' expense, execute, acknowledge and deliver, or cause the execution, acknowledgment and delivery of, and thereafter register, file or record, or cause to be registered, filed or recorded, in an appropriate governmental office, any document or instrument supplemental to or confirmatory of the Security Documents or otherwise deemed by the Administrative Agent, the Collateral Agent or Required Lenders reasonably necessary for the continued validity, enforceability, perfection and priority of the Liens on the Collateral covered thereby subject to no other Liens except Permitted Liens, or obtain any consents or waivers as may be necessary or appropriate in connection therewith.

(b)    Deliver or cause to be delivered to the Administrative Agent and the Collateral Agent from time to time such other documentation, instruments, consents, authorizations, approvals and Orders in form and substance reasonably satisfactory to the Required Lenders as the Required Lenders shall reasonably deem necessary or advisable to perfect or maintain the validity, enforceability, perfection and priority of the Liens on the Collateral pursuant to the Security Documents.

Notwithstanding anything to the contrary in this <u>Section 5.11</u>, the Administrative Agent, the Collateral Agent and the Required Lenders shall not require any action for the continued validity,

enforeceability, perfection or priority of the Liens on the Collateral as to which the cost, burden, difficulty or consequence of such action outweighs the benefit to the Lenders.

**Section 5.12    [Reserved].**

**Section 5.13    [Reserved].**

**Section 5.14    [Reserved].**

**Section 5.15    Priority of Liens.**  Each Debtor hereby covenants, represents and warrants that, upon entry of the Interim Order (and when applicable, the Final Order) and to the extent provided for in such Order, its Obligations hereunder and under the other Loan Documents:

(a)        pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute an allowed Superpriority Claim payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof (including, upon entry of the Final Order, Avoidance Proceeds), having priority over all other administrative claims subject only to payment of the Carve-Out and any Claims secured by Permitted Liens that (A) are in existence on the Petition Date and (B) are either perfected as of the Petition Date or perfected subsequent to the Petition Date solely to the extent permitted by Section 546(b) of the Bankruptcy Code, each to the extent set forth in the DIP Orders;

(b)        pursuant to Sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code, shall be secured by a Lien on all Collateral of the Debtors, which Lien shall have the priority over all other Liens and be subject, as to priority, only to the Carve-Out and the Permitted Liens that (A) are in existence on the Petition Date and (B) are either perfected as of the Petition Date or perfected subsequent to the Petition Date solely to the extent permitted by Section 546(b) of the Bankruptcy Code, each in accordance with the DIP Orders, in each case to the extent set forth in the DIP Orders;

(c)        shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under Section 551 of the Bankruptcy Code or (ii) unless otherwise provided for in the Loan Documents, any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors; and

(d)        for the avoidance of doubt, subject to and effective only upon entry of the Final Order and the terms thereof, the Collateral shall include Avoidance Proceeds.

Except to the extent of the Carve-Out, no costs or expenses of administration of the Cases or any future proceeding that may result therefrom, including a case under Chapter 7 of the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to Sections 105 or 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of Section 552 of the Bankruptcy Code, or any other legal  or equitable doctrine (including, without limitation, unjust enrichment) or any similar principle of law, without the prior written consent of the Administrative Agent and the Required Lenders, with respect to their respective interests, and no consent shall be implied from any action, inaction or acquiescence by the Administrative Agent or the Lenders. In no event shall the Administrative Agent or the Lenders be subject to (i) the "equities of the case" exception contained in Section 552(b) of the Bankruptcy Code, or (ii) the equitable doctrine of "marshaling" or any other similar doctrine with respect to the Collateral.

Except for the Carve-Out, subject to the entry of the DIP Orders and the terms thereof, the Superpriority Claims shall at all times be senior to the rights of Borrower, any Chapter 11 trustee and,

subject to Section 726 of the Bankruptcy Code, any Chapter 7 trustee, or any other creditor (including, without limitation, post-petition counterparties and other post-petition creditors) in the Cases or any subsequent proceedings under the Bankruptcy Code, including, without limitation, any Chapter 7 cases (if any of the Cases are converted to cases under Chapter 7 of the Bankruptcy Code).

Each Loan Party hereby confirms and acknowledges that, pursuant to the Interim Order (and, when entered, the Final Order), the Liens on the Collateral of the Debtors in favor of the Collateral Agent on behalf of and for the benefit of the Secured Parties in all of the assets of the Debtors shall be created and (to the extent the Interim Order (and, when entered, the Final Order) is effective to perfect under local law) perfected, without the necessity of the execution, recordation of filings by any Loan Party of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Collateral Agent of, or over, any Collateral of the Debtors, as set forth in the Interim Order and the Final Order, as applicable.

**Section 5.16     Milestones.**  The Loan Parties shall ensure the satisfaction of the milestones (collectively, the "**Milestones**" and each a "**Milestone**") set forth in Section 3 of the RSA (as in effect on the date hereof), unless waived or extended with the consent of the Required Lenders or the Administrative Agent (with the written consent of the Required Lenders (which may be by email)).

**Section 5.17     Bankruptcy Related Matters.**  Borrower will and will cause each of the Guarantor and the Subsidiaries to:

(a)          cause all proposed (i) "first day" orders, (ii) "second day" orders, (iii) other orders entered by the Bankruptcy Court in the Cases, in each case to the extent that such orders directly relate to, or materially affect the treatment of, the Obligations, the Obligations (as defined in the Pre-Petition Term Loan Credit Agreement), the Loan Documents and the Pre-Petition Term Loan Documents, any other financing or use of Cash Collateral, any sale or other disposition of Collateral outside the ordinary course, cash management, adequate protection, any plan of reorganization and/or any disclosure statement related thereto, to be reasonably acceptable to the Required Lenders, it being understood and agreed that the forms of orders approved by the Required Lenders prior to the Petition Date are in accordance with and permitted by the terms of this Agreement and are reasonably acceptable in all respects;

(b)          provide the Administrative Agent and the Lenders with reasonable access to non-privileged information (including historical information) and relevant personnel regarding strategic planning, cash and liquidity management, operational and restructuring activities, in each case subject to customary confidentiality restrictions;

(c)          (i) deliver to the Administrative Agent (for distribution to the Lenders) and to counsel to the Administrative Agent promptly as soon as available but not later than two (2) Business Days prior to filing, copies of pleadings, motions, applications, orders, financial information and other documents to be filed by or on behalf of the Loan Parties with the Bankruptcy Court in the Cases related to a plan, a disclosure statement, plan exclusivity, assumption or rejection of material executory contracts and unexpired leases (except as provided in the motion seeking approval of the Bidding Procedures and Sale), key employee incentive or retention plans, and (ii) use reasonable best efforts to deliver any other pleading, motion, application, order, financial information or other document as set forth in, and with the timing set forth in, preceding clause (i) to the Administrative Agent (for distribution to the Lenders) and to counsel to the Administrative Agent and Lenders, in each case subject to appropriate confidentiality restrictions to the extent applicable; and

(d)          if not otherwise provided through the Bankruptcy Court's electronic docketing system, as soon as available, deliver to the Administrative Agent (for distribution to the Lenders) and to

counsel to the Administrative Agent promptly as soon as available, copies of all final pleadings, motions, applications, orders, financial information and other documents filed by or on behalf of the Loan Parties with the Bankruptcy Court in the Cases.

**Section 5.18    Budget Compliance.**  The Loan Parties shall comply with, and the proceeds of the Loans shall be used by the Loan Parties in accordance with, the Approved Budget, subject to Permitted Variances.

**Section 5.19    Lender Calls.**  Borrower shall facilitate and hold weekly calls between advisors to the Lenders and the Pre-petition Lenders, on the one hand, and Borrower's advisors, on the other hand. At least once per calendar month, members of Borrower's executive management team shall be required to participate in such calls.  Calls may also be attended by any Lenders or Pre-Petition Lenders who are not Public Lenders.

**Section 5.20    Ordinary Course and Compliance with Applicable Laws.**  Borrower shall operate its business in the ordinary course of business and in compliance with all applicable laws, including Aviation Laws.

**Section 5.21    Post-Closing Date Covenants.**

(a)      Within fifteen (15) Business Days after the Closing Date (or such later date as the Required Lenders may agree in their reasonable discretion (which agreement may be by email)), Borrower shall deliver to the Collateral Agent any endorsements required under Section 5.04.

(b)      Within thirty (30) Business Days after the Closing Date (or such later date as the Required Lenders may agree in their reasonable discretion (which agreement may be by email)), Borrower shall complete the wind down and dissolution of its dormant subsidiary, Monterrey Aerospace Mexico S. de R.L. de C.V.

(c)      Within ten (10) Business Days after the Closing Date (or such later date as the Required Lenders may agree in their reasonable discretion (which agreement may be by email)), each Loan Party shall have delivered to the Administrative Agent a true and complete copy of each Organizational Document of such Loan Party certified by the Secretary of State of the state of its organization; *provided,* however, Monterrey Aerospace, LLC shall have delivered such certified Organizational Documents in accordance with the timing set forth in Section 4.01.

## ARTICLE VI
## NEGATIVE COVENANTS

Each Loan Party warrants, covenants and agrees with the Administrative Agent, the Collateral Agent and each Lender that, so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest and premium (if any) on each Loan, and all Fees and all other expenses or amounts payable under any Loan Document have been paid in full, no Loan Party will, nor will any Loan Party cause or permit any of its Subsidiaries to:

**Section 6.01    Indebtedness.**  Incur, create, assume or permit to exist, directly or indirectly, any Indebtedness, except:

(a)      Indebtedness incurred under this Agreement and the other Loan Documents;

(b)      Indebtedness outstanding on the Closing Date and listed on Schedule 6.01(b);

60

(c)        Indebtedness created under the Pre-Petition Term Loan Documents in an aggregate principal amount not to exceed the aggregate principal amount thereunder as of the Petition Date;

(d)        Indebtedness permitted by Section 6.04;

(e)        [reserved];

(f)        Indebtedness in respect of workers' compensation claims, self-insurance obligations, bankers' acceptances and bid, performance or surety bonds issued for the account of any Company in the ordinary course of business, including guarantees or obligations of any Company with respect to letters of credit supporting such workers' compensation claims, self-insurance obligations, bankers' acceptances and bid, performance or surety obligations (in each case other than for an obligation for money borrowed), in each case consistent with the Approved Budget;

(g)        Contingent Obligations of any Loan Party in respect of Indebtedness otherwise permitted under this Section 6.01(other than Section 6.01(i)); *provided*, that in the event that such Indebtedness in respect of which such Contingent Obligation relates is Subordinated Indebtedness, then the related Contingent Obligation shall be subordinated to the Obligations on the same terms;

(h)        Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business; *provided, however*, that such Indebtedness is extinguished within five Business Days of incurrence;

(i)        Indebtedness arising in connection with endorsement of instruments for deposit in the ordinary course of business and consistent with the Approved Budget; and

(j)        in each case consistent with the Approved Budget, Indebtedness owed to any Person providing property, casualty, liability, or other insurance to Borrower or any of its Subsidiaries that is incurred in the ordinary course of business, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the period in which such Indebtedness is incurred and such Indebtedness is outstanding only during the period covered by such insurance.

**Section 6.02    Liens.** Create, incur, assume or permit to exist, directly or indirectly, any Lien on any property now owned or hereafter acquired by it or on any income or revenues or rights in respect of any thereof, except the following (collectively, the "**Permitted Liens**"):

(a)        inchoate Liens for Taxes, assessments or governmental charges or levies, in each case arising Post-Petition, not yet due and payable or delinquent and Liens for Taxes, assessments or governmental charges or levies, which are being contested in good faith by appropriate proceedings promptly initiated and diligently conducted for which adequate reserves have been established in accordance with GAAP, which proceedings (or Orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien, and (i) which do not in the aggregate materially detract from the value of the property of the Companies, taken as a whole, or the Loan Parties, taken as a whole, and do not materially impair the use thereof in the operation of the business of the Companies, taken as a whole, or the Loan Parties, taken as a whole, and (ii) which, if they secure obligations that are then due and unpaid, are being contested in good faith by appropriate proceedings promptly initiated and diligently conducted for which adequate reserves have been established in accordance with GAAP, which proceedings (or Orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien;

(b)        Liens in respect of property of any Company imposed by law, which were incurred in the ordinary course of business and do not secure Indebtedness for borrowed money, such as carriers', warehousemen's, materialmen's, landlords', workmen's, suppliers', repairmen's and mechanics' Liens and other similar Liens arising in the ordinary course of business;

(c)        any Lien in existence on the Closing Date and set forth on Schedule 6.02(c) (any such Lien, an "**Existing Lien**");

(d)        easements, rights-of-way, restrictions (including zoning restrictions), covenants, licenses, encroachments, protrusions, servitudes and other similar charges or encumbrances, and minor title deficiencies, in each case, on or with respect to any Real Property, whether now or hereafter in existence, not (i) securing Indebtedness, (ii) in the aggregate materially impairing the value of such Real Property or (iii) in the aggregate materially interfering with the ordinary conduct of the business of the Companies at or otherwise with respect to such Real Property;

(e)        Liens arising Post-Petition out of judgments, attachments or awards not resulting in a Default and in respect of which such Company shall in good faith be diligently prosecuting an appeal or proceedings for review in respect of which there shall be secured a subsisting stay of execution pending such appeal or proceedings;

(f)        Liens (other than any Lien imposed by ERISA) (x) imposed by law or deposits made in connection therewith in the ordinary course of business and subject to the DIP Orders and the terms thereof in connection with workers' compensation, unemployment insurance and other types of social security legislation, (y) incurred in the ordinary course of business to secure the performance of tenders, statutory obligations (other than excise taxes), surety, stay, customs and appeal bonds, statutory bonds, bids, leases, government contracts, trade contracts, performance and return of money bonds and other similar obligations (in each case, exclusive of obligations for the payment of Indebtedness) or (z) arising by virtue of deposits made, subject to the DIP Orders and the terms thereof,  in the ordinary course of business to secure liability for premiums to insurance carriers; *provided* that (i) with respect to clauses (x), (y) and (z) of this Section 6.02(f), such Liens are for amounts not yet due and payable or delinquent or, to the extent such amounts are so due and payable, such amounts are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, which proceedings (or Orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien, and (ii) to the extent such Liens are not imposed by Legal Requirements, such Liens shall in no event encumber any property other than cash and Cash Equivalents;

(g)        Leases of the properties of any Company, in each case entered into in the ordinary course of such Company's business so long as such Leases do not, individually or in the aggregate, (i) interfere in any material respect with the ordinary conduct of the business of any Company or (ii) materially impair the use (for its intended purposes) or the value of the property subject thereto;

(h)        Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by any Company in the ordinary course of business in accordance with the past practices of such Company;

(i)        bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by any Company, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank with respect to cash management and operating account arrangements, including those involving pooled accounts and netting arrangements; *provided* that,

62

unless such Liens are non-consensual and arise by operation of applicable Legal Requirements, in no case shall any such Liens secure (either directly or indirectly) the repayment of any Indebtedness;

(j)        Liens securing the Secured Obligations;

(k)        licenses of Intellectual Property granted by any Company in the ordinary course of business and any non-exclusive licenses to Intellectual Property;

(l)        the filing of UCC financing statements prior to the Petition Date solely as a precautionary measure in connection with operating leases or consignment of goods;

(m)        Liens of a collecting bank arising in the ordinary course of business under Section 4-208 of the UCC (or any equivalent provision of the UCC) covering only the items being collected upon;

(n)        Liens in the nature of the right of setoff in favor of counterparties to contractual agreements with Borrower or any Subsidiary in the ordinary course of business; and

(o)        Liens created under the Pre-Petition Term Loan Documents securing the Obligations (as defined in the Pre-Petition Term Loan Credit Agreement).

**Section 6.03    Sale and Leaseback Transactions.**  Enter into any arrangement, directly or indirectly, with any Person whereby it shall sell or transfer any property used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property which it intends to use for substantially the same purpose or purposes as the property being sold or transferred (a "**Sale and Leaseback Transaction**").

**Section 6.04    Investments, Loans and Advances.**  Directly or indirectly, lend money or credit (by way of guarantee, assumption of debt or otherwise) or make advances to any Person, or purchase or acquire any stock, bonds, notes, debentures or other obligations or securities of, or any other interest in, or make any capital contribution to, any other Person, or purchase or own a futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract (all of the foregoing, collectively, "**Investments**"), except that the following shall be permitted:

(a)        Investments outstanding on the Closing Date and identified on Schedule 6.04(b);

(b)        the Companies may (i) acquire and hold accounts receivables owing to any of them if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary terms, (ii) invest in, acquire and hold cash and Cash Equivalents, (iii) endorse negotiable instruments held for collection in the ordinary course of business or (iv) make lease, utility and other similar deposits in the ordinary course of business;

(c)        Investments by any Company in Borrower or any Subsidiary Guarantor;

(d)        Investments in securities of trade creditors or customers in the ordinary course of business and consistent with such Company's past practices that are received in settlement of bona fide disputes or pursuant to any plan of reorganization or liquidation or similar arrangement upon the bankruptcy or insolvency of such trade creditors or customers;

63

(e)        mergers and consolidations in compliance with Section 6.05;

(f)        Investments made by Borrower or any Subsidiary as a result of consideration received in connection with an Asset Sale made in compliance with Section 6.06; and

(g)        acquisitions of property in compliance with Section 6.07 (other than Section 6.07(a)).

**Section 6.05    Mergers and Consolidations.**  Wind up, liquidate or dissolve its affairs or enter into any transaction of merger or consolidation (including, in each case, pursuant to a Delaware LLC Division), (or agree to do any of the foregoing at any time), except that the following shall be permitted:

(a)        dispositions of assets in compliance with Section 6.06 (other than Section 6.06(d) and Section 6.06(e));

(b)        any solvent Company (other than Borrower) may merge or consolidate with or into Borrower or any Subsidiary Guarantor (as long as Borrower or a Subsidiary Guarantor is the surviving Person in such merger or consolidation and, in the case of any Subsidiary Guarantor, remains a Wholly Owned Subsidiary of Borrower); *provided* that the Lien on and security interest in such property granted or to be granted in favor of the Collateral Agent under the DIP Orders or the Security Documents shall be maintained or created in accordance with the provisions of Section 5.10; and

(c)        any Subsidiary may dissolve, liquidate or wind up its affairs at any time if such dissolution, liquidation or winding up is not disadvantageous to any Agent or Lender in any respect.

To the extent the Required Lenders under Section 10.02(b) waive the provisions of this Section 6.05 with respect to the sale of any Collateral, or any Collateral is sold as permitted by this Section 6.05, such Collateral (unless sold to a Company or any Affiliate thereof), but not the proceeds thereof, shall be sold free and clear of the Liens created by the DIP Order or the Security Documents, and, so long as Borrower shall have previously provided to the Collateral Agent and the Administrative Agent such certifications or documents as the Collateral Agent and/or the Administrative Agent shall reasonably request in order to demonstrate compliance with this Section 6.05, the Collateral Agent shall take all actions it deems appropriate in order to effect the foregoing.

**Section 6.06    Asset Sales.**  Effect any Asset Sale, or agree to effect any disposition of any property, except that the following shall be permitted:

(a)        dispositions of obsolete property by Borrower or any of its Subsidiaries in the ordinary course of business and the lapse, abandonment or other disposition of Intellectual Property that is, in the reasonable good faith judgment of Borrower, not material to the conduct of the business of the Companies as a whole, no longer commercially reasonable or desirable to maintain, or no longer useful in the conduct of the business of the Companies taken as a whole;

(b)        [reserved];

(c)        leases of real or personal property in the ordinary course of business and in accordance with the applicable Security Documents;

(d)        Investments in compliance with Section 6.04;

(e)        mergers and consolidations in compliance with Section 6.05;

64

(f)        Dividends in compliance with <u>Section 6.08</u>;

(g)        sales of inventory in the ordinary course of business and dispositions of cash and Cash Equivalents in the ordinary course of business;

(h)        any disposition of property that constitutes a Casualty Event;

(i)        any disposition of property by any Subsidiary of Borrower to Borrower or any of its Wholly Owned Subsidiaries; *provided* that if the transferor of such property is a Subsidiary Guarantor, the transferee thereof must be Borrower or a Subsidiary Guarantor;

(j)        dispositions of Investments or receivables in connection with the compromise, settlement or collection thereof in the ordinary course of business or in bankruptcy or similar proceedings and exclusive of factoring or similar arrangements;

(k)        non-exclusive licenses, sublicenses, leases or subleases of tangible property in the ordinary course of business which do not materially interfere with the business of Borrower and its Subsidiaries; and

(l)        an Acceptable Sale.

To the extent the requisite Lenders under <u>Section 10.02(b)</u> waive the provisions of this <u>Section 6.06</u>, with respect to the sale of any Collateral, or any Collateral is sold as permitted by this <u>Section 6.06</u>, such Collateral (unless sold to a Company or any Affiliate thereof), but not the proceeds thereof, shall be sold free and clear of the Liens created by the DIP Orders or Security Documents, and, so long as Borrower shall have previously provided to the Collateral Agent and the Administrative Agent such certifications or documents as the Collateral Agent and/or the Administrative Agent shall reasonably request in order to demonstrate compliance with this <u>Section 6.06</u>, the Collateral Agent shall take all actions it deems appropriate in order to effect the foregoing.

**Section 6.07    <u>Acquisitions.</u>**    Purchase or otherwise acquire (in one or a series of related transactions) any part of the property of any Person (or agree to do any of the foregoing at any time), except that the following shall be permitted:

(a)        Investments in compliance with <u>Section 6.04</u>;

(b)        [reserved];

(c)        purchases and other acquisitions of inventory, materials, equipment and intangible property in the ordinary course of business and consistent with the Approved Budget;

(d)        leases or licenses of real or personal property in the ordinary course of business and in accordance with this Agreement and the applicable Security Documents and consistent with the Approved Budget;

(e)        mergers and consolidations in compliance with <u>Section 6.05</u>; and

(f)        Dividends in compliance with <u>Section 6.08</u>;

65

*provided* that the Lien on and security interest in such property granted or to be granted in favor of the Collateral Agent under the DIP Orders or Security Documents shall be maintained or created in accordance with the provisions of <u>Section 5.10</u>.

**Section 6.08    Dividends.**  Authorize, declare or pay, directly or indirectly, any Dividends with respect to any Company (including pursuant to any Synthetic Purchase Agreement) or incur any obligation (contingent or otherwise) to do so, except that the following shall be permitted:

(a)    Dividends by any Company that (i) is a Wholly Owned Subsidiary of Borrower to Borrower or any Subsidiary Guarantor that is a Wholly Owned Subsidiary of Borrower and (ii) is a non-Wholly Owned Subsidiary of Borrower or any Subsidiary Guarantor to the holders of Equity Interests therein so long as such Dividend is made pro rata as among all such holders; and

(b)    in each case to the extent consistent with the Approved Budget, (i) to the extent actually used substantially concurrently by Borrower to pay such taxes, costs and expenses, payments to or on behalf of Borrower in an amount sufficient to pay franchise Taxes and other fees required to maintain the legal existence of Borrower and (ii) payments to or on behalf of Borrower in an amount sufficient to pay out-of-pocket legal, accounting and filing costs and other expenses in the nature of overhead in the ordinary course of business of Borrower.

**Section 6.09    Transactions with Affiliates.**  Enter into, directly or indirectly, any transaction or series of related transactions, whether or not in the ordinary course of business, with any Affiliate of any Company (other than between or among Borrower and one or more Subsidiary Guarantors), other than on terms and conditions at least as favorable to such Company as would reasonably be obtained by such Company at that time in a comparable arm's-length transaction with a Person other than an Affiliate, except that the following shall be permitted:

(a)    Dividends permitted by <u>Section 6.08</u>;

(b)    Investments permitted by <u>Section 6.04(c)</u>, <u>(e)</u>, <u>(f)</u> and <u>(g)</u>;

(c)    reasonable and customary director, officer and employee compensation (including bonuses) and other benefits (including retirement, health, stock option and other benefit plans) and indemnification arrangements, in each case approved by the Board of Directors of the applicable Company and to the extent in existence on the Closing Date and in accordance with the Approved Budget; *provided, however*, notwithstanding anything to the contrary set forth herein, the Borrower shall not alter or amend any agreement by and among the Borrower and any independent director as of the Petition Date to increase fees paid to any such independent director without prior written consent of the Required Lenders;

(d)    the Transactions; and

(e)    any transaction with suppliers or franchisees in the ordinary course of business that are on substantially similar terms to those contained in similar transactions by Borrower or any of its Subsidiaries with unaffiliated suppliers and franchisees consistent with past practice.

**Section 6.10    [Reserved].**

**Section 6.11    Prepayments of Other Indebtedness; Modifications of Organizational Documents, Acquisition and Certain Other Documents, etc.**  Directly or indirectly:

(a)        (including pursuant to any Synthetic Purchase Agreement) make or offer to make (or give any notice in respect thereof) any voluntary or optional payment or prepayment on or redemption, retirement, defeasance, or acquisition for value of, or any prepayment or redemption as a result of any asset sale, change of control or similar event of, any Subordinated Indebtedness or any Indebtedness incurred prior to the Petition Date; or

(b)        terminate, amend, modify (including electing to treat any Collateral consisting of Equity Interests in limited liability companies or limited partnerships as a "security" under Section 8-103 of the UCC) or change any of its Organizational Documents (including by the filing or modification of any certificate of designation) or any agreement to which it is a party with respect to its Equity Interests (including any stockholders' agreement), or enter into any new agreement with respect to its Equity Interests.

**Section 6.12    Limitation on Certain Restrictions on Subsidiaries.**  Directly or indirectly, create or otherwise cause or suffer to exist or become effective any encumbrance, restriction or condition on the ability of any Subsidiary to (i) pay Dividends or make any other distributions on its Equity Interests or any other interest or participation in its profits owned by any Company, or pay any Indebtedness owed to any Company, (ii) make loans or advances to any Company or (iii) transfer any of its properties to any Company, except for such encumbrances, restrictions or conditions existing under or by reason of:

(a)        applicable Legal Requirements;

(b)        this Agreement, the other Loan Documents and the Pre-Petition Term Loan Documents;

(c)        customary provisions restricting subletting or assignment of any lease governing a leasehold interest of a Subsidiary;

(d)        customary provisions restricting assignment of any agreement entered into by a Subsidiary in the ordinary course of business;

(e)        customary restrictions and conditions contained in any agreement relating to the sale or other disposition of any property pending the consummation of such sale; *provided* that (i) such restrictions and conditions apply only to the property to be sold, and (ii) such sale or other disposition is permitted hereunder; or

(f)        agreements listed on Schedule 6.12.

**Section 6.13    Business.**  With respect to Borrower and its Subsidiaries, engage (directly or indirectly) in any businesses other than those businesses in which Borrower and its Subsidiaries are engaged on the Closing Date.

**Section 6.14    Limitation on Issuance of Capital Stock.**  With respect to Borrower or any Subsidiary, issue any Equity Interest (including by way of sales of treasury stock) or any options or warrants to purchase, or securities convertible into, any Equity Interest, except (i) for stock splits, stock dividends and additional issuances of Equity Interests which do not decrease the percentage ownership of Borrower or any Subsidiaries in any class of the Equity Interests of such Subsidiary, (ii) Subsidiaries of Borrower formed or acquired after the Closing Date in accordance with Section 6.14 may issue Equity Interests to Borrower or the Wholly Owned Subsidiary of Borrower which is to own such Equity Interests, and (iii) Borrower may issue common stock that is Qualified Capital Stock to Holdings.  All Equity Interests issued

in accordance with this <u>Section 6.13(b)</u> shall, to the extent required by <u>Section 5.11</u> or any Security Document, be delivered to the Collateral Agent for pledge pursuant to the applicable Security Document.

**Section 6.15    Limitation on Accounting Changes.**    Make or permit, any material change in accounting policies or reporting practices, without the consent of the Required Lenders, which consent shall not be unreasonably withheld, except (a) changes that are required by GAAP or (b) to implement IFRS (subject in each case to the provisions of <u>Section 1.04</u>).

**Section 6.16    Fiscal Periods.**    Change its fiscal year or fiscal quarter which currently end on the calendar year and calendar quarter, respectively.

**Section 6.17    No Further Negative Pledge.**    Enter into any agreement, instrument, deed or lease which prohibits or limits the ability of any Company to create, incur, assume or suffer to exist any Lien upon any of its properties or assets, whether now owned or hereafter acquired, or which requires the grant of any security for an obligation if security is granted for another obligation, except the following:  (a) this Agreement and the other Loan Documents and the Pre-Petition Term Loan Documents; (b) covenants in documents creating Liens permitted by <u>Section 6.02</u> prohibiting further Liens (other than Liens permitted under <u>Section 6.02(j)</u>) on the properties encumbered thereby; (c) any prohibition or limitation that (i) exists pursuant to applicable Legal Requirements, or (ii) consists of customary restrictions and conditions contained in any agreement relating to the sale of any property pending the consummation of such sale; *provided* that (1) such restrictions apply only to the property to be sold and such sale is permitted hereunder, and (2) such sale is permitted hereunder, or (iii) restricts subletting or assignment of any lease governing a leasehold interest of Borrower or one of its Subsidiaries; (d) prohibitions and limitations contained in any agreement to which a Subsidiary is a party that was in effect at the time such Subsidiary became a Subsidiary of Borrower, so long as such agreement was not entered into in anticipation or contemplation of such Person becoming a Subsidiary and such prohibitions and limitations only relate to such Subsidiary; (e) customary non-assignment provisions in customer contracts and licenses of (or any other grants of rights to use) Intellectual Property, in each case entered into in the ordinary course of business; and (f) is imposed by any amendments that are otherwise permitted by the Loan Documents of the contracts, instruments or obligations referred to in this <u>Section 6.17</u>; *provided* that such amendments are no more restrictive with respect to the prohibitions and limitations in such contracts, instruments or obligations as in effect prior to any such amendment.

**Section 6.18    Anti-Terrorism Law; Anti-Money Laundering.**

(a)    Directly or indirectly, (i) knowingly conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in <u>Section 3.21</u>, (ii) knowingly deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order or any other Anti-Terrorism Law, or (iii) knowingly engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law (and the Companies shall deliver to the Lenders any certification or other evidence requested from time to time by any Lender in its reasonable discretion, confirming the Companies' compliance with this <u>Section 6.18</u>).

(b)    Cause or permit any of the funds of such Company that are used to repay the Credit Extensions to be derived from any unlawful activity with the result that the making of the Credit Extensions would be in violation of Legal Requirements.

**Section 6.19    Embargoed Person.**    Cause or permit (a) any of the funds or properties of the Companies that are used to repay the Loans or other Credit Extensions to constitute property of, or be beneficially owned directly or indirectly by, any Person subject to sanctions or trade restrictions under

United States law ("**Embargoed Person**" or "**Embargoed Persons**") that is identified on (1) the "List of Specially Designated Nationals and Blocked Persons" maintained by OFAC and/or on any other similar list maintained by OFAC pursuant to any authorizing statute including the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Order or regulation promulgated thereunder, with the result that the investment in the Companies (whether directly or indirectly) is prohibited by applicable Legal Requirements, or the Loans or other Credit Extensions made by the Lenders would be in violation of Legal Requirements, or (2) the Executive Order, any related enabling legislation or any other similar executive orders (the Legal Requirements referred to in clauses (1) and (2), collectively, "**Sanctions Laws**"), (b) any Embargoed Person to have any direct or indirect interest, of any nature whatsoever in the Companies, with the result that the investment in the Companies (whether directly or indirectly) is prohibited by applicable Legal Requirements or the Credit Extensions are in violation of applicable Legal Requirements or (c) any Company to conduct any business or engage in any action that is in violation of any Sanctions Law.

Section 6.20    **Subsidiaries.**    Create, acquire or otherwise permit to exist any Subsidiary that is not in existence as of the Closing Date.

Section 6.21    **Additional Bankruptcy Matters.**    Without the Required Lenders' prior written consent, neither Borrower nor any Subsidiary will, directly or indirectly:

(a)    except to the extent authorized pursuant to authority granted in any "first day" or "second day" order in the Case, enter into any agreement to return any of its inventory to any of its creditors for application against any pre-petition Indebtedness, pre-petition trade payables or other pre-petition claims under Section 546(c) of the Bankruptcy Code or allow any creditor to take any setoff or recoupment against any of its pre-petition Indebtedness, pre-petition trade payables or other pre-petition claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, setoff or recoupment, the aggregate amount applied to pre-petition Indebtedness, pre-petition trade payables and other pre-petition claims subject to all such agreements, setoffs and recoupments since the Petition Date would exceed $100,000;

(b)    incur, create, assume, suffer to exist or permit any other superpriority administrative claim which is pari passu with or senior to the claim of the Administrative Agent or the Lenders against the Debtors, except for payment of the Carve-Out;

(c)    subject to the terms of the Interim Order or the Final Order, as applicable, object to, contest, delay, prevent or interfere with in any material manner the exercise of rights and remedies by the Administrative Agent, the Collateral Agent or the Lenders with respect to the Collateral following the occurrence of an Event of Default (provided that any Loan Party may contest or dispute whether an Event of Default has occurred);

(d)    seek, consent to, or permit to exist, without the prior written consent of the Administrative Agent, at the direction of Required Lenders, any order granting authority to take any action that is prohibited by the terms of this Agreement, the Interim Order, the Final Order or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement, the Interim Order, the Final Order or any of the other Loan Documents;

except (i) as expressly provided or permitted hereunder (it being understood that any payment made pursuant to any "first day" or "second day" orders complying with the terms of this Agreement is permitted hereunder), (ii) with the prior consent of the Required Lenders not to be unreasonably withheld or (iii) as provided pursuant to any other order of the Bankruptcy Court (x) approving payment of any prepetition

69

claims of less than $250,000 in the aggregate or (y) reasonably acceptable to the Required Lenders, make any payment or distribution on account of any Indebtedness arising prior to the Petition Date;

(e)        make any payment, or set aside funds for the purpose of making any payments, or otherwise transfer any economic value (including the payment of any fees, costs or expenses of any advisors) to any direct or indirect equity holder of Borrower solely in its capacity as such; or

(f)        without the prior written consent of the Required Lenders (which consent shall not be unreasonably withheld), make, enter into or implement any amendment, waiver, supplement or other modification to any employment agreement or employee compensation plan, in each case, solely to the extent such agreement or compensation plan relates to an Executive Officer (as defined below), or pay or cause to be paid any amount contemplated by such agreements or plans before the date on which such amount becomes due and payable pursuant to the terms of the such agreements or plans, as applicable, (it being understood that "Executive Officer" means Borrower's Chief Executive Officer, Chief Financial Officer, and General Counsel).

## ARTICLE VII
## GUARANTEE

**Section 7.01    The Guarantee.**  The Subsidiary Guarantors hereby, jointly and severally, guarantee, as primary obligors and not as sureties, to each Secured Party and their respective successors and assigns, the prompt payment and performance in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the principal of, and premium and interest on the Loans made by the Lenders to, and the Notes held by each Lender of, Borrower, and all other Secured Obligations from time to time owing to the Secured Parties by any Loan Party in each case strictly in accordance with the terms thereof (such obligations being herein collectively called the "**Guaranteed Obligations**").  The Subsidiary Guarantors hereby jointly and severally agree that if Borrower or other Subsidiary Guarantor(s) shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, the Subsidiary Guarantors will promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

**Section 7.02    Obligations Unconditional.**  The obligations of the Subsidiary Guarantors under Section 7.01 shall constitute a guaranty of payment and performance and not of collection and to the fullest extent permitted by applicable Legal Requirements, are primary, absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations under this Agreement, the Notes, if any, or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Subsidiary Guarantor (except for payment in full of the Guaranteed Obligations).  Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Subsidiary Guarantors hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

(a)        at any time or from time to time, without notice to the Subsidiary Guarantors, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(b)       any of the acts mentioned in any of the provisions of this Agreement, the other Loan Documents or the Notes, if any, or any other agreement or instrument referred to herein or therein shall be done or omitted;

(c)       the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

(d)       any Lien or security interest granted to, or in favor of, any Secured Party as security for any of the Guaranteed Obligations shall fail to be valid, perfected or to have the priority required under the Loan Documents; or

(e)       the release of any other Subsidiary Guarantor pursuant to Section 7.09.

The Subsidiary Guarantors hereby expressly waive diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that any Secured Party exhaust any right, power or remedy or proceed against Borrower or any Subsidiary Guarantor under this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein, or against any other Person under any other guarantee of, or security for, any of the Guaranteed Obligations. The Subsidiary Guarantors waive any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Secured Party upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between Borrower and the Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee. This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment and performance without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by the Secured Parties, and the obligations and liabilities of the Subsidiary Guarantors hereunder shall be primary and shall not be conditioned or contingent upon the pursuit by the Secured Parties or any other Person at any time of any right or remedy against Borrower or against any other Person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto. This Guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Subsidiary Guarantors and their respective successors and assigns, and shall inure to the benefit of the Secured Parties, and their respective successors and assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guaranteed Obligations outstanding.

**Section 7.03    Reinstatement.**  The obligations of the Subsidiary Guarantors under this Article VII shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of Borrower or other Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

**Section 7.04    Subrogation; Subordination.**  Each Subsidiary Guarantor hereby agrees that until the indefeasible payment and satisfaction in full in cash of all Guaranteed Obligations and the expiration and termination of the Commitments of the Lenders under this Agreement it shall waive any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 7.01, whether by subrogation or otherwise, against Borrower or any other Subsidiary Guarantor of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations.

71

Section 7.05    **Remedies.**  The Subsidiary Guarantors jointly and severally agree that, as between the Subsidiary Guarantors and the Lenders, the obligations of Borrower under this Agreement and other Loan Documents may be declared to be forthwith due and payable as provided in Article VIII (and shall be deemed to have become automatically due and payable in the circumstances provided in Article VIII) for purposes of Section 7.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by Borrower) shall forthwith become due and payable by the Subsidiary Guarantors for purposes of Section 7.01.

Section 7.06    **Instrument for the Payment of Money.**  Each Subsidiary Guarantor hereby acknowledges that the guarantee in this Article VII constitutes an instrument for the payment of money, and consents and agrees that any Lender or any Agent, at its sole option, in the event of a dispute by such Subsidiary Guarantor in the payment of any moneys due hereunder, shall have the right to bring a motion-action under New York CPLR Section 3213.

Section 7.07    **Continuing Guarantee.**  The guarantee in this Article VII is a continuing guarantee of payment and performance, and shall apply to all Guaranteed Obligations whenever arising.

Section 7.08    **General Limitation on Guarantee Obligations.**  In any action or proceeding involving any state corporate limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency or reorganization law or other Legal Requirement affecting the rights of creditors generally, if the obligations of any Subsidiary Guarantor under Section 7.01 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 7.01, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Subsidiary Guarantor, any Loan Party or any other Person, be automatically limited and reduced to the highest amount (after giving effect to the rights of subrogation and contribution established in Sections 7.04 and 7.10, respectively) that is valid and enforceable, not void or voidable and not subordinated to the claims of other creditors as determined in such action or proceeding.

Section 7.09    **[Reserved].**

Section 7.10    **Right of Contribution.**  Each Subsidiary Guarantor hereby agrees that to the extent that a Subsidiary Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Subsidiary Guarantor shall be entitled to seek and receive contribution from and against any other Subsidiary Guarantor hereunder which has not paid its proportionate share of such payment. Each Subsidiary Guarantor's right of contribution shall be subject to the terms and conditions of Section 7.04. The provisions of this Section 7.10 shall in no respect limit the obligations and liabilities of any Subsidiary Guarantor to the Agents and the Lenders, and each Subsidiary Guarantor shall remain liable to the Agents and the Lenders for the full amount guaranteed by such Subsidiary Guarantor hereunder.

## ARTICLE VIII
## EVENTS OF DEFAULT

Section 8.01    **Events of Default.**  Upon the occurrence and during the continuance of any of the following events (each, an "**Event of Default**"):

(a)    any Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan, or (ii) within three (3) Business Days after the same becomes due, any

72

interest on any Loan, any fees or other amounts payable hereunder or with respect to any other Loan Document;

(b)        any representation or warranty made or deemed made in or in connection with any Loan Document or the borrowings of Loans hereunder, or any representation, warranty, statement or information contained in any report, certificate, financial statement or other instrument furnished in connection with or pursuant to any Loan Document, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished;

(c)        default shall be made in the due observance or performance by any Company of any covenant, condition or agreement contained in Sections 5.01 (other than Sections 5.01(d), (f) and (h)), 5.02(a), 5.02(b)), 5.02(g), 5.03(a), 5.08, 5.15, 5.16, 5.17, 5.18, 5.19, 5.20, 5.21 or in Article VI;

(d)        default shall be made in the due observance or performance by any Company of any covenant, condition or agreement contained in Section 5.01(d), (f), and (h) and such default shall continue unremedied or shall not be waived for a period of three (3) Business Days after such default;

(e)        default shall be made in the due observance or performance by any Company of any covenant, condition or agreement contained in any Loan Document (other than those specified in paragraphs (a), (b) (c) or (d) immediately above) and such default shall continue unremedied or shall not be waived for a period of thirty (30) days after the delivery of written notice thereof to Borrower by the Administrative Agent;

(f)        the occurrence of any of the following with respect to the Qui Tam Settlement:

(i)        the Debtors shall have failed to file the Qui Tam Settlement Motion in accordance with the timing set forth in the RSA;

(ii)        the Bankruptcy Court denies approval of the Qui Tam Settlement Motion;

(iii)        the failure of the Insurers (as defined in the Qui Tam Settlement) to remit the Cash Payments when due;

(g)        the occurrence of any of the following in any of the Cases:

(i)        other than a motion in support of the DIP Orders, the bringing of a motion, taking of any action or the filing of any plan of reorganization or plan of liquidation or disclosure statement attendant thereto by any of the Loan Parties or any of their Subsidiaries, in the Cases: (A) to obtain additional financing under Section 364(c) or Section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement unless such additional financing contemplates payment in full in cash of the Obligations immediately upon consummation of the transactions contemplated thereby; (B) to grant any Lien other than Permitted Liens upon or affecting any Collateral; (C) except as provided in the DIP Order, to use cash collateral of the Administrative Agent and the other Secured Parties under Section 363(c) of the Bankruptcy Code; or (D) any other action or actions adverse to the Administrative Agent and Lenders or their rights and remedies hereunder, under any other Loan Documents, or their interest in the Collateral, in each case, without the prior written consent of the Administrative Agent (at the direction of the Required Lenders);

(ii)        (A) the filing of any plan of reorganization or plan of liquidation or disclosure statement attendant thereto, or any direct or indirect amendment to any such plan or disclosure statement, by a Loan Party that does not propose to indefeasibly repay in full in cash the Obligations under

73

this Agreement, or by any other Person to which the Administrative Agent (at the direction of the Required Lenders) does not consent, or any of the Loan Parties or their Subsidiaries shall seek, support or fail to contest in good faith the filing or confirmation of any such plan or entry of any such order, (B) the entry of any order terminating any Loan Party's exclusive right to file a plan of reorganization or plan of liquidation (or such an order is sought by any party and not actively contested by the Loan Parties), or (C) the expiration of any Loan Party's exclusive right to file a plan of reorganization or plan of liquidation, , in each case, without the prior written consent of the Administrative Agent (at the direction of the Required Lenders);

(iii)    the entry of an order in any of the Cases confirming a plan of reorganization or plan of liquidation that (A) is not acceptable to the Required Lenders in their sole discretion or (B) does not contain a provision for termination of the Commitments and indefeasible repayment in full in cash of all of the Obligations under this Agreement on or before the effective date of such plan or plans;

(iv)    (x) the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents, the Interim Order, the Final Order or any other order with respect to any of the Cases affecting in any material respect this Agreement and/or the other Loan Documents without the written consent of the Administrative Agent (at the direction of the Required Lenders) or the filing by a Loan Party of a motion to alter, amend, vacate, supplement, modify, or reconsider, in any respect, the Interim Order, the Final Order or any other order with respect to any of the Cases affecting in any material respect this Agreement and/or the other Loan Documents, or the failure of any of the Interim Order or the Final Order to be in full force and effect or (y) any Loan Party or any Subsidiary shall fail to comply with, or perform any of its obligations under, the DIP Order then in effect, or the failure of any Loan Party to perform in any material respect its obligations under the Bidding Procedures Order or any other order with respect to any of the Cases;

(v)    the Bankruptcy Court's entry of an order granting relief from the Automatic Stay to permit foreclosure of security interests in assets of the Loan Parties of a value in excess of $250,000;

(vi)    any Loan Party or any person on behalf of any Loan Party shall file any motion seeking authority to consummate a sale of assets of the Loan Parties or the Collateral (other than an Acceptable Sale) having a value in excess of $250,000 outside the ordinary course of business and not otherwise permitted hereunder;

(vii)    (x) the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the Administrative Agent, any Lender or any of the Collateral or (y) an order in the Cases shall be entered charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Administrative Agent and the Secured Parties;

(viii)    the appointment of an interim or permanent trustee in the Cases or the appointment of a trustee receiver or an examiner in the Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Loan Parties (without consent of the Administrative Agent (at the direction of the Required Lenders));

(ix)    (A) the dismissal of any of the Cases or (B) any Loan Party shall file a motion or other pleading seeking the dismissal of the any of the Cases under Section 1112 of the Bankruptcy Code or otherwise;

(x)    any Loan Party shall file a motion (without consent of the Administrative Agent (at the direction of the Required Lenders)) seeking, or the Bankruptcy Court shall enter an order

74

granting, relief from or modifying the Automatic Stay (A) to allow any creditor (other than the Administrative Agent) to execute upon or enforce a Lien on any Collateral, (B) approving any settlement or other stipulation not approved by the Required Lenders with any creditor of any Loan Party providing for payments as adequate protection or otherwise to such secured creditor or (C) permit other actions that would have a Material Adverse Effect on the Debtors or their estates (taken as a whole);

(xi)     the commencement of a suit or an action (but not including a motion for standing to commence a suit or an action) against either the Administrative Agent or any Lender brought by any Person, a claim or any legal or equitable remedy that would (x) have the effect of invalidating, subordinating or challenging any or all of the Obligations or Liens of the Administrative Agent or any Lender under the Loan Documents, or (y) have a Material Adverse Effect on the rights and remedies of the Administrative Agent or any Lender or the collectability of all or any portion of the Obligations under the Loan Documents;

(xii)     the entry of an order in the Cases avoiding or permitting recovery of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents;

(xiii)     the existence of any claims or charges, or the entry of any order of the Bankruptcy Court authorizing any claims or charges, other than in respect of this Agreement and the other Loan Documents, or as otherwise permitted under the applicable Loan Documents or permitted under the DIP Order then in effect, entitled to superpriority administrative expense claim status in any of the Cases pursuant to Section 364(c)(1) of the Bankruptcy Code *pari passu* with or senior to the claims of the Administrative Agent and the Secured Parties under this Agreement and the other Loan Documents, or there shall arise or be granted by the Bankruptcy Court (i) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code or (ii) any Lien on the Collateral having a priority senior to or *pari passu* with the Liens and security interests granted herein, except, in each case, as expressly provided in the Loan Documents or in the DIP Order then in effect or otherwise with the consent of the Administrative Agent (at the direction of the Required Lenders);

(xiv)     the Interim Order or Final Order shall cease to create a valid and perfected Lien (which creation and perfection shall not require any further action other than the entry of the Interim Order or Final Order) on the Collateral or to be in full force and effect, shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, in the case of modification or amendment, without prior written consent of the Administrative Agent (at the direction of the Required Lenders);

(xv)     any order having been entered or granted (or requested, unless actively opposed by the Loan Parties) by either the Bankruptcy Court or any other court of competent jurisdiction materially adversely impacting the rights and interests of the Administrative Agent and the Lenders, as determined by the Required Lenders, acting reasonably, without the prior written consent of the Administrative Agent (at the direction of the Required Lenders);

(xvi)     an order of the Bankruptcy Court shall be entered denying or terminating use of cash collateral by the Loan Parties authorized by the DIP Order then in effect;

(xvii)     any Loan Party shall challenge, support or encourage a challenge of any payments made to the Administrative Agent or any Lender with respect to the Obligations, or without the consent of the Required Lenders, the filing of any motion by the Loan Parties seeking approval of (or the entry of an order by the Bankruptcy Court approving) adequate protection to the Pre- Petition Agent or any Pre-Petition Lender that is inconsistent with the DIP Order then in effect;

(xviii)    without the Administrative Agent's consent (at the direction of the Required Lenders), the entry of any order by the Bankruptcy Court granting, or the filing by any Loan Party or any of its Subsidiaries of any motion or other request with the Bankruptcy Court (in each case, other than the DIP Order and motions seeking entry thereof or permitted amendments or modifications thereto) seeking authority to use any cash proceeds of any of the Collateral without the Required Lenders' consent or to obtain any financing under Section 364 of the Bankruptcy Code other than the Loan Documents unless such motion or other request, or order granting the same, contemplates payment in full in cash of the Obligations immediately upon consummation of the transactions contemplated thereby;

(xix)    without the Administrative Agent's consent (at the direction of the Required Lenders), any Loan Party or any Subsidiary thereof shall file any motion or other request with the Bankruptcy Court seeking (a) to grant or impose, under Section 364 of the Bankruptcy Code or otherwise, liens or security interests in any Collateral, whether senior, equal or subordinate to the Administrative Agent's liens and security interests; or (b) to modify or affect any of the rights of the Administrative Agent or the Lenders under the DIP Order then in effect, the Loan Documents, and related documents by any plan of reorganization confirmed in the Cases or subsequent order entered in the Cases;

(xx)    any Loan Party or any Subsidiary thereof or any Debtor shall take any action in support of any matter set forth in this Section 8.01 or any other Person shall do so and such application is not contested in good faith by the Loan Parties and the relief requested is granted in an order that is not stayed pending appeal;

(xxi)    any Debtor shall deny in writing that such Debtor has liability or obligation under this Agreement for the Obligations or seeks to recover any monetary damages from the Administrative Agent or any Lender;

(xxii)    a Challenge (as defined in the DIP Order then in effect) shall be filed by any party in interest and shall be sustained by the Bankruptcy Court, in whole or in part;

(xxiii)    the RSA is terminated in accordance with its terms; or

(xxiv)    the failure to satisfy any milestone in the RSA or the DIP Order;

(h)    except for the allowance in the Cases of a general unsecured claim, one or more judgments or decrees shall be entered against any Loan Party or any Subsidiary thereof after the Petition Date involving a liability in excess of $500,000 in the aggregate for all such judgments and decrees (to the extent not covered by insurance or indemnities as to which the applicable insurance company has not denied coverage) and such judgments or decrees shall not have been satisfied, vacated, discharged or stayed or bonded pending appeal within twenty (20) days after the entry thereof (or such later date as the Required Lenders may agree in writing in their sole discretion);

(i)    any material provision of the Loan Documents, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or as a result of acts or omissions by the Administrative Agent or any Lender or the satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of any provision of any Loan Document or the validity or priority of a Lien as required by the DIP Order on a material portion of the Collateral;

(j)    any Debtor shall be enjoined, suspended or barred from conducting any material portion of its business and, in each case, such event would reasonably be expected to have a Material Adverse Effect;

76

(k)        any disruption of the material business operations of the Debtors shall occur, or any material damage to or loss of material assets of any Debtor shall occur and, in each case, such event or circumstance would reasonably be expected to have a Material Adverse Effect;

(l)        any Loan Party shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition Indebtedness or payables in excess of $150,000, other than (i) payments in respect of the repayment of the Indebtedness outstanding under the Pre-Petition Term Loan Documents or as otherwise permitted under this Agreement, or (ii) to the extent authorized by one or more "first day" orders or "second day" orders, the Interim Order or the Final Order, in each case to the extent consistent with the Approved Budget;

(m)        any Material Contract shall be terminated in accordance with its terms (other than as a result of the expiration thereof in accordance with its terms); or

(n)        the occurrence of any ERISA Event or any other substantially similar event with respect to a Foreign Plan, that, alone or together with any other ERISA Events or any other substantially similar events with respect to a Foreign Plan that have occurred, that could reasonably be expected to result in a Material Adverse Effect.

then, and in every such event, and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the written request of the Required Lenders shall, subject to the terms and conditions of the DIP Orders, take any one or more of the following actions, at the same or different times:  (i) terminate forthwith the Commitments; (ii) declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Loan Parties accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Loan Parties, anything contained herein or in any other Loan Document or otherwise to the contrary notwithstanding; (iii) deliver a Carve-Out Trigger Notice invoking the Post Carve-Out Trigger Notice Cap as of the Carve-Out Trigger Date; and (iv) exercise any and all of its other rights and remedies under applicable Legal Requirements, hereunder and under the other Loan Documents.

In addition, without limiting the foregoing, in the event of a foreclosure (or other similar exercise of remedies) by the Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition, the Collateral Agent, the Administrative Agent or any Secured Party may be the purchaser of any or all of such Collateral at any such sale or other disposition and, in addition, the Collateral Agent or the Administrative Agent, as agent for and representative of all of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale or other disposition, to use and apply any of the Obligations as a credit on account of the purchase price for any Collateral payable by the Collateral Agent at such sale.

Notwithstanding anything to the contrary herein, except with respect to Section 8.01(a), subject to the provisions of the Interim Order (and, when entered, the Final Order), (x) with respect to enforcement of Liens or remedies with respect to Collateral, the Collateral Agent shall provide Borrower five (5) Business Days' notice prior to taking such action (the "**Remedies Notice Period**"), and (y) after expiration of the Remedies Notice Period, the Agents shall, at the request of, or may, with the consent of, the Required Lenders, (x) terminate the consensual use of Cash Collateral and (y) exercise all other rights and remedies provided for in this Agreement, the DIP Orders and under applicable law.  Solely during the Remedies Notice Period, the Debtors may continue to use Cash Collateral in the ordinary course of business,

consistent with past practices, including for the purpose of funding the Carve-Out. During the Remedies Notice Period, any party in interest shall be entitled to seek an emergency hearing with the Bankruptcy Court with respect to any attempt by the Administrative Agent, the Collateral or any Lender to exercise rights and/or remedies. With respect to underline Section 8.01(a), notwithstanding the provisions of Section 362 of the Bankruptcy Code and subject to the applicable provisions of the Interim Order or the Final Order, the Administrative Agent and Lenders shall be entitled to immediate payment of the Obligations and to enforce the remedies provided for hereunder or under applicable Laws, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court.

**Section 8.02**    **Rescission.**  If at any time after termination of the Commitments or acceleration of the maturity of the Loans, the Loan Parties shall pay all arrears of interest and all payments on account of principal of the Loans owing by them that shall have become due otherwise than by acceleration (with interest on principal and, to the extent permitted by law, on overdue interest, at the rates specified herein) and all Defaults (other than non-payment of principal of and accrued interest on the Loans due and payable solely by virtue of acceleration) shall be remedied or waived pursuant to Section 10.02, then upon the written consent of the Required Lenders (which may be given or withheld in their sole discretion) and written notice to Borrower, the termination of the Commitments or the acceleration and their consequences may be rescinded and annulled; but such action shall not affect any subsequent Default or Event of Default or impair any right or remedy consequent thereon. The provisions of the preceding sentence are intended merely to bind the Lenders, and the other Secured Parties to a decision that may be made at the election of the Required Lenders, and such provisions are not intended to benefit Borrower or any of the other Loan Parties and do not give Borrower and/or any of the Loan Parties the right to require the Lenders to rescind or annul any acceleration hereunder, even if the conditions set forth herein are met.

**Section 8.03**    **[Reserved].**

**Section 8.04**    **Application of Proceeds.**  After the exercise of remedies provided for in this Article XIII (or after the Loans have automatically become immediately due and payable), any amounts received under any Loan Documents shall be applied by the Administrative Agent and Collateral Agent as follows:

(a)    *First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Agents) then due and payable to the Agents in their respective capacities as such, until payment in full of all such fees shall have been made;

(b)    *Second*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest) payable to the Lenders, ratably among them in proportion to the amounts described in this clause *second* payable to them;

(c)    *Third*, to pay ratably all accrued and unpaid interest on the Loans, until payment in full of all such interest shall have been made;

(d)    *Fourth*, to pay the unpaid principal amount of the Loans ratably, until payment in full of the principal of all Loans shall have been made;

(e)    *Fifth*, to pay all other Obligations ratably, until payment in full of all such other Obligations shall have been made; and

(f)    *Sixth*, the balance, if any, to the Person lawfully entitled thereto (including the applicable Loan Party or its successors or assigns) or as a court of competent jurisdiction may direct.

In the event that any such proceeds are insufficient to pay in full the items described in clauses (a) through (f) above, the Loan Parties shall remain liable, jointly and severally, for any deficiency.

## ARTICLE IX
## THE ADMINISTRATIVE AGENT AND THE COLLATERAL AGENT

**Section 9.01** **Appointment.** (a) Each Lender hereby irrevocably designates and appoints Acquiom Agency Services LLC as the Administrative Agent and the Collateral Agent under this Agreement and the other Loan Documents and Acquiom Agency Services LLC hereby accepts such designations and appointments. Each Lender irrevocably authorizes each Agent, in such capacity, through its agents or employees, to take such actions on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are delegated to such Agent by the terms of this Agreement and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto. The provisions of this <u>Article IX</u> are solely for the benefit of the Agents and the Lenders, and no Loan Party shall have rights as a third party beneficiary of any such provisions. Without limiting the generality of the foregoing, the Agents are hereby expressly authorized to execute any and all documents (including releases) with respect to the Collateral and any rights of the Secured Parties with respect thereto as contemplated by and in accordance with the provisions of this Agreement and the other Loan Documents. In performing its functions and duties hereunder, each Agent shall act solely as an agent of the Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for Borrower or any of its Subsidiaries. Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement with reference to the Administrative Agent or the Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom and is intended to create or reflect only an administrative relationship between independent contracting parties.

(b) Each Lender hereby irrevocably authorizes the Administrative Agent and the Collateral Agent, based upon the instruction of the Required Lenders, to credit bid and purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted by Collateral Agent under the provisions of the UCC, including pursuant to Sections 9-610 or 9-620 of the UCC (or any equivalent provision of the UCC), at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code, or at any other sale or foreclosure conducted by Collateral Agent (whether by judicial action or otherwise) in accordance with applicable Legal Requirements.

(c) Each Lender irrevocably appoints each other Lender as its agent and bailee for the purpose of perfecting Liens (whether pursuant to Section 8-301(a)(2) of the UCC or otherwise), for the benefit of the Secured Parties, in assets in which, in accordance with the UCC or any other applicable Legal Requirement a security interest can be perfected by possession or control. Should any Lender (other than the Collateral Agent) obtain possession or control of any such Collateral, such Lender shall notify the Collateral Agent thereof, and, promptly following the Collateral Agent's request therefor, shall deliver such Collateral to the Collateral Agent or otherwise deal with such Collateral in accordance with the Collateral Agent's instructions.

(d) Any corporation or association into which any Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which such Agent is a party, will be and become the successor Agent, as applicable, under this Agreement and will have and

succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

**Section 9.02     Agent in Its Individual Capacity.**  Each Person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender, if applicable, as any other Lender and may exercise the same as though it were not an Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as an Agent hereunder, if applicable, in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, any Company or Affiliate thereof as if it were not an Agent hereunder and without duty to account therefor to the Lenders.

**Section 9.03     Exculpatory Provisions.**  No Agent shall have any duties or obligations except those expressly set forth in the Loan Documents.  Without limiting the generality of the foregoing, (a) no Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing, (b) no Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the Loan Documents that such Agent is required to exercise in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in <u>Section 10.02</u>); *provided* that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability, if the Agent is not indemnified to its satisfaction, or that is contrary to any Loan Document or applicable Legal Requirements including, for the avoidance of doubt any action that may be in violation of the automatic stay under any Insolvency Law or that may effect a foreclosure, modification or termination of Property of a Defaulting Lender under any Debtor Relief Law, and (c) except as expressly set forth in the Loan Documents, no Agent shall have any duty to disclose or shall be liable for the failure to disclose, any information relating to any Company or any of its Affiliates that is communicated to or obtained by the Person serving as such Agent or any of its Affiliates in any capacity.  No Agent shall be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as any Agent shall believe in good faith shall be necessary, under the circumstances as provided in <u>Section 8.04</u> or <u>Section 10.02</u>) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by a final and nonappealable judgment.  No Agent shall be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof describing such Default or Event of Default is given to such Agent by Borrower or a Lender, and no Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in <u>Article IV</u> or elsewhere in any Loan Document.  Each party to this Agreement acknowledges and agrees that the Administrative Agent may from time to time use one or more outside service providers for the tracking of all UCC financing statements (and/or other collateral related filings and registrations from time to time) required to be filed or recorded pursuant to the Loan Documents and the notification to the Administrative Agent, of, among other things, the upcoming lapse or expiration thereof, and that each of such service providers will be deemed to be acting at the request and on behalf of Borrower and the other Loan Parties.  No Agent shall be liable for any action taken or not taken by any such service provider.  Neither any Agent nor any of its officers, partners, directors, employees or agents shall be liable to the Lenders for any action taken or omitted by any Agent under or in connection with any of the Loan Documents.  In no event shall any Agent be liable for any failure or delay in the performance of their respective obligations under this Agreement or any related documents because of

circumstances beyond such Agent's control, including, but not limited to, a failure, termination, or suspension of a clearing house, securities depositary, settlement system or central payment system in any applicable part of the world or acts of God, flood, war (whether declared or undeclared), civil or military disturbances or hostilities, nuclear or natural catastrophes, political unrest, explosion, severe weather or accident, earthquake, terrorism, fire, riot, labor disturbances, strikes or work stoppages for any reason, embargo, government action, including any laws, ordinances, regulations or the like (whether domestic, federal, state, county or municipal or foreign) which delay, restrict or prohibit the providing of the services contemplated by this Agreement or any related documents, or the unavailability of communications or computer facilities, the failure of equipment or interruption of communications or computer facilities, or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility, or any other causes beyond such Agent's control whether or not of the same class or kind as specified above.

Nothing in this Agreement or any other Loan Document shall require the Administrative Agent or the Collateral Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties or in the exercise of any of its rights or powers hereunder.

The Agents shall have no obligation for (a) perfecting, maintaining, monitoring, preserving or protecting the security interest or Lien granted under the Credit Agreement, any other Loan Document, or any agreement or instrument contemplated hereby or thereby; (b) the filing, re-filing, recording, re-recording, or continuing of any document, financing statement, mortgage, assignment, notice, instrument of further assurance, or other instrument in any public office at any time or times; or (c) providing, maintaining, monitoring, or preserving insurance on or the payment of taxes with respect to any Collateral.

The Agents shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to Borrower Competitors. Without limiting the generality of the foregoing, the Agents shall not (a) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or prospective Lender or Participant is a Borrower Competitor or (b) have any liability with respect to or arising out of any assignment or participation of Loans, or disclosure of confidential information, to any Borrower Competitor.

**Section 9.04**    **Reliance by Agent.**  Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent, or otherwise authenticated by a proper Person. Each Agent also may rely upon any statement made to it orally and believed by it to be made by a proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, each Agent may presume that such condition is satisfactory to such Lender unless each Agent shall have received written notice to the contrary from such Lender prior to the making of such Loan.  Each Agent may consult with legal counsel (who may be counsel for Borrower), independent accountants and other advisors selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or advisors.

**Section 9.05**    **Delegation of Duties.**  Each Agent may perform any and all of its duties and exercise its rights and powers by or through, or delegate any and all such rights and powers to, any one or more sub-agents appointed by such Agent.  Each Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates.  The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Affiliates of each Agent and any such sub-agent, and shall apply, without limiting the foregoing, to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent. The Agents shall not be responsible for the negligence or misconduct of any sub-agent except to the extent

that a court of competent jurisdiction determines in a final and nonappealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such sub-agent.

Section 9.06    **Successor Agent.**    Each Agent may resign as such at any time upon at least 10 days' prior notice to the Lenders and Borrower.  Upon any such resignation, the Required Lenders shall have the right to appoint a successor Administrative Agent or Collateral Agent, as the case may be.  If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 10 days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Lenders, appoint a successor Administrative Agent or Collateral Agent, as the case may be.  If no successor Agent shall have been appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation, the retiring Agent's resignation shall nevertheless thereupon become effective and the retiring (or retired) Agent shall be discharged from its duties and obligations under the Loan Documents, and the Required Lenders shall assume and perform all of the duties of such Administrative Agent or Collateral Agent, as the case may be, under the Loan Documents until such time, if any, as the Required Lenders appoint a successor Agent.

Upon the acceptance of its appointment as an Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring (or retired) Agent shall be discharged from its duties and obligations under the Loan Documents (if not already discharged therefrom as provided in this paragraph).  The fees payable by Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between Borrower and such successor.  After an Agent's resignation hereunder, the provisions of this Article IX, Section 10.03 and Sections 10.08 to 10.10 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Affiliates in respect of any actions taken or omitted to be taken by any of them while it was acting as an Agent.

Section 9.07    **Non-Reliance on Agent and Other Lenders.**    Each Lender acknowledges that it has, independently and without reliance upon any Agent or any other Lender or any of their respective Affiliates and based on such documents and information as it has deemed appropriate, conducted its own independent investigation of the financial condition and affairs of the Loan Parties and their Subsidiaries and made its own credit analysis and decision to enter into this Agreement.  Each Lender further represents and warrants that it has reviewed each document made available to it on the Platform in connection with this Agreement and has acknowledged and accepted the terms and conditions applicable to the recipients thereof (including any such terms and conditions set forth, or otherwise maintained, on the Platform with respect thereto).  Each Lender also acknowledges that it will, independently and without reliance upon any Agent or any other Lender or any of their respective Affiliates and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or related agreement or any document furnished hereunder or thereunder.

Section 9.08    **[Reserved].**

Section 9.09    **Indemnification.**    The Lenders severally agree to indemnify each Agent in its capacity as such and each of its Related Persons (to the extent not reimbursed by Borrower or the Subsidiary Guarantors and without limiting the obligation of Borrower or the Subsidiary Guarantors to do so), ratably according to their respective outstanding Loans and Commitments in effect on the date on which indemnification is sought under this Section 9.09 (or, if indemnification is sought after the date upon which all Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such outstanding Loans and Commitments as in effect immediately prior to such date), from and against any and all Indemnified Liabilities (IN ALL CASES, WHETHER OR NOT CAUSED OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE

NEGLIGENCE OF ANY AGENT OR RELATED PERSON); *provided* that no Lender shall be liable for the payment of any portion of such Indemnified Liabilities that are found by a final and nonappealable judgment of a court of competent jurisdiction to have directly resulted solely and directly from such Agent's or Related Person's, as the case may be, gross negligence or willful misconduct; *provided*, *however*, that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be provided by the Loan Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this <u>Section 9.09</u>.  In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this <u>Section 9.09</u> shall apply whether or not any such investigation, litigation or proceeding is brought by any Lender or any other Person. Without limiting the foregoing, the Lenders shall reimburse the Agent upon demand ratably according to their respective outstanding Loans and Commitments in effect on the date on which reimbursement is sought under this <u>Section 9.09</u> (or if such reimbursement payment is sought after the date on which the Loans have been paid in full and the Commitments have terminated, ratably in accordance with the outstanding Loans and Commitments as in effect immediately prior to such date) any costs or out-of-pocket expenses (including the fees, disbursements and other charges of counsel) incurred by such Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise and including the enforcement of this <u>Section 9.09</u>) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that the Agents are not reimbursed for such expenses by or on behalf of Borrower. Each Lender hereby authorizes the Agents to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Agents to such Lender from any source against any amount due to the Agents under this <u>Section 9.09</u>. The undertaking in this <u>Section 9.09</u> shall survive termination of the Commitments, the payment of all other Obligations and the resignation or removal of the Agents.  The agreements in this <u>Section 9.09</u> shall survive the payment of the Loans and all other amounts payable hereunder.

Section 9.10    [Reserved].

Section 9.11    **Lender Action.**  Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party or any other obligor under any of the Loan Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures or cause any of the foregoing (through Affiliates or otherwise), with respect to any Collateral or any other Property of any such Loan Party, without the prior written consent of the Administrative Agent.  Without limiting the foregoing, each Lender agrees that, except as otherwise provided in any Loan Documents or with the written consent of the Administrative Agent, it will not take any enforcement action, accelerate Obligations under any Loan Documents, or exercise any right that it might otherwise have under applicable Legal Requirements to credit bid or purchase any portion of the Collateral at any sale or foreclosure thereof referred to in <u>Section 9.01(b)</u>; *provided* that nothing contained in this Section shall affect any Lender's right to credit bid its pro rata share of the Obligations pursuant to Section 363(k) of the Bankruptcy Code.

Section 9.12    [Reserved].

Section 9.13    **Lender's Representations, Warranties and Acknowledgements.**  (a) Each Lender represents and warrants that it has made its own independent investigation of the financial condition and affairs of Borrower and its Subsidiaries in connection with Credit Extensions hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of Borrower and its Subsidiaries. No Agent shall have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of Lenders or to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at

any time or times thereafter, and no Agent shall have any responsibility with respect to the accuracy of or the completeness of any information provided to the Lenders. Each Lender acknowledges that no Agent or Related Person of any Agent has made any representation or warranty to it. Except for documents expressly required by any Loan Document to be transmitted by an Agent to the Lenders, no Agent shall have any duty or responsibility (either express or implied) to provide any Lender with any credit or other information concerning any Loan Party, including the business, prospects, operations, Property, financial and other condition or creditworthiness of any Loan Party or any Affiliate of a Loan Party, that may come in to the possession of an Agent or any of its Related Persons.

(b)      Each Lender, by delivering its signature page to this Agreement or an Assignment and Assumption and funding its Loan, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be approved by any Agent, the Required Lenders or the Lenders, as applicable, on the Closing Date.

**Section 9.14      Security Documents and Guarantee.**

(a)      Agents under Security Documents and Guarantee. Each Secured Party hereby further authorizes the Administrative Agent or the Collateral Agent, as applicable, on behalf of and for the benefit of the Secured Parties, to be the agent for and representative of the Secured Parties with respect to the Guarantee, the Collateral and the Loan Documents. Subject to Section 10.02, without further written consent or authorization from any Secured Party, the Administrative Agent or the Collateral Agent, as applicable, may execute any documents or instruments necessary to (i) in connection with a sale or disposition of assets permitted by this Agreement, release any Lien encumbering any item of Collateral that is the subject of such sale or disposition of assets, release any Lien encumbering any item of Collateral owned by any Subsidiary no longer required to become a Subsidiary Guarantor pursuant to Section 5.10 or to which the Required Lenders (or such other Lenders as may be required to give such consent under Section 10.02) have otherwise consented or (ii) release any Subsidiary Guarantor from the Guarantee pursuant to Section 7.09, or to the extent such Subsidiary is no longer required to be a Subsidiary Guarantor pursuant to Section 5.10, or with respect to which the Required Lenders (or such other Lenders as may be required to give such consent under Section 10.02) have otherwise consented.

(b)      Right to Realize on Collateral and Enforce Guarantee. Anything contained in any of the Loan Documents to the contrary notwithstanding, Borrower, the Administrative Agent, the Collateral Agent and each Secured Party hereby agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guarantee, it being understood and agreed that all powers, rights and remedies hereunder and under any of the Loan Documents may be exercised solely by the Administrative Agent or the Collateral Agent, as applicable, for the benefit of the Secured Parties in accordance with the terms hereof and thereof and all powers, rights and remedies under the Security Documents may be exercised solely by the Collateral Agent for the benefit of the Secured Parties in accordance with the terms thereof, and (ii) in the event of a foreclosure or similar enforcement action by the Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition (including, without limitation, pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code), the Collateral Agent (or any Lender, except with respect to a "credit bid" pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code) may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and the Collateral Agent, as agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities) shall be entitled, upon instructions from the Required Lenders, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale or disposition, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Collateral Agent at such sale or other disposition.

84

(c)        <u>Release of Collateral and Guarantees, Termination of Loan Documents</u>.

(i)        Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Administrative Agent shall, subject to, and to the extent required by the Bankruptcy Court, take such actions as shall be required to release its security interest in any Collateral subject to any disposition permitted by the Loan Documents, and to release any guarantee obligations under any Loan Document of any Person subject to such disposition, to the extent necessary to permit consummation of such disposition in accordance with the Loan Documents, to release any guarantee obligations under any Loan Document of any Subsidiary that is no longer required to be a Subsidiary Guarantor pursuant to <u>Section 5.10</u> and to release its security interest in any Collateral owned by any Subsidiary that is no longer required to be a Subsidiary Guarantor pursuant to <u>Section 5.10</u>.

(ii)        Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Secured Obligations (other than contingent expense reimbursement and indemnity obligations that are not then due and payable) have been paid in full and all Commitments have terminated or expired, upon request of Borrower, the Administrative Agent and the Collateral Agent shall (without notice to, or vote or consent of, any Lender, or any other Secured Party) take such actions as shall be required to release its security interest in all Collateral, and to release all guarantee obligations provided for in any Loan Document, whether or not on the date of such release there may be outstanding contingent expense reimbursement and indemnity obligations that are not then due and payable.  Any such release of guarantee obligations shall be deemed subject to the provision that such guarantee obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of Borrower or any Subsidiary Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, Borrower or any Subsidiary Guarantor or any substantial part of its Property, or otherwise, all as though such payment had not been made.

(iii)        The Collateral Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Collateral Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Collateral Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

**Section 9.15    <u>Administrative Agent May File Bankruptcy Disclosure and Proofs of Claim</u>.**  In case of the pendency of any proceeding under any Debtor Relief Laws relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)        to file a verified statement pursuant to rule 2019 of the Federal Rules of Bankruptcy Procedure that, in its sole opinion, complies with such rule's disclosure requirements for entities representing more than one creditor;

(b)        to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Collateral Agent and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Collateral Agent and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders, the Collateral Agent and the

Administrative Agent Administrative Agent under <u>Sections 2.05</u> and <u>10.03</u>) allowed in such judicial proceeding; and

(c)        to collect and receive any monies or other Property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and the Collateral Agent to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders and the Collateral Agent, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under this Agreement.  To the extent that the payment of any such compensation, expenses, disbursements and advances of the Administrative Agent, its agents and counsel, and any other amounts due the Administrative Agent under this Agreement out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Lenders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

## ARTICLE X
## MISCELLANEOUS

**Section 10.01   Notices.** (a)  Generally.  Notices and other communications provided for herein shall, except as provided in <u>Section 10.01(b)</u>, be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy or e-mail, as follows:

(i)        if to any Loan Party, to Borrower at:

MD Helicopters, Inc.
4555 E. McDowell Road
Mesa, Arizona 85215
Attention:   Alan Carr
                    Barry Sullivan
Email        acarr@drivetrainllc.com
                    barry.sullivan@mdhelicopters.com

with a copy, which shall not constitute notice, to:

Latham & Watkins LLP
1271 Avenue of the Americas
New York, New York 10020
Attention:   Suzzanne Uhland
                    Christopher Plaut
                    Brianna Oller
                    Brett Neve
Email        suzzanne.uhland@lw.com

86

chris.plaut@lw.com
brianna.oller@lw.com
brett.neve@lw.com

(ii)    if to the Administrative Agent or the Collateral Agent, to it at:

Acquiom Agency Services LLC
150 South Fifth Street,
Suite 2600 Minneapolis,
MN 55402
Attention: MD Helicopter
Email: loanagency@srsacquiom.com

with a copy, which shall not constitute notice, to:

Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, New York 10019
Attention: Brian J. Lohan
              Sheryl Gittlitz
Email:  brian.lohan@arnoldporter.com
sheryl.gittlitz@arnoldporter.com

(iii)    if to a Lender, to it at its address (or telecopy number) set forth on its Administrative Questionnaire; with a copy, which shall not constitute notice, to:

Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, New York 10019
Attention: Brian J. Lohan
              Sheryl Gittlitz
Email: brian.lohan@arnoldporter.com
        sheryl.gittlitz@arnoldporter.com

and

Baker & McKenzie LLP
452 Fifth Avenue
New York, New York 10018
Attention: Andrew Sagor
Email:  andrew.sagor@bakermckenzie.com

Notices and other communications to the Lenders hereunder may (subject to Section 10.01(b)) be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent.  Any party hereto may change its address, telecopier number or e-mail address for notices and other communications hereunder by notice to the other parties hereto.  The Administrative Agent or Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, *provided* that approval of such procedures may be limited to particular notices or communications.  Unless the Administrative Agent otherwise prescribes, (A) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended

recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment), *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (B) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (A) of notification that such notice or communication is available and identifying the website address therefor.

(b)        Posting.    Each Loan Party hereby agrees that it will provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to this Agreement and any other Loan Document, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) relates to a request for a new, or a conversion of an existing, Loan or other extension of credit, (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default under this Agreement or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any borrowing or other extension of credit hereunder (all such non-excluded communications, collectively, the "**Communications**"), by transmitting the Communications in an electronic/soft medium in a format reasonably acceptable to the Administrative Agent at such e-mail address(es) provided to Borrower by the Administrative Agent from time to time or in such other form, including hard copy delivery thereof, as the Administrative Agent shall require.  In addition, each Loan Party agrees to continue to provide the Communications to the Administrative Agent in the manner specified in this Agreement or any other Loan Document or in such other form, including hard copy delivery thereof, as the Administrative Agent shall reasonably require.  Nothing in this Section 10.01 shall prejudice the right of the Agents, any Lender or any Loan Party to give any notice or other communication pursuant to this Agreement or any other Loan Document in any other manner specified in this Agreement or any other Loan Document or as any such Agent shall reasonably require.

(c)        To the extent consented to by the Administrative Agent in writing from time to time, the Administrative Agent agrees that receipt of the Communications by the Administrative Agent at its e-mail address(es) set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents.

(d)        Each Loan Party further agrees that the Administrative Agent may make the Communications available to the other Agents or the Lenders by posting the Communications on IntraLinks, SyndTrak or a substantially similar electronic transmission system (the "**Platform**").  The Platform is provided "as is" and "as available."  The Agents do not warrant the accuracy or completeness of the Communications, or the adequacy of the Platform and expressly disclaim liability for errors or omissions in the communications.  No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects, is made by any Agent in connection with the Communications or the Platform.  In no event shall any Agent have any liability to any Loan Party, any Lender or any other Person for damages of any kind, whether or not based on strict liability and including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in contract, tort or otherwise) arising out of or related to any Loan Party's or any Agent's transmissions of Communications through Internet (including the Platform), except to the extent caused by the willful misconduct or gross negligence of such Agent, as determined by a final, non-appealable judgment of a court of competent jurisdiction.  Notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address of notification that such notice or communication is available and identifying the website address therefor. Each Loan Party understands that the distribution of material through an electronic medium is not necessarily secure and that there are

88

confidentiality and other risks associated with such distribution and agrees and assumes the risks associated with such electronic distribution, except to the extent caused by the willful misconduct or gross negligence of the Administrative Agent, as determined by a final, non-appealable judgment of a court of competent jurisdiction.

(e)        The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents.  Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents.  Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such e-mail address.  Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

(f)        Each Loan Party, each Lender and each Agent agrees that the Administrative Agent may, but shall not be obligated to, store any Approved Electronic Communications on the Platform in accordance with the Administrative Agent's customary document retention procedures and policies.

(g)        Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including United States federal and state securities laws, to make reference to information that is not made available through the "Public Side Information" portion of the Platform and that may contain Non-Public Information with respect to Borrower, its Subsidiaries or their securities for purposes of United States federal or state securities laws.  In the event that any Public Lender has determined for itself to not access any information disclosed through the Platform or otherwise, such Public Lender acknowledges that (i) other Lenders may have availed themselves of such information and (ii) neither Borrower nor the Administrative Agent has any responsibility for such Public Lender's decision to limit the scope of the information it has obtained in connection with this Agreement and the other Loan Documents.

**Section 10.02    Waivers; Amendment.**  (a)  No failure or delay by any Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of each Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by Section 10.02(b), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether any Agent or any Lender may have had notice or knowledge of such Default at the time.  No notice or demand on Borrower or any other Loan Party in any case shall entitle Borrower or any other Loan Party to any other or further notice or demand in similar or other circumstances.

(b)        Subject to Section 2.16(c) and Section 10.02(c), this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended, supplemented or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by

89

Borrower and the Required Lenders or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent, the Collateral Agent (in the case of any Security Document) and the Loan Party or Loan Parties that are parties thereto, in each case with the written consent of the Required Lenders; *provided* that no such agreement shall:

(i)    increase or extend the expiry date of the Commitment of any Lender without the written consent of such Lender (it being understood that no amendment, modification, termination, waiver or consent with respect to any condition precedent, covenant or Default (or any definition used, respectively, therein) shall constitute an increase in or an extension of the expiry date of the Commitment of any Lender for purposes of this clause (i));

(ii)    reduce the principal amount or premium, if any, of any Loan or reduce the rate of interest thereon (other than interest pursuant to Section 2.06(c)), or reduce any Fees payable hereunder, or change the form or currency of payment of any Obligation, without the written consent of each Lender directly affected thereby (it being understood that any amendment or modification to the financial definitions in this Agreement shall not constitute a reduction in the rate of interest for purposes of this clause (ii));

(iii)    postpone or extend the maturity of any Loan (including via an amendment to the definition of "Maturity Date"), or any scheduled date of payment of or the installment otherwise due on the principal amount of any Loan under Section 2.09, or any date for the payment of any interest or fees payable hereunder, or reduce the amount of, waive or excuse any such payment (other than a waiver of any increase in the interest rate pursuant to Section 2.06(c)), or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender directly affected thereby;

(iv)    change Section 2.14(b) or (c) in a manner that would alter the order of or the *pro rata* sharing of payments or setoffs required thereby, without the written consent of each Lender;

(v)    change the percentage set forth in the definition of "Required Lenders" or any other provision of any Loan Document (including this Section 10.02) specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender;

(vi)    release all or substantially all of the Subsidiary Guarantors from their respective Guarantees (except as expressly provided in Article VII), or limit their liability in respect of such Guarantees, without the written consent of each Lender;

(vii)    except as expressly permitted in this Agreement or any Security Document, release all or substantially all of the Collateral from the Liens of the Security Documents or alter the relative priorities of the Secured Obligations entitled to the Liens of the Security Documents except in connection with a "credit bid" undertaken by the Collateral Agent at the direction of the Required Lenders pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or any other section of the Bankruptcy Code or any other sale or other disposition of assets in connection with the Bankruptcy Code or other Debtor Relief Laws or an enforcement action with respect to the Collateral permitted pursuant to the Loan Documents;

(viii)    [reserved];

(ix)    [reserved];

(x)    [reserved];

90

(xi)     change <u>Section 10.04(b)</u> in a manner which further restricts assignments thereunder without the written consent of each Lender;

(xii)     permit assignments by any Loan Party of its rights or obligations under the DIP Term Facility without the written consent of each Lender, the Administrative Agent and the Collateral Agent; or

(xiii)     subordinate the Obligations under the Loan Documents to any other Indebtedness without the written consent of each Lender;

(xiv)     except as provided by operation of law and otherwise permitted hereunder, amend or modify the Superpriority Claims status of the Loan Obligations under the Orders or under any Loan Document without the written consent of each Lender, the Administrative Agent and the Collateral Agent;

*provided*, *further*, that (1) no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or the Collateral Agent without the prior written consent of the Administrative Agent or the Collateral Agent, as the case may be and (2) any amendment or waiver to the Fee Letter, or waiver of any rights or privileges thereunder, shall only require the consent of Borrower and the Agents.

(c)     Without the consent of any other Person, the applicable Loan Party or Loan Parties and the Administrative Agent and/or Collateral Agent may (at the direction of the Required Lenders) enter into any amendment or waiver of any Loan Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the Secured Parties, or as required by applicable Legal Requirements to give effect to, or protect any security interest for the benefit of the Secured Parties, in any property or assets so that the security interests therein comply with applicable Legal Requirements.

**Section 10.03    Expenses; Indemnity; Damage Waiver.**  The Loan Parties shall promptly pay (or cause to be paid): (i) all reasonable, documented and invoiced out-of-pocket expenses of the Agents and the Lenders (but limited, in the case of legal and consultant or other advisors' fees and expenses, to the reasonable and actual disbursements and other charges of (a) Arnold & Porter Kaye Scholer LLP, (b) Baker & McKenzie LLP, (c) Womble, (d) Seabury, (e) one or more consultants or appraisers, (f) one firm of local counsel in each appropriate jurisdiction, (g) one primary outside counsel of the Agents and (h) one local counsel of the Agents (if necessary) whether accrued on, prior to or after the Closing Date, in connection with the Cases, including, but not limited to: (A) the preparation, negotiation, execution and approval of the Loan Documents; (B) the syndication and funding of the Loans; (C) the creation, perfection or protection of the DIP Liens (including all search, filing and recording fees); (D) the ongoing administration of the Loan Documents (including the preparation, negotiation and execution of any amendments, consents, waivers, assignments, restatements or supplements thereto); (E) the enforcement of the Loan Documents; (F) any refinancing or restructuring of the DIP Term Facility in the nature of a "work-out"; (G) all matters relevant to the Cases; (H) the monitoring of the Collateral; and (I) any legal proceeding relating to or arising out of the DIP Term Facility or the other transactions contemplated by the DIP Term Facility (collectively, the items in this clause <u>(i)</u>, the "**DIP Professional Fees**"); and (ii) all fees of the Administrative Agent charged (and agreed to by Borrower in the Fee Letter) in connection with the DIP Term Facility, the Commitment Re-allocation and the other services they provide in connection with the DIP Term Facility. All of the fees and expenses set forth in the preceding clauses <u>(i)</u> and <u>(ii)</u> that have accrued on or prior to the Closing Date shall be paid by Borrower on such date (and may be netted out of Loans incurred on such date). Any amounts payable pursuant to this paragraph following the Closing Date shall be paid by

91

Borrower within thirty days of receipt of an invoice relating thereto, setting forth such expenses in reasonable detail, subject to the provisions of the applicable DIP Order.

(a)        The Loan Parties agree, jointly and severally, to indemnify the Agents, each Lender and each of their respective Related Persons (each such Person being called an "**Indemnitee**") against, and to hold each Indemnitee harmless from, all reasonable out-of-pocket costs and any and all losses, claims, damages, liabilities, fees, fines, penalties, actions, judgments, suits and related expenses, including reasonable Advisors fees, charges and disbursements, incurred by, imposed on or asserted against any Indemnitee, directly or indirectly, arising out of, in any way connected with, or as a result of (i) the execution, delivery, performance, administration, enforcement of, or exercise of any rights or remedies under, the Loan Documents or any agreement or instrument contemplated thereby or the performance by the parties thereto of their respective obligations thereunder, (ii) any actual or proposed use of the proceeds of the Loans, (iii) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto, (iv) any actual or alleged presence or Release or threatened Release of Hazardous Materials, on, at, under or from any property owned, leased or operated by any Company at any time, or any Environmental Claim or threatened Environmental Claim related in any way to any Company, (v) any past, present or future non-compliance with, or violation of, Environmental Laws or Environmental Permits applicable to any Company, or any Company's business, or any property presently or formerly owned, leased, or operated by any Company or their predecessors in interest, (vi) the environmental condition of any property owned, leased, or operated by any Company at any time, or the applicability of any Legal Requirements relating to such property, whether or not occasioned wholly or in part by any condition, accident or event caused by any act or omission of any Company, (vii) the imposition of any environmental Lien encumbering any Real Property, (viii) the consummation of the Transactions and the other transactions contemplated hereby  or (ix) any actual or prospective action, claim, suit, litigation, investigation, inquiry or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Loan Party or otherwise, and regardless of whether any Indemnitee is a party thereto (all of the foregoing, collectively, the "**Indemnified Liabilities**"); *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have directly resulted solely from the gross negligence or willful misconduct of such Indemnitee. This Section 10.03(a) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(b)        [Reserved].

(c)        The provisions of this Section 10.03 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the Transactions and the other transactions contemplated hereby, the repayment of the Loans, and any other Secured Obligations, the release of any Subsidiary Guarantor or of all or any portion of the Collateral, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Agents, the or any Lender.  All amounts due under this Section 10.03 shall be accompanied by reasonable documentation with respect to any reimbursement, indemnification or other amount requested.

(d)        To the extent that the Loan Parties fail to pay any amount required to be paid by them to the Agents under Sections 10.03(a) or (b), each Lender severally agrees to pay to the Agents, such Lender's *pro rata* share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought (or, if such payment is sought after the date on which the Loans have been paid in full and the Commitments terminated, determined immediately prior to the time that the Loans were paid in full and the Commitments terminated)) of such unpaid amount (such indemnity shall be effective whether or not the related losses, claims, damages, liabilities and related expenses are incurred or asserted

by any party hereto or any third party); *provided* that the unreimbursed amount was incurred by or asserted against any of the Agents in its capacity as such. For purposes of this Section 10.03(d), a Lender's "*pro rata* share" shall be determined based upon its share of the sum of the total outstanding Loans and unused Commitments at the time. Each Lender hereby authorizes the Agents to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Agents to such Lender from any source against any amount due to the Agents under this Section 10.03(e).

(e)        To the fullest extent permitted by applicable Legal Requirements, no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, exemplary, consequential, or punitive damages (including any loss of profits, business or anticipated savings) arising out of, in connection with, or as a result of, any Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions, or the use of the proceeds thereof. No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with the Loan Documents or the transactions contemplated hereby or thereby.

(f)        All amounts due under this Section 10.03 shall constitute Obligations secured by Collateral and shall be payable not later than 10 days after demand therefor, subject to the provisions of the applicable DIP Order.

(g)        The agreements in this Section 10.03 shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all the other Obligations.

**Section 10.04   Successors and Assigns.** (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Loan Parties may not assign or otherwise transfer any of their respective rights or obligations hereunder without the prior written consent of the Administrative Agent, the Collateral Agent, and each Lender, which consent may be withheld in their respective sole discretion (and any attempted assignment or transfer by any Loan Party without such consent shall be null and void). Nothing in this Agreement or any other Loan Document, express or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent expressly provided in Section 10.04(e) and, to the extent expressly contemplated hereby, the other Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement or any other Loan Document.

(b)        Any Lender shall have the right at any time to assign to one or more assignees (other than any Company or any Affiliate thereof, a natural Person or a Borrower Competitor) all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); *provided* that:

(i)        except in the case of (A) an assignment to a Lender, a direct or indirect owner of a Lender, an Affiliate of the foregoing or an Approved Fund, (B) contemporaneous assignments to related Approved Funds that equal at least the amount specified in this Section 10.04(b)(i) in the aggregate, (C) [reserved] or (D) an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000; *provided* that the foregoing may be reduced with the consent of the Administrative Agent;

93

(ii)         each partial assignment shall be made as an assignment of a proportionate part of all of the assigning Lender's rights and obligations under this Agreement;

(iii)        the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with any Tax forms required to be delivered by Section 2.15(e), and a processing and recordation fee of $3,500; *provided* that in its sole discretion the Administrative Agent may elect to waive such processing and recordation fee in connection with any such assignment;

(iv)        the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire;

(v)         except (x) in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or (y) if an Event of Default has occurred and is continuing, Borrower must give its prior written consent to such assignment; *provided* that Borrower shall be deemed to have consented to any such assignment unless Borrower shall have objected thereto by written notice to the Administrative Agent not later than the fifth Business Day following the date Borrower acknowledges its receipt of notice of the proposed assignment; and

(vi)        except in the case of an assignment to a Lender, a direct or indirect owner of a Lender, an Affiliate of the foregoing or an Approved Fund, the Administrative Agent must give its prior written consent to such assignment (which consent shall not be unreasonably withheld, delayed or conditioned).

Subject to acceptance and recording thereof pursuant to Section 10.04(d), from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement (*provided* that any liability of Borrower to such assignee under Section 2.12 or 2.15 shall be limited to the amount, if any, that would have been payable thereunder by Borrower in the absence of such assignment, except to the extent any such amounts are attributable to a Change in Law occurring after the date of such assignment), and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.12, 2.15 and 10.03).

(c)         The Administrative Agent, acting for this purpose as a non-fiduciary agent of Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of and stated interest on the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive and binding in the absence of manifest error, and Borrower, the Administrative Agent, and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by Borrower, the Collateral Agent, and any Lender (with respect to its own interest only), at any reasonable time and from time to time upon reasonable prior notice.

(d)         Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in Section 10.04 and any written consent to such assignment required by Section 10.04(b), the Administrative Agent

94

shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this Section 10.04(b).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with the requirements of this Section 10.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.04(e).

(e)        Any Lender shall have the right at any time, without the consent of, or notice to Borrower, the Administrative Agent, or any other Person to sell participations to any Person (other than any Company or any Affiliate thereof or a natural Person) (a "**Participant**") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) Borrower, the Administrative Agent, the Collateral Agent, and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision of the Loan Documents; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) is described in clauses (i), (ii) or (iii) of the proviso to Section 10.02(b) and (2) directly affects such Participant.  Subject to Section 10.04(f), each Participant shall be entitled to the benefits of Sections 2.12 and 2.15 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.04(b) (it being understood that the documentation required under Section 2.15(e) shall be delivered to the participating Lender).  To the extent permitted by Legal Requirements, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender; *provided* that such Participant agrees in writing to be subject to Section 2.14(c) as though it were a Lender.  Each Lender that sells a participation shall, acting for this purpose as a non-fiduciary agent of Borrower, maintain at one of its offices a register for the recordation of the names and addresses of its Participants, the principal amounts of and stated interest on, and terms of, its participations (the "**Participant Register**").  The entries in the Participant Register shall be conclusive and binding absent manifest error, and such Lender (and Borrower, to the extent that the Participant requests payment from Borrower) shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  No Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such commitment, loan, or other obligation is in registered form under Section 5f.103-1(c) of the U.S. Department of the Treasury Regulations.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(f)        A Participant shall not be entitled to receive any greater payment under Sections 2.12 or 2.15 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the prior written consent of Borrower (which consent shall not be unreasonably withheld, delayed or conditioned) or the greater payment results from a Change in Law after the date the participation was sold to such Participant.

(g)        Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or any other central bank, and this Section

10.04(g) shall not apply to any such pledge or assignment of a security interest; *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.  Without limiting the foregoing, in the case of any Lender that is a fund that invests in bank loans or similar extensions of credit, such Lender may, without the consent of Borrower, the Administrative Agent or any other Person, collaterally assign or pledge all or any portion of its rights under this Agreement, including the Loans and Notes or any other instrument evidencing its rights as a Lender under this Agreement, to any holder of, trustee for, or any other representative of holders of, obligations owed or securities issued, by such fund, as security for such obligations or securities.

       (h)       [Reserved].

       (i)       This Agreement, any other Loan Document and any document, amendment, approval, consent, information, notice, certificate, request, statement, disclosure or authorization related to this Agreement or any other Loan Document (each, for purposes of this clause (i), a "**Communication**"), including Communications required to be in writing, may be in the form of an Electronic Record and may be executed using Electronic Signatures.  Each of the Loan Parties agrees that any Electronic Signature on or associated with any Communication shall be valid and binding each of the Loan Parties to the same extent as a manual, original signature, and that any Communication entered into by Electronic Signature, will constitute the legal, valid and binding obligation of each of the Loan Parties enforceable against such in accordance with the terms thereof to the same extent as if a manually executed original signature was delivered.  Any Communication may be executed in as many counterparts as necessary or convenient, including both paper and electronic counterparts, but all such counterparts are one and the same Communication.  For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance by the Administrative Agent, the Collateral Agent and each of the Lenders of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format), or an electronically signed Communication converted into another format, for transmission, delivery and/or retention. The Administrative Agent, the Collateral Agent and each of the Lenders may, at its option, create one or more copies of any Communication in the form of an imaged Electronic Record ("**Electronic Copy**"), which shall be deemed created in the ordinary course of the such Person's business, and destroy the original paper document.  All Communications in the form of an Electronic Record, including an Electronic Copy, shall be considered an original for all purposes, and shall have the same legal effect, validity and enforceability as a paper record.  Notwithstanding anything contained herein to the contrary, neither the Administrative Agent nor the Collateral Agent is under any obligation to accept an Electronic Signature in any form or in any format unless expressly agreed to by the Administrative Agent or the Collateral Agent pursuant to procedures approved by it; *provided* that, without limiting the foregoing, (a) to the extent the Administrative Agent or Collateral Agent has agreed to accept such Electronic Signature, the Administrative Agent, the Collateral Agent and each of the Lenders shall be entitled to rely on any such Electronic Signature purportedly given by or on behalf of any Loan Party without further verification and (b) upon the request of the Administrative Agent, the Collateral Agent or any Lender, any Electronic Signature shall be promptly followed by such manually executed counterpart. For purposes hereof, "**Electronic Record**" and "**Electronic Signature**" shall have the meanings assigned to them, respectively, by 15 USC §7006, as it may be amended from time to time.

       **Section 10.05    Survival of Agreement.**    All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the reports, certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Agents, or any Lender may have had notice or knowledge of any Default or Event of Default, failure of any condition set forth in Article IV to be

96

satisfied or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as any Obligation (other than contingent indemnification obligations not then payable) is outstanding and so long as the Commitments have not expired or terminated. The provisions of <u>Article IX</u> and <u>Sections 2.12</u> to <u>2.15</u>, <u>10.03</u> and <u>10.08</u> to <u>10.10</u> shall survive and remain in full force and effect regardless of the consummation of the Transactions and the other transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

**Section 10.06    Counterparts; Integration; Effectiveness.** This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents, and any separate letter agreements with respect to fees payable to the Administrative Agent and/or the Arrangers, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in <u>Section 4.01</u>, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

**Section 10.07    Severability.** Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

**Section 10.08    Right of Setoff; Marshalling; Payments Set Aside.** Subject to the terms of the DIP Orders, if an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable Legal Requirements, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of any Loan Party against any and all of the obligations of any Loan Party now or hereafter existing under this Agreement or any other Loan Documents held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each Lender under this <u>Section 10.08</u> are in addition to other rights and remedies (including other rights of setoff) which such Lender may have, but subject to the terms of the DIP Orders. Each Lender agrees to notify Borrower and the Administrative Agent promptly after any such setoff and application; *provided*, *however*, that in no event shall the failure to give such notice effect the validity or enforceability of any such setoffs. Subject to the Final Order, none of any Agent or any Lender shall be under any obligation to marshal any assets in favor of any Loan Party or any other Person or against or in payment of any or all of the Obligations. To the extent that any Loan Party makes a payment or payments to Administrative Agent or Lenders (or to Administrative Agent, on behalf of Lenders), or any Agent or Lender enforces any security interests or exercises any right of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any Debtor Relief Law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied,

97

shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

**Section 10.09   Governing Law; Jurisdiction; Consent to Service of Process.**  (a)  Except to the extent superseded by the Bankruptcy Code, this Agreement and the other Loan Documents and any claims, controversy, dispute or cause of action (whether sounding n contract law or tort law or otherwise) based upon, arising out of or relating to this Agreement or any other Loan Document (except, as to any other Loan Document, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the law of the State of New York without giving effect to any choice of law principles that would apply the laws of another jurisdiction and, to the extent applicable, the Bankruptcy Code.

(b)        Each Loan Party hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have, or abstains from exercising, jurisdiction, the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding shall be heard and determined in the Bankruptcy Court and, if the Bankruptcy Court does not have, or abstains from jurisdiction, such New York State court or, to the extent permitted by applicable Legal Requirements, in such federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Legal Requirements.  Nothing in this Agreement or any other Loan Document or otherwise shall affect any right that the Administrative Agent, any other Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Loan Party or its properties in the courts of any jurisdiction, and hereby submits to the jurisdiction of any such court.

(c)        Each Loan Party hereby irrevocably and unconditionally waives, to the fullest extent permitted by applicable Legal Requirements, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in Section 10.09(b).  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable Legal Requirements, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)        Each party to this Agreement irrevocably consents to service of process in any action or proceeding arising out of or relating to any Loan Document, in the manner provided for notices (other than telecopy or email) in Section 10.01.  Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by applicable Legal Requirements.

**Section 10.10   Waiver of Jury Trial.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LEGAL REQUIREMENTS, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT, THE TRANSACTIONS OR THE OTHER TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT**

98

**OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 10.10</u>.**

**Section 10.11    <u>Headings</u>.** Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

**Section 10.12    <u>Confidentiality</u>.** Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' and Approved Funds' directors, officers, employees, investors and potential investors, agents, advisors and other representatives, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential pursuant to the terms hereof), (b) to the extent requested by any regulatory authority or any quasi-regulatory authority (such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Legal Requirements or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies under the Loan Documents or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this <u>Section 10.12</u>, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to Borrower and its obligations, (iii) any actual or prospective investor in an SPC or (iv) any rating agency for the purpose of obtaining a credit rating applicable to any Loan or Loan Party, (g) with the consent of Borrower, (h) to any assignee or pledgee under <u>Section 10.04(g)</u> or to any other party to this Agreement, or (i) to the extent such Information (i) is publicly available at the time of disclosure or becomes publicly available other than as a result of a breach of this <u>Section 10.12</u> or (ii) becomes available to the Administrative Agent or any Lender on a nonconfidential basis from a source other than Borrower or any Subsidiary.  In addition, the Agents and the Lenders may disclose the existence of the Loan Documents and information about the Loan Documents to market data collectors, similar service providers to the financing community, and service providers to the Agents and the Lenders.  For the purposes of this <u>Section 10.12</u>, "**Information**" shall mean all information received from Borrower relating to Borrower or any of its Subsidiaries or its business that is clearly identified at the time of delivery as confidential, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by Borrower.  Any Person required to maintain the confidentiality of Information as provided in this <u>Section 10.12</u> shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

**Section 10.13    <u>Interest Rate Limitation</u>.** Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively, the "**Charges**"), shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable Legal Requirements, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this <u>Section 10.13</u> shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with

99

interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

Section 10.14    **Assignment and Assumption.**  Each Lender to become a party to this Agreement (other than the Administrative Agent and any other Lender that is a signatory hereto) shall do so by delivering to the Administrative Agent an Assignment and Assumption duly executed by such Lender and the Administrative Agent.

Section 10.15    **Obligations Absolute.**  To the fullest extent permitted by applicable law, all obligations of the Loan Parties hereunder shall be absolute and unconditional irrespective of:

(a)        any lack of validity or enforceability of any Loan Document or any other agreement or instrument relating thereto against any Loan Party;

(b)        any change in the time, manner or place of payment of, or in any other term of, all or any of the Secured Obligations, or any other amendment or waiver of or any consent to any departure from any Loan Document or any other agreement or instrument relating thereto;

(c)        any exchange, release or non-perfection or loss of priority of any Liens on any or all of the Collateral, or any release or amendment or waiver of or consent to any departure from any guarantee, for all or any of the Secured Obligations;

(d)        any exercise or non-exercise, or any waiver of any right, remedy, power or privilege under or in respect hereof or any Loan Document; or

(e)        any other circumstances which might otherwise constitute a defense available to, or a discharge of, the Loan Parties.

Section 10.16    **Waiver of Defenses; Absence of Fiduciary Duties.**  (a)  Each of the Loan Parties hereby waives any and all suretyship defenses available to it as a Subsidiary Guarantor arising out of the joint and several nature of its respective duties and obligations hereunder (including any defense contained in Article VII).

(b)        Each Agent, each Lender and their Affiliates (collectively, solely for purposes of this paragraph, the "**Lenders**"), may have economic interests that conflict with those of the Loan Parties, their stockholders and/or their affiliates.  Each Loan Party agrees that nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender, on the one hand, and such Loan Party, its stockholders or its affiliates, on the other.  The Loan Parties acknowledge and agree that (i) the transactions contemplated by the Loan Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Lenders, on the one hand, and the Loan Parties, on the other, and (ii) in connection therewith and with the process leading thereto, (x) no Lender has assumed an advisory or fiduciary responsibility in favor of any Loan Party, its stockholders or its affiliates with respect to the transactions contemplated hereby or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise any Loan Party, its stockholders or its Affiliates on other matters) or any other obligation to any Loan Party except the obligations expressly set forth in the Loan Documents and (y) each Lender is acting solely as principal and not as the agent or fiduciary of any Loan Party, its management, stockholders, creditors or any other Person. Each Loan Party acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto.  Each Loan Party agrees that it

100

will not claim that any Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to such Loan Party, in connection with such transaction or the process leading thereto.

**Section 10.17    Reinstatement.**  To the extent that any payments on the Indebtedness or proceeds of any Collateral are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, receiver and manager, interim receiver or other Person under any bankruptcy law or other Insolvency Law, common law or equitable cause, then to such extent, the Indebtedness so satisfied shall be revived and continue as if such payment or proceeds had not been received and the Secured Parties' Liens, security interests, rights, powers and remedies under this Agreement and each Loan Document shall continue in full force and effect.  In such event, each Loan Document shall be automatically reinstated and each Loan Party shall take (and shall cause each other Loan Party to take) such action as may be requested by the Administrative Agent, the Collateral Agent or the Required Lenders to effect such reinstatement.

**Section 10.18    USA Patriot Act.**  Each Lender hereby notifies each Loan Party that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Loan Parties, which information includes the name, address  and taxpayer identification number of each Loan Party and other information that will allow such Lender to identify such Loan Party in accordance with the Patriot Act.

**Section 10.19    DIP Orders.**  In the event of any conflict between the terms of the DIP Orders and the terms of this Agreement or any other Loan Document, the terms of the DIP Orders shall govern and control.

**Section 10.20    Acknowledgement and Consent to Bail-In of EEA Financial Institutions.**  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected  Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

(Signature Pages Follow)

101

IN WITNESS WHEREOF, the parties hereto have caused this Credit Agreement to be duly executed by their respective authorized officers or other authorized signatories as of the day and year first above written.

**MD HELIPCOPTERS, INC.**, as Borrower

By: _____
Name: _____
Title: _____

**MONTERREY AEROSPACE, LLC**, as a Subsidiary Guarantor

By: _____
Name: _____
Title: _____

[Signature Page to DIP Credit Agreement]

**Acquiom Agency Services LLC**, as Administrative
Agent and Collateral Agent


By:_____
Name:
Title:

[Signature Page to DIP Credit Agreement]

ANNEX I

**Lenders and Commitments**

[On file with Administrative Agent]

Annex I-1

171390607

**ANNEX II**

**Backstop Lenders and Backstop Commitments**

[On file with Administrative Agent]

171390607

**SCHEDULE 1.01(c)**

**Pledgors**

1.   MD Helicopters, Inc.

2.   Monterrey Aerospace, LLC

171390607

**SCHEDULE 3.05(c)**

**Real Property**

Owned Real Property

None.

Leased Real Property

|     | **Location** | **Address** |
| --- | --- | --- |
| 1. | Main Site | 4555 E McDowell Rd, Mesa AZ 85215 |
| 2. | Madison Hangar | 4555 E McDowell Rd, Mesa AZ 85215 |
| 3. | Turf Area | 4555 E McDowell Rd, Mesa AZ 85215 |
| 4. | AMO Main (unit 101) | 5456 E. McDowell Road, Suite 101 |
| 5. | AMO unit 125 | 5456 E. McDowell Road, Suite 125 |
| 6. | AMO unit 109 | 5456 E. McDowell Road, Suite 109 |
| 7. | Falcon Hangar 101 | 4562 E. Mallory #101, Mesa AZ 85215 |
| 8. | Falcon Hangar 102 | 4562 E. Mallory #102, Mesa AZ 85215 |
| 9. | Falcon Hangar 103 | 4562 E. Mallory #103, Mesa AZ 85215 |
| 10. | Falcon Hanger 105 | 4562 E. Mallory #105, Mesa AZ 85215 |
| 11. | Falcon Hanger 106 | 4562 E. Mallory #106, Mesa AZ 85215 |

171390607

SCHEDULE 3.07(a)

**Subsidiaries**

|    | Entity | Jurisdiction | Record Owner | % Owned |
|----|--------|-------------|--------------|---------|
| **1.** | Monterrey Aerospace, LLC | Delaware | MD Helicopters, Inc. | 100.00% |
| **2.** | Monterrey Aerospace Mexico S. de R.L. de C.V. | Mexico | MD Helicopters, Inc. | 0.03% |
|    |        |             | Monterrey Aerospace, LLC | 99.97% |

171390607

**SCHEDULE 3.07(c)**

**Organizational Chart**

Attached.



# MD Helicopters Corporate Structure



**SCHEDULE 3.08**

**Litigation**

1. United States ex rel. Philip Marsteller, et al. v. Lynn Tilton, MD Helicopters, Inc., et al. Case No. 5:13-cv-00830-AKK (the "Qui Tam Action").

2. Litigation arising out of a contract dispute between the Dutch National Police Services Agency and Helifly, nv.:

    a. Judgment against MDH issued by the Hague Court of Appeal in May 2012.

    b. State of the Netherlands v. MD Helicopters, Inc., No. CV2015-095127 (AZ Maricopa Super. Ct. Nov. 13, 2018).

    c. State of the Netherlands v. MD Helicopters, Inc., 250 Ariz. 235 (2020).

    d. State of Netherlands v. MD Helicopters, Inc., Index No. 157756/2020, ECF No. 6 (N.Y. Sup. Ct. Sept. 23. 2020).

    e. Claim filed by the Netherlands in the Hague District Court seeking additional contractual damages against the Company based on the 2001 Contract following the affirmation of the Foreign Judgment by the Netherlands Court of Appeals, on December 2, 2015.

3. Arbitration with the International Chamber of Commerce, between TAI and MD Helicopters Inc., filed on March 20, 2015 and decision issued on July 20, 2021. New request for arbitration initiated 4 February 2022, ICC Arbitration No. 26802/FS.

4. MD Helicopters, Inc. v. Aerometals, Inc. and Rex Kamphefner pending in the United States District Court for the Eastern District of California; Case No. 2:16-cv-02249-TLN-AC (the "Aerometals, Inc. Matter").

5. Michael Sandidge vs. MD Helicopters, Inc., dated January 14, 2022, CRD No. CRD-2022-0048, EEOC No. 35A-2022-00135.

6. Dennis Welsh, Plaintiff, vs. MD Helicopters, Inc., an Arizona corporation, Southwest Technical Solutions, Inc., an Arizona corporation, Alan Carr and Jane Doe Carr, a married couple, Yaropolk Hladkyj and Jane Doe Hladkyj, a married couple, Barry Sullivan and Jane Doe Sullivan, a married couple, Timothy Mahowald and Jane Doe Mahowald, a married couple, and Joetta Midkiff and John Doe Midkiff, a married couple, Defendants. UNITED STATES DISTRICT COURT DISTRICT OF ARIZONA, Case 2:22-cv-00401-DMF, Filed 03/15/22.

171390607

SCHEDULE 3.19

**Insurance**

| | Type | Policy Number | Period |
|---|---|---|---|
| 1. | (Willis Limited) Aviation Manufacturers Hull and Liability | B080116326A20 | 12/25/2021-12/25/2022 |
| 2. | (Liberty Mutual) Business Auto | BAS (22) 60 97 26 99 | 5/1/2021-5/12022 |
| 3. | (Steadfast Insurance Company) Zurich Cyber Insurance Policy | SPR 8663007 - 00 | 5/10/2021-5/10/2022 |
| 4. | (North American Elite Insurance Company) One Form - Property Policy for North America | NAP 2001646 04 | 5/1/2021-5/1/2022 |
| 5. | (Starr Indemnity & Liability Co.) Workers Compensation and Employers Liability Policy | 100 0001691 | 5/1/2021-5/1/2022 |
| 6. | (RSUI Indemnity Company) Excess Liability Policy | NHS694647 | 7/11/2021-7/11/2022 |
| 7. | (Ascot Insurance Company) Excess Follow Form Insurance Policy | MLXS2110000655-01 | 7/11/2021-7/11/2022 |
| 8. | (AXA XL Professional Insurance) Excess Policy | ELU176565-21 | 7/11/2021-7/11/2022 |
| 9. | (Wesco Insurance Company) Private Company Liability, Employment Practices Liability, Fiduciary Liability, Excess Private Management Liability | EUW1909932 00 | 7/11/2021-7/11/2022 |
| 10. | (RSUI Indemnity Company) Excess Private Management Liability | NHS694647 | 7/11/2021-7/11/2022 |
| 11. | (Old Republic Insurance Company) Primary, Personal Injury, Aircraft Physical Damage | MP 00025204 | 12/25/2021-12/25/2022 |
| 12. | (Ascot Insurance Company) Excess Management Liability | MLXS2110000655-01 | 7/11/2021-7/11/2022 |
| 13. | (Willis Limited/Willis Towers Watson) Hull War Risks | B080116424A21 | 12/25/2021-12/25/2022 |
| 14. | (Willis Limited/Willis Towers Watson) Aviation Manufacturers Hull and Liability | B080116326A21 | 12/25/2021-12/25/2022 |
| 15. | (Starr Indemnity & Liability Co.) Aviation Manufacturers Hull and Liability | 1000189383-01 | 12/25/2021-12/25/2022 |
| 16. | (Allianz) Aviation Manufacturers Hull and Liability | A1PR000207521AM | 12/25/2021-12/25/2022 |

|  | **Type** | **Policy Number** | **Period** |
|---|---|---|---|
| 17. | (National Union Fire Insurance Company of Pittsburgh (AIG)) Cargo Stock Throughput | 023551213 | 7/1/2021-7/1/2022 |
| 18. | (Continental Insurance Company) Cargo – Malaysia Shipment 50% | 261842 | 12/23/2021-12/23/2022 |
| 19. | (Travelers Casualty and Surety) ERISA/CRIME | 106393168 | 10/13/2021-2024 |
| 20. | (Hiscox Insurance Company Inc.) Crime | UC24686297 22 | 1/11/2022–1/11/2023 |

Schedule 3.19-2

**SCHEDULE 3.23**

**Intercompany Notes**

None.

**SCHEDULE 6.01(b)**

**Existing Indebtedness**

1. Credit Agreement, dated as of July 8, 2005, among MD Helicopters, Inc. as Borrower, the Lenders signatory thereto, and Patriarch Partners Agency Services, LLC, as agent (as amended by those certain Amendments No. 1 through 55) (the "Patriarch Credit Agreement").

2. Term A Note issued pursuant to the Patriarch Credit Agreement, dated as of July 8, 2005.

3. Term B Note issued pursuant to the Patriarch Credit Agreement, dated as of July 8, 2005.

4. Term C Note issued pursuant to the Patriarch Credit Agreement, dated as of July 8, 2005.

5. Security Agreement, dated as of July 8, 2005, among the grantor signatory thereto and Patriarch Partners Agency Services, LLC, as agent.

6. Note Purchase Agreement, dated April 17 2007, among MD Helicopters, Inc., Ark II CLO 2001-1, Limited, Ark Investment Partners II, L.P., Zohar CDO 2003-1, Limited, and Zohar II 2005-1, Limited (as amended by that certain Amendment No. 4 to Note Purchase Agreement dated January 17, 2016).

7. Subordinated Note Due May 15, 2019, dated as of January 17, 2016, between MD Helicopters, Inc. and Zohar CDO 2003-1 Limited.

8. Subordinated Note Due May 15, 2019, dated as of January 17, 2016, between MD Helicopters, Inc. and Ark II CLO 2001-1 Limited.

9. Subordinated Note Due May 15, 2019, dated as of January 17, 2016, between MD Helicopters, Inc. and Ark Investment Partners II, L.P.

10. Subordinated Note Due May 15, 2019, dated as of January 17, 2016, between MD Helicopters, Inc. and Zohar II 2005-1, Limited.

11. Amended and Restated Subordinated Security Agreement, dated as of May 31, 2011, by and among MD Helicopters, Inc. and Ark Investment Partners II, L.P.

12. Amended and Restated Subordinated Security Agreement, dated as of May 31, 2011, by and among MD Helicopters, Inc. and Zohar CDO 2003-1, Limited.

13. Amended and Restated Subordinated Security Agreement, dated as of May 31, 2011, by and among MD Helicopters, Inc. and Zohar II 2005-1, Limited.

14. Cash Balance Pension Plan.

**SCHEDULE 6.02(c)**

**Existing Liens**

1.  Commercial Lease Agreement No. 300-1587197-001 (forklift lease), dated as of June 11, 2021, between Bank of the West and MD Helicopters Inc.

2.  Product Schedule with Purchase Option, dated as of March 1, 2021, between Ricoh US, Inc. and MD Helicopters, Inc.

171390607

**SCHEDULE 6.04(b)**

**Existing Investments**

None.

**SCHEDULE 6.12**

## Existing Restrictive Agreements

None.

**EXHIBIT A**

[Form of]
**ASSIGNMENT AND ASSUMPTION**

This Assignment and Assumption (the "**Assignment and Assumption**") is dated as of the Effective Date set forth below and is entered into by and between [*Insert Name of Assignor*] (the "**Assignor**") and [*Insert Name of Assignee*] (the "**Assignee**").  Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below, receipt of a copy of which is hereby acknowledged by the Assignee.  The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below (including without limitation any guarantees included in such facilities), and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by the Assignor to the Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as the "**Assigned Interest**").  Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1.    Assignor:                    _____

2.    Assignee:                   _____
      [and is a Lender, an Affiliate of a Lender or an Approved Fund][1]

3.    Borrower:                   MD Helicopters, Inc., an Arizona Corporation

4.    Administrative Agent:    Acquiom Agency Services LLC, as the administrative agent
                                        under the Credit Agreement

---

[1] Select as applicable

171390607

5.     Credit Agreement:        The Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of April 1, 2022 (as amended, restated, amended and restated, extended, supplemented or otherwise modified in writing from time to time, the "**Credit Agreement**"), among MD Helicopters, Inc. (the "**Borrower**"), the Subsidiary Guarantors party thereto, the Lenders party thereto, and Acquiom Agency Services LLC, as Administrative Agent and Collateral Agent.

6.     Assigned Interest[s]:

| Facility Assigned | Aggregate Amount of Commitment/Loans for all Lenders | Amount of Commitment/Loans Assigned | Percentage Assigned of Commitment/ Loans[2] |
|---|---|---|---|
| | $ | $ | % |
| | $ | $ | % |
| | $ | $ | % |

[7.     Trade Date:    _____][3]

Effective Date:    _____ __, 20___ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

---

[2] Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

[3] To be completed if the Assignor(s) and the Assignee(s) intend that the minimum assignment amount is to be determined as of the Trade Date.

171390607

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR
[NAME OF ASSIGNOR]

By: _____
      Name:
      Title:

ASSIGNEE
[NAME OF ASSIGNEE]

By: _____
      Name:
      Title:

[Consented to and][4] Accepted:

ACQUIOM AGENCY SERVICES LLC, as
Administrative Agent

By: _____
      Name:
      Title:

---

[4] To be added only if the consent of the Administrative Agent is required by the terms of the Credit Agreement.

A-3

## STANDARD TERMS AND CONIDTIONS FOR
## ASSIGNMENT AND ASSUMPTION

1.      Representations and Warranties.

1.1     <u>Assignor</u>.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and (iv) it is not a Defaulting Lender; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document (other than this Assignment and Assumption), (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents (other than this Assignment and Assumption) or any collateral thereunder, (iii) the financial condition of Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document, or (iv) the performance or observance by Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2.    <u>Assignee</u>.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it is not a Company or an Affiliate of a Company, or a natural Person, and it meets all the requirements of an Eligible Assignee under the Credit Agreement (subject to such consents, if any, as may be required under the Credit Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to <u>Section 5.01</u> thereof, as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest, (vi) it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest, (vii) it is not a Defaulting Lender, (viii) if it is not already a Lender under the Credit Agreement, attached to the Assignment and Assumption an Administrative Questionnaire in the form provided by the Administrative Agent and (viii) attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to <u>Section 2.15</u> of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action

A-4

under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

        2.    <u>Payments</u>.  From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts that have accrued to but excluding the Effective Date and to the Assignee for amounts that have accrued from and after the Effective Date.

        3.    <u>General Provisions</u>.  This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption.  This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

**EXHIBIT B**

[Form of]
**BORROWING REQUEST**

[Date]

To:    Acquiom Agency Services LLC, as administrative agent (in such capacity, the "***Agent***") under that certain Superpriority Secured Debtor-In-Possession Credit Agreement (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Credit Agreement***"), by and among MD Helicopters, INC. (the "***Borrower***") , the financial institutions that are or may from time to time become parties thereto as lenders (the "***Lenders***") , and the Agent.

Ladies and Gentlemen:

Reference is made to the above-described Credit Agreement. Terms defined in the Credit Agreement, wherever used herein, unless otherwise defined herein, shall have the same meanings herein as are prescribed by the Credit Agreement. The undersigned hereby irrevocably notifies you, pursuant to Section 2.03 of the Credit Agreement, of the Borrowing Specified below:

    1.   The aggregate amount of the proposed Borrowing is: $[___]
    2.   The Business Day of the proposed Borrowing is: [___]
    3.   The location and number of the account to which the proceeds of such Borrowing are to be disbursed is as follows:

Borrower hereby represents and warrants that the conditions to lending specified in Sections 4.01 and 4.03 of the Credit Agreement are satisfied (or have been waived) as of the date of the proposed Borrowing (specified above).

*[Remainder of page intentionally left blank; signature page follows]*

B-1

This Borrowing Request is issues pursuant to and is subject to the Credit Agreement, executed as of the date first written above.

**MD HELICOPTERS, INC.**

By: _____
      Name:
      Title:

A-2

**EXHIBIT C**

[Form of]
**COMPLIANCE CERTIFICATE**

This compliance certificate (this "**Certificate**") is delivered to you pursuant to Section 5.01(f) of the Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of April 1, 2022 (as amended, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Credit Agreement**"), among MD Helicopters, Inc., an Arizona corporation ("**Borrower**"), the Subsidiary Guarantors party thereto, the Lenders party thereto, and Acquiom Agency Services LLC, as administrative agent and collateral agent for the Lenders (in such capacity, the "**Administrative Agent**"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

1.      I am the duly elected, qualified and acting [*specify type of Financial Officer*] of Borrower.

2.      I have reviewed and am familiar with the contents of this Certificate.

3.      I have reviewed the terms of the Credit Agreement and the other Loan Documents and have made, or caused to be made under my supervision, a review in reasonable detail of the transactions and condition of Borrower and its Subsidiaries during the accounting period covered by the financial statements attached hereto as Attachment 1 (the "**Financial Statements**"). Such review did not disclose the existence during or at the end of the accounting period covered by the Financial Statements, and I have no knowledge of the existence, as of the date of this Certificate, of any condition or event which constitutes a Default or Event of Default [, except as set forth below].

*[Signature Page Follows]*

IN WITNESS WHEREOF, I execute this Certificate this _____ day of      , 20__.

**MD HELICOPTERS, INC.**

By:  _____
     Name:
     Title:  [Financial Officer]

**ATTACHMENT 1**

**TO**

**COMPLIANCE CERTIFICATE**

**<u>Financial Statements</u>**

The information described herein is as of [_____], and pertains to the fiscal [month] [quarter] ended [_____].

**EXHIBIT D**

## **Interim Order**

Attached.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MD Helicopter Inc., *et al.*,[1] | Case No. 22-_____ (  ) |
| Debtors. | **Ref. Docket No. _____** |

## INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

Upon consideration of the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (collectively, the "Cases") for entry of an interim order (this "Interim Order") and a final order (the "Final Order"), pursuant to sections 105, 361, 362, 363, 364, 503, 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 2002-1(b), 4001-2, 9006-1, and 9013 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"):

(i) authorizing MD Helicopter, Inc., in its capacity as borrower (the "DIP Borrower"), to obtain postpetition financing, and for debtor Monterrey Aerospace, LLC to

---

[1] The two Debtors in these cases are MD Helicopters, Inc. and Monterrey Aerospace, LLC, and their address is 4555 E. McDowell Road, Mesa, AZ 85215. The last four digits of MD Helicopters, Inc.'s taxpayer identification number are 4088. Monterrey Aerospace, LLC has not been assigned a taxpayer identification number as of the date hereof.

[2] Capitalized terms used but not defined herein have the meaning given to such terms in the Motion or the DIP Credit Agreement, as applicable.

guarantee unconditionally (the "DIP Guarantor"), the DIP Borrower's obligations in connection with a superpriority senior secured credit facility (the "DIP Facility") consisting of a $60,000,000 term loan credit facility (the "DIP Loans"), of which $12,500,000 will be available immediately upon entry of this Interim Order, in accordance with the terms and conditions set forth in this Interim Order, the DIP Credit Agreement (as defined below), the other DIP Documents (as defined below), and the Final Order;

(ii)     authorizing the Debtors to enter into that certain Superpriority Secured Debtor-In-Possession Credit Agreement (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time, the "DIP Credit Agreement," attached hereto as **Exhibit A**, and together with this Interim Order, the Final Order, and all agreements, documents, and instruments delivered or executed in connection therewith, including any fee letters executed by the DIP Borrower in connection with the DIP Facility, and other guarantee and security documentation, collectively, the "DIP Documents"), among the DIP Borrower, the DIP Guarantor, the lenders party thereto (collectively in such capacities, the "DIP Lenders"), and Acquiom Agency Services LLC, as administrative agent and collateral agent (in such capacities, the "DIP Agent," and together with the DIP Lenders, the "DIP Secured Parties"), and to perform such other and further acts as may be required in connection with the DIP Documents;

(iii)     authorizing the Debtors to use the proceeds of the DIP Loans and the Prepetition Collateral (as defined below), including Cash Collateral (as defined below), in accordance with the Approved DIP Budget (as defined below) in form and substance acceptable to the required lenders under and pursuant to the DIP Credit Agreement (the "Required DIP Lenders") to provide working capital for, and for other general corporate purposes of, the Debtors, including for payment of reasonable and documented transaction costs, fees, and expenses incurred

2

in connection with any transactions to be implemented through the Cases as provided for herein and in the DIP Documents;

(iv)    granting adequate protection to the Prepetition First Lien Secured Parties (as defined below) to the extent of any Diminution in Value (as defined below) in the Prepetition Collateral as provided for herein;

(v)    granting valid, enforceable, binding, non-avoidable, and fully perfected first priority priming liens on and senior security interests in substantially all of the property and assets of the Debtors, whether such property is presently owned or after-acquired, and each Debtor's estate as created by section 541 of the Bankruptcy Code, of any kind or nature whatsoever, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date (as defined below), subject only to the (x) Carve Out (as defined below) and (y) liens permitted pursuant to the terms of the DIP Credit Agreement and other valid, perfected and unavoidable liens, if any, existing as of the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) (collectively, the "DIP Permitted Encumbrances"), on the terms and conditions set forth herein and in the DIP Documents;

(vi)    granting superpriority administrative expense claims against each of the Debtors' estates to the DIP Secured Parties with respect to the DIP Obligations (as defined below) over any and all administrative expenses of any kind or nature, subject and subordinate only to the Carve Out on the terms and conditions set forth herein and in the DIP Documents;

(vii)    waiving the rights of the Debtors and their estates to surcharge against the DIP Collateral and, subject to entry of the Final Order and to the extent set forth herein, the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code;

3

(viii)    subject to entry of the Final Order and to the extent set forth herein, for the "equities of the case" exception under section 552(b) of the Bankruptcy Code to not apply with respect to the proceeds, products, offspring, or profits of any of the Prepetition Collateral;

(ix)    pursuant to Bankruptcy Rule 4001, holding an interim hearing (the "Interim Hearing") on the Motion before this Court to consider entry of this Interim Order, among other things, (1) authorizing the Debtors, on an interim basis, to borrow from the DIP Lenders a principal amount of up to $12,500,000 in DIP Loans, (2) authorizing the DIP Guarantor to guaranty the DIP Obligations, (3) authorizing the Debtors' use of Prepetition Collateral (including Cash Collateral), (4) granting the adequate protection described in this Interim Order, and (5) authorizing the Debtors to execute and deliver the DIP Documents to which they are a party and to perform their respective obligations thereunder and such other and further acts as may be necessary or appropriate in connection therewith;

(x)    scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order, and approving the form of notice with respect to the Final Hearing; and

(xi)    granting related relief.

This Court having considered the Motion, including the exhibits thereto, the *Declaration of Barry Sullivan, Chief Financial Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), the *Declaration of Adam B. Keil in Support of Motion of Debtors for Interim and Final Orders Under 11 U.S.C. §§ 105, 361, 362, 363 and 364 (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing, (B) Grant Liens and Superpriority Administrative Expense Status, (C) Use Cash Collateral of Prepetition Secured Parties and (D) Grant Adequate Protection to Prepetition Secured Parties; (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and*

4

*4001(c); and (III) Granting Related Relief* (the "<u>Keil Declaration</u>," and together with the First Day Declaration, the "<u>Declarations</u>"), and the other evidence submitted or adduced and the arguments of counsel made at the Interim Hearing held pursuant to Bankruptcy Rule 4001(b)(2) on [ ● ], 2022; and this Court having heard and resolved or overruled any objections, reservations of rights, or other statements with respect to the relief requested in the Motion; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and all parties in interest, and is essential for the continued operation of the Debtors' business and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Credit Agreement and the other DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and the Debtors having provided notice of the Motion and the relief provided for herein as set forth in the Motion, and except as otherwise provided for herein, it appearing that no other or further notice of the Motion and the relief provided for herein need be given under the circumstances; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

A.    *Petition Date*.  On March 30, 2022 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code in this Court, thereby commencing these Cases.

---

[3]    Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

US-DOCS\129980735.10

B.      _Debtors in Possession_.  The Debtors continue to manage and operate their business and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Cases.

C.      _Jurisdiction and Venue_.  This Court has jurisdiction over the Motion, these Cases, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334 and the _Amended Standing Order of Reference_ from the United States District Court for the District of Delaware, dated February 29, 2012.  Venue for these Cases is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This Court may enter a final order consistent with Article III of the United States Constitution.

D.      _Committee_.  As of the date hereof, no official committee of unsecured creditors has been appointed in these Cases pursuant to section 1102 of the Bankruptcy Code (any such committee, the "Committee").

E.      _Debtors' Stipulations_.  Without prejudice to the rights of parties in interest other than the Debtors, including any Committee as set forth in this Interim Order, and subject to the limitations thereon contained in this Interim Order, the Debtors stipulate and agree that (collectively, paragraphs E(i) through (viii) below are referred to herein as the "Debtors' Stipulations"):

(i)      Prepetition First Lien Loans.

(a)      _Prepetition First Lien Credit Agreement_.  Under that certain Credit Agreement, dated as of July 8, 2005 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified, the "Prepetition First Lien Credit Agreement," and collectively with all agreements, documents, notes, letters of credit, mortgages, security agreements, pledges, guarantees, subordination agreements, deeds, instruments, indemnities, indemnity letters, fee

6

letters, assignments, charges, amendments, and any other agreements delivered pursuant thereto or in connection therewith, including, without limitation, the Security Agreement, the New Agent Order, and the New Agent Agreement (each as defined below), the "<u>Prepetition First Lien Loan Documents</u>"), by and among MD Helicopter, Inc., as borrower (the "<u>Borrower</u>"), Monterrey Aerospace, LLC, as guarantor (the "<u>Guarantor</u>"), the Lenders (as defined in the Prepetition First Lien Credit Agreement) from time to time party thereto (collectively, the "<u>Prepetition First Lien Lenders</u>"), Ankura Trust Company, LLC ("<u>Ankura</u>"), as administrative agent for the Zohar Lenders,[4] pursuant to the *Order (I) Authorizing the Appointment of Ankura Trust Company, LLC as New Agent Under the Court-Approved Settlement Agreement By and Between the Debtors, Lynn Tilton, the Patriarch Stakeholders, MBIA Insurance Corp., and The Zohar III Controlling Class And (II) Granting Related Relief* entered in *Zohar III, Corp.*, Case No. 18-10512 (Bankr. D. Del.) at [Docket No. 709] (the "<u>New Agent Order</u>") and the New Agent Agreement (as defined in the New Agent Order) Patriarch Partners Agency Services, LLC ("<u>PPAS</u>," and together with Ankura, the "<u>Prepetition First Lien Agent</u>"), as administrative agent for the Patriarch Lenders,[5] and Ankura and PPAS, as collateral agent (together, in such capacity, the "<u>Prepetition First Lien Collateral Agent</u>"), the Prepetition First Lien Lenders provided certain loans, advances and other extensions of credit (collectively, the "<u>Prepetition First Lien Loans</u>").  The Prepetition First Lien Agent, the Prepetition First Lien Collateral Agent, and the Prepetition First Lien Lenders are collectively referred to herein as the "<u>Prepetition First Lien Secured Parties</u>".

---

[4]    For purposes of this Interim Order, the "<u>Zohar Lenders</u>" and "<u>Zohar Noteholders</u>" shall mean Zohar CDO 2003-1, Limited, Zohar II 2005-1, Limited, and Zohar III, Limited, collectively.  It has been represented to this Court that the Zohar Lenders constitute the Required Lenders (as defined in the Prepetition First Lien Credit Agreement) under the Prepetition First Lien Credit Agreement.

[5]    For purposes of this Interim Order, the "<u>Patriarch Lenders</u>" and "<u>Patriarch Noteholders</u>" shall mean Ark Investment Partners II, L.P. and Ark II CLO 2001-1, Ltd.

(b)      *Prepetition First Lien Obligations*.   All indebtedness, liabilities, and

obligations owing from time to time under the Prepetition First Lien Loan Documents, specifically

to the extent constituting Obligations (as defined in the Prepetition First Lien Credit Agreement),

are collectively referred to herein as "Prepetition First Lien Obligations".  As of the Petition Date,

the applicable Debtors were indebted and liable under the Prepetition First Lien Loan Documents,

without defense, counterclaim, or offset of any kind to the Prepetition First Lien Secured Parties

in respect of the Prepetition First Lien Obligations for an aggregate amount of not less than $357

million in respect of the loans made under the Prepetition First Lien Credit Agreement, including

outstanding principal and accrued and unpaid interest, fees, costs, expenses (including any

attorneys' and financial advisors' fees), charges, indemnities and all other unpaid Obligations (as

defined in the Prepetition First Lien Credit Agreement) incurred or accrued with respect to the

foregoing pursuant to, and in accordance with, the Prepetition First Lien Loan Documents.

(ii)      *First Lien Loan Collateral*.   In connection with the Prepetition First Lien

Credit Agreement, the Debtors entered into that certain Security Agreement, dated as of July 8,

2005 (as amended, supplemented or otherwise modified from time to time,

the "Security Agreement"), by and between the Borrower, the other loan parties thereto, and the

Prepetition First Lien Agent.  Pursuant to the Security Agreement and the other Prepetition First

Lien Loan Documents, the Prepetition First Lien Obligations are secured by valid, binding,

perfected, and enforceable first-priority security interests in and liens on (the "Prepetition First

Lien Loan Liens") the "Collateral" (the "Prepetition Collateral"), pursuant to, and as such term is

defined in, the Security Agreement, consisting of substantially all of the Debtors' assets, except as

set forth in the Security Agreement, subject only to liens (collectively, the "First Lien Permitted

Encumbrances") senior by operation of law or otherwise permitted by the Prepetition First Lien

US-DOCS\129980735.10

Loan Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition First Lien Loan Liens as of the Petition Date, or valid, non-avoidable, senior priority liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code).

(iii)    *Subordinated Notes*. Under that certain Note Purchase Agreement, dated as of April 17, 2007 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified, the "Prepetition Note Purchase Agreement," and collectively with all agreements, documents, notes, mortgages, security agreements, pledges, guarantees, subordination agreements, deeds, instruments, indemnities, indemnity letters, fee letters, assignments, charges, amendments, and any other agreements delivered pursuant thereto or in connection therewith, the "Prepetition Note Documents") MD Helicopter, Inc. issued certain Notes (as defined in the Prepetition Note Purchase Agreement) to the Purchasers (as defined in the Prepetition Note Purchase Agreement).  The holders of the Notes as of the entry of this Interim Order and their respective successors and assigns are collectively referred to herein as the "Prepetition Noteholders".  The Prepetition First Lien Secured Parties and the Prepetition Noteholders are collectively referred to herein as the "Prepetition Secured Parties".[6]

(iv)    *Prepetition Note Obligations*.  All indebtedness, liabilities, and obligations owing from time to time under the Prepetition Note Documents are collectively referred to herein as "Prepetition Note Obligations".  Prepetition First Lien Obligations and Prepetition Note Obligations are collectively referred to herein as "Prepetition Secured Obligations".  As of the Petition Date, except as otherwise set forth herein, the applicable Debtors were indebted and liable

---

[6]    It has been represented to this Court that the Zohar Noteholders constitute the Required Holders (as defined in the Prepetition Note Purchase Agreement) under the Prepetition Note Purchase Agreement.

9

under the Prepetition Note Documents, without defense, counterclaim, or offset of any kind, to the Prepetition Noteholders in respect of the Prepetition Note Obligations for an aggregate amount of not less than $60 million, including outstanding principal and accrued and unpaid interest, fees, costs, expenses (including any attorneys' and financial advisors' fees), charges, indemnities and all other unpaid obligations under the Prepetition Note Documents.

(v)     *Subordinated Note Collateral*. Pursuant to and as more particularly described in the Prepetition Note Documents, the Prepetition Note Obligations are secured by second priority liens and mortgages on, security interests in, and assignments and pledges of (collectively, the "Prepetition Note Liens," and together with the Prepetition First Lien Loan Liens, the "Prepetition Liens") the Prepetition Collateral as set forth in the Prepetition Note Documents and subject to the terms of the Subordination Agreement (as defined herein), and as of the Petition Date, such Prepetition Note Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to (a) the Prepetition First Lien Loan Liens and (b) liens (collectively, the "Second Lien Permitted Encumbrances") senior by operation of law or otherwise permitted by the Prepetition Note Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition Note Liens as of the Petition Date, or valid, non-avoidable, senior priority liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code).

(vi)     *Cash Collateral*.  Any and all of the Debtors' cash, including the Debtors' cash and other amounts on deposit or maintained in any account or accounts by the Debtors, and any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral existing as of the Petition Date, and the proceeds of any of the foregoing, is

the Prepetition Secured Parties' cash collateral within the meaning of section 363(a) of the Bankruptcy Code ("Cash Collateral").

(vii)    *Bank Accounts*.    The Debtors acknowledge and agree that as of the Petition Date, none of the Debtors has opened or maintains any bank accounts other than the accounts listed in the exhibit attached to the Debtors' motion filed with this Court for relief to continue to use the Debtors' existing cash management system.

(viii)    *Validity, Perfection, and Priority of Prepetition Liens and Prepetition Secured Obligations*.    Subject to the Challenge Period (as defined below), each of the Debtors acknowledges and agrees that, in each case as of the Petition Date:  (A) the Prepetition Liens are valid, binding, enforceable, non-avoidable, and properly perfected liens on and security interests in the Prepetition Collateral; (B) the Prepetition First Lien Loan Liens are subject and subordinate only to the First Lien Permitted Encumbrances that, in each case, are senior in priority to the Prepetition First Lien Loan Liens, and the Prepetition Note Liens are subject and subordinate only to the Prepetition First Lien Loan Liens and to the Second Lien Permitted Encumbrances that, in each case, are senior in priority to the Prepetition Note Liens; (C) the Prepetition Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors; and (D) except with respect to the Prepetition Secured Obligations owed to the Patriarch Lenders, the Patriarch Noteholders, and PPAS, solely in its capacity as agent for the Patriarch Lenders (but not for any other Prepetition Secured Parties), (i) no offsets, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Secured Obligations exist, and no portion of the Prepetition Liens or Prepetition Secured Obligations is subject to any challenge or defense including impairment, set-off, right of recoupment, avoidance, attachment, disallowance, disgorgement, reduction, recharacterization, recovery, subordination

(whether equitable or otherwise), attack, offset, defense, counterclaims, cross-claims, or "claim" (as defined in the Bankruptcy Code), pursuant to the Bankruptcy Code or applicable nonbankruptcy law, and (ii) the Debtors and their estates have no claims, objections, challenges, causes of actions, recoupments, counterclaims, cross-claims, setoff rights, and/or choses in action, including "lender liability" causes of action or avoidance claims under chapter 5 of the Bankruptcy Code, whether arising under applicable state law or federal law (including any recharacterization, subordination, avoidance, disgorgement, recovery, or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code) arising out of, based upon, or related to the Prepetition Liens or Prepetition Secured Obligations.  For the avoidance of doubt, notwithstanding anything to the contrary provided for herein, any and all rights of the Debtors, their estates and any third parties to commence and prosecute any and all claims, causes of action and defenses, including claims for recharacterization or equitable subordination, with respect to any Prepetition Secured Obligations owed to the Patriarch Lenders, the Patriarch Noteholders, or PPAS, solely in its capacity as agent for the Patriarch Lenders (but not for any other Prepetition Secured Parties) are expressly preserved.

> F.    *Findings Regarding the DIP Facility and Use of Cash Collateral.*

(i)    The Debtors have an immediate need to obtain the DIP Facility and to use Cash Collateral (to the extent consistent with the Approved DIP Budget, subject to permitted variances as set forth in this Interim Order and the DIP Documents) to, among other things, (A) permit the orderly continuation of their business; (B) fund the Adequate Protection Account; and (C) pay the costs of administration of their estates and satisfy other working capital and general corporate purposes of the Debtors.  The proceeds of the DIP Facility will provide the Debtors with the ability to fund day-to-day operations, meet administrative obligations during the Cases, and

12

preserve the value of their estates. The DIP Facility will also reassure the Debtors' customers and employees that the Debtors will have access to additional liquidity to meet their commitments during the Cases. The ability of the Debtors to obtain sufficient working capital and liquidity through the incurrence of the new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the Debtors' going concern values, preservation and maintenance of the value of the Prepetition Collateral, and prospects for a successful reorganization. The Debtors will not have sufficient sources of working capital and financing to fund the anticipated administrative expenses associated with the Cases, and operate their business in the ordinary course of business throughout the Cases without access to the DIP Facility and authorized use of Cash Collateral.

(ii)     The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense. The Debtors also are unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code for the purposes set forth in the DIP Documents without the Debtors granting to the DIP Secured Parties, subject to the Carve Out as provided for herein, the DIP Liens (as defined below) and DIP Superpriority Claims (as defined below) under the terms and conditions set forth in this Interim Order and the DIP Documents.

(iii)    The DIP Facility has been negotiated in good faith and at arm's length among the Debtors and the DIP Secured Parties, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP Facility and the DIP Documents, including, without limitation, all loans made to and guarantees issued by the Debtors pursuant to the DIP Documents and all other obligations under the DIP Documents (collectively,

13

the "DIP Obligations") shall be deemed to have been extended by the DIP Secured Parties in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code.  The DIP Obligations, the DIP Liens, and the DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is reversed or modified on appeal, and any liens or claims granted to, or payments made to, the DIP Agent or the DIP Lenders hereunder arising prior to the effective date of any such reversal or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

(iv)    *No Claims or Causes of Action*.  As of the date hereof, there exist no claims or causes of action against any of the DIP Secured Parties with respect to, in connection with, related to, or arising from the DIP Documents that may be asserted by the Debtors or their estates.

(v)    *Priming of the Prepetition Liens*.  The priming of the Prepetition Liens under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Documents and as provided herein, will enable the Debtors to obtain the DIP Facility and to continue to operate their business during the pendency of the Chapter 11 Cases, to the benefit of their estates and creditors, and the Debtors would not be able to obtain debtor-in-possession financing in a sufficient amount without granting such priming liens.  The priming of the Prepetition Liens under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Documents and as provided herein, is appropriate because (i) the holders of the Prepetition Liens have consented to the DIP Liens granted pursuant to this Interim Order and/or (ii) the terms of the adequate protection arrangements provided for herein are fair and reasonable and otherwise sufficient under the circumstances to

14

adequately protect the Prepetition Secured Parties against any postpetition diminution in value of the Prepetition Collateral (including Cash Collateral) as provided for herein.

(vi) *Consent to Use of Cash Collateral.* Prepetition First Lien Lenders constituting Required Lenders under the Prepetition First Lien Credit Agreement (such Prepetition First Lien Lenders, the "Consenting Prepetition First Lien Lenders") have delivered written direction to the Prepetition First Lien Agent to consent to the Debtors' use of the Prepetition Collateral (including Cash Collateral) on the terms and conditions set forth in this Interim Order.[7] Pursuant and subject to the terms of the Prepetition Note Documents, including, without limitation, that certain Subordination Agreement, dated as of April 17, 2007, by and among the Purchasers (as defined in the Prepetition Note Purchase Agreement) and the Prepetition First Lien Agent, and those certain Amended and Restated Subordinated Security Agreements, dated as of May 31, 2011, by and among MDHI, as grantor, and each of the Purchasers (collectively, the "Subordination Agreement"), the Prepetition Noteholders are deemed to have consented to the use of the Prepetition Collateral (including Cash Collateral). No other or further consents to the use of the Prepetition Collateral (including Cash Collateral) need be provided.

(vii) *Adequate Protection for Prepetition First Lien Secured Parties.* To the extent provided for herein, each of the Prepetition First Lien Secured Parties are entitled, pursuant to sections 105, 361, 362, 363(e), and 364(d) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, including Cash Collateral, for any postpetition diminution in the value thereof. Based on the DIP Motion, the Declarations, and other

---

[7]  Prepetition First Lien Lenders that have not delivered written consent to the Prepetition First Lien Agent, in a form reasonably satisfactory to the Debtors, to the Debtors' use of the Prepetition Collateral and incurrence of the DIP Facility on the terms and conditions set forth herein and in the DIP Documents are referred to herein as "Non-Consenting Prepetition First Lien Lenders".

evidence filed in support of the DIP Motion, and the record presented to the Court in connection with the Interim Hearing, under the circumstances, the terms of the adequate protection arrangements and the use of Prepetition Collateral (including Cash Collateral) as provided for herein are fair and reasonable, reflect the Debtors' prudent exercise of business judgment, and are otherwise sufficient to adequately protect the Prepetition Secured Parties against any postpetition diminution in value of the Prepetition Collateral (including Cash Collateral) as provided for herein.

      (viii)    _Sections 506(c) and 552(b) Waivers_.  In light of the Prepetition Liens being subordinated under this Interim Order to the DIP Obligations and the Carve Out and the Debtors' use of the Prepetition Collateral (including Cash Collateral) as set forth herein, the Prepetition Secured Parties are entitled to the rights and benefits of section 552(b) of the Bankruptcy Code and, subject to and upon entry of the Final Order, (i) a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code and (ii) a waiver of the provisions of section 506(c) of the Bankruptcy Code.

      (ix)    _Consent to Incurrence of DIP Facility_.  The Consenting Prepetition First Lien Lenders have consented to the Debtors' incurrence of the DIP Facility on the terms and conditions set forth in this Interim Order.  Pursuant and subject to the terms of the Prepetition Note Documents, including, without limitation, the Subordination Agreement, the Prepetition Noteholders are deemed to have consented to the Debtors' incurrence of the DIP Facility on the terms and conditions set forth in this Interim Order.  In addition, the Zohar Noteholders, acting as the Required Holders under the Note Purchase Agreement, have consented to the Debtors' incurrence of the DIP Facility on the terms and conditions set forth in this Interim Order.  By virtue of that consent, pursuant and subject to the terms of the Note Purchase Agreement, the Prepetition

US-DOCS\129980735.10

Noteholders are deemed to have consented to the Debtors' incurrence of the DIP Facility on the terms and conditions set forth in this Interim Order.

G.    *Subordination Agreement*.    Pursuant to section 510 of the Bankruptcy Code, the Subordination Agreement shall (i) remain in full force and effect, (ii) continue to govern the relative obligations, priorities, rights and remedies of the Prepetition First Lien Secured Parties and the Prepetition Noteholders, and (iii) not be deemed to be amended, altered or modified by the terms of this Interim Order or the DIP Documents, in each case, unless expressly set forth herein or therein.

H.    *Good Faith*.    The DIP Lenders, the Consenting Prepetition First Lien Lenders, and Ankura have negotiated at arms' length and acted in good faith regarding (a) the Debtors' incurrence of the DIP Facility and use of the Prepetition Collateral (including Cash Collateral), as provided for in this Interim Order, and (b) the other terms of this Interim Order, including, without limitation, the terms of the adequate protection provided for herein.

I.    *Good Cause Shown; Best Interest*.    Good cause has been shown for entry of this Interim Order, and entry of this Interim Order is in the best interests of the Debtors' estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing business and enhance the Debtors' prospects for a successful reorganization. Absent granting the relief sought by this Interim Order, the Debtors' estates will be immediately and irreparably harmed.

J.    *Notice*.    In accordance with Bankruptcy Rules 2002, 4001(b) and (c), and 9014 and the applicable Local Rules, notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors.    Under the circumstances, the notice given by the

Debtors of the Motion, the relief provided for herein, and the Interim Hearing complies with Bankruptcy Rules 2002, 4001(b) and (c), and 9014 and the applicable Local Rules.

Based upon the foregoing findings and conclusions, the Motion, and the record before this Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.    <u>DIP Financing Approved</u>.  The Motion is granted on an interim basis as set forth herein.

2.    <u>Objections Overruled</u>.  Any objections, reservations of rights, or other statements with respect to entry of this Interim Order, to the extent not withdrawn or resolved, are overruled on the merits.  This Interim Order shall become effective immediately upon its entry.

3.    <u>Authorization of the DIP Facility and the DIP Documents</u>.

(a)    The Debtors are hereby immediately authorized and empowered to enter into, and execute and deliver, the DIP Documents, and such additional documents, instruments, certificates and agreements as may be reasonably required or requested by the DIP Secured Parties to implement the terms or effectuate the purposes of this Interim Order and the DIP Documents. The Interim Order, the DIP Credit Agreement, and the other DIP Documents shall govern and control the DIP Facility.  Upon execution and delivery thereof, the DIP Documents shall constitute valid and binding obligations of the Debtors enforceable in accordance with their terms.  To the extent there exists any conflict among the terms and conditions of the DIP Documents and this Interim Order, the terms and conditions of this Interim Order shall govern and control.  In all respects, the DIP Documents shall be consistent with this Interim Order and the DIP Credit Agreement.

(b)       Upon entry of this Interim Order, the DIP Borrower is hereby authorized to borrow, and the DIP Guarantor is hereby authorized to guaranty, borrowings up to an aggregate principal amount of $12,500,000 of DIP Loans, subject to and in accordance with this Interim Order, without any further action by the Debtors or any other party.

(c)       Upon entry of this Interim Order, the Backstop Fee and Exit Fee shall be fully earned and payable pursuant to the terms of the DIP Documents.  The Backstop Fee and Exit Fee shall not be subject to any offset, defense, claim, counterclaim or diminution of any type, kind or nature whatsoever.

(d)       It shall be an Event of Default if proceeds of the DIP Loans are used other than for the purposes as permitted under the DIP Documents and this Interim Order, and in accordance with the Approved DIP Budget, subject to permitted variances as set forth in this Interim Order and the DIP Documents.  Attached as **Exhibit B** hereto and incorporated herein by reference is a budget prepared by the Debtors and approved by the Required DIP Lenders in accordance with the DIP Credit Agreement (together with any subsequent Budget approved from time to time in accordance with paragraph 4 of this Interim Order, the "Approved DIP Budget").[8]

(e)       In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized, and the automatic stay imposed by section 362 of the Bankruptcy Code is hereby lifted to the extent necessary, to perform all acts and to make, execute, and deliver all instruments and documents and to pay all fees, expenses and indemnities (including all fees and expenses owed to the DIP Secured Parties under the DIP Documents) that may be reasonably

---

[8]    As used in this Interim Order, "Budget" shall have the meaning ascribed to such term in the DIP Credit Agreement.

US-DOCS\129980735.10

required or necessary for the Debtors' performance of their obligations under the DIP Facility, including, without limitation:

(1)      the execution, delivery, and performance of the DIP Documents, including, without limitation, the DIP Credit Agreement, any security and pledge agreement, and any mortgage to the extent contemplated thereby;

(2)      the execution, delivery, and performance of one or more amendments, waivers, consents, or other modifications to and under the DIP Documents (in each case in accordance with the terms of the applicable DIP Documents), it being understood that no further approval of this Court shall be required for amendments, waivers, consents, or other modifications to and under the DIP Documents that are not material; provided that notice of any amendments, waivers, or other modifications to or under the DIP Documents shall be provided to counsel to the Prepetition First Lien Lenders and counsel to Ankura not less than three (3) calendar days prior to the effectiveness thereof;

(3)      the non-refundable payment to each of and/or on behalf of the DIP Secured Parties, as applicable, of the fees, expenses, indemnity and other amounts referred to in the DIP Documents, including (x) all fees, expenses, indemnity and other amounts owed to the DIP Secured Parties and (y) all reasonable and documented costs and expenses as may be due from time to time, including, without limitation, the reasonable and documented fees and expenses of counsel and other professionals retained as provided for in the DIP Documents and this Interim Order (whether incurred before or after the Petition Date, including, for the avoidance of doubt, (a) Arnold & Porter Kaye Scholer LLP (as counsel), (b) Baker & McKenzie LLP (as counsel), (c) Seabury Capital Group LLC (as financial advisor), and (d) Womble Bond Dickenson (US) LLP

(as Delaware bankruptcy counsel) to the DIP Lenders and DIP Agent (collectively, the "DIP Professionals");

(4)    the performance of all other acts required under or in connection with the DIP Documents.

(f)    Upon entry of this Interim Order, such DIP Documents, the DIP Obligations, and the DIP Liens shall constitute valid, binding, and non-avoidable obligations of the Debtors enforceable against each Debtor party thereto in accordance with their respective terms and the terms of this Interim Order for all purposes during the Cases, any subsequently converted Case of any Debtor to a case under chapter 7 of the Bankruptcy Code or after the dismissal of any Case. No obligation, payment, transfer, or grant of security under the DIP Credit Agreement, the other DIP Documents, or this Interim Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 548, or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim. All payments or proceeds remitted to or on behalf of the DIP Agent on behalf of any DIP Secured Parties, pursuant to the DIP Documents, the provisions of this Interim Order, or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment, or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code.

(g)    The DIP Guarantor hereby is authorized and directed to unconditionally guarantee, and upon entry of this Interim Order shall be deemed to have guaranteed, in full, all of the DIP Obligations of the DIP Borrower.

21

4.      <u>Budget and Variance Reporting</u>.  On the final business day of every fourth calendar week following entry of this Interim Order beginning with the fourth full week following the Petition Date (or more frequently if determined by the Debtors), the Debtors will deliver to the DIP Agent (for distribution to the DIP Lenders), the Prepetition First Lien Lenders, and Ankura an updated Budget for the subsequent 13-week period, which shall be in form and substance satisfactory to the Required DIP Lenders and the Required Lenders under the Prepetition First Lien Credit Agreement.  The initial Approved DIP Budget or any subsequent Approved DIP Budget shall be deemed to constitute the "Approved DIP Budget" for purposes of this Interim Order with the most recently delivered Budget constituting the "Approved DIP Budget," upon (i) approval by the Required DIP Lenders and the Required Lenders under the Prepetition First Lien Credit Agreement (which must be in writing, email being sufficient) or (ii) 5:00 p.m. (prevailing Eastern time) three (3) business days following delivery of such Budget if the Required DIP Lenders and the Required Lenders under the Prepetition First Lien Credit Agreement have neither approved nor rejected the Budget.  In the event the conditions for the most recently delivered Budget to constitute an "Approved DIP Budget" are not met as set forth herein, the prior Approved DIP Budget shall remain in full force and effect.  Commencing on the first full calendar week after the Petition Date, on or before 5:00 p.m. (prevailing Eastern time) on Thursday of each week, the Debtors shall deliver to the DIP Agent (for distribution to the DIP Lenders), the Prepetition First Lien Lenders, and Ankura a budget variance report/reconciliation (the "<u>Approved DIP Budget Variance Report</u>"), setting forth in reasonable detail actual operating receipts and operating disbursements for the applicable Budget Period (as defined below) and all Budget Variances (as defined below), in each case, on both an individual line item basis and an aggregate basis, as compared to the projected amounts therefor set forth in the then applicable Approved DIP Budget,

22

together with a statement set forth in Section 5.01(h) of the DIP Credit Agreement.  The Approved

DIP Budget Variance Report shall include indications as to whether each variance therein is

temporary or permanent and an explanation, in reasonable detail, of any material variance.  The

Debtors' advisors shall hold weekly meetings with the DIP Lenders and the Prepetition First Lien

Lenders and their respective advisors to discuss the applicable Approved DIP Budget Variance

Report.  "Budget Period" shall mean the four-week period following the first full calendar week

after entry of this Interim Order and each successive four-week period (e.g., full calendar weeks 1

through 4 following entry of this Interim Order shall be the first Budget Period and weeks 5

through 8 following entry of this Interim Order shall be the second Budget Period).  The Debtors

shall not permit the percentage variance with respect to (i) total projected operating disbursements

in each then-current Approved DIP Budget to exceed (a) 125% in week 1 of the applicable Budget

Period, (b) 120% in week 2 of the applicable Budget Period, (c) 115% in week 3 of the applicable

Budget Period, and (d) 110% in week 4 of the applicable Budget Period, each on an aggregate

basis of total actual operating disbursements, and (ii) total projected operating receipts in each

then-current Approved DIP Budget to be less than (a) 75% in weeks 1 and 2 of the applicable

Budget Period and (b) 80% in weeks 3 and 4 of the applicable Budget Period on an aggregate basis

of total actual operating receipts, in each case, for measuring the variance, tested weekly on a

cumulative basis for the Budget Period under the then-current Approved DIP Budget (the "Budget

Variances") (i.e., in week 1 of each Budget Period, only week 1 variances are tested; in week 2 of

each Budget Period, weeks 1 and 2 variances are tested on a cumulative basis; in week 3 of each

Budget Period, weeks 1 through 3 variances are tested on a cumulative basis; and in week 4 of the

applicable Budget Period, weeks 1 through 4 variances are tested on a cumulative basis); provided

that each dollar of favorable variance in operating disbursements in any Approved DIP Budget

Variance Report may be credited to operating receipts in the same Approved DIP Budget Variance Report for purposes of the weekly variance test.  All references in this Interim Order and the DIP Documents to "Approved DIP Budget" shall mean the Approved DIP Budget as it is subject to the Budget Variances.

     5.    <u>Access to Records</u>.  The Debtors shall provide the DIP Agent (for distribution to the DIP Lenders), the Prepetition First Lien Lenders, and Ankura with all reporting and other information required to be provided to the DIP Agent under the DIP Documents.  In addition to, and without limiting, whatever rights to access the DIP Secured Parties have under the DIP Documents, upon reasonable notice to Debtors' counsel (email being sufficient) and subject to any limitation that the Debtors reasonably believe to be necessary to protect the fairness and integrity of the sale process, at reasonable times during normal business hours, the Debtors shall permit representatives, agents, and employees of the DIP Secured Parties, the Prepetition First Lien Lenders, and Ankura to have reasonable access to (i) inspect the Debtors' assets, and (ii) all information (including historical information and the Debtors' books and records) and personnel, including regularly scheduled meetings as mutually agreed with senior management of the Debtors and other company advisors (during normal business hours), and the DIP Secured Parties, the Prepetition First Lien Lenders, and Ankura shall be provided with access to all information they shall reasonably request, excluding any information for which confidentiality is owed to third parties, information subject to attorney client or similar privilege, or where such disclosure would not be permitted by any applicable requirements of law.

     6.    <u>DIP Superpriorty Claims</u>.  Pursuant to section 364(c)(1) of the Bankruptcy Code, and without the need to file any proof of claim, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors' estates (the "<u>DIP</u>

24

<u>Superpriority Claims</u>") with priority over any and all administrative expenses, adequate protection claims, diminution claims, and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for the purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, without limitation, subject to entry of the Final Order, any proceeds or property recovered in connection with the pursuit of claims or causes of action arising under chapter 5 of the Bankruptcy Code, if any (the "<u>Avoidance Actions</u>"), all subject only to, and subordinated in all respects to, the Carve Out.

7.      <u>DIP Liens</u>.  As security for the DIP Obligations, effective and perfected upon the date of this Interim Order, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by the DIP Secured Parties of or over any DIP Collateral (as defined below), subject to (x) the DIP Permitted Encumbrances and (y) the Carve Out, the following security interests and liens are hereby granted by the Debtors to the DIP Agent, for the benefit of the DIP Lenders (collectively, the "<u>DIP Liens</u>," and all property on which the DIP Liens are granted, the "<u>DIP Collateral</u>"):

(a)     <u>First Priority DIP Lien On Any Unencumbered Property</u>.   Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, non-avoidable, automatically, and properly perfected first priority senior security interest in and lien upon all property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected, and non-avoidable liens (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), including, without limitation (in each case, to the extent not subject to valid, perfected, and non-avoidable liens) unencumbered cash of the Debtors (whether maintained with the DIP Agent or otherwise) and any investment of such cash, accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests in or of any entity (including equity interests in subsidiaries of each Debtor), money, investment property, intercompany claims, claims arising on account of transfers of value from a Debtor to (x) another Debtor or (y) a non-Debtor affiliate incurred on or following the Petition Date, causes of action (other than Avoidance Actions), all products and proceeds of the foregoing, proceeds and property recovered in respect of section 549 of the Bankruptcy Code, and, subject to entry of the Final Order, all proceeds and property recovered in respect of Avoidance Actions.

(b)     <u>DIP Liens Priming the Prepetition Liens</u>.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all property of the Debtors that was subject to the Prepetition Liens, including, without limitation, the Prepetition Collateral (including Cash Collateral); <u>provided</u> that such liens shall be immediately junior to any DIP Permitted Encumbrances; <u>provided</u>, <u>further</u>, that, for the avoidance of doubt and notwithstanding anything to the contrary contained herein, to the extent a lien cannot attach to any of the foregoing pursuant to applicable law, the liens granted pursuant to this Interim Order shall attach to the Debtors' economic rights, including, without limitation, any and all proceeds of the foregoing.

8.     <u>Adequate Protection for the Prepetition First Lien Secured Parties</u>.  Subject only to the Carve Out and the terms of this Interim Order, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), solely for and equal in amount to the postpetition diminution in value of such interests (each such diminution, a "<u>Diminution in Value</u>"), resulting from, among other things, the imposition of the priming DIP Liens on the Prepetition Collateral, the Carve Out, the Debtors' use of the Prepetition Collateral (including Cash Collateral), and the imposition of the automatic stay, the Prepetition First Lien Agent, for the benefit of itself and the other Prepetition First Lien Secured Parties, is hereby granted the following (collectively, the "<u>First Lien Adequate Protection Obligations</u>"):

(a)     <u>First Lien Adequate Protection Liens</u>.  As security for and solely to the extent of any Diminution in Value, additional and replacement, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens as of the Petition Date (together, the "<u>First Lien Adequate Protection Liens</u>"), without the necessity

of the execution by the Debtors (or recordation or other filing), of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, on all DIP Collateral and, upon entry of the Final Order, all proceeds or property recovered from Avoidance Actions.  Subject to the terms of this Interim Order, the First Lien Adequate Protection Liens shall be subordinate only to the (A) Carve Out, (B) the DIP Liens, and (C) First Lien Permitted Encumbrances that, in each case, are senior in priority to the Prepetition First Lien Loan Liens.  The First Lien Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral (including, for the avoidance of doubt, any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code).

(b)      First Lien Adequate Protection Superpriority Claims.  As further adequate protection, and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code, allowed administrative expense claims in each of the Cases ahead of and senior to any and all other administrative expense claims in such Cases to the extent of any Diminution in Value (the "First Lien Adequate Protection Superpriority Claims"), but junior to the Carve Out and the DIP Superpriority Claims.  Subject to the Carve Out and the DIP Superpriority Claims in all respects, the First Lien Adequate Protection Superpriority Claims will not be junior to any claims and shall have priority over all administrative expense claims against any of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 361, 362, 363, 364, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(d), 726, 1113 or 1114 of the Bankruptcy Code.  The Prepetition First Lien Secured Parties shall not receive or retain any payments, property or other amounts in respect of the First Lien

28

Adequate Protection Superpriority Claims under section 507(b) of the Bankruptcy Code granted hereunder unless and until the DIP Obligations have been indefeasibly paid in full, in cash, or satisfied in a manner otherwise agreed to by the Required DIP Lenders, in each case as provided in the DIP Documents.

(c)      Adequate Protection Account.  As further adequate protection, the Debtors shall transfer an amount equal to seven (7) percent of each dollar of DIP Loans drawn to a segregated account in the name of MDHI with Wells Fargo Bank, N.A. (the "Adequate Protection Account"), for the benefit of the Non-Consenting Prepetition First Lien Lenders solely to the extent of any Diminution in Value of the Non-Consenting Prepetition First Lien Lenders' interests in the Prepetition Collateral arising from the imposition of the priming DIP Liens on the Prepetition Collateral.  The funds on deposit in the Adequate Protection Account shall be referred to herein as the "Adequate Protection Funds".  The Adequate Protection Account, the Adequate Protection Funds, and the proceeds thereof shall be DIP Collateral; provided that the rights of the Non-Consenting Prepetition First Lien Lenders to the Adequate Protection Account, the Adequate Protection Funds, and the proceeds thereof shall be senior to the DIP Liens solely to the extent of any Diminution in Value of the Non-Consenting Prepetition First Lien Lenders' interests in the Prepetition Collateral arising from the imposition of the priming DIP Liens on the Prepetition Collateral.  The Debtors shall (i) continue to segregate and maintain the Adequate Protection Funds and (ii) not use, commingle, or further encumber the Adequate Protection Account or the Adequate Protection Funds.  The Debtors shall provide weekly reporting identifying the balance of the Adequate Protection Account and the nature and amount of all deposits to or withdrawals from the Adequate Protection Account to the DIP Secured Parties and the Prepetition First Lien Secured Parties.  The Adequate Protection Funds shall be held in the Adequate Protection Account subject

29

to the terms and conditions of this paragraph 8(c), until the earlier of (i) indefeasible payment in full of the DIP Obligations, which shall include the assumption or refinance of the DIP Facility, (ii) entry of a final order in favor of the plaintiff or the movant sustaining any Challenge to the mortgages, liens or security interests of the Non-Consenting Prepetition First Lien Lenders with respect to the Prepetition First Lien Loan Liens and Prepetition First Lien Obligations in any timely and properly filed adversary proceeding or contested matter under paragraph 11 of this Interim Order (a "Successful Challenge"), or (iii) entry of a further order of this Court authorizing the release of the Adequate Protection Funds; provided that the Adequate Protection Funds shall be released from the Adequate Protection Account pursuant to clause (ii) in proportion with the portion of the Prepetition First Lien Obligations of the Non-Consenting Prepetition First Lien Lenders that are subject to the Successful Challenge.  Upon release of the Adequate Protection Funds pursuant to the preceding sentence, the Debtors shall be authorized to use such funds for general corporate purposes subject to the terms and conditions of this Interim Order.

(d)      Right to Seek Additional Adequate Protection.  This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly:  (i) the rights of the Prepetition First Lien Secured Parties to request further or alternative forms of adequate protection at any time or the rights of the Debtors or any other party to contest such request; and (ii) subject to the terms of the Subordination Agreement, the rights of the Prepetition Noteholders to request adequate protection at any time or the rights of the Debtors or any other party to contest such request.

9.      Carve Out.

(a)      Priority of Carve Out.  Subject to the terms and conditions contained herein, each of the DIP Liens, DIP Superpriority Claims, Prepetition Liens, First Lien Adequate Protection

Liens, and First Lien Adequate Protection Superpriority Claims shall be subject and subordinate to the Carve Out.

(b)    <u>Definition of Carve Out</u>. As used in this Interim Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) to the extent payable or allowed at any time, whether by interim order, procedural order, or otherwise, but not to exceed the amounts set forth for each Professional Person (as defined below) in the Approved DIP Budget as of the delivery of the Carve Out Trigger Notice (as defined below), all unpaid fees and expenses (including any success or transaction fees owed to Moelis & Company LLC (the "<u>Investment Banker</u>"), to the extent payable pursuant to an order entered by this Court) (collectively, the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "<u>Debtor Professionals</u>") and the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (collectively, the "<u>Committee Professionals</u>," and together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before the delivery by the DIP Agent (at the direction of the Required DIP Lenders) of a Carve Out Trigger Notice (as defined below), whether allowed by this Court prior to or after delivery of such Carve Out Trigger Notice (the amounts set forth in the foregoing clauses (i) and (ii), collectively, the "<u>Pre-Carve Out Trigger Notice Cap</u>"); and (iii) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $1,250,000 incurred on and after the delivery by the DIP Agent of a Carve Out Trigger Notice (such date, the "<u>Trigger Date</u>"), to the extent allowed at any time, whether by interim order, procedural order, or otherwise, less for each Professional Person the amount of any prepetition retainers received by any such Professional Person and not previously returned or applied to fees

31

and expenses (the amounts set forth in this clause (iii) being the "Post-Carve Out Trigger Notice Cap," and together with the Pre-Carve Out Trigger Notice Cap, the "Carve Out Cap"). For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (at the direction of the Required DIP Lenders) to the Debtors' lead restructuring counsel (Latham & Watkins LLP) and co-restructuring counsel (Troutman Pepper Hamilton Sanders LLP), the U.S. Trustee, and counsel to any Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(c)     Carve Out Reserve. Notwithstanding the occurrence of an Event of Default or conditions to borrowing or release of funds from the DIP Facility, and subject to the amounts set forth for each Professional Person in the Approved DIP Budget as of the delivery of such Carve Out Trigger Notice, on the day on which a Carve Out Trigger Notice is delivered by the DIP Agent as provided for herein (the "Termination Declaration Date"), unless otherwise set forth in the Carve Out Trigger Notice, the Carve Out Trigger Notice shall (i) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor or available in the Debtors' Accounts (including the Adequate Protection Funds in the Adequate Protection Account) to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees; provided that the Debtors shall only be obligated use cash on hand to fund such reserve, in the first instance, to the extent of the Debtors' cash balance in excess of $2,000,000, and (ii) also be deemed a draw request and notice of borrowing by the Debtors for DIP Loans under the DIP Facility (on a pro rata basis based on the then outstanding DIP Obligations) and/or request to release funds from the Debtors' Accounts, in an amount equal to

the then unpaid amounts of the Allowed Professional Fees to the extent not funded after utilizing cash on hand in (i). The Debtors shall deposit and hold such amounts in a segregated account in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims. On the Termination Declaration Date, the Carve Out Trigger Notice shall also (x) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor or available in the Debtors' Accounts (including the Adequate Protection Funds in the Adequate Protection Account), after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap and (y) be deemed a request by the Debtors for DIP Loans under the DIP Facility (on a pro rata basis based on the then outstanding DIP Obligations) and/or request to release funds from the Debtors' Accounts in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP Loans) to the extent not funded utilizing cash on hand in (x). The Debtors shall deposit and hold such amounts in a segregated account in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve," and together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims. On the first business day after the DIP Agent delivers such notice to such DIP Lenders, notwithstanding anything in the DIP Credit Agreement to the contrary, including with respect to the existence of an Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for DIP Loans under the DIP Facility, any termination of the DIP Obligations following an Event of Default, or the occurrence of the Maturity Date (as defined in the DIP Credit Agreement), each DIP Lender with an outstanding Commitment (as defined in the DIP Credit Agreement, on a pro rata basis based on the then outstanding Commitments) shall make available

to the DIP Agent such DIP Lender's pro rata share with respect to such borrowing in accordance with the DIP Facility to the extent necessary to fund the Pre-Carve Out Amounts. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in the Pre-Carve Out Trigger Notice Cap (the "<u>Pre-Carve Out Amounts</u>"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition First Lien Secured Parties in accordance with their rights and priorities as of the Petition Date. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in the Post-Carve Out Trigger Notice Cap (the "<u>Post-Carve Out Amounts</u>"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition First Lien Secured Parties in accordance with their rights and priorities as of the Petition Date. Notwithstanding anything to the contrary in the DIP Documents, or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserves, up to the applicable amount set forth in this paragraph, prior to making any payments to the DIP Agent or the Prepetition First Lien Secured Parties, as applicable. Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Agent and the Prepetition First Lien

Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Documents.  Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Loans or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) subject to the Approved DIP Budget, in no way shall the Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Facility, the Prepetition First Lien Loan Documents or the Prepetition Note Documents, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the First Lien Adequate Protection Liens, the First Lien Adequate Protection Superiority Claims, any claims arising under section 507(b) of the Bankruptcy Code, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations and the Prepetition Secured Obligations.

(d)      <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(e)      <u>No Direct Obligation To Pay Allowed Professional Fees</u>.  Except for funding the Carve Out Reserves as provided herein, none of the DIP Agent, DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or

35

disbursements of any Professional Person incurred in connection with the Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f)     <u>Payment of Carve Out On or After the Termination Declaration Date</u>.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

10.     <u>Reservation of Rights of the DIP Secured Parties and Prepetition Secured Parties</u>. Subject in all cases to the Carve Out, notwithstanding any other provision in this Interim Order or the DIP Documents to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair:  (a) any of the rights of any of the Prepetition First Lien Secured Parties or, subject to the terms of the Subordination Agreement, the Prepetition Noteholders to seek any other or supplemental relief in respect of the Debtors, including in the case of the Prepetition First Lien Secured Parties the right to seek additional adequate protection at and following the Final Hearing; <u>provided</u> that any such further or different adequate protection shall at all times be subordinate and junior to the Carve Out and the claims and liens of the DIP Secured Parties granted under this Interim Order and the DIP Documents; (b) any of the rights of the DIP Secured Parties, the Prepetition First Lien Secured Parties, or the Prepetition Noteholders under the DIP Documents, the Prepetition First Lien Loan

36

Documents, the Prepetition Note Documents, the Subordination Agreement, or the Bankruptcy Code or under non-bankruptcy law (as applicable), including, without limitation, the right of any of the DIP Secured Parties, the Prepetition First Lien Secured Parties or, subject to the terms of the Subordination Agreement, the Prepetition Noteholders to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases, conversion of any of the Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers in any of the Cases, (iii) seek to propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Secured Parties or the Prepetition Secured Parties.  The delay or failure of the DIP Secured Parties or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order shall not constitute a waiver of any of the rights and remedies of the DIP Secured Parties or the Prepetition Secured Parties, nor should any such delay or failure enable any party to rely upon or in any way seek to assert any such delay or failure as a defense to any obligation owed by the Debtors to the DIP Secured Parties or the Prepetition Secured Parties.

11.     <u>Reservation of Certain Committee and Third Party Rights and Bar of Challenges and Claims</u>.  Subject to the Challenge Period, the findings, stipulations, admissions, waivers, and releases contained in this Interim Order with respect to the Prepetition Liens and the Prepetition Secured Obligations, including the Debtors' Stipulations, shall be binding upon the Debtors, their estates, and any of their respective successors and assigns in all circumstances and for all purposes, and the Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined below) as of the Petition Date.  The findings, stipulations, admissions, waivers and releases contained in this Interim Order with respect to the Prepetition Liens and the Prepetition Secured

US-DOCS\129980735.10

Obligations, including the Debtors' Stipulations, shall be binding upon all other parties in interest, including any Committee and any other person acting on behalf of the Debtors' estates (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), unless and to the extent that a party in interest with proper standing granted by order of this Court has timely and properly filed an adversary proceeding or contested matter under the Bankruptcy Rules (i) by no later than seventy-five (75) calendar days after entry of this Interim Order, subject to further extension by written agreement of the Debtors and the Required Lenders under the Prepetition First Lien Credit Agreement, in the case of the Prepetition First Lien Obligations and the Prepetition First Lien Loan Liens, and by the Required Noteholders under the Prepetition Note Purchase Agreement, in the case of the Prepetition Note Obligations and the Prepetition Note Liens (in each case, a "Challenge Period," and the date of expiration of each Challenge Period being a "Challenge Period Termination Date"); (ii) seeking to avoid, object to, or otherwise challenge the findings in this Interim Order and the Debtors' Stipulations regarding:  (a) the validity, enforceability, extent, priority, and perfection of the mortgages, security interests, and liens of the Prepetition First Lien Secured Parties and the Prepetition Noteholders, as applicable; or (b) the validity, enforceability, allowability, priority, secured status, and amount of the Prepetition First Lien Obligations and the Prepetition Note Obligations, as applicable (any such claim, a "Challenge"); and (iii) in which this Court enters a final order in favor of the plaintiff or the movant sustaining any such Challenge in any such timely and properly filed adversary proceeding or contested matter.  The timely and proper filing of a motion seeking standing to file a Challenge before the termination of the Challenge Period, which

attaches a proposed Challenge, shall toll the Challenge Period Termination Date only as to the party that timely and properly filed such standing motion, and only with respect to challenges expressly asserted in the proposed Challenge attached to such standing motion, until such motion is resolved or adjudicated by this Court.  Upon the expiration of the Challenge Period Termination Date without the filing of a Challenge (or if any such Challenge is filed and overruled):  (a) any and all such Challenges by any party (including the Committee, any chapter 11 trustee, and/or any examiner or other estate representative appointed or elected in these Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any Successor Case) shall be deemed to be forever barred; (b) the Prepetition First Lien Obligations and the Prepetition Note Obligations, as applicable, shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, reduction, subordination, recharacterization, defense, or avoidance for all purposes in the Debtors' Cases and any Successor Cases; (c) the Prepetition First Lien Loan Liens and the Prepetition Note Liens, as applicable, shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected secured claims, not subject to recharacterization, subordination, or avoidance; and (d) all of the findings, stipulations, admissions, waivers and releases contained in this Interim Order, including the Debtors' Stipulations, as to the priority, extent, and validity of the claims, liens, and interests of the Prepetition First Lien Secured Parties and the Prepetition Noteholders shall be of full force and effect and forever binding upon the Debtors, their estates, and all creditors, interest holders, and other parties in interest in these Cases and any Successor Cases.  Furthermore, if any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules, the findings, stipulations, admissions, waivers and releases contained in this Interim Order with respect to the Prepetition Liens and the Prepetition Secured Obligations, including the Debtors' Stipulations, shall nonetheless remain binding and preclusive

on any Committee and any other person or entity except to the extent that such findings, stipulations, admissions, waivers and releases were expressly challenged in such adversary proceeding or contested matter prior to the Challenge Period Termination Date.  Nothing in this Interim Order vests or confers on any person or entity, including, without limitation, any Committee, standing or authority to pursue any claims or causes of action belonging to the Debtors or their estates, including, without limitation, any Challenges, with respect to any of the Prepetition First Lien Loan Documents, the Prepetition Note Documents, the Prepetition Liens, or the Prepetition Secured Obligations.

12.    <u>DIP Termination Date; Maturity Date</u>.

(a)    On the DIP Termination Date (as defined below):  (i) all DIP Obligations shall be immediately due and payable, all Commitments shall immediately terminate, and the Carve Out Reserves shall be funded as provided for in this Interim Order; (ii) all authority to use Cash Collateral shall cease unless the Court orders otherwise prior to the expiration of the Remedies Notice Period; *provided*, *however*, that during the Remedies Notice Period (as defined below), the Debtors may use Cash Collateral solely to fund the Carve Out as provided for herein and pay payroll and other expenses critical to the administration of the Debtors' estates strictly in accordance with the Approved DIP Budget, subject to such variances as permitted in this Interim Order or the DIP Credit Agreement; and (iii) upon expiration of the Remedies Notice Period, unless the Court orders otherwise, the DIP Secured Parties shall be otherwise entitled to exercise rights and remedies under the DIP Documents in accordance with this Interim Order.

(b)    On the Maturity Date:  (i) to the extent not terminated earlier, the Commitments of each DIP Lender shall terminate immediately and without further action; (ii) the DIP Borrower shall repay to the DIP Agent for the ratable account of the DIP Lenders the

40

aggregate principal amount of all DIP Loans outstanding on such date, together with all accrued and unpaid interest thereon; and (iii) notwithstanding the provisions of section 362 of the Bankruptcy Code, the DIP Agent and the DIP Lenders shall be entitled to immediate payment of the DIP Obligations.

13.    Events of Default.  The occurrence of any of the following events, unless waived by the Required DIP Lenders in accordance with the terms of the DIP Documents, shall constitute an event of default (each, an "Event of Default"):  (a) the failure of the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order; (b) the failure of the Debtors to satisfy any of the Milestones (as defined below) or (c) the occurrence of an "Event of Default" under the DIP Credit Agreement.

14.    Milestones.  The Debtors shall satisfy the milestones set forth in Section 3 of the RSA (as in effect on the date hereof), unless waived or extended with the consent of the Required DIP Lenders or the DIP Agent.

15.    Rights and Remedies Upon Event of Default.

(a)    Immediately upon the occurrence and during the continuation of an Event of Default, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from this Court, but subject to the terms of this Interim Order and the Remedies Notice Period, the DIP Agent (at the direction of the Required DIP Lenders) may declare (any such declaration shall be referred to herein as a "Termination Declaration") (i) all DIP Obligations owing under the DIP Documents to be immediately due and payable, (ii) a termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the DIP Facility, (iii) termination of the DIP Facility and the DIP Documents as to any future liability or obligation

41

of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, (iv) that the Carve Out shall be triggered, through the delivery of the Carve Out Trigger Notice as provided for herein, and (v) subject to paragraph 12(a)(ii) of this Interim Order, a termination, reduction or restriction on the ability of the Debtors to use Cash Collateral (the date on which a Termination Declaration is delivered, the "DIP Termination Date").  Any Termination Declaration shall not be effective until notice has been provided by electronic mail (or other electronic means) to counsel to the Debtors, counsel to Ankura, counsel to the Zohar Lenders, counsel to the Patriarch Lenders, counsel to a Committee (if appointed), and the U.S. Trustee.

(b)    Without the need for any further notice (other than notice of a Termination Declaration as provided for herein) or order or application or motion to this Court, the automatic stay in the Cases otherwise applicable to the DIP Agent, the DIP Lenders, and the Prepetition First Lien Secured Parties is hereby automatically modified so that five (5) Business Days after the DIP Termination Date (the "Remedies Notice Period"), unless otherwise ordered by the Court prior to the expiration of the Remedies Notice Period:  (a) the DIP Agent (at the direction of the Required DIP Lenders) shall be entitled to exercise any of its rights and remedies set forth in the DIP Documents and this Interim Order and otherwise available at law, including to satisfy the DIP Obligations, DIP Superpriority Claims, and the DIP Liens, subject to the Carve Out; and (b) subject to the foregoing clause (a), the Prepetition First Lien Agent and the Required Lenders under the Prepetition First Lien Credit Agreement shall be entitled to exercise any of their rights and remedies set forth in the Prepetition First Lien Loan Documents and this Interim Order and otherwise available at law with respect to the Debtors' use of Cash Collateral.  During the Remedies Notice Period, the Debtors, the Committee (if appointed), and/or any party in interest shall be entitled to seek an emergency hearing with this Court to be held within the Remedies

Notice Period, including for the contested use of Cash Collateral.  Except as set forth in this paragraph or otherwise ordered by this Court prior to expiration of the Remedies Notice Period, after the Remedies Notice Period, the Debtors shall be deemed to have waived their right to, and shall not be entitled to, seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Secured Parties or the Prepetition First Lien Secured Parties under this Interim Order.

16.    <u>Limitation on Charging Expenses Against Collateral</u>.  No expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from (a) the DIP Collateral (except to the extent of the Carve Out) or the DIP Secured Parties or (b) subject to entry of the Final Order, the Prepetition Collateral (except to the extent of the Carve Out) or the Prepetition Secured Parties, in each case, pursuant to sections 105(a) or 506(c) of the Bankruptcy Code or any similar principle of law or equity, without the prior written consent of the DIP Secured Parties, in the case of the DIP Collateral, and the Required Lenders under the Prepetition First Lien Credit Agreement, in the case of the Prepetition Collateral, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Secured Parties or the Prepetition Secured Parties.

17.    <u>Use of Cash Collateral</u>.  The Debtors are hereby authorized to use all Cash Collateral of the Prepetition Secured Parties, for the purposes set forth in this Interim Order and in accordance with the Approved DIP Budget (subject to permitted variances as set forth in this Interim Order and the DIP Documents), from the date of this Interim Order through and including the earlier of the Maturity Date and the DIP Termination Date, subject to paragraph 12(a)

of this Interim Order (a) in the event that the Maturity Date occurs as a result of the DIP Termination Date or a Termination Declaration, including, for the avoidance of doubt, the acceleration of the DIP Obligations pursuant to paragraphs 12(a)(i) or 15(a)(i), or (b) in the case of the DIP Termination Date.  It shall be an Event of Default if Cash Collateral is used other than for the purposes set forth in this Interim Order and in accordance with the Approved DIP Budget (subject to permitted variances as set forth in this Interim Order and the DIP Documents).

18.    No Third Party Rights.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

19.    Section 507(b) Reservation.  Subject to the Carve Out, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition First Lien Secured Parties is insufficient to compensate for any Diminution in Value.  Nothing contained herein shall be deemed a finding by this Court, or an acknowledgment by any of the Prepetition First Lien Secured Parties that the adequate protection granted herein does in fact adequately protect any of the Prepetition First Lien Secured Parties against any Diminution in Value.

20.    Insurance.  Until the DIP Obligations have been indefeasibly paid in full, in cash, at all times the Debtors shall maintain casualty and loss insurance coverage for the Prepetition Collateral and the DIP Collateral on substantially the same basis as maintained prior to the Petition Date and in accordance with the DIP Documents.

21.    No Waiver for Failure to Seek Relief.  The failure or delay of the DIP Secured Parties or the Prepetition Secured Parties to exercise rights and remedies under, as applicable, this Interim Order, the DIP Documents, the Prepetition First Lien Loan Documents, the Prepetition

Note Documents, or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder, or otherwise.

      22.    <u>Perfection of the DIP Liens and First Lien Adequate Protection Liens</u>.  The DIP Agent and the Prepetition First Lien Agent (acting at the written direction of the Required Lenders under the Prepetition First Lien Loan Documents) are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted hereunder.  Whether or not the DIP Agent or the Prepetition First Lien Agent (acting at the written direction of the Required Lenders under the Prepetition First Lien Loan Documents) choose to file such financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and subject to the Challenge Period, not subject to challenge, dispute, or subordination as of the date of entry of this Interim Order.  If the DIP Agent or the Prepetition First Lien Agent (acting at the written direction of the Required Lenders under the Prepetition First Lien Loan Documents) determines to file or execute any financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments, the Debtors shall cooperate and assist in any such execution and/or filings as reasonably requested by the DIP Agent or the Prepetition First Lien Agent, and the automatic stay shall be modified to allow such filings.  A certified copy of this Interim Order may be filed with or recorded in filing or recording offices by the DIP Agent or the Prepetition First Lien Agent in addition to or in lieu of any such filings, and all filing offices are hereby authorized to accept such certified copy of this

Interim Order for filing and recording; *provided*, *however*, that notwithstanding the date of any such filing, the date of such perfection shall be the date of this Interim Order.

23.    <u>Credit Bidding</u>.

(a)    To the fullest extent permissible under section 363(k) of the Bankruptcy Code, the DIP Agent (at the direction of the Required DIP Lenders) shall have the right to credit bid (either directly or through one or more acquisition vehicles) up to the full amount of the DIP Obligations in connection with any sale, lease, transfer, license or other disposition of property of the Debtors that constitutes DIP Collateral outside the ordinary course of business (to the extent permitted by this Interim Order), whether pursuant to section 363 of the Bankruptcy Code, a chapter 11 plan confirmed in these Cases, or otherwise.

(b)    To the fullest extent permissible under section 363(k) of the Bankruptcy Code, and subject to entry of the Final Order, the Prepetition First Lien Agent (acting at the written direction of the Required Lenders under the Prepetition First Lien Loan Documents) shall have the right to credit bid (either directly or through one or more acquisition vehicles) up to the full amount of the Prepetition First Lien Obligations and any First Lien Adequate Protection Superpriority Claims in connection with any sale, lease, transfer, license or other disposition of property of the Debtors that constitutes (i) Prepetition Collateral or (ii) to the extent subject to any First Lien Adequate Protection Liens, DIP Collateral, outside the ordinary course of business (to the extent permitted by this Interim Order or any other order of this Court), whether pursuant to section 363 of the Bankruptcy Code, a chapter 11 plan confirmed in these Cases, or otherwise.

24.    <u>Release</u>.  Each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of its predecessors, successors, and assigns, shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably, and fully forever release, remise, acquit,

relinquish, irrevocably waive, and discharge each of the DIP Secured Parties (all in their respective roles as such), and each of their respective affiliates, former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, assigns, and predecessors in interest, each in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to the DIP Obligations, the DIP Liens, and the DIP Documents, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Secured Parties; provided that nothing in this paragraph shall in any way limit or release the obligations of any DIP Secured Party under the DIP Documents or this Interim Order.

25.     Proceeds of Sale or Subsequent Financing.

(a)     Subject to the Carve Out, in the event of any sale, lease, transfer, license or other disposition of property of the Debtors that constitutes DIP Collateral outside the ordinary course of business (to the extent permitted by this Interim Order or any other order of this Court), the Debtors are authorized to and shall promptly pay, without further notice or order of this Court,

US-DOCS\129980735.10

such amount (if any) of net cash proceeds resulting therefrom no later than the business day following receipt of such proceeds, to the DIP Agent up to the amount which indefeasibly pays in full, in cash, the DIP Obligations.

(b)     Subject to the Carve Out, any First Lien Permitted Encumbrances and the indefeasible payment in full, in cash, of the DIP Obligations, and except as ordered by this Court with respect to the Prepetition Secured Obligations owed to the Patriarch Lenders, the Patriarch Noteholders, and PPAS, solely in its capacity as agent for the Patriarch Lenders (but not for any other Prepetition Secured Parties), and the Prepetition Liens securing such obligations, in the event of any sale, lease, transfer, license or other disposition of property of the Debtors that constitutes (i) Prepetition Collateral or (ii) to the extent subject to any First Lien Adequate Protection Liens, DIP Collateral, outside the ordinary course of business (to the extent permitted by this Interim Order or any other order of this Court), the Debtors are authorized to and shall promptly pay, without further notice or order of this Court, such amount (if any) of net cash proceeds resulting therefrom no later than the business day following receipt of such proceeds, to Ankura to be applied according to the priorities in accordance with the Prepetition First Lien Loan Documents.

(c)     If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Cases or any subsequent cases obtains credit or incurs debt pursuant to sections 364(b), 364(c) or 364(d) of the Bankruptcy Code in violation of the DIP Documents or this Interim Order at anytime before the indefeasible repayment in full of the DIP Obligations and the termination of the Commitments under the DIP Facility, including subsequent to confirmation of any plan with respect to any or all of the Debtors, then (i) the outstanding Commitments, if any, shall be terminated and reduced to zero; and (ii) all proceeds

48

from such credit or debt extension shall immediately be paid to the DIP Agent to repay the DIP Obligations.

26.     <u>Preservation of Rights Granted Under this Interim Order</u>.

(a)     The DIP Obligations and the DIP Liens shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Interim Order or any provision hereof is vacated, reversed or modified on appeal or otherwise, and any liens or claims granted to the DIP Agents or the DIP Lenders hereunder arising prior to the effective date of any such vacatur, reversal or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

(b)     In the event this Interim Order or any provision hereof is vacated, reversed or modified on appeal or otherwise, any liens or claims granted to the Prepetition Secured Parties hereunder arising prior to the effective date of any such vacatur, reversal or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein, and the Prepetition Secured Parties shall be entitled to the protections afforded in section 363(m) of the Bankruptcy Code with respect to all uses of the Prepetition Collateral (including Cash Collateral) and all First Lien Adequate Protection Obligations.

(c)     Notwithstanding any order dismissing any of the Cases entered at any time, (x) the DIP Liens, the DIP Superiority Claims, the First Lien Adequate Protection Liens, the First Lien Adequate Protection Superpriority Claims, and the other administrative claims granted pursuant to this Interim Order shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until, as applicable, all DIP Obligations and First Lien

US-DOCS\129980735.10

Adequate Protection Obligations are indefeasibly paid in full, in cash, and such DIP Liens, DIP Superpriority Claims, First Lien Adequate Protection Liens, First Lien Adequate Protection Superpriority Claims, and the other administrative claims granted pursuant to this Interim Order, shall, notwithstanding such dismissal, remain binding on the Debtors, their estates and all parties in interest; and (y) to the fullest extent permitted by law, this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the provisions of this Interim Order.

(d)     Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the First Lien Adequate Protection Liens, the First Lien Adequate Protection Superpriority Claims, and all other rights and remedies of the DIP Secured Parties and the Prepetition Secured Parties granted under this Interim Order and the DIP Documents shall survive, and shall not be modified, impaired, or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of these Cases or by any other act or omission, (ii) the entry of an order approving the sale of any DIP Collateral or Prepetition Collateral pursuant to section 363 of the Bankruptcy Code, or (iii) the entry of an order confirming a chapter 11 plan in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or First Lien Adequate Protection Obligations. The terms and provisions of this Interim Order and the DIP Documents shall continue in these Cases, in any successor cases if these Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code.  The DIP Liens, the DIP Superpriority Claims, the First Lien Adequate Protection Liens, the First Lien Adequate Protection Superpriority Claims, and all other rights and remedies of the DIP Secured Parties and the Prepetition Secured Parties

under this Interim Order shall continue in full force and effect until, as applicable, the DIP

Obligations and the Prepetition First Lien Obligations are indefeasibly paid in full, in cash.

(e)     Other than as set forth in this Interim Order or as otherwise ordered by the

Court, neither the DIP Liens nor the First Lien Adequate Protection Liens shall be made subject to

or *pari passu* with any lien or security interest granted in any of the Cases or arising after the

Petition Date, and neither the DIP Liens nor the First Lien Adequate Protection Liens shall be

subject or junior to any lien or security interest that is avoided and preserved for the benefit of the

Debtors' estates under Bankruptcy Code section 551, and except as set forth in this Interim Order

the occurrence of any of the foregoing shall be an Event of Default.

27.     <u>Limitation on Use of DIP Facility Proceeds, DIP Collateral, and Prepetition</u>

<u>Collateral</u>.  Notwithstanding anything to the contrary set forth in this Interim Order, other than as

consented to in writing by the Required DIP Lenders, the Required Lenders under the Prepetition

First Lien Credit Agreement, and Ankura, none of the DIP Facility, the DIP Collateral, the

Prepetition Collateral (including Cash Collateral) or the Carve Out or proceeds thereof may be

used:  (a) to investigate (including by way of examinations or discovery proceedings), initiate,

assert, prosecute, join, commence, support, or finance the initiation or prosecution of any claim,

counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense,

adversary proceeding, or other litigation of any type (i) against any of the DIP Secured Parties or

the Prepetition Secured Parties (each in their capacities as such), or any of their respective

affiliates, officers, directors, employees, agents, representatives, attorneys, consultants, financial

advisors, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission,

action, or other matter (including formal discovery proceedings in anticipation thereof), including,

without limitation, any so-called "lender liability" claims and causes of action, or seeking relief

US-DOCS\129980735.10

that would impair the rights and remedies of the DIP Secured Parties or the Prepetition Secured

Parties (each in their capacities as such) under the DIP Documents, the Prepetition First Lien Loan

Documents, the Prepetition Note Documents, or this Interim Order, including, without limitation,

for the payment of any services rendered by the professionals retained by the Debtors or any

Committee appointed in these Cases in connection with the assertion of or joinder in any claim,

counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense,

adversary proceeding, or other contested matter, the purpose of which is to seek, or the result of

which would be to obtain, any order, judgment, determination, declaration, or similar relief that

would impair the ability of any of the DIP Secured Parties or the Prepetition Secured Parties to

recover on the DIP Collateral or the Prepetition Collateral or seeking affirmative relief against any

of the DIP Secured Parties or the Prepetition Secured Parties related to the DIP Obligations or the

Prepetition Secured Obligations; (ii) invalidating, setting aside, avoiding, or subordinating, in

whole or in part, the DIP Obligations, the Prepetition Secured Obligations, or liens or security

interests of the DIP Secured Parties or the Prepetition Secured Parties in the DIP Collateral or

Prepetition Collateral, as applicable; or (iii) for monetary, injunctive, or other affirmative relief

against the DIP Secured Parties or the Prepetition Secured Parties, or the respective liens on or

security interests in the DIP Collateral or the Prepetition Collateral of the DIP Secured Parties or

the Prepetition Secured Parties that would impair the ability of any of the DIP Secured Parties or

the Prepetition Secured Parties, as applicable, to assert or enforce any lien, claim, right, or security

interest or to realize or recover on the DIP Obligations or the Prepetition Secured Obligations, to

the extent applicable; (b) for objecting to or challenging in any way the legality, validity, priority,

perfection, or enforceability of the claims, liens, or interests held by or on behalf of each of the

DIP Secured Parties or the Prepetition Secured Parties related to the DIP Obligations and the

Prepetition Secured Obligations, as applicable; (c) for asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions related to the DIP Obligations, the DIP Liens, the Prepetition Secured Obligations, or the Prepetition Liens; or (d) for prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of: (x) any of the DIP Liens or any other rights or interests of the DIP Agent or the DIP Lenders related to the DIP Obligations or the DIP Liens, (y) any of the Prepetition First Lien Loan Liens or any other rights or interests of any of the Prepetition First Lien Secured Parties related to the Prepetition First Lien Obligations or the Prepetition First Lien Loan Liens, or (z) any of the Prepetition Note Liens or any other rights or interests of any of the Prepetition Noteholders related to the Prepetition Note Obligations or the Prepetition Note Liens, *provided* that no more than $50,000 of the proceeds of the DIP Facility, the DIP Collateral, or the Prepetition Collateral (including Cash Collateral), in the aggregate, may be used by any Committee appointed in these Cases, if any, solely to investigate, within the Challenge Period, the claims, causes of action, adversary proceedings, or other litigation against the Prepetition Secured Parties solely concerning the legality, validity, priority, perfection, enforceability or extent of the claims, liens, or interests held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition Secured Obligations.

28.    <u>Conditions Precedent</u>.  Except as provided for in the Carve Out, no DIP Lender shall have any obligation to make any DIP Loan under the respective DIP Documents unless all of the conditions precedent to the making of such extensions of credit under the applicable DIP Documents have been satisfied in full or waived in accordance with such DIP Documents.

29.    <u>Subordination Agreement.</u>  Pursuant to section 510 of the Bankruptcy Code, the Subordination Agreement and any other applicable intercreditor or subordination provisions

contained in any of the Prepetition First Lien Loan Documents or any of the Prepetition Note Documents (i) shall remain in full force and effect, and (ii) shall continue to govern the relative priorities, rights, and remedies of the Prepetition Secured Parties.

30.     <u>Expenses and Indemnification</u>.    The Debtors shall pay the reasonable and documented professional fees, expenses, and disbursements of the DIP Professionals to the extent provided for in this Interim Order promptly following ten (10) business days (the "<u>Review Period</u>") after the receipt by counsel for the Debtors, any Committee, and the U.S. Trustee of each of the invoices therefor (the "<u>Invoiced Fees</u>") and without the necessity of filing formal fee applications or complying with the U.S. Trustee Guidelines.  Invoiced Fees shall be in the form of an invoice summary for professional fees and categorized expenses incurred during the pendency of the Cases, and such invoice summary shall not be required to contain time entries, but shall include a general, brief description of the nature of the matters for which services were performed, and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any work product doctrine, privilege or protection, common interest doctrine privilege or protection, any other evidentiary privilege or protection recognized under applicable law, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege, work product doctrine, privilege or protection, common interest doctrine privilege or protection, or any other evidentiary privilege or protection recognized under applicable law.  The Debtors, any Committee, or the U.S. Trustee may dispute the payment of any portion of the Invoiced Fees (the "<u>Disputed Invoiced Fees</u>") if, within the Review Period, a Debtor, any Committee, or the U.S. Trustee notifies the submitting party in writing setting forth the specific objections to the Disputed Invoiced Fees within the Review Period (to be followed by the filing with this Court, if necessary, of a motion or other pleading, with at

least ten (10) days prior written notice to the submitting party of any hearing on such motion or other pleading).  Notwithstanding the foregoing, the Debtors are authorized and directed to pay on the Closing Date (as defined in the DIP Documents) all reasonable and documented fees, costs, and expenses of the DIP Professionals, including the fees and expenses of counsel to the DIP Lenders and the DIP Agent, incurred on or prior to such date, which payment shall not be subject to the Review Period.

31.    <u>Binding Effect; Successors and Assigns</u>.  The DIP Documents and the provisions of this Interim Order, including (subject to the provision of paragraph 11 of this Interim Order) all findings herein, shall be binding upon all parties in interest in these Cases, including, without limitation, the DIP Secured Parties, the Prepetition Secured Parties, any Committee, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Secured Parties, the Prepetition Secured Parties and other parties as expressly provided for herein.  In determining to make any loan under the DIP Documents, to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order, the DIP Secured Parties and the Prepetition Secured Parties, in their capacities as such, shall not (i) be deemed to be in control of the operations of the Debtors or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.

32.    <u>Limitation of Liability</u>.  In determining to make any loan under the DIP Documents, permitting the use of Cash Collateral, or in exercising any rights or remedies as and when permitted

pursuant to this Interim Order, the DIP Secured Parties and the Prepetition Secured Parties shall not, solely by reason thereof, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).  Furthermore, nothing in this Interim Order or in the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, the Zohar Lenders, or Ankura, as administrative and collateral agent with respect to the Prepetition First Lien Loans, any liability for any claims arising from the prepetition or post-petition activities of any of the Debtors.

33.    <u>No Requirement to File Claim for DIP Obligations</u>.  Notwithstanding anything to the contrary contained in any prior or subsequent order of this Court, including, without limitation, any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, the DIP Secured Parties shall not be required to file any proof of claim or request for payment of administrative expenses with respect to any of the DIP Obligations, all of which shall be due and payable in accordance with the DIP Documents without the necessity of filing any such proof of claim or request for payment of administrative expenses, and the failure to file any such proof of claim or request shall not affect the validity, priority, or enforceability of any of the DIP Documents or of any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect the rights, remedies, powers, or privileges of the DIP Secured Parties under any of the DIP Documents, this Interim Order, or applicable law.  The provisions set forth in this

paragraph are intended solely for the purpose of administrative convenience, and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

34.    <u>No Requirement to File Claim for Prepetition Secured Obligations</u>. Notwithstanding anything to the contrary contained in any prior or subsequent order of this Court, including, without limitation, any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, none of the Prepetition Secured Parties shall be required to file any proof of claim or request for payment of administrative expenses with respect to any of the Prepetition Secured Obligations, and the failure to file any such proof of claim or request shall not affect the validity, priority, or enforceability of any of the Prepetition First Lien Loan Documents or the Prepetition Note Documents or of any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect the rights, remedies, powers, or privileges of the Prepetition Secured Parties under the Prepetition First Lien Loan Documents or the Prepetition Note Documents, as applicable, this Interim Order, or applicable law.   The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

35.    <u>No Marshaling</u>.   Notwithstanding anything in this Interim Order or the DIP Documents to the contrary, the DIP Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral, and the proceeds of the DIP Collateral shall be received and applied pursuant to this Interim Order and the DIP Documents; and (b) subject to entry of the Final Order, the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral or DIP Collateral.

36.  <u>Equities of the Case</u>.  Subject to entry of the Final Order, the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception shall not apply to the Prepetition Secured Parties with respect to proceeds, product, offspring, or profits of any of the Prepetition Collateral.

37.  <u>Final Hearing</u>.  A final hearing to consider the relief requested in the Motion on a final basis shall be held on _____, 2022 at _____ (ET).  Any objections or responses to entry of the Final Order shall be filed on or before 4:00 p.m. (ET) on _____, 2022, and shall be served on:  (a) proposed counsel to the Debtors, Latham & Watkins LLP, 1271 Avenue of the Americas, New York, NY 10020, Attn: Suzzanne Uhland (suzzanne.uhland@lw.com), Adam S. Ravin (adam.ravin@lw.com), and Brett M. Neve (brett.neve@lw.com) and Troutman Pepper Hamilton Sanders LLP, Hercules Plaza, Suite 5100, 1313 Market Street, Wilmington, Delaware 19801, Attn: David B. Stratton (david.stratton@troutman.com), David M. Fournier (david.fournier@troutman.com) and Evelyn J. Meltzer (evelyn.meltzer@troutman.com); (b) counsel to the DIP Lenders, (i) Arnold & Porter Kaye Scholer LLP, 250 W. 55th Street, New York, NY 10019, Attn: Brian J. Lohan (brian.lohan@arnoldporter.com) and Jonathan Levine (jonathan.levine@arnoldporter.com), (ii) Baker & McKenzie LLP, 452 Fifth Avenue, New York, NY 10018, Attn: Blaire A. Cahn (blaire.cahn@bakermckenzie.com) and Andrew Sagor (andrew.sagor@bakermckenzie.com), and (iii) Womble Bond Dickinson (US) LLP, 1313 N. Market Street, Suite 1200, Wilmington, Delaware 19801, Attn: Morgan L. Patterson (morgan.patterson@wbd-us.com); (c) counsel to the Zohar Lenders and the Zohar Noteholders, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn: Michael R. Nestor (mnestor@ycst.com), Joseph M. Barry (jbarry@ycst.com) and Ryan M. Bartley

(rbartley@ycst.com); (d) counsel to the Patriarch Lenders, the Patriarch Noteholders and PPAS, 500 Delaware Avenue, Suite 1410, Wilmington, DE 19801, Attn: Norman L. Pernick (npernick@coleschotz.com) and G. David Dean (ddean@coleschotz.com); (e) counsel to Ankura, Milbank, 55 Hudson Yards, New York, NY 10001, Attn: Dennis F. Dunne (ddunne@milbank.com), Eric K. Stodola (estodola@milbank.com), and Andrew Harmeyer (aharmeyer@milbank.com); (f) the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Joseph J. McMahon, Jr. (joseph.mcmahon@usdoj.gov); and (g) counsel to any Committee.  In the event no objections to entry of the Final Order are timely received, this Court may enter the Final Order without need for any further notice or the Final Hearing.

38.    <u>Effect of this Interim Order</u>.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, and shall take effect and be enforceable immediately upon execution hereof.

39.    <u>Retention of Jurisdiction</u>.  This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Interim Order.

**<u>EXHIBIT A</u>**

**DIP Credit Agreement**

**EXHIBIT B**

**Approved DIP Budget**

**EXHIBIT E**

[Form of]
**NOTE**

$[_____]                                                 New York, New York
                                                              [Date]

     FOR VALUE RECEIVED, the undersigned, MD Helicopters, Inc., an Arizona corporation ("**Borrower**"), hereby promises to pay to [_____] or its registered assigns (the "**Lender**") on the Maturity Date (as defined in the Credit Agreement referred to below) in lawful money of the United States and in immediately available funds, the principal amount of [_____] DOLLARS or, if less, the aggregate unpaid principal amount of all Loans of the Lender outstanding under the Credit Agreement referred to below, which sum shall be due and payable in such amounts and on such dates as are set forth in the Credit Agreement. Borrower further agrees to pay interest in like money on the unpaid principal amount hereof from time to time at the rates, and on the dates, specified in Section 2.06 of the Credit Agreement. Terms used in this Term Note (this "**Note**") which are defined in the Credit Agreement shall have such defined meanings unless otherwise defined herein.

     The holder of this Note may endorse and attach a schedule to reflect the date and amount of each Loan of the Lender outstanding under the Credit Agreement, the date and amount of each payment or prepayment of principal hereof; *provided* that the failure of the Lender to make any such recordation (or any error in such recordation) shall not affect the obligations of Borrower hereunder or under the Credit Agreement.

     This Note is one of the Notes referred to in the Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of April 1, 2022 (as amended, amended and restated, supplemented, waived or otherwise modified from time to time, the "**Credit Agreement**"), among Borrower, the Subsidiary Guarantors, the Lenders and Acquiom Agency Services LLC, as administrative agent and collateral agent for the Lenders. This Note is subject to the provisions thereof and is subject to optional and mandatory prepayment in whole or in part as provided therein.

     This Note is secured and guaranteed as provided in the Credit Agreement and the Security Documents. Reference is hereby made to the Credit Agreement and the Security Documents for a description of the properties and assets in which a security interest has been granted, the nature and extent of the security and guarantees, the terms and conditions upon which the security interest and each guarantee was granted and the rights of the holder of this Note in respect thereof.

     Upon the occurrence and during the continuation of any one or more of the Events of Default specified in the Credit Agreement, all amounts then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable, all as provided therein.

     All parties now and hereafter liable with respect to this Note, whether maker, principal, surety, guarantor, endorser or otherwise, hereby waive presentment, demand, protest and all other notices of any kind.

     **THIS NOTE MAY NOT BE TRANSFERRED EXCEPT IN COMPLIANCE WITH THE TERMS OF THE CREDIT AGREEMENT. TRANSFERS OF THIS NOTE MUST BE RECORDED IN THE REGISTER MAINTAINED BY THE ADMINISTRATIVE AGENT PURSUANT TO THE TERMS OF THE CREDIT AGREEMENT.**

171390607

**THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.**

**MD HELICOPTERS, INC.,**
as Borrower

By: _____
      Name:
      Title:

E-2

**EXHIBIT F-1**

[Form of]

**U.S. TAX COMPLIANCE CERTIFICATE**

(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to that certain Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of April 1, 2022 (as amended, amended and restated, supplemented, waived or otherwise modified from time to time, the "Credit Agreement"), among Borrower, the Subsidiary Guarantors, the Lenders and Acquiom Agency Services LLC, as Administrative Agent and Collateral Agent for the Lenders.

Pursuant to the provisions of Section 2.15(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. Person status on: (i) an IRS Form W-8BEN or (ii) an IRS Form W-8BEN-E. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to such terms in the Credit Agreement.

[NAME OF LENDER]

By: _____
       Name:
       Title:

Date: _____ __, 20__

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**
(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to that certain Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of April 1, 2022 (as amended, amended and restated, supplemented, waived or otherwise modified from time to time, the "Credit Agreement"), among Borrower, the Subsidiary Guarantors, the Lenders and Acquiom Agency Services LLC, as Administrative Agent and Collateral Agent for the Lenders.

Pursuant to the provisions of Section 2.15(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on: (i) an IRS Form W-8BEN or (ii) an IRS Form W-8BEN-E.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to such terms in the Credit Agreement.

[NAME OF PARTICIPANT]


By: _____
     Name:
     Title:

Date: _____ __, 20__

**EXHIBIT F-3**

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**
(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to that certain Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of April 1, 2022 (as amended, amended and restated, supplemented, waived or otherwise modified from time to time, the "Credit Agreement"), among Borrower, the Subsidiary Guarantors, the Lenders and Acquiom Agency Services LLC, as Administrative Agent and Collateral Agent for the Lenders.

Pursuant to the provisions of Section 2.15(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E (as applicable) or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E (as applicable) from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to such terms in the Credit Agreement.

[NAME OF PARTICIPANT]


By: _____
     Name:
     Title:

Date: _____ __, 20__


[U.S. Tax Compliance Certificate]
F-3

**EXHIBIT F-4**

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**
(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to that certain Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of April 1, 2022 (as amended, amended and restated, supplemented, waived or otherwise modified from time to time, the "<u>Credit Agreement</u>"), among Borrower, the Subsidiary Guarantors, the Lenders and Acquiom Agency Services LLC, as Administrative Agent and Collateral Agent for the Lenders.

Pursuant to the provisions of <u>Section 2.15(e)</u> of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E (as applicable) or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E (as applicable) from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to such terms in the Credit Agreement.

[NAME OF LENDER]

By: _____
      Name:
      Title:

Date: _____ __, 20__