**IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MD HELICOPTERS, INC., *et al.*,[1] | Case No. 22-10263 (KBO) |
| Debtor. | (Jointly Administered) |
| | **Re: D.I. 205** |
| | **Hearing Date: May 26, 2022, at 9:00 a.m. (ET)** |
| | **Response Deadline: May 13, 2022, at 4:00 p.m. (ET)** |

## THE NETHERLANDS PHASE ONE STATEMENT UNDER THE FINAL DIP ORDER

The State of the Netherlands (the "Netherlands"), by and through its undersigned counsel, hereby submits this statement under Paragraph 37(d)(c)(i) of the Final DIP Order[2] to determine, for adequate protection and distribution purposes, the validity, extent and priority of the Netherlands Claim and the Netherlands Lien (each as defined in the Final DIP Order). In support of the Netherlands Phase One Statement, the Netherlands respectfully states as follows:

## PRELIMINARY STATEMENT

1. The Netherlands has a valid lien, which extends to all the of Debtors' real property in Maricopa County, and which thus makes it the sole senior, secured creditor as to the leasehold interests and related improvements at the Debtors' Mesa, Arizona manufacturing facility, which are integral and indispensable to the Debtors' ongoing operations.

---

[1] The two debtors in these chapter 11 cases (the "Chapter 11 Cases") are MD Helicopters, Inc. ("MDHI") and Monterrey Aerospace, LLC ('Monterrey," and together with MDHI, the "Debtors"), and their address is 4555 E. McDowell Road, Mesa, AZ 85215.

[2] *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief* (the "Final DIP Order") entered on April 26, 2022 [D.I. 205]. Capitalized terms not defined in this Statement have the meanings given in the Final DIP Order.

2. The Debtors concede the existence of the Netherlands Judgment, its domestication by an Arizona court, and its docketing in the relevant county recorder's office. However, the Debtors have yet to acknowledge—for reasons that have not yet been fully articulated—(i) the existence, scope and effect of the Netherlands Lien on the Debtors' real estate assets created as a result of the Netherlands recording the Netherlands Judgment in the Recorder's Office in Maricopa County, Arizona; (ii) the consequently secured nature of the Netherlands Claim as to the Netherlands Collateral; and (iii) the absence of any properly recorded lien that is senior to the Netherlands Lien with respect to the relevant Debtor real property assets.

3. The Debtors and the Netherlands reached an agreement in the Final DIP Order that, among other things, (i) acknowledged certain of the Netherlands' contentions; (ii) granted the Netherlands adequate protection; and (iii) put in place a process to determine, for adequate protection and distribution purposes, the validity, extent and priority of the Netherlands Claim and the Netherlands Lien (the "Lien Determination Process").

4. The Lien Determination Process has two phases. In this first phase, the Court is asked to decide, on a final basis (i) whether the Netherlands Lien is a valid and binding lien that arose by operation of Arizona law; (ii) whether and to what extent the Netherlands Lien properly attached to any real property of the Debtors, including any leasehold interests and related improvements owned by the Debtors in Maricopa County, Arizona; and (iii) whether the Netherlands Lien is senior to the Prepetition Liens and all other relevant encumbrances. (Final DIP Order ¶ 37(d).)

5. The Lien Determination Process issues must be decided in accordance with the schedule set forth in the Final DIP Order because the Final DIP Order and Bidding Procedures Order confer on the DIP Lenders and the Netherlands a credit bid right. And, absent a Lien

Determination in the Netherlands' favor and/or continuation of the consensual stay on DIP Lender action imposed by the Final DIP Order, the DIP Lenders cannot credit bid unless they pay the Full Cash Value Amount to the Netherlands. (Final DIP Order ¶ 37(h).)

6. The Netherlands, as a secured creditor, is entitled to receive the full value of the Netherlands Collateral and so the Lien Determination must be made and Orders entered (i) after the Phase One Hearing, finding and concluding that (A) the Netherlands Lien is a valid and binding lien that arose by operation of Arizona law; (B) the Netherlands Lien properly attached to the Netherlands First Priority Collateral, which includes all the leasehold interests and related improvements owned by the Debtors in Maricopa County, Arizona; and (C) the Netherlands Lien is senior to the Prepetition Liens and all other relevant encumbrances; and (ii) after the Phase Two Hearing, (A) establishing the value of the Netherlands First Priority Collateral; and (B) the Netherlands' entitlement to any additional adequate protection, specifically in terms of cash payments, with respect to any Diminution in Value of the Netherlands First Priority Collateral.

## BACKGROUND

### A. Debtors and Chapter 11 Cases

7. On March 30, 2022 (the "Petition Date"), the Debtors filed voluntary petitions in this Court commencing the Chapter 11 Cases and seeking relief under chapter 11 of the Bankruptcy Code. At a hearing on April 1, 2022 (the "First Day Hearing"), the Court made available to the Debtors a range of "first day" relief, including by granting, on an interim basis, the DIP Motion, which sought interim and final approval of the Debtors' proposed debtor-in-possession financing facility (the "DIP Facility"), by Order dated April 4, 2022 (the "Interim DIP Order" [D.I. 114].)



EAST\190990381.1

8. On the Petition Date, the Debtors also filed the Bid Procedures Motion, which sought approval of a stalking horse bidder and related bid protections and sale procedures, and which was noticed for hearing on April 24, 2022 (the "Second Day Hearing"). Entry of an Order granting final approval of the DIP Facility (the "Final DIP Order") was also scheduled for consideration by the Court at the Second Day Hearing.

9. Both the DIP Motion and the Bid Procedures Motion sought for the lenders under the DIP Facility (the "DIP Lenders") authority, in their capacity as Stalking Horse Bidders, to "credit bid" their prepetition and DIP Facility debt at the Auction contemplated by the Bid Procedures Motion.

10. In the period between the First and Second Day Hearings, the Debtors, the DIP Lenders, Prepetition Lenders, and the Netherlands engaged in discussions seeking to resolve objections to both the DIP Motion and the Bid Procedures Motion that the Netherlands had first raised at the First Day Hearings. These discussions yielded material revisions to both the Final DIP Order and the Bid Procedures Order, which (i) addressed certain of the Netherlands' objections and preserved the rest for future resolution; and (ii) permitted both Orders to be entered on an uncontested basis at the Second Day Hearing.[3]

**B. Netherlands Claim and Judgment**

11. In 2005, the National Police Services Agency of the Netherlands (the "KLPD") brought suit against MDHI in two separate actions in the Hague District Court in the

[3] In the Final DIP Order, as originally proposed, the Debtors sought, without any consideration of the Netherlands' rights, to place a priming lien on the Netherlands Collateral in favor of the DIP Lenders and grant the DIP Lenders a right to credit bid this new lien to purchase, among other property, the Netherlands Collateral. If the modifications reflected in the Final DIP Order had not been agreed, the Netherlands Lien would have been primed by the DIP Liens, without the full range of adequate protection granted to the Zohar and Patriarch Lenders and the Netherlands, thereby, placed at risk of a zero recovery if the Stalking Horse Bid had been consummated as proposed.



EAST\190990381.1

Netherlands, alleging that MDHI was liable by way of a corporate guaranty for the default of a distributor in failing to deliver certain aircraft to the KLPD under a procurement contract executed in 2001 (the "2001 Contract"). (First Day Decl. ¶ 35.) The Hague District Court rendered two separate judgments against MDHI for damages plus fees and interest. (*Id.*) The KLPD thereafter assigned the judgments to the Netherlands for further prosecution. (*Id.*)

12. On August 28, 2015, the Netherlands sought to domesticate the Netherlands Judgment in the Superior Court of Maricopa County, Arizona (the "Arizona Court"). (*Id.*) On November 13, 2018, the Arizona Court issued a judgment in favor of the Netherlands in the amount of $15,074,750, including interest, costs, and fees (the "2018 Arizona Judgment"). (*Id.*; *State of the Netherlands v. MD Helicopters, Inc.,* No. CV2015-095127 (AZ Maricopa Super. Ct. Nov. 13, 2018); O'Donnell Decl. Ex. A.) The 2018 Arizona Judgment was duly filed in the Office of the Maricopa County Recorder—which maintains land and judgment records for the Mesa, Arizona location of the Debtors' headquarters and plant—on the same date. (*Id.*)

13. MDHI appealed the August 2018 grant of summary judgment, first, to the Arizona Court of Appeal, and then, to the Arizona Supreme Court, which affirmed the Arizona Court's decision and ruled that the judgment was enforceable in Arizona by decision dated December 30, 2020. (*Id.* ¶ 36; O'Donnell Decl. Ex. B (*State of the Netherlands v. MD Helicopters, Inc.,* 250 Ariz. 235, 478 P.3d 230 (2020))). On August 3, 2021, a Final Judgment with Mandate (the "2021 Arizona Judgment," and together with the 2018 Arizona Judgment and as previously defined, the "Netherlands Judgment")—reflecting the outcome of the appeal and increasing the

judgment amount to $15,539,198[4] (the "Netherlands Claim")—was duly recorded in the Maricopa County Recorder's Office. (O'Donnell Decl. Ex. C.)

**C. Relevant Debtor Real Estate Assets**

14. The Debtors acknowledge the existence of real estate assets belonging to the Debtors that are potentially subject to the Netherlands Judgment and Lien. Indeed, as noted in the First Day Declaration, the Debtors' headquarters is located in Mesa, Arizona, at an airport called "Falcon Field." As illustrated in the maps and images annexed to the O'Donnell Declaration, the facility occupies a total of two million square feet of land area and is located in Maricopa County, where the Netherlands Judgment was docketed. (First Day Decl. ¶ 24; O'Donnell Decl. Ex. D.)

15. The Debtors lease the bulk of the land pursuant to the terms of a long-term ground lease from the City of Mesa, dated March 28, 2023 (the "Mesa Ground Lease"), and under the terms of that ground lease and various Quitclaim Deeds, own the various improvements constructed on the land occupied by the Mesa facility (the "Mesa Improvements"). (*Id.*) Additionally, the Debtors (i) took assignment of another lease, originally entered into between the City of Mesa and Madison Aviation, dated June 1, 1983 (the "Madison Aviation Lease"); and (ii) lease adjacent locations for maintenance and overhaul, flight and maintenance training, airframe components production, and pre-assembly work (the "Other Mesa Leases," and together with the Mesa Ground Lease, the Madison Aviation Lease, and the Mesa Improvements, the "Mesa Real Estate Assets").[5] (*Id.*)

[4] Post-judgment interest has been accruing on the Netherlands Judgment at the 9% Federal statutory rate, and the full amount of the judgment is now in excess of $17.5 million.

[5] The Netherlands has engaged in informal discovery with the Debtors as to the Other Mesa Leases and will continue to work with them to ensure all relevant real property interests in Maricopa County owned by the Debtors are identified. As of the date of this Phase One Statement, the Netherlands has determined that the

16. In a schedule to the DIP Credit Agreement [D.I. 205, Ex. A, Sch. 3.05(c)], the Debtors have listed the Mesa Real Estate Assets as follows:

**Real Property**

Owned Real Property

None.

Leased Real Property

| | **Location** | **Address** |
|---|---|---|
| 1. | Main Site | 4555 E McDowell Rd, Mesa AZ 85215 |
| 2. | Madison Hangar | 4555 E McDowell Rd, Mesa AZ 85215 |
| 3. | Turf Area | 4555 E McDowell Rd, Mesa AZ 85215 |
| 4. | AMO Main (unit 101) | 5456 E. McDowell Road, Suite 101 |
| 5. | AMO unit 125 | 5456 E. McDowell Road, Suite 125 |
| 6. | AMO unit 109 | 5456 E. McDowell Road, Suite 109 |
| 7. | Falcon Hangar 101 | 4562 E. Mallory #101, Mesa AZ 85215 |
| 8. | Falcon Hangar 102 | 4562 E. Mallory #102, Mesa AZ 85215 |
| 9. | Falcon Hangar 103 | 4562 E. Mallory #103, Mesa AZ 85215 |
| 10. | Falcon Hanger 105 | 4562 E. Mallory #105, Mesa AZ 85215 |
| 11. | Falcon Hanger 106 | 4562 E. Mallory #106, Mesa AZ 85215 |

17. These real estate assets have, upon information and belief, substantial value. The Mesa Ground Lease alone, given its critical role in the Debtors' ongoing operations, may have a market value in the tens of millions of dollars. The Mesa Improvements, as well, could have substantial sale or rental value—the headquarters contains 257,000 square feet of office and factory space that consists of, among other things, a production building, a paint facility, a

Debtors have several leasehold interests in Maricopa County, including, without limitation, (i) the Fixed Base Operating Lease entered into by Hughes on June 1, 1983; (ii) the Commercial Lease dated October 1, 1986; (iii) the Mesa Industrial Complex leases entered into in 2007, 2014, and 2017; and (iv) the Falcon Hangar Leases entered into in 2017 and 2021. More detail as to each of foregoing will be furnished in advance of the Phase Two Hearing; for current purposes, all that is relevant is that each is a leasehold interest held by the Debtors and related to real property in Maricopa County, Arizona.

warehouse, an engineering and administration building, and a repair station. (First Day Decl. ¶ 24.) Finally, the Other Mesa Leases, which have been in place and renewed as necessary for a number of years, likely would have significant value to any purchaser of the Debtors' assets.

18. The Debtors have also proposed to sell the Mesa Real Estate Assets under the Stalking Horse Asset Purchase Agreement (the "Stalking Horse APA"). (Bid Procedures Motion [D.I. 28] ¶ 24 (Assets).) To this end, the Mesa Real Estate Assets have been identified on the list of contracts and leases to be assumed and assigned, each as a "Real Estate Lease Agreement." *See Notice of Counterparties to Potentially Assumed Executory Contracts and Unexpired Leases Regarding Cure Amounts and Possible Assignment to the Stalking Horse Bidder or Such Other Successful Bidder at Auction* [D.I. 219] at App. 1, at 2 (listing 5 leases with Falcon Hanger and 3 leases with the City of Mesa); 3 (listing 3 leases with the Mesa Industrial Center Complex). No other approach was possible—the Debtors' business could not be operated without the Mesa Real Estate Assets and they are thus likely of immense value to any purchaser.[6]

[6] The Stalking Horse APA (a) proposes to sell, among other assets, "the Leased Real Property set forth on *Schedule 2.1(a)*, together with any buildings, fixtures and improvements located on or attached to such real property, and all rights arising therefrom, and all tenements, hereditaments, appurtenances and other real property rights appertaining thereto." (Stalking Horse APA [D.I. 28-1 § 2.1].) The APA's definition of "Leased Real Property" is "any real property leased, subleased or which any Seller has the right to use or occupy, pursuant to a Lease." The proposed Stalking Horse purchase price is an amount not less than $210 million. (*Id.* § 3.2.)



EAST\190990381.1

## PHASE ONE STATEMENT

## POINT I

## NETHERLANDS JUDGMENT GAVE RISE TO LIEN ON REAL PROPERTY AND ATTACHED TO MESA REAL ESTATE ASSETS

19. The Netherlands Lien is, without doubt, a valid and binding lien that arose by operation of Arizona law; has properly attached to any real property, including leasehold interests and related improvements owned by the Debtors in Maricopa County; and is senior to the Prepetition Liens. The Netherlands Judgment makes the Netherlands Claim a claim that is court-approved and fully liquidated, other than as to still accruing post-judgment interest that can be readily tallied at any point in time. (O'Donnell Decl. Ex. C.) The Netherlands Judgment was duly docketed in the Maricopa County Recorder's Office, which gave the Netherlands a lien under Arizona law, which, if not for the chapter 11 filing, would be immediately enforceable against the Mesa Real Estate Assets.[7]

### A. Netherlands Lien Is Valid and Binding Lien That Arose by Operation of Arizona Law

20. Title 33 of the Arizona Revised Statutes (the "Arizona Property Code") provides that:

[7] Since the Lien Determination Process is a continuation of the Final DIP Order approval process, the burden of proof is on the Debtors. Under section 364(d)(1) of the Bankruptcy Code, the burden of proof as to whether a secured creditor whose liens are being primed is adequately protected is on the debtor, as to both the existence and scope of the affected creditor's liens and the adequacy of protection. 11 U.S.C. 364(d)(1)(b)(2) ("In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection;" no reference to "validity, priority, or extent" of interests); *see In re Packard Square LLC*, 574 B.R. 107, 116 (Bankr. E.D. Mich. 2017) ("The Debtor has the burden of proving such adequate protection."); *In re Jennings*, No. BKR. 09-13097-JMD, 2010 WL 757341, at *6 (Bankr. D.N.H. Feb. 25, 2010) (same). Thus, unlike under section 363(p), the burden is not on the secured creditor to establish the validity, scope or priority of its liens. 11 U.S.C. § 363(p) ("In any hearing under this section— (1) the trustee has the burden of proof on the issue of adequate protection; and (2) the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest.")

> A certified copy of the judgment of any court in this state may be filed and recorded in the office of the county recorder in each county where the judgment creditor desires the judgment to become a lien on the real property of the judgment debtor. On recording in substantial compliance with both the requirements of this section and the requirements of § 33-967 regarding an information statement, the judgment becomes a lien on the real property of the judgment debtor, including any part of the real property of the judgment debtor as otherwise provided by law.

Ariz. Rev. Stat. Ann. § 33-961.A.

21. The Arizona Property Code further provides in relevant part that, "from and after the time of recording as provided in Ariz. Rev. Stat. Ann. § 33-961, a judgment shall become a lien for a period of ten years after the date it is given on all real property of the judgment debtor in the county in which the judgment is recorded, whether the property is then owned by the judgment debtor or is later acquired." Ariz. Rev. Stat. Ann. § 33-964; *see also In re Westpark One, LLC*, No. 2:13-ap-00486-DPC, 2015 WL 5199368, at *1 (Bankr. D. Ariz. Sept. 4, 2015) ("The issue before this Court is whether [plaintiff] is a creditor secured by the Property or simply an unsecured creditor of this estate. . . If [plaintiff]'s Judgment against [defendant] attached to the Property when [plaintiff] recorded the Judgment on August 3, 2009. . . [plaintiff] is secured by the Property.").

22. The Netherlands Lien is a valid and binding lien that arose by operation of Arizona law because on August 3, 2021, the Netherlands filed a certified copy of the 2021 Judgment with the Maricopa County Recorder's Office in accordance with section 33-961 of the Arizona Property Code. (O'Donnell Decl. Ex. C.). That judgment thus became a lien "on the real property of the judgment debtor, including any part of the real property of the judgment debtor as otherwise provided by law." Ariz. Rev. Stat. Ann. § 33-961.A. Under both Arizona law and the law of other comparable jurisdictions, a "leasehold interest" is a real property interest and

"improvements" are deemed to be "part of the real property," to both of which a judgment lien may attach.

## B. Netherlands Lien Properly Attached to Leasehold Interests and Improvements <u>Owned by Debtors in Maricopa County</u>

### *1. Netherlands Lien Attached to Debtor Leasehold Interests*

23. Under sections 33-961 and 33-964 of the Arizona Property Code, the Netherlands Lien attaches to the Mesa Ground Lease, the Madison Aviation Lease, and the Other Mesa Leases because an estate of years (*e.g.,* a lease), is an interest in real property. *See* Ariz. Rev. Stat. Ann. § 33-202.A.2. ("Estates in lands, as respects the extent of the interest of the holder, are divided into: . . . Estates for years."). Indeed, "leasehold interests," while derivative of the underlying fee estate, have universally been deemed, first and foremost, real property interests. *See* 4 White & Summers, *Uniform Commercial Code* § 30:24 (6th ed. 2009) ("[T]he lessee's interest in an appreciated leasehold is a possessory, real estate interest. One wishing to take a security interest in it should use a mortgage and comply with the real estate recording laws."); *see, e.g.*, *In re Le Sueur's Fiesta Store, Inc.*, 40 B.R. 160, 162 (Bankr. D. Ariz. 1984) ("Treatment of leases as real property interests appears consistent throughout the Arizona statutes."); *In re Kavolchyck*, 164 B.R. 1018, 1022 (Bankr. S.D. Fla. 1994) ("[A] leasehold interest in land [is to] be construed and treated as a real estate interest and that the creation, encumbrance, and transferring of such interests be excluded from the provisions of the Uniform Commercial Code–Secured Transactions."); *In re DBSI, Inc.*, 432 B.R. 126, 132 (Bankr. D. Del. 2010) ("It is widely held that security interests in leases must be recorded in the real property records of the county where the applicable real property is located."); *The Bus. Bank v. White, et al. (In re Timothy Dean Rest. & Bar)*, 342 B.R. 1, 29 (Bankr. D.D.C. 2006) (finding that "[b]ecause Article 9 does not

apply to the creation of a security interest in real property, the Bank could only perfect its interest in the Lease by using District of Columbia law pertaining to real property.").[8]

24. The Mesa Ground Lease is an interest in real property and it was recorded—as it was required to be—as an "instrument affecting real property," in the Maricopa County Recorder's Office (on March 13, 1983, at 3:15 p.m.), as were many other documents related to the Mesa Ground Lease and the Other Mesa Leases. *See* 4 White & Summers § 30:24 ("One wishing to take a security interest in [a leasehold interest] should use a mortgage and comply with the real estate recording laws."); *In re Le Sueur's Fiesta,* 40 B.R. at 162 ("An interest in real property which must be foreclosed by real property procedures in logic should be perfected through application of real property law. Accordingly, as an "instrument affecting real property,"' a

[8] As interests in real property, leasehold interests have long been deemed, by case law or statute, to be subject to properly docketed judgment liens. *See, e.g.*, *Bachyrycz v. Gateway Bank*, No. 30 04 77, 1992 WL 43598, at *2–3 (Conn. Super. Ct. Mar. 2, 1992) (recognizing that "legal and equitable interests in real estate which are less than a fee simple interest," including leasehold interests, are "subject to attachment and a judgment lien"), *aff'd*, 30 Conn. App. 52, 618 A.2d 1371 (1993); *In re De Leon*, No. 11-56921-ASW, 2013 WL 3805733, at *10 (Bankr. N.D. Cal. July 18, 2013) ("By statute, the [judgment] lien can attach to real property, but does not reach rental payments, a leasehold estate with an unexpired term of less than two years, the interest of a beneficiary under a trust, or real property that is subject to an attachment lien in favor of the creditor and was transferred before judgment."); *Mayfield Smithson Enterprises v. Com-Quip, Inc*., 1995-NMSC-034, 120 N.M. 9, 15, 896 P.2d 1156, 1162 n. 4 (1995) ("[I]n 1991, the legislature amended the statutory definition of 'real estate' to encompass leaseholds," thereby making them subject to judgment liens); *Joslyn v. Spellman*, 1884 WL 6423, at *2 (Ohio Super. 1884) ('[U]nder our statute permanent leaseholds have for some purposes taken their place as real estate. They are subject to the same laws of devolution and transfer and to judgment liens as real estate."); *In re KIKI, Ltd*., 41 B.R. 825, 826–27 (Bankr. D. Haw. 1984) (holding that judgment lien could have been "secured as to Debtor's leasehold interest" if it had been "properly recorded on the appropriate TCT filed with the land court system"); *Henderson v. Tomb*, 169 Misc. 737, 739, 8 N.Y.S.2d 612, 614–15 (Sup. Ct. 1938) ("[A] judgment lien on a leasehold for a term of five years or more can be enforced by execution sale of real property, and a leasehold of a lesser term which at the time of the levy was owned by the judgment debtor can be sold as personal property."); *Ives v. Beecher*, 75 Conn. 564, 54 A. 207, 208 (Conn. 1903) ("Under Gen.St.1902, § 930 (C.G.S.A. § 52-380), providing that leasehold interests shall be subject to execution, a leasehold estate is subject to a judgment lien."); *First Nat. Bank of Davenport v. Bennett*, 40 Iowa 537, 539 (1875) ("The leasehold interest of [the judgment debtor] in the lot whereon the improvements are situated, was such a right to it as brought the same subject to the judgment lien under our statute."); *N. Bank of Kentucky v. Roosa*, 1844 WL 44, at *15 (Ohio Dec. 1844) ("We therefore declare, that permanent leasehold estates are lands, subject to all the rules and laws which attach to land for all purposes, and that judgment liens attach to them as lands."); *McClean v. Rockey, 3 McLean 235 (*Circuit Court, D. Ohio 1843) ("Under the law of Ohio, a permanent leasehold estate is land, within the execution law, and is bound by a judgment.").

security interest in an Arizona lease is valid against the Trustee or subsequent purchasers or creditors without notice only if recorded in the County Recorder's office rather than with the Secretary of State.")

25. Significantly, other secured creditors with interests in the Mesa Ground Lease and the Other Mesa Leases knew how to, and did in fact, make appropriate filings in the Maricopa County Recorder's Office. Thus, on the date that Hughes entered into the Mesa Ground Lease, it simultaneously assigned its interest in that leasehold to Mellon Bank as a security for a $13 million loan, and, in order to perfect the requisite security interest, Mellon filed an "Assignment of Commercial Lease" in the Maricopa land records. (O'Donnell Decl. Ex. F.) Mellon, in turn, assigned its interest in the Mesa Ground Lease, in what appears to be a secondary market transaction, to the Arizona State Retirement System (the "ASRS"), and documented this assignment by filing an "Assignment of Beneficial Interest under Deed of Trust." (*Id.* Ex. G.) In January 1984—presumably upon payoff of the loan—the ASRS reassigned the interest in the Mesa Ground Lease assigned to it by Mellon, pursuant to a Reassignment of Commercial Lease filed on March 14, 1984. (*Id.* Ex. H.) Other parties with debts secured by, among other collateral, the Mesa Real Estate made similar filings over the course of the ensuing 18 years. (*Id.* Ex. H.)

26. Any arguments to the contrary by the Debtors would be undermined entirely by an Arizona bankruptcy court's decision in *In re Le Sueur's Fiesta Store, Inc.*, 40 B.R. 160, 162 (Bankr. D. Ariz. 1984). In that case, a bank that claimed a security interest in the debtor's leasehold interests sought to recover from the trustee the proceeds of a sale of the debtor's leased store locations. *Id.* at 160. The *Le Sueur* court denied the bank's claim, holding that: (i) a security interest in a lease is valid against a trustee or subsequent purchasers or creditors without notice only if it is recorded in the relevant Arizona county recorder's office, rather than with the Arizona

Secretary of State; and (ii) inclusion in UCC financing statement filed by the bank of terms "general intangible" or "contract rights" was insufficient to put third parties on notice of a security interest claimed in a specific shopping center leases. *Id.* at 161-62.

27. Conceding that a leasehold interest is not specifically defined in the Arizona Commercial Code, the bank invoked *Harbel Oil Co. v. Steele,* 83 Ariz. 181, 318 P.2d 359, 361 (1957), and argued that Arizona common law defined a leasehold interest as personalty. The *Le Sueur* court rejected this argument.

28. In so doing, the *Le Sueur* court noted that "*Harbel Oil* reflects the often contradictory aspects of a leasehold: while it possesses many characteristics of personalty, it nevertheless transfers a present interest in real estate." *Le Sueur*, 40 B.R. at 162. In the end, in keeping with this observation, the Arizona court concluded that "[t]he court [in *Harbel*] held the leasehold was to be foreclosed pursuant to the Arizona real property statutes," and, thus, that "[a]n interest in real property which must be foreclosed by real property procedures in logic should be perfected through application of real property law." *Id.* (citing *Harbel*, 318 P.2d, at 361); *see also Harbel Oil v. Superior Court of Maricopa County,* 86 Ariz. 303, 345 P.2d 427, 428 (1959); *Valley Nat'l Bank of Ariz. v. Avco Dev. Co.,* 14 Ariz. App. 56, 480 P.2d 671, 673–75 (1971) (assignment of rent due under a lease is a realty interest under Arizona law which must be recorded pursuant to Ariz. Rev. Stat. Ann. § 33–412).

29. Thus, as an "instrument affecting real property," the *Le Sueur* court ultimately held that "a security interest in an Arizona lease is valid against the Trustee or subsequent purchasers or creditors without notice only if recorded in the County Recorder's office rather than with the Secretary of State." *Le Sueur*, 40 B.R. at 162; Ariz. Rev. Stat. Ann. §§ 33–411(A), 33–412(A); *see In re Wonderfair Stores, Inc.,* 511 F.2d 1206, 1214–15 (9th Cir.

1975) ("No instrument affecting real property is valid against subsequent purchasers for valuable consideration without notice, unless recorded as provided by law in the office of the county recorder of the county in which the property is located." (quoting Ariz. Rev. Stat. Ann. §§ 33–411(A))); *In re Kennedy Mortg. Co.*, 17 B.R. 957, 962–65 (Bankr. D.N.J. 1982) ("A mortgage instrument, though manifesting a lien on real estate, is, actually personal property as to the mortgagee, and in order to be effective in favor of the mortgagee as against other creditors of the mortgagor must be recorded in the proper office where the real estate is located.").

30. The *Le Sueur* court relied on a Third Circuit decision, *In re Bristol Assocs.*, 505 F.2d 1056 (3d Cir. 1974), which noted that "[t]he universal practice of Pennsylvania lenders in these circumstances is to ignore any application of the [UCC] to leases received as collateral [and] bank[s] often take[] an assignment of a lease or the rents due under a lease as security for a loan." *Id.* at 1061. In *Bristol*, a receiver under the Bankruptcy Act, asserting strong-arm powers sought to avoid a lender's lien in a leasehold estate on the theory that the lender had failed to file a UCC statement reflecting its lien and that as a result its lien was avoidable. *Id.* at 1058. The Third Circuit rejected this argument in a detailed decision that determined that the leasehold interest was not subject to the UCC and, as a result, the leasehold interest was properly perfected and senior to the interest of the receiver in asserting the rights of a *bona fide* creditor on the date of the bankruptcy filing. *Id.* at 1060-61.

31. No different outcome is warranted here—the Netherlands recorded its judgment in the land records, Ankura Trust Company LLC ("Ankura"), as collateral agent for the Prepetition Lenders, filed UCC statements, and, as a result, the Netherlands must be deemed to have a fully perfected lien on the Mesa Real Estate Assets, which, as discussed below in more

detail, is senior to the rights of the Prepetition Lenders and all other claimant, as there are no other relevant filings in the Maricopa County land records.

**2. *Netherlands Lien Attached to Mesa Real Estate Improvements***

30. Under the terms of the Mesa Ground Lease, as is the case with most of the Other Mesa Leases, the "Demised Premises" contained a number of existing improvements and permitted the Debtors, subject to compliance with local zoning, safety and other laws, to construct additional improvements, all of which the Debtors expressly "owned" and agreed to occupy and maintain during the term of the Lease. (O'Donnell Decl. Ex. E (Mesa Ground Lease § 7).)

31. However—evidencing their "attachment" to the underlying real property—"[u]pon termination of this Lease, all buildings, structures, and other improvements placed on the Demised Premises by the Lessee [were to] become the property of the Lessor, subject to Section 26 hereof." (*Id.*) Additionally, the City of Mesa has transferred certain of the improvements by Quitclaim Deed to the Debtors. (O'Donnell Decl. Ex. I.) Finally, the effective "ownership" of the Improvements by the Debtors during term of the Mesa Ground Lease is demonstrated by Section 26 of the Lease, which grants to MDHI, upon involuntary termination of the Lease by the City of Mesa before the end of its term, what amounts to a condemnation award, to compensate MDHI for the deprivation of its ownership or other possessory interest in the Improvements.[9] (O'Donnell Decl. Ex. E (Mesa Ground Lease § 26).)

---

[9] It does so by providing that "[i]f this Lease is cancelled under the provisions of this Section, [City of Mesa] will be obligated to pay to [MDHI] the then fair market value, taking into consideration the remaining lease term and the original cost of improvements less depreciation at the rate of four percent (4%) per year from the date of completion, of all [MDHI] owned improvements located on the Demised Premises, and at such time all such improvements shall become the property of [City of Mesa]." (O'Donnell Decl. Ex. E (Mesa Ground Lease § 26).).

32. These improvements are substantial structures constructed on and affixed to the leased premises, and thus part of the real property, as can be seen on the map of Falcon Field and Google Maps satellite images annexed to the O'Donnell Declaration. (O'Donnell Decl. Ex. D.) Any purchaser of the Debtors' business, as a going concern, will need and want these structures, along with the purpose-built equipment they contain, in order to continue the Debtors' operations and, thus, will attribute significant value to these improvements.

33. Any "improvements" existing or constructed on the Mesa Real Estate are and will remain "part of the real property" and are, thus, subject to judgment liens under Ariz. Rev. Stat. Ann. § 33-964.A. *See Maricopa Cty. v. Novasic*, 12 Ariz. App. 551, 554-55, 473 P.2d 476, 479-80 (1970) (holding that "the lease intended ownership of all the improvements in the lessor as real property during the term of the lease" owing to "the absence of clear and express language in this lease evidencing an intent to treat the improvements on the real property as personal property with ownership in the lessee"); *see also Fort Mojave Indian Tribe v. Killian*, No. CIV 02-1212-PCT-MHM, 2004 WL 5833529, at *8 (D. Az. Mar. 30, 2004) (noting that *Novasic* and related cases are predicated on "the common law principle that permanent structures placed by a tenant on leased premises are generally deemed to be 'real property improvements' owned by the lessor, and cannot be taxed as 'unsecured personal property' of the lessee."); *Cutter Aviation, Inc. v. Arizona Department of Revenue*, 191 Ariz. 485, 492, 958 P.2d 1, 8 (App. 1997) ("Reiterating the rule cited by *Novasic* that parties may, by agreement, alter the general rule that improvements on leased land belong to the lessor and not the lessee"); *Havasu Springs Resort Co. v. La Paz Cty.*, 199 Ariz. 349, 350, 18 P.3d 143, 144 (App. 2001) (holding that "general rule" is that "lessors own permanent improvements on leased property"); *Fam. Fin. Fund v. Abraham*, 657 P.2d 1319, 1323 (Utah Sup. Ct. 1982) ("Buildings are generally treated as fixtures and are considered a part of the

realty to which they are attached.") (*citing* 1 G. Thompson, *Commentaries on the Modern Law of Real Property* § 69 (1980) and *35 Am.Jur.2d Fixtures* § 78 (1967)).[10]

**POINT II**

**NETHERLANDS LIEN IS FIRST-PRIORITY LIEN, SENIOR TO ALL OTHER LIENS, AS TO MESA REAL ESTATE ASSETS**

34. The Netherlands Lien is also a first-priority lien as to the Mesa Real Estate Assets, senior to all other liens upon such assets, including any held by the Prepetition Secured Parties.

35. No one ever made comparable filings on behalf the Prepetition Secured Parties—not when Zohar Funds first acquired MDHI in 2005, not over the course of the 15 years that followed, and not even when Ankura replaced Patriarch Partners Agency Services, LLC as the Zohar Lender administrative agent in March 2019. (First Day Decl. ¶ 25 n. 5.) Ankura apparently set about to address any defects in the Zohar collateral package by filing UCC statements in a number of jurisdictions, including Arizona. (O'Donnell Decl. Ex. H.)

36. However, no filings were ever made in the Maricopa Recorder's Office, thereby leaving the Prepetition Secured Parties without any cognizable, let alone a senior, interest in the Netherlands Collateral. In this connection, it should be noted, as set forth above, that the Prepetition First Lien Agent did file UCC financing statements in Arizona and other jurisdictions in an effort to perfect the "all assets" security interest granted to Prepetition First Lien Secured

[10] To the extent that the Mesa Improvements constitute "fixtures"—which they do—they also constitute interests in "real estate" under Arizona law. *See* Ariz. Rev. Stat. Ann. § 47–9102(41) (defining "fixtures" as "goods that have become so related to particular real property that an interest in them arises under real property law"); *Fish v. Valley Nat'l Bank of Phoenix,* 64 Ariz. 164, 170, 167 P.2d 107, 111 (1946) ("The rule is that for a chattel to become a fixture and be considered as real estate, three requisites must unite: There must be an annexation to the realty or something appurtenant thereto; the chattel must have adaptability or application as affixed to the use for which the real estate is appropriated; and there must be an intention of the party to make the chattel a permanent accession to the freehold.")

Parties under the Prepetition First Lien Security Agreement. (O'Donnell Decl. J.) However, as reflected in the Fidelity National Title Insurance Company "Condition of Title Report" annexed to the O'Donnell Declaration, neither the Prepetition First Lien Agent nor any party acting on behalf of any of the Prepetition Secured Parties appears to have made the requisite filings (*e.g*., leasehold mortgages and/or fixture mortgages) in the land records of the Maricopa County Recorder's Office. (*Id.* Ex. K.)

37. Only such a filing could have afforded the Prepetition Secured Parties priority over the Netherlands Lien, and since it was not made, the Netherlands Lien must be deemed the senior lien as to the Mesa Real Estate Assets. *See In re Le Sueur's Fiesta,* 40 B.R. at 162 ("[A]s an 'instrument affecting real property,' a security interest in an Arizona lease is valid against the Trustee or subsequent purchasers or creditors without notice only if recorded in the County Recorder's office rather than with the Secretary of State."); *In re DBSI, Inc.,* 432 B.R. at 132 ("It is widely held that security interests in leases must be recorded in the real property records of the county where the applicable real property is located."); *see generally* 4 White & Summers § 30:24 ("One wishing to take a security interest in [a leasehold interest] should use a mortgage and comply with the real estate recording laws.").

38. To extent that the requisite filings were ever subsequently made on behalf of the Prepetition Secured Parties, their liens would necessarily be junior to the Netherlands. *See Lewis v. Debord*, 236 Ariz. 57, 60, 335 P.3d 1136, 1139 (2014) ("[A]ny subsequent purchaser who has notice of the judgment lien takes the property subject to it."), *vacated on other grounds*, 238 Ariz. 28, 356 P.3d 314; *Lewis v. Debord*, 238 Ariz. 28, 33, 356 P.3d 314, 319 (2015) ("Purchasers of property took property subject to preexisting, recorded judgment lien, even though prior

lienholders had failed to file information statement; purchasers had constructive notice of recorded, certified judgment.”).[11]

39. In light of all the foregoing, the Court should find, as a matter of fact and as part of its Phase One Order, that (i) the Netherlands Lien is a valid and binding lien that arose by operation of Arizona law; (ii) the Netherlands Lien properly attached to any real property of the Debtors, including any leasehold interests and related improvements owned by the Debtors in Maricopa County, Arizona; and (iii) the Netherlands Lien is senior to the Prepetition Liens and all other relevant encumbrances.

## CONCLUSION

WHEREFORE, the Netherlands respectfully requests that the Court enter an Order (i) finding and concluding that (A) the Netherlands Lien is a valid and binding lien that arose by operation of Arizona law; (B) the Netherlands Lien properly attached to the Netherland First Priority Collateral, which includes all the leasehold interests and related improvements owned by the Debtors in Maricopa County, Arizona; and (C) the Netherlands Lien is senior to the Prepetition

[11] Even if it could be shown—which it cannot be—that the Prepetition Secured Parties hold liens as to the Netherlands Collateral that are facially senior to the Netherlands Lien, those liens would not trump the Netherlands Lien with respect to such collateral because such liens would be subject to subordination, for reasons that can be separately briefed by the Netherlands, on recharacterization and/or equitable subordination grounds. Here, colorable claims for recharacterization and equitable subordination clearly exist based on facts and circumstances that evidence a pervasive blurring of the lines between debt and equity and persistent self-dealing by Lynn Tilton and her affiliates—all of which is set forth in pleadings (well known to the Court) in other proceedings involving Tilton, the Zohar Funds, and various other Tilton-related entities.

Liens and all other relevant encumbrances; and (ii) granting such other and further relief as the Court deems just and proper.

Dated: May 2, 2022
Wilmington, Delaware

**DLA PIPER LLP (US)**

By: /s/ R. Craig Martin
R. Craig Martin (DE 5032)
1201 North Market Street
Suite 2100
Wilmington, Delaware 19801-1147
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: craig.martin@us.dlapiper.com

-and-

Dennis O'Donnell (Admitted *Pro Hac Vice*)
James E. Berger (Admitted *Pro Hac Vice*)
Charlene C. Sun (Admitted *Pro Hac Vice*)
**DLA PIPER LLP (US)**
1251 Avenue of the Americas, 27th Floor
New York, New York 10020-1104
Telephone: (212) 335-4500
Facsimile: (212) 335-4501
Email: dennis.odonnell@us.dlapiper.com
james.berger@us.dlapiper.com
charlene.sun@us.dlapiper.com

*Counsel for The State of the Netherlands*