## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MD HELICOPTERS, INC., *et al.*,[1] | Case No. 22-10263 (KBO) |
| Debtor. | (Jointly Administered) |
| | **Re: Docket Nos.  205** |

## DECLARATION OF DENNIS C. O'DONNELL IN SUPPORT
## OF THE NETHERLANDS PHASE ONE STATEMENT UNDER
## THE FINAL DIP ORDER

I, DENNIS C. O'DONNELL, make this declaration pursuant to 28 U.S.C. § 1746:

1.       I am a partner at the law firm DLA Piper LLP (US) ("DLA Piper"), which maintains an office for the practice of law at 1251 Avenue of the Americas, New York, New York 10020.  I am duly authorized to practice law in the State of New York and the Southern and Eastern Districts of New York, and I have been admitted *pro hac vice* for purposes of these chapter 11 cases [D.I. 79].  Unless otherwise stated, I am familiar with the matters set forth in this declaration (the "Declaration").

2.       More specifically, I submit this Declaration in support of *The Netherlands Phase One Statement Under the Final DIP Order* (the "Netherlands Phase One Statement"), to make available for the Court's consideration documents referenced in the Netherlands Phase One Statement.

---

[1]     The two debtors in these chapter 11 cases (the "Chapter 11 Cases") are MD Helicopters, Inc. ("MDHI") and Monterrey Aerospace, LLC ('Monterrey," and together with MDHI, the "Debtors"), and their address is 4555 E. McDowell Road, Mesa, AZ 85215.  The last four digits of MDHI's taxpayer identification number are 4088. Monterrey has not been assigned a taxpayer identification number as of the Petition Date.

3.      Annexed hereto as Exhibit "A" is a true and correct copy of the Judgment issued by the Superior Court of Maricopa County (the "Arizona Court") in favor of the Netherlands on November 13, 2018, in the amount of $15,074,750, including interest and fees.

4.      Annexed hereto as Exhibit "B" is a true and correct copy of the December 20, 2020 decision of the Arizona Supreme Court in *State of the Netherlands v. MD Helicopters, Inc.,* 250 Ariz. 235, 478 P.3d 230 (2020), affirming the Arizona Court's August 2018 grant of summary judgment to the Netherlands.

5.      Annexed hereto as Exhibit "C" is a true and correct copy of the Final Judgment on Mandate issued by the Arizona Court in favor of the Netherlands on August 3, 2021, in the amount of $15,539,198.35, including interest and fees.

6.      Annexed hereto as Exhibit "D is a true and correct copy of a map, with the caption "Falcon Field, Mesa, Arizona," which, upon information and belief, shows all the real property and improvements leased and/or owned by the Debtors in Maricopa County, Arizona, and a Google Maps screenshot of the same.  The map is a public document available for download from the Falcon Field Airport website.[2] The map has been modified with a red border and text indicating the "area of enlargement," as well as enlarging certain building descriptions. The Google Maps screenshot is taken from Google's free, online maps and satellite imaging website,[3] and is a satellite image of the real property and improvements leased and/or owned by the Debtors in Maricopa County, Arizona.

---

[2]      https://www.falconfieldairport.com/about-us/documents-forms/airport-master-plan

[3]      https://www.google.com/maps/place/MD+Helicopters+Inc/@33.4644737,-111.7311468,17z/data=!3m1!4b1!4m5!3m4!1s0x872ba44cebd456ff:0xe56d637fd33cfd9b!8m2!3d33.4643387!4d-111.7291571

7.      Annexed hereto as Exhibit "E" is a true and correct copy of Commercial Lease entered into between the City of Mesa and Hughes Helicopter, Inc. on March 28, 1983, for the property on which the Debtors' headquarters is located.

8.      Annexed hereto as Exhibit "F" is a true and correct copy of the "Assignment of Commercial Lease" filed by Mellon Bank in the Maricopa Recorder's Office on March 30, 1983.

9.      Annexed hereto as Exhibit "G" is a true and correct copy of the "Assignment of Beneficial Interest under Deed of Trust" filed by Mellon Bank in Maricopa Recorder's Office on January 27, 1984.

10.      Annexed hereto as Exhibit "H" is a true and correct copy of the Reassignment of Commercial Lease filed by the Arizona State Retirement System on March 14, 1984.  Annexed hereto as Exhibit "I" are true and correct copies of the Quitclaim Deeds relating to improvements subject to the Mesa Ground Lease filed by the City of Mesa on January 31, 2007.

11.      Annexed hereto as Exhibit "J" is a true and correct copy of UCC Financing Statement filed on behalf of Ankura Trust Company, LLC, as co-Agent against MD Helicopters, Inc. in the office of the Arizona Secretary of State on January 8, 2021.

12.      Annexed hereto as Exhibit "K" is a true and correct copy of the "Condition of Title Report" relating to MD Helicopter, Inc. and the Mesa Real Estate Assets issued by Fidelity National Title Insurance Company on April 19, 2022.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on May 2, 2022

/s/ *Dennis C. O'Donnell*
Dennis C. O'Donnell

**Exhibit A**

Unofficial
Document

When recorded mail to:

Name: _____

Address: _____

_____

City/State/Zip: _____

_____

20

11
Ca

Area reserved for county recorder

*CAPTION HEADING:*

## DO  NOT  REMOVE

## This is part of the official document

FILED
11/13/18
CHRIS DEROSE, Clerk
By _L. Nevenhoven_
L. Nevenhoven, Deputy

**⊞ Davis Miles**
McGuire Gardner

40 E. Rio Salado Pkwy., Ste. 425
Tempe, AZ 85281
Telephone: (480) 733-6800
Fax: (480) 733-3748
efile.dockets@davismiles.com
Bradley D. Weech, SBN: 011135
Robert N. Sewell, SBN: 024938
Marshall R. Hunt, SBN: 031060
*Attorneys for Plaintiff*

## STATE OF ARIZONA
## MARICOPA COUNTY SUPERIOR COURT

| | |
|---|---|
| The State of the Netherlands (Ministry of the Interior and Kingdom Relations, National Police Services Agency [Agentschap KLPD], successor judgment creditor: Ministry of Security and Justice Directorate-General Police), a foreign government, <br><br> Plaintiff, <br><br> vs. <br><br> MD Helicopters, Inc., an Arizona corporation, <br><br> Defendant. | CASE NO. CV2015-095127 <br><br><br> **JUDGMENT** |

The Court having considered Plaintiff the State of the Netherlands'

("**Netherlands**") Motion for Summary Judgment, and Defendant MD Helicopters,

Inc.'s ("**MD Helicopters**") Cross-Motion for Summary Judgment, including without

limitation all responses and replies, along with post-oral argument supplemental

filings, and having reviewed the arguments and attachments included in the same,

along with all other relevant portions of the Court's file, and the Court having granted

the Netherlands' Motion for Summary Judgment and denied MD Helicopters' Cross-

Motion for Summary Judgment by Minute Entry filed June 21, 2018, and good cause

appearing, finds and grants judgment as follows:

1  IT IS ORDERED granting the Netherlands' Motion for Summary Judgment

2  domesticating the judgments and denying MD Helicopters' Cross-Motion for Summary

3  Judgment for the reasons set out in the Court's June 21, 2018 Minute Entry, which is

4  incorporated in this Judgment by this reference;

5  IT IS FURTHER ORDERED domesticating the Netherlands' judgments and

6  granting the Netherlands judgment against MD Helicopters under those judgments in

7  the amount of **$14,724,084.50**, which amount includes principal damages and accrued

8  interest (less partial payments made toward the judgments) in the amount of

9  $14,651,285.46, and attorneys' fees and costs of $72,799.04, as awarded by the Hague

10  District Court and Hague Court of Appeal, as more fully set out in the Netherlands'

11  July 10, 2018 Statement of 1) Accrued Interest, 2) Post-Judgment Interest Computation,

12  and 3) Currency Conversion and Proposed Judgment Amount;

13  IT IS FURTHER ORDERED recognizing and domesticating the Netherlands'

14  continuing right to interest on the domesticated judgments at the Dutch statutory rate

15  as set forth in the Netherlands' July 10, 2018 Statement of 1) Accrued Interest, 2) Post-

16  Judgment Interest Computation, and 3) Currency Conversion and Proposed Judgment

17  Amount;

18  IT IS FURTHER ORDERED granting Judgment to the Netherlands and against

19  MDH Helicopters for the Netherlands' reasonable attorneys' fees incurred in this action

20  in the amount of $350,000.00                    ;

21  IT IS FURTHER ORDERED granting Judgment to the Netherlands and against

22  MD Helicopters for the Netherlands' taxable costs incurred in this action in the amount

23  of $665.70                    ;

24  IT IS FURTHER ORDERED that that above stated attorneys' fees and costs

25  incurred in this action shall bear interest at the current statutory judgment rate of 6.25%

26  per annum;

27

1  IT IS FURTHER ORDERED that The State of the Netherlands is authorized to

2  record this Judgment and it shall attach as a lien against real property pursuant to

3  A.R.S. §§ 33-421 & 33-961;

4  IT IS FURTHER ORDERED awarding the Netherlands post Judgment collection

5  costs and fees in an amount as may be awarded by this Court following supplemental

6  application by the Netherlands;

7  IT IS FURTHER ORDERED that this Court's decision is a final judgment entered

8  pursuant to Ariz.R.Civ.P. 54(b) as there is no just reason for delaying this Judgment on

9  this issue as to these parties.

10

11  NOVEMBER 13, 2018

12  Maricopa County Superior Court Judge
    Unofficial Document

13  Judge Joshua D. Rogers

14

15

16

17

18

19

20

21

22

23

24

25  The foregoing instrument is a full, true and correct copy
    of the original on file in this office.

26  Attest_____ 11 5 ___20 18___
    CHRIS DEROSE, Clerk of the Superior Court of the
    State of Arizona, in and for the County of Maricopa.

27  By_____, Deputy Clerk

3

**Exhibit B**

250 Ariz. 235
Supreme Court of Arizona.

The STATE OF THE **NETHERLANDS**,
Plaintiff/Appellee,
v.
**MD HELICOPTERS**, INC.,
Defendant/Appellant.

No. CV-20-0112-PR
|
Filed December 30, 2020

**Synopsis**
**Background:** The Netherlands, as assignee of Dutch judgment in favor of its National Police Services Agency, brought action seeking recognition of the judgment under the Uniform Foreign-Country Money Judgments Recognition Act and common law principles. The Superior Court, Maricopa County, No. CV2015-095127, Joshua Rogers, J., entered summary judgment in favor of the Netherlands, recognizing the judgment and permitting its enforcement. Judgment debtor appealed, and the Court of Appeals, 248 Ariz. 533, 462 P.3d 1038, affirmed. Judgment debtor sought review.

**Holdings:** The Supreme Court, Scott Timmer, Vice C.J., held that:

[1] term "law," in Act's reciprocity provision, was broad term that included a foreign country's jurisprudence, and

[2] jurisprudential law of the Netherlands provided for recognition of foreign judgments in a manner similar to the Act.

Affirmed.

Montgomery, J., filed dissenting opinion in which Bolick, J., joined.

**Procedural Posture(s):** Petition for Discretionary Review; On Appeal; Motion for Attorney's Fees; Motion for Summary Judgment; Other.

West Headnotes (10)

**[1]** **Statutes** ⬥ Intent

When interpreting statutes, Supreme Court's goal is to effectuate the legislature's intent.

**[2]** **Statutes** ⬥ Construction based on multiple factors

When interpreting statutes so as to effectuate the legislature's intent, Supreme Court interprets statutory language in view of the entire text, considering the context and related statutes on the same subject.

**[3]** **Statutes** ⬥ Absence of Ambiguity;  Application of Clear or Unambiguous Statute or Language

When interpreting a statute, if the statutory language is clear and has only one reasonable meaning, Supreme Court will apply that meaning.

**[4]** **Statutes** ⬥ In general;  factors considered

When interpreting a statute, if statutory language yields more than one reasonable meaning, Supreme Court applies secondary interpretive principles, such as examining the statute's subject matter, historical background, effect and consequences, and spirit and purpose.

**[5]** **Statutes** ⬥ Particular Words and Phrases

Statutory term "law" may have a broad or narrow meaning, depending on context and legislative intent; the term can include constitutions, statutes, the common law, and the various rules of court or an act of the legislature only.

**[6]** **Judgment** Judgments of Courts of Foreign Countries

Term "law," in provision of Uniform Foreign-Country Money Judgments Recognition Act excluding from the Act judgments originating from a foreign country that has not "adopted or enacted a reciprocal law," was broad term that included a foreign country's jurisprudence, and was not limited to legislative enactments; limiting term to enactments would render statute's use of word "adopted" superfluous, statute did not include language limiting term to legislative acts or treaties, despite legislature's undisputed knowledge that "law" could include more than statutes, and restricting scope of term would not further reciprocity provision's purpose of ensuring foreign countries would recognize Arizona judgments under similar circumstances. Ariz. Rev. Stat. Ann. § 12-3252(B)(2).

**[7]** **Judgment** Judgments of Courts of Foreign Countries

Term "foreign country," in provision of Uniform Foreign-Country Money Judgments Recognition Act excluding from the Act judgments originating from a "foreign country that has not adopted or enacted a reciprocal law," did not exclude foreign courts, so as to require the reciprocal law to be a legislative enactment or treaty rather than jurisprudence; term was defined to refer to a government, which necessarily included courts. Ariz. Rev. Stat. Ann. §§ 12-3251(1), 12-3252(B)(2).

**[8]** **Judgment** Judgments of Courts of Foreign Countries

Phrase "a reciprocal law related to foreign-country money judgments," in reciprocity provision of Uniform Foreign-Country Money Judgments Recognition Act, means a foreign country's formally recognized and enforced rule that authorizes recognition of Arizona money judgments; that rule can be established by a foreign country's caselaw. Ariz. Rev. Stat. Ann. § 12-3252(B)(2).

**[9]** **Judgment** Judgments of Courts of Foreign Countries

To avoid exclusion from the Uniform Foreign-Country Money Judgments Recognition Act under Act's reciprocity provision, the foreign county's law must recognize Arizona judgments in a manner similar to the Act; in essence, reciprocity provision provides that an Arizona court will only recognize a foreign-country money judgment if it is assured that the rendering foreign country would recognize an Arizona judgment if circumstances were reversed. Ariz. Rev. Stat. Ann. § 12-3252(B)(2).

**[10]** **Judgment** Judgments of Courts of Foreign Countries

The law of the Netherlands provided for recognition of foreign judgments in a manner similar to the Uniform Foreign-Country Money Judgments Recognition Act, and thus Act's reciprocity provision did not bar recognition of Dutch money judgment under the Act; though Dutch Code of Civil Procedure generally barred enforcement of foreign judgments, it authorized

Dutch courts to settle such matters de novo, and Dutch courts had developed, through caselaw, principles for recognition of foreign judgments that were similar to the Act. 📑 Ariz. Rev. Stat. Ann. § 12-3252(B)(2).

**231 Appeal from the Superior Court in Maricopa County, The Honorable Joshua D. Rogers, Judge, The Honorable Margaret Benny, Judge *Pro Tempore*, No. CV2015-095127. **AFFIRMED**

Opinion of the Court of Appeals, Division One 248 Ariz. 533, 462 P.3d 1038 (App. 2020). **AFFIRMED**

**Attorneys and Law Firms**

James E. Berger (argued), King & Spalding LLP, New York, NY; Daniel G. Dowd, Cindy C. Albracht-Crogan, Stacey F. Gottlieb, Kevin C. Moyer, Cohen Dowd Quigley P.C., Phoenix, Attorneys for The State of the Netherlands

Karl M. Tilleman (argued), Erin Bradham, Douglas D. Janicik, Dentons US LLP, Phoenix, Attorneys for MD Helicopters, Inc.

C. Bradley Vynalek, Brian A. Howie, Lauren Elliot Stine, Daniel G. Roberts, Quarles & Brady LLP, Phoenix, Attorneys for Amicus Curiae Arizona Bankers Association and Canada Arizona Business Council

VICE CHIEF JUSTICE TIMMER authored the opinion of the Court, in which JUSTICES GOULD, LOPEZ, BEENE, and JUDGE EPPICH joined.* JUSTICE MONTGOMERY authored a dissenting opinion in which JUSTICE BOLICK joined.

**Opinion**

VICE CHIEF JUSTICE TIMMER, opinion of the Court:

¶1 Arizona's version of the Uniform Foreign-Country Money Judgments Recognition Act, A.R.S. §§ 12-3251 to -3254 ("Act"), authorizes courts to recognize judgments originating from a foreign country with a "reciprocal law" that is "similar" to the Act. § 12-3252(B)(2). We are asked whether reciprocity requires a legislative act or if court decisions authorizing such procedures can be

considered. We hold that court-authorized procedures recognizing foreign-country money judgments in a manner similar to the Act can satisfy the reciprocity requirement.

**BACKGROUND**

¶2 The District Court of The Hague entered a monetary judgment in favor of the **232 *237 Netherlands' National Police Services Agency and against MD Helicopters, Inc. ("MDHI") in a breach-of-contract lawsuit. The Hague Court of Appeal upheld the judgment. The State of the Netherlands, as assignee of the judgment, filed suit in the superior court in Maricopa County seeking recognition of the Dutch judgment under both the Act and common law principles. The superior court entered summary judgment for the Netherlands, recognizing the judgment under the Act and permitting its enforcement in Arizona.

¶3 The court of appeals affirmed. *State of the Netherlands v. MD Helicopters, Inc.*, 248 Ariz. 533, 462 P.3d 1038 (App. 2020). In doing so, it rejected MDHI's argument that the Act did not apply here because the Netherlands did not have a reciprocal, similar legislative act. *Id.* at 539 ¶ 16, 462 P.3d at 1044. The court concluded that the Netherlands' legislatively enacted code of civil procedure, along with the court decisions applying it, combined to satisfy that requirement. *Id.* at 541–42 ¶¶ 23–24, 462 P.3d at 1046–47. Because the court based its decision on the Act, it did not address whether common law principles would also have authorized recognition of the judgment. *Id.* at 546 ¶ 41, 462 P.3d at 1051.

¶4 We granted review to decide whether the Act's reciprocity requirement is satisfied when a foreign country's caselaw recognizes judgments in a manner that is similar to the Act, an issue of statewide importance.

**DISCUSSION**

¶5 Arizona does not recognize or permit enforcement of a foreign-country money judgment unless the judgment creditor first domesticates that judgment in an Arizona court. *See, e.g.*, A.R.S. § 12-3254 (describing the process for domestication under the Act). Before 2015, Arizona courts only applied common law principles to decide whether to recognize foreign-country money judgments. *See, e.g.*, 📕 *Alberta Sec. Comm'n v. Ryckman*, 200 Ariz.

540, 545 ¶ 15, 30 P.3d 121, 126 (App. 2001) (applying Restatement (Third) of the Foreign Relations Laws of the United States §§ 481–82 (Am. Law Inst. 1987)). Under the common law, a court recognizes a judgment if the foreign jurisdiction that issued the judgment "afforded the defendant an opportunity for a hearing that comports with basic due process principles before a court of competent jurisdiction." *Id.* ¶ 18. Whether that jurisdiction would recognize Arizona judgments if circumstances were reversed was not considered. *See* Restatement § 481 cmt. d.

¶6 In 2015, the Arizona Legislature passed the Act, which is based on the Uniform Foreign-Country Money Judgments Recognition Act. *See* 2015 Ariz. Sess. Laws ch. 170, § 1 (1st Reg. Sess.). It requires courts to recognize foreign-country money judgments subject to the Act unless a listed exception exists. §§ 12-3252 and -3253. Unlike the uniform act and common law, the Act includes a reciprocity requirement, § 12-3252(B)(2), which excludes from the Act any judgment that "[o]riginates from a foreign country that has not adopted or enacted a reciprocal law related to foreign-country money judgments that is similar to this chapter." The Act does not address whether courts may domesticate excluded judgments under common law principles.

¶7 MDHI argues that § 12-3252(B)(2) prevents an Arizona court from recognizing a foreign-country money judgment unless it originates from a country that either entered a treaty with the United States or Arizona or enacted a statute similar to the Act. Because the Netherlands applies principles grounded in Dutch caselaw to recognize foreign-country money judgments, rather than relying exclusively on a treaty or statute, MDHI asserts that the Act's reciprocity clause excludes the judgment here from recognition under the Act. In contrast, the Netherlands asserts, and the prior courts agreed, that judgment-recognition procedures established by caselaw that are similar to the Act satisfy the clause. *See State of the Netherlands*, 248 Ariz. at 539 ¶ 16, 462 P.3d at 1044. It therefore contends that because Dutch caselaw establishes recognition principles similar to the Act, the Act applies to the judgment here.

[1] [2] [3] [4]¶8 Resolution of this dispute turns on the meaning of "a reciprocal law" in § 12-3252(B)(2), an issue we review de novo. *See* **233 *238 *BMO Harris Bank, N.A. v. Wildwood Creek Ranch, LLC*, 236 Ariz. 363, 365 ¶ 7, 340 P.3d 1071, 1073 (2015). When interpreting statutes, our goal is to effectuate the legislature's intent. *SolarCity Corp. v. Ariz. Dep't of Revenue*, 243 Ariz. 477, 480 ¶ 8, 413 P.3d 678, 680 (2018). To do so, "we interpret statutory language in view

of the entire text, considering the context and related statutes on the same subject." *Molera v. Hobbs*, 250 Ariz. 13, 24 ¶ 34, 474 P.3d 667, 678 (2020) (citation omitted) (internal alterations omitted). "If the language is clear and has only one reasonable meaning, we will apply that meaning." *Id.* If it yields more than one reasonable meaning, we apply secondary interpretive principles, such as examining "the statute's subject matter, historical background, effect and consequences, and spirit and purpose." *Id.* (quoting *Rosas v. Ariz. Dep't of Econ. Sec.*, 249 Ariz. 26, 28 ¶ 13, 465 P.3d 516, 518 (2020)).

¶9 We reject MDHI's argument that "reciprocal" necessarily means a corresponding legislative enactment. The plain meaning of "reciprocal" does not itself direct the form of "law." *New York v. O'Neill*, 359 U.S. 1, 4, 79 S.Ct. 564, 3 L.Ed.2d 585 (1959), and *State v. Jordan*, 83 Ariz. 248, 251, 320 P.2d 446 (1958), relied on by MDHI, did not conclude otherwise by describing the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings as operative between states that had enacted the same or similar legislation. The reciprocity clause in that act uses different language, *see* A.R.S. § 13-4093(A), and, regardless, neither case addressed the meaning of the reciprocity clause. *See* *O'Neill*, 359 U.S. at 4, 79 S.Ct. 564; *Jordan*, 83 Ariz. at 251, 320 P.2d 446. Whether § 12-3252(B)(2) requires a reciprocal legislative enactment depends entirely on the meaning of "law."

[5]¶10 "Law" may have a broad or narrow meaning, depending on context and legislative intent. *See* *State ex rel. Conway v. Superior Court*, 60 Ariz. 69, 75–77, 131 P.2d 983 (1942), *overruled in part on other grounds by* *Adams v. Bolin*, 74 Ariz. 269, 275, 247 P.2d 617 (1952). The term can include "constitutions, statutes, the common law and the various [rules of court]" or "an act of the legislature only." *Id.* at 76, 131 P.2d 983; *see also Law*, Black's Law Dictionary (11th ed. 2019) (defining "law" in relevant part as "[t]he aggregate of legislation, judicial precedents, and accepted legal principles," or "[t]he set of rules or principles dealing with a specific area of a legal system"); *Law*, Webster's Third New International Dictionary (3d ed. 2002) (defining "law" in relevant part as an "ordinance, statute, resolution, rule [or] judicial decision," or the "common law"). Pinpointing whether the legislature intended "law" to have a broad meaning or a narrower one forms the crux of the dispute here.

[6]¶11 Reading "law" in context, we agree with the Netherlands and the court of appeals that the legislature

intended a broad meaning, which includes a foreign country's jurisprudence. *See State of the Netherlands*, 248 Ariz. at 540 ¶ 21, 462 P.3d at 1045. First, interpreting "law" as including caselaw, rules, regulations, and the like avoids rendering "adopted" in § 12-3252(B)(2) redundant to "enacted" and thus superfluous. *See Nicaise v. Sundaram*, 245 Ariz. 566, 568 ¶ 11, 432 P.3d 925, 927 (2019) ("A cardinal principle of statutory interpretation is to give meaning, if possible, to every word and provision so that no word or provision is rendered superfluous."). Legislative bodies "enact" laws. *See Enact*, Black's Law Dictionary (11th ed. 2019) (defining "enact" as meaning "[t]o make into law by authoritative act; to pass"); *Cronin v. Sheldon*, 195 Ariz. 531, 537 ¶ 28, 991 P.2d 231, 237 (1999) (acknowledging that "the legislature has the authority to enact laws"). If the legislature intended to restrict the meaning of "law" to legislative enactments, "adopted" would add nothing to § 12-3252(B)(2). But courts "adopt" rules, procedures, and common law principles, and executive agencies "adopt" rules and regulations. *See State of the Netherlands*, 248 Ariz. at 539–40 ¶ 19, 462 P.3d at 1044–45 (citing examples); *see also Dobson Bay Club II DD, LLC v. La Sonrisa de Siena, LLC*, 242 Ariz. 108, 111 ¶ 15, 393 P.3d 449, 452 (2017) ("We *adopt* the Restatement Second § 356(1) to test the enforceability of a stipulated damages provision." (emphasis added)); Ariz. Const. art. 6, § 2 ("The supreme court shall **234 *239 sit in accordance with rules *adopted* by it." (emphasis added)). Interpreting "law" as including these authorities gives "adopted" a meaning distinct from "enacted."

¶12 MDHI briefly asserts that a treaty could also be "a reciprocal law." Countries, however, do not "enact" or "adopt" treaties but rather enter into such agreements. *Cf. Begay v. Miller*, 70 Ariz. 380, 385, 222 P.2d 624 (1950) (addressing Indian tribe's sovereign "power to enter into treaties with foreign nations"); U.S. Const. art. 1, § 10, cl. 3 ("No State shall, without the Consent of Congress ... enter into any Agreement or Compact with ... a foreign Power ....").

¶13 Second, the legislature did not include any language in § 12-3252(B)(2) restricting "law" to a legislative act or treaty. *See Collins v. Stockwell*, 137 Ariz. 416, 420, 671 P.2d 394, 398 (1983) ("Courts will not read into a statute something that is not within the manifest intent of the Legislature as gathered from the statute itself."). The absence of restrictive language is particularly telling as the legislature was indisputably aware that "law" includes more than statutes. *See, e.g.*, *Conway*, 60 Ariz. at 75–76, 131 P.2d 983 (including the common law within the meaning of "law"); A.R.S. § 12-122 ("The superior court, in addition to the powers conferred by constitution,

rule or statute, may proceed according to the common law."). And the legislature knew that Arizona historically recognized foreign-country money judgments under common law principles of comity. *See* Ariz. H.R. B. Summ. for S.B. 1447, 52d Leg., 1st Reg. Sess. (Mar. 18, 2015) (explaining that the Act "allows a court to give a foreign-country judgment greater effect than it is currently required to" and "outlines policy for listing today[']s generally-accepted policies and preserves the right for courts to recognize further bases").

¶14 Third, the focus of § 12-3252(B)(2) is on ensuring that a foreign country would recognize Arizona judgments under circumstances similar to those in the Act. No reason appears why the legislature would restrict the myriad types of "law" under which a foreign country may recognize an Arizona judgment. *See Molera*, 250 Ariz. at 24 ¶ 34, 474 P.3d at 678 (providing that the "spirit and purpose" of the statute is a pertinent consideration to interpretation (quoting *Rosas*, 249 Ariz. at 28 ¶ 13, 465 P.3d at 518)).

¶15 We are not persuaded by MDHI's contrary arguments. It contends that because § 12-3252(B)(2) refers to "*a* reciprocal law," only a single act, like a statute or treaty, can fulfill that requirement. But in our statutes, words phrased singularly include the plural, so "a" does not necessarily mean one singular act. *See* A.R.S. § 1-214(B) ("Words in the singular number include the plural, and words in the plural number include the singular."). Mirroring the uniform act, the Act is phrased primarily in the singular throughout, and nothing indicates a legislative intent to exclude plural references. *See, e.g.*, § 12-3253(C)(3) (permitting a court to refuse recognition of a judgment "repugnant to *the* public policy of this state or of *the* United States" (emphasis added)). *But see* § 12-3253(E)(4) (providing that a foreign-country money judgment may not be refused for lack of personal jurisdiction if the defendant was a business entity "organized under the *laws* of[ ] the foreign country" (emphasis added)). For example, § 12-3252(A) provides that the Act applies to judgments that are final, conclusive, and enforceable "under *the* law of the foreign country," which, as in Arizona, may consist of a combination of legislation and court rules. *See, e.g.*, Ariz. R. Civ. P. 58 (entry of judgment); A.R.S. § 12-1611 (renewal of judgments).

[7]¶16 MDHI also argues that "foreign country" in § 12-3252(B)(2) excludes foreign courts, meaning "a reciprocal law" that is "adopted or enacted" by that country must be a legislative enactment or treaty. The Act defines "foreign country" as "a government" other than the United States, its territories and possessions and any

other government where "a judgment of that government's courts" is "subject to determination under the full faith and credit clause of the United States Constitution." *See* § 12-3251(1)(c). MDHI reasons that "government," and by extension "foreign country," necessarily excludes courts, otherwise the reference to "courts" would be redundant. It further points out that § 12-3253's references to "foreign court" rather than "foreign country" **235 *240 when describing circumstances in which judgments cannot or may not be recognized further demonstrates that the legislature intended to differentiate the terms. *See, e.g.*, § 12-3253(B)(2) ("A court may not recognize a foreign-country judgment if any of the following applies: ... [t]he foreign court did not have personal jurisdiction over the defendant.").

¶17 Like the court of appeals, we are unpersuaded. *See State of the Netherlands*, 248 Ariz. at 539 ¶ 18, 462 P.3d at 1044. A "foreign country" means "a government," *see* § 12-3252(1), and governments include courts. *See Government*, Black's Law Dictionary (11th ed. 2019) (defining "government" in relevant part as meaning "the political organs of a country regardless of their function or level"). By referring to a "government's courts," § 12-3251(1)(c) recognizes that courts belong to government. Section 12-3251(2) also acknowledges that courts are part of government by defining a "foreign-country judgment" as one issued by "a court of a foreign country." The references to "foreign courts" in § 12-3253 do not suggest otherwise by identifying the part of government issuing the judgments at issue. Singling out the component of government that issues money judgments (i.e., courts) when discussing those judgments does not make the terms "government" and "courts" redundant if the former term includes the latter.

¶18 MDHI finally argues that interpreting "a reciprocal law" as including caselaw and court practices thwarts the legislature's intent to only recognize foreign-country money judgments from rendering countries that provide a "guarantee of reciprocity" through legislation. In support, MDHI relies on remarks during a senate committee hearing on Senate Bill 1447, which resulted in the Act. There, a representative of the Arizona Bankers Association, who requested the bill, stated the bill was prompted by Alberta, Canada's desire "to have a reciprocal arrangement with Arizona." He also stated that any country wanting a "reciprocal arrangement" with Arizona would qualify if it met the Act's requirements of "essentially" having court systems that parallel those in the United States. The bill's sponsoring senator added that three states had "agreements" with Alberta like ones the Act would authorize. Because Alberta recognizes foreign judgments under its Reciprocal Enforcement of Judgments Act, R.S.A. 2000, ch. R-6, MDHI asserts that the hearing remarks reflect the legislature's intent that only governments that "establish a mutual relationship with Arizona [through legislation] should be allowed to enjoy the [Act's] benefits."

¶19 Neither the language in § 12-3252(B)(2) nor the Act's limited legislative history supports MDHI's contention. As previously explained, nothing in § 12-3252(B)(2) restricts "a reciprocal law" to legislation. And neither the sponsoring senator nor the banking representative specified that any "reciprocal arrangement" or "agreement" had to take the form of legislation. Regardless, their remarks do not necessarily reflect the intent of the legislators who voted to enact Senate Bill 1447. *See* Hayes v. Cont'l Ins. Co., 178 Ariz. 264, 269–70, 872 P.2d 668, 673–74 (1994) ("When seeking to ascertain the intent of legislators, courts normally give little or no weight to comments made at committee hearings by nonlegislators."); *City of Tucson v. Woods*, 191 Ariz. 523, 528, 959 P.2d 394, 399 (App. 1997) ("[A] single member of the legislature is not able to testify regarding the intent of the legislature in passing a law.").

¶20 Significantly, Alberta's Reciprocal Enforcement of Judgments Act does not itself guarantee recognition of Arizona money judgments. That act provides that "[w]hen the Lieutenant Governor in Council is satisfied that reciprocal provision will be made by a jurisdiction" for enforcement of Alberta judgments, the Lieutenant Governor in Council "may by order declare it to be a reciprocating jurisdiction." R.S.A. 2000, ch. R-6, § 8. No limits are placed on the Lieutenant Governor in Council's discretion, and an order may be revoked in his or her discretion. *Id.* Although the Lieutenant Governor in Council has recognized Arizona as a reciprocating jurisdiction, *see* Alberta Regulation 344/85, the act itself does not provide Arizona judgment creditors with the "guarantee" MDHI asserts is required by "a reciprocal law."

**236 *241 ¶21 Our dissenting colleagues argue that "a reciprocal law" precludes caselaw because other states with broader reciprocity clauses consider caselaw, meaning our legislature must have intended a different result by using more restrictive language. *See infra* ¶¶ 28, 33–36. But even if other states' reciprocity clauses are broader than § 12-3252(B)(2), that circumstance has no bearing on our legislature's intent. Nothing in the legislative history suggests the legislature was aware of other states' reciprocity clauses or intended to be more restrictive than other states. Any comparison with other states' reciprocity clauses to determine legislative intent is

therefore of little use in interpreting the Act. And notably, the legislative history reflects a legislative intent to permit greater recognition of foreign-country money judgments; no mention is made of an intent to be more restrictive than other states. *See* Ariz. S.B. Summ. for S.B. 1447, 52d Leg., 1st Reg. Sess. (Mar. 25, 2015) (stating the Act is modeled on the uniform act, which "allows a court to give a foreign-country judgment greater effect than it is currently required to" and "outlines policy for listing today[']s generally-accepted policies and preserves the right for courts to recognize further bases").

[8]  [9]¶22 In sum, "a reciprocal law related to foreign-country money judgments" means a foreign country's formally recognized and enforced rule that authorizes recognition of Arizona money judgments. That rule can be established by a foreign country's caselaw. To avoid exclusion under § 12-3252(B)(2), the law must recognize such judgments in a manner "similar" to the Act. In essence, § 12-3252(B)(2) provides that an Arizona court will only recognize a foreign-country money judgment if it is assured that the rendering foreign country would recognize an Arizona judgment if circumstances were reversed.

[10]¶23 We now turn to the facts of this case. Article 431 of the Dutch Code of Civil Procedure, enacted by the Dutch Legislature, generally prohibits enforcement of foreign judgments but authorizes the Dutch courts to "deal[ ] with and settle[ ] de novo" such matters. Pursuant to this delegation, Dutch courts developed principles for recognizing foreign-country money judgments, which is necessary to later enforce such judgments. *See State of the Netherlands*, 248 Ariz. at 541 ¶ 24, 462 P.3d at 1046. MDHI does not contest that Dutch caselaw has recognized foreign-country money judgments, including United States judgments, for nearly a century under principles "similar to" the Act. *See id.* at 541–42 ¶¶ 24–26, 462 P.3d at 1046–47 (describing similarities and listing Dutch cases that recognized money judgments entered by United States courts). Although Dutch courts could cease applying such principles, just as countries could rescind reciprocal legislation or Alberta's Lieutenant Governor in Council could revoke recognition of Arizona judgments, their steadfast recognition of foreign-country money judgments constitutes "a reciprocal law" that is "similar to" the Act.

¶24 The dissent argues that although formally adopted court procedures, evidentiary rules, and the like can be "similar to" the Act, caselaw cannot meet that requirement. *See infra* ¶ 27. It asserts that because the legislature did not enact the uniform act's "savings clause," which provides that foreign-country money

judgments outside that act may still be recognized under common law principles, the Act prohibits recognizing foreign-country money judgments under the common law. *See infra* ¶¶ 29, 38. And because Dutch courts recognize foreign-country money judgments under principles developed in caselaw, the Dutch system, according to the dissent, is dissimilar to the Act. *See infra* ¶ 41.

¶25 We find the dissent's reasoning flawed. Whether the lack of a savings clause in the Act evidences a legislative intent to prohibit recognition of all foreign-country money judgments under common law principles is not properly before us because we denied review of that issue in this case. Regardless, even if the legislature intended to entirely displace the common law for recognizing judgments in Arizona, it does not logically follow that foreign caselaw cannot establish a reciprocal law similar to the Act. The Act did not eschew the common law but codified "the most prevalent common law rules" for recognizing foreign-country money judgments. *See* **\*\*237 \*242** Uniform Foreign-Country Money Judgments Recognition Act § 11 prefatory note (2005) (Unif. Law Comm'n prefatory note); *see also* § 12-3253 (codifying common law considerations like whether the judgment emanated from a court of competent jurisdiction providing due process of law); *Alberta Sec. Comm'n*, 200 Ariz. at 545 ¶ 15, 30 P.3d at 126 (citing common law principles later codified in the Act). The key inquiry is whether the foreign system similarly adheres to the Act's recognition rules. *See* Ariz. S.B. Summ. for S.B. 1447, 52d Leg., 1st Reg. Sess. (Mar. 25, 2015) ("Though the Act applies to judgment from any foreign court, it does not allow recognition of judgments rendered under a system not providing impartial tribunals or is incompatible with the requirements of due process of law."). As the court of appeals concluded, and we agree, the Dutch system meets that standard. *See State of the Netherlands*, 248 Ariz. at 541–42 ¶¶ 24–26, 462 P.3d at 1046–47.

## CONCLUSION

¶26 We affirm the trial court and the court of appeals. Both parties ask for attorney fees pursuant to A.R.S. § 12-341.01(A). We award fees to the Netherlands as the prevailing party.

MONTGOMERY, J., joined by BOLICK, J., concurring in part and dissenting in part:

¶27 While it may be possible for a foreign court to adopt rules of procedure or evidence or some process that would satisfy the requirements of Arizona's Uniform Foreign-Country Money Judgment Act ("Act"), I respectfully dissent from the Majority's conclusion that Dutch caselaw satisfies the requirements in the matter before us.

¶28 There are two main reasons for my dissent. First, the Majority's conclusion that Dutch caselaw is similar enough to the Act does not adequately account for the significant differences between the Arizona legislature's version unanimously passed without amendment in 2015 and the Act as originally proposed in 2005 by the National Conference of Commissioners on Uniform State Laws ("NCCUSL Act"). *See* Unif. Foreign-Country Money Judg. Recog. Act (Unif. Law Comm'n 2005). Arizona's version has a more stringent reciprocity requirement than any other state in the country and omits specific language that would accommodate the recognition of foreign judgments based on common law principles. While the latter difference does not necessarily mean that an Arizona court could not recognize a foreign judgment based on the common law—an issue we did not accept for review—it does bear on the comparison between the recognition of judgments pre-dating passage of the Act, the requirements of the Act, and Dutch caselaw today.

¶29 Second, the Majority's conclusion does not account for the simple fact that, with passage of the Act, the Arizona legislature changed the means by which foreign judgments are recognized in Arizona from the common law approach to the statutory framework as set forth, whether exclusive or not. Given that Dutch caselaw reflects a common law approach, the Dutch process is more like what Arizona utilized before the Act. Therefore, the Dutch means for recognizing foreign judgments, being the same or similar to what we had before the Act, cannot be similar enough to the Act to warrant recognition of the judgment before us. Otherwise, either the entire action by the legislature in passing the Act was without effect, leaving the means for recognizing a foreign judgment no different now than it was before, or the Majority's reading of the Act's reciprocity requirement of similarity renders it meaningless.

¶30 As an initial point, I concur with the Majority's interpretive principles, set forth at *supra* ¶¶ 8 and 9, as well as the balance of the Majority's refutation of points raised by MDHI. *See supra* ¶¶ 7, 9, 10, 12, 13, 16, 17, and 19. However, when considering the "subject matter, historical background, effect and consequences, and spirit and purpose" of the Act, *Molera v. Hobbs*, 250 Ariz. 13, 24 ¶ 34, 474 P.3d 667, 678 (2020) (quoting *Rosas v. Ariz. Dep't of Econ. Sec.*, 249 Ariz. 26, 28 ¶ 13, 465 P.3d 516, 518 (2020)), I depart from the Majority's conclusion. *Supra* ¶ 23.

¶31 The Arizona legislature did not consider its version of the NCCUSL Act in a **238 vacuum nor did it adopt the version approved by the NCCUSL in 2005. At the time Arizona passed its Act in 2015, twenty other states had adopted the NCCUSL Act or a version thereof[1] and the legislature specifically referenced the NCCUSL Act as a source for the introduced legislation. *See* Ariz. State Senate Fact Sheet for S.B. 1447, 52d Leg., 1st Reg. Sess. (Apr. 14, 2015). Instead of mirroring the NCCUSL Act, our legislature added a reciprocity requirement at A.R.S. § 12-3252 and declined to include Section 11 of the NCCUSL Act, entitled "Savings Clause." Arizona also declined to include the Uniformity of Interpretation provision at Section 10, which states that "[i]n applying and construing this uniform act, consideration must be given to the need to promote uniformity of the law with respect to its subject matter among states that enact it."

¶32 With respect to the requirement for reciprocity, the prefatory note to the NCCUSL Act states:

> [T]he drafters revisited the decision made in the 1962 Act not to require reciprocity as a condition to recognition of the foreign-country money judgments covered by the Act. After much discussion, the drafters decided that the approach of the 1962 Act continues to be the wisest course with regard to this issue. While recognition of U.S. judgments continues to be problematic in a number of foreign countries, there was insufficient evidence to establish that a reciprocity requirement would have a greater effect on encouraging foreign recognition of U.S. judgments than does the approach taken by the Act. At the same time, the certainty and uniformity provided by the approach of the 1962 Act, and continued in this Act, creates a stability in this area that facilitates international commercial transactions.

¶33 Nonetheless, Arizona included a reciprocity requirement, as did six other states—Florida, Maine, Massachusetts, Ohio, Tennessee, and Texas. Fl. Stat. § 55.605(2)(g); Me. Rev. Stat. tit. 14, § 8505(2)(G); Mass. Gen. Laws Ch. 235 § 23A(7); Ohio Rev. Code § 2329.92(B); Tenn. Code Ann. § 26-6-204(c)(9); Tex. Civ. Prac. & Rem. Code Ann. § 36A.004(c)(9).[2]

¶34 Of the states requiring reciprocity, Arizona is the only one that expressly requires "*a reciprocal law.*" A.R.S. § 12-3252(B)(2) (emphasis added). Specifically, § 12-3252(B)(2) excludes recognition for judgments that "originate[ ] from a foreign country that has not adopted or enacted a reciprocal law related to foreign-country money judgments that is similar to this chapter." The other states only require that the foreign jurisdiction rendering the judgment "recognize" a judgment from that state. *See* Fl. Stat. § 55.605(2)(g) ("An out-of-country foreign judgment need not be recognized if ... [t]he foreign jurisdiction where the judgment was rendered would not give recognition to a similar judgment rendered in this state"); Me. Rev. Stat. tit. 14, § 8505(2)(G) ("A foreign judgment need not be recognized if ... [t]he foreign court rendering the judgment would not recognize a comparable judgment of this State."); Mass. Gen. Laws Ch. 235, § 23A(7) ("A foreign judgment shall not be recognized if ... judgments of this state are not recognized in the courts of the foreign state."); Ohio Rev. Code § 2329.92(B) (providing that the court has the discretion to recognize judgments rendered "in a foreign country that does not have a procedure for recognizing judgments made by courts of other countries and their political subdivisions in its statutes, rules, or common law that is substantially similar to sections 2329.90 to 2329.94 of the Revised Code"); Tenn. Code Ann. § 26-6-204(c)(9) ("A court of this state need not recognize a foreign-country judgment if ... [t]he foreign jurisdiction where the judgment was rendered would not give recognition to a similar judgment rendered in this state."); Tex. Civ. Prac. & Rem. Code Ann. § 36A.004(c)(9) (providing that a court *is not required to* recognize a foreign judgment if the jurisdiction that rendered it **\*\*239 \*244** would not recognize a judgment from Texas) (emphasis added)).

¶35 Courts that have considered whether a foreign judgment is entitled to recognition in states with the different, broader recognition language have understandably focused on the foreign country's judicial process. In *Reading Bates Construction Co. v. Baker Energy Resources Corp.*, the Court of Appeals of Texas relied on Canadian caselaw to find reciprocity. 976 S.W.2d 702, 710–11 (Tex. Ct. App. 1998). Canadian caselaw sets forth five instances in which Canada would recognize a foreign judgment. *Id.* Because Texas law merely required that the foreign jurisdiction would "recognize" a Texas judgment, the court held that the Canadian judicial practice of recognizing foreign judgments was sufficient for reciprocity. *Id. See also* Genujo Lok Beteiligungs GmbH v. Zorn, 943 A.2d 573, 581 (Me. 2008) (finding reciprocity because "German courts would likely recognize a comparable judgment from Maine"); Chabert v. Bacquié, 694 So.2d 805, 815 (Fla. Dist. Ct. App. 1997) (requiring the party challenging recognition to establish that "a French court would refuse to recognize an American judgment against a non-French party sought to be enforced in a French court"); McCord v. Jet Spray Int'l Corp., 874 F. Supp. 436, 439–40 (D. Mass. 1994) (holding that Belgian procedures amounted to "recognition" sufficient for reciprocity).

¶36 There is an obvious difference in language between requiring "a reciprocal law ... similar to the Act" and merely calling for "recognition." Yet, the Majority's approach, *see supra* ¶¶ 10–15, disregards that difference and gives Arizona's reciprocity provision, which demands the former, the same meaning as provisions in other states that only call for the latter. The Majority's point that the legislative history of the Act does not reflect awareness of what other states were doing with respect to reciprocity is beside the point. *See supra* ¶ 21. We must give meaning to the words chosen by our legislature and our analysis should account for those choices accordingly.

¶37 Were we to apply a plain-meaning analysis and give effect to the unique language chosen by our legislature, this Court would not be the first to interpret a reciprocity requirement to render a result that might not necessarily align with the legislature's expectations. For instance, Colorado courts originally interpreted a "foreign state" in its version of the Act so narrowly that it did not allow recognition of judgments from any other country. Milhoux v. Linder, 902 P.2d 856, 859 (Colo. App. 1995) (reasoning that because Colorado law required a "reciprocal agreement" between the United States and a foreign country and no such agreement existed, no foreign judgments could be recognized under its version of the Act). Consequently, the court held that "the district court was not required by the Recognition Act to recognize the Belgian judgment." *Id.* at 860. In response, the Colorado legislature repealed the restrictive reciprocity requirement in 2008. *See* Ledroit Law v. Kim, 360 P.3d 247, 254 n.1 (Colo. App. 2015) ("The Recognition Act has since been amended to eliminate the reciprocity requirement."). If the standard set out in A.R.S. §

12-3252 proves likewise unworkable, it is up to the legislature to rectify the consequence. *Orca Commc'ns Unlimited, LLC v. Noder*, 236 Ariz. 180, 182 ¶ 11, 337 P.3d 545, 547 (2014) ("The choice of the appropriate wording rests with the Legislature, and the court may not substitute its judgment for that of the Legislature.") (quoting *City of Phoenix v. Butler*, 110 Ariz. 160, 162, 515 P.2d 1180, 1182 (1973)). Similar to Colorado, Arizona can repeal and replace § 12-3252 to better achieve its goals if the legislature so desires.

¶38 Our legislature chose to omit the Savings Clause as proposed by the NCCUSL, which provides that "[t]his [act] does not prevent the recognition under principles of comity or otherwise of a foreign-country judgment not within the scope of this [act]." The following comment notes:

> Section 11 makes clear that no negative implication should be read from the fact that this Act does not provide for recognition of other foreign-country judgments. Rather, this Act simply does not address the issue of whether foreign-country judgments not within its scope ... should be recognized. Courts are free to recognize those foreign-country judgments not within **240 *245 the scope of this Act under common law principles of comity or other applicable law.

Almost every state that has adopted the NCCUSL Act or a variant thereof has included a savings clause.[3] And as the majority notes, prior to 2015, the only means available for securing recognition of a foreign judgment in Arizona was provided by the common law. *See supra* ¶ 5. Therefore, by omitting a savings clause to retain the use of common law principles, the legislature afforded parties a different (and much narrower) means by which a foreign judgment can be recognized in Arizona. The Majority's cite for legislative history for the proposition that the legislature intended to actually give courts the ability to give greater recognition to foreign judgments, *see supra* ¶ 13, underscores the problem with omitting a Savings Clause or similar language and is not a basis to read into the statute what the legislature failed to include.

¶39 While I agree with the Majority's conclusion that the term "adopted" is rendered "superfluous" if caselaw and court practices cannot amount to "a reciprocal law," *see supra* ¶ 11, I disagree with the ultimate conclusion that Dutch court practices and caselaw as they are today satisfy the Act's requirements. *Supra* ¶ 23. The apparent source of authority for Dutch courts to consider foreign judgments, Article 431 of the Dutch Civil Code of Procedure, is inapplicable. *Id.* Article 431 explicitly refers to enforcement of judgments, not recognition. Article 431(1) states that "no decision rendered by foreign courts ... can be *enforced* within The Netherlands." (emphasis added). Article 431(2) is equally unavailing, stating that "[d]isputes may be litigated again in the Dutch courts." Relitigating an underlying dispute involving enforcement is hardly similar to the statutory process established by the Act for recognition of a judgment rendered after a dispute has been litigated.

¶40 As for the particular Dutch court process for considering foreign judgments, the Netherlands Supreme Court refers to it as "disguised exequatur proceedings." Dutch Supreme Court, 26 September 2014, ECLI:NL:HR:2014:2838 (*Gazprombank*). Even if there may be a circumstance where a foreign country's caselaw could constitute "a reciprocal law," a process characterized as "disguised" is hardly similar to the explicit and formal process of recognizing a foreign judgment as afforded by Arizona's Act.

¶41 What the Dutch system is similar to is what Arizona relied on prior to the 2015 Act, namely application of the common law to determine whether to recognize a foreign judgment. *See supra* ¶ 5. With the passage of the Arizona Act, though, the legislature instituted a different process for recognizing foreign judgments that, by omitting the Savings Clause, does not reference the use of common law principles. Therefore, the Dutch system, reflecting an approach "similar" to the method Arizona previously utilized for foreign judgment recognition, cannot be similar to the system now in place. To conclude otherwise renders the process of passing the Act as drafted by the legislature, as well as the resulting distinctive and narrow terms, superfluous.

¶42 Where the legislature has omitted language that may make it easier to achieve a policy objective or added language that may make a declared policy objective more challenging to achieve or outright frustrate it, they need to correct it. If the ultimate consequence of our forbearance is more careful deliberation in the crafting of legislation to begin with, so much the better for the people of Arizona.

¶43 I would remand to the court of appeals for a

determination of whether the Act is the **241 *246 exclusive means by which a foreign money judgment can be recognized.

**All Citations**

250 Ariz. 235, 34 Arizona Cases Digest 30, 478 P.3d 230

## Footnotes

*    Chief Justice Brutinel is recused from this matter. Pursuant to article 6, section 3 of the Arizona Constitution, Hon. Karl C. Eppich, Judge of the Court of Appeals Division Two, was designated to sit in this matter.

1    The number is now up to twenty-five. https: //www.uniformlaws.org/ committees/community-home?CommunityKey=ae280c30-094a-4d8fb722-8dcd614a8f3e

2    All cites to state statutes are to current versions, unless otherwise noted.

3    Ala. Code § 6-9-260; Alaska Stat. § 09.30.150; Cal. Civ. Proc. Code § 1723; Colo. Rev. Stat. § 13-62-111; Conn. Gen. Stat. § 50a-37; Del. Code Ann. tit. 10, § 4807; D.C. Code § 15-371; Ga. Code Ann. § 9-12-119; Haw. Rev. Stat. § 658F-10; Idaho Code § 10-1411; 735 Ill. Comp. Stat. Ann. 5/12-671; Ind. Code § 34-54-12-9; Iowa Code § 626B.111; Me. Stat. tit. 14 § 8508; Md. Code Ann., Cts. & Jud. Proc. § 10-707; Mich. Comp. Laws § 691.1141; Minn. Stat. § 548.63; Mo. Stat. Ann. § 511.787; Mont. Code Ann. § 25-9-608; Nev. Rev. Stat. § 17.820; N.J. Stat. Ann. § 2A:49A-16.11; N.M. Stat. Ann. § 39-4D-10; 🚩 N.Y. C.P.L.R. § 5307; N.C. Gen. Stat. § 1C-1852; 🚩 Okla. Stat. tit. 12, § 12-718.11; Or. Rev. Stat. § 24.395; 42 Pa. Cons. Stat. § 22008; Utah Code Ann. § 78B-5-460; Va. Code Ann. § 8.01-465.13:10; Wash. Rev. Code § 6.40A.090.

---

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**Exhibit C**

OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
STEPHEN RICHER
20210849172   08/05/2021   03:18
ELECTRONIC RECORDING

2243001FJM-9-1-1--
morenoa

**When Recorded Return to:**

Cindy Albracht-Crogan
COHEN DOWD QUIGLEY
The Camelback Esplanade One
2425 E. Camelback Road, Suite 1100
Phoenix, Arizona 85016

## JUDGMENT INFORMATION STATEMENT
(Attachment to Certified Copy of the Judgment)

Pursuant to A.R.S. § 33-967, this separate information statement contains the following information:

1. **The correct name and last known address of each judgment debtor and address at which each judgment debtor received the summons by personal service or by mail:**

    **Name:** MD Helicopters, Inc.

    **Last Known Address:**
    Physical Address:  4555 E. McDowell Rd, Mesa, Arizona 85215
    Statutory Agent Address: David W. Kash, 3800 N. Central Ave., Ste. 1500, Phoenix, AZ 85012

    **Address Where Judgment Debtor Received Summons:**
    The original complaint and affidavit pursuant to A.R.S. § 12-1703 were mailed to the debtor at 4555 E. McDowell Road, Mesa AZ  85219-0730.  Thereafter, service of the Second Amended Complaint was accepted by debtor's counsel of record at that time, Thomas D. Arn, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., 2415 E. Camelback Rd., Suite 800, Phoenix, AZ 85016, and Ana C. Reyes, Williams & Connolly, LLP, 725 12th Street, NW, Washington, D.C. 20005.

2. **The name and address of the judgment creditor:**
    State of the Netherlands
    Ministry of Security and Justice, Directorate-General Police
    c/o Mr. W. Heemskerk
    Pels Rijcken & Droogleever Fortuijn N.V.
    P.O. Box 11756
    2502 AT The Hague
    The Netherlands

Copy all correspondence to local counsel of record:
Cindy Albracht-Crogan, Cohen Dowd Quigley, P.C., 2425 E. Camelback Road, Suite 1100, Phoenix, AZ 85016

3.  **The amount of the judgment or decree as entered or as most recently renewed:**
    Judgment for principal damages and accrued interest in the amount of **$15,539,198.35** as of May 1, 2021, plus interest which continues to accrue at the Dutch statutory rate until paid; judgment for attorneys' fees and costs in the amount of **$405,126.97** as of May 1, 2021, plus interest which continues to accrue at a rate of 6.25% per annum until paid; and **$242,031.69** in fees and costs on appeal, plus interest continuing to accrue at the statutory rate of 4.25% per annum until paid.

4.  **The judgment debtor's social security number, date of birth and driver license number:**
    Not Applicable

5.  **Whether the court has ordered a stay of enforcement and the date the stay expires:**
    No stay of enforcement has been ordered with respect to the above-referenced judgment.

Grant with New Order
***See eSignature page***

CERTIFIED COPY

Clerk of the Superior Court
*** Electronically Filed ***
C. Avena, Deputy
8/3/2021 8:00:00 AM
Filing ID 13194467

COHEN DOWD QUIGLEY
The Camelback Esplanade One
2425 East Camelback Road, Suite 1100
Phoenix, Arizona 85016
Telephone 602•252•8400

Daniel G. Dowd (012115)
Email: ddowd@CDQLaw.com
Cindy C. Albracht-Crogan (020336)
Email: ccrogan@CDQLaw.com
Stacey F. Gottlieb (015084)
Email: sgottlieb@CDQLaw.com
Kevin C. Moyer (032037)
Email: kcmoyer@CDQLaw.com
Attorneys for Plaintiff The State of the Netherlands

## ARIZONA SUPERIOR COURT

## COUNTY OF MARICOPA

| | |
|---|---|
| THE STATE OF THE NETHERLANDS (Ministry of the Interior and Kingdom Relations, National Police Services Agency [Agentschap KLPD], successor judgment creditor: Ministry of Security and Justice, Directorate-General Police), a foreign government,<br><br>Plaintiff,<br><br>vs.<br><br>MD HELICOPTERS, INC., an Arizona Corporation,<br><br>Defendant. | Case No: CV2015-095127<br><br>**FINAL JUDGMENT ON MANDATE**<br><br>(Assigned to the Hon. Stephen M. Hopkins) |

On November 13, 2018, this Court entered final judgment (the "Judgment") in favor of Plaintiff, the State of the Netherlands (the "Netherlands") and against Defendant MD Helicopters, Inc. ("MDHI"), after granting the Netherlands' Motion for Summary Judgment, denying MDHI's Cross-Motion for Summary Judgment, and considering all responses and replies, along with post-oral argument supplemental filings, attachments and arguments, and all other relevant portions of the Court's file, for

1   the reasons set forth in this Court's Minute Entry filed June 21, 2018, which is incorporated into this

2   Judgment on Mandate by reference. The Judgment recognized and domesticated the Netherlands'

3   underlying Dutch judgments.

4       Based on the domesticated judgments, this Court entered Judgment in favor of the Netherlands

5   the amount of $14,724,084.50, which amount included principal damages and accrued interest (less

6   partial payments made toward the judgments) in the amount of $14,651,285.46, and attorneys' fees and

7   costs of $72,799.04, as awarded by the Hague District Court and Hague Court of Appeal, as more fully

8   set out in the Netherlands' July 10, 2018 Statement of 1) Accrued Interest, 2) Post-Judgment Interest

9   Computation, and 3) Currency Conversion and Proposed Judgment Amount (the "First Interest

10   Statement"), incorporated into this Final Judgment on Mandate as if fully set forth herein. The

11   Judgment also recognized and domesticated the Netherlands' continuing right to interest on the

12   domesticated judgments at the Dutch statutory rate, as set forth in the First Interest Statement.

13       This Court further entered Judgement for the Netherlands and against MDHI for the

14   Netherlands' reasonable attorneys' fees incurred in this action in the amount of $350,000.00 plus taxable

15   costs in the amount of $665.70, with interest at the statutory judgment rate 6.25% per year until paid,

16   and awarded the Netherlands post-Judgment collection costs and fees in an amount as may be awarded

17   by this Court following supplemental application by the Netherlands.

18       Thereafter, MDHI appealed from the Judgment and lost. The Court of Appeals, Division 1,

19   issued an opinion upholding the final Judgment in favor of the Netherlands and against MDHI. *See*

20   Opinion in *The State of the Netherlands v. MD Helicopters Inc.*, 1-CA-CV 19-0019, dated March 19,

21   2020, published at 248 Ariz. 533 (App. 2020). The Court of Appeals also awarded the Netherlands its

22   reasonable attorneys' fees and costs on appeal in the amount of $82,854.70. *See* Order in *The State of*

23   *the Netherlands v. MD Helicopters Inc.*, 1-CA-CV 19-0019, dated May 4, 2020.

24       MDHI then filed a petition for review of two issues in the Arizona Supreme Court, which

25   granted review on one issue and denied review on the other. The Arizona Supreme Court published an

26   opinion affirming the Court of Appeals and Superior Court rulings in the Netherlands' favor. *See*

27   Opinion in *The State of the Netherlands v. MD Helicopters Inc.*, CV-20-0112-PR, dated December 30,

28   2020, published at 250 Ariz. 235 (2020). The Arizona Supreme Court awarded the Netherlands its

COHEN DOWD QUIGLEY

2

1  additional, reasonable attorneys' fees of $158,772.83 and costs of $202.08 incurred in response to

2  MDHI's petition for review. *See* Order in *The State of the Netherlands v. MD Helicopters Inc.*, CV-20-

3  0112-PR, dated February 24, 2021. Consistent with these orders, on March 2, 2021, the Arizona

4  Supreme Court issued its Mandate to this Court, which incorporates the attorneys' fees and costs the

5  Court of Appeals and the Supreme Court awarded to the Netherlands, an amount totaling **$242,031.69**

6  (collectively, "Award of Fees and Costs on Appeal").

7      The Netherlands has filed a Notice of Proposed Final Judgment on Mandate and Updated Interest

8  Statement to bring the amounts awarded under the Judgment up to date based on the accrual of interest

9  and the Award of Fees and Costs on Appeal.

10     Accordingly, having considered all of the foregoing, and good cause appearing,

11     **IT IS HEREBY ORDERED** affirming and incorporating the November 13, 2018 Judgment in

12  its entirety by reference into this Final Judgment on Mandate, with the following revisions[1]:

13     **IT IS FURTHER ORDERED** updating the award of damages to the Netherlands and against

14  MDHI on the domesticated judgments in the amount of **$15,539,198.35**, which amount includes

15  principal damages and accrued interest as of May 1, 2021, at the Dutch statutory rate (less partial

16  payments made toward the judgments) in the amount of $14,651,285.46, and attorneys' fees and costs of

17  $72,799.04, as awarded by the Hague District Court and Hague Court of Appeal, as more fully

18  delineated in the Netherlands' First Interest Statement and its Notice of Proposed Final Judgment on

19  Mandate and Updated Interest Statement, both incorporated herein by reference;

20     **IT IS FURTHER ORDERED** affirming and domesticating the Netherlands' continuing right to

21  interest on the domesticated judgments at the Dutch variable statutory rate as set forth in the

22  Netherlands' First Interest Statement and its Notice of Proposed Final Judgment on Mandate and

23  Updated Interest Statement;

24     **IT IS FURTHER ORDERED** updating this Court's principal award of attorneys' fees and costs

25  ($350,000.00 and $665.70, respectively) in favor of the Netherlands and against MDHI to include

26  interest in the amount of **$54,461.27** as of May 1, 2021. Thus, as of May 1, 2021, this Court's Judgment

27  for attorneys' fees and costs, plus interest owed by MDHI, is **$405,126.97**, and interest continues to

28  [1] New or updated totals appear in **bold underlined** text.

3

COHEN DOWD QUIGLEY

1  accrue on this amount at a rate of 6.25% per annum until paid;

2      **IT IS FURTHER ORDERED** entering judgment for the Netherlands and against MDHI for the

3  Award of Fees and Costs on Appeal in the principal amount of **$242,031.69**, plus interest accruing at the

4  current statutory judgment rate of **4.25%** per annum from the date of this Final Judgment on Mandate

5  until paid;

6      **IT IS FURTHER ORDERED** that the State of the Netherlands is authorized to record this Final

7  Judgment on Mandate, which shall attach as a lien against real property pursuant to A.R.S. §§ 33-421 &

8  33-961; and

9      **IT IS FURTHER ORDERED** dismissing the Netherlands' breach of contract claims.

10      No further matters remain pending.  This is a final judgment as to all claims and parties entered

11  pursuant to Ariz. R. Civ. P. 54(c).

13      DATED this 2nd day of August, 2021.

16  _____
    The Honorable Stephen M. Hopkins
17  Maricopa County Superior Court Judge

COHEN DOWD QUIGLEY

4

# eSignature Page 1 of 1

Filing ID: 13194467   Case Number: CV2015-095127
Original Filing ID: 12973081

**Grant with New Order**



/S/ Steve Hopkins Date: 7/31/2021
Judicial Officer of Superior Court

## ENDORSEMENT PAGE

CASE NUMBER: CV2015-095127                    SIGNATURE DATE: 7/31/2021

E-FILING ID #: 13194467                       FILED DATE: 8/3/2021 8:00:00 AM


DANIEL G DOWD


KARL M TILLEMAN

The foregoing instrument is a full, true and correct copy
of the original on file in this office.

Attest___AUG 0 4 2021___20_____

JEFF FINE, Clerk of the Superior Court of the
State of Arizona, in and for the County of Maricopa.

By_____, Deputy Clerk

**Exhibit D**





East McDowell Road

8' Fence

To Boeing Company

| | | |
|---|---|---|
| 132 | MD Helicopters Conventional Hangar | 1394.19' |
| 133 | MD Helicopters Conventional Hangar | 1422.4' |
| 134 | MD Helicopters Delivery Center | 1408.74' |
| 135 | MD Helicopters Building | 1386.93' |
| 136 | MD Helicopters Administration Building | 1391.39' |
| 137 | MD Helicopters Paint Shop | 1409.24' |
| 138 | MD Helicopters Warehouse | 1413.64' |



**Exhibit E**

TICOR TITLE INSURANCE COMPANY

WHEN RECORDED RETURN TO:
William G. Ridenour
Ridenour, Swenson, Cleere & Evans
2350 Valley Bank Center
201 North Central Avenue
Phoenix, Arizona  85073

**83 114683**



LEASE (LB)

RECORDED IN OFFICIAL RECORDS
OF MARICOPA COUNTY, ARIZONA
MAR 3 0 1983 -315
BILL HENRY, COUNTY RECORDER
FEE 29ᵖᵖ PGS 29

COMMERCIAL LEASE

HUGHES HELICOPTERS, INC.

AND

CITY OF MESA

FALCON FIELD

CONFIDENTIAL DISCOVERY

## 83 114683

COMMERCIAL LEASE

HUGHES HELICOPTERS, INC.

THIS LEASE, made this 28 day of MARCH , 1983,
by and between the CITY OF MESA, a municipal corporation, and
HUGHES HELICOPTERS, INC., a Delaware corporation, hereinafter
respectively referred to as LESSOR and LESSEE, without regard
to number or gender.

W I T N E S S E T H:

THAT WHEREAS, Lessor owns certain real property known
as "FALCON FIELD", and

WHEREAS, the Lessor is willing to lease to the Lessee,
and the Lessee desires to take and lease from the Lessor a
certain portion of real property of the airport for the pur-
poses hereinafter set forth, subject to all of the terms and
conditions of that certain Instrument of Transfer between the
United States of America and the Reconstruction Finance Cor-
poration and the Lessor herein, which instrument is recorded
in Docket 270, at Pages 90 through 101, and filed in the
office of the County Recorder of Maricopa County, Arizona, and
as amended by Instrument of Release recorded in Docket 5984 at
Pages 126 and 127, records of the Recorder of Maricopa County,
Arizona, which releases paragraph 4 of said original Instru-
ment of Transfer.

-2-

CONFIDENTIAL DISCOVERY

MDHI_0005038

83 114683

NOW, THEREFORE, in consideration of the mutual pro-
mises and conditions of the parties herein contained, it is
agreed as follows:

1. DEMISED PREMISES

The premises leased to Lessee are hereinafter referred
to as the Demised Premises and are described on Exhibit A, at-
tached hereto and made a part hereof, and further described by
the attached legal description.  The approximate location of
the Demised Premises is also outlined in red on the plat of
Falcon Field, marked Exhibit B, which is also attached hereto
and made a part hereof.

2. TERM; OPTIONS Unofficial Document ID

That the term of the Lease shall be for thirty (30)
years, commencing on the _28_ day of _MARCH_ , 1983, and
ending on the _28_ day of _MARCH_ , 2013.  The Lessee shall
have the option to extend the Lease for one (1) additional ten
(10) year term and two (2) additional five (5) year terms fol-
lowing the initial thirty (30) year term by giving Lessor six
(6) months written notice of its intent to so extend.  Should
Lessee not elect to exercise the option to extend the Lease at
the end of the initial term, or any extension thereof, the
Lease shall be terminated.

3. USES OF THE DEMISED PREMISES

Lessee shall have the right to use the Demised Premi-
ses for any lawful purpose directly related to its manufactur-

-3-

CONFIDENTIAL DISCOVERY                                             MDHI_0005039

83 114683

ing operations including, but not limited to:

      1.  Fixed and rotary wing factory acceptance and training flights.

      2.  Operation of a company owned airline type service operation.

      3.  Factory acceptance facilities in conjunction with the manufacture of the Lessee's products.

4.  Installation of refueling facilities provided they meet the city code and that the Lessee executes a separate Fuel Agreement with Lessor.

Use of the Demised Premises by Lessee in violation of any use authorized by this Section shall be an Event of Default.

    4.  **RENTAL**

As the rental for the Demised Premises, the Lessee agrees to pay to the Lessor the sum of $2,000.00 per year per acre for the first five (5) years, $3,000.00 per year per acre for the second five (5) years, $4,000.00 per year per acre for the next ten (10) years, and thereafter the rental rate will be established at ten percent (10%) of the market value per acre per year. The market value will be established by the Real Estate Division of the City of Mesa and in the event the Lessee does not agree with the City's market value, a market value will be negotiated between the two parties. In the event that the two parties cannot agree on a market value, each party will name an appraiser, and the two appraisers will name a third appraiser, and the market value established by

-4-

CONFIDENTIAL DISCOVERY

MDHI_0005040

83 114683

the three appraisers will be binding. The cost of the apprai-
sers will be borne equally by the Lessee and Lessor.  Such
rental will be payable annually, in advance, on or before the
1st day of APRIL of each year beginning on _____
APRIL    1    , 1983.  Failure by Lessee to pay rents
when such rents become due, and all costs payable by Lessee to
Lessor under this Lease, shall be an event of Default.

    5.  OPTION TO PURCHASE

        Lessee is granted an option to purchase the Demised
Premises for a purchase price of $35,000.00 per acre payable
in cash upon passage of title, subject to any limitations on
the Lessee's right to sell as contained in the Instrument of
Transfer referred to herein.  The option granted herein shall
expire at the end of the tenth year of this Lease agreement.
Lessee shall exercise its option by giving Lessor twelve (12)
months prior written notice of its election to exercise the
option.  In the event the option is exercised, Lessee agrees
to use its best efforts to obtain any and all required con-
sents and/or releases from any applicable government
agencies.

    6.  TAXES AND FEES

        Lessee also agrees to pay to Lessor with and in addi-
tion to the annual rental payments all privilege license
taxes, sales taxes, and other governmental impositions imposed
by any governmental body on the rentals received by the Lessor
from Lessee during the term hereof.

-5-

CONFIDENTIAL DISCOVERY                                                    MDHI_0005041

83 114683

The Lessee agrees to pay all taxes of every nature levied or assessed on the Demised Premises during the term hereof and all personal property of the Lessee's placed upon the Demised Premises, unless being contested in good faith.

### 7. IMPROVEMENTS

Improvements other than those shown on the development plan attached hereto and made a part hereof as Exhibit C, shall be subject to the approval of Lessor, which approval shall not be unreasonably withheld.

Lessee agrees to comply with the notification and review requirements covered in Part 77 of the Federal Aviation Regulations prior to the construction of any improvements, and prior to construction upon the Demised Premises, or in the event of any planned modification or alteration of any present or future building or structures situated on the Demised Premises.

Lessee shall conduct its construction operations so that such operations will in no way interfere with the normal operation and use of Falcon Field by Lessor and other persons and organizations entitled to use the same.

The Lessee agrees that all construction on the premises shall comply with the Zoning, Building, Plumbing, Electrical, and Mechanical codes of the City of Mesa and further agrees to secure all necessary permits in connection therewith and to pay the required fees therefor. In addition thereto,

-6-

CONFIDENTIAL DISCOVERY

MDHI_0005042

S3 114683

the Lessee agrees to install and pay for, at its sole expense,
all necessary paving improvements on the Demised Premises nec-
essary to provide for a dust free wearing surface in all traf-
fic areas and after installation of all such improvements to
maintain same in good condition at its sole expense.

Upon termination of this Lease, all building, struc-
tures, and other improvements placed on the Demised Premises
by the Lessee shall become the property of the Lessor, subject
to Section 26 hereof.  Violation by Lessee of the covenants
contained in this Section shall be an Event of Default.

8.  MECHANIC'S LIENS

Lessee agrees to keep the Demised premises free of any
mechanic's or materialman's liens or other liens of any kind
or nature for work done, labor performed, or material fur-
nished thereon at the instance or occasion of Lessee, and Les-
see further agrees to indemnify and save harmless Lessor from
and against any and all claims, liens, demands, costs, and ex-
penses of whatsoever nature for any such work done, labor per-
formed, or materials furnished.  Failure by Lessee to keep the
Demised Premises free from such liens as defined in this para-
graph shall constitute an Event of Default.

9.  STORAGE OF EQUIPMENT AND MATERIAL

Lessee agrees that the Demised Premises shall not be
used for outside storage of equipment or material.  This pro-
vision does not apply to or preclude the Lessee from parking

-7-

CONFIDENTIAL DISCOVERY                                              MDHI_0005043

83  114683

flyable aircraft and related ground service equipment on the
Demised premises, but does preclude the outside parking of
aircraft being held for salvage purposes.  Violation by Lessee
of the covenants contained in this Section shall be an Event
of Noncompliance.

   10.  PUBLIC LIABILITY INSURANCE

      As a condition precedent to the effectiveness of this
Lease, Lessee shall place and maintain in full force and ef-
fect during the term of this Lease, a policy or policies of
public liability and property damage insurance with a company
or companies acceptable to Lessor with minimum coverage of
$500,000.00 for death or bodily injury or loss sustained by
any one person in any one occurrence, $1,000,000.00 for death
or bodily injury or loss sustained by more than one person in
any one occurrence, and $250,000.00 for loss by damage or in-
jury to property in any one occurrence.  Lessee shall cause to
be attached to said policy of insurance an endorsement recit-
ing Clause 11 of this Lease.  The policy shall also either
contain a provision providing for a broad form of contractual
liability including leases, or there shall be attached thereto
an endorsement providing for such coverage.  The policy shall
further provide that the same shall not be cancelled until a
ten (10) day written notice of cancellation has been served
upon the Airport Director of Lessor.  Lessee shall deliver
said policy or policies of insurance or a certificate eviden-

-8-

CONFIDENTIAL DISCOVERY

MDHI_0005044

<sup>83</sup> 11·1683

cing the above coverages to the Airport Director of Lessor for approval as to sufficiency.  Lessor's Airport Director's failure to disapprove said policy within fifteen (15) days of its submission, shall constitute an approval of the policy or policies submitted.  Lessor shall be named as additional insured on all policies required by this clause.

The placing of such insurance cannot be construed to be a limitation upon Lessee's liability or as a full performance on its part of the indemnification provisions of this Lease; Lessee's obligation being, notwithstanding said policy of insurance, for the full and total amount of any damage, injury, or loss caused by the negligence or neglect of Lessee connected with the operation under this Lease.

In the event Lessee fails to provide such insurance as required by this Section, Lessor may provide such policies of insurance and add the costs thereof to the rent, and such costs shall be payable by the Lessee when the next rent payment is due.

11.  HANGAR-KEEPER'S LIABILITY INSURANCE

In the event the Lessee intends to park aircraft on the Demised Premises, the Lessee shall maintain in full force for the term of this Lease a policy or policies of standard and in-flight hangar-keeper liability insurance from a company or companies acceptable to Lessor.

Said standard policy or policies shall have a minimum

-9-

CONFIDENTIAL DISCOVERY
MDHI_0005045

83  114683

coverage of $100,000.00 for any one aircraft and $200,000.00
for loss in any one occurrence.

The in-flight hangar-keeper policy or policies shall
have a minimum coverage of $100,000.00 for any one aircraft,
or in any one occurrence.

Lessee shall deliver said policy or policies of insur-
ance, or certificates evidencing the above coverages to the
Airport Director for approval as to sufficiency.  Lessor's
Airport Director's failure to disapprove said policy or poli-
cies within fifteen (15) days of submission, shall constitute
an approval of the policy or policies submitted.

In the event Lessee fails to provide such insurance as
required by this Section, Lessor may provide such policies of
insurance and add the costs thereof to the rent, and such
costs shall be payable by the Lessee when the next rent pay-
ment is due.

12.  HOLD HARMLESS

Lessee shall indemnify and save harmless Lessor, its
officers, agents and employees, from and against any and all
claims, demands, loss or liability of any kind or nature which
Lessor, its officers, agents, and employees may sustain or in-
cur, or which may be imposed upon them or any of them for in-
jury to, or death of, persons; or damage to property arising
out of or in any manner connected with the negligence or lack
of care of Lessee, its officers, agents or employees in their

-10-

CONFIDENTIAL DISCOVERY                                           MDHI_0005046

83 114683

use of the Demised Premises, including the use of Falcon Field
and its facilities.

13. **MAINTENANCE**

Lessee agrees to repair and maintain all improvements
constructed on the Demised Premises in good order and repair
and to keep the Demised Premises in a neat, clean and orderly
condition.  This includes, but is not limited to, the preven-
tion of the accumulation of any refuse or waste materials
which might be or constitute a fire hazard or a public or pri-
vate nuisance.  Failure of Lessee to maintain the Demised Pre-
mises in accordance with this Section shall constitute an
Event of Noncompliance.

14. **INSPECTION**

Lessor's Airport Director, or his authorized represen-
tative, shall have the right at all reasonable times to in-
spect the Demised Premises to determine if the provisions of
this Lease are being complied with.

15. **NON-EXCLUSIVE RIGHT**

Nothing herein contained shall be construed to grant
or authorize the granting of an exclusive right within the
meaning of Section 1349, Title 49, of the United States Code.

16. **DEVELOPMENT OF LANDING AREA.**

Subject to Lessee's right to quiet possession, as pro-
vided for herein, Lessor reserves the right to further develop
or improve the landing area of the Airport as it sees fit re-

-11-

CONFIDENTIAL DISCOVERY                                                                MDHI_0005047

83 114683

gardless of the desires or views of Lessee and without inter-
ference or hindrance.

17.  USE OF PUBLIC AIRPORT FACILITIES

Lessee is granted the non-exclusive use of all public
airport facilities including, but not limited to, taxiways,
runways, aprons, navigational aids and facilities relating
thereto for purposes of landings, take-offs and taxiing of
Lessee and Lessee's customers or visitors.  All such use shall
be in accordance with the laws of the United States of Amer-
ica, the State of Arizona, and the rules and regulations pro-
mulgated by their authority with reference to aviation and air
navigation, and in accordance with all reasonable and appli-
cable rules, regulations, and ordinances of Lessor now in
force or hereafter prescribed or promulgated by ordinance or
by law.

Lessor agrees, during the term of this Lease, to oper-
ate and maintain the airport and its public airport facilities
as a public airport consistent with, and pursuant to, the
Sponsor's Assurances given by Lessor to the United States Gov-
ernment under the Federal Airport Act.

Nothing contained herein shall be construed to prevent
the City of Mesa from closing the landing area of the airport
on special occasions from time to time at the discretion of
the Lessor.

18.  LEASE SUBORDINATE TO AGREEMENTS WITH U.S.A.

This lease shall be subordinate to the provisions and

-12-

CONFIDENTIAL DISCOVERY                                          MDHI_0005048

83 114683

requirements of any existing or future agreement between
Lessor and the United States of America, subject to Lessee's
right to quiet possession, required for the development, oper-
ation, or maintenance of the airport.

19. NON-DISCRIMINATION

Lessee agrees that it will not violate the provisions
of any applicable anti-discrimination laws whether promulgated
under the laws of the United States, the State of Arizona, the
County of Maricopa, and the City of Mesa, and any ordinance,
rules or regulations promulgated thereunder.

20. UTILITIES

Lessee agrees that it will at all times during the
term of this Lease pay for all utilities of every nature used
by it on the premises before the charges therefor become de-
linquent. Lessee's failure to pay such charges shall be an
Event of Noncompliance.

21. ASSIGNMENT-SUBLETTING

This Lease may not be assigned or sublet without the
prior written consent of Lessor.

22. GRANT OF EASEMENTS

Certain facilities of the Lessee are located on the
parcel of property containing approximately thirty-three (33)
acres and described on the document marked Exhibit D, attached
hereto and made a part hereof. Title to this parcel of prop-
erty will be in Terramics/Mesa Limited Partnership, an Arizona

-13-

CONFIDENTIAL DISCOVERY                                    MDHI_0005049

83 114653

limited partnership, with a lease to the Lessee herein.  Per-
manent financing for improvements constructed thereon will be
obtained through Mellon Mortgage, Inc.-West, a corporation,
and assigned to the Arizona State Retirement System.  As a
condition to providing the permanent financing, the lending
institutions require an easement across the Demised Premises
appurtenant to the parcel described on Exhibit D only and sub-
ject to the limitations on the use of the Demised Premises as
contained in this Lease agreement and to reasonable rules and
regulations of the Airport Director of general application re-
lating to the use of the airport.  Nothwithstanding the provi-
sions of Section 21 of this Lease agreement relating to
assignment and subletting, the Lessor consents to the grant of
an easement as set forth above but the term of any such ease-
ment shall expire at the end of the thirty (30) year initial
term of this Lease.  Lessor further agrees that any easement
so granted shall survive any termination of this Lease agree-
ment by reason of default occuring prior to the end of the
initial term hereof.

    23.  **BILLBOARDS AND SIGNS**

       Lessee agrees not to construct or maintain upon the
outside of any improvements on Demised Premises any billboards
or advertising signs except those approved in writing by the
Airport Director of Lessor.  Construction of any billboards or
signs in violation of this Section shall be an Event of
Noncompliance.

-14-

CONFIDENTIAL DISCOVERY                                                      MDHI_0005050

83 114683

24. **ABANDONMENT**

If Lessee shall abandon or be dispossessed by process
of law or otherwise, any personal property belonging to Lessee
and left on the Demised Premises, ninety (90) days after such
abandonment or dispossession shall be deemed to have been
transferred to Lessor; and Lessor shall have the right to re-
move and to dispose of the same without liability to account
therefor to Lessee or to any person claiming under Lessee.

25. **TERMINATION BY LESSEE**

If it should occur that during the term of this Lease
any law or ordinance of general application relating to the
use of the airport should come into effect, the terms of which
so restricts the use of which the leasehold premises can be
put, that the Lessee is unable to use the Demised Premises in
the manner contemplated herein, then Lessee may, upon first
obtaining written consent from the holder of any encumbrance
upon the Demised Premises, upon thirty (30) days written
notice to Lessor, terminate this Lease.  In the event of ter-
mination by Lessee under this clause, Lessee, in addition to
the right of termination, shall have all rights and relief as
provided by law.

26. **TERMINATION BY LESSOR**

Should the Federal Government or any of its agencies
assume control of the airport or any portion thereof in a man-
ner that would preclude Lessee from operating under the terms

-15-

CONFIDENTIAL DISCOVERY                                                    MDHI_0005051

83 11.4683

of this Lease, Lessor will, upon written request from Lessee, as Lessee may elect, cancel this Lease or extend the term of this Lease for the period of time Lessee's operation is so precluded and no rent shall accrue during said period.

If this Lease is cancelled under the provisions of this Section, Lessor will be obligated to pay to Lessee the then fair market value, taking into consideration the remaining lease term and the original cost of improvements less depreciation at the rate of four percent (4%) per year from the date of completion, of all Lessee owned improvements located on the Demised Premises, and at such time all such improvements shall become the property of Lessor. In the event the Lessor should terminate this Lease under the provisions of this clause, Lessee shall have the right to lease a site similar in size to the Demised Premises and contiguous to Lessee's manufacturing facility with direct airport access on the same terms and conditions as contained in this Lease.

This right shall be effective if Lessee has faithfully performed (or cured all non-performance in a timely manner) the terms and conditions of this Lease, and if land is available on Falcon Field for the development.

27.   RESERVATIONS TO LESSOR

The Demised Premises are accepted by Lessee subject to any and all existing easements or other encumbrances of record or disclosed by Lessor prior to execution of this Lease; and

-16-

CONFIDENTIAL DISCOVERY                                                        MDHI_0005052

83 114683

Lessor shall have the right to install, lay, construct, main-
tain, repair and operate such sanitary sewers, drains, storm
water sewers, pipelines, manholes, connections; water, oil and
gas pipelines; and telephone and telegraph power lines and
such other appliances and appurtenances necessary or conven-
ient to use in connection therewith, over, in, upon, through,
across and along the Demised Premises or any part thereof, as
will not interfere with Lessee's operations hereunder and to
enter thereupon for any and all such purposes. Lessor also
reserves the right to grant franchises, easements, rights of
way and permits in, over, upon, along or across any and all
portions of the Demised Preᵤₙₒffᵢcᵢₐₗ Dₒcᵤₘₑₙₜ s Lessor may elect so to do,
provided, however, that no right of the Lessor provided for in
this paragraph shall be so executed as to interfere unreason-
ably with Lessee's rights hereunder, or impair the security of
any secured creditor of Lessee.

Lessor and Lessee agree that any rights set forth by
this clause shall not be exercised unless a prior written
notice of sixty (60) days is given to the other party. How-
ever, if such right must be exercised by reason of emergency,
then each party will give the other such notice in writing as
is reasonable under the existing circumstances.

Lessor agrees that it will cause the surface of the
Demised Premises to be restored to its original condition upon
the completion of any construction. Lessor further agrees

-17-

CONFIDENTIAL DISCOVERY                    MDHI_0005053

83 114683

that, should the granting of these rights temporarily inter-
fere with the use of any or all of the Demised Premises by the
Lessee, the rental shall be reduced in a proportion to the
amount said interference bears to the total use of the Demised
Premises.

There is hereby reserved to the Lessor, its successors
and assigns, for the use and benefit of the public, a right of
flight for the passage of aircraft in the airspace above the
surface of the premises herein leased.  This public right of
flight shall include the right to cause in said airspace any
noise inherent in the operation of any aircraft used for navi-
gation or flight through the said airspace or landing at, tak-
ing off from, or operation on the Falcon Field Airport.

The Lessee, by accepting this Lease, expressly agrees
for itself, its successors and assigns that it will not erect
nor permit the erection of any structure or object nor permit
the growth of any tree on the land leased hereunder above a
ground level elevation of thirty-five (35) feet.  In the event
the aforesaid covenants are breached, the owner reserves the
right to enter upon the land leased hereunder and to remove
the offending structure or object and cut the offending tree,
all of which shall be at the expense of the Lessee.

The Lessee, by accepting this Lease, agrees for it-
self, its successors and assigns that it will not make use of
the Demised Premises in any manner which might interfere with

-18-

CONFIDENTIAL DISCOVERY                                                           MDHI_0005054

83 114683

the landing and taking off of aircraft from Falcon Field Air-
port or otherwise constitute a hazard. In the event the
aforesaid covenant is breached, the Lessor reserves the right
to enter upon the Demised Premises hereby leased and cause the
abatement of such interference at the expense of the Lessee.

28. **WARRANTIES OF TITLE AND QUIET ENJOYMENT**

Lessor covenants that Lessor is seized of the real
property in fee simple subject only to such restrictions as
evidenced by this Lease, and has full right to make this Lease
and that Lessee shall have quiet and peaceable possession of
the Demised Premises during the term hereof subject to the
terms and conditions of this Lease.

29. **EVENTS OF NONCOMPLIANCE**

In the event of a breach of Lease covenant which gives
rise to a declaration of an Event of Noncompliance, as herein-
before defined, Lessor shall give to Lessee written notice of
such Event of Noncompliance.

Lessee shall have sixty (60) days from the mailing
date of the notice of Event of Noncompliance to cure, or com-
mence curing, the conditions giving rise to the declaration of
an Event of Noncompliance, and if not cured within such sixty
(60) day period, to continue necessary action to cure the
breach of the Lease with reasonable diligence and complete
necessary action within a reasonable time.

If, after the cure period provided for in this Sec-

-19-

CONFIDENTIAL DISCOVERY                                                                       MDHI_0005055

83 114683

tion, Lessee has not cured or commenced curing the conditions
giving rise to a declaration of an Event of Noncompliance, and
in the event the conditions giving rise to a declaration of an
Event of Noncompliance are not cured within the sixty (60) day
period, if Lessee does not use reasonable diligence to com-
plete curing such conditions within a reasonable time, then
Lessor may enter upon the Demised Premises and cure or cause
to have cured such violating conditions as gave rise to the
declaration of the Event of Noncompliance.   All costs incurred
by the Lessor in curing such conditions shall be payable by
Lessee when the next rental payment shall become due under
this Lease.

30.   **EVENTS OF DEFAULT**
<small>Unofficial Document</small>

In the event of a breach of Lease covenant which gives
rise to a declaration of an Event of Default, as hereinbefore
defined, Lessor shall give to Lessee written notice of such
Event of Default.

Lessee shall have sixty (60) days from the mailing
date of the notice of Event of Default to cure, or commence
curing, the conditions giving rise to the declaration of an
Event of Default, and if not cured within such sixty (60) day
period, to continue necessary action to cure the breach of the
Lease with reasonable diligence and complete necessary action
within a reasonable time.

If, after the cure period provided for in this Sec-

-20-

CONFIDENTIAL DISCOVERY

MDHI_0005056

S3  114683

tion, Lessee has not cured or commenced curing the conditions
giving rise to a declaration of an Event of Default, and in
the event the conditions giving rise to a declaration of an
Event of Default are not cured within the sixty (60) day
period, if Lessee does not use reasonable diligence to com-
plete curing such conditions within a reasonable time, then
Lessor may, at its option, terminate and cancel this Lease.

31.  **PARTIAL INVALIDITY**

If any term, covenant, condition or provision of this
Lease is held by a court of competent jurisdiction to be in-
valid, void or unenforceable, the remainder of the provisions
hereof shall remain in full force and effect and shall in no
way be affected, impaired or invalidated thereby.

32.  **MARGINAL CAPTIONS**

The various headings and numbers herein and the group-
ing of the provisions of this Lease into separate sections and
paragraphs are for the purpose of convenience only, and shall
not be considered a part hereof.

33.  **WAIVER**

The failure of Lessee or Lessor to insist upon strict
performance of any of the terms, conditions, or covenants
herein shall not be deemed a waiver of any rights or remedies
that either may have, and shall not be deemed a waiver of any
subsequent breach or default of the terms, conditions, or
covenants herein contained.

-21-

CONFIDENTIAL DISCOVERY    MDHI_0005057

19830114683.29

83 114683

34. **APPROACH PROTECTION**

The Lessor reserves the right to take action is considers necessary to protect the aerial approaches of the airport against obstruction, together with the right to prevent Lessee from erecting or permitting to be erected, any building or other structure on the airport which, in the opinion of the Lessor, would constitute a hazard to aircraft.

35. **NATIONAL EMERGENCY**

This Lease and all the provisions hereof shall be subject to whatever right the United States Government now has or in the future may have or acquire, affecting the control, operation, regulation and taking over of said airport or the exclusive or nonexclusive use of the airport by the United States during the time of war or national emergency.

36. **PARTIES LIABLE**

The covenants and conditions herein contained shall apply to and bind the heirs, administrators, executors, successors and assigns of the parties thereto.

37. **HOLDING OVER**

In the event Lessee shall hold possession of the Demised Premises after the term herein created, then such holdings shall be a tenancy from month to month only and governed by the same conditions and covenants as contained in this Lease.

38. **NOTICES**

All notices given, or to be given, by either party to

-22-

CONFIDENTIAL DISCOVERY

MDHI_0005058

83  114683 ·

the other, shall be given in writing and shall be addressed to the parties at the addresses hereinafter set forth or at such other address as the parties may by written notice hereafter designate.   Notices and payments to Lessor, and notices to Lessee shall be addressed as follows:

To: **LESSOR**                    **LESSEE**

    Airport Director            Hughes Helicopters, Inc.
    Falcon Field Airport       Attn:  Executive Vice President
    4800 Falcon Drive          and Chief Financial Officer
    Mesa, AZ 85205             Culver City, CA 90230

    39.  **AMENDMENTS TO BE IN WRITING**

This Lease sets forth all of the agreements and understandings of the parties and is not subject to modification except in writing.         <span style="font-size:smaller">Unofficial Document</span>

    40.  **SUCCESSORS IN INTEREST**

The covenants herein contained shall, subject to the provisions as to assignment, apply to and bind the heirs, successors, executors, administrators and assigns of all the parties hereto; and all of the parties hereto shall be jointly and severally liable hereunder.

    41.  **FORCE MAJEURE**

If either party hereto shall be delayed or prevented from the performance of any act required hereunder by reason of acts of God, strikes, lockouts, labor troubles, inability to procure materials, restrictive governmental laws or regulations or other cause, without fault and beyond the control of

-23-

CONFIDENTIAL DISCOVERY                                           MDHI_0005059

83 114683

the party obligated (financial inability excepted), perfor-
mance of such act will be excused for the period of the de-
lay; and the period for the performance of any such act shall
be extended for a period equivalent to the period of such
delay; provided, however, nothing in this Section shall excuse
Lessee from the prompt payment of any rental or other charges
required of Lessee hereunder except as may be expressly pro-
vided elsewhere in this Lease.

    42.   **TIME**

       Time is of the essence of this Lease.

Unofficial Document

CITY OF MESA, a municipal corporation

By_____
         **"LESSOR"**

ATTEST:

City Clerk

HUGHES HELICOPTERS, INC.

By_____

Title_____
        **"LESSEE"**

RECOMMEND FOR APPROVAL:

_____
Airport Director

-24-

CONFIDENTIAL DISCOVERY
MDHI_0005060

S3 114683

STATE OF ARIZONA     )
                     ) ss.
County of Maricopa   )

The foregoing Lease Agreement was acknowledged to be-
fore me this 17th day of __March__, 1983, by C.K. LUSTER and
GRACE COKELEY                    Acting
~~NORTHEXBANK~~, the City Manager and/City Clerk, respectively, of
the CITY OF MESA, a municipal corporation, they being there-
unto duly authorized.

_____
Notary Public

My commission expires:

_____

STATE OF ARIZONA     )     Unofficial Document
                     ) ss.
County of Maricopa   )

The foregoing Lease Agreement was acknowledged to be-
fore me this 18th day of _March_, 1983, by William H.
Murphy _____ ~~and~~ _____,
as Exec V.P. & CFO _____ ~~and~~ _____,
respectively, of Hughes Helicopters, Inc. _____,
they being thereunto duly authorized.

_____
Notary Public

My commission expires:
My Commission Expires Sept. 8, 1984
_____

-25-

S3 114683

Legal Description, Lot 7, Northwest Aviation Area

That portion of Section 3, Township 1 North, Range 6 East,
of the Gila and Salt River Base and Meridian, Maricopa
County, Arizona, more fully described as follows:

Commencing at the Northwest corner of said Section 3,
thence N.89°38'45"E., along the North line of said Section
3, a distance of 2099.71 feet; thence S.00°21'15"E., a
distance of 60 feet to the True Point of Beginning; thence
N.89°38'45"E., parallel to and 60 feet South of the North
line of said Section 3, a distance of 1196.54 feet; thence
S.50°45'08"W., a distance of 1045.03 feet; thence
N.39°14'52"W., a distance of 629.39 feet; thence
N.00°21'15"W., a distance of 154.29 feet; thence through a
curve to the right, with a central angle of 90°00'00", a
radius of 12 feet, and a tangent of 12 feet, a distance of
18.85 feet to the True Point of Beginning.

Reserving unto the Lessor, its successors and assigns, an
easement for public utilities over the North 15 feet and
the West 8 feet of the above described property.

Also known as Lot 7 of the NORTHWEST AVIATION AREA.

Exhibit A

CONFIDENTIAL DISCOVERY                                                          MDHI_0005062

19830114683 29



93 114683

EXHIBIT "B"

FINAL PLAT

NORTHWEST
FALCON FIELD

NORTHWEST AVIATION
A PORTION OF THE NORTHWEST CORNER
OF SECTION 3, T.1N, R.6E, G.& S.R.B. & M.
MARICOPA COUNTY, ARIZONA

CONFIDENTIAL DISCOVERY

MDHI_0005063

19830114683 29

83 114683



Hughes Helicopters, Inc.

EXHIBIT 'C'

PHASE 1C

SITE PLAN

SCHEMATIC

1

CONFIDENTIAL DISCOVERY

MDHI_0005064

83 114683

That portion of Section 34, Township 2 North, Range 6 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona, described as follows:

COMMENCING at the Northeast corner of the Southeast quarter of said Section 34; thence South 89 degrees 39 minutes 10 seconds West, along the North line of said Southeast quarter, a distance of 55.00 feet to the TRUE POINT OF BEGINNING; thence South 00 degrees 03 minutes 18 seconds West, parallel to and 55.00 feet West of the East line of said Section 34, a distance of 1,137.55 feet; thence South 89 degrees 38 minutes 15 seconds West, a distance of 319.20' feet; thence North 45 degrees 21 minutes 45 seconds West, a distance of 166.77 feet; thence South 89 degrees 39 minutes 43 seconds West, a distance of 581.38 feet; thence North 00 degrees 21 minutes 15 seconds West, a distance of 125.00 feet; thence South 89 degrees 38 minutes 15 seconds West, a distance of 203.00 feet; thence North 00 degrees 21 minutes 45 seconds West, a distance of 360.26 feet; thence North 89 degrees 38 minutes 15 seconds East, a distance of 251.18 feet; thence North 00 degrees 21 minutes 15 seconds West, a distance of 834.33 feet to a point on the North line of the Southeast quarter of said Section 34; thence North 89 degrees 39 minutes 10 seconds East, along said North line a distance of 978.01 feet to the TRUE POINT OF BEGINNING.

EXHIBIT "D"

CONFIDENTIAL DISCOVERY

MDHI_0005065

**Exhibit F**

**TICOR TITLE INSURANCE COMPANY**

WHEN RECORDED RETURN TO:                    GRC 03/17/83 Judy71
William G. Ridenour
Ridenour, Swenson, Cleere & Evans
201 North Central, Suite 2350                **83 114705**
Pheonix, Arizona  85073

*/11904-u6  ,514 ·*

ASSIGNMENT
OF
COMMERCIAL LEASE

DATE:   **March 28**, 1983

PARTIES:   HUGHES HELICOPTERS, INC., a
           Delaware corporation      ("Assignor")
           Centinela & Teale Streets
           Culver City, California  90230

           MELLON MORTGAGE, INC.-WEST, a
           Colorado corporation      ("Assignee")
           3225 North Central Avenue
           Phoenix, Arizona  85012

---

RECORDED IN OFFICIAL RECORDS
OF MARICOPA COUNTY, ARIZONA

**MAR 30 '83 -3 15**

BILL HENRY, COUNTY RECORDER

FEE  *11⁵²*   PGS  *10*

---

RECITAL:

Assignee has agreed to make the Loan, as
defined in Article 1 (b), but only if, among other
things, it receives an assignment of the Commercial
Lease, as defined in Article 1(a), and Assignee has
agreed to make such an assignment.

NOW, THEREFORE, in consideration of making the
Loan, Assignor and Assignee agree as follows:

AGREEMENTS:

1.   DEFINITIONS.

In this Assignment the following terms shall
have the following meanings:

(a)  "Commercial  Lease"  means  the
Commercial Lease dated **MARCH 28**, 1983 by
and between City of Mesa, as lessor, and
Assignor, as lessee, with respect to the real
property  described  in  Exhibit  "A"  attached
hereto and made a part hereof; which Lease was
recorded at Recorder's Number *83  114683*,
on March *30*, 1983.

(b)  "Loan" means the first mortgage loan
by Assignee to Terramics with respect to the
Project  in  the  amount  of  Thirteen  Million
Dollars ($13,000,000.00).

83 114705

(c) "Note" means the Promissory Note, dated MARCH 28, 1983, in the principal sum of Thirteen Million Dollars ($13,000,000.00) given by Terramics to Assignee with respect to the Loan.

(d) "Project" means the real property located in the City of Mesa, Maricopa County, Arizona, that is described on Exhibit "B" attached hereto and made a part hereof, together with all improvements thereto and all furniture, fixtures and equipment therein and thereon, which are to be operated by Assignor pursuant to the Project Lease for the production, manufacture and testing of aircraft.

(e) "Project Lease" means the Lease dated MARCH 28, 1983 by and between Terramics, as lessor, and Assignor, as lessee, with respect to the Project.

(f) "Terramics" means Terramics/Mesa Limited Partnership, an Arizona limited partnership.

2. ASSIGNMENT.

Assignor hereby assigns, transfers, sets over and conveys to Assignee as security for the obligations referred to in Article 3, all Assignor's right, title and interest, as lessee, under and pursuant to the Commercial Lease, for a period of one hundred twenty (120) days from and after the date hereof.

3. SECURITY.

This Assignment is given as security for the following obligations:

(a) Payment and performance by Assignor of all its obligations under the Project Lease.

(b) Performance of each agreement of Assignor herein contained or contained in any other document or instrument given by Assignor in connection with the Project Lease.

-2-

CONFIDENTIAL DISCOVERY

MDHI_0005028

83 114705

(c)  Payment and performance by Terramics of all its obligations under the Note and all documents given as security for the Note.

4.  PERFORMANCE OF COMMERCIAL LEASE.

Assignor shall observe and perform fully, as and when the same shall be due, all covenants and agreements in the Commercial Lease that are binding upon it.

5.  AMENDMENT, TERMINATION OR CANCELLATION OF COMMERCIAL LEASE.

Assignor shall not amend, terminate or cancel the Commercial Lease without the prior written consent of Assignee, which consent may be withheld in Assignee's sole discretion.

6.  EASEMENTS.

Contemporaneou[Unofficial Document] herewith, Assignor has executed a Grant of Easements whereby Assignee has been granted undefined easements over and across the property described in Exhibit "A" for the purpose of providing access to Falcon Field Airport. These easements shall be for the benefit of and shall be appurtenant to, the real property described in Exhibit "B", as the dominant estate, and these easements shall be released at such time as Assignor grants to Assignee specific easements providing access to Falcon Field Airport, which easements shall be located in a manner, and granted pursuant to documents, which shall be satisfactory to Assignee in its sole discretion, and shall be consistent with paragraph 22 of the Commercial Lease. Upon the grant to Assignee of such specific easements, and provided that no event of default shall have occurred and be continuing under the Project Lease, this Assignment shall be released. Assignor covenants and agrees to submit documents to Assignee, for its approval, with respect to such specific easements, within one hundred twenty (120) days after the date hereof.

7.  PURCHASE OPTION.

If Assignor shall at any time exercise its purchase option under the Commercial Lease, Assignor shall, as a condition precedent to the closing thereof, ratify, confirm and agree to perform all obligations

-3-

CONFIDENTIAL DISCOVERY    MDHI_0005029

83 114705

under Article 7 hereof, by the execution of an agreement, in recordable form, that shall be satisfactory to Assignee in its sole discretion.

8. NO ASSUMPTION.

This Assignment is given as security and Assignee does not assume or agree to perform any obligations under the Commercial Lease by the execution and acceptance hereof.

9. MARSHALLING.

Assignor hereby waives any right or privilege which it or its creditors might otherwise have to require Assignee to proceed against the Commercial Lease or any other security document or instrument securing the Note in any particular order or fashion under any legal or equitable doctrine, or principle of marshalling and/or suretyship and further agrees that upon default and after the expiration of any applicable grace period following notice, Assignee may proceed to exercise any or all remedies with regard to the Commercial Lease in such manner and order as Assignee in its sole discretion may determine.

10. EFFECT OF CLAIM OF GUARANTY.

To the extent that Assignor, by the execution and delivery of this Assignment, may be claimed or be held to have guaranteed Terramics' obligations under the Note and all documents securing the Note, Assignor understands, covenants and agrees as follows:

(a) The guaranty is unconditional and constitutes a guaranty of payment, not a guaranty of collection.

(b) The obligations of Assignor hereunder are independent of the obligations of Terramics to Assignee, and a separate action or actions may be brought and prosecuted against Assignor whether action is brought against Terramics or whether Terramics is joined in any such action or actions, and irrespective of any invalidity, illegality, irregularity, or unenforceability of the obligations of Terramics.

-4-

CONFIDENTIAL DISCOVERY                                                 MDHI_0005030

83 114705

    (c)   Assignor waives any action required, upon notice, by any statute against Terramics.

    (d)   Assignee may do any of the following without affecting or impairing Assignor's obligations hereunder:   (i) renew, compromise, extend, accelerate or otherwises change the time for payment of, or otherwise change the terms of, the Note, including increase or decrease of the rate of interest thereon, (ii) exchange, enforce, waive or release any security for the Note or take additional security, and (iii) apply any security for the Note and direct the order or manner of sale thereof as Assignee may determine in its sole discretion.

    (e)   Assignor waives any right to require Assignee to proceed against Terramics, proceed against or exhaust any security for the Note, or pursue any other remedy in Assignee's power whatsoever.

    (f)   Assignor waives any defense arising by reason of any disability or other defense of Terramics or by reason of the cessation, from any cause whatsoever, of the liability of Terramics.

    (g)   Assignor waives any right of subrogation until the Note has been fully paid and satisfied.

    (h)   Assignor waives any right to enforce any remedy Assignee now has, or may hereafter have, against Terramics, and any benefit of or right to participate in any security for the Note.

    (i)   Assignor waives notice of acceptance hereof and all rights it may have under Arizona law which may be in contravention of this Article 11, including without limitation, those provided by Arizona Revised Statutes, Sections 12-1641, et seq.

-5-

CONFIDENTIAL DISCOVERY                                                                                                          MDHI_0005031

83 114705

11.   NOTICES.

All notices required to be sent hereunder shall be in writing and sent by United States registered or certified mail, return receipt requested, postage prepaid, addressed as set forth above.

12.   SOLE DISCRETION.

Whenever in this Assignment Assignee is to act or make a determination or decision in its "sole discretion", Assignee may consider such factors as it shall deem relevant, it may make its determination or decision subjectively, it shall have no obligation to make any independent investigation, it need not act in a reasonable manner, and it shall not be subject to any implied duties such as (but not limited to) the implied duty to act in "good faith" or "deal fairly". Assignee's determination or decision, when made in its "sole discretion", shall be final. binding and conclusive against Assignor and the City of Mesa.

13.   FURTHER ASSURANCES.

If the manner whereby the assignment provided for herein is ever held to be invalid or unenforceable by a court of competent jurisdiction, Assignor shall, promptly upon demand of Assignee, execute such other and additional documents required by Assignee.

14.   SUCCESSORS AND ASSIGNS.

All agreements, covenants, conditions and provisions of this Assignment shall, apply to and bind the successors and assigns of Assignor and Assignee, including without limitation, the Arizona State Retirement System, a statutory body created by and existing under the laws of the State of Arizona, should it succeed to the rights of Assignee hereunder. Assignor shall not have any right to assign or transfer any of its rights or obligations hereunder.

15.   TIME OF ESSENCE.

Time is of the essence of this Assignment and all its provisions.

-6-

CONFIDENTIAL DISCOVERY                                    MDHI_0005032

1983 0114705 10

83 114705

IN WITNESS WHEREOF, this Assignment has been
executed as of the date first above written.

HUGHES HELICOPTERS, INC.

By _____
William H. Murphy

Its: Executive Vice President

[Assignor]


MELLON MORTGAGE, INC.-WEST,

Unofficial Document

By _____

Its: Manager/Income Loan Division

By _____
Margaret Rust

Its: Asst. Manager/Income Loan
     Division

[Assignee]

-7-

CONFIDENTIAL DISCOVERY                                                    MDHI_0005033

83 114705

State of Arizona

County of Maricopa

The foregoing instrument was acknowledged before me this ____ day of March, 1983, by WILLIAM H. MURPHY, the Executive Vice President of HUGHES HELICOPTERS, INC.

In witness whereof, I hereunto place my hand and official seal.

_____
Notary Public

My commission expires:

My Commission Expires Sept. 8, 1984

Unofficial Document

State of Arizona

County of Maricopa

The foregoing instrument was acknowledged before me this ____ day of March, 1983, by LEE PRIMACK, Manager/Income Loan Division, and MARGARET RUST, Assistant Manager/Income Loan Division, respectively, of MELLON MORTGAGE, INC.-WEST.

In witness whereof, I hereunto place my hand and official seal.

_____
Notary Public

My commission expires:

My Commission Expires Sept. 8, 1984

-8-

CONFIDENTIAL DISCOVERY

MDHI_0005034

83 114705

That portion of Section 3, Township 1 North, Range 6 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona, more fully described as follows:

COMMENCING at the Northwest corner of said Section 3; thence North 89 degrees 38 minutes 45 seconds East, along the North line of said Section 3, a distance of 2099.71 feet; thence South 00 degrees 21 minutes 15 seconds East, a distance of 60 feet t(Unofficial Document) ue Point of Beginning; thence North 89 degrees 38 minutes 45 seconds East, parallel to and 60 feet South of the North line of said Section 3, a distance of 1196.54 feet; thence South 50 degrees 45 minutes 08 seconds West, a distance of 1045.03 feet; thence North 39 degrees 14 minutes 52 seconds West, a distance of 629.39 feet; thence North 00 degrees 21 minutes 15 seconds West, a distance of 154.29 feet; thence through a curve to the right, with a central angle of 90 degrees 00 minutes 00 seconds, a radius of 12 feet, and a tangent of 12 feet, a distance of 18.85 feet to the True Point of Beginning.

# EXHIBIT A

(10 acres)

CONFIDENTIAL DISCOVERY

MDHI_0005035

83 114705

That portion of Section 34, Township 2 North, Range 6 East of the Gila and
Salt River Base and Meridian, Maricopa County, Arizona, described as follows:

COMMENCING at the Northeast corner of the Southeast quarter of said
Section 34; thence South 89 degrees 39 minutes 10 seconds West, along
the North line of said Southeast quarter, a distance of 55.00 feet to
the TRUE POINT OF BEGINNING; thence South 00 degrees 03 minutes 48
seconds West, parallel to and 55.00 feet West of the East line of said
Section 34, a distance of 1437.55 feet; thence South 89 degrees 38
minutes 15 seconds West, a distance of 319.20 feet; thence North 45
degrees 21 minutes 45 seconds West, a distance of 166.77 feet; thence
South 89 degrees 39 minutes 43 seconds West, a distance of 581.38 feet;
thence North 00 degrees 21 minutes 45 seconds West, a distance of 125.00
feet; thence South 89 degrees 38 minutes 15 seconds West, a distance of
200.00 feet; thence North 00 degrees 21 minutes 45 seconds West, a
distance of 360.26 feet; thence North 89 degrees 38 minutes 15 seconds
East, a distance of 251.18 feet; thence North 00 degrees 21 minutes
45 seconds West, a distance of 834.33 feet to a point on the North
line of the Southeast quarter of said Section 34; thence North 89
degrees 39 minutes 10 seconds East, along said North line a distance
of 978.01 feet to the TRUE POINT OF BEGINNING.

Unofficial Document

Policy No. 111904-A-U6 Amended No. 2

# EXHIBIT B

CONFIDENTIAL DISCOVERY

MDHI_0005036

**Exhibit G**

# Unofficial Document

WHEN RECORDED RETURN TO:
Ridenour, Swenson, Cleere & Evans
2350 Valley Bank Center
201 North Central Avenue
Phoenix, Arizona 85073
Attn:  Mr. William G. Ridenour

WGR 01-10-84 JAB116

**84 037217**

## ASSIGNMENT OF BENEFICIAL INTEREST
### UNDER DEED OF TRUST

X DEED OF (AD)

FOR VALUE RECEIVED, the undersigned Beneficiary

hereby assigns and transfers to the ARIZONA STATE RETIREMENT

SYSTEM, a statutory body created and existing under the laws

of the State of Arizona, all beneficial interest under that

certain Deed of Trust and Assignment of Rents identified as

follows:

Dated:     January 26 , 1984.

Trustor:   HUGHES HELICOPTERS, INC., a
           Delaware corporation

           Centinela & Teale Streets
           Culver City, California  90230

Trustee:   TICOR TITLE INSURANCE COMPANY OF CALIFORNIA,
           a California corporation

           3033 North Central Avenue, Suite 100
           Phoenix, Arizona  85012

Recorded in Maricopa County, Arizona, on January 27 ,
1984, at Recorder's Number 84 037215; the beneficial
interest having been assigned to Mellon Financial Services
Corporation #9 by Assignment of Beneficial Interest Under
Deed of Trust Recorded in Maricopa County, Arizona, at
Recorder's Number 84 037216 on January 27 , 1984.

RECORDED IN OFFICIAL RECORDS
OF MARICOPA COUNTY, ARIZONA

**JAN 27 1984 -2 00**

BILL HENRY, COUNTY RECORDER

FEE        PGS 3

BY

84 037217

TOGETHER with any and all notes and contracts described or referred to in said Deed of Trust, all sums, including interest, due or to become due thereunder, and all rights accrued or to accrue thereunder.

IN WITNESS WHEREOF, said Beneficiary has signed this instrument this __26__ day of January, 1984.

MELLON FINANCIAL SERVICES
CORPORATION #9, a Colorado
corporation

By_____
Lee Primack

Its: Manager/Income Loan
     Division, Assistant Vice President

By_____
William A. Killian

Its:   Vice President

Address of Assignee:

The Arizona State Retirement System
c/o The Valley National Bank of Arizona
Trust Real Estate Department
241 North Central Avenue
Phoenix, Arizona  85001

-2-

CONFIDENTIAL DISCOVERY

MDHI_0005095

19840037217_3

84 037217

State of Arizona

County of Maricopa

On this the 25th day of January, 1984, before me the undersigned Notary Public personally appeared LEE PRIMACK, who acknowledged himself to be the Manager/Income Loan Division of MELLON FINANCIAL SERVICES CORPORATION #9, a Colorado corporation, and he as such officer, being authorized to do so, executed the foregoing instrument for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Notary Public

My commission expires:
My Commission Expires Sept. 8, 1984

Unofficial Document

State of Arizona

County of Maricopa

On this the 25th day of January, 1984, before me the undersigned Notary Public personally appeared WILLIAM A. KILLIAN, who acknowledged himself to be the Vice President of MELLON FINANCIAL SERVICES CORPORATION #9, a Colorado corporation, and he as such officer, being authorized to do so, executed the foregoing instrument for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Notary Public

My commission expires:
My Commission Expires Sept. 8, 1984

-3-

CONFIDENTIAL DISCOVERY

MDHI_0005096

**Exhibit H**

# Unofficial Document

TICOR TITLE INSURANCE COMPANY OF CALIFORNIA
WGR 01-12-84 JAB116

WHEN RECORDED RETURN TO:
William G. Ridenour, Esq.
Ridenour, Swenson, Cleere & Evans
2350 Valley Bank Center
201 North Central Avenue
Phoenix, Arizona  85073          RE ASG

## 84 105287

BILL H........., C........ ......
FEE *5 00* PGS *2* M.L.

MAR 1 4 '84-8 00

REASSIGNMENT OF COMMERCIAL LEASE:
TERMINATION OF ASSIGNMENT OF
COMMERCIAL LEASE AND
ASSIGNMENT OF COMMERCIAL LEASE ASSIGNMENT

KNOW ALL MEN BY THESE PRESENTS:

That the Assignment of Commercial Lease dated
March 28, 1983, executed by and between Hughes Helicopters,
Inc., a Delaware corporation, as "Assignor", and Mellon
Mortgage, Inc.-West, a Colorado corporation, as "Assignee",
which Assignment of Commercial Lease was recorded March 30,
1983 at Recorder's No. 83-114705 in the office of the County
Recorder of Maricopa County, Arizona, and that Assignment of
Commercial Lease Assignment dated March 28, 1983, which
assigned all Assignee's right, title and interest to the
Arizona State Retirement System and which Assignment of
Commercial Lease Assignment was recorded March 30, 1983 at
Recorder's No. 83-114706 in the office of the County
Recorder of Maricopa County, Arizona, are hereby terminated
and discharged of public record; that the Commercial Lease
dated March 28, 1983, by and between the City of Mesa and
Hughes Helicopters, Inc., a Delaware corporation, referred
to in the Assignment of Commercial Lease and Assignment of
Commercial Lease Assignment, which Lease was recorded March
30, 1983 at Recorder's No. 83-114683, records of Maricopa

CONFIDENTIAL DISCOVERY

MDHI_0005155

19840105287.2

84 105287

County, Arizona, is hereby reassigned to Hughes Helicopters, Inc., a Delaware corporation.

DATED this 26th day of January, 1984.

> THE ARIZONA STATE RETIREMENT
> SYSTEM by The Valley National
> Bank of Arizona as investment
> manager for and on behalf of
> The Arizona State Retirement
> System

By _____
   Robert L. Dupnik

Its Assistant Vice President

Unofficial Document

State of Arizona

County of Maricopa

The foregoing instrument was acknowledged before me this 26th day of January, 1984, by ROBERT L. DUPNIK, Assistant Vice President of The Valley National Bank of Arizona as investment manager for and on behalf of The Arizona State Retirement System.

IN WITNESS WHEREOF, I hereunto place my hand and official seal.

_____
Notary Public

My commission expires:
My Commission Expires Sept. 8, 1984

-2-



CONFIDENTIAL DISCOVERY

**Exhibit I**

Unofficial
Document

20

COURTESY RECORDING
NO TITLE LIABILITY

19
Es

**WHEN RECORDED RETURN TO:**

David W. Kash
Ryley Carlock & Applewhite
One North Central Avenue
Suite 1200
Phoenix, Arizona 85004-4417

EXEMPT PER
ARS11-1134-A3

## QUIT CLAIM BILL OF SALE

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned, the **CITY OF MESA**, an Arizona municipal corporation ("Grantor") does by these presents bargain, sell and deliver unto **MD HELICOPTERS, INC.**, an Arizona corporation ("**Grantee**"), its successors and assigns without representation or warranty of any kind, all machinery, furniture, equipment, furnishings, moveable walls or partitions, or other personal property used or procured for use directly and solely in connection with the operation, maintenance and protection of the Land and Improvements, and all its current rights to the fixtures and other items of property, now or hereafter attached or affixed to or incorporated into the Improvements, which are located on or in the Improvements or the Land including, without limiting the generality thereof, plumbing, heating, ventilating, lighting and air conditioning systems, boilers, furnaces, heaters, electrical equipment, incineration, air and water pollution control, waste disposal, sprinkler systems, fire and their protection equipment, facilities used to provide any utility services, parking and common area facilities, refrigeration, garbage disposal, and all landscaping, paving and parking areas, together with all repairs, replacements, modifications and alterations thereto (collectively, the "**Personal Property**"), if any, owned by Grantor, subject to the terms and conditions of the Ground Leases identified as follows:

Commercial Lease dated March 28, 1983 between the City of Mesa, as Lessor, and Hughes Helicopters, Inc., as, Lessee, recorded March 30, 1983 in 83-114683 of Official Records of Maricopa County, Arizona, as amended by Amended Commercial Lease dated March 22, 1985 and, further amended by Supplemental Agreement No. 1 dated June 26, 1992 and by Supplemental Agreement No. 2 dated as of June 25, 1996;

Commercial Lease dated as of October 1, 1986 between the City of Mesa, as Lessor, and McDonnell Douglas. Helicopter Company, as Lessee, as amended by Supplemental Agreement No. 1 dated as of June 26; 1992;

Commercial Fixed Base Operator Lease dated June 1, 1983 between the City of Mesa, as Lessor, and Madison Aviation, as Lessee, as amended by Amendment to Lease dated July 7, 1986, a memorandum of which dated August 7, 1986, is recorded in 86-426027 in the Official Records of Maricopa County, Arizona, and as further amended by Supplemental Agreement No. 1,

705307.2

dated as of June 3, 1993 and by Supplemental Agreement No. 2 dated June 1, 1995;

governing Grantees use of the following:

(1)    That certain real property in the City of Mesa, County of Maricopa, State of Arizona, more particularly described on **Exhibit A** attached hereto, together with any and all easements, rights of way, licenses, permits, consents, hereditaments, tenements and appurtenances belonging or pertaining thereto (collectively, the "**Land**"); and,

(2)    Any and all buildings, structures, improvements and fixtures now or at any time hereafter situated on the Land (collectively, the "**Improvements**").

To have and to hold the same unto Grantee, its successors and assigns forever.

Notwithstanding anything to the contrary herein, Grantor hereby transfers the Personal Property unto Grantee, its successors and assigns, forever, "AS IS", without any representation or warranty whatsoever, express or implied, INCLUDING ANY REPRESENTATION OR WARRANTY AS TO MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

IN WITNESS WHEREOF, the Grantor has set its hand this _31ST_ day of _January_, 2007.

Unofficial Document

CITY OF MESA, an Arizona municipal corporation

By: _____
Name: _JACK FRIEDLINE_
Title: _DEPUTY CITY MANAGER_

STATE OF ARIZONA    )
                    )
County of Maricopa  )

The foregoing instrument was acknowledged before me this _31st_ day of _January_, 2007, by _Jack Friedline_ who acknowledged before me that he/she is the _Deputy City Manager_ of the City of Mesa, an Arizona municipal corporation, and that he/she, in such capacity, being authorized so to do, signed the foregoing instrument, on behalf of the City of Mesa.

_Carla Wagner_
Notary Public

OFFICIAL SEAL
CARLA WAGNER
NOTARY PUBLIC-ARIZONA
MARICOPA COUNTY
My Commission Expires March 14, 2008

My commission expires:

3-14-08

Unofficial Document

# EXHIBIT A

### To

## QUIT CLAIM BILL OF SALE

## LEGAL DESCRIPTION OF LAND

Unofficial Document

EXHIBIT A

To

QUIT CLAIM BILL OF SALE

LEGAL DESCRIPTION OF LAND

**PARCEL NO. 1:  (Site "D1/D2")**

That portion of Section 3, Township 1 North, Range 6 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona, more fully described as follows:

COMMENCING at the Northwest corner of said Section 3;

Thence bear North 89 degrees 38 minutes 45 seconds East, a distance of 3290.05 feet;

Thence bear South 00 degrees 21 minutes 15 seconds East, a distance of 65.00 feet to the TRUE POINT OF BEGINNING;

Thence bear South 50 degrees 45 minutes 08 seconds West, a distance of 1978.98 feet;

Thence bear North 39 degrees 14 minutes 52 seconds West, a distance of 1596.47 feet;

Thence bear North 89 degrees 38 minutes 45 seconds East, a distance of 2542.65 feet, to the TRUE POINT OF BEGINNING, containing 36.265 net acres, more or less.

**PARCEL NO. 2:  (Site D3 "Turf Movement Area")**

That portion of Section 3, Township I North, Range 6 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona, more fully described as follows:

COMMENCING at the Northwest corner of said Section 3;

Thence bear North 89 degrees 38 minutes 45 seconds East, a distance of 3290.05 feet;

Thence bear South 00 degrees 21 minutes 15 seconds East, a distance of 65.00 feet;

Thence bear South 50 degrees 45 minutes 08 seconds West, a distance of 1978.98 feet, to the TRUE POINT OF BEGINNING;

Thence South 39 degrees 14 minutes 52 seconds East, a distance of 200 feet;

Thence bear North 50 degrees 45 minutes 08 seconds East, a distance of 900 feet;

Thence bear North 39 degrees 14 minutes 52 seconds West, a distance of 200 feet;

Thence bear South 50 degrees 45 minutes 08 seconds West, a distance of 900 feet, to the TRUE POINT OF BEGINNING.

### PARCEL NO. 3: (Site: "Madison")

That portion of Section 3, Township 1 North, Range 6 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona, more fully described as follows:

COMMENCING at the Southwest corner of said Section 3;

Thence bear North 00 degrees 00 minutes 00 seconds East along the West line of said Section 3 a distance of 2,560.54 feet;

Thence bear North 50 degrees 45 minutes 08 seconds East, a distance of 1,474.33 feet to the TRUE POINT OF BEGINNING;

Thence bear North 50 degrees 45 minutes 08 seconds East, a distance of 645.56 feet;

Thence bear North 39 degrees 14 minutes 52 seconds West, a distance of 405.00 feet;

Thence bear South 50 degrees 45 minutes 08 seconds West, a distance of 106.01 feet;

Thence bear along a curve to the right with a central angle of 95 degrees 11 minutes 36 seconds, a radius of 45.00 feet and whose center bears South 48 degrees 30 minutes 05 seconds West for a curve distance of 74.76 feet;                    Unofficial Document

Thence bear along a curve to the left with a central angle of 38 degrees 56 minutes 33 seconds, a radius of 45.00 feet and whose center bears South 00 degrees 18 minutes 19 seconds East, for a curve distance of 30.59 feet;

Thence bear South 50 degrees 45 minutes 08 seconds West, a distance of 445.56 feet;

Thence bear South 39 degrees 14 minutes 52 seconds East, a distance of 405.00 feet to the TRUE POINT OF BEGINNING.

### PARCEL NO. 4:

That portion of Section 3, Township 1 North, Range 6 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona, more fully described as follows:

COMMENCING at the Northwest corner of said Section 3;

Thence bear North 89 degrees 38 minutes 45 seconds East, a distance of 3290.05 feet;

Thence bear South 00 degrees 21 minutes 15 seconds East, a distance of 65.00 feet to the TRUE POINT OF BEGINNING;

Thence bear South 50 degrees 45 minutes 08 seconds West, a distance of 1978.98 feet;

Thence bear North 39 degrees 14 minutes 62 seconds West, a distance of 1596.47 feet;

Thence bear North 89 degrees 38 minutes 45 seconds East, a distance of 2542.65 feet, to the TRUE POINT OF BEGINNING, containing 36.265 net acres, more or less.

## PARCEL NO. 5:

All improvements in and to said property described as follows:

That portion of Section 3, Township 1 North, Range 6 East of the Gila and Salt River Base and meridian, Maricopa County, Arizona, more fully described as follows:

COMMENCING at the Southwest corner of said Section 3;

Thence bear North 00 degrees 00 minutes 00 seconds East along the West line of said Section 3 a distance of 2,560.54 feet;

Thence bear North 50 degrees 45 minutes 08 seconds East, a distance of 1,474.33 feet to the TRUE POINT OF BEGINNING;

Thence bear North 50 degrees 45 minutes 08 seconds East, a distance of 645.56 feet;

Thence bear North 30 degrees 14 minutes 52 seconds West, a distance of 405.00 feet;

Thence bear south 50 degrees 45 minutes 08 seconds West, a distance of 106.01 feet;

Thence bear along a curve to the right with a central angle of 95 degrees 11 minutes 36 seconds, a radius of 45.00 feet and whose center bears south 48 degrees 30 minutes 05 seconds West for a curve distance of 74.76 feet;

Thence bear along a curve to the left with a central angle of 38 degrees 56 minutes 33 seconds, a radius of 45.00 feet and whose center bears South 00 degrees 18 minutes 19 seconds East, for a curve distance of 30.50 feet;

Thence bear south 50 degrees 45 minutes 08 seconds West, a distance of 445.56 feet;

Thence bear South 39 degrees 14 minutes 52 seconds East, a distance of 405.00 feet to the TRUE POINT OF BEGINNING.

First American **Title**

**WHEN RECORDED RETURN TO:**

David W. Kash
Ryley Carlock & Applewhite
One North Central Avenue
Suite 1200
Phoenix, Arizona 85004-4417

176577 5/5

## QUIT CLAIM DEED TO IMPROVEMENTS

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned, the **CITY OF MESA**, an Arizona municipal corporation ("**Grantor**") does by these presents bargain, sell and deliver unto **MD HELICOPTERS, INC.**, an Arizona corporation ("**Grantee**"), its successors and assigns without representation or warranty of any kind, all of its current right, title and interest in any and all buildings, structures, improvements, fixtures now or at any time hereafter situated on the Land and all alterations, changes, additions or improvements, including all restorations, repairs, replacements and rebuilding of such buildings, improvements and structures, including, but not limited to, improvements commonly known as Building 610, Building 612, Building 615, Building 620 and Building 630/Madison Hanger (collectively, the "**Improvements**"), if any, owned by Grantor, subject to the terms and conditions of the Ground Leases as identified as follows:

Commercial Lease dated March 28, 1983 between the City of Mesa, as Lessor, and Hughes Helicopters, Inc., as Lessee, recorded March 30, 1983 in 83-114683 of Official Records of Maricopa County, Arizona, as amended by Amended Commercial Lease dated March 22, 1985 and, further amended by Supplemental Agreement No. 1 dated June 26, 1992 and by Supplemental Agreement No. 2 dated as of June 25, 1996; and

Commercial Lease dated as of October 1, 1986 between the City of Mesa, as Lessor, and McDonnell Douglas Helicopter Company, as Lessee, as amended by Supplemental Agreement No. 1 dated as of June 26, 1992; and

Commercial Fixed Base Operator Lease dated June 1, 1983 between the City of Mesa, as Lessor, and Madison Aviation, as Lessee, as amended by Amendment to Lease dated July 7, 1986, a memorandum of which dated August 7, 1986, is recorded in 86-426027 in the Official Records of Maricopa County, Arizona, and as further amended by Supplemental Agreement No. 1 dated as of June 3, 1993 and by Supplemental Agreement No. 2 dated June 1, 1995;

This Transfer is Exempt
from the Affidavit
and Transfer Tax
under ARS § 11-1134 *A3*

705309.2

governing Grantees use of the following:

That certain real property in the City of Mesa, County of Maricopa, State of Arizona, more particularly described on **Exhibit A** attached hereto, together with any and all easements, rights-of-way, licenses, permits, consents, hereditaments, tenements and appurtenances belonging or pertaining thereto (collectively, the **"Land"**).

To have and to hold the same unto Grantee, its successors and assigns forever.

IN WITNESS WHEREOF, the Grantor has set its hand this _____31ST_____ day of _Anuary_____, 2007.

CITY OF MESA, an Arizona municipal corporation

By: _Jack Friedline_____
Name: _JACK FRIEDLINE_____
Title _DEPUTY CITY MANAGER_____

Unofficial Document

STATE OF ARIZONA          )
                          )
County of Maricopa        )

The foregoing instrument was acknowledged before me this _31st_ day of _January_____, 2007, by _Jack Friedline_____ who acknowledged before me that he/she is the _Deputy City Manager_ of the City of Mesa, an Arizona municipal corporation, and that he/she, in such capacity, being authorized so to do, signed the foregoing instrument, on behalf of the City of Mesa.

_Carla Wagner_____
Notary Public

My commission expires:

_3-14-08_____

OFFICIAL SEAL
CARLA WAGNER
NOTARY PUBLIC-ARIZONA
MARICOPA COUNTY
My Commission Expires March 14, 2008

EXHIBIT A

To

QUIT CLAIM DEED TO IMPROVEMENTS

LEGAL DESCRIPTION OF LAND

## PARCEL NO. 1:  (Site "D1/D2")

That portion of Section 3, Township 1 North, Range 6 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona, more fully described as follows:

COMMENCING at the Northwest corner of said Section 3;

Thence bear North 89 degrees 38 minutes 45 seconds East, a distance of 3290.05 feet;

Thence bear South 00 degrees 21 minutes 15 seconds East, a distance of 65.00 feet to the TRUE POINT OF BEGINNING;

Thence bear South 50 degrees 45 minutes 08 seconds West, a distance of 1978.98 feet;

Thence bear North 39 degrees 14 minutes 52 seconds West, a distance of 1596.47 feet;

Thence bear North 89 degrees 38 minutes 45 seconds East, a distance of 2542.65 feet, to the TRUE POINT OF BEGINNING, containing 36.265 net acres, more or less.

## PARCEL NO. 2:  (Site D3 "Turf Movement Area")

That portion of Section 3, Township 1 North, Range 6 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona, more fully described as follows:

COMMENCING at the Northwest corner of said Section 3;

Thence bear North 89 degrees 38 minutes 45 seconds East, a distance of 3290.05 feet;

Thence bear South 00 degrees 21 minutes 15 seconds East, a distance of 65.00 feet;

Thence bear South 50 degrees 45 minutes 08 seconds West, a distance of 1978.98 feet, to the TRUE POINT OF BEGINNING;

Thence South 39 degrees 14 minutes 52 seconds East, a distance of 200 feet;

Thence bear North 50 degrees 45 minutes 08 seconds East, a distance of 900 feet;

Thence bear North 39 degrees 14 minutes 52 seconds West, a distance of 200 feet;

Thence bear South 50 degrees 45 minutes 08 seconds West, a distance of 900 feet, to the TRUE POINT OF BEGINNING.

### PARCEL NO. 3: (Site: "Madison")

That portion of Section 3, Township 1 North, Range 6 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona, more fully described as follows:

COMMENCING at the Southwest corner of said Section 3;

Thence bear North 00 degrees 00 minutes 00 seconds East along the West line of said Section 3 a distance of 2,560.54 feet;

Thence bear North 50 degrees 45 minutes 08 seconds East, a distance of 1,474.33 feet to the TRUE POINT OF BEGINNING;

Thence bear North 50 degrees 45 minutes 08 seconds East, a distance of 645.56 feet;

Thence bear North 39 degrees 14 minutes 52 seconds West, a distance of 405.00 feet;

Thence bear South 50 degrees 45 minutes 08 seconds West, a distance of 106.01 feet;

Thence bear along a curve to the right with a central angle of 95 degrees 11 minutes 36 seconds, a radius of 45.00 feet and whose center bears South 48 degrees 30 minutes 05 seconds West for a curve distance of 74.76 feet;

Thence bear along a curve to the left with a central angle of 38 degrees 56 minutes 33 seconds, a radius of 45.00 feet and whose center bears South 00 degrees 18 minutes 19 seconds East, for a curve distance of 30.59 feet;

Thence bear South 50 degrees 45 minutes 08 seconds West, a distance of 445.56 feet;

Thence bear South 39 degrees 14 minutes 52 seconds East, a distance of 405.00 feet to the TRUE POINT OF BEGINNING.

### PARCEL NO. 4:

That portion of Section 3, Township 1 North, Range 6 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona, more fully described as follows:

COMMENCING at the Northwest corner of said Section 3;

Thence bear North 89 degrees 38 minutes 45 seconds East, a distance of 3290.05 feet;

Thence bear South 00 degrees 21 minutes 15 seconds East, a distance of 65.00 feet to the TRUE POINT OF BEGINNING;

Thence bear South 50 degrees 45 minutes 08 seconds West, a distance of 1978.98 feet;

20070147411

Case 22-10263-KBO    Doc 221-1    Filed 05/02/22    Page 96 of 115

Thence bear North 39 degrees 14 minutes 62 seconds West, a distance of 1596.47 feet;

Thence bear North 89 degrees 38 minutes 45 seconds East, a distance of 2542.65 feet, to the TRUE POINT OF BEGINNING, containing 36.265 net acres, more or less.

## PARCEL NO. 5:

All improvements in and to said property described as follows:

That portion of Section 3, Township 1 North, Range 6 East of the Gila and Salt River Base and meridian, Maricopa County, Arizona, more fully described as follows:

COMMENCING at the Southwest corner of said Section 3;

Thence bear North 00 degrees 00 minutes 00 seconds East along the West line of said Section 3 a distance of 2,560.54 feet;

Thence bear North 50 degrees 45 minutes 08 seconds East, a distance of 1,474.33 feet to the TRUE POINT OF BEGINNING;

Thence bear North 50 degrees 45 minutes 08 seconds East, a distance of 645.56 feet;

Thence bear North 30 degrees 14 minutes 52 seconds West, a distance of 405.00 feet;

Thence bear south 50 degrees 45 minutes 08 seconds West, a distance of 106.01 feet;

Thence bear along a curve to the right with a central angle of 95 degrees 11 minutes 36 seconds, a radius of 45.00 feet and whose center bears south 48 degrees 30 minutes 05 seconds West for a curve distance of 74.76 feet;

Thence bear along a curve to the left with a central angle of 38 degrees 56 minutes 33 seconds, a radius of 45.00 feet and whose center bears South 00 degrees 18 minutes 19 seconds East, for a curve distance of 30.50 feet;

Thence bear south 50 degrees 45 minutes 08 seconds West, a distance of 445.56 feet;

Thence bear South 39 degrees 14 minutes 52 seconds East, a distance of 405.00 feet to the TRUE POINT OF BEGINNING.

**Exhibit J**

**2021-000-3051-3**

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS

**ARIZONA
SECRETARY OF STATE
01/08/21 15:42
F I L E D**

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| B. E-MAIL CONTACT AT FILER (optional) |
| C. SEND ACKNOWLEDGMENT TO:   (Name and Address) |

┌─────────────────────────────────────┐
**Milbank LLP
55 Hudson Yards
New York, NY 10001-2163
Attn: AIP UCC Committee**
└─────────────────────────────────────┘

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **MD Helicopters, Inc.** | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **4555 East McDowell Road M615** | **Mesa** | **AZ** | **83215-9734** | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **Ankura Trust Company, LLC, as co-Agent** | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **140 Sherman Street, 4th Floor** | **Fairfield** | **CT** | **06824** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:
**This Financing Statement covers all assets of the Debtor whether now owned or hereafter acquired and wherever located, and all proceeds thereof, including, without limitation, all of Debtor's right, title and interest in the Collateral described on Exhibit A attached hereto and made a part hereof.**

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative |
| 6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | 6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing |
| 7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor |

8. OPTIONAL FILER REFERENCE DATA:
**To be filed with the Arizona Secretary of State; Debtor: MD Helicopters, Inc.**

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)        International Association of Commercial Administrators (IACA)

2021-000-3051-3

## EXHIBIT A

**Debtor**
MD Helicopters, Inc.
4555 East McDowell Road M615
Mesa, AZ 85215-9734

**Secured Party**
Ankura Trust Company, LLC, as co-Agent
140 Sherman Street, 4th Floor
Fairfield, CT 06824

This Financing Statement covers all of Debtor's right, title and interest in and to the following, in each case, as to each type of property described below, whether now owned or hereafter acquired by such Grantor, wherever located and whether now or hereafter existing or arising, (collectively, the "Collateral"):

(a) all equipment and machinery in all of its forms, including, without limitation, the equipment described on Schedule XI hereto as such schedule may be supplemented from time to time, all production equipment, facility equipment, bar code systems, paint mixers, time clocks, work stands, pallet trucks, receiving equipment, warehouse racks, turret trucks data processing and computer equipment (whether owned or licensed), apparatus, installation facilities, satellites, tools, productions tooling, jigs and molds, phone systems, video equipment, telescopes, digital air data test equipment, flight instrument test equipment, DGPS test systems, motor vehicles, vessels, aircraft, furniture and fixtures, and all parts thereof and all accessions thereto and all software related thereto, including, without limitation, software that is imbedded in and is part of the equipment, in each case wherever located, and whether on earth on in orbit; provided that the foregoing shall not include Aircraft in or any equipment, spare parts, accessories or accessories that may be installed on or made a part of any Aircraft (collectively, the "Equipment");

(b) all inventory in all of its forms, including, without limitation, (A) all raw materials, work in process, finished goods and materials used or consumed in the manufacture, production, preparation or shipping thereof, (B) goods in which such Grantor has an interest in mass or a joint or other interest or right of any kind (including, without limitation, goods in which such Grantor has an interest or right as consignee), (C) goods that are returned to or repossessed or stopped in transit by such Grantor and (D) all Aircraft (including, without limitation, Eligible Aircraft and Eligible Recurring and Spares Inventory) set forth opposite such Grantor's name on and as otherwise described on Schedule X hereto as such schedule may be supplemented from time to time, and all accessions thereto and products thereof and documents therefor, and all software related thereto, including, without limitation, software that is imbedded in and is part of the inventory (collectively, the "Inventory");

(c) all rights, claims and benefits of such Grantor against any Person arising out of, relating to or in connection with Inventory or Equipment purchased by such Grantor, including, without limitation, any such rights, claims or benefits against any Person storing or transporting such Inventory or Equipment;

(d) the following (collectively, the "Security Collateral"):

2021-000-3051-3

(i)     all Capital Stock of whatever class of any Person (including (A) the Capital Stock set forth opposite such Grantor's name on and as otherwise described on Schedule I hereto and issued by the Persons named therein and (B) all additional Capital Stock acquired by such Grantor) and the certificates, if any, representing the same, and all dividends, distributions, return of capital, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Capital Stock (collectively, the "Pledged Equity");

(ii)    the indebtedness owed to such Grantor (including (A) the indebtedness set forth opposite such Grantor's name on Schedule II hereto and issued by the obligors named therein and (B) all additional indebtedness from time to time owed to such Grantor), and the instruments, if any, evidencing such indebtedness, and all interest, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such indebtedness (collectively, the "Pledged Debt"); and

(iii)   all other investment property (including, without limitation, all securities (whether certificated or uncertificated), security entitlements, security accounts, commodity contracts and commodity accounts) in which such Grantor has now, or acquires from time to time hereafter, any right, title or interest in any manner, and the certificates or instruments, if any, representing or evidencing such investment property, and all dividends, distributions, return of capital, interest, distributions, value, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such investment property and all subscription warrants, rights or options issued thereon or with respect thereto;

(e)     all Accounts (as such terms as defined in the UCC), chattel paper (including, without limitation, tangible chattel paper and electronic chattel paper), instruments (including, without limitation, promissory notes), deposit accounts, letter-of-credit rights and general intangibles (as such term is defined in the UCC and including, without limitation, payment intangibles and all FAA Certificates issued by the FAA to any Grantor, including, without limitation, any Type Certificates of any Grantor, together with the underlying specifications, other data and other tangible and intangible property or property rights related thereto), and other obligations of any kind, whether or not arising out of or in connection with the sale or lease of goods or the rendering of services and whether or not earned by performance, and all rights now or hereafter existing in and to all supporting obligations and in and to all security agreement, mortgages, Liens, leases, letters of credit and other contracts securing or otherwise relating to the foregoing property (collectively, the "Receivables");

(f)     the following (collectively, the "Intellectual Property Collateral"):

(i)     all United States, international and foreign patent, patent application, utility models, and statutory invention registration, including, without limitation, the patents and patent applications set forth in Schedule III hereto (as

2021-000-3051-3

such <u>Schedule III</u> may be supplemented from time to time by supplements to this Agreement (an "<u>IP Security Agreement Supplement</u>"), executed and delivered by such Grantor to the Agent from time to time), together with all reissues, divisions, continuations, continuations-in-part, extensions and reexaminations thereof, all inventions therein, all rights therein provided by international treaties or conventions and all improvements thereto, and all other rights of any kind whatsoever of such Grantor accruing thereunder or pertaining thereto (collectively, the "<u>Patents</u>");

(ii)    all trademarks (including, without limitation, service marks), certification marks, collective marks, trade dress, logos, internet domain names, product configurations, trade names, business names, corporate names and other source identifies, whether or not registered, whether currently in use or not, including, without limitation, all common law rights and registrations and application for registration thereof, including, without limitation, the trademark registrations and trademark applications set forth in <u>Schedule IV</u> hereto (as such <u>Schedule IV</u> may be supplemented from time to time by IP Security Agreement Supplements executed and delivered by such Grantor to the Collateral Agent from time to time), and all other marks registered in the U.S. Patent and Trademark Office or in any office or agency of any state or territory of the United States or any foreign country (but excluding any United States intent-to-use trademark application prior to the filing and acceptance of a Statement of Use or an Amendment to allege use in connection therewith to the extent that a valid security interest may not be taken in such an intent-to-use- trademark application under applicable law), and all rights therein provided by international treaties or conventions, all renewals of any of the foregoing, together in each case with the goodwill of the business connected therewith and symbolized thereby, and all rights corresponding thereto throughout the world and all other rights of any kind whatsoever of such Grantor accruing thereunder or pertaining thereto (collectively, the "<u>Trademarks</u>");

(iii)    all copyrights, copyright applications, copyright registrations and like protections in each work of authorship, whether statutory or common law, whether published or unpublished, any renewals or extensions thereof, all copyrights of works based on, incorporated in, derived from, or relating to works covered by such copyrights, including, without limitation, the copyright registrations and copyright applications set forth in <u>Schedule V</u> hereto (as such <u>Schedule V</u> may be supplemented from time to time by IP Security Agreement Supplements executed and delivered by such Grantor to Agent from time to time), together with all rights corresponding thereto throughout the world and all other rights of any kind whatsoever of such Grantor accruing thereunder or pertaining thereto (collectively, the "<u>Copyrights</u>");

(iv)    all proprietary information, including, without limitation, know-how, trade secrets, manufacturing and production processes and techniques, inventions, research and development information, technical data, plans, blueprints, designs, models, recorded knowledge, surveys, architectural, structural, mechanical

- 3 -

2021-000-3051-3

and engineering plans and specifications, studies, reports and drawing, test reports, manuals, financial, marketing and business data, pricing and cost information, business and marketing plans and customer and supplier lists and information (collectively, the "Trade Secrets");

(v)     all software, including, without limitation, computer software programs and databases (including, without limitation, source code, object code and all related applications and data files), firmware, and documentations and materials relating thereto, and all rights with respect to the foregoing, together with any and all options, warranties, service contracts, program services, test rights, maintenance rights, improvement rights, renewal rights and indemnifications and any substitutions, replacements, additions or model conversions of any of the foregoing (collectively, the "Computer Software");

(vi)     all names, including, without limitation, combinations of words and abbreviations, that represent a uniquely identifiable internet protocol address of a World Wide Web internet location and all registrations thereof, including, without limitation, those names set forth on Schedule VI hereto (as such Schedule VI may be supplemented from time to time by IP Security Agreement Supplements executed and delivered by such Grantor to Agent from time to time), together with all rights corresponding thereto throughout the world and all other rights of any kind whatsoever of such Grantor accruing thereunder or pertaining thereto (collectively, the "Domain Names");

(vii)     all license agreements, permits, authorizations and franchises, whether with respect to the Patents, Trademarks, Copyrights, Trade Secrets, Computer Software or Domain Names, or with respect to the patents, trademarks, copyrights, trade secrets, computer software or other proprietary right of any other Person, and all income, royalties and other payments now or hereafter due and/or payable to such Grantor with respect thereto, subject, in each case, to the terms of such license agreements, permits, authorizations and franchises (collectively, the "Licenses"); provided, however, that to the extent that the consent of any other party to any of the Licenses is required, under the terms thereof, for the collateral assignment thereof, then this Agreement shall not affect any collateral assignment of (or otherwise be applied so as to cause a default under) such Licenses; and

(viii)     any and all claims for damages for past, present and future infringement, misappropriation or breach with respect to the Patents, Trademarks, Copyrights, Trade Secrets, Computer Software, Domain Names or Licenses, with the right, but not the obligation, to sue for and collect, or otherwise recover, such damages;

(g)     the following (collectively, the "Account Collateral"):

(i)     the deposit accounts listed on Schedule VII hereto (collectively, the "Accounts"),

2021-000-3051-3

(ii)     all promissory notes, certificates of deposit, deposit accounts, checks and other instruments from time to time delivered to or otherwise possessed by the Agent for or on behalf of such Grantor; and

(iii)     all interest, dividends, distributions, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Accounts;

(h)     all commercial tort claims;

(i)     all books and records (including, without limitation, customer lists, credit files, computer programs, software, printouts and other computer materials and records) of such Grantor pertaining to any of the Collateral;

(j)     all insurance policies, whether owned by or payable to such Grantor, insuring against any risk whatsoever (including, without limitation, casualty, property damage, liability and death), including, without limitation, all such policies required to be maintained under Section 5.1(h) of the Credit Agreement with respect to any property of such Grantor, all loss proceeds and other amounts payable thereunder to such Grantor, any indemnity, warranty or guaranty in respect of the property insured thereby, and all eminent domain or similar proceeds or awards with respect thereto and all other rights of such Grantor with respect thereto (collectively, the "Insurance Receivables"); and

(k)     all proceeds (as such term is defined in the UCC), products, offspring, rents, profits, royalties, revenues, issues, income, benefits, accessions, additions, substitutions and replacements of and to any of the property of such Grantor described in the preceding clauses (a) through (j) of this Section (including, without limitation, all causes of action, claims, warranties and guaranties now or hereafter held by such Grantor in respect of any of the items listed above).

The terms below shall have the following meanings when used herein:

"Aircraft" means a completed or substantially completed aircraft now or hereafter owned by the Borrower or a Guarantor and shall include, without limitation, all existing and future airframes, engines, rotors and propellers, parts and other goods, accessions and property attached to, incorporated in, affixed to or used in connection with such aircraft.

"Airworthiness Certificate" mean, as to any Aircraft, an Airworthiness Certificate with respect to such Aircraft issued by the FAA pursuant to the Federal Aviation Act Laws.

"Capital Stock" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person ( other than a corporation), including, without limitation, partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"Eligible Aircraft" means Eligible Ship Ready Aircraft and Eligible Demonstrator Aircraft.

2021-000-3051-3

"Eligible Demonstrator Aircraft" means Aircraft manufactured and owned by the Borrower and used for demonstration purposes by Borrower in connection with the sale of Aircraft by the Borrower, as to which: (a) an Airworthiness Certificate exists, (b) an Aircraft Registration exists in favor of a Borrower, ( c) an Aircraft Mortgage Recordation exists in favor of the Agent, for the benefit of the Lenders, defined under the Federal Aviation Act Laws) and not registered in a foreign jurisdiction.

"Eligible Recurring and Spares Inventory" means finished aircraft rotors, fuselages, engines, engine mounts, fuel pumps, cowlings, appliances, flight instruments, accessories, avionics, (including, without limitation, raders, radar and navigations systems or electronic equipment) and other components and parts for Aircraft manufactured by Borrower or a supplier to Borrower and which Borrower holds for incorporation and assembly of Aircraft manufactured and sold by Borrower or for sale in the ordinary course of its business to third parties as replacement parts for completed Aircraft previously manufactured and sold by Borrower, which are not attached to, incorporated into or affixed to any Aircraft.

"Eligible Ship Ready Aircraft" means Aircraft, now or hereafter manufactured by Borrower, as to which (a) manufacture and assembly of such Aircraft, including the installation and attachment of the appropriate aircraft engine or engines and instrumentation thereon, has been at least eighty percent (80%) completed for delivery to a prospective buyer, subject only to the installation of certain nonessential components acceptable to Lenders, (b )(i) such Aircraft complies with the airworthiness requirements prescribed by the Federal Aviation Act Laws for the issuance of an Airworthiness Certificate or (ii) an Airworthiness Certificate has been issued and ( c )(i) an Aircraft Registration exists for such Aircraft and (ii) an Aircraft Recordation exists in favor of the Agent, for the benefit of the Lenders.

"FAA" means the Federal Aviation Administration of the United States Department of Transportation, an agency of the United States of America, and any subdivision or office thereof, and any successor or replacement administrator, agency or other entity having the same or similar authority and responsibilities.

"FAA Certificates" means, collectively, all certificates required by the FAA and the Federal Aviation Act Laws for the manufacture, design, production, maintenance, use and/or sale of aircraft by the Borrower, including, without limitation, each Type Certificate, Production Certificate, Airworthiness Certificate, and Dealer's Aircraft Registration Certificate issued in favor of the Borrower or its successor and pursuant to a license relating thereto, as the same now exist or may hereafter be amended, supplemented, renewed, extended, reissued or replaced.

"Federal Aviation Act Laws" means Title 49 of the United States Code, as the same now exists or may hereafter from time to time be amended, modified, recodified or supplemented, together with all rules, regulations, procedures, orders, handbooks, guidelines and interpretations thereunder or related thereto.

"Lien" means any encumbrance, mortgage, pledge, hypothecation, charge, restriction or other security interest of any kind securing any obligation of any Person.

- 6 -

2021-000-3051-3

"Person" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, Joint Ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, other legal entities and Governmental Bodies.

"Production Certificate" means a Production Certificate issued by the FAA to any Person pursuant to the Federal Aviation Act Laws certifying that the manufacturing, production, inspection and quality control capabilities of such Person to manufacture, produce and deliver airworthy aircraft comply with the requirements of the FAA Aviation Act Laws, as the same now exist or may hereafter be amended, modified, supplemented, renewed, reissued or replaced.

"Type Certificate" means, individually and collectively, any Type Certificates issued or assigned to the Borrower and pursuant to the Federal Aviation Act Laws certifying that the type design, operating limitations and certificate data sheets of certain aircraft models which are the subject of such type certificate comply with the requirements of the Federal Aviation Act Laws, as the same now exist or may hereafter be amended, modified, supplemented, renewed, reissued or replaced.

"UCC" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

A Full and Unredacted Certified Copy Secretary of State

**Exhibit K**

## APPLICATION FOR THE ISSUANCE OF CONDITION OF TITLE REPORT

Applicant is in the process of investigating the Ownership of and defects, liens and encumbrances against an Interest in Land. As a component of that investigation, Applicant hereby requests the Company to furnish Applicant with a Report based upon the hereinafter defined Title Instruments, which Report will disclose the Ownership of and defects, liens and encumbrances against the hereinafter identified Interest in the hereinafter described Land. Applicant does not at this time need nor desire the benefit or protection afforded by a Policy of Title Insurance. The Report provided will be solely for the purpose of facilitating Applicant's investigation and for the sole use and benefit of Applicant and may not be used or relied upon by any other party.

1.      The following terms when used in the Application and the Report shall mean:

      a.      Applicant – The party or parties who have executed this Application and who are named in the Report.

      b.      Company – The Title Insurance Company making the Report.

      c.      Report – Condition of Title Report.

      d.      Land – The real property described in the Application.

      e.      Interest – The Estate in the Land described on the Application.

      f.      Ownership – The Vesting of title to the Interest identified in the Application.

      g.      Title Instruments:

            1.      Documents recorded in the Office of the County Recorder of the County in which the land is located reviewed by the Company to facilitate the Company's issuance of title insurance policies excluding therefrom, however, any documents pertaining to (a) unpatented mining claims, (b) patents, (c) water rights, claims or title to water, (d) the lease, grant, exception or reservation of minerals or mineral rights.

            2.      Documents, obtained by the Company to facilitate the issuance of title insurance policies, relating to the payment of Real Estate Taxes levied on the Interest in the Land excluding therefrom, however, any special assessments which are not collected by the Tax Collector for the County in which the Land is located.

2.      The Land is described as follows:

      **See Exhibit A attached hereto and made a part hereof.**

3.      The Interest in the Land is a:

      X      a.      Fee

      ☐      b.      Leasehold created by _____

      ☐      c.      Other _____

4.      Applicant specifically instructs the Company to set forth in the Report only the Ownership of and defects, liens and encumbrances against the Interest in the Land as disclosed by the Title Instruments. Applicant understands that during the course of preparing the Report, the Company may become aware of other matters pertaining to the Land or other Interests therein. Even if the company knows or would have reason to know Applicant may have an interest in these other matters, Applicant imposes no duty or responsibility on the Company to disclose those matters to Applicant either through the Report or otherwise.

5.      BY THE EXECUTION AND SUBMISSION OF THIS APPLICATION TO THE COMPANY, APPLICANT ACKNOWLEDGES AND AGREES:

a.      That the Company's sole obligation under the Report, and this Application, shall be to set forth the Ownership of and defects, liens and encumbrances against the Interest in the Land as disclosed by the Title Instruments.

b.      That the Company shall not be obligated under this Report to pay costs, attorneys' fees, or expenses incurred in any action, proceeding, or other claim brought against Applicant.

c.      That the Report is not an abstract of title, title opinion, preliminary report or commitment to issue title insurance.

d.      That the Company's liability under the Report for an error or omission is, as stated below, limited and that if Applicant desires that the Company assume additional liability, a Policy of Title Insurance, Binder, Commitment, or Guarantee should be requested.

e.      That Applicant shall have no right of action against the Company, whether or not based on negligence, except under the terms and provisions of, and subject to all limitations of this Application and the Report.

f.      That the Report is not valid and the Company shall have no liability thereunder unless this Application is attached thereto.

## LIMITATION OF LIABILITY

APPLICANT RECOGNIZES THAT IT IS EXTREMELY DIFFICULT, IF NOT IMPOSSIBLE, TO DETERMINE THE EXTENT OF LOSS WHICH COULD ARISE FROM ERRORS OR OMISSIONS IN THE REPORT. APPLICANT RECOGNIZES THAT THE FEE CHARGED IS NOMINAL IN RELATION TO THE POTENTIAL LIABILITY WHICH COULD ARISE FROM SUCH ERRORS OR OMISSIONS. THEREFORE, APPLICANT UNDERSTANDS THAT THE COMPANY IS NOT WILLING TO PROCEED IN THE PREPARATION AND ISSUANCE OF THE REQUESTED REPORT UNLESS THE COMPANY'S LIABILITY IS STRICTLY LIMITED. APPLICANT AGREES WITH THE PROPRIETY OF THIS LIMITATION AND AGREES TO BE BOUND BY ITS TERMS.

THIS LIMITATION IS AS FOLLOWS:

APPLICANT AGREES, AS PART OF THE CONSIDERATION FOR THE ISSUANCE OF THIS REPORT, THAT THE COMPANY SHALL BE LIABLE TO APPLICANT UNDER THIS REPORT SOLELY BY REASON OF AN ERROR OR OMISSION BY THE COMPANY IN FAILING TO SET FORTH THE OWNERSHIP OF AND DEFECTS, LIENS AND ENCUMBRANCES AGAINST THE INTEREST IN THE LAND AS DISCLOSED BY THE TITLE INSTRUMENTS, WHICH ERROR OR OMISSION BY THE COMPANY HAS CAUSED LOSS TO THE APPLICANT; AND THEN THE LIABILITY SHALL BE A ONE-TIME PAYMENT TO APPLICANT OF FIVE THOUSAND DOLLARS ($5,000.00).

ACCORDINGLY, APPLICANT REQUESTS THAT THE REPORT BE ISSUED WITH THIS LIMITATION AS A PART OF THE CONSIDERATION THAT APPLICANT GIVES THE COMPANY TO PREPARE AND ISSUE THE REPORT.

APPLICANT CERTIFIES THAT HE HAS READ AND UNDERSTOOD ALL OF THE TERMS, LIMITATIONS AND CONDITIONS OF THIS APPLICATION.

EXECUTED THIS _____ day of _____, _____ .

(This Application must be signed by the Applicant or an agent representing the Applicant.)

APPLICANT: _____    MAILING ADDRESS:
                Print or Type Name                  _____

                                                                                   _____
                Signature                           Telephone

AGENT FOR
APPLICANT      _____
                Print or Type Name                MAILING ADDRESS:

                                                                                   _____
                Signature                           Telephone

Condition of Title Report



**Fidelity National Title Insurance Company**

Title No.:  **AZ-FMPC-IMP-N/A-1-22-10007356**

## CONDITION OF TITLE REPORT
**Fidelity National Title Insurance Company, a Florida Corporation,**
herein called the Company,

*SUBJECT TO THE TERMS, LIMITATIONS AND CONDITIONS OF THE APPLICATION FOR THIS CONDITION OF TITLE REPORT, WHICH APPLICATION, OR COPY THEREOF, IS ATTACHED HERETO AND MADE A PART HEREOF*

*REPORTS*

*To the party named in Schedule A, that as disclosed by the Title Instruments, the ownership of and the defects liens and encumbrances against the Interest in the Land are as shown in Schedule B.*

*Any claim or other notice to the Company shall be in writing and shall be addressed to the Company at the issuing office or to:*

*Fidelity National Title Insurance Company Claims Center*
*PO Box 45023*
*Jacksonville, Florida, 32232-5023*
*Attn: Claims Administration*

*THIS REPORT IS NOT VALID AND THE COMPANY SHALL HAVE NO LIABILITY HEREUNDER UNLESS THE APPLICATION REFERRED TO ABOVE, OR COPY THEREOF, IS ATTACHED HERETO.*

Countersigned by:

Natalie Bombardieri

_____
Authorized Signature

CORPORATE SEAL

By: Michael J. Nolan
President

ATTEST: Marjorie Nemzura
Secretary

## CONDITION OF TITLE REPORT

## SCHEDULE A

Fee:        **$0.00**
Date of Report:    **April 19, 2022 at 7:30 AM (First Amended)**

1.        Name of Party:

        **DLA PIPER, LLP**

2.        The Interest referred to in the Application is:

        **A FEE**

3.        The Land referred to in the Application is described as follows:

        **See Exhibit A attached hereto and made a part hereof.**

**Issuing agent for Fidelity National Title Insurance Company**

Title No.:  **AZ-FMPC-IMP-N/A-1-22-10007356**

## EXHIBIT A

## LEGAL DESCRIPTION

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF MARICOPA, STATE OF ARIZONA, AND IS DESCRIBED AS FOLLOWS:

APN:  141-36-001E

Title No.:  AZ-FMPC-IMP-N/A-1-22-10007356

# CONDITION OF TITLE REPORT

## SCHEDULE B

Fidelity National Title Insurance Company reports that Title Instruments, on the date hereof, disclose:

1.   Ownership of the Interest is in the name of:

City of Mesa, a municipal corporation as to Fee and MD HELICOPTERS, INC., an Arizona corporation as to any improvements and personal property

2.   The following defects, liens and encumbrances (which are not necessarily shown in their order of priority) against the Interest:

   1.   Property taxes, which are a lien not yet due and payable, including any assessments collected with taxes to be levied for the year 2022.

   2.   Reservations contained in the Patent

   | | |
   |---|---|
   | From: | The United States of America |
   | To: | The Heirs of Ethel M. Dorman |
   | Recording Date: | December 10, 1923 |
   | Recording No: | Book 179 of Deeds, page 504 |

   (as to the East half of subject Section 3) and also

   Reservations contained in the Patent

   | | |
   |---|---|
   | From: | The United States of America |
   | To: | William S. Dorman |
   | Recording Date: | December 10, 1923 |
   | Recording No: | Book 179 of Deeds, page 505 |

   (as to the West half of subject Section 3)

   Which among other things each recites as follows:

   Subject to any vested and accrued water rights for mining, agricultural, manufacturing or other purposes and rights to ditches and reservoirs used in connection with such water rights as may be recognized and acknowledged by local customs, laws and decisions of courts. A right of way thereon for ditches or canals constructed by the authority of the United States of America.

   3.   Covenants, conditions, restrictions and easements but omitting any covenants or restrictions, if any, including but not limited to those based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, or source of income, gender, gender identity, gender expression, medical condition or genetic information, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law, as set forth in the document

   | | |
   |---|---|
   | Recording No: | Docket 270, page 90 |

   Modification(s) of said covenants, conditions and restrictions

   | | |
   |---|---|
   | Recording No: | Docket 5984, page 126 |

## SCHEDULE B
### (Continued)

4.      An unrecorded lease with certain terms, covenants, conditions and provisions set forth therein as disclosed by the document

| | |
|---|---|
| Entitled: | Commercial Lease |
| Lessor: | City of Mesa, a municipal corporation |
| Lessee: | Hughes Helicopters, Inc., a Delaware corporation |
| Recording Date: | March 30, 1983 |
| Recording No: | 83-114683 |

Thereafter a Memorandum of Agreement

| | |
|---|---|
| Recording Date: | March 28, 1985 |
| Recording No: | 85-135424 and Supplemental Agreement No. 1 dated June 29, 1992 and that certain Supplemental Agreement No. 2 dated June 25, 1996, as disclosed in Memorandum of Assignment and Assumption of Ground Lease recorded August 4, 2000 in 00-0599026 |

Assignment of the Lessee's interest under said lease,

| | |
|---|---|
| Assignor: | McDONNELL DOUGLAS HELICOPTER COMPANY, a Delaware corporation, doing business as McDonnell Douglas Helicopter Systems |
| Assignee: | MD HELICOPTERS, INC., an Arizona corporation and ECR-I, LLC., a Delaware limited liability company |
| Recording Date: | August 04, 2000 |
| Recording No: | 2000-0599026 |
| Re-Recording Date: | October 05, 2000 |
| Re-Recording No: | 2000-0766411 |

Assignment of the Lessee's interest under said lease,

| | |
|---|---|
| Assignor: | Woodgreen Power, LLC FKA as ECR-I, LLC., a Delaware limited liability company |
| Assignee: | MD HELICOPTERS, INC., an Arizona corporation |
| Recording Date: | February 05, 2007 |
| Recording No: | 20070147407 |

5.      Easement(s) for the purpose(s) shown below and rights incidental thereto as set forth in a document:

| | |
|---|---|
| Purpose: | Ingress and Egress |
| Recording Date: | March 30, 1983 |
| Recording No: | 83-114686 |

6.      Easement(s) for the purpose(s) shown below and rights incidental thereto as set forth in a document:

| | |
|---|---|
| Purpose: | Ingress and Egress |
| Recording Date: | March 30, 1983 |
| Recording No: | 83-114687 |

7.      Easement(s) for the purpose(s) shown below and rights incidental thereto as set forth in a document:

| | |
|---|---|
| Purpose: | Ingress and Egress |
| Recording Date: | March 30, 1983 |
| Recording No: | 83-114688 |

## SCHEDULE B
### (Continued)

8.      Easement(s) for the purpose(s) shown below and rights incidental thereto as set forth in a document:

      Purpose:                    Ingress and Egress
      Recording Date:             July 26, 1983
      Recording No:               83-294420 and Assignment on
      Recording Date:             November 09, 1983
      Recording No:               83-453109

9.      Easement(s) for the purpose(s) shown below and rights incidental thereto as set forth in a document:

      Purpose:                    Public utilities, irrigation and incidental purposes
      Recording Date:             January 16, 1986
      Recording No:               86-023338

10.     A resolution in favor of City of Mesa, Arizona

      For:                        Authorization of Underground power easement
      Recording Date:             July 07, 1997
      Recording No:               97-0457057

11.     Easement(s) for the purpose(s) shown below and rights incidental thereto as set forth in a document:

      Purpose:                    Right-of-Way
      Recording Date:             August 04, 2000
      Recording No:               2000-0599020

12.     Matters contained in that certain document

      Entitled:                   Falcon Field Airport Sound Contours and Primary Flight Track
      Recording Date:             April 10, 2001
      Recording No:               2001-0285395

      Reference is hereby made to said document for full particulars.

13.     Easement(s) for the purpose(s) shown below and rights incidental thereto as set forth in a document:

      Purpose:                    Power distribution
      Recording Date:             September 14, 2011
      Recording No:               20110760926

      2021 Tax Note:

      Tax Parcel No:                          141-36-001E
      Total Tax:                              Not assessed/Exempt

Title No.:  **AZ-FMPC-IMP-N/A-1-22-10007356**

## SCHEDULE B
### (Continued)

3.      The following matters are disclosed by name only and the Company, without additional information, is unable to determine whether any or all of these matters are defects, liens or encumbrances against the Interest:

14.     An abstract of judgment for the amount shown below and any other amounts due:

| | |
|---|---|
| Amount: | $14,724,084.50 |
| Debtor: | MD Helicopters, Inc., an Arizona corporation |
| Creditor: | The State of the Netherlands (Ministry of the Interior and Kingdom Relations, National Police Services Agency Agentschap KLPD, successor judgment creditor: Ministry of Security and Justice, Directorate-General Police), a foreign government |
| Date entered: | November 13, 2018 |
| County: | Maricopa |
| Court: | Superior Court |
| Case No.: | CV2015-095127 |
| Recording Date: | November 15, 2018 |
| Recording No: | 20180850166 |

Thereafter Final Judgment on Mandate along with Judgment Information Statement

| | |
|---|---|
| Recording Date: | August 05, 2021 |
| Recording No: | 20210849172 |