**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------- x
In re:                                                            :     Chapter 11
                                                                      :
MD HELICOPTERS, INC., *et al.*,[1]                :     Case No. 22-10263 (KBO)
                                                                      :
           Debtors.                                          :     (Jointly Administered)
                                                                      :
---------------------------------------------------------- x   **Ref. D.I. 221**

**DEBTORS' RESPONSE TO THE NETHERLANDS
PHASE ONE STATEMENT UNDER THE FINAL DIP ORDER**

---

[1]    The two Debtors in these cases are MD Helicopters, Inc. and Monterrey Aerospace, LLC ("**Monterrey**"), and their address is 4555 E. McDowell Road, Mesa, AZ 85215.  The last four digits of MD Helicopters, Inc.'s taxpayer identification number are 4088.  Monterrey has not been assigned a taxpayer identification number as of the date hereof.

# CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ..................................................................................................................... 5

    A.    Chapter 11 Cases .................................................................................................. 5

    B.    The Final DIP Order and Netherlands Lien Dispute ........................................... 6

    C.    The Leases ........................................................................................................... 6

           1.    Headquarters Lease ................................................................................. 6

           2.    Madison Hangar Lease ............................................................................ 7

           3.    Turf Area Lease ....................................................................................... 8

           4.    Quitclaim Deeds ...................................................................................... 8

           5.    AMO Leases ........................................................................................... 9

           6.    Falcon Hangar Leases ........................................................................... 10

    D.    MDHI's Prepetition Secured Indebtedness ....................................................... 10

           1.    Prepetition Term Loan Facility ............................................................. 10

           2.    Prepetition Subordinated Notes ............................................................ 12

    E.    The Netherlands' Judgment Lien ...................................................................... 13

ARGUMENT ........................................................................................................................ 14

I.      THE NETHERLANDS DOES NOT HAVE A LIEN ON ANY ASSETS OF
        MDHI BECAUSE MDHI DOES NOT OWN ANY REAL PROPERTY IN
        MARICOPA COUNTY .......................................................................................... 14

    A.    The Netherlands Bears the Burden of Establishing the Validity and Scope
          of Its Lien. .......................................................................................................... 14

    B.    Neither the Leases nor the Mesa Improvements are Real Property. .................. 18

           1.    The Leases are Not "Real Property" but rather "Chattels Real" and,
               therefore, Personal Property .................................................................. 19

           2.    The Mesa Improvements are Not Subject to the Netherlands Lien. .......... 29

II.     TO THE EXTENT THE MESA IMPROVEMENTS ARE FIXTURES OWNED
        BY MDHI, THE NETHERLANDS LIEN IS JUNIOR TO THE PREPETITION
        SECURED PARTIES' LIENS. ................................................................................. 40

## Table of Authorities

### CASES

*Abraham v. Fioramonte*,
 107 N.E. 2d 321 (Ohio 1952)........................................................................... 22, 24

*Adams v. Chamberlin*,
 188 S.E. 550 (Ga. 1936).................................................................................... 37

*Airport Props. v. Maricopa County*,
 985 P.2d 574 (Ariz. Ct. App. 1999).................................................................. 33

*Assocs. Com. Corp. v. Rash*,
 520 U.S. 953 (1997)............................................................................................ 7

*Bachyrycz v. Gateway Bank*,
 No. 30 04 77, 1992 WL 43598 (Conn. Super. Ct. Mar. 2, 1992) .......................... 26

*Callahan v. Martin*,
 43 P.2d 788 (Cal. 1935) ............................................................................... 21, 22

*Calpine Constr. Fin. Co. v. Ariz. Dept. of Revenue*,
 211 P.3d 1228 (Ariz. Ct. App. 2009).................................................................. 35

*City of New York v. Mabie*,
 13 N.Y. 151 (1855) .......................................................................................... 23

*Cutter Aviation, Inc. v. Ariz. Dept. of Revenue*,
 958 P.2d 1 (Ariz. Ct. App. 1997)......................................................... 30, 31, 33

*Dietl v. Spika*,
 923 N.E.2d 692 (Ohio Ct. App. 2009)............................................................... 25

*Fam. Fin. Fund v. Abraham*,
 657 P.2d 1319 (Utah 1982)........................................................................... 38, 39

*First Nat'l Bank in Grand Prairie v. Lone Star Life Ins. Co.*,
 524 S.W.2d 525 (Tex. Civ. App. 1975)............................................................. 27

*First Nat'l Bank of Davenport v. Bennett*,
 40 Iowa 537 (1875)........................................................................................... 26

*Fish v. Valley Nat'l Bank of Phx.*,
 167 P.2d 107 (Ariz. 1946).................................................................................. 40

*Fort Mojave Indian Tribe v. Killian*,
 No. CIV 02-1212-PCT-MHM, 2004 WL 5833529 (D. Ariz. Mar. 30, 2004)....... 35

*Greene Line Terminal Co. v. Martin*,
    10 S.E.2d 901 (W. Va. 1940) .................................................................................. 24

*Harbel Oil Co. v. Steele*,
    318 P.2d 359 (Ariz. 1975) ..................................................................................... 23

*Hardinge v. Empire Zinc Co.*,
    148 P. 306 (Ariz. 1915) ......................................................................................... 30

*Havasu Springs Resort Co. v. La Paz County*,
    18 P.3d 143 (Ariz. Ct. App. 2001) ........................................................................ 30

*Henderson v. Tomb*,
    169 Misc. 737 (N.Y. Sup. Ct. 1938) ..................................................................... 26

*In re DBSI, Inc.*,
    432 B.R. 126 (Bankr. D. Del. 2010) ...................................................................... 43

*In re De Leon*,
    No. 11-56921-ASW, 2013 WL 3805733 (Bankr. N.D. Cal. July 18, 2013) ........... 26

*In re Heritage Highgate, Inc.*,
    679 F.3d 132 (3d Cir. 2012) .................................................................................. 15

*In re Jennings*,
    No. BKR. 09-13097-JMD, 2010 WL 757341 (Bankr. D.N.H. Feb. 25, 2010) ...... 17

*In re KIKI, Ltd.*,
    41 B.R. 825 (Bankr. D. Haw. 1984) ...................................................................... 26

*In re Le Sueur's Fiesta Store, Inc.*,
    40 B.R. 160 (Bankr. D. Ariz. 1984) ........................................................... 27, 28, 43

*In re Motors Liquidation Co.*,
    482 B.R. 485 (Bankr. S.D.N.Y. 2012) .................................................................... 7

*In re Packard Square LLC*,
    574 B.R. 107 (Bankr. E.D. Mich. 2017) ................................................................ 17

*In re Residential Cap., LLC*,
    501 B.R. 549 (Bankr. S.D.N.Y. 2013) ............................................................. 14, 15

*In re Winthrop Old Farm Nurseries, Inc.*,
    50 F.3d 72 (1st Cir. 1995) ..................................................................................... 14

*Ives v. Beecher*,
    54 A. 207 (1903) ................................................................................................... 26

iii

*Jinkins v. City of Jal,*
   386 P.2d 599 (N.M. 1963) ........................................................... 21

*Joslyn v. Spellman,*
   1884 WL 6423 (Ohio Super. 1884) ............................................. 26

*Lenow v. Fones,*
   4. S.W. 56 (Ark. 1887) ............................................................... 24

*Lewis v. Debord,*
   356 P.3d 314 (Ariz. 2015) .................................................... 23, 25

*Long v. White,*
   42 Ohio St. 59 (1884) ................................................................ 37

*Marcos v. Tex. Co.,*
   251 P.2d 647 (Ariz. 1952) .......................................................... 37

*Maricopa County v. Novasic,*
   473 P.2d 476 (Ariz. Ct. App. 1970) ........................ 30, 32, 33, 37, 38

*Mayfield Smithson Enters. v. Com-Quip, Inc.,*
   896 P.2d 1156 (N.M. 1995) ....................................................... 26

*McClean v. Rockey,*
   3 McLean 235 (C.C.D. Ohio 1843) ............................................ 26

*Munson v. Wade,*
   298 S.W. 25 (Ark. 1927) ............................................................ 26

*N. Bank of Ky. v. Roosa,*
   1844 WL 44 (Ohio Dec. 1844) .................................................. 26

*Orchard v. Wright-Dalton-Bell-Anchor Store Co.,*
   125 S.W. 486 (Mo. 1909) .......................................................... 21

*Pac. Sw. Realty Co. v. County of Los Angeles,*
   820 P.2d 1046 (Cal. 1991) .................................................... 21, 24

*People ex rel. Int'l Navigation Co. v. Barker,*
   47 N.E. 46 (N.Y. 1897) .............................................................. 31

*Rowe v. Schultz,*
   642 P.2d 881 (Ariz. Ct. App. 1982) ........................................... 30

*Sabatino v. Liberty Life Assurance Co. of Bos.,*
   286 F. Supp. 2d 1222 (N.D. Cal. 2003) ..................................... 14

*SDI, Inc. v. Pivotal Parker Com., LLC*,
   339 P.3d 672 (Colo. 2014) ............................................................................ 20

*State v. Burbey*,
   403 P.3d 145 (Ariz. 2017) ............................................................................. 20

*State v. Sweet*,
   693 P.2d 921 (Ariz. 1985) ............................................................................. 19

*Summerville v. Stockton Milling Co.*,
   76 P. 243 (Cal. 1904) ................................................................................... 26

*Tway v. Payne*,
   101 P.2d 455 (Ariz. 1940) ............................................................................. 25

*Wetkopsky v. New Haven Gas Light Co.*,
   88 Conn. 1. (1914) ....................................................................................... 37

*Wood v. Galpert*,
   204 N.E.2d 384 (1965) ................................................................................. 21

*Yeadon Fabric Domes, Inc. v. Me. Sports Complex, LLC*,
   901 A.2d 200 (Me. 2006) ............................................................................. 40

## STATUTES

1 Vt. St. Ann. § 132 ....................................................................................... 23

11 U.S.C. § 364 ............................................................................................. 17

11 U.S.C. § 506 ............................................................................................. 14

15 U.S.C. § 1060 ........................................................................................... 27

17 U.S.C. § 205 ............................................................................................. 27

35 U.S.C. § 261 ............................................................................................. 27

46 U.S.C. § 31321 ......................................................................................... 27

49 U.S.C. § 11301 ......................................................................................... 27

49 U.S.C. § 44017 ......................................................................................... 27

A.R.S. § 1-201 .............................................................................................. 21

A.R.S. § 1-211 .............................................................................................. 19

A.R.S. § 12-1141 ........................................................................................... 23

v

A.R.S. § 1-213 ......................................................................................................... 23

A.R.S. § 1-215 ........................................................................................... 2, 19, 20, 28

A.R.S. § 33-202 ......................................................................................... 2, 20, 28

A.R.S. § 33-961 ......................................................................................................... 24

A.R.S. § 33-964 ................................................................................................. 19, 24

A.R.S. § 47-9109 ....................................................................................................... 27

A.R.S. § 47-9311 ....................................................................................................... 27

A.R.S. § 47-9334 ............................................................................................ 5, 40, 41, 42

A.R.S. § 47-9501 ....................................................................................................... 40

A.R.S. §§ 33-961–968 ............................................................................................... 19

Cal. Code Civ. Pro. § 697.340 ................................................................................. 25

Conn. Gen. St. Ann. § 52-286 ................................................................................. 25

Ind. Code Ann. § 34-55-9-2 ..................................................................................... 25

Iowa Code § 4.1(13) ................................................................................................. 23

Mass. Gen. Laws. Ann. Chapter 4 § 7 ..................................................................... 23

## OTHER AUTHORITIES

2 Thompson on Real Property § 14.04 ...................................................................... 21

Black's Law Dictionary (11th ed. 2019) ............................................................ 20, 22

Henry E. Colton, *Personal Property – Estates for Years – Nature of Interests of Lessee in Estates for Years*, 25 N.C. L. Rev. 516 (1947) ................................... 22

U.C.C. § 9-334 (Am. Law Inst. & Unif. Law Comm'n 2010) ................................. 42

White & Summers, *Uniform Commercial Code* (6th ed.) ........................................ 43

The debtors and debtors in possession in the above-captioned cases (collectively, the "**Debtors**") hereby submit this response (this "**Response**") to *The Netherlands Phase One Statement Under the Final DIP Order* [D.I. 221] (the "**Netherlands Brief**") (cited herein as "Netherlands Br. __").[2]  In support of this Response, the Debtors submit the *Declaration of Barry Sullivan in Support of Debtors' Response to the Netherlands Phase One Statement Under the Final DIP Order* (the "**Sullivan Declaration**"), filed concurrently herewith, and respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The judgment lien of the State of the Netherlands (the "**Netherlands**") does not attach to any of the assets of MD Helicopters, Inc. ("**MDHI**") because MDHI simply does not own any "real property" in Maricopa County, Arizona, to which the lien could attach.  Under Arizona law, a judgment lien attaches only to "real property" of the judgment debtor (i.e., MDHI) in the county in which the judgment lien is recorded.  The Netherlands recorded its judgment lien in Maricopa County and asserts that its lien attached to MDHI's interest under certain Leases (as defined below) and the Mesa Improvements (as defined in the Netherlands Brief)—namely, six prefabricated buildings located on the leased premises.  Thus, the principal question presented is: Are the Leases and the Mesa Improvements "real property" of MDHI within the meaning of Arizona's judgment lien statute?  The answer with respect to both the Leases and the Mesa Improvements is "no."

2.      MDHI's interests in the Leases are plainly and unambiguously defined by statute as personal property and, thus, not real property.  The Arizona Revised Statutes define "real

---

[2]    Unless otherwise noted, capitalized terms used but not otherwise defined herein shall, as applicable, have the meanings ascribed to such terms in the Netherlands Brief or the Final DIP Order (as defined herein).

property" as "lands, tenements and hereditaments," *see* A.R.S. § 1-215(34), while "personal property" is defined to include, among other assets, "chattels," *see* A.R.S. § 1-215(30). "Lands, tenements and hereditaments" is a term of art that at common law is coextensive with the bundle of rights historically associated with ownership of land. The defining feature of "lands, tenements and hereditaments," which distinguishes real property from personal property, is a freehold interest of indeterminate duration (e.g., ownership in fee simple or a term for life). By contrast, leasehold interests—i.e., estates for years—are for a definite term and, therefore, not considered "real property" at common law. At common law, leasehold interests are instead defined as "chattels real," a form of intangible chattel that grants a possessory interest in real property that falls short of a freehold estate and, as such, is treated as personal property. Ultimately, far from having abrogated the common law rule, as the Netherlands suggests, the Arizona legislature has expressly codified the common law rule by defining "[e]states for years" (i.e., leaseholds) as "chattels real" and then defining "chattels" as personal property. *See* A.R.S. §§ 1-215(30), 33-202(B). Thus, because MDHI's interests under the Leases are chattels real, and likewise are not "lands, tenements and hereditaments," such interests are personal property—not real property—to which the Netherlands' judgment lien cannot attach under Arizona law.

3.      The Netherlands' arguments to the contrary entirely ignore the controlling Arizona statutes—Sections 1-215 and 33-202—defining MDHI's leasehold interests as personal property. This oversight alone is fatal to the Netherlands' purported lien. Further, the Netherlands' argument that the judgment lien attaches to the Leases as "an interest in real property" would impermissibly expand Arizona's judgment lien statute beyond its plain language. Netherlands Br. at ¶ 23. The Arizona judgment lien statute does not authorize judgment liens to attach to *interests* in real property; it authorizes judgment liens to attach to *real property*. This distinction is critical because,

2

while MDHI's leasehold interests are possessory interests in real property, they are not "real property" as that term is defined under Arizona statute or understood at common law.  Likewise, the Netherlands' argument that the Leases must be considered real property because consensual security interests granted in real property leases are perfected through the real property system rather than under the Arizona UCC (as defined below) is irrelevant and answers the wrong question.  *See id.* ¶¶ 23-30.  The Arizona UCC and the parallel system for recording interests in real property are statutory schemes for the creation, perfection, and enforcement of security interests.  But, before there is any security interest to perfect, there must first be "real property," which is defined under Section 1-215(34) of the Arizona Revised Statutes, not under the Arizona UCC.  The Arizona UCC does not speak to the character of property as real or personal, nor does it purport to do so.

4.      Likewise, the Netherlands' judgment lien does not attach to the Mesa Improvements because, under Arizona law, either (a) the Mesa Improvements are owned by the City of Mesa ("**Mesa**") in its capacity as lessor and thus, are Mesa's real property, or (b) the Mesa Improvements are owned by MDHI and thus, are MDHI's personal property.  In either case, the Netherlands' judgment lien does not attach to the Mesa Improvements.  Arizona law provides that, absent clear and unambiguous language evidencing the parties' intent that ownership of the improvements be with the lessee, the default rule is that improvements on the leased real property are owned by the lessor.  Under the facts here, it is at best ambiguous as to whether the Mesa Quitclaims (as defined below), which are subject to numerous restrictive conditions, actually conveyed true "ownership" of the Improvements to MDHI.  Specifically, the Mesa Quitclaims are, by their express terms, subject to the terms and conditions of the Mesa Leases.  The Mesa Leases contain provisions that so significantly restrict MDHI's authority to control and dispose of the

Mesa Improvements—the historical hallmarks of ownership—that there is significant ambiguity regarding whether Mesa, rather than MDHI, should be considered the true owner of the Mesa Improvements.  Given the ambiguity regarding ownership of the Mesa Improvements, the default rule under Arizona law—which resolves ambiguities in favor of the lessor—controls and Mesa should be deemed the owner of improvements on the leased premises given the absence of clear and unambiguous language to the contrary.  Accordingly, the Netherlands' judgment lien could not attach to the Mesa Improvements because the improvements are owned by Mesa—not MDHI.

5.      However, to the extent the Mesa Improvements are determined to be owned by MDHI, the Mesa Improvements are personal property—not real property—in the hands of MDHI. This conclusion flows from the fact that, under Arizona law, improvements are treated as personal property when they are conveyed to or constructed by lessees.  Thus, even if MDHI owns the Mesa Improvements (which, to be clear, it does not), the Netherlands' judgment lien cannot attach to those assets because they are not real property.

6.      The Netherlands' position that the Mesa Improvements constitute "fixtures" does not alter the outcome.  While it is unclear whether property can constitute fixtures in the hands of a tenant, if it could then the Netherlands' lien would be junior to the existing lien of the Prepetition Secured Parties (as defined below) and, consequently, the Netherlands' claim would be rendered wholly unsecured under Section 506(a) of the Bankruptcy Code.  MDHI granted the Prepetition Secured Parties a security interest in, among other collateral, any "fixtures" owned by MDHI and the Prepetition First Lien Agent (as defined below) properly filed a UCC-1 financing statement with the Arizona Secretary of State covering all assets of MDHI.  Under the Arizona UCC, a security interest in fixtures perfected by a prior-in-time filed UCC-1 financing statement is senior to a conflicting "lien on real property obtained by legal or equitable proceedings" that is later

4

recorded in the real property records of the applicable Arizona county. *See* A.R.S. § 47-9334(E)(3). Accordingly, to the extent the Netherlands' judgment lien attaches to the Mesa Improvements and such improvements are "fixtures" owned by MDHI, as the Netherlands contends, the judgment lien is junior in priority to the Prepetition Secured Parties' security interest in such fixtures.

7.      For each of the foregoing reasons, as well those set forth below, the Debtors request entry of an order concluding and finding that (a) the Netherlands' judgment lien did not attach to any assets of MDHI, and (b) to the extent the Netherlands' judgment lien did attach to the Mesa Improvements and the Mesa Improvements are fixtures, such lien is junior to the Prepetition Liens (as defined below). And because the Netherlands' judgment lien did not attach to any assets of MDHI, the Netherlands Lien Dispute can be resolved in totality as a matter of law at this first phase without the need to address any of the fact-intensive Phase Two Issues or hold a Phase Two Hearing.

## BACKGROUND

### A.    Chapter 11 Cases

8.      On March 30, 2022 (the "**Petition Date**"), the Debtors filed voluntary petitions in this Court commencing cases (the "**Chapter 11 Cases**") for relief under Chapter 11 of the Bankruptcy Code.

9.      The Debtors continue to manage and operate their businesses as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been requested in the Chapter 11 Cases, and no committees have yet been appointed.

10.     The Chapter 11 Cases are jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.

B.      **The Final DIP Order and Netherlands Lien Dispute**

11.      On April 26, 2022, the Court entered a final order that, among other things, authorized the Debtors to obtain postpetition financing and use collateral (including cash collateral) and granted adequate protection to the Prepetition Secured Parties (as defined below) [D.I. 205] (the "**Final DIP Order**").  The Final DIP Order also granted adequate protection superpriority claims and liens to the Netherlands to the extent provided therein and established a process to address certain disputes regarding the extent, value and priority of the Netherlands Lien (as defined below) on the assets of MDHI.

12.      On May 2, 2022, pursuant to the Final DIP Order, the Netherlands filed the Netherlands Brief, asserting that the (a) Netherlands holds a valid and binding lien (the "**Netherlands Lien**") that attached to MDHI's interests as lessee under MDHI's leases and certain improvements on the leased premises and (b) Netherlands Lien is senior to the Prepetition Liens with respect to such assets.

C.      **The Leases**

13.      The Debtors do not own any land.  Instead, the Debtors lease properties to operate their business.  Specifically, as described in the following paragraphs, MDHI is the lessee under multiple leases for property located in Maricopa County, Arizona:

1.      **Headquarters Lease**

14.      Pursuant to that certain Commercial Lease, dated March 28, 1983, between MDHI (as successor in interest to Hughes Helicopters, Inc.) and Mesa (as amended, restated, supplemented, or otherwise modified from time to time, the "**Headquarters Lease**," which is attached to the Sullivan Declaration as **Exhibit 1**), MDHI leases its headquarters and certain manufacturing and installation facilities located at 4555 East McDowell Road, Mesa, Arizona 85215 ("**4555 East McDowell**").  The buildings situated on the premises include a production

facility in which the Debtors manufacture helicopters (Building 610), a paint facility (Building 612), a warehouse (Building 614), a repair station (Building 620), and the headquarters building (Building 615).   Building 615 houses the engineering and administrative departments and is comprised of a number of conjoined mobile homes.  Each of the other buildings is modular (i.e., prefabricated).  The Headquarters Lease currently expires on March 28, 2023.  Headquarters Lease § 2.  MDHI has two options to extend the lease term for an additional five years, such that the lease will expire on March 28, 2033 if both options are exercised.[3]  *Id.*

### 2.    Madison Hangar Lease

15.    Pursuant to that certain Commercial—Fixed Base Operator Lease, dated June 1, 1983, between MDHI (as successor in interest to Madison Aviation) and Mesa (as amended, restated, supplemented, or otherwise modified from time to time, the "**Madison Hangar Lease**," which is attached to the Sullivan Declaration as **Exhibit 2**), MDHI leases a hangar (the "**Madison Hangar**") located at 4555 East McDowell.  The Madison Hangar Lease expires on May 31, 2033.  Madison Hanger Lease § 3.

---

[3]    Although the issue of valuation will be decided at the Phase Two Hearing, to the extent necessary, it is important to briefly address the Netherlands' claim that the relevant "real estate assets have . . . substantial value." Netherlands Br. ¶ 17.  With no support whatsoever, the Netherlands asserts that "[t]he Mesa Ground Lease [i.e., the Headquarters Lease] alone, given its critical role in the Debtors' ongoing operations, may have a market value in the tens of millions of dollars."  *Id.*  The importance of a lease to a specific debtor does not factor into the valuation of that lease—i.e., "the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller"—as required by the Supreme Court of the United States in *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 960 (1997).  *See also In re Motors Liquidation Co.*, 482 B.R. 485, 494 (Bankr. S.D.N.Y. 2012) (holding that the fair market value of collateral is the replacement value of the collateral and declining to apply the "value in use" standard, which is defined as "[t]he value a specific property has to a ***specific person or a specific firm as opposed to the value to persons or the market in general***." (emphasis added)).  To the extent a Phase Two Hearing is necessary, the Debtors will demonstrate that, given the Headquarters Lease currently expires in under a year and can only be extended for an additional 10 years, such lease falls significantly below the typical amount of time by which commercial leases last and thus has limited fair market value.  Likewise, the other Leases are for short terms and therefore, have limited market value.  In addition, the Leases significantly restrict among other things, MDHI's use of the property and the related improvements and MDHI's ability to assign and sublet the Leases.

### 3. Turf Area Lease

16. Pursuant to that certain Commercial Lease, dated October 1, 1986, between MDHI (as successor in interest to McDonnell Douglas Helicopter Company) and Mesa (as amended, restated, supplemented, or otherwise modified from time to time, the "**Turf Area Lease**," which is attached to the Sullivan Declaration as **Exhibit 3**, and, together with the Headquarters Lease and the Madison Hangar Lease, the "**Mesa Leases**"), MDHI leases land adjacent to the runway at Falcon Field Airport located at 4555 East McDowell. There are no improvements on the land subject to the Turf Area Lease. The Turf Area Lease's term is tied to the Headquarters Lease such that it expires upon expiration of the Headquarters Lease. Turf Area Lease § 2.

### 4. Quitclaim Deeds

17. In 2007, Mesa executed quitclaim deeds purporting to convey to MDHI (a) all of its "right, title and interest in any and all buildings, structures, improvements, fixtures now or at any time hereafter situated on the Land . . . , including, but not limited to, improvements commonly known as Building 610, Building 612, Building 615, Building 620 and Building 630/Madison Hangar" leased under the Mesa Leases pursuant to the Quit Claim Deed to Improvements, dated January 31, 2007; and (b) all personal property and its rights to "fixtures and other items of property, now or hereafter attached or affixed to or incorporated into the Improvements, which are located on or in the Improvements or the Land" leased under the Mesa Leases pursuant to the Quit Claim Bill of Sale, dated January 31, 2007 (collectively, the "**Mesa Quitclaims**," which are attached to the Sullivan Declaration as **Exhibit 4** and **Exhibit 5**, respectively).

18. Each of the Mesa Quitclaims, however, are expressly subject to the terms and conditions of the Mesa Leases, Quit Claim Bill of Sale ¶ 1; Quit Claim Deed to Improvements ¶ 1. And the Headquarters Lease and the Madison Hangar Lease (the only properties with improvements located thereon) each provide that "[u]pon termination of this Lease, all building[s],

8

structures, or other improvements placed on the Demised Premises by [MDHI] shall become the property of [Mesa]." Headquarters Lease § 7; Madison Hangar Lease § 7.

19.     In addition to granting Mesa a reversionary interest in the improvements, the Headquarters Lease and the Madison Hangar Lease significantly restrict MDHI's rights to control and dispose of the Mesa Improvements:

- MDHI may only use the property and Mesa Improvements for operation of helicopter manufacturing and service operations, *see* Headquarters Lease §§ 3, 9, Madison Hangar Lease § 4;

- MDHI may not make further improvements to the property without Mesa's consent, *see* Headquarters Lease § 7, Madison Hangar Lease §§ 7, 31;

- MDHI must maintain public liability and property damage insurance that is acceptable to Mesa, name Mesa an additional insured, and provide notice to Mesa if the policy is cancelled, *see* Headquarters Lease § 10, Madison Hangar Lease § 10;

- Under the Madison Hangar Lease, MDHI must also maintain fire insurance "to the extent of eighty percent (80%) of the insurable value of the buildings and other insurable improvements" that is acceptable to Mesa, name Mesa as a loss payee on the policy, and provide notice to Mesa if the policy is cancelled, *see* Madison Hangar Lease § 12;

- MDHI is obligated to pay utilities and taxes related to the properties as they come due, repair and maintain the Mesa Improvements, and keep the premises and Mesa Improvements free of mechanic's liens and materialman's liens, *see* Headquarters Lease §§ 6, 8, 13, Madison Hangar Lease §§ 6, 8, 15; and

- The Headquarters Lease and the Madison Hangar Lease may not be assigned or sublet without prior written consent of Mesa and, with respect to the Madison Hangar Lease, MDHI may not encumber MDHI's interest, in each case without the consent of Mesa, *see* Headquarters Lease § 22, Madison Hangar Lease § 28.

**5.      AMO Leases**

20.     Pursuant to that certain Lease Agreement, dated May 1, 2017, that certain Lease Agreement, dated September 1, 2017, and that certain Lease Agreement, dated October 1, 2014 (collectively, the "**AMO Leases**," each of which is attached to the Sullivan Declaration as

9

Exhibit 7, **Exhibit 6**, and **Exhibit 8**, respectively), MDHI leases from Mesa Industrial Center

Complex, LLC two units in a commercial building located at 5456 East McDowell, Mesa, Arizona

85215. MDHI uses these units for the assembly and maintenance of helicopters. Each of the AMO

Leases expires on September 30, 2022. The improvements on the property leased under the AMO

Leases are part of the leased premises and no portion thereof was conveyed to MDHI.

### 6. Falcon Hangar Leases

21.    MDHI leases five hangars (the "**Mallory Hangars**") located at 4562 East Mallory

Circle, Mesa, Arizona 85215, from Falcon Hangar, LLC, which MDHI uses to store helicopters,

parts, supplies, and accessories for the maintenance of helicopters (such leases, the "**Falcon**

**Hangar Leases**," each of which is attached to the Sullivan Declaration as **Exhibits 9-13**, and,

together with the Mesa Leases and the AMO Leases, the "**Leases**").[4] Each of the Falcon Hangar

Leases expires on February 23, 2023. The hangars are part of the leased premises and no portion

thereof was conveyed to MDHI.

### D.    MDHI's Prepetition Secured Indebtedness

### 1.    Prepetition Term Loan Facility

22.    MDHI is the borrower under that certain Credit Agreement, dated as of July 8, 2005

(as amended, restated, amended and restated, supplemented, waived, or otherwise modified from

time to time, the "**Prepetition Credit Agreement**," which is attached to the Sullivan Declaration,

as **Exhibit 14**), with Monterrey as guarantor, Ankura Trust Company, LLC ("**Ankura**"), as

---

[4]    The Falcon Hangar Leases consist of: the Falcon Hangar Rental Agreement, dated November 3, 2016; the Falcon Hangar Rental Agreement, dated November 3, 2016; the Falcon Hangar Rental Agreement, dated August 9, 2017; the Falcon Hangar Rental Agreement, dated May 22, 2017; and the Falcon Hangar Rental Agreement, dated May 22, 2017.

US-DOCS\131584123.20

administrative agent for the Zohar Lenders,[5] Patriarch Partners Agency Services, LLC ("**PPAS**"), as administrative agent for the Patriarch Lenders,[6] Ankura and PPAS as collateral agent (together, the "**Prepetition First Lien Collateral Agent**" and, together with Ankura as administrative agent for the Zohar Lenders and PPAS as administrative agent for the Patriarch Lenders, the "**Prepetition First Lien Agent**") and the lenders party thereto (the "**Prepetition First Lien Lenders**" and, together with the Prepetition Agent, the "**Prepetition First Lien Secured Parties**").

23.     Pursuant to the Prepetition First Lien Credit Agreement, the Prepetition First Lien Lenders provided MDHI with a term loan facility (the "**Prepetition First Lien Facility**").  As of the Petition Date, not less than $375 million in respect of the loans made under the Prepetition First Lien Facility remains outstanding (collectively, the "**Prepetition First Lien Obligations**").

24.     In connection with the Prepetition First Lien Credit Agreement, MDHI is party to that certain Security Agreement, dated as of July 8, 2005 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Prepetition First Lien Security Agreement**," which is attached to the Sullivan Declaration as **Exhibit 15**), among MDHI, the Prepetition First Lien Agent, and the other loan parties thereto.  Pursuant to the Prepetition First Lien Security Agreement, the Prepetition First Lien Loan Obligations are secured by valid, binding, and enforceable first-priority security interests in and liens on (the "**Prepetition First Liens**") the "Collateral" (the "**Prepetition Collateral**"), which includes, among other assets constituting substantially all of MDHI's assets, "fixtures."   Prepetition First Lien Security

---

[5]     The "**Zohar Lenders**" and "**Zohar Noteholders**" shall mean, collectively, Zohar CDO 2003-1, Limited, Zohar II 2005-1, Limited, and Zohar III, Limited.

[6]     The "**Patriarch Lenders**" and "**Patriarch Noteholders**" shall mean Ark Investment Partners II, L.P. and Ark II CLO 2001-1, Ltd.

Agreement § 1(a).  On July 12, 2005, the Prepetition First Lien Agent filed a UCC-1 financing statement with the Arizona Secretary of State's office covering all assets, thereby perfecting the Prepetition First Liens on the Prepetition Collateral, including any fixtures owned by MDHI.[7]  The UCC-1 remains in effect until July 12, 2025.  The Prepetition Secured Parties did not file a "fixture filing" in the Office of the Maricopa County Recorder.

### 2.    Prepetition Subordinated Notes

25.    Under that certain Notes Purchase Agreement, dated as of April 17, 2007 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Prepetition Note Purchase Agreement**"), MDHI issued certain Notes (as defined in the Prepetition Note Purchase Agreement) to the Purchasers (as defined in the Prepetition Note Purchase Agreement) (such Notes, collectively, the "**Prepetition Notes**").[8]  As of the Petition Date, an aggregate amount of not less than $60 million was outstanding under the Prepetition Notes (the "**Prepetition Note Obligations**" and, together with the Prepetition First Lien Obligations, the "**Prepetition Secured Obligations**").

26.    MDHI and each of the Zohar Noteholders and Patriarch Noteholders are party to certain Amended and Restated Subordinated Security Agreements dated as of May 31, 2011 (collectively, "**Prepetition Notes Security Agreements**," each of which is attached to the Sullivan Declaration as **Exhibits 16-19**).  The Prepetition Note Obligations are secured by second-priority

---

[7]    Ankura's liens are perfected under the UCC-3 amendment that was filed on August 8, 2019, pursuant to which PPAS and Ankura were both made co-agents under the 2005 UCC-1 financing statement.  Ankura also filed an identical UCC-1 financing statement on January 20, 2021, which remains in effect until January 8, 2026.  The July 12, 2005 UCC-1 financing statement and the January 20, 2021 UCC-1 financing statement are each attached to the Sullivan Declaration as **Exhibit 20** and **Exhibit 21**, respectively.

[8]    The holders of the Notes as of the date hereof and their respective successors and assigns are collectively referred to herein as the "**Prepetition Noteholders**" and, together with the Prepetition First Lien Secured Parties, the "**Prepetition Secured Parties**."

security interests in and liens on the Prepetition Collateral, including "fixtures" owned by MDHI (collectively, the "**Prepetition Note Liens**" and, together with the Prepetition First Liens, the "**Prepetition Liens**").

        E.     **The Netherlands' Judgment Lien**

27.     In 2005, the National Police Agency of the Netherlands (the "**KLPD**") brought suit against MDHI in two separate actions in the Hague District Court in the Netherlands, alleging that MDHI is liable by way of a corporate guaranty for the default of a distributor to deliver certain aircraft to the KLPD under a procurement contract executed in 2001. The Hague District Court rendered two separate judgments against MDHI for damages plus fees and interest. The judgments were assigned to the Netherlands and appealed to the Hague Court of Appeal, which consolidated the appeals and awarded a consolidated judgment in the amount of approximately €7 million in May 2012.

28.     On August 28, 2015, the Netherlands sought recognition of the judgment in the Superior Court of Maricopa County, Arizona (the "**Superior Court**"). MDHI moved successfully to dismiss the action on December 15, 2015. The Netherlands filed an amended claim and moved for summary judgment in March 2018. The Superior Court issued a decision in favor of the Netherlands in August 2018 and, on November 13, 2018, issued a judgment in favor of the Netherlands in the amount of $15,074,750, including interest and fees (the "**2018 Arizona Judgment**"). The 2018 Arizona Judgment was filed in the Office of the Maricopa County Recorder on the same date. MDHI appealed the 2018 Arizona Judgment to the Arizona Supreme Court, which upheld the Superior Court's entry of the 2018 Arizona Judgment. On August 3, 2021, a final judgment reflecting the outcome of the appeal and increasing the judgment amount to $15,539,198 was recorded in the Maricopa County Recorder's Office.

13

## ARGUMENT

I.    **THE NETHERLANDS DOES NOT HAVE A LIEN ON ANY ASSETS OF MDHI BECAUSE MDHI DOES NOT OWN ANY REAL PROPERTY IN MARICOPA COUNTY.**

A.    **The Netherlands Bears the Burden of Establishing the Validity and Scope of Its Lien.**

29.    It is well established (and axiomatic) that the burden of proof may vary from issue to issue in a given dispute and, thus, determining which party bears the burden of proof depends on the relevant legal or factual issue.  *See, e.g.*, *Sabatino v. Liberty Life Assurance Co. of Bos.*, 286 F. Supp. 2d 1222, 1232 (N.D. Cal. 2003) ("The Court must first determine which party has the burden of proof on each issue").  Here, the fundamental issue in Phase One is whether the Netherlands has a valid lien and, on that issue, the burden of proof falls squarely upon the Netherlands under both Section 506(a) and Section 363(p) of the Bankruptcy Code

30.    The determination of the value of a secured claim, even for adequate protection purposes, must be viewed through the prism of Section 506(a) of the Bankruptcy Code.[9]  *See, e.g.*, *In re Residential Cap., LLC*, 501 B.R. 549, 592 (Bankr. S.D.N.Y. 2013) (to answer the question of how to value collateral for adequate protection purposes, "the Court looks to valuation principles under Section 506(a)" of the Bankruptcy Code); *In re Winthrop Old Farm Nurseries, Inc.*, 50 F.3d 72, 74 (1st Cir. 1995) ("a valuation for § 361 [i.e., adequate protection] purposes necessarily looks to § 506(a) for a determination of the amount of a secured claim").  This basic understanding of

---

[9]    Section 506(a) of the Bankruptcy Code, which governs the allowance and valuation of secured claims, provides in part:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . .   Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property . . . .

11 U.S.C. § 506(a).

the nature of the dispute here and the applicability of Section 506 of the Bankruptcy Code is itself critical because in determining the extent to which an entity's claim is secured, the Third Circuit employs a burden-shifting framework, pursuant to which "[t]he initial burden should be on the party challenging a secured claim[]" but, once the challenging party refutes the validity of the claim "with sufficient evidence," "the burden shifts [and] [t]he creditor thereafter bears 'the ultimate burden of persuasion . . . to demonstrate by a preponderance of the evidence both the extent of its lien and the value of the collateral securing its claim.'" *In re Heritage Highgate, Inc.*, 679 F.3d 132, 140 (3d Cir. 2012). Only "[o]nce the amount and extent of the secured claim has been set, the burden shifts to a debtor seeking to use, sell, lease, or otherwise encumber the lender's collateral under Sections 363 or 364 of the Code to prove that the secured creditor's interest will be adequately protected." *Residential Cap.*, 501 B.R. at 590. Given that the Debtors are challenging whether the Netherlands has any lien at all (in addition to what value it would have), the Netherlands bears the burden "to demonstrate by a preponderance of the evidence both the extent of its lien and the value of the collateral securing its claim." *Heritage Highgate*, 679 F.3d at 140.

31. The burden framework set out under Section 363(p) of the Bankruptcy Code is also applicable here. Specifically, Section 363(p) of the Bankruptcy Code provides that "[i]n any hearing under this section—(1) the trustee has the burden of proof on the issue of adequate protection; and (2) the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest." This is effectively the same burden framework as the one the Third Circuit employs when determining the value of a secured claim under Section 506(a) of the Bankruptcy Code—i.e., while the Debtors bear the burden of proving adequate protection, the Netherlands must first prove it has an interest that is actually secured and

thus entitled to adequate protection.  This makes perfect sense because "[t]hroughout the Code, the burden of proving the 'validity, priority, and extent' of security interests lies upon the creditors asserting such interests."  *Heritage Highgate*, 679 F.3d at 140, n.4 (quoting *In re Buick*, 126 B.R. 840, 851 (Bankr. E.D. Pa. 1991)).

32.    Any hearing on the instant dispute is necessarily a hearing under Section 363 of the Bankruptcy Code that, in turn, requires that the Netherlands bear the burden of proving the validity and scope of its lien.  This dispute will not only impact the asset sale the Debtors may undertake pursuant to Section 363(b) of the Bankruptcy Code, but also the ability of secured lenders to credit bid in such sale under Section 363(k) of the Bankruptcy Code.  The Netherlands recognizes this much in its brief.  *See* Netherlands Br. ¶ 5 ("And, absent a Lien Determination in the Netherlands' favor and/or continuation of the consensual stay on DIP Lender action imposed by the Final DIP Order, the DIP Lenders cannot credit bid unless they pay the Full Cash Value Amount to the Netherlands.").  Further, the instant dispute directly invokes Section 363(e) of the Bankruptcy Code, which provides that "on request of an entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee [or the debtor], the court . . . shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  The Netherlands filed its brief for the express purpose of determining whether it is entitled to, among other things, additional adequate protection.  Netherlands Br. ¶ 6.  Thus, given that this dispute is replete with issues that directly fall under or implicate Section 363 of the Bankruptcy Code, Section 363(p) of the Bankruptcy Code necessitates that the Netherlands bear "the burden of proof on the issue of the validity, priority, or extent of [its] interest."

33.    The Netherlands' arguments to the contrary are unavailing.  The Netherlands states that, "[u]nder section 364(d)(1) of the Bankruptcy Code, the burden of proof as to whether a

secured creditor whose liens are being primed is adequately protected is on the debtor." Netherlands Br. ¶ 19, n.7.  The Debtors do not dispute they have the ultimate burden of demonstrating adequate protection.  The Netherlands, however, makes an unsupportable leap that because the instant dispute first arose during the approval process for the Final DIP Order, the Debtors also bear the burden of proving "both the existence and scope of the affected creditor's liens" under Section 364(d)(1) of the Bankruptcy Code.  No court has held that, and the Netherlands has invented that standard out of whole cloth.[10]

34.    The Netherlands' attempts to mischaracterize Phase One as a question of adequate protection fly in the face of reality that this dispute extends well beyond the confines of Section 364(d)(1) of the Bankruptcy Code.  Although this dispute first arose during the approval process for the Final DIP Order and it has a bearing on the nature or amount of adequate protection (if any) that the Debtors must provide to the Netherlands, this dispute has implications that reach well beyond the context of that order because the central focus of this dispute is whether the Netherlands has a secured claim under Section 506(a) of the Bankruptcy Code which raises issues under Section 363 of the Bankruptcy Code.  Indeed, the Netherlands recognizes that the goal of this proceeding is to determine "the validity, extent and priority of the Netherlands Claim and the Netherlands Lien" for both "*adequate protection and distribution purposes*."  Netherlands Br. ¶ 3 (emphasis added).  And that is exactly right—this dispute will not only determine whether the Netherlands is entitled to adequate protection under the Final DIP Order, but also whether it will

---

[10]    The Netherlands readily acknowledges that Section 364(d)(1) of the Bankruptcy Code makes "no reference to 'validity, priority, or extent' of interests."  *See id.*  The cases the Netherlands cite to—*In re Packard Square LLC*, 574 B.R. 107, 116 (Bankr. E.D. Mich. 2017) and *In re Jennings*, No. BKR. 09-13097-JMD, 2010 WL 757341, at *6 (Bankr. D.N.H. Feb. 25, 2010)—likewise make no mention of who bears the burden of proving the existence and scope of a security interest because it was already established in those cases that the creditors were actually secured.

be treated as a secured creditor in either the Debtors' asset sale or reorganization.  While the Netherlands attempts to distinguish the burdens in the current dispute from those of Section 363(p) of the Bankruptcy Code (presumably on the basis that the current dispute does not qualify as a hearing under Section 363 of the Bankruptcy Code), Netherlands Br. ¶ 19, n.7, such attempt is patently incorrect.  *First*, the burden always falls on the secured creditor to prove the extent and scope of its lien.  *Heritage Highgate*, 679 F.3d at 140, n.4.  ("Allocating the ultimate burden of persuasion [as to the validity, priority, and extent of a security interest] to the creditor whose proof of claim has been challenged is consistent with the rest of the Code.").  And that is the same the burden set out under Section 363(p) of the Bankruptcy Code.  *Second*, for the reasons expressed above, this dispute is inextricably tied to Section 363 of the Bankruptcy Code and it requires the burden framework set out under Section 363(p) thereof.

35.     Thus, the dispute at hand is not whether the Netherlands is adequately protected but whether it has a secured claim under Section 506(a) of the Bankruptcy Code and this dispute raises corollary issues that under Section 363 of the Bankruptcy Code.  Only after the Netherlands establishes that it has a lien, and its value, would the Debtors then have the burden to show that the lien is adequately protected.  As such, the Netherlands bears the ultimate burden of proving the validity and scope of its purported lien.

36.     For the reasons set forth herein, the Netherlands has failed to meet its burden.

**B.     Neither the Leases nor the Mesa Improvements are Real Property.**

37.     Under Arizona law, a properly recorded judgment lien attaches to "all ***real property of the judgment debtor*** in the county in which the judgment is recorded, whether the property is

then owned by the judgment debtor or is later acquired." A.R.S. § 33-964(A) (emphasis added).[11]

The Netherlands asserts its judgment lien attaches to the Leases and the Mesa Improvements.

Thus, the question at the core of this dispute is:  Are the Leases and the Mesa Improvements "real

property" of MDHI within the meaning of Article 5?  The statutes are clear—the Leases are not

real property and, therefore, the Netherlands' judgment lien did not attach to MDHI's interests in

the leases.  Likewise, the Mesa Improvements are not owned by MDHI or, to the extent MDHI

does own the Mesa Improvements, the improvements are personal property of MDHI—but in

either case, the Netherlands' judgment lien would not attach to the Mesa Improvements.  Finally,

as discussed in the next section, to the extent that the Mesa Improvements are "fixtures" owned by

MDHI, the Netherlands Lien would be junior to the Prepetition Lien.

### 1.     The Leases are Not "Real Property" but rather "Chattels Real" and, therefore, Personal Property.

38.     The term "real property" is not defined in Article 5 or in any other provision of

Title 33 of the Arizona Revised Statutes, which addresses interests in property.  In the absence of

a definition specifically applicable to Article 5, the definition of "real property" in Section 1-215

controls in construing the judgment lien statute.[12]  Section 1-215 of the Arizona Revised Statutes

defines "property" to include "both real and personal property."  A.R.S. § 1-215(33).  "Real

Property" is then defined as "coextensive with lands, tenements and hereditaments," A.R.S. § 1-

215, while "personal property" is defined to include "money, goods, *chattels*, things in action and

evidences of debt."  A.R.S. § 1-215(30) (emphasis added).  The Arizona legislature has plainly

---

[11]   Arizona's judgment lien statute is contained in Article 5 (Judgement Liens on Real Property) of Chapter 7 (Liens) of Title 33 (Property) of the Arizona Revised Statutes, *see* A.R.S. §§ 33-961–968 ("**Article 5**").

[12]   The definitions in Section 1-215 are contained in Title 1 (General Provisions) and "shall be observed in the construction of the laws of the state unless such construction would be inconsistent with the manifest intent of the legislature."  A.R.S. § 1-211; *see also State v. Sweet*, 693 P.2d 921, 926 (Ariz. 1985).

and unambiguously defined leasehold interests as personal property—and thus, not real property. Under Title 33 of the Arizona Revised Statutes, which addresses interests in property, "[e]states for years [(i.e., leasehold interests)] are chattels real."  A.R.S. § 33-202(B).[13]  "Chattels real" is not defined by statute and, therefore, the Arizona legislature has instructed that the term is to be understood in accordance with its meaning at common law.[14]  And at common law, a "chattel real" is a form of "chattel."  *See, e.g., Abraham v. Fioramonte*, 107 N.E. 2d 321, 325 (Ohio 1952) ("The courts have quite generally held that a lease for a term of years short of a freehold estate . . . is a special form of chattel commonly referred to as a chattel real."); Chattel, Black's Law Dictionary (11th ed. 2019) (defining "chattel" to include both "chattel personal" and "chattel real").  It is therefore "personal property" as defined in Section 1-215(30).  Thus, the statute defines leasehold interests as personal property.[15]

---

[13]    In full, Section 33-202 provides:

    A.  Estates of inheritance and for life are freehold estates, except that an estate for the life of a third person, whether limited to heirs or otherwise, is a freehold only during the life of the grantee or devisee, and after his death is chattel real.

    B.  Estates for years are chattels real.

    C.  Estates at will or by sufferance are chattel interests, but are not liable as such to sale on execution.

[14]    *See* A.R.S. § 1-201 ("The common law only so far as it is consistent with and adapted to the natural and physical conditions of this state and the necessities of the people thereof, and not repugnant to or inconsistent with the Constitution of the United States or the constitution or laws of this state, or established customs of the people of this state, is adopted and shall be the rule of decision in all courts of this state."); *see also Valley Nat'l Bank of Ariz v. Avco Dev. Co.*, 480 P.2d 671, 674 (Ariz. App. 1971) (citing A.R.S. § 1-201 for the proposition that the court is "instructed to look to common law for guidance" in interpreting the phrase "lands, tenements and hereditaments").

[15]    Because the leasehold interests are "personal property," the inescapable conclusion is that leasehold interests cannot be real property.  *See* A.R.S. § 1-215(33) (defining "property" as "real and personal property"); *SDI, Inc. v. Pivotal Parker Com., LLC*, 339 P.3d 672, 677 (Colo. 2014) ("[Personal property] includes everything that is subject to ownership, tangible and intangible, ***that is not real property***") (emphasis added); *see also* Personal Property, Black's Law Dictionary (11th ed. 2019) ("Any movable or intangible thing that is subject to ownership ***and not classified as real property***") (emphasis added).  Consequently, the Netherlands' judgment lien, which attaches only to real property of MDHI, does not attach to the MDHI's interests under the Leases. *See, e.g., State v. Burbey*, 403 P.3d 145, 147 (Ariz. 2017) ("When the text is clear and unambiguous, we apply the plain meaning and our inquiry ends.").

39.    In addition to leasehold interests fitting squarely within the statutory definition of "personal property," they also are not "lands, tenements and hereditaments" and therefore cannot be "real property."  The phrase "lands, tenements and hereditaments" is not defined by statute and, therefore, should be understood in accordance with its meaning at common law.  *See* A.R.S. § 1-201.  At common law, the phrase "lands, tenements and hereditaments" consists of the "ground, soil or earth," including the space above and below the soil, and "all things that have become a fixed part of the soil," as well as rights in the same that can be inherited.  *See Orchard v. Wright-Dalton-Bell-Anchor Store Co.*, 125 S.W. 486, 494 (Mo. 1909); *Callahan v. Martin*, 43 P.2d 788, 793 (Cal. 1935) ("A hereditament, as defined by Blackstone, included not only lands and tenements, but whatsoever passed to the heirs at law, rather than to personal representatives."); *Wood v. Galpert*, 204 N.E.2d 384, 386-87 (1965) (explaining that the phrase "lands, tenements and hereditaments" itself is a term of art at common law to "designate an owner's whole 'bundle of rights' in any given piece of land.").[16]

40.    Critically, the defining and essential feature of "lands, tenements and hereditaments"—which distinguishes real property from personal property—is permanence in the form of an indeterminate term.  *See Pac. Sw. Realty Co. v. County of Los Angeles*, 820 P.2d 1046, 1051 (Cal. 1991) ("A freehold estate is distinguished from other forms of estates in that it is of indeterminate duration"); *Jinkins v. City of Jal*, 386 P.2d 599, 602 (N.M. 1963) (explaining that

---

[16]    *See also* 2 Thompson on Real Property § 14.04 ("The word 'lands' soon obtained a well-settled meaning in law, and included the surface of the ground, together with everything that was on it and under it. . . . [Tenement] incudes not only land, but rents, commons and other rights and interests issuing out of or concerning land . . . at present nothing is considered as a tenement which is not of a permanent nature. . . . [Hereditaments are] everything that can be inherited, be it corporeal [e.g., lands and buildings] or incorporeal [e.g., easements or rents].").

interests short of a "freehold estate" are not lands, tenements and hereditaments).[17]  For this reason,

leasehold interests—mere possessory estates for a definite term—are not considered real property

at common law.  *See, e.g.*, *Callahan v. Martin*, 43 P.2d at 792 (interpreting statutory definition of

"real property" as "coextensive with lands, tenements, and hereditaments" and explaining "[t]he

rights or estate which the owner in fee or for life has in land are also described as real property,

but those rights which the owner of a leasehold interest has in and to the land or real property, as

the object of rights, are not real property, or real estate, but a chattel real, which is personalty");

*Abraham v. Fioramonte*, 107 N.E. 2d 321, 325 (Ohio 1952) ("[C]ourts have quite generally held

that a lease for a term of years short of a freehold estate is not 'land, tenements or

---

[17]    *See also* Freehold, Black's Law Dictionary (11th ed. 2019) (defining "freehold" as "[a]n estate in land held in fee simple, in fee tail, or for term of life"); Henry E. Colton, *Personal Property – Estates for Years – Nature of Interests of Lessee in Estates for Years*, 25 N.C. L. Rev. 516, 518 (1947) ("At common law, 'lands, tenements and hereditaments' embraced only estates of freehold.").

hereditaments.'").[18]  Thus, the Arizona statutory definition of "real property" does not include

leaseholds.

41.     It is for this precise reason that the Arizona Supreme Court has held that leasehold

interests are personal property.  As the Arizona Supreme Court has explained in a case upon which

the Netherlands itself relies, at common law leasehold interests are considered chattels real, a

special form of intangible chattel granting a possessory interest in real property.  Such form of

intangible chattel falls short of a freehold estate, and as such is personal property.  *See Harbel Oil*

*Co. v. Steele*, 318 P.2d 359, 361 (Ariz. 1975) ("One of the estates in land less than a freehold estate

is an estate for years [i.e., a leasehold]. Estates for years are chattels real. . . . ***At common law a***

***lease for years, being chattel real, is personal property***.") (emphasis added; internal citations

omitted).  Other courts faced with the question of whether leasehold interests are personal or real

property have also consistently held that leasehold interests, although granting a possessory

---

[18]  If the Arizona legislature had intended to deviate from the common law understanding of "real property" by expanding the scope of such term to include leasehold interests, it would have done so expressly rather than choosing a common law term of art with a well-established meaning.  *See* A.R.S. § 1-213 (Words and phrases) ("Technical words and phrases and those which have acquired a peculiar and appropriate meaning in the law shall be construed according to such peculiar and appropriate meaning.");  *see also Lewis v. Debord*, 356 P.3d 314, 317 (Ariz. 2015) (declining to read unwritten language into Section 33-967 and stating that because the legislature did not include language it had used elsewhere, "we assume that this omission was purposeful"); *see also City of New York v. Mabie*, 13 N.Y. 151, 158 (1855) (stating, in reference to "lands, tenement and hereditaments," that "[t]he legislature was dealing with terms of art and is presumed to have used them in their technical sense"). Indeed, a number of states have expanded their statutory definition of real property to "include lands, tenements, hereditaments, and all rights thereto and interests therein." *See, e.g.*, 1 Vt. St. Ann. § 132; Mass. Gen. Laws. Ann. ch. 4 § 7; Iowa Code § 4.1(13) (also includes "equitable as well as legal" interests).

Reliance on the common law formulation of real property in the judgment lien statute is particularly notable given that other provisions of the Arizona Revised Statutes have supplied their own definitions of "real property," typically expanding the scope of interests covered beyond the common law definition to fit the particular context and purpose of the statute.  *See* A.R.S. § 12-1141 (stating that for the purposes of Article 3 (Private Property Rights Protection Act) of Chapter 8 (Special Actions and Proceedings Relating to Property) of Title 12 (Courts and Civil Proceedings) of the Arizona Revised Statutes, "'[r]eal property,' 'property' or 'land' means all lands, including improvements and fixtures thereon, lands under water, all easements and hereditaments, corporeal or incorporeal, and every estate, interest and right, legal or equitable, in lands or water, and all rights, interests, privileges, easements, encumbrances and franchises relating thereto, including terms for years and liens of judgment, mortgage or otherwise.").

interest in real property, are personal property.  *See, e.g., Pac. Sw. Realty*, 820 P.2d at 1501 ("[A]n estate for years—in this case, a nonperiodic tenancy under a lease—is not a freehold estate. . . . [A]n estate for years is not real property at all but rather a chattel real—a form of personalty—even though the substance of the estate, being land, is real property."); *Fioramonte*, 107 N.E.2d at 325 ("The courts have quite generally held that a lease for a term of years short of a freehold estate is ***not 'land, tenements or hereditaments'*** . . .  that it is a special form of chattel commonly referred to as a chattel real.") (emphasis added); *Lenow v. Fones*, 4. S.W. 56, 59 (Ark. 1887) ("No proposition has been better settled from the earliest days of the common law than that a lease, of whatever duration, is but a chattel.").  Far from abrogating the common law on this point,  the legislature has codified the common law rule.  *See* A.R.S. §§ 1-215(30), 33-202(B).

42.    The Netherlands' arguments to the contrary are not merely deficient but actually suffer from a number of fatal flaws.  The Netherlands fails to grapple with, or even cite to, the controlling statutory provisions—i.e., Sections 1-215 and 33-202—that together clearly define leasehold interests as personal property and not as real property.

43.    Further, the Netherlands erroneously equates "an interest in real property" to "real property."  Netherlands Br. at ¶ 23.  Article 5 does not authorize judgment liens to attach to *interests* in real property; it authorizes judgment liens to attach to *real property*.  *See* A.R.S. §§ 33-961, 964.  The distinction is more than mere semantics.  At common law, while leases grant a possessory interest in real property, leaseholds nonetheless are considered, as chattels real, to be personal property.  *See, e.g. Fioramonte*, 107 N.E. 2d at 325; *Greene Line Terminal Co. v. Martin*, 10 S.E.2d 901, 906 (W. Va. 1940) ("Though a leasehold is intangible personal property—a chattel real—it possesses characteristics peculiar unto itself; it constitutes an interest in land, whereas other intangibles do not; it is immobile, and thereby differs from other intangibles such as

24

evidences of debt, which may be moved with the person."); *see also* 1 Powell on Real Property § 5.04 ("Estates for years, gradually evolving out of contracts . . . clearly became interests in land but never fully attained the historical dignity of being 'real property.'").

44.    Indeed, judgment liens—non-consensual liens that are purely "creatures of statute"—must be strictly construed in accordance with the terms of the statute. *See Tway v. Payne*, 101 P.2d 455, 456 (Ariz. 1940) (stating that "[j]udgment liens are creatures of statute, and are governed by its terms" and holding that the phrase "after acquired property" did not permit a duly docketed judgment lien, which was otherwise invalid as against community property, to attach to the judgment debtor's estate property after the judgment debtor's death); *Lewis v. Debord*, 356 P.3d 314, 316 (Ariz. 2015) ("[j]udgment liens are purely statutory remedies"); *see also Dietl v. Spika*, 923 N.E.2d 692, (Ohio Ct. App. 2009) ("Judgment liens are creatures of statute. From its earliest decisions, this court has recognized that the creation, existence and validity of judgment liens are strictly dependent upon statutory provisions."). Had the Arizona legislature intended to extend judgment liens beyond "real property" to any ***interest*** in real property, including chattels real, it would have done so expressly, as other states have. *See, e.g.*, Cal. Code Civ. Pro. § 697.340 ("A judgment lien on real property attaches to all interests in real property . . . but does not reach rental payments [or] a leasehold estate with an unexpired term of less than two years."); Conn. Gen. St. Ann. § 52-286 ("Leasehold interests in real estate . . . and any interest in buildings owned by one person on the land of another, may be attached in the same manner as real estate."); Ind. Code Ann. § 34-55-9-2 ("All final judgments for the recovery of money or costs . . . constitute a lien upon real estate ***and chattels real***.") (emphasis added).

45.    The cases cited by the Netherlands at footnote 8 for the proposition that leasehold interests "have long been" subject to judgment liens are each inapposite. A number of these cases

addressed judgment lien statutes that expressly extended the reach of such liens to leasehold interests or other interest in real property. *See Bachyrycz v. Gateway Bank*, No. 30 04 77, 1992 WL 43598, at *2–3 (Conn. Super. Ct. Mar. 2, 1992); *In re De Leon*, No. 11-56921-ASW, 2013 WL 3805733, at *10 (Bankr. N.D. Cal. July 18, 2013); *Henderson v. Tomb*, 169 Misc. 737, 739 (N.Y. Sup. Ct. 1938); *Ives v. Beecher*, 54 A. 207 (1903); *N. Bank of Ky. v. Roosa*, 1844 WL 44, at *15 (Ohio Dec. 1844); *McClean v. Rockey*, 3 McLean 235 (C.C.D. Ohio 1843). Similarly, a number of the cases addressed statutes that defined real property more broadly to include all interests in real property. *See Mayfield Smithson Enters. v. Com-Quip, Inc.*, 896 P.2d 1156, 1162 n.4 (N.M. 1995); *Joslyn v. Spellman*, 1884 WL 6423, at *2 (Ohio Super. 1884); *First Nat'l Bank of Davenport v. Bennett*, 40 Iowa 537, 539 (1875). Finally, the only other case cited by the Netherlands—a bankruptcy opinion interpreting Hawaii law—found that there was not a valid judgment lien on the leasehold. *See In re KIKI, Ltd.*, 41 B.R. 825, 826–27 (Bankr. D. Haw. 1984).[19]

46.     In an effort to suggest that leasehold interests must be real property, the Netherlands points to (a) the exclusion of security interests in real property leases from Article 9 of the Uniform Commercial Code, as adopted in Arizona (the "**Arizona UCC**") and (b) statutory provisions providing that such interests must be perfected in the real property system. *See* Netherlands Br. ¶¶ 29-31. But the methods prescribed by statute for attaching, perfecting, and enforcing *consensual* security interests have no bearing on whether MDHI's leasehold interests are real

---

[19]     Instead—contrary to the Netherlands' position—in the absence of express statutory authority, courts have consistently held that judgment liens ***do not*** attach to leasehold interests. *See, e.g.*, *Munson v. Wade*, 298 S.W. 25, 26 (Ark. 1927) (stating that "[w]e have no statute which in specific terms declares that a judgment lien on land or real estate includes under these terms likewise a leasehold interest in such land for any purpose" and holding that a judgment lien could only attach to a freehold); *see also Summerville v. Stockton Milling Co.*, 76 P. 243, 246 (Cal. 1904) ("The authorities generally are to the effect that at common law a judgment lien does not extend to estates for years.").

property within the meaning of the judgment lien statute.  These statutory schemes are concerned with the fair and orderly creation and enforcement of security interests and do not purport to speak to the character of property as real or personal.  *See, e.g., First Nat'l Bank in Grand Prairie v. Lone Star Life Ins. Co.*, 524 S.W.2d 525, 530 (Tex. Civ. App. 1975) ("The concept and intention of article 9 of the [Uniform Commercial Code] is to provide a method whereby all security interests in personal property and fixtures can be perfected.").

47.     Leasehold interests in real property are far from the only personal property carved out of the Arizona UCC—interests in automobiles,[20] rolling stock,[21] aircraft registered with the Federal Aviation Administration,[22] vessels,[23] and certain intellectual property,[24] among other types of personal property, are all generally created, perfected, and enforced outside the Arizona UCC. The fact that security interests in such property are not governed by the UCC hardly changes the property's character as personal property and certainly does not make it real property.

48.     For these reasons, the Netherlands' reliance on *In re Le Sueur's Fiesta Store, Inc.*, 40 B.R. 160, 162 (Bankr. D. Ariz. 1984), is misplaced.  The question addressed in *Le Sueur's* was "the proper place of filing to perfect a leasehold security interest" under Arizona law—not whether a leasehold interest is "real property" within the meaning of the judgment lien statute.  *See* 40 B.R. at 161.  In that case, the secured lender argued that it properly perfected its security interest in the debtor's leasehold by filing a financing statement with the Arizona Secretary of State's office

---

[20]   *See* A.R.S. § 47-9311(A)(2).

[21]   *See* A.R.S. §§  47-9109(C)(1), 47-9311(A)(1); 49 U.S.C. § 11301.

[22]   *See* A.R.S. §§  47-9109(C)(1), 47-9311(A)(1); 49 U.S.C. § 44017.

[23]   *See* A.R.S. §§  47-9109(C)(1), 47-9311(A)(1); 46 U.S.C. § 31321.

[24]   *See* A.R.S. §§  47-9109(C)(1), 47-9311(A)(1); 17 U.S.C. § 205 (copyrights); 35 U.S.C. § 261 (patents); 15 U.S.C. § 1060 (trademarks).

because the leasehold interest was personal property at common law and, therefore, governed by the Arizona UCC. *See id.* at 162. The bankruptcy court disagreed, finding that the leasehold interest must be perfected under the real property system, rather than the commercial code, because the creation of a security interest in real property leases was specifically excluded from the Arizona UCC, thereby abrogating by statute the common law rule that interests in leaseholds are perfected in the personal property system. *See id.*

49.     *Le Sueur's*, a non-controlling bankruptcy court decision, addresses only the narrow question presented—the proper method of creating and perfecting a consensual security interest in a leasehold interest—and as such, has no bearing on the question presented here—whether MDHI's leasehold interests fit within the term "real property" in Article 33 to which a nonconsensual judgment lien attaches. To the extent the Netherlands relies on *Le Sueur's* for the broader proposition that the "common law principle [that] a leasehold is chattel real" set forth in *Harbel* "has been abrogated by Arizona's enactment of its Commercial Code," the bankruptcy court's statement can only be understood in the specific context of that case. *Id.* at 162. The Arizona legislature's adoption of the Arizona UCC supplanted the common law rules for creation and perfection of security interests in real property leaseholds. But the adoption of the Arizona UCC did nothing to abrogate the common law rule in *Harbel* that leasehold interests, as chattel real, are personal property. In fact, as noted above, the opposite is true: the Arizona legislature has codified the common law rule in *Harbel* by specifically defining leasehold interests as chattels real and including "chattels" in the definition of personal property. *See* A.R.S. §§ 1-215(30), 33-202(B).

50.     Critically, the *Le Sueur's* court did not discuss, or even mention, Section 1-215(30) or Section 33-202(B). The only plausible explanation for what would otherwise be a glaring

omission is that the *Le Sueur's* court was only addressing the proper process for creation and perfection of security interests in leasehold interests, not the character of leasehold interests as real or personal property, which is what Section 1-215(30) and Section 33-202(B) address.  Until the Netherlands first establishes that it has a security interest, i.e., that a leasehold is "real property" within the meaning of Arizona's judgment lien statute, it is simply irrelevant how the Netherlands would perfect that interest.

51.     For the foregoing reasons, MDHI's interests in the Leases are personal property and thus, not real property subject to the Netherlands' judgment lien.

### 2.     The Mesa Improvements are Not Subject to the Netherlands Lien.

52.     The Netherlands confusingly conflates two issues—who owns the Mesa Improvements and whether the Mesa Improvements are real or personal property.  By conflating them, the Netherlands glosses over the critical hole in its argument—if the Mesa Improvements are somehow owned by Mesa (despite the general rule and lease terms to the contrary), that means that the improvements would be deemed personal property, not real property.[25]  No case has held that if a lessee owns improvements they are "real property."   So either Mesa owns the improvements as real property, or MDHI owns them as personal property, but in either case the Netherlands Lien cannot attach to the Mesa Improvements.

### a.     The Mesa Improvements are Owned by Mesa—Not MDHI.

53.     The Netherlands' judgment lien cannot attach to the Mesa Improvements because the Mesa Improvements are owned by Mesa—not MDHI.  Under Article 5, a judgment lien only attaches to "real property *of the judgment debtor*."   A.R.S. § 33-964(A) (emphasis added).  If

---

[25]   As discussed below, even if the Mesa Improvements are owned by MDHI and are real property in the hands of MDHI, to the extent they are "fixtures," as the Netherlands contends, the Prepetition Secured Parties' liens are senior to the Netherlands Lien.

property is not owned by the judgment debtor, it cannot be subject to the judgment lien. *See Rowe v. Schultz*, 642 P.2d 881, 882 (Ariz. Ct. App. 1982) ("If [the judgment debtor] effectively divested himself of ownership before [the judgment creditor] recorded his abstract of judgment, then the land was not 'real property of the judgment debtor' under A.R.S. § 33-964(A) and the lien did not attach.").

54.     As the Netherlands' own case recognizes, under Arizona law the general rule is that "permanent structure[s] placed by a tenant upon leased premises and attached to the realty are deemed to be real property ***and belong to the lessor***." *Maricopa County v. Novasic*, 473 P.2d 476, 478 (Ariz. Ct. App. 1970) (emphasis added). While "[t]his general rule is subject to the exception that the parties by express agreement may treat the building as belonging to the tenant," the terms of the lease and related documents must clearly and unambiguously express such intent. *Havasu Springs Resort Co. v. La Paz County*, 18 P.3d 143, 144 (Ariz. Ct. App. 2001).

55.     Further, in considering questions of ownership, Arizona courts will look beyond the form of ownership on paper—i.e., which party holds title to the property—and engage in a holistic examination of the substance of the parties' rights—i.e., which party holds the bundle of rights traditionally associated with true ownership of property. *See, e.g., Hardinge v. Empire Zinc Co.*, 148 P. 306, 312 (Ariz. 1915) ("The contract which, on the one hand, 'transfers and assigns' an estate in property, and on the other hand withholds from the transferee or assignee all right of control over the property, and all right of disposal of the property, is lacking in the elements of a sale or transfer of title, and vests no rights of ownership of title in the transferee, for the reason one who has no right to control, handle or dispose of a thing cannot be considered its owner, for the essential attributes of ownership of property, real and personal, are the rights in the owner to control, handle and dispose of the thing owned."); *see also Cutter Aviation, Inc. v. Ariz. Dept. of*

*Revenue*, 958 P.2d 1, 6 (Ariz. Ct. App. 1997) (quoting *Hardinge* with approval).  "[T]he *sin qua non* of ownership is the right to control and dispose of the asset."  *Cutter Aviation*, 958 P.2d at 6.

56.    Mesa purported to convey title to the Mesa Improvements to MDHI pursuant to the Mesa Quitclaims.  But that fact is not dispositive on the question of ownership and only serves as the starting point for the inquiry.  By their express terms, each of the Mesa Quitclaims is subject to the terms and conditions of the Mesa Leases, and the Mesa Leases significantly restrict MDHI's authority to control and dispose of the Mesa Improvements such that true ownership of the Mesa Improvements remains with Mesa.  *See* Quit Claim Deed to Improvements ¶ 1; Quit Claim Bill of Sale ¶ 1; *see also Cutter Aviation*, 958 P.2d at 7 ("[W]here the putative taxpayer leases property and the lease significantly restricts the lessee's authority to control and dispose of the improvements thereon, the lessee should not be considered to be the 'owner' of the improvements.").

57.    Specifically, both the Headquarters Lease and the Madison Hangar Lease (the leases for the premises where the Mesa Improvements are located) provide that upon termination of the leases, "all building[s], structures, and other improvements" shall become "the property of the Lessor."  Headquarters Lease § 7; Madison Hangar Lease § 7.  Consistent with Mesa's reversionary interest, MDHI's rights in the Mesa Improvements are limited to occupancy and use of the buildings for the term of the lease.  MDHI has no right to remove or dispose of the Mesa Improvements as no such right is granted in the leases and removing any improvements would necessarily interfere with Mesa's superior reversionary right.  *See People ex rel. Int'l Navigation Co. v. Barker*, 47 N.E. 46, 47 (N.Y. 1897) ("When the lease in question provides that the sheds are to become the property of the city at its expiration, the language does not warrant the inference of an immediate ownership, unless we attach an undue significance to the word 'become' . . . . Its use

31

was evidently to prevent any misunderstanding as to a right of removal . . . . It was to make the city's ownership definite."); *see also Novasic*, 473 P.2d at 479 (citing *Barker* with approval).

58.     Further, MDHI's use of the Mesa Improvements during the lease terms is strictly circumscribed such that MDHI may only use the property and Mesa Improvements for the operation of helicopter manufacturing and service operations. *See* Headquarters Lease §§ 3, 9; Madison Hangar Lease § 4.  MDHI is also prohibited from making further improvements to the property without Mesa's consent.  *See* Headquarters Lease § 7, Madison Hangar Lease §§ 7, 31. These restrictions are fundamentally inconsistent with the notion that MDHI is the owner of the Mesa Improvements.

59.     In addition, both the Headquarters Lease and the Madison Hangar Lease include provisions designed to protect Mesa's ownership interest in the Mesa Improvements at the expense of MDHI's authority to control and dispose of the property:

- MDHI must maintain public liability and property damage insurance that is acceptable to Mesa, name Mesa an additional insured, and provide notice to Mesa if the policy is cancelled, *see* Headquarters Lease § 10, Madison Hangar Lease § 10;

- Under the Madison Hangar Lease, MDHI must maintain fire insurance "to the extent of eighty percent (80%) of the insurable value of the buildings and other insurable improvements" that is acceptable to Mesa, name Mesa as a loss payee on the policy, and provide notice to Mesa if the policy is cancelled, *see* Madison Hangar Lease § 12;

- MDHI must keep the premises and Mesa Improvements free of mechanic's liens and materialman's liens, *see* Headquarters Lease §§ 6, 8, 13, Madison Hangar Lease §§ 6, 8, 15; and

- The Headquarters Lease and the Madison Hangar Lease may not be assigned or sublet without prior written consent of Mesa and, with respect to the Madison Hangar Lease, MDHI may not encumber MDHI's interest, in each case without the consent of Mesa, *see* Headquarters Lease § 22, Madison Hangar Lease § 28.

60.     Considering the Mesa Leases in totality, each of which expressly qualifies the Mesa Quitclaims, MDHI does not "enjoy traditional rights of control and disposition" of the Mesa Improvements and, therefore, cannot be considered the owner of the Mesa Improvements. *Cutter Aviation*, 958 P.2d at 6-7.  In holding that lessors retained ownership of improvements, Arizona courts have consistently cited similar provisions restricting the rights of lessees in holding that ownership of improvements remains in the lessor.  *See Novasic*, 473 P.2d at 479 (citing lessor's right to approve all building plans; lessee's obligation to provide insurance and name lessor as additional insured; prohibition on sublease and assignment without lessor consent; and lessee's right to mortgage leasehold interest only, without reference to the building, in each case as inconsistent with lessee owning the building); *Cutter Aviation*, 958 P.2d at 6-7 (holding that lessee "did not enjoy traditional rights of control and disposition of the improvements" where leases (a) "mandated the improvements to be built and the uses to which they could be put, and required the city's approval of the building specifications;" (b) required that the lessee "maintain insurance on the improvements which designated the city as the named insured;" (c) restricted the lessee's right to "transfer any interest in their leaseholds, which could include any interest in the improvements, without the city's prior written consent;" and (d) provides that "upon termination, the improvements were not subject to [lessee's] removal or destruction but were to be property of the city"); *Airport Props. v. Maricopa County*, 985 P.2d 574, 579-80 (Ariz. Ct. App. 1999) (same).

61.     The Netherlands' argument that ownership of the Mesa Improvements by MDHI is demonstrated by Section 26 of the Headquarters Lease and Section 34 of the Madison Hangar Lease is also unavailing.  Netherlands Br. ¶ 31; *see also Novasic*, 473 P.2d at 478 (interpreting lease provisions "in light of all other parts of the lease").  Section 26 of the Headquarters Lease and Section 34 of the Madison Hangar Lease each provide that if the lease is terminated by Mesa

because the U.S. government "assume[s] control of the airport or any portion thereof in a manner that would preclude [MDHI] from operating under the terms of the Lease," Mesa is obligated to compensate MDHI for depriving it of use of the improvements in accordance with the terms of the lease.  Headquarters Lease § 26; Madison Hangar Lease § 34.  The Madison Hangar Lease further provides that Mesa must also compensate MDHI if Mesa "should require the Demised Premises in connection with the future expansion and/or operation of the Airport."  Madison Hangar Lease § 34.  Under the Headquarters Lease, if the lease is terminated pursuant to Section 26, compensation due to MDHI is calculated as "the then fair market value, ***taking into consideration the remaining lease term*** and the original cost of improvements, less depreciation at the rate of four percent (4%) per year from the date of completion . . ." (emphasis added).  Likewise, the Madison Hangar Lease provides that upon termination pursuant to Section 34, Mesa is obligated to pay MDHI the "fair market value" of the Madison Hangar with fair market value to be determined in consideration of the terms of the lease.  Critically, because fair market value in this context is to be determined "taking into consideration the remaining term of the lease" and the costs of the improvements to MDHI, these provisions are more appropriately considered reimbursement for costs and compensation for depriving MDHI of occupancy and use of the Mesa Improvements during the lease term—i.e., depriving MDHI of its leasehold interest—rather than as payment for MDHI's purported "ownership" of the improvements.  Indeed, rather than evidence ownership in MDHI, those provisions make clear that Mesa retains all of the risk and reward associated with the Mesa Improvements, which only reinforces the conclusion that Mesa is the true owner.  For similar reasons, the court in *Cutter Aviation*, a case upon which the Netherlands relies, specifically rejected an argument that a lease provision providing that "net condemnation" proceeds belong to the lessee shows that improvements are owned by the lessee.  958 P.2d at 8,

34

n.1; *cf. Calpine Construction Finance Company v. Arizona Department of Revenue*, 211 P.3d 1228, 1230 (Ariz. Ct. App. 2009) (finding that lease provision stating that *all* condemnation awards would be distributed to the tenant supports finding that improvements are owned by the tenant).

62.     *Calpine* and *Fort Mojave Indian Tribe v. Killian*, No. CIV 02-1212-PCT-MHM, 2004 WL 5833529 (D. Ariz. Mar. 30, 2004), do not dictate a contrary result.  In *Calpine*, the Arizona Supreme Court held that even a lease provision explicitly transferring ownership "is not conclusive by itself," and instead "we read one part of the Lease agreement in light of all other parts of the lease."  *See Calpine*, 211 P.3d at 1232 (internal quotations omitted).  And once one does so, the differences between the lease in *Calpine*/*Fort Mojave* and the lease here show why the Debtors do not own the improvements.  In both *Calpine* and *Fort Mojave*, the court considered whether structures erected by a commercial tenant on leased tribal land were owned by the tenant for the purposes of Arizona's tax code.  Both courts relied on the following facts, among others, in finding that the tenant owned the improvements:  (a) the lease provided that the improvements "shall be the property of Calpine," and (b) the lease expressly permitted the tenant to remove and replace improvements in the ordinary course.  *See Calpine*, 211 P.3d at 1232-33; *Fort Mojave*, No. CIV 02-1212-PCT-MHM, 2004 WL 5833529, at *8.

63.     Here, by contrast, the Leases do not transfer ownership of the Mesa Improvements to MDHI.  Rather, the Headquarters Lease and Madison Hangar Lease both provide that the Mesa Improvements "shall become the property of the Lessor."  Headquarters Lease § 7; Madison Hangar Lease § 7.  This "shall become" language is insufficient to demonstrate ownership by the lessee.  It is very similar to the language in *Novasic*—improvements "shall [upon termination] *become* the property of the Lessor"—which the court found was insufficient to evidence a transfer of ownership.  473 P. 2d at 478; *see also Barker*, 47 N.E. 46 (1897) ("When the lease in question

35

provides that sheds are to *become the property of the city at its expiration*, the language does not warrant the inference of an immediate ownership, unless we attach an undue significance to the word 'become' . . . Its use was evidently to prevent any misunderstanding as to a right of removal . . . It was to make the city's ownership definite.").  Further, while the Mesa Quitclaims purport to convey an ownership interest in the Mesa Improvements, that conveyance is conditioned by Mesa's reversionary right under the Headquarters Lease and the Madison Hangar Lease and the various restrictions on MDHI's disposition and use of the property that deprive MDHI of real ownership.

64.      Compared to the language at issue in *Calpine* and *Fort Mojave*—all improvements "shall be the property of Calpine"—the Headquarters Lease and the Madison Hangar Lease hardly include language evidencing a clear and unambiguous intent to transfer the Mesa Improvements to MDHI.  Likewise, where in *Calpine* and *Fort Mojave* the tenant had an express right to remove and replace improvements, here, the leases do not grant MDHI any express right of removal, and any implied right of removal would be inconsistent with terms of the lease providing that improvements shall become property of Mesa at the conclusion of the lease term and that MDHI must maintain the improvements and keep them free from encumbrance.

65.      Ultimately, the *Calpine* court found:  "The Lease gives all control to Calpine regarding the removal or destruction of improvements on [the leased premises].  Calpine bears nearly all of the risk of ownership and it receives nearly all the benefits."  *Calpine*, 211 P. 3d at 1233; *see also Fort Mojave*, No. CIV 02-1212-PCT-MHM, 2004 WL 5833529, at *8 (reaching the same result on the same facts).  The opposite is the case here:  MDHI has no control over the removal or destruction of the Mesa Improvements and Mesa bears nearly all the risk and reward associated with ownership.

36

66.    For each of these reasons, the Mesa Improvements are owned by Mesa—not MDHI—and thus, the Netherlands' judgment lien did not attach to the Mesa Improvements.

### b.    To the extent the Mesa Improvements are Owned by MDHI, They are Personal Property in the Hands of MDHI.

67.    Even if the Court were to determine that the Mesa Improvements are owned by MDHI, notwithstanding the significant restrictions on MDHI's rights in such improvements under the Mesa Leases, the Mesa Improvements would constitute personal property in the hands of MDHI.  Where the parties contract around the default rule that improvements are owned by the lessor, thereby dividing ownership of the improvements and the underlying land between the lessee and lessor, respectively, the improvements are personal property in the hands of the lessee.  *See Novasic*, 473 P.2d at 479 (explaining that where there is "clear and express language in [the] lease evidencing an intent to treat the improvements on the real property as personal property with ownership in the lessee," Arizona courts will enforce the intent of the parties); *Marcos v. Tex. Co.*, 251 P.2d 647, 649 (Ariz. 1952) (stating that parties may treat property as "realty or personalty" by agreement).[26]

68.    The *Novasic* line of cases is instructive here.  In *Novasic*, the plaintiff-lessee brought an action against certain taxing authorities seeking a refund of personal property taxes paid under protest with respect to buildings sitting on the leased premises.  *See Novasic*, 473 P. 2d at 477.  The lessee argued that the buildings were owned by the lessor, the City of Phoenix and, as a result, the lessee could not be taxed on the buildings.  *See id.* at 478.  The Arizona Court of

---

[26]    *See also Wetkopsky v. New Haven Gas Light Co.*, 88 Conn. 1. (1914) ("Where the intent to sell a building as a chattel is thus apparent from the contract and circumstances attending it, the severance may be made by the vendee."); *Long v. White*, 42 Ohio St. 59, 61 (1884) ("buildings are realty or personalty, according to the intention of the parties"); *Adams v. Chamberlin*, 188 S.E. 550, 553 (Ga. 1936) (MacIntyre, J., dissenting) ("An agreement is effective, as between the parties, to prevent a building from becoming real property when built by one on the land of another.") (citing numerous cases).

Appeals held that the lease did not "clear[ly] and express[ly]" evidence an intent "to treat the improvements on the real property as personal property with ownership in the lessee" and thus, ownership of the improvements remained with "the lessor as a real property." *Id.* at 479-80.

69.     By contrast, the Arizona Supreme Court has enforced the intent of the parties to treat improvements as personal property where the lease documents clearly express such intent. *See Marcos v. Tex. Co.*, 251 P.2d 647, 650 (Ariz. 1952). In *Marcos*, the court found that a lease expressing the clear intent of the parties that gasoline tanks affixed to the land would be owned by the lessee was enforceable and, consequently, the gasoline tanks "should be considered personalty and should not become part of the realty." *Id.*

70.     The Netherlands relies on the *Novasic* line of cases for the proposition that improvements constructed on real property will remain part of the real property and therefore subject to judgment liens. Netherlands Br. ¶ 33. But, under these cases, that is only accurate so long as (a) the improvements remain the property of the lessor and ownership of the land and the improvements thereon is united and (b) the lessor is the judgment debtor. If, as in *Marcos*, the lease and related documents unambiguously express the parties intent that the lessee own the improvements, then the *Novasic* line of cases supports the conclusion that the improvements are personal property in the hands of the lessee. Notably, the Netherlands cites no cases that conflate and confuse the two issues as the Netherlands seeks to do—i.e., finding that an improvement is owned by the lessee but nevertheless is real property.

71.     In fact, the only case the Netherlands cites on this issue—*Family Finance Fund v. Abraham*—directly contradicts its position. 657 P.2d 1319 (Utah 1982). *Family Finance*, a statute of frauds case, required the Utah Supreme Court to decide whether a cabin built on federal land was real property or personal property. *Id.* at 1321. In finding that the cabin was personal property,

the court relied on the "well settled" rule that if "buildings or other improvements" are "erected on another's land . . . with the consent of the landowner that they should remain the personal property of the builder [as opposed to a fixture belonging to the lessor] . . . in such case the character of the building as personalty is fixed before the attachment to the realty, and the agreement involves no sale of an interest in the land." *Id.* at 1323.  Moreover, the question, which "depend[ed] primarily on the intent or understanding of the parties," was a binary one: whether the cabin was "characterized as a fixture [i.e., owned by the landlord] or personal property [i.e., owned by the tenant]." *Id.*

72.     Here, as in *Family Finance*, the Mesa Improvements are either (a) owned by Mesa, in which case they are treated as real property; or (b) owned by MDHI, in which case they are personal property.  The conclusion that to the extent MDHI owns the Mesa Improvements, they are personal property, is further supported by MDHI's tax records, which reflect that the company does not pay, and has never paid, real property taxes with respect to company's headquarters and manufacturing facility at 4555 East McDowell Road.[27]

73.     Again, because in Arizona a judgment lien attaches only to real property, the Netherlands Lien would not have attached to the Mesa Improvements as they are personal property to the extent owned by MDHI.

---

[27]     Searches through the Maricopa County Assessor's website (https://mcassessor.maricopa.gov/home/) for the 4555 East McDowell Road address show no results for real property taxes and the Debtors are unaware of any real property taxes having been assessed with respect to the premises.  Mesa, as a tax exempt entity, would not have been taxed on the property if it is the owner.  Thus, the tax records support the conclusion that either (a) Mesa owns the Mesa Improvements as real property or (b) MDHI owns the Mesa Improvements as personal property, as those are the only logical explanations for the absence of any real property tax assessments with respect to the premises.

## II.    TO THE EXTENT THE MESA IMPROVEMENTS ARE FIXTURES OWNED BY MDHI, THE NETHERLANDS LIEN IS JUNIOR TO THE PREPETITION SECURED PARTIES' LIENS.

74.    And even if the Mesa Improvements have become fixtures (as the Netherlands asserts, Netherlands Br. ¶ 33, n.10) and are in fact owned by MDHI, the Prepetition Secured Parties have a security interest that is senior to the Netherlands Lien and, therefore, the result remains unchanged.[28]

75.    The priority of security interests in fixtures is specifically addressed by the Arizona UCC.  "A security interest under [chapter 9 of the Arizona UCC] may be created in goods that are fixtures or may continue in goods that become fixtures."  A.R.S. § 47-9334.  Under the Arizona UCC, there are two methods to perfect a security interest in fixtures:  a secured creditor may either (a) file a UCC-1 financing statement with the Secretary of State's office or (b) the secured creditor may record a fixture filing with the county recorder office where the fixture is located.  *See* A.R.S. § 47-9501(A); *see also Yeadon Fabric Domes, Inc. v. Me. Sports Complex, LLC*, 901 A.2d 200, 203 (Me. 2006) ("A security interest in fixtures may be perfected by filing the financing statement in either of two places: in the registry of deeds for the county where the related real

---

[28] Under Arizona law, personal property becomes a fixture if three requirements are satisfied (a) "[t]here must be an annexation to the realty or something appurtenant thereto"; (b) "the chattel must have adaptability or application as affixed to the use for which the real estate is appropriated"; and (c) "there must be an intention of the party to make [the] chattel a permanent accession to the freehold."  *Fish v. Valley Nat'l Bank of Phx.*, 167 P.2d 107, 111 (Ariz. 1946).  The contention that personal property that became a "fixture" is real property in the hands of a tenant is highly questionable.  Regardless, the analysis of whether personal property has become a "fixture" is highly factual and more appropriate for resolution at the second phase of this dispute.  The Debtors believe that such analysis would only be necessary if this Court determines that (i) the Netherlands Lien attaches to the Mesa Improvements (it does not) and (ii) the Netherlands Lien is senior to the Prepetition Liens notwithstanding the clear priority rules under the Arizona UCC to the contrary.  Nonetheless, to the extent the Court determines that the Debtors own the Mesa Improvements, the Debtors reserve all rights with respect to the question of whether the Mesa Improvements constitute "fixtures."

However, as the Netherlands apparently concedes that all of the Mesa Improvements constitute fixtures, the Debtors address here the implications of such a finding—i.e., the Prepetition Secured Parties have a security interest in the Mesa Improvements that is senior to the Netherlands.  Netherlands Br. ¶ 33, n.10 ("To the extent that the Mesa Improvements constitute 'fixtures'—which they do . . . .").

property is located, or in the Secretary of State's office.") (citing Maine's UCC § 9-501(a) provision).[29]

76.     Subject to an important exception that is outcome determinative here, a consensual security interest in fixtures perfected by filing a fixture filing in the county recorder's office has priority over a security interest in fixtures perfected by filing a UCC-1 financing statement with the Secretary of State's office, even if the UCC-1 financing statement is earlier in time. *See* A.R.S. § 47-9334(C). A critical exception, however, is that a security interest perfected by filing a UCC-1 financing statement with the Secretary of State's office is senior to a later-in-time judgment lien recorded in the county recorder's office. *See* A.R.S. § 47-9334(E)(3). Specifically, the Arizona UCC states that a "a perfected security interest in fixtures has priority over a conflicting interest of an encumbrancer or owner of the real property if: . . . (3) The conflicting interest is a lien on the real property ***obtained by legal or equitable proceedings*** after the security interest was perfected by any method permitted by [chapter 9 of the Arizona UCC]." *Id.* (emphasis added). The official comments to the Uniform Commercial Code confirm:

> Priority in Fixtures: Judicial Liens. Subsection (e)(3), which follows former Section 9-313(4)(d), adopts a first-in-time rule applicable to

---

[29]   Section 47-9501 states:

> A.  Except as otherwise provided in subsection B, if the local law of this state governs perfection of a security interest or agricultural lien, the office in which to file a financing statement to perfect the security interest or agricultural lien is:
>
> 1.  The office designated for the filing or recording of a record of a mortgage on the related real property, if:
>
> (a)  The collateral is as-extracted collateral or timber to be cut; or
>
> (b)  The financing statement is filed as a fixture filing and the collateral is goods that are or are to become fixtures; or
>
> 2.  The office of the secretary of state, in all other cases, ***including a case in which the collateral is goods that are or are to become fixtures and the financing statement is not filed as a fixture filing***.

A.R.S. § 47-9501 (emphasis added).

> conflicts between a fixture security interest and a lien on the real property obtained by legal or equitable proceedings. Such a lien is subordinate to an earlier-perfected security interest, regardless of the method by which the security interest was perfected. Judgment creditors generally are not reliance creditors who search real-property records. ***Accordingly, a perfected fixture security interest takes priority over a subsequent judgment lien or other lien obtained by legal or equitable proceedings, even if no evidence of the security interest appears in the relevant real-property records***.

U.C.C. § 9-334 cmt. 9 (Am. Law Inst. & Unif. Law Comm'n 2010) (emphasis added).

77.    Accordingly, a consensual lien perfected only by a first-in-time UCC-1 financing statement has the following priority vis-à-vis competing liens perfected in the real property system: (a) *first*, a consensual lien perfected by filing a fixture filing in the county recorder's office (here, there are no such liens); (b) *second*, a consensual lien perfected by filing a UCC-1 financing statement (here, the Prepetition Liens); and (c) *third*, a judicial lien perfected in the county recorder's office (here, the Netherlands Lien).  *See* A.R.S. § 47-9334.

78.    The Netherlands' position that only a fixture filing in the Maricopa County Recorder's office "could have afforded the Prepetition Secured Parties priority over the Netherlands Lien" is untenable in the face of the clear and unambiguous text of the Arizona UCC to the contrary.  Netherlands Br. ¶ 37.  And again, the Netherlands' reliance on *Le Sueur's* is

misplaced.  *Le Sueur's* dealt with a security interest in a leasehold—not fixtures.  40 B.R. at 162. Indeed, the bankruptcy court in *Le Sueur's* did not mention the word "fixtures" at all.[30]

79.    The Prepetition Security Agreement grants the Prepetition Secured Parties a security interest in any "fixtures" owned by MDHI, among other collateral.  *See* Prepetition First Lien Security Agreement § 1(a).  As the Netherlands acknowledges, on July 12, 2005, the Prepetition Agent filed an "all asset" UCC-1 financing statement with the Arizona Secretary of State's office, thereby perfecting the Prepetition Secured Parties security interest in any fixtures owned by MDHI in accordance with the Arizona UCC.  *See* July 12, 2005 Financing Statement; Netherlands Br. ¶ 36.  The financing statement was continued on January 8, 2021 and remains in effect.

80.    Thus, if the Netherlands prevails on its argument that the Mesa Improvements are owned by MDHI, to the extent such improvements are fixtures, as the Netherlands contends, then the Netherlands Lien is behind over $435 million in secured debt and is wholly unsecured.

---

[30]    Likewise, the *In re DBSI, Inc.*, 432 B.R. 126, 132 (Bankr. D. Del. 2010) and 4 White & Summers, *Uniform Commercial Code* § 30:21 (6th ed.) (Lessor's interest in lease payments), each cited by the Netherlands, address security interests in leasehold interests – not fixtures – and therefore have no bearing on whether the Prepetition Secured Parties interest in fixtures is properly perfected.  *See* Netherlands Br. ¶ 37.  It is worth noting, too, that White & Summers refer to *Le Sueur's* as standing for the proposition that "[o]ne wishing to take a security interest in [lessee's interest in an appreciated leasehold] should use a mortgage and comply with the real estate recording laws."  4 White & Summers, *Uniform Commercial Code* § 30:24 (6th ed.).  Moreover, in a separate section, White & Summers state that "[t]here are several exceptions to the general principle that Article 9 does not apply to realty interests. [For example], section 9-334 provides that an Article 9 security interest may be created in goods that are fixtures or may continue in goods that become fixtures."  4 White & Summers, *supra*, at § 30:21 (Article 9 and claims to interests in, and arising from, real estate).

43

WHEREFORE, for the foregoing reasons, the Debtors respectfully requests that the Court enter an order (i) finding and concluding that (a) the Netherlands Lien did not attach to any assets of MDHI, and (b) to the extent the Netherlands Lien did attach to the Mesa Improvements and the Mesa Improvements are fixtures, as the Netherlands contends, the Netherlands Lien is junior to the Prepetition Liens, and (ii) granting such other relief as the Court deems just and proper.

*[Signature Page Follows]*

44

Dated: May 13, 2022
      Wilmington, Delaware

Respectfully Submitted,

*/s/ Evelyn J. Meltzer*
**TROUTMAN PEPPER HAMILTON SANDERS LLP**

David B. Stratton (DE No. 960)
David M. Fournier (DE No. 2812)
Evelyn J. Meltzer (DE No. 4581)
Kenneth A. Listwak (DE No. 6300)
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, DE 19801
Telephone:  (302) 777-6500
Facsimile:  (302) 421-8390
Email:  david.stratton@troutman.com
      david.fournier@troutman.com
      evelyn.meltzer@troutman.com
      kenneth.listwak@troutman.com

- and -

**LATHAM & WATKINS LLP**

Suzzanne Uhland (admitted *pro hac vice*)
Adam S. Ravin (admitted *pro hac vice*)
Brett M. Neve (admitted *pro hac vice*)
Tianjiao (TJ) Li (admitted *pro hac vice*)
Alexandra M. Zablocki (admitted *pro hac vice*)
1271 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 906-1200
Facsimile:  (212) 751-4864
Email:  suzzanne.uhland@lw.com
      adam.ravin@lw.com
      brett.neve@lw.com
      tj.li@lw.com
      alexandra.zablocki@lw.com

*Counsel for Debtors and Debtors-in-Possession*

45