# EXHIBIT 19

# AMENDED AND RESTATED SUBORDINATED SECURITY AGREEMENT

THIS AMENDED AND RESTATED SUBORDINATED SECURITY AGREEMENT, dated as of May 3/, 2011 (as amended, restated, supplemented or otherwise modified from time to time, this "Agreement"), is entered into by and among MD HELICOPTER, INC., an Arizona corporation ("Parent" and, together with any Additional Grantor party to a joinder pursuant to Section 23 below, each a "Grantor") and ZOHAR II 2005-1, LIMITED (together with its successors and permitted assigns, the "Secured Party").

## WITNESSETH:

WHEREAS, the Secured Party owns 15% Subordinated Convertible Notes in Parent, which interests are entitled to receive preferred payments and to be redeemed by Parent as more fully set forth in and subject to the terms, provisions and conditions of the Note Purchase Agreement of Parent (as amended from time to time, the "Note Purchase Agreement");

WHEREAS, to provide security for the prompt and timely payment of any amount due, and all other indebtedness, obligations and liabilities, to the Secured Party as and when the same may be due and payable pursuant to the terms, provisions and conditions of the Note Purchase Agreement (collectively, the "Secured Obligations"), Parent has previously granted a second priority security interest in and lien upon substantially all of its assets to the Secured Party pursuant to a security agreement with the Secured Party (the "Existing Subordinated Security Agreement");

WHEREAS, Parent previously has provided a first priority security interest in and lien upon all of its assets to certain parties pursuant to that certain (i) Credit Agreement dated as of July 8, 2005 among certain lenders described therein, Patriarch Partners Agency Services, LLC, as agent for itself and for the benefit of such lenders (the "Agent"), the Secured Party, Parent, and certain affiliates of Parent (as the same has been or hereafter may be modified or refinanced, the "Credit Agreement"), and (ii) that certain Security Agreement dated as of July 8, 2005, among Parent and certain of its affiliates and subsidiaries, and the Agent (as modified or refinanced from time to time, the "Senior Security Agreement"), which security interest and lien shall continue to provide a first priority security interest in and lien upon all of the assets of Parent;

WHEREAS, the parties hereto wish to amend and restated the Existing Subordinated Security Agreement on the terms and conditions set forth herein;

WHEREAS, the security interest in and lien upon all of the assets the Grantors and the obligations of the Grantors to the Secured Party under this Agreement and the Note Purchase Agreement are and shall be and remain subject and subordinate to the security interest in and lien upon all of the assets of Grantors and the obligations of the Grantors under the Senior Security Agreement; and

WHEREAS, the parties hereto wish to continue the liens granted in the Subordinated Security Agreement and amend and restate the Subordinated Security Agreement upon the terms and subject to the conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

Section 1.    <u>Grant of Security Interest</u>.  To secure the due and prompt payment and performance by Parent of the Obligations (as defined below) as and when the same may be due and payable pursuant to the terms, provisions and conditions of the Note Purchase Agreement, each Grantor hereby pledges, charges, assigns and grants to Secured Party, a continuing security interest in and Lien on all of such Grantor's right, title and interest in and to the following, in each case, as to each type of property described below, whether now owned or hereafter acquired by such Grantor, wherever located and whether now or hereafter existing or arising, (collectively, the "<u>Collateral</u>"):

(a)    all equipment in all of its forms, including, without limitation, all machinery, apparatus, installation facilities, tools, motor vehicles, vessels, aircraft, furniture and fixtures, and all parts thereof and all accessions thereto and all software related thereto, including, without limitation, software that is imbedded in and is part of the equipment, in each case wherever located (collectively, the "<u>Equipment</u>");

(b)    all inventory in all of its forms, including, without limitation, (A) all raw materials, work in process, finished goods and materials used or consumed in the manufacture, production, preparation or shipping thereof, (B) goods in which such Grantor has an interest in mass or a joint or other interest or right of any kind (including, without limitation, goods in which such Grantor has an interest or right as consignee) and (C) goods that are returned to or repossessed or stopped in transit by such Grantor, and all accessions thereto and products thereof and documents therefor, and all software related thereto, including, without limitation, software that is imbedded in and is part of the inventory (collectively, the "<u>Inventory</u>");

(c)    all rights, claims and benefits of such Grantor against any Person arising out of, relating to or in connection with Inventory or Equipment purchased by such Grantor, including, without limitation, any such rights, claims or benefits against any Person storing or transporting such Inventory or Equipment;

(d)    the following (collectively, the "<u>Security Collateral</u>"):

(i)    (A) all Capital Stock of whatever class of any Person (including (x) the Capital Stock owned by such Grantor on the date hereof, and (y) all additional Capital Stock acquired by such Grantor, (B) all other investment property (including, without limitation, all securities (whether certificated or uncertificated), security entitlements, security accounts, commodity contracts and commodity accounts) in which such Grantor has now, or acquires from time to time hereafter, any right, title or interest in any manner, (C) the certificates or instruments, if any, representing or evidencing the same and (D) all dividends, distributions, return of capital, interest, distributions, value, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Capital Stock or investment property and all subscription warrants, rights or options issued thereon or with respect thereto (collectively, the "<u>Pledged Equity</u>"); and

(ii)     the indebtedness owed to such Grantor (including (A) the indebtedness owned by such Grantor on the date hereof, and (B) all additional indebtedness from time to time owed to such Grantor), and the instruments, if any, evidencing such indebtedness, and all interest, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such indebtedness (collectively, the "Pledged Debt");

(e)     all accounts (as such term is defined in the UCC), chattel paper (including, without limitation, tangible chattel paper and electronic chattel paper), instruments (including, without limitation, promissory notes), deposit accounts, letter-of-credit rights and general intangibles (as such term is defined in the UCC and including, without limitation, payment intangibles), and other obligations of any kind, whether or not arising out of or in connection with the sale or lease of goods or the rendering of services and whether or not earned by performance, and all rights now or hereafter existing in and to all supporting obligations and in and to all security agreement, mortgages, Liens, leases, letters of credit and other contracts securing or otherwise relating to the foregoing property (collectively, the "Receivables");

(f)     the following (collectively, the "Intellectual Property Collateral"):

(i)     all United States, international and foreign patent, patent application, utility models, and statutory invention registrations owned by such Grantor on the date hereof, together with all reissues, divisions, continuations, continuations-in-part, extensions and reexaminations thereof, all inventions therein, all rights therein provided by international treaties or conventions and all improvements thereto, and all other rights of any kind whatsoever of such Grantor accruing thereunder or pertaining thereto (collectively, the "Patents");

(ii)     all trademarks (including, without limitation, service marks), certification marks, collective marks, trade dress, logos, internet domain names, product configurations, trade names, business names, corporate names and other source identifies, whether or not registered, whether currently in use or not, including, without limitation, all common law rights and registrations and application for registration thereof, in each case owned by such Grantor on the date hereof, and all other marks registered in the U.S. Patent and Trademark Office or in any office or agency of any state or territory of the United States or any foreign country (but excluding any United States intent-to-use trademark application prior to the filing and acceptance of a Statement of Use or an Amendment to allege use in connection therewith to the extent that a valid security interest may not be taken in such an intent-to-use- trademark application under applicable law), and all rights therein provided by international treaties or conventions, all renewals of any of the foregoing, together in each case with the goodwill of the business connected therewith and symbolized thereby, and all rights corresponding thereto throughout the world and all other rights of any kind whatsoever of such Grantor accruing thereunder or pertaining thereto (collectively, the "Trademarks");

(iii)     all copyrights, copyright applications, copyright registrations and like protections in each work of authorship, whether statutory or common law, whether published or unpublished, any renewals or extensions thereof, all copyrights of works

based on, incorporated in, derived from, or relating to works covered by such copyrights, in each case owned by such Grantor on the date hereof, together with all rights corresponding thereto throughout the world and all other rights of any kind whatsoever of such Grantor accruing thereunder or pertaining thereto (collectively, the "Copyrights");

(iv)     all proprietary information, including, without limitation, know-how, trade secrets, manufacturing and production processes and techniques, inventions, research and development information, technical data, plans, blueprints, designs, models, recorded knowledge, surveys, architectural, structural, mechanical and engineering plans and specifications, studies, reports and drawing, test reports, manuals, financial, marketing and business data, pricing and cost information, business and marketing plans and customer and supplier lists and information (collectively, the "Trade Secrets");

(v)     all software, including, without limitation, computer software programs and databases (including, without limitation, source code, object code and all related applications and data files), firmware, and documentations and materials relating thereto, and all rights with respect to the foregoing, together with any and all options, warranties, service contracts, program services, test rights, maintenance rights, improvement rights, renewal rights and indemnifications and any substitutions, replacements, additions or model conversions of any of the foregoing (collectively, the "Computer Software");

(vi)     all names, including, without limitation, combinations of words and abbreviations, that represent a uniquely identifiable internet protocol address of a World Wide Web internet location and all registrations thereof, in each case owned by such Grantor on the date hereof, together with all rights corresponding thereto throughout the world and all other rights of any kind whatsoever of such Grantor accruing thereunder or pertaining thereto (collectively, the "Domain Names");

(vii)     all license agreements, permits, authorizations and franchises, whether with respect to the Patents, Trademarks, Copyrights, Trade Secrets, Computer Software or Domain Names, or with respect to the patents, trademarks, copyrights, trade secrets, computer software or other proprietary right of any other Person, and all income, royalties and other payments now or hereafter due and/or payable to such Grantor with respect thereto, subject, in each case, to the terms of such license agreements, permits, authorizations and franchises (collectively, the "Licenses"); provided, however, that to the extent that the consent of any other party to any of the Licenses is required, under the terms thereof, for the collateral assignment thereof, then this Agreement shall not affect any collateral assignment of (or otherwise be applied so as to cause a default under) such Licenses; and

(viii)     any and all claims for damages for past, present and future infringement, misappropriation or breach with respect to the Patents, Trademarks, Copyrights, Trade Secrets, Computer Software, Domain Names or Licenses, with the right, but not the obligation, to sue for and collect, or otherwise recover, such damages;

(g)     the following (collectively, the "Account Collateral"):

     (i)     all deposit accounts (collectively, the "<u>Accounts</u>");

     (ii)     all promissory notes, certificates of deposit, deposit accounts, checks and other instruments from time to time delivered to or otherwise possessed by Secured Party for or on behalf of such Grantor; and

     (iii)     all interest, dividends, distributions, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Accounts;

     (h)     all commercial tort claims described in any document delivered by any Grantor to the Secured Party and attached by the Secured Party to this Agreement (collectively, the "<u>Commercial Tort Claims</u>");

     (i)     all books and records (including, without limitation, customer lists, credit files, computer programs, software, printouts and other computer materials and records) of such Grantor pertaining to any of the Collateral;

     (j)     all insurance policies, whether owned by or payable to such Grantor, insuring against any risk whatsoever (including, without limitation, casualty, property damage, liability and death), all loss proceeds and other amounts payable thereunder to such Grantor, any indemnity, warranty or guaranty in respect of the property insured thereby, and all eminent domain or similar proceeds or awards with respect thereto and all other rights of such Grantor with respect thereto (collectively, the "<u>Insurance Receivables</u>"); and

     (k)     all proceeds (as such term is defined in the UCC), products, offspring, rents, profits, royalties, revenues, issues, income, benefits, accessions, additions, substitutions and replacements of and to any of the property of such Grantor described in the preceding clause (a) through (j) of this Section (including, without limitation, all causes of action, claims, warranties and guaranties now or hereafter held by such Grantor in respect of any of the items listed above).

Notwithstanding anything herein to the contrary, in no event shall the Collateral of any Grantor include or the security interest granted under <u>Section 1</u> hereof attach to (a) any lease, license, contract, property rights or agreement to which such Grantor is a party or any of its rights or interests thereunder if and for so long as the grant of such security interest shall constitute or result in (i) the abandonment, invalidation or unenforceability of any right, title or interest of such Grantor therein or (ii) in a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract property rights or agreement (other than to the extent that any such term would be rendered ineffective pursuant to Sections 9-406, 9407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code) or principles of equity), <u>provided however</u> that the Collateral shall include and such security interest shall attach immediately at such time as the condition causing such abandonment, invalidation or unenforceability shall be remedied and to the extent severable, shall attach immediately to any portion of such lease, license, contract, property rights or agreement that does not result in any of the consequences specified in (i) or (ii) above; or (b) any of the outstanding capital stock of a controlled foreign corporation (as defined in the Internal Revenue Code) in excess of 65% of the voting power of

all classes of capital stock of such controlled foreign corporation entitled to vote; provided that immediately upon the amendment of the Internal Revenue Code to allow the pledge of a greater percentage of the voting power of capital stock in a controlled foreign corporation without adverse tax consequences, the Collateral shall include, and the security interest granted by such Grantor shall attach to, such greater percentage of capital stock of each controlled foreign corporation.

Section 2.    Obligations Secured.    The Collateral hereunder constitutes and will constitute continuing security for all of the Secured Obligations, whether such Secured Obligations are now existing or hereafter arising, direct or indirect, absolute or contingent, due or to become due, matured or unmatured, liquidated or unliquidated, arising by contract, operation of law or otherwise, whether for principal, interest (including, without limitation, interest which, but for the filing of a petition in bankruptcy with respect to Grantor, would have accrued on any obligation, whether or not a claim is allowed against Grantor for such interest in the related bankruptcy proceeding), fees, expenses, indemnification or otherwise (collectively, the "Obligations").

Section 3.    Each Grantor Remains Liable.    Anything herein to the contrary notwithstanding, (a) each Grantor shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by Secured Party of any of the rights hereunder shall not release any Grantor from any of its duties or obligations under the contracts and agreements included in the Collateral and (c) Secured Party shall not have any obligation or liability under the contracts and agreements included in the Collateral by reason of this Agreement, nor shall Secured Party be obligated to perform any of the obligations or duties of any Grantor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

Section 4.    Pro Rata Security; Application of Proceeds of Collateral.    All amounts owing with respect to the Obligations shall be secured pro rata by the Collateral without distinction as to whether some Obligations are then due and payable and other Obligations are not then due and payable. Upon any realization upon the Collateral by Secured Party, whether by receipt of insurance proceeds pursuant to Section 5(d) hereof or upon foreclosure and sale of all or part of the Collateral pursuant to Section 9 hereof or otherwise and subject to the rights of the secured parties under the Senior Security Agreement, the proceeds thereof shall be applied (i) first, to the payment of expenses incurred with respect to maintenance and protection of the Collateral and of expenses incurred pursuant to Section 14 hereof with respect to the sale of or realization upon any of the Collateral or the perfection, enforcement or protection of the rights of Secured Party (including reasonable attorneys' fees and expenses of every kind), (ii) second, to all amounts of interest, expenses and fees outstanding which constitute the Obligations; (iii) third, to all amounts of principal outstanding under the Obligations; and (iv) fourth, any proceeds remaining after the repayment of all of the Obligations to be paid over to the applicable Grantor or such other person or persons as may be entitled thereto. Each Grantor shall remain liable for any deficiency remaining unpaid after the application of proceeds in accordance with the foregoing provisions.

Section 5.    Representations and Covenants of Each Grantor.

(a)    Location of Chief Executive Offices; Domicile; Organizational Identification Number; Location of Assets.    Each Grantor agrees that it will not change its name, organizational identification number (if any), the jurisdiction of its organization, the location of its chief executive office, the location where its books and records are kept or the localities of its property without providing at least thirty (30) days' prior written notice to Secured Party.

(b)    Ownership of Collateral.

(i)    Each Grantor represents that it is the owner of its Collateral free from any adverse Lien, security interest or encumbrance, except for the security interests granted in this Agreement, the security interests granted in the Senior Security Agreement and other security interests expressly permitted by the Senior Security Agreement. No effective financing statement or other instrument similar in effect covering all or any part of such Collateral or listing such Grantor or any trade name of such Grantor as debtor is on file in any recording office (including, without limitation, the United States Patent and Trademark Office and the United States Copyright Office), except such as may have been filed in favor of Secured Party relating to this Agreement or as otherwise permitted under this Agreement or the Senior Security Agreement.

(ii)    Except for the security interests granted in this Agreement, the security interests granted in the Senior Security Agreement and other security interests expressly permitted by the Senior Security Agreement, each Grantor shall be the owner of the Collateral free of any Liens or other encumbrances, and such Grantor shall defend the same against all claims and demands of all persons at any time claiming the same or any interest therein adverse to Secured Party. Except as otherwise expressly permitted by this Agreement or the Senior Security Agreement, no Grantor shall pledge, mortgage or create or suffer to exist a security interest in the Collateral in favor of any person other than Secured Party.

(c)    Transfers and Other Liens.  Each Grantor agrees that it will not create or suffer to exist any Lien upon or with respect to any of the Collateral except for the pledge, assignment and security interest created under this Agreement, the pledge, assignment and security interest created under the Senior Security Agreement and liens permitted under the Senior Security Agreement.

(d)    Insurance.  Each Grantor shall have and maintain at all times with respect to the Collateral such insurance as is required by the Senior Security Agreement.

(e)    Maintenance of Collateral.  Each Grantor shall keep the Collateral in good order and repair, ordinary and reasonable wear and tear excepted, and will not use the same in violation of law or any policy of insurance thereon. Secured Party may inspect the Collateral at any reasonable time, wherever located. In its discretion, Secured Party may discharge taxes and other encumbrances at any time levied or placed on the Collateral, which remain unpaid in violation of this Agreement and/or the Senior Security Agreement, make repairs thereof and pay any necessary filing fees incurred in connection with the perfection, protection or enforcement of Secured Party's rights hereunder. Each Grantor agrees to reimburse Secured Party on demand for any and all expenditures so made, and until paid, the amount thereof shall be a debt secured

by the Collateral. Secured Party shall have no obligation to any Grantor to make any such expenditures, nor shall the making thereof relieve any Grantor of any default.

    (f)    <u>Creation and Perfection of Lien</u>. Each Grantor represents and warrants to Secured Party and covenants with Secured Party that this Agreement creates a valid security interest in the Collateral as security for the payment and performance of the Obligations. Upon (i) the filing of UCC-1 financing statements in the jurisdiction of organization of each Grantor under the Uniform Commercial Code against such Grantor as the same may be in effect from time to time in the jurisdiction of organization of such Grantor (the "<u>UCC</u>"), (ii) the taking of possession by Secured Party of any certificates constituting the Security Collateral of any Grantor, to the extent such Security Collateral are represented by certificates, together with undated powers endorsed in blank by such Grantor, (iii) with respect to the Accounts, delivery of account control agreements in favor of Secured Party and (iv) the filing of evidence of this Agreement with the United States Patent and Trademark Office and the United States Copyright Office, as applicable, in each case naming the applicable Grantor as debtor and Secured Party, as secured party, all filings, assignments, pledges and deposits of documents or instruments will have been made and all other actions will have been taken that are necessary or advisable, under applicable law, to establish and perfect Secured Party's security interest in such of the Collateral as to which a security interest may be perfected by filing under the UCC, and such security interest shall remain senior and prior to all other Liens, except, in each case, to the limited extent expressly permitted under this Agreement and/or the Senior Security Agreement. No further filings, recordings or other actions are or will be necessary to maintain the priority of such security interest with respect to such Collateral other than the filing of UCC continuation statements within six months prior to the expiration of a period of five years after the original filing and any amendments that may be required from time to time to maintain the validity and/or sufficiency of such filing under the UCC. Except as expressly permitted by this Agreement and the Senior Security Agreement, the Collateral and Secured Party's rights with respect to the Collateral are not subject to any setoff, claims, withholdings or other defenses (except for setoffs, claims, withholdings or other defenses arising with respect to (x) accounts receivable in the ordinary course of business or (y) account control agreements with respect to the Accounts).

    (g)    <u>No Further Actions</u>. Each Grantor represents that, except for the filings referred to in paragraph (f) above, no consent, authorization, approval or other action by, and no notice of filing with, any governmental authority or regulatory body or other Person that has not been received, taken or made is required (i) for the grant by such Grantor of the security interest granted hereby or for the execution, delivery or performance of this Agreement by such Grantor, (ii) for the perfection and maintenance of the security interest hereunder (including the second priority nature of such security interest) to the extent such security interest may be perfected by such filings referred to in paragraph (f) above or (iii) for the exercise by Secured Party of the rights or the remedies in respect of the Collateral pursuant to this Agreement.

    (h)    <u>Accounts Receivable</u>. Each Grantor shall keep or cause to be kept separate records of accounts which are complete and accurate in all material respects, and from time to time upon the request of Secured Party, at reasonable intervals and upon reasonable notice, shall deliver to Secured Party a list of the names, addresses, face value, and dates of invoices for each debtor obligated on an account receivable (which records may be provided in an electronic format reasonably acceptable to Secured Party).

(i)    Government Contracts. Each Grantor agrees that, at the request of Secured Party, it shall execute all such documents, and take all such actions, as such Person shall reasonably determine to be necessary or appropriate from time to time under the Federal Assignment of Claims Act of 1940, as amended, in order to confirm and assure to Secured Party its rights under this Agreement with respect to any and all Collateral consisting of such Grantor's rights to monies due or to become due under any contracts or agreements with or orders from the United States government or any agency or department thereof, the assignment of which is not prohibited by such contract or agreement.

(j)    Delivery of Certificated Security Collateral. Each Grantor represents that, as of the Closing Date, all certificates evidencing any Security Collateral to be delivered hereunder, after the payment in full in cash of all indebtedness, obligations and liabilities (whether or not due and including specifically, without limitation, all interest which, but for the filing of a petition in bankruptcy with respect to any Grantor, would have accrued on any obligation, whether or not a claim is allowed against such Grantor for such interest in the related bankruptcy proceeding) under the Credit Agreement and the termination of all commitments or other agreements of the Lenders and the Administrative Agent to make further extensions of credit under the Credit Agreement ("Payment-in-Full"), have been delivered to Secured Party. Each Grantor agrees that it shall forthwith, after Payment-in-Full, deliver and pledge to Secured Party all certificates representing securities which it shall acquire on or after the date hereof, whether by purchase, stock dividend, distribution of capital or otherwise, along with stock powers or other appropriate instruments of assignment with respect thereto, duly executed in blank, and in the event that an Event of Default has occurred and is continuing, such Grantor shall, after Payment-in-Full, at the request of the Secured Party, promptly cause the Collateral to be registered in the name of the Secured Party or in the name of the nominee or nominees specified by the Secured Party.

(k)    Cooperation. Each Grantor agrees, after the occurrence of an Event of Default, to take any actions that Secured Party may reasonably request in order to enable Secured Party to obtain and enjoy the full rights and benefits granted to them by this Agreement and/or the Note Purchase Agreement. Each Grantor further consents, after the occurrence of an Event of Default, to the transfer of control or assignment of all or any portion of the Collateral to a receiver, trustee, transferee, or similar official or to any purchaser of the Collateral pursuant to any public or private sale, judicial sale, foreclosure or exercise of other remedies available to Secured Party as permitted by this Agreement and/or the Senior Security Agreement, applicable law or otherwise, subject to the receipt of any required Governmental Approvals.

(l)    Access to Books and Records and the Collateral. Each Grantor shall permit Secured Party's representatives to have access to its books and records and the Collateral from time to time, as and to the same extent as is authorized and/or permitted under the Senior Security Agreement.

(m)    Intellectual Property. As to each Grantor's Intellectual Property:

(i)    Grantor's Rights. The rights of any Grantor in or to any material Intellectual Property Collateral do not conflict with, misappropriate or infringe the intellectual property rights or any third party, and no claim has been asserted that the use

of such Intellectual Property Collateral does or may infringe the intellectual property rights of any third party.

(ii)    <u>Ownership</u>.  Without limiting the generality of <u>Section 5(b)</u>, each Grantor is the exclusive owner of the entire and unencumbered right, title and interest in and to any material Intellectual Property Collateral of such Grantor and is entitled to use all such Intellectual Property Collateral without limitation, subject only to the license terms of the Licenses.

(iii)    <u>Identification of Intellectual Property</u>.  Each Grantor has made all necessary filings and recordations to protect and maintain its interest in the patents, patent applications, trademark and service mark recordations, material trademarks, service marks, trade names and other indicia of origin, copyright registrations and copyrights applications, material common law copyrights and works of authorship, internet domain names, interest domain name registrations and Licenses in which such Grantor has an interest.

(iv)    <u>Validity of Intellectual Property Collateral</u>.  Each of the Intellectual Property Collateral assets in which any Grantor has an interest on the date hereof (except for Licenses, which are addressed below) is subsisting and has not been adjudged invalid, unregisterable or unenforceable, in whole or in part, and is valid and enforceable.  Each License of each Grantor is, to the best of such Grantor's Knowledge, subsisting and has not been adjudged invalid or unenforceable, in whole or in part, and is, to the best of such Grantor's Knowledge, valid and enforceable.  Each Grantor is not aware of any uses of any item of Intellectual Property Collateral which would be expected to lead to such item becoming invalid or unenforceable, including unauthorized uses by third parties and uses which were not supported by the goodwill of the business connected with such Intellectual Property Collateral.

(v)    <u>No Outstanding Claims</u>.  No claim has been made, continuing or, to such Grantor's Knowledge, threatened to or by such Grantor, that any items of Intellectual Property Collateral is invalid or unenforceable or that the use by such Grantor of any Intellectual Property Collateral does or may violate the rights of any Person.  There is currently no infringement or unauthorized use of any item of Intellectual Property Collateral.  There is currently no use of Intellectual Property Collateral that violates the rights of any Person.

(vi)    <u>Quality Control</u>.  Each Grantor has taken all reasonable steps to use consistent standards of quality in the manufacture, distribution and sale of all products sold and the provision of all services provided under or in connection with any of the Intellectual Property Collateral, and has taken all commercially reasonable steps to ensure that all licensed users of any of the Intellectual Property Collateral, use such consistent standards of quality.

Section 6.    <u>Covenants and Further Assurances</u>.

(a)     Each Grantor agrees to execute and deliver to Secured Party from time to time at its request, all documents and instruments, including financing statements, supplemental security agreements, notices of assignments under the United States Assignment of Claims Act and under similar or local statutes and regulations, and to take all action as Secured Party may reasonably deem necessary, desirable or proper to perfect or otherwise protect the security interest and Lien created in this Agreement.  In furtherance of the foregoing, each Grantor hereby authorizes the Secured Party to file financing or continuation statements, and amendments thereto, in any jurisdictions and with any filing offices as the Secured Party may determine, in its sole discretion, are necessary or advisable to perfect the security interest granted to the Secured Party herein.  Such financing statements may describe the Collateral in the same manner as described herein or may contain an indication or description of collateral that describes such property in any other manner as the Secured Party may determine, in its sole discretion, is necessary, advisable or prudent to ensure the perfection of the security interest in the Collateral granted to the Secured Party herein, including, without limitation, describing such property as "all assets" or "all personal property, whether now owned or hereafter acquired." Each Grantor shall furnish to the Secured Party from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Secured Party may reasonably request, all in reasonable detail.

(b)     Each Grantor agrees that it shall not create or suffer to exist any Lien upon or with respect to any of the Intellectual Property Collateral, except for the pledge, assignment and security interest created by this Agreement, the pledge, assignment and security interest created under the Senior Security Agreement and except for liens expressly permitted by this Agreement and/or the Senior Security Agreement.

(c)     Without limiting the generality of Section 6(a) above, each Grantor will, upon the reasonable request of Secured Party, with respect to the Intellectual Property Collateral, execute and file such financing or continuation statements, or amendments thereto, and such other instruments or notices, as may be reasonably necessary, or as Secured Party may reasonably request, in order to perfect and preserve the pledge, assignment, Lien, priority and security interest granted or purported to be granted in this Agreement.

(d)     Each Grantor acknowledges and agrees that, if it obtains an ownership interest in any patent, patent application, patentable invention, trademark, service mark, trade name, trade dress, other indicia of trade origin, trademark or service mark registration, trademark or service mark application, copyright, copyright registration, copyright application, work of authorship, internet domain name, internet domain name registration or any interest in a License or other intellectual property, which is not now a part of the Intellectual Property Collateral (the "New IP Collateral"), (i) the provisions of Section 1 will automatically apply thereto, and (ii) any such New IP Collateral (together with the goodwill of the business connected with the use of any trademark, service mark, trade name, trade dress, other indicia of trade origin and symbolized by same that is included in the New IP Collateral) will automatically become part of the Intellectual Property Collateral; provided, however, that to the extent the consent of any other party to any such License is required, under the terms thereof, for the collateral assignment thereof, then this Agreement shall not affect any collateral assignment of (or otherwise be applied so as to cause a default under) such License for so long as (but only for so long as) such consent would be required and has not been obtained.  Within ten (10) days of acquisition by any Grantor of a new

patent, patent application, trademark or service mark registration, trademark or service mark application, material trademark, service mark, trade name or other indicia of origin, copyright registration or copyright application, material common law copyright and work of authorship, internet domain name, internet domain name registration, or License, such Grantor shall deliver to Secured Party (x) a copy of said patent, patent application, trademark or service mark registration, trademark or service mark application, material trademark, service mark, trade name or other indicia of origin, copyright registration or copyright application, material common law copyright and work of authorship, internet domain name, internet domain name registration, or License, as the case may be and (y) an short form intellectual property security agreement in a form acceptable to the Secured Party listing such New IP Collateral.

(e)     With respect to each material patent, patent application, trademark or service mark registration, trademark or service mark application, copyright registration or copyright application, internet domain name or internet domain name registration of such Grantor, each Grantor agrees to take all reasonably necessary steps, including, without limitation, in the United States Patent and Trademark Office and the United States Copyright Office or in any court, to (i) maintain each such patent, trademark or service mark registration, copyright registration, internet domain name registration and (ii) pursue each such patent application, trademark or service mark application and copyright application now or hereafter included in the Intellectual Property Collateral, including, without limitation, the filing of responses to office actions issued by the United States Patent and Trademark Office, the filing of affidavits under Sections 8 and 15 of the United States Trademark Act, the filing of divisional, continuation, continuation-in-part and substitute applications, the filing of applications for re-issue, renewal or extensions, the payment of maintenance fees, and the participation in interference, reexamination, opposition, cancellation, infringement and misappropriation proceedings. Each Grantor agrees to take corresponding steps with respect to each new or acquired material patent, patent application, trademark or service mark registration, trademark or service mark application, material trademark, service mark, trade name and other indicia of origin, copyright registration and copyright application, material common law copyright, work of authorship, internet domain name and internet domain name registration, to which it is now or later becomes entitled. Any and all expenses incurred in connection with such activities will be borne by the Grantors jointly and severally.

(f)     Each Grantor agrees to notify Secured Party promptly and in writing if it learns (i) that any item of material Intellectual Property Collateral has been determined to have become abandoned or dedicated to the public, (ii) of the institution of any proceeding by or against any Grantor (including, without limitation, the institution of any proceeding in the United States Patent and Trademark Office, the Copyright Office or any court) regarding any infringement or unauthorized use of (or similar claim with respect to) an item of material Intellectual Property Collateral or (iii) of any adverse determination in any such proceeding.

(g)     In the event that any item of Intellectual Property Collateral of any Grantor is infringed or misappropriated by a third party, such Grantor shall promptly notify Secured Party and will take such actions as Secured Party deems reasonable and appropriate under the circumstances to protect such Intellectual Property Collateral, including, without limitation, suing for infringement or misappropriation and for an injunction against such infringement or

misappropriation. Any expense incurred in connection with such activities will be borne by such Grantor.

(h)    Each Grantor shall use the applicable proper statutory notice in connection with its use of each of its patents, registered trademarks and service marks, copyrights and internet domain names.

Section 7.    Securities as Collateral.

(a)    Upon the occurrence and during the continuance of an Event of Default, subject to the rights of the secured parties under the Senior Security Agreement, the Secured Party may at any time, at its option, transfer to itself or any nominee any securities constituting Collateral, receive any income thereon and hold such income as additional Collateral or apply it to the Obligations. If the Secured Party so elects to exercise its right herein and gives notice of such election to any Grantor, upon the occurrence and during the continuance of an Event of Default to the extent permitted under applicable law and after Payment-in-Full, the Secured Party may vote any or all of the securities of such Grantor constituting Collateral possessing voting rights (whether or not the same shall have been transferred into its name or the name of its nominee or nominees) and give all consents, waivers and ratifications in respect of the securities constituting Collateral and otherwise act with respect thereto as though it were the outright owner thereof, each Grantor hereby constituting and appointing the Secured Party the proxy and attorney-in-fact of such Grantor, with full power of substitution, to do so. This power of attorney is coupled with an interest and may not be revoked by any Grantor while any Obligations are owing to the Secured Parties. So long as no Event of Default is continuing, subject to the rights of the secured parties under the Senior Security Agreement, each Grantor shall be entitled to receive all cash dividends paid in respect of the securities of which such Grantor is the registered owner, to vote such securities and to give consents, waivers and ratifications in respect of such securities, provided that no vote shall be cast, or consent, waiver or ratification given or action taken which would be inconsistent with or violate any provisions of the Credit Agreement, this Agreement, the Senior Security Agreement or the Note Purchase Agreement.

(b)    Subject to the rights of the secured parties under the Senior Security Agreement, any sums paid upon or with respect to any of the securities upon the liquidation or dissolution of the issuer thereof shall be paid over to the Secured Party to be held by it as security for the Obligations; and in case any distribution of capital shall be made on or in respect of any of the securities or any property shall be distributed upon or with respect to any of the securities pursuant to the recapitalization or reclassification of the capital of the issuer thereof or pursuant to the reorganization thereof, the property so distributed shall be delivered to the Secured Party to be held by it as security for the Obligations. All sums of money and property paid or distributed in respect of the securities upon such a liquidation, dissolution, recapitalization or reclassification which are received by any Grantor shall, until paid or delivered to the Secured Party, be held in trust for the Secured Party as security for the Obligations.

Section 8.    Power of Attorney.

(a)    Each Grantor acknowledges Secured Party's right, to the extent permitted by applicable law, singly to execute and/or file financing or continuation statements and similar

13

notices required by applicable law, and amendments thereto, concerning the Collateral without execution by any Grantor. A copy of this Agreement or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law.

(b)     Each Grantor hereby irrevocably appoints Secured Party as such Grantor's attorney-in-fact, effective at all times subsequent to the occurrence of an Event of Default, and during the continuance thereof, subject to the rights of the secured parties under the Senior Security Agreement, with full authority in the place and stead of such Grantor and in the name of such Grantor or otherwise, to take any action and to execute any instrument which Secured Party may deem necessary or advisable to accomplish the purpose of this Agreement, including, without limitation, the power and right (i) to endorse such Grantor's name on any checks, notes, acceptances, money orders, drafts, filings or other forms of payment or security of such Grantor that may come into Secured Party's possession and (ii) to do all other things which Secured Party then determines to be necessary to carry out the terms of this Agreement; provided, however, Secured Party acknowledges that applicable law does not permit the grantee of a power of attorney to execute any application, report, document or other instrument to be filed with the Federal Communications Commission on behalf of and in place of the party granting such power of attorney, except in the case of the grantor's absence from the United States, or in the case of grantor's physical disability. Each Grantor ratifies and approves all acts of such attorney-in-fact. The power conferred on Secured Party hereunder is solely to protect Secured Party's interests in the Collateral and shall not impose any duty upon Secured Party to exercise such power. This power of attorney is coupled with an interest and may not be revoked by such Grantor while any Obligations are owing to Secured Party.

Section 9.     Special Provisions Relating to Certain Collateral.

(a)     Intellectual Property. For the purpose of enabling Secured Party to exercise rights and remedies under Section 10 of this Agreement at such time as Secured Party shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, subject to the rights of the secured parties under the Senior Security Agreement, each Grantor hereby grants to Secured Party, to the extent assignable, an irrevocable, non-exclusive license (exercisable without payment of royalty or other compensation to such Grantor) to use, assign, license or sublicense any of the Intellectual Property now owned or hereafter acquired by such Grantor, wherever the same may be located, including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout thereof.

(b)     Accounts Receivable. Until Secured Party elects (which election may be made after the occurrence of an Event of Default) that debtors on accounts receivable of any Grantor or obligors on accounts, chattel paper or general intangibles of any Grantor or obligors on instruments for which any Grantor is an obligee or lessees or conditional vendees under agreements governing the leasing or selling by conditional sale of Collateral by any Grantor, be notified of Secured Party's security interest, such Grantor shall continue to collect payment thereof. Upon the making of such an election by Secured Party, subject to the rights of the secured parties under the Senior Security Agreement, each Grantor shall hold the proceeds received from collection as trustee for Secured Party and shall turn the same over to Secured Party, or to such other bank or Person as may be approved by Secured Party, immediately upon

receipt in the identical form received. At the election of Secured Party, subject to the rights of the secured parties under the Senior Security Agreement, after the occurrence of an Event of Default, each Grantor shall so notify its account debtors and obligors that payment thereof is to be made directly to Secured Party, and Secured Party may itself, at any time after the occurrence of an Event of Default and during the continuance thereof, without notice to or demand upon any Grantor, so notify such account debtors and obligors. The making of such an election or the giving of any such notification shall not affect the duties of any Grantor described above with respect to proceeds of collection of accounts receivable received by any Grantor. Secured Party shall apply the proceeds of such collection received by Secured Party to the Obligations in accordance with Section 4 of this Agreement. The application of the proceeds of such collection shall be conditional upon final payment in cash or solvent credits of the items giving rise to them. If any item is not so paid, Secured Party in its discretion, whether or not the item is returned, may either reverse any credit given for the item.

Section 10.    Events of Default; Remedies.

(a)    Upon the occurrence of an Event of Default and during the continuation thereof, whether or not the Obligations are due, Secured Party may demand, sue for, collect, or make any settlement or compromise it deems desirable with respect to the Collateral.

(b)    An "Event of Default" hereunder shall mean the failure of any Grantor to make any payment with respect to the Obligations as and when the same may be due and payable pursuant to the terms, provisions and conditions of the Note Purchase Agreement.

(c)    Upon the occurrence and during the continuance of an Event of Default, to the fullest extent permitted by applicable law, subject to the rights of the secured parties under the Senior Security Agreement, in addition to the remedies set forth elsewhere in this Agreement:

(i)    Secured Party shall have, in addition to all other rights and remedies given it by any instrument or other agreement evidencing, or executed and delivered in connection with, any of the Obligations and otherwise allowed by law, the rights and remedies of a secured party under the Uniform Commercial Code as enacted in any jurisdiction in which the Collateral may be located and without limiting the generality of the foregoing, Secured Party may immediately, without (to the fullest extent permitted by law) demand of performance or advertisement or notice of intention to sell or of time or place of sale or of redemption or other notice or demand whatsoever (except that Secured Party shall give to Parent at least ten days' notice of the time and place of any proposed sale or other disposition), all of which are hereby expressly waived to the fullest extent permitted by law, sell at public or private sale or otherwise realize upon, the whole or from time to time any part of the Collateral in or upon which Secured Party shall have a security interest or Lien hereunder, or any interest which any Grantor may have therein, and after deducting from the proceeds of sale or other disposition of the Collateral all expenses (including all reasonable expenses for legal services) as provided in Section 14 hereof, shall apply the residue of such proceeds toward the payment of the Obligations in accordance with Section 4 of this Agreement, the applicable Grantor remaining liable for any deficiency remaining unpaid after such application. If notice of any sale or other disposition is required by law to be given to any Grantor, then a notice given as provided

in this Agreement shall be reasonable notice of such sale or other disposition. Each Grantor also agrees to assemble the Collateral at such place or places as Secured Party reasonably designates by written notice. At any such sale or other disposition, Secured Party may, to the extent permitted by applicable law, purchase the whole or any part of the Collateral sold, free from any right of redemption on the part of any Grantor, which right is hereby waived and released to the fullest extent permitted by law.

(ii)    Furthermore, without limiting the generality of any of the rights and remedies conferred upon Secured Party under Section 10(c)(i) hereof, Secured Party to the fullest extent permitted by law, may enter upon the premises of any Grantor, exclude any Grantor or any guarantor therefrom and take immediate possession of the Collateral, either personally or by means of a receiver appointed by a court therefor, and may, at its option, use, operate, manage and control the Collateral in any lawful manner and may collect and receive all rents, income, revenue, earnings, issues and profits therefrom, and may maintain, repair, renovate, alter or remove the Collateral as Secured Party may determine in its discretion, and any such monies so collected or received by such Person shall be remitted to Secured Party and shall be applied to, or may be accumulated for application upon, the Obligations in accordance with Section 4 of this Agreement.

(iii)    Secured Party agrees that such Person will give notice to any Grantor of any enforcement action taken by it pursuant to this Section 10 promptly after commencing such action.

(iv)    Each Grantor recognizes that Secured Party may be unable to effect a public sale of securities constituting Collateral by reason of certain prohibitions contained in the Securities Act and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers consistent with all applicable laws. Each Grantor agrees that any such private sales may be at prices and other terms less favorable to such Grantor than if sold at public sales and that such private sales shall not solely by reason thereof be deemed not to have been made in a commercially reasonable manner. Secured Party shall not be under any obligation to delay a sale of any of the securities for the period of time necessary to permit the issuer of such securities to register such securities for public sale under the Securities Act of 1933, as amended, even if the issuer would agree to do so.

Section 11.    Marshalling. Secured Party shall not be required to marshal any present or future security for (including but not limited to this Agreement and the Collateral subject to the security interest created hereby), or guarantees of, the Obligations or any of them, or to resort to such security or guarantees in any particular order; and all of its rights hereunder and in respect of such securities and guaranties shall be cumulative and in addition to all other rights, however existing or arising. To the extent that it lawfully may, each Grantor hereby agrees that it will not invoke any law relating to the marshalling of Collateral which might cause delay in or impede the enforcement of Secured Party's rights under this Agreement, the Note Purchase Agreement or any other instrument evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or guaranteed, and to the extent that it lawfully may do so each Grantor hereby irrevocably waives the benefits of all such laws. Except as otherwise provided by applicable law, Secured Party shall not have any duty as to the

collection or protection of the Collateral or any income thereon, nor as to the preservation of rights against prior parties, nor as to the preservation of any rights pertaining thereto beyond the sole custody thereof.

Section 12.    Security Interest Absolute.    To the extent permitted by applicable law, the obligations of each Grantor under this Agreement shall remain in full force and effect without regard to, and shall not be impaired by (a) any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of any Grantor, to the extent permitted by law; (b) any exercise or nonexercise, or any waiver, by Secured Party of any right, remedy, power or privilege under or in respect of any of the Obligations or any security therefor (including this Agreement); (c) any amendment to or modification of any instrument evidencing any of the Obligations or pursuant to which any of them were issued; (d) any amendment to or modification of any instrument or agreement (other than this Agreement) securing any of the Obligations; or (e) the taking of additional security for or any guaranty of any of the Obligations or the release or discharge or termination of any security or guaranty for any of the Obligations; and whether or not any Grantor shall have notice or knowledge of any of the foregoing.

Section 13.    No Waiver.    No failure on the part of Secured Party to exercise, and no delay in exercising, any right, remedy or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by such Person of any right, remedy or power hereunder preclude any other or future exercise of any other right, remedy or power. Each and every right, remedy and power hereby granted to Secured Party or the future holders of any of the Obligations or allowed to any of them by law or other agreement, including, without limitation, the Note Purchase Agreement, shall be cumulative and not exclusive of any other, and, subject to the provisions of this Agreement, may be exercised by Secured Party or the future holders of any of the Obligations from time to time.

Section 14.    Expenses.    Each Grantor agrees to pay, on demand, all costs and expenses (including reasonable attorneys' fees and expenses for legal services of every kind) of Secured Party incidental to the sale of, or realization upon, any of the Collateral or in any way relating to the perfection, enforcement or protection of the rights of such Person hereunder; and Secured Party may at any time apply to the payment of all such costs and expenses all monies of such Grantor or other proceeds arising from its possession or disposition of all or any portion of the Collateral.

Section 15.    Consents, Amendments and Waivers.    Any term of this Agreement may be amended only upon the prior written consent of the Secured Party and each Grantor. The performance or observance by any Grantor of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only upon the prior written consent of the Secured Party.

Section 16.    Secured Party's Duties.    The powers conferred on Secured Party hereunder are solely to protect Secured Party's interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, Secured Party shall have no duty as to any Collateral, as to ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Collateral, whether or

not Secured Party has or is deemed to have knowledge of such matters, or as to the taking of any necessary steps to preserve rights against any parties or any other rights pertaining to any Collateral. Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its possession if such Collateral is accorded treatment substantially equal to that which it accords its own property.

Section 17.     Indemnity and Expenses.  The Grantors jointly and severally agree to, and shall, indemnify, defend and save and hold harmless each Secured Party and each of their Affiliates and their respective officers, directors, employees, agents, attorneys and advisors (each, an "Indemnified Party") from and against, and shall pay on demand, any and all claims, damages, losses, liabilities and expenses that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or resulting from this Agreement and/or the Note Purchase Agreement (including, without limitation, enforcement of this Agreement and/or the Note Purchase Agreement), except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

Section 18.     Governing Law.  This Agreement and all claims, disputes and matters arising hereunder or related hereto shall be governed by and construed under the laws of the State of New York without reference to conflict of laws provisions.  The parties acknowledge the exclusive jurisdiction of the state and federal courts located within the County of New York, State of New York over controversies arising from or relating to this Agreement.

Section 19.     Parties in Interest.  All terms of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto and the Agent; provided that no Grantor may assign or transfer its rights hereunder without the prior written consent of Secured Party.  Any assignment or transfer by any Grantor of its rights hereunder in violation of this Agreement shall be void ab initio.

Section 20.     Counterparts.  This Agreement and any amendment hereof may be executed in any number of counterparts and by each party on a separate counterpart, which when so executed and delivered shall be an original, but all of which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or electronic mail shall be effective as delivery of an original executed counterpart of this Agreement.

Section 21.     Termination.  Upon payment in full of the Obligations in accordance with their terms, this Agreement and the Liens and security interests created hereunder shall terminate and Secured Party shall return to each Grantor, at the expense of such Grantor, such Collateral of such Grantor in the possession or control of Secured Party as has not theretofore been disposed of pursuant to the provisions hereof and shall deliver to such Grantor documents in recordable form (which documents shall be prepared by, and the expense thereof to be borne by, such Grantor) sufficient to discharge the Liens and security interests granted hereunder in such Collateral.

Section 22.    <u>Notices</u>.  All notices, requests, demands and other communications to any party or given under this Agreement (collectively, the "<u>Notices</u>") will be in writing and delivered personally, by overnight courier or by registered mail to the parties at the following address or sent by facsimile, with confirmation received, to the facsimile number specified below (or at such other address or telecopy number as will be specified by a party by like notice given at least five calendar days prior thereto):

(a)    If to any Grantor, at:

> MD Helicopter, Inc.
> 4555 East McDowell Road M615
> Mesa, AZ 85215-9734

> Attention:  Chief Financial Officer

(b)    If to the Secured Party, at:

> c/o Patriarch Partners Agency Services, LLC
> 32 Avenue of the Americas, 17th Floor
> New York, NY 10013
> Attn:  Loan Administration/MD HELICOPTER, INC.
> Telephone:  (212) 825-0550
> Facsimile:  (212) 825-2038

<u>provided</u>, that Notices for clause (a) above may be delivered by e-mail, effective upon delivery by the recipient of a confirmation of the receipt thereof, when addressed to the contact party specified in clause (a) above.

All Notices will be deemed delivered when actually received.  Each of the parties will hereafter notify the other in accordance with this Section of any change of address or telecopy number to which notice is required to be mailed.

Section 23.    <u>Additional Grantors</u>.  From time to time subsequent to the date hereof, Subsidiaries of Parent may become parties hereto, as additional grantors (each an "<u>Additional Grantor</u>"), by executing a joinder in the form of <u>Exhibit A</u> attached hereto.  Upon delivery of any such joinder to Secured Party, notice of which is hereby waived by each Grantor, each such Additional Grantor shall be a Grantor hereunder  and shall be as fully a party hereto as if such Additional Grantor were an original signatory hereof.  Each Grantor expressly agrees that its obligations arising hereunder shall not be affected or diminished by the addition or release of any other Grantor hereunder, nor by any election of Secured Party not to cause any Subsidiary of Parent to become an Additional Grantor hereunder.  This Agreement shall be fully effective as to any Grantor that is or becomes a party hereto regardless of whether any other Person becomes or fails to become or ceases to be a Grantor hereunder.

Section 24.    <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law, or public policy, all other conditions and provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any

manner adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

Section 25.   Integration; Conflict.  This Agreement and the Note Purchase Agreement contain and constitute the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior negotiations, agreements and understandings, whether written or oral, of such parties.   In the event that there is a conflict between any provision of this Agreement and the Credit Agreement, then the provisions of the Credit Agreement shall control.

Section 26.   Subordinate to the Terms and Conditions of the Senior Security Agreement.  Notwithstanding anything to the contrary contained in this Agreement, the terms and conditions set forth in this Agreement are and shall be and remain subordinate to the terms and conditions set forth in the Senior Security Agreement, in each case at all times prior to Payment-in-Full. Nothing in this Agreement shall require any Grantor to take any act or refrain from taking any act in violation of any term or condition of the Senior Security Agreement or shall permit any Grantor to contest or take any actions in violation of the priorities set forth herein. Notwithstanding the date, manner or order of grant, attachment or perfection of any security interest, the security interest granted to the Secured Party under this Agreement, while first in priority with respect to all other security interests, shall be subordinate to the security interest granted by the Grantors under the Senior Security Agreement. No action shall be taken hereunder by any Secured Party without the consent of the Agent until Payment-in-Full, including, without limitation, any objection to any sale of Collateral, any request for adequate protection in any bankruptcy, insolvency or similar proceeding, the exercise of any right of set-off, the commencement of any bankruptcy or insolvency proceeding, causing or requesting any sale of assets, objecting to any action initiated or supported by the Agent, or the enforcement of any other right that the Secured Party would not have in the absence of this Agreement.  In addition, the Secured Party shall (1) if requested by the Agent, release any Collateral, (2) consent to any sale of Collateral permitted by the Credit Agreement or consented to by the Agent, and (3) support any action of the Agent in any bankruptcy or insolvency proceeding.

Section 27.   Physical Possession and/or Control of Certain Collateral.  Notwithstanding anything to the contrary contained in this Agreement, if (a) any clause of the Senior Security Agreement requires that a certain type or item of Collateral be delivered to and/or held by and/or controlled by the "Agent" and/or any "secured party" thereunder, and (b) any clause of this Agreement requires that the same type or item of Collateral be delivered to and/or held by and/or controlled by the Secured Party, then in such event such type or item of Collateral may be delivered to or put into the control of the "Agent" and/or any "secured party" under the Senior Security Agreement in satisfaction of the obligations under this Agreement; provided, the "Agent" and/or any "secured party" under the Senior Security Agreement shall serve as bailee or as agent of the Secured Party hereunder, as the case may be, for the purposes of perfecting the security interests and Liens granted to the Secured Parties hereunder in and on any of the Collateral (including, without limitation, any deposit account, investment account, securities account or similar account included in the Collateral that is subject to the "control" (as defined in

the UCC) of such other party, such bailment and agency being intended, among other things, to satisfy the requirements of Sections 8-301(a)(2) and 9-313(c) of the UCC).

Section 28.    Definitions.    Each capitalized term that is used buy not otherwise defined in this Agreement shall have the meanings ascribed to such term in the Senior Security Agreement.

Section 29.    Amendment and Restatement.    On the date hereof, the Existing Subordinated Security Agreement shall be amended and restated in its entirety by this Agreement and (i) all references to the Subordinated Security Agreement in the Note Purchase Agreement (including in any amendment, waiver or consent) shall be deemed to refer to the Subordinated Security Agreement as amended and restated hereby, (ii) all references to any section (or subsection) of the Subordinated Security Agreement in the Note Purchase Agreement (but not herein) shall be amended to be, mutatis mutandis, references to the corresponding provisions of this Agreement and (iii) except as the context otherwise provides, all references to this Agreement herein (including for purposes of indemnification and reimbursement of fees) shall be deemed to be reference to the Subordinated Security Agreement as amended and restated hereby.  This Agreement is not intended to constitute, and does not constitute, a novation of the obligations and liabilities under the Existing Subordinated Security Agreement (including the grant of liens thereunder) or to evidence payment of all or any portion of such obligations and liabilities.

(b)    Effect on Subordinated Security Agreement and on the Obligations.    On and after the Effective Date, (i) the Existing Subordinated Security Agreement shall be of no further force and effect except as amended and restated hereby and except to evidence (A) the granting of any liens, (B) the representations and warranties made by any Grantor prior to the date hereof and (C) any action or omission performed or required to be performed pursuant to such Subordinated Security Agreement prior to the date hereof (including any failure, prior to the date hereof, to comply with the covenants contained in such Subordinated Security Agreement) and (ii) the terms and conditions of this Agreement and the Secured Party's rights and remedies under the Note Purchase Agreement shall apply to all liens granted and obligations incurred under the Subordinated Security Agreement.

(c)    No Implied Waivers.    This Agreement (x) shall not cure any breach of the Existing Subordinated Security Agreement and (y) is limited as written and is not a consent to any other modification of any term or condition of the Note Purchase Agreement, which shall remain in full force and effect.

[SIGNATURE PAGES FOLLOW]

**IN WITNESS WHEREOF**, the undersigned have caused this Agreement to be duly executed by their authorized representatives as of the date first above written.

GRANTOR:

MD HELICOPTER, INC.

By: _____

Name: Kenneth A. Roche KEP

Title: CFO

SECURED PARTY:


ZOHAR II 2005-1, LIMITED,


By: Patriarch Partners XIV, LLC,
    its Collateral Manager


By: _____
    Name: Lynn Tilton
    Title:   Manager


c/o Patriarch Partners XIV, LLC
    32 Avenue of the Americas, 17th Floor
    New York, NY 10013
    Telephone:  (212) 825-0550
    Facsimile:  (212) 825-2038
    Attention:  Loan Administration/MD Helicopter, Inc.

**IN WITNESS WHEREOF**, the undersigned, as agent for the secured parties under the Senior Security Agreement has caused this Agreement to be duly executed by its authorized representatives as of the date first written above for the sole purpose of agreeing to the terms of Section 27 of this Agreement, including, without limitation, agreeing to serve as bailee or as agent of the Secured Party for the purpose of perfecting the security interests and Liens granted to the Secured Party under this Agreement.

AGENT:

PATRIARCH PARTNERS AGENCY
SERVICES, LLC

By: _____
Name: Lynn Tilton
Title: Manager

Subordinated Security Agreement

# EXHIBIT A
## TO
## SECURITY AGREEMENT

### Form of Joinder to Security Agreement

The undersigned, _____, a _____, hereby joins in the execution of that certain Security Agreement dated as of [May __, 2011] (as amended, restated, supplemented or otherwise modified, the "Security Agreement") issued and executed by each Person that is or becomes a Grantor thereunder on and/or after the date and pursuant to the terms thereof to and in favor of Secured Parties thereunder.  By executing this Joinder, the undersigned hereby agrees that it is a Grantor thereunder with the same force and effect as if originally named therein as a Grantor.  The undersigned agrees to be bound by all of the terms and provisions of the Security Agreement and represents and warrants that the representations and warranties set forth in Section 5 of the Security Agreement are, with respect to the undersigned, true, complete and correct as of the date hereof.  Each reference to a Grantor in the Security Agreement shall be deemed to include the undersigned.  Capitalized terms used but not defined herein shall have the meanings set forth in the Security Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Joinder this ___ day of _____, 20__.

**[Name of Grantor]**

By: _____
            Name:
            Title:
            Address:

**IN WITNESS WHEREOF**, the undersigned, as agent for the secured parties under the Senior Security Agreement has caused this Agreement to be duly executed by its authorized representatives as of the date first written above for the sole purpose of agreeing to the terms of Section 27 of this Agreement, including, without limitation, agreeing to serve as bailee or as agent of the Secured Party for the purpose of perfecting the security interests and Liens granted to the Secured Party under this Agreement.

<div style="margin-left: 40%;">

AGENT:

PATRIARCH PARTNERS AGENCY
SERVICES, LLC

By: _____
      Name:  Lynn Tilton
      Title:   Manager

</div>