**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------- x

In re:

MD HELICOPTERS, INC., et al.,1

          Debtors.

---------------------------------------------------------- x

:    Chapter 11
:
:    Case No. 22-10263 (KBO)
:
:    (Jointly Administered)
:
:    **Hearing Date: July 14, 2022 at 9:30 a.m. (ET)**
:    **Obj. Deadline: June 23, 2022 at 4:00 p.m. (ET)**

**MOTION OF DEBTORS FOR**
**ENTRY OF ORDER UNDER 11 U.S.C. §§ 105(a), 363(b), 1107(a) AND 1108, AND**
**FED. R. BANKR. P. 6004 AND 9019 (I) AUTHORIZING THE DEBTORS TO PAY**
**GOVERNMENT SUBCONTRACTOR, (II) APPROVING RELATED SETTLEMENT**
**AND RELEASE AGREEMENT, AND (III) GRANTING RELATED RELIEF**

The debtors and debtors-in-possession in the above-captioned cases (collectively, the "**Debtors**") hereby file this motion (this "**Motion**") for entry of an order, substantially in the form attached hereto as Exhibit A (the "**Proposed Order**"), under Sections 105(a), 363(b), 1107(a), and 1108 of Title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), and Rules 6004 and 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"): (a) authorizing, but not directing, Debtor MDHI to pay AXXEUM, Inc. (the "**Subcontractor**") amounts owed to it under the Subcontract (as defined below) only after MDHI's receipt of certain amounts from the Government (as defined below), (b) approving the Settlement and Release Agreement between MDHI and the Subcontractor (the "**Settlement**

---

1    The two Debtors in these cases are MD Helicopters, Inc. ("MDHI") and Monterrey Aerospace, LLC ("Monterrey Aerospace"), and their address is 4555 E. McDowell Road, Mesa, AZ 85215. The last four digits of MDHI's taxpayer identification number are 4088. Monterrey Aerospace has not been assigned a taxpayer identification number as of the date hereof.

**Agreement**"),[2] and (c) granting related relief.  In support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

### JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are Sections 105(a), 363(b), 1107(a), and 1108 of the Bankruptcy Code.  Such relief is warranted under Bankruptcy Rules 6004 and 9019.

### BACKGROUND

3.      On March 30, 2022 (the "**Petition Date**"), the Debtors filed voluntary petitions in this Court commencing cases (the "**Chapter 11 Cases**") for relief under Chapter 11 of the Bankruptcy Code.  The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the *Declaration of Barry Sullivan, Chief Financial Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 19] (the **First Day Declaration**")[3] and is fully incorporated herein by reference.

4.      The Debtors continue to manage and operate their businesses as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been requested in the Chapter 11 Cases and no committees have been appointed.

---

[2]      A copy of the Settlement Agreement is attached to the Proposed Order as Exhibit 1.

[3]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

5.      The Chapter 11 Cases are jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

## RELIEF REQUESTED

6.      By this Motion, the Debtors request entry of the Proposed Order under Sections 105(a), 363(b), 1107(a), and 1108 of the Bankruptcy Code and Bankruptcy Rules 6004 and 9019 (a) authorizing, but not directing, MDHI to pay the Subcontractor Claim, with the payment to be made only after MDHI's receipt of the Closeout Amount from the Government (each as defined below), (b) approving the Settlement Agreement, and (c) granting related relief.

## BASIS FOR RELIEF

### I.      The Afghanistan Contracts

7.      As discussed in the First Day Declaration, the Debtors are a leading global manufacturer and supplier of commercial and military helicopters, spare parts, and related services with their sole manufacturing facility located in Mesa, Arizona.  On May 23, 2017, MDHI and the United States Army (together with the other agencies, departments or agents of the United States, the "**Government**") entered into that certain firm-fixed price letter agreement bearing contract number W58RGZ-17-C-0038 (including all agreements thereunder and related thereto, and as amended, restated, supplemented, or otherwise modified from time to time the "**Prime Contract**"), under which MDHI agreed to provide, among other things, military helicopters, spare parts, and services related to their maintenance and repair (the "**Afghanistan Deliverables**") for the Afghanistan Air Force.  Under the Prime Contract, and as is typical in defense contracting, MDHI was the sole prime contractor in privity of contract with the Government.  As is also common in defense contracting, MDHI subcontracted certain of the work related to the Prime Contract.  Specifically, in July 2018, MDHI entered into a subcontract with the Subcontractor (the

"**Subcontract**"[4] and, together with the Prime Contract, the "**Afghanistan Contracts**") pursuant to which the Subcontractor agreed to provide certain parts and services to MDHI in connection with the Afghanistan Deliverables in order to enable MDHI to fulfill its obligations under the Prime Contract.  The Afghanistan Contracts are structured such that the Government makes direct payments only to MDHI, in its capacity as the prime contractor, for goods and services provided pursuant to the Prime Contract.  MDHI then uses the funds received from the Government to meet its obligations to the Subcontractor under the Subcontract.

8.     Upon the U.S. military's withdrawal from Afghanistan in August 2021, the Government informed MDHI of its intention to allow the Prime Contract to expire and MDHI and the Subcontractor began winding down the Afghanistan Contracts.  As part of the Afghanistan Contracts closeout process (which is the standard process by which the Government reconciles and approves final payment of qualifying costs under a completed contract), the Government determines which of the costs incurred pursuant to the Afghanistan Contracts are compensable and which are non-compensable before their termination.  MDHI has thus been engaged in extensive, ongoing discussions with the Government over the course of several months regarding the specific costs that are due and payable by the Government to MDHI.

9.     Although that process is ongoing, the Debtors believe that, of the qualifying amounts that the Government owes MDHI under the Prime Contract (as ultimately reconciled by MDHI and the Government, the "**Closeout Amount**"), approximately $7,519,862.00 is on account of costs incurred by the Subcontractor before the Petition Date (the "**Subcontractor Claim**").  In

---

[4]     Specifically, the Subcontract refers to that certain Firm Fixed Price Subcontract Agreement No. WS8RGZ-17-C-0038-AAL-SC-001 for Afghanistan On-Site Contractor Logistics Support in Support of Prime Contract Number W58RGZ-17-C-0038 (including all agreements thereunder and related thereto, and as amended, restated, supplemented, or otherwise modified from time to time), dated July 28, 2018, between MDHI and the Subcontractor (as successor in interest to AAL USA, Inc.).

4

arriving at the Closeout Amount and the Subcontractor Claim, the Government designated as non-compensable certain services performed and costs incurred by MDHI under the Prime Contract and by the Subcontractor under the Subcontract (the latter, the "**Contested Amounts**").

II.    **Payment of the Subcontractor Claim and Entry into the Settlement Agreement Are in the Best Interests of the Debtors' Estates and Their Creditors**

A.    **Maintaining a Strong Relationship with the Government as a Compliant Government Contractor Is Critical to the Success of the Debtors' Business**

10.    In the years prior to the Petition Date, the Government has been the Debtors' largest and most important customer by far, representing a significant majority of the Debtors' gross revenue.  Maintaining a strong relationship with the Government as a compliant contractor is, therefore, critical to the success of these Chapter 11 Cases and the Debtors' business going forward.  Non-payment of the Subcontract Claim would threaten that relationship.  The Subcontractor Claim likely constitutes a prepetition unsecured claim because the work performed by the Subcontractor accrued prior to the Petition Date.  Thus, its payment would be precluded in the absence of this Court's authorization to do so.  For the reasons that follow, payment of the Subcontractor Claim is here warranted, as it is essential to preserve the important business relationship that MDHI has developed with the Government as a compliant government contractor.

11.    While the Government's general practice is to work directly and exclusively with the prime contractor, it does so on the expectation that the prime contractor will manage affairs with and delegate responsibilities to its subcontractors competently and fairly.  This includes, among other things, the expectation that the prime contractor will pay its subcontractors for all services rendered under subcontracts in furtherance of obligations existing under the prime contract.  Any failure to meet these expectations by not paying the Subcontractor could erode the Government's trust in and goodwill toward MDHI, and impede MDHI's ability to obtain future government contracts.

5

12.     In addition, the Subcontractor qualifies as a small business subcontractor, and numerous government contracting regulations require prime contractors, here MDHI, to issue prompt payment to small business subcontractors.  For example, federal regulations require the prime contractor to notify the Government in writing after "[a] small business subcontractor was entitled to payment under the terms and conditions of the subcontract" and the prime contractor "[f]ailed to make a payment, which is now untimely."  48 C.F.R. § 42.1504(b).  Moreover, the Government is required to perform "past performance evaluations" of all contractors annually and upon completion of a contract, and one of the factors that must be considered is "[s]mall business subcontracting, including reduced or untimely payments to small business subcontractors."  48 C.F.R. § 42.1503(b)(2)(v).

13.     The negative consequences for the Debtors that would flow from the Government's issuance of an adverse past performance evaluation, especially involving a small business subcontractor, could be severe.  In determining whether to award a contract to a prospective prime contractor, the Government must consider past performance information.  48 C.F.R. § 15.304(c)(3)(i).  Moreover, federal regulations require the Government to award contracts only to "responsible prospective [prime] contractors," which means, among other things, that the prospective prime contractor has "a satisfactory performance record." 48 C.F.R. § 9.104-1(c).  The Government could find any report of MDHI's failure to pay the Subcontractor as indicative of an unsatisfactory performance record or of non-responsibility.  In either case, MDHI may fail to receive new government contracts because of its failure to pay the Subcontractor, creating an unnecessary and potentially insurmountable barrier to working with the Government in the future.

6

**B.      Paying the Subcontractor Claim Is Necessary to Work with the Subcontractor in the Future**

14.      In addition to the potential harm to the Debtors' relationship with the Government, if the Debtors are unable to pay the Subcontractor there is a significant risk that the Subcontractor (and other potential future subcontractors) may be unwilling to do business with the Debtors in the future or may condition their willingness to work with the Debtors on onerous trade terms that could disrupt the Debtors' operations and negatively affect liquidity.  As described in further detail in the First Day Declaration, the Debtors rely on a complex network of vendors to provide them with highly specialized goods and services needed to satisfy the strict demands of Federal Aviation Administration safety and other regulations, as well as the exacting demands of their customers, including the Government.  The Subcontractor is one such vendor.  For example, the Subcontractor provides logistics support and personnel to service customer needs in non-U.S. jurisdictions (such as, in this instance, Afghanistan).  While there may be alternative vendors that provide similar services, the Debtors often do business with the Subcontractor because it possesses intimate knowledge of the Debtors' business and helicopters and transacts business with the Debtors on favorable terms.  If the Subcontractor were unwilling to do business with the Debtors, the Debtors would be compelled to spend time and resources identifying and training a new vendor, which likely would not contract with the Debtors on as favorable terms.

15.      Moreover, the failure to pay the Subcontractor Claim would not only severely harm MDHI's relationships with the Government and the Subcontractor, but would also threaten to tarnish MDHI's reputation in the market in which MDHI operates.  The helicopter industry is comprised of a relatively small number of original equipment manufacturers ("**OEMs**") and a community of vendors that provide goods and services to the OEMs.  Maintaining the Debtors' sound reputation in the marketplace is critical to their continued ability to attract the most highly

qualified and skilled vendors on attractive terms. If the Debtors were unable to pay the Subcontractor in connection with the closeout of the Afghanistan Contracts, then not only the Subcontractor, but other vendors on which the Debtors rely (or may seek to do business with in the future) may be unwilling to do business with the Debtors or may impose onerous terms that impair the Debtors ability to do business (e.g., requiring cash payment on delivery of parts). Compounding these issues, if the Debtors are unable to attract highly qualified and skilled vendors, the Government would be less likely to award the Debtors contracts in the future, resulting in further harm to the Debtors' business.

16.     The Debtors respectfully submit, therefore, that payment of the Subcontractor Claim is essential to protect the Debtors' assets and operations and preserve value for the Debtors' estates and creditors.

### C.     Entering into the Settlement Agreement Is Necessary to Foreclose the Possibility of Costly Litigation

17.     Under the terms of the Settlement Agreement, the Debtors will pay the Subcontractor Claim to the Subcontractor. In return, the Subcontractor will release any and all claims it could arguably have against MDHI under the Subcontract, including any claim to the Contested Amounts. Because the Debtors and the Subcontractor dispute the amount and validity of the Contested Amounts (the "**Dispute**"), there is a reasonable likelihood that, in the absence of the proposed settlement, the Debtors would be forced to expend time and resources in litigating the Dispute. Accordingly, the Debtors respectfully submit that the Settlement Agreement avoids costly and time-consuming litigation, which would harm the Debtors' estates and creditors.

### APPLICABLE AUTHORITY

18.     The relief requested in this Motion is not only supported by Bankruptcy Rule 9019 (discussed below in Section D), but is also supported by several provisions of the Bankruptcy Code

that authorize a debtor to honor prepetition obligations in certain circumstances. Courts have recognized each of these statutory provisions as valid authority for such payment.

A.    **The Court Should Authorize Payment of the Subcontractor Claim as a Valid Exercise of the Debtors' Fiduciary Duties**

19.    Authority for the payment of the Subcontractor Claim is found in Sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors, operating their businesses as debtors-in-possession under Sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Courts have recognized that implicit in the duties of a chapter 11 debtor-in-possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." *Id.*

20.    The *CoServ* court held that there are instances in which a debtor-in-possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id.* That court specifically held that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." *Id.* The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*Id.*

21.    Payment of the Subcontractor Claim satisfies each *CoServ* element. As described above, the ability of the Debtors to maintain its relationship with the Government, a relationship

Case 22-10263-KBO    Doc 328    Filed 06/09/22    Page 10 of 19


that is critical to the success of the Debtors' chapter 11 objectives, necessitates that the Debtors pay the Subcontractor Claim. The potential harm and economic disadvantage that would stem from the Government's refusal to award contracts to the Debtors in the future is grossly disproportionate to the amount of the Subcontractor Claim. Likewise, as described above, the Debtors' continuing relationship with the Subcontractor and the Subcontractor's willingness to continue to do business with the Debtors is critical to the Debtors' business. Finally, there is simply no practical or legal alternative for the Debtors that would allow them to maintain their relationships with the Government and the Subcontractor, both of which are essential to the future of the Debtors' business. Indeed, the importance of the Government as a current and future customer simply cannot be overstated. Therefore, the Debtors respectfully submit that they can only meet their fiduciary duties as debtors-in-possession under Sections 1107(a) and 1108 of the Bankruptcy Code by payment of the Subcontractor Claim.

**B.     The Court May Authorize Payment of the Subcontractor Claim under Section 363 of the Bankruptcy Code**

22.     The Court may also authorize payment of the Subcontractor Claim under Section 363(b) of the Bankruptcy Code. Section 363(b)(1) of the Bankruptcy Code authorizes the trustee to use property of the estate other than in the ordinary course of business after notice and a hearing. 11 U.S.C. § 363(b)(1).

23.     Courts in this and other circuits have indicated that the use of property of the estate outside of the ordinary course of business is proper where the debtor in possession has articulated a good business reason for such use. *See Institutional Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) (holding that Section 363(b) requires that "there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business"); *United States Trustee v. Bethlehem*

US-DOCS\130478037.18

*Steel Corp. (In re Bethlehem Steel Corp.)*, No. 02 Civ. 2854 (MBM), 2003 WL 21738964, at \*12 (S.D.N.Y. July 28, 2003) ("To approve a transaction under § 363(b), the bankruptcy court must find that there is a good business reason to allow the transaction."); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under [Section 363(b)], courts require the debtor to show that a sound business purpose justifies such actions."); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989) (applying *Continental* to require "articulated business justification" for section 363 transaction); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) ("[A] § 363 application requires a showing that there is a 'good business reason to grant such an application.'") (quoting *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983)).

24.    Where a debtor has articulated a valid business justification for a proposed transaction, courts generally apply the business judgment rule in evaluating such transaction. *Lange v. Schropp (In re Brook Valley VII, Joint Venture)*, 496 F.3d 892, 900 (8th Cir. 2007) ("In general, courts do not second-guess business decisions made in good faith."); *In re ALH Holdings LLC*, 675 F. Supp. 462, 477 (D. Del. 2009) ("[A] court will not disturb the business decisions of loyal and informed directors 'if they can be attributed to any rational business purpose.'") (citing *Sinclair Oil Corp. v. Levien*, 280 A. 2d 717, 720 (Del. 1971)); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) ("In evaluating whether a sound business purpose justifies the use, sale or lease of property under Section 363(b), courts consider a variety of factors, which essentially represent a 'business judgment test'"); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) ("The business judgment rule 'is a presumption that in making a business decision the directors of a

corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'") (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a Debtor's management decisions."). This standard prohibits other parties from second-guessing the debtor's business judgment if the debtor has shown that the proposed use will benefit the debtor's estate. *See In re Johns-Manville*, 60 B.R. at 616 ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

25.     Here, as discussed above, it is the Debtors' business judgment that the failure to pay the Subcontractor Claim could have a material adverse impact on the future performance of the Debtors' business. The potential harm to the value of the Debtors' estates if the Motion is not granted and either the Government refuses to award future contracts to the Debtors or the Subcontractor refuses to continue to do business with the Debtors is significant. Were either of those outcomes to occur, the Debtors' business could be severely harmed. The authority to pay the Subcontractor Claim as set forth herein is therefore necessary to maximize the value of the estates by ensuring that the Debtors preserve their relationships with the Government and the Subcontractor.

US-DOCS\130478037.18

26.     For these reasons, the Debtors respectfully submit that satisfying the Subcontractor Claim represents a sound exercise of the Debtors' business judgment and the relief sought is warranted under Section 363 of the Bankruptcy Code.

      **C.**      **The Court May Authorize Payment of the Subcontractor Claim under Section 105(a) of the Bankruptcy Code and the Doctrine of Necessity**

27.     The relief sought is further supported by the "doctrine of necessity" because paying the Subcontractor Claim as set forth herein is necessary to the success of these Chapter 11 Cases.

28.     Section 105(a) of the Bankruptcy Code provides that a bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.    11 U.S.C. § 105(a).    Courts have interpreted this provision to authorize payments on prepetition claims prior to the completion of a chapter 11 case where the payments are essential to the success of the debtor's reorganization under the well-settled "necessity of payment doctrine".    *See In re Lehigh & New Eng. Ry.*, 657 F.2d 570, 581 (3d Cir. 1981) ("Thus, the 'necessity of payment' doctrine…teaches no more than, if a payment of a claim which arose prior to reorganization is essential to the continued operation of the [debtor's business] during reorganization, payment may be authorized…"); *see also In re Penn Central Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that the necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or materials essential to the conduct of the business until their pre-reorganization claims have been paid"); *In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) "provides a statutory basis for payment of pre-petition claims" under necessity of payment doctrine); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) ("The appropriate standard…is commonly referred to as 'the necessity of payment doctrine.'"); *In re NVR L.P.*, 147 B.R. 126, 127

(Bankr. E.D. Va. 1992) ("[T]he court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor.").

29.    The United States Supreme Court first articulated the doctrine of necessity over a century ago, in *Miltenberger v. Logansport, C. & S.W. R. Co.*, 106 U.S. 286 (1882), in affirming the authorization by the lower court of the use of receivership funds to pay pre-receivership debts owed to employees, vendors and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership. *See id*. at 309-14.  The modern application of the doctrine of necessity is largely unchanged from the Court's reasoning in *Miltenberger.  See In re Lehigh & New Eng. Ry.*, 657 F.2d at 581-82 ("[I]n order to justify payment under the 'necessity of payment' rule, a real and immediate threat must exist that failure to pay will place the [debtor's] continued operation . . . in serious jeopardy.").

30.    Here, the foregoing "necessity" standard is clearly met.  Given (a) the essential nature of the Debtors' relationships with the Government and the Subcontractor, (b) the consequences that the Debtors would likely face should the Government cease to award future contracts to the Debtors, and (c) the related potential loss of value to the Debtors' estates, paying the Subcontractor Claim is necessary to accomplish the Debtors' objectives in these Chapter 11 Cases.  Accordingly, the Court should authorize the payment of the Subcontractor Claim under Section 105(a) of the Bankruptcy Code and the doctrine of necessity.

**D.    Entry into the Settlement Agreement Is Appropriate Under Bankruptcy Rule 9019**

31.    Bankruptcy Rule 9019(a) provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  FED. R. BANKR. P. 9019(a).  Compromises and settlements are "a normal part of the process of reorganization."  *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.*

14

*Anderson*, 390 U.S. 414, 424 (1968) (quoting *Case v. L.A. Lumber Prods. Co.,* 308 U.S. 106, 130

(1939)).  The compromise or settlement of time-consuming and burdensome litigation, especially

in the bankruptcy context, is encouraged and "generally favored in bankruptcy."  *In re World*

*Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006); *see also In re Penn Cent.*

*Transp. Co.*, 596 F.2d 1102 (3d Cir. 1979).

32.    "[T]he decision whether to approve a compromise under [Bankruptcy] Rule 9019

is committed to the sound discretion of the Court, which must determine if the compromise is fair,

reasonable, and in the interest of the estate."  *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997).

Courts should not, however, substitute their judgment for that of the debtor, but instead should

canvass the issues to see whether the compromise falls below the lowest point in the range of

reasonableness.  *See In re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986); *In*

*re W.T. Grant and Co.*, 699 F.2d 599, 608 (2d Cir. 1983); *see also In re World Health*, 344 B.R.

at 296 ("[T]he court does not have to be convinced that the settlement is the best possible

compromise.  Rather, the court must conclude that the settlement is 'within the reasonable range

of litigation possibilities.'" (internal citations omitted)).

33.    The Third Circuit Court of Appeals has enumerated four factors that should be

considered in determining whether a compromise should be approved: "(1) the probability of

success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation

involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount

interest of the creditors."  *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); *accord*

*Will v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) (finding that the *Martin*

factors are useful when analyzing a settlement of a claim against the debtor as well as a claim

belonging to the debtor); *see also TMT Trailer Ferry, Inc.*, 390 U.S. at 424; *In re Marvel Entm't*

15

*Group, Inc.*, 222 B.R. 243 (D. Del. 1998) (proposed settlement held in best interest of the estate);

*In re Mavrode*, 205 B.R. 716, 721 (Bankr. D.N.J. 1997).  The test boils down to whether the terms

of the proposed compromise fall "within a reasonable range of litigation possibilities."  *In re Penn*

*Cent.*, 596 F.2d at 1114 (citations omitted); *see In re Pa. Truck Lines, Inc.*, 150 B.R. 595, 598

(E.D. Pa. 1992) (same).

34.     The compromise embodied in the Settlement Agreement is a fair and equitable

compromise, falls well within the range of reasonableness, and satisfies each of the applicable

*Martin* factors:

    a.    ***The Probability of Success in Litigation***.  The Debtors submit that there exists a *bona fide* dispute as to the amounts owed to the Subcontractor under the Subcontract.  While the Debtors believe that any prosecution of the Dispute is unlikely to succeed and would vigorously contest such claim during the claims-administration process, the Dispute carries with it inherent uncertainties, and there is no assurance that a better result for the Debtors would be achieved than the one set forth in the Settlement Agreement.  Without the compromise set forth in the Settlement Agreement, there is a chance that the Debtors engage in expensive and time-consuming litigation in connection with the Contested Amounts and ultimately do not prevail.  The Settlement Agreement eliminates this risk and therefore satisfies this factor.

    b.    ***The Complexity of the Litigation and the Attendant Expense, Inconvenience, and Delay***.  Litigation of the Dispute, which involves complicated issues related to governmental contract law, could be complex and expensive and involve a great deal of time.  Without the agreement embodied in the Settlement Agreement, the Debtors would be forced to expend resources litigating the Dispute to the detriment of creditors and other stakeholders.

    c.    ***The Paramount Interests of Creditors***.  The Settlement Agreement is in the paramount interest of the Debtors' creditors because, as discussed above, approval of the Settlement Agreement will ensure maintenance of the important relationship with the Government and will avoid potentially costly and time-consuming litigation, the outcome of which would be uncertain, and will provide immediate benefits to the Debtors' estates—*i.e.*, a release and discharge of any claims the Subcontractor may arguably have against MDHI, including the Contested Amounts.  In the Debtors' business judgment, especially because the Contested Amounts will not be paid under the Settlement Agreement, the value of these benefits exceeds the net

16

benefits that the Debtors could potentially obtain through litigation of the Dispute.

35.     For these reasons, the Debtors contend that Settlement Agreement satisfies Bankruptcy Rule 9019 as it is fair, reasonable, and in the best interests of the Debtors, their estates, and their stakeholders.  The Settlement Agreement (a) satisfies the *Martin* factors, (b) allows the parties to avoid litigation related to the Dispute and any associated costs, risks, and distractions, and (c) preserves the value of the Debtors' estates to maximize the recoveries of creditors in these chapter 11 cases.  Thus, the Debtors respectfully request that the Court authorize entry into the Settlement Dispute.

### E.     Bankruptcy Rule 6004 Should Be Waived

36.     To the extent that any aspect of the relief sought herein constitutes a use of property under Section 363(b) of the Bankruptcy Code, the Debtors request a waiver of the fourteen-day stay under Bankruptcy Rule 6004(h).  As described above, the relief that the Debtors request in this Motion is immediately necessary in order for the Debtors to be able to timely pay the Subcontractor Claim upon the Government's final determination of the Closeout Amount. The Debtors respectfully request that the Court waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

### CONSENT TO JURISDICTION

37.     Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

### RESERVATION OF RIGHTS

38.     Nothing contained herein is or should be construed as: (a) an admission as to the validity of any claim against any Debtor or the existence of any lien against the Debtors' properties;

US-DOCS\130478037.18

(b) a waiver of the Debtors' rights to dispute any claim or lien on any grounds; (c) a promise to pay any claim; (d) an implication or admission that any particular claim would constitute an allowed claim; (e) an assumption or rejection of any executory contract or unexpired lease pursuant to Section 365 of the Bankruptcy Code; or (f) a limitation on the Debtors' rights under Section 365 of the Bankruptcy Code to assume or reject any executory contract with any party subject to the proposed Order (once entered).  Nothing contained in the Order shall be deemed to increase, decrease, reclassify, elevate to an administrative expense status, or otherwise affect any claim to the extent it is not paid.

### NOTICE

39.     Notice of this Motion will be given to: (a) the U.S. Trustee; (b) the United States Attorney for the District of Delaware; (c) the Internal Revenue Service; (d) the creditors listed on the Debtors' consolidated list of thirty creditors holding the largest unsecured claims; (e) counsel to Ankura; (f) counsel to PPAS; (g) counsel to the Zohar Lenders; (h) counsel to the Patriarch Lenders; (i) counsel to the DIP Lenders; (j) the Government; (k) the Subcontractor; and (l) all parties entitled to notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, under the circumstances, no other or further notice is required.

40.     A copy of this Motion is available on (a) the Court's website, at www.deb.uscourts.gov, and (b) the website maintained by Kroll Restructuring Administration LLC, at https://cases.ra.kroll.com/MDHelicopters/.

**WHEREFORE**, the Debtors respectfully request that the Court enter the Proposed Order attached hereto as Exhibit A granting the relief requested in this Motion and such other and further relief as may be just and proper.

*[Remainder of page intentionally left blank]*

Dated: June 9, 2022
        Wilmington, Delaware

Respectfully Submitted,

*/s/ Evelyn J. Meltzer*
**TROUTMAN PEPPER HAMILTON SANDERS LLP**

David B. Stratton (DE No. 960)
David M. Fournier (DE No. 2812)
Evelyn J. Meltzer (DE No. 4581)
Kenneth A. Listwak (DE No. 6300)
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, DE 19801
Telephone:  (302) 777-6500
Facsimile:  (302) 421-8390
Email:  david.stratton@troutman.com
        david.fournier@troutman.com
        evelyn.meltzer@troutman.com
        kenneth.listwak@troutman.com

- and -

**LATHAM & WATKINS LLP**

Suzanne Uhland (admitted *pro hac vice*)
Adam S. Ravin (admitted *pro hac vice*)
Brett M. Neve (admitted *pro hac vice*)
Tianjiao (TJ) Li (admitted *pro hac vice*)
Alexandra M. Zablocki (admitted *pro hac vice*)
1271 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 906-1200
Facsimile:  (212) 751-4864
Email:  suzanne.uhland@lw.com
        adam.ravin@lw.com
        brett.neve@lw.com
        tj.li@lw.com
        alexandra.zablocki@lw.com

*Counsel for Debtors and Debtors-in-Possession*

US-DOCS\130478037.18