# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- x
In re:
:
MD HELICOPTERS, INC., *et al.*,[1]
:
Debtors.
:
---------------------------------------------------------- x

Chapter 11

Case No. 22-10263 (KBO)

(Jointly Administered)

**Re: D.I. 28 and 333**

**SUPPLEMENTAL DECLARATION OF ADAM B. KEIL IN SUPPORT OF DEBTORS' (I) OBJECTION TO EMERGENCY MOTION FOR STAY PENDING APPEAL PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 8007 AND (II) SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS TO THE STALKING HORSE BIDDER FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS**

I, Adam B. Keil, make this declaration pursuant to 28 U.S.C. § 1746:

1. I submit this declaration (this "**Declaration**") in support of the above-captioned debtors' (the "**Debtors**") (a) *Objection to Emergency Motion for Stay Pending Appeal Pursuant to Federal Rule of Bankruptcy Procedure 8007* [D.I. 333] (the "**Objection**"), and (b) *motion seeking entry of an order, among other things, (i) approving the Sale of the Assets free and clear of all liens, claims, encumbrances, and other interests, (ii) authorizing the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases related thereto, and (iii) granting related relief* [D.I. 28] (the "**Sale Motion**").[2]

---

[1] The two Debtors in these cases are MD Helicopters, Inc. ("**MDHI**") and Monterrey Aerospace, LLC ("**Monterrey**"), and their address is 4555 E. McDowell Road, Mesa, AZ 85215.  The last four digits of MD Helicopters, Inc.'s taxpayer identification number are 4088.  Monterrey Aerospace, LLC has not been assigned a taxpayer identification number as of the date hereof.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Sale Motion.

#127180622 v2

2.  Except as otherwise indicated, the statements in this Declaration are based on my direct personal knowledge or views, my opinion based upon experience, or on information that I have obtained from the members of the Debtors' management, the Debtors' advisors, my review of relevant documents and/or employees of Moelis & Company LLC ("**Moelis**") working directly with me and under my supervision, direction, or control. Any documents materially relied on to support the opinions I set forth herein are specifically referenced in this Declaration. I am not being specifically compensated for this testimony other than through payments that Moelis receives in its capacity as a professional retained by the Debtors in these cases [D.I. 230]. I am over the age of 18 years and am authorized to submit this Declaration on behalf of the Debtors. If I were called upon to testify, I could and would competently testify to the facts set forth herein.

## Background and Qualifications

3.  I am a Managing Director at Moelis, a global investment banking firm providing financial advisory services, including with respect to mergers and acquisitions, capital raising, and restructuring transactions. Moelis is the financial advisor and investment banker to the Debtors.

4.  I personally have 21 years of experience as an investment banker specializing in recapitalization and restructuring transactions. Throughout my career, I have advised debtors, creditors, equity holders, and other constituents on a wide variety of restructuring transactions across a broad range of industries. I have been involved in several dozen chapter 11 cases and dozens of sale processes. Over the last four years, the matters in which I have provided testimony include *In re Knotel, Inc.*, No. 21-10146 (MFW) (Bankr. D. Del. Jan. 31, 2021), *In re Internap Technology Solutions, Inc.*, No. 20-22393 (RDD) (Bankr. S.D.N.Y. May 5, 2020), *In re ATD Corporation*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 4, 2018), and *In re iHeartMedia, Inc.*, No.

18-31274 (MI) (Bankr. S.D. Tex. Jul. 24, 2018). I have not authored any publications in the last 10 years.

5. Prior to joining Moelis in 2008, I spent approximately eight years in the Recapitalization and Restructuring Group at Jefferies & Company, Inc. I hold a Bachelor of Science degree in Economics with concentrations in Finance and Entrepreneurial Management from the Wharton School at the University of Pennsylvania.

6. Moelis provides a broad range of financial advisory and investment banking services to its clients, including: (a) general corporate finance; (b) mergers, acquisitions, and divestitures; (c) corporate restructurings; (d) special committee assignments; and (e) capital raising. Moelis and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 cases. Moelis' business reorganization professionals have served as financial advisors and/or investment bankers in numerous cases, including: *In re Knotel, Inc.*, No. 21-10146 (MFW) (Bankr. D. Del. Jan. 31, 2021); *In re CBL & Assocs. Properties, Inc.*, No. 20-35226 (Bankr. S.D. Tex. Dec. 30, 2020); *In re Energy Alloys Holdings, LLC*, No. 20-12088 (MFW) (Bankr. D. Del. Nov. 23, 2020); *In re Jason Industries, Inc.*, No. 20-22766 (RDD) (Bankr. S.D.N.Y. Aug. 27, 2020); *In re The Hertz Corp.*, No. 20-11218 (MFW) (Bankr. D. Del. Jul. 30, 2020); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Jun. 14, 2020); *In re The McClatchy Company*, No, 20-10418 (MEW) (Bankr. S.D.N.Y. May 18, 2020); *In re Internap Technology Solutions, Inc.*, No. 20-22393 (RDD) (Bankr. S.D.N.Y. May 5, 2020); *In re Whiting Petroleum Corp.*, No. 20- 32021 (DRJ) (Bankr. S.D. Tex. May 9, 2020); *In re Rentpath Holdings, Inc.*, No. 20-10312 (BLS) (Bankr. D. Del. Mar. 10, 2020); *In re Sanchez Energy Corp.*, No. 19-34508 (MI) (Bankr. S.D. Tex. Oct. 21, 2019); *In re Monitronics Int'l, Inc.*, No. 19-33650 (DRJ) (Bankr. S. D. Tex. Aug. 2, 2019); *In re*

*Aegerion Pharmaceuticals, Inc.*, No. 19-11632 (MG) (Bankr. S.D.N.Y. Jul. 10, 2019); *In re Joerns WoundCo Holdings, Inc.*, No. 19-11401 (JTD) (Bankr. D. Del. Jul. 25, 2019); *In re FTD Cos., Inc.*, No. 19-11240 (LSS) (Bankr. D. Del. Jul. 2, 2019); *In re Hexion Holdings LLC*, No. 19-10684 (KG) (Bankr. D. Del. May 15, 2019); *In re Aegean Marine Petroleum Network Inc.*, No. 18-13374 (MEW) (Bankr. S.D.N.Y. Feb. 20, 2019); *In re Parker Drilling Company, Inc.*, No. 18-36958 (MI) (Bankr. S.D. Tex. Jan. 15, 2019); *In re Aralez Pharmaceuticals US Inc.*, No. 18-12425 (MG) (Bankr. S.D.N.Y. Nov. 1, 2018); *In re iHeartMedia, Inc.*, No. 18-31274 (MI) (Bankr. S.D. Tex. Jul. 24, 2018); *In re Global A&T Electronics Ltd*, No. 17-23931 (RDD) (Bankr. S.D.N.Y. Feb. 26, 2018).[3]

## Moelis Engagement

7.    In July 2020, the Debtors engaged Moelis to serve as their financial advisor and investment banker in connection with developing, and advising the Debtors with respect to, various strategic alternatives, including a potential sale and chapter 11 sale process.[4]

8.    Since Moelis began working with the Debtors to provide assistance in connection with the Debtors' sale process, I, along with others at Moelis and the Debtors' other restructuring advisors, have become knowledgeable about the Debtors' capital structure, business, finances, and business operations, which has allowed us to market the Debtors' assets.

9.    The Debtors retained Moelis on a postpetition basis to serve as a financial advisor and investment banker and to run, among other things, an extensive marketing process for all or

---

[3]  Because of the voluminous nature of the orders cited herein, such orders are not attached to this Declaration. Copies of these orders are available upon request of the Debtors' proposed counsel.

[4]  Moelis was previously retained by the Debtors in May 2018 to explore strategic alternatives. The Debtors (under prior leadership) ultimately determined not to pursue a transaction at that time. Moelis was then reengaged by the Director in July 2020.

#127180622 v2

substantially all of the Debtors' assets (the "**Assets**") and such retention was approved by order of this Court on May 6, 2022 [D.I. 230].

### The Pre-Petition Sale Process

10.     As described in my declaration dated March 30, 2022 [D.I. 30] (the "**March 30 Declaration**"), in October 2021, Moelis, at the direction of and under the supervision of the Director, commenced a process to market the Debtors' assets.  The Debtors' marketing efforts included both potential strategic and financial entities that the Debtors and their advisors believed might be interested in discussing a potential purchase of the Assets.  In certain instances the Debtors also received and responded to inbound inquiry from potential acquirers who had not been contacted in the Debtors' initial outreach efforts.  During this process, the Debtors and/or Moelis contacted and sent form non-disclosure agreements to over 170 potential buyers, including 26 strategic buyers.  The potential buyers included 19 of the 24 parties that were contacted as part of a prior sale process that had been commenced in 2018.[5]  The Debtors invited these potential buyers to execute non-disclosure agreements and submit an initial indication of interest with respect to a sale of the Assets.  In response to the initial outreach, the Debtors executed non-disclosure agreements (collectively, the "**NDAs**") with 83 prospective buyers of the Assets, each of which received the same package of marketing materials.  Of these parties 21 submitted initial indications of interest.

11.     The Debtors, in consultation with their advisors (including Moelis), invited the 12 potential buyers with the most competitive indications of interest to move to the next phase of the

---

[5]   Given the overall deterioration in the financial performance of the Debtors since the 2018 process commenced, there were five parties contacted by Moelis in connection with the prior process for whom the Debtors' financial profile no longer fit with the party's investment mandate.  As a result, these parties were not contacted in connection with the current process.

sale process. Over the following week, the Debtors engaged in further discussions regarding a sale transaction for the Assets with those potential buyers over the following weeks. During this period, each of the potential buyers was granted dataroom access and the Debtors additionally arranged for representatives of each potential buyer to meet with members of the Debtors' management team, either in person at the Debtors' headquarters in Mesa, Arizona or through video conference depending on the preference of the particular potential buyer. Each potential buyer was also given an opportunity to meet with the Debtors' management team to conduct additional financial due diligence and to ask any follow-up diligence questions. Each of the potential bidders were asked to re-affirm or modify their initial indication of interest based on their access to additional information in this phase of the process.

12. On or before December 26, 2021, the Debtors received nine re-affirmed or revised indications of interest and invited the two potential buyers with the highest and best offers to move to the next phase of the sale process. The Debtors engaged in advanced discussions regarding a sale transaction for the Assets with each of those potential buyers over the following 12 weeks leading up to the Petition Date, including engaging in extensive negotiations with each regarding the form of a stalking horse asset purchase agreement.

13. Despite these robust marketing efforts, the Stalking Horse Bid was the highest and otherwise best offer received during the prepetition marketing process.

### Stalking Horse Agreement

14. As detailed in the March 30 Declaration, the prepetition sale process culminated on or before March 30, 2022, with the Debtors' selection of the Stalking Horse Bid as the highest and otherwise best available offer and the Debtors' execution of the Stalking Horse Agreement. As more fully described in the Stalking Horse Agreement, the Stalking Horse Bid is comprised of (a)

a $150 million credit bid of the Prepetition First Lien Obligations and (b) assumption of up to $60 million of the DIP Obligations plus any accrued and unpaid interest, fees, and expenses payable in accordance with and under the DIP Facility as of the Closing Date, for a total purchase price of not less than $210 million; provided that the credit bid amount shall be increased by the difference between $60 million and the outstanding DIP Obligations being assumed, up to a maximum increase of $30 million.  The Debtors determined, with the assistance of their advisors, that the Stalking Horse Bid was the highest or otherwise best offer for the Assets reasonably available to the Debtors under the circumstances, recognizing that such bid will be subjected to an open auction process.

15. The Stalking Horse Agreement was the product of arms' length, good faith negotiations among the Debtors and the Stalking Horse Bidder.  The negotiation of the Stalking Horse Agreement on behalf of the Debtors was led by the Debtors' management and advisors under the oversight of the Director.

16. The procedures attendant to the Stalking Horse Bid obliged the Debtors and Moelis to run a postpetition marketing process and solicit any bid or combination of bids that could provide value for the Debtors' estates in excess of that provided by the Stalking Horse Bid.

## The Post-Petition Sale Process

17. The Debtors continued the marketing process for the Assets following the Petition Date.  The Court authorized certain bidding procedures (the "**Bidding Procedures**") for the sale of substantially all of the Debtors' assets on April 26, 2022, pursuant to the *Order (I) Approving Bid Procedures in Connection With the Sale of Substantially All of the Debtors' Assets, (II) Scheduling an Auction and a Sale Hearing, (III) Approving the Form and Manner of Notice Thereof, (IV) Authorizing the Debtors to Enter Into the Stalking Horse Agreement, (V) Approving*

#127180622 v2

*Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief* [Dkt. No. 206] (the "**Bidding Procedures Order**"). The Bidding Procedures Order established an initial deadline to submit Intention(s) to Submit Qualified Bid of May 20, 2022, the Bid Deadline of June 3, 2022, indicated that an Auction (if needed) would be held on June 9, 2022, and scheduled a Sale Hearing for May 26, 2022 if the Debtors did not receive any Intention(s) to Submit Qualified Bid for June 17, 2022 if the Debtors received one or more Intention(s) to Submit Qualified Bid.

18. The Debtors' postpetition sale process was designed to yield the highest or otherwise best offer for the Debtors' Assets in connection with the section 363 sale process contemplated under the Bidding Procedures.

19. Because of the prepetition marketing process, the Debtors had the benefit of already having (a) marketed the Assets to the most likely bidders and (b) engaged with many of them. As a result, the Debtors were able immediately to re-engage with certain potential buyers that had conducted diligence and submitted indications of interest in the prepetition sale response following the Petition Date and were able to quickly begin marketing to additional parties following entry of the Bidding Procedures Order. Specifically, since the Petition Date, Moelis contacted 173 parties in connection with the sale of the Assets. Of those parties, 84 executed an NDA, including 83 that were executed prepetition.

20. For those parties that executed NDAs, Moelis provided access to a data room with relevant information and supplemented that diligence by engaging in discussions with interested bidders, including offering and conducting meetings with management.

21. On or prior to the deadline to submit Intention(s) to Submit Qualified Bid, the Debtors received three such indications of interest, including the Intention to Submit Qualified Bid

submitted by the Netherlands [D.I. 262]. One of the parties who submitted an indication of interest ultimately decided not to submit a bid by the Bid Deadline.

22. The Debtors did receive a bid from the Netherlands that contemplated a credit bid of the full amount of the Netherlands' judgment for certain leases and improvements located on the leased premises. However, that proposal failed to meet the requirements of a Qualified Bid under the Bidding Procedures because the Netherlands' submission (1) was prohibited by a prior Court Order, and (2) constituted a credit bid of only an unsecured claim. The third party who submitted an indication of interest did also submit a bid by the Bid Deadline. However, it did not fund the required deposit and was not able to address certain structural concerns the Debtors had regarding its bid, and was therefore not deemed to be a Qualified Bid. Thus, notwithstanding a robust sale process, in addition to the Stalking Horse Bid, the Debtors did not receive any Qualified Bids by the Bid Deadline. As a result, the Stalking Horse Bid remains the only actionable bid received by the Debtors.

23. Notably, even if the Netherlands' bid was permitted and actionable, it was materially lower than the Stalking Horse Bid. The Netherlands' credit bid was a bid for a subset of the Assets, and no bidder had expressed an interest in purchasing only the remaining assets; accordingly the Netherlands' bid could not be combined with any other bid to potentially become a higher or otherwise better offer as compared to the Stalking Horse Bid. Furthermore, as the Netherlands bid was a credit bid of the judgment in full, the Netherlands' bid indicated no viable prospect for the Netherlands to improve its bid amount. Accordingly, the Debtors determined, in consultation with their advisors, that the Stalking Horse Bid is a higher or otherwise better offer than the Netherlands' bid irrespective of the fact that the Netherlands' bid was not permitted or actionable.

#127180622 v2

**The Stalking Horse Bid is the Successful Bid**

24. Because the Stalking Horse Bid was the only Qualified Bid the Debtors received, Moelis, in conjunction with the Debtors' other advisors, recommended to the Debtors that the Auction be canceled and that moving forward with the Stalking Horse Bid would provide the highest value reasonably available under the circumstances. As a result of that recommendation, and in accordance with the Bidding Procedures, the Debtors canceled the Auction and designated the Stalking Horse Bid as the Successful Bid. *See Notice of Successful Bidder and Canceling of Auction* [D.I. 319].

25. I believe that the Stalking Horse Bid provides the best (and only) option to provide the highest value reasonably available for the Debtors' stakeholders, as it is the highest or otherwise best offer received after an extensive, robust, and months-long sale process. As a result, I believe that the Debtors' sale of the Assets to the Stalking Horse Bidder is in the best interest of the Debtors and their estates under the circumstances.

26. The Stalking Horse Bid provides valuable consideration—namely, (a) the credit bid (and related satisfaction) of $150 million of the Prepetition First Lien Obligations and, (b) assumption of up to $60 million of the DIP Obligations plus any accrued and unpaid interest, fees, and expenses payable in accordance with and under the DIP Facility as of the Closing Date.

27. Critically, despite a robust marketing process consistent with the approved Bidding Procedures, the Debtors were unable to obtain any bid, either as a whole or through a combination of individual bids, that was higher or otherwise better than the Stalking Horse Bid. Moreover, the Debtors received no bid proposing to liquidate the Assets, indicating that the market did not believe that liquidation would yield a higher value than any of the bids that were received.

28. Based on my experience, I believe that moving forward with the Stalking Horse Bid in accordance with the timeline provided in the Bidding Procedures will provide the highest

#127180622 v2

value reasonably available under the circumstances for the Debtors, particularly because the Stalking Horse Agreement assures timely completion of the Sale, and if the agreed-upon time line is not met, there is no guarantee the Stalking Horse Bidder will proceed to close. In addition, the DIP Credit Agreement has milestones for approval and consummation of the Sale, which if breached, could result in the Stalking Horse Bidder walking away.

29. Overall, I believe that (a) the Stalking Horse Bid provides the Debtors with the highest value reasonably available under the circumstances for the Assets; and (b) entry of the Sale Order is in the best interests of the Debtors, their estates, and all parties in interest under the circumstances.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on June 14, 2022

                                          /s/ Adam B. Keil
                                          Adam B. Keil

#127180622 v2