IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| MD HELICOPTERS, INC., *et al.*,[1] | : | Case No. 22-10263 (KBO) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |
|  | : | Re: D.I. 28, 256, 305, 333 |

**DECLARATION OF DAVID ORLOFSKY IN SUPPORT OF
DEBTORS' (I) OBJECTION TO EMERGENCY MOTION FOR STAY PENDING
APPEAL PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 8007
AND (II) SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS TO THE
STALKING HORSE BIDDER FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES, AND INTERESTS**

I, David Orlofsky, make this declaration pursuant to 28 U.S.C. § 1746:

1. I submit this declaration (this "**Declaration**") in support of the above-captioned debtors' (the "**Debtors**") (a) motion seeking entry of an order, among other things, (i) approving the Sale of the Assets free and clear of all liens, claims, encumbrances, and other interests, (ii) authorizing the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases related thereto, and (iii) granting related relief [D.I. 28] (the "**Sale Motion**"), and (b) *Objection to Emergency Motion for Stay Pending Appeal Pursuant to Federal Rule of Bankruptcy Procedure 8007* [D.I. 333] (the "**Objection**").[2]

2. Except as otherwise indicated, the statements in this Declaration are based on my direct personal knowledge or views, my opinion based upon experience, or on information that I

---

[1] The two Debtors in these cases are MD Helicopters, Inc. ("**MDHI**") and Monterrey Aerospace, LLC ("**Monterrey**"), and their address is 4555 E. McDowell Road, Mesa, AZ 85215. The last four digits of MDHI's taxpayer identification number are 4088. Monterrey has not been assigned a taxpayer identification number as of the date hereof.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Sale Motion or Objection, as applicable.

have obtained from the members of the Debtors' management, Debtors' advisors, my review of relevant documents and/or employees of AlixPartners, LLP (the "**AlixPartners**") working directly with me and under my supervision, direction, or control. Any documents materially relied on to support the opinions I set forth herein are specifically referenced in this Declaration. Over the last four years, the only matter in which I have testified as an expert is *In re Bumble Bee Parent, Inc.*, No. 19-12505 (LSS) (Bankr. D. Del. Dec. 26, 2019). I have not authored any publications in the last 10 years. I am not being specifically compensated for this testimony other than through payments that AlixPartners receives in its capacity as a professional retained by the Debtors [D.I. 196]. I am over the age of 18 years and am authorized to submit this declaration on behalf of the Debtors. If I were called upon to testify, I could and would competently testify to the facts set forth herein.

## Background and Qualifications

3.      AlixPartners is an internationally recognized restructuring and turnaround firm with substantial experience in providing financial advisory services and has an excellent reputation for services it has rendered in large and complex chapter 11 cases on behalf of debtors and creditors throughout the United States. AlixPartners has assisted, advised, and provided strategic advice to debtors, creditors, bondholders, investors, and other entities in numerous chapter 11 cases of similar size and complexity to these Chapter 11 Cases. AlixPartners professionals have provided restructuring or crisis management services in numerous large cases, including recent filings in this district. *See, e.g.*, *In re Alto Maipo Delaware LLC*, No. 21-11507 (KBO) (Bankr. D. Del. Dec. 16, 2021); *In re Riverbed Tech., Inc.*, No. 21-11503 (CTG) (Bankr. D. Del. Dec. 8, 2021); *In re Alpha Latam Mgmt., LLC*, No. 21-11109 (JKS) (Bankr. D. Del. Sept. 15, 2021); *In re Nine Point Energy, LLC*, No. 21-10570 (MFW) (Bankr. D. Del. Apr. 20, 2021); *In re HighPoint Res. Corp.*,

No. 21-10565 (CSS) (Bankr. D. Del. Apr. 13, 2021); *In re Mallinckrodt plc*, No. 20-12522 (JTD) (Bankr. D. Del. Nov. 19, 2020); *In re RGN-Grp. Holdings, LLC*, No. 20-11961 (BLS) (Bankr. D. Del. Sept. 15, 2020); *In re Skillsoft Corp.*, No. 20-11532 (MFW) (Bankr. D. Del. Jul. 23, 2020); *In re Celadon Grp., Inc.*, No. 19-12606 (KBO) (Bankr. D. Del. Jan. 3, 2020); *In re Bumble Bee Parent, Inc.*, No. 19-12505 (LSS) (Bankr. D. Del. Dec. 26, 2019); *In re Hexion Holdings LLC*, No. 19-10684 (KG) (Bankr. D. Del. May 1, 2019); *In re David's Bridal,* No. 18-12635 (LSS) (Bankr, D. Del. Dec. 18, 2018); *In re Mattress Firm, Inc.*, No. 18-12241 (CSS) (Bankr. D. Del. Nov. 7, 2018); *In re Am. Tire Distribs.*, No. 18-12221 (KJC) (Bankr. D. Del. Nov. 1, 2018); *In re The Bon-Ton Stores, Inc.,* No. 18-10248 (MFW) (Bankr. D. Del. Mar. 6, 2018); *In re Charming Charlie Holdings, Inc.*, No. 17-12906 (CSS) (Bankr. D. Del. Jan. 20, 2018); *In re Prospector Offshore Drilling S.à r.l.*, No. 17-11572 (CSS) (Bankr. D. Del. Oct. 2, 2017); *In re Tidewater Inc.*, No. 17-11132 (BLS) (Bankr. D. Del. Jun. 13, 2017); and *In re Sungevity Inc.*, No. 17-10561 (KG) (Bankr. D. Del. Apr. 11, 2017).

4.  I have more than 23 years of restructuring experience in providing both interim management and advisory services spanning multibillion-dollar transactions and middle-market situations. Some of my previous roles include serving as the Chief Restructuring Officer ("**CRO**") of Preferred Sands, CRO and interim CFO of RCS Capital, CRO of Mark IV Industries, as interim Chief Operating Officer and Chief Financial Officer of Malden Mills, and as the financial advisor to Bumble Bee, among others. As part of this extensive restructuring experience, I have created and evaluated financial forecasts and models, assessed liquidity and cash needs, and performed liquidation analyses for dozens of debtors.

**AlixPartners' Engagement**

5.     In October 2021, the Debtors engaged AlixPartners as their financial advisor in connection with the evaluation and implementation of the Debtors' potential chapter 11 process. AlixPartners has worked with the Debtors on a number of issues, including contingency planning efforts, financial forecasting, liquidity management, and general bankruptcy filing preparations. Since the beginning of AlixPartners' retention, I have worked closely with the Debtors' management team and other advisors to evaluate the Debtors' liquidity and cash needs in the case of a chapter 11 filing, and have become well-acquainted with the Debtors' capital structure, which is more fully set forth in the *Declaration of Barry Sullivan, Chief Financial Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**"), liquidity needs, and business operations.

**The Stalking Horse Bid Maximizes Value**

6.     If the Debtors are unable to close the Sale with the Stalking Horse Bidder and instead were forced to liquidate their assets under chapter 7, there is a strong likelihood that the Debtors would receive significantly less value in consideration for their assets than is offered by the Stalking Horse Bid. As more fully described in the Stalking Horse Agreement, the Stalking Horse Bid is comprised of (a) a $150 million credit bid of the Prepetition First Lien Obligations and (b) assumption of up to $60 million of the DIP Obligations plus any accrued and unpaid interest, fees, and expenses payable in accordance with and under the DIP Facility as of the Closing Date, for a total purchase price of not less than $210 million.[3]

---

[3]    The credit bid amount shall be increased by the difference between $60 million and the outstanding DIP Obligations being assumed, up to a maximum increase of $30 million.

US-DOCS\132753206.10

7.      By contrast, in a chapter 7 liquidation the Debtors would receive significantly less value than is offered by the Stalking Horse Bid.  Based on an inventory valuation obtained by the Debtors in connection with ongoing financing efforts, the net orderly liquidation value ("**NOLV**") of the Debtors' inventory, which projects the amount that the Debtors could expect to recover in the context of an orderly liquidation of the inventory net of all liquidation expenses, is approximately $68 million.  Based on my experience and review of the NOLV analysis, my familiarity with the Debtors, and my experience performing liquidation analyses, I believe that the NOLV analysis is a sound and reasonable measure of the liquidation value of the Debtors' inventory, which are the Debtors' most valuable assets in an orderly, out-of-court liquidation.

8.      While the NOLV analysis is a sound foundation, based on my experience, several adjustments to the NOLV analysis are required to determine the value of the Debtors' assets in a chapter 7 liquidation.  The NOLV analysis contemplates an orderly liquidation over an extended 12 to 18 months, which would in all likelihood not be possible in a chapter 7 liquidation, and thus, the NOLV of the inventory must be discounted to account for the realities of a chapter 7 liquidation.  The Debtors have additional assets, including cash on hand, receivables, intellectual property, and certain other assets, that would also be monetized in a chapter 7 case that are not captured in the NOLV of the inventory.  The Debtors' estates would also incur additional administrative expenses associated with a chapter 7 liquidation that are not captured in the NOLV of the inventory.  I understand these additional administrative expenses to be principally attributable to the increased risk of litigation in a chapter 7 case and, specifically, I understand that if the Debtors do not satisfy certain milestones with respect to approval and consummation of the Sale, the parties to the Restructuring Support Agreement ("**RSA**") have a right to terminate the agreement and termination of the RSA could, in turn, jeopardize the Qui Tam Settlement.  If the

Qui Tam Settlement were not approved, the Debtors and their estates could find themselves in litigation with the Relators, the Insurers, and the United States.

9. Taking these factors into consideration, among others, the net chapter 7 liquidation value of the Debtors' estates would not exceed the value of the Stalking Horse Bid.

### Delay in the Sale Could Harm the Debtors' Business

10. The Debtors have been able to stabilize their business following the chapter 11 filing due in large part to the efforts of management and employees in providing assurances to their vendors, suppliers, customers, and workforce that the Debtors' situation is only temporary, and that they are working expeditiously to consummate a transaction that will allow the business to emerge from chapter 11 process with new owners, a more stable capital structure, and resolution of the legacy issues that have presented difficulties for the business, including the False Claims Act litigation. A delay in the Sale and emergence of the Debtors' business from these Chapter 11 Cases could materially erode the trust that the Debtors' have worked to establish with its key stakeholders and cause the Debtors to lose the confidence and cooperation of their employees and key business partners. Specifically, significant delays to the Sale and the assurances it would provide could result in the Debtors' facing (a) workforce attrition resulting from declining employee morale, (b) onerous trade demands from their vendors and suppliers, and (c) challenges in winning new business in the face of such uncertainty, each of which could cause deterioration of the Debtor's business.

### Delay in the Sale Could Cause Significant Additional Administrative Expense

11. A significant delay in the Sale could also cause the Debtors to incur material incremental administrative costs (assuming the DIP Lenders continue to make financing available to fund these Chapter 11 Cases notwithstanding the event of default that could occur as a result of

such delay). If the Sale is approved at the June 17, 2022 hearing and the parties are able to close the Sale by August 27, 2022 (i.e., the outside date in the Stalking Horse Agreement), the Debtors project that the estates will incur administrative expenses relating to the costs of the ongoing bankruptcy through October 2022 of approximately $3 million. If, however, the parties were not able to close until the end of calendar year 2022, the estates would incur an additional $6 million in administrative expense and if closing were delayed further still until the end of March 2023, the estates would incur an additional $10.5 million in administrative expense (again, assuming the Debtors would even have financing to fund the Chapter 11 Cases into March 2023 as the Debtors currently project to exceed available DIP financing before that time).

12. The Debtors believe that the actual incremental administrative costs if the Sale is delayed could be significantly higher than what I describe in the above paragraph. Specifically, if the delay in approval and/or closing of the Sale resulted in the parties to the RSA terminating that agreement and jeopardizing the Qui Tam Settlement, the Debtors would expect material costs associated with litigation with the Relators, the Insurers, and the United States, including among other potential litigation, litigation related to a potential chapter 11 plan.

### The Debtors' Limited Liquidity

13. The Debtors currently project to have approximately $15 million in cash on hand the week ending June 17, 2022. The cash on hand is necessary to fund the Debtors' ongoing business operations and these Chapter 11 Cases. Accordingly, the Debtors do not currently have enough cash on hand to fund an escrow in the amount of no less than $16 million—i.e., the full amount of the Netherlands' judgment. In the event approval and/or closing the Sale were conditioned on the Debtors escrowing $16 million or more for the benefit of the Netherlands, the Debtors would need to attempt to draw that amount on the DIP Facility. Assuming that the DIP

lenders honored that draw request, the additional financing would come at a substantial cost to the Debtors and their estates: under the terms of the DIP Facility, the Debtors would accrue interest on the escrowed funds at a rate of 8.50% per annum. Assuming that the Debtors were forced to escrow $16 million for 12 months, the Debtors would incur $1.36 million in additional interest expense.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on June 15, 2022

                                            */s/ David Orlofsky*
                                            David Orlofsky
                                            Managing Director
                                            AlixPartners, LLP